IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE CONCRETE COMPANY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: 2:05CV1026-D |
| | * | |
| HARRY E. LAMBERT, CAROL'S | * | |
| CONTRACTING, INC. and | * | |
| ALABAMA GRAVEL, LLC, | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT

COMES NOW, Plaintiff The Concrete Company ("TCC") and files this Complaint
against Defendants Harry E. Lambert, Carol's Contracting, Inc. and Alabama Gravel, LLC
(collectively, "Defendants") as follows:

### JURISDICTION AND VENUE

1.

Plaintiff TCC is a Georgia corporation with its principal place of business in Georgia.

2.

Defendant Harry E. Lambert ("Harry Lambert") is a resident of Elmore County,
Alabama, and is subject to the jurisdiction of this Court. He may be served with process at 541
Gunnells Road, Deatsville, Alabama, 36022.

3.

Defendant Carol's Contracting, Inc. ("Carol's Contracting") is an Alabama corporation
with its principal place of business in Elmore County, Alabama. It may be served with process

upon its registered agent for service:  Carol L. Lambert, 541 Gunnells Road, Deatsville, Alabama, 36022.

4.

Defendant Alabama Gravel, LLC ("Alabama Gravel") is an Alabama limited liability company with its principal place of business in Elmore County, Alabama.  It may be served with process upon its registered agent for service:  Daniel L. Lindsey, Jr., 184 Commerce Street, Montgomery, Alabama, 36104.

5.

Under 28 U.S.C. § 1332, this Court has subject-matter jurisdiction over this proceeding because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.

Venue is proper in the Middle District of Alabama (Northern Division) because a substantial part of the events or omissions giving rise to the claim occurred in Elmore County, Alabama.

## **FACTUAL BACKGROUND**

I.     **Historical Dealings Between Plaintiff TCC And Defendant Harry Lambert**

   A.     *Plaintiff TCC And Defendant Harry Lambert Form And Operate Montgomery Materials*

7.

Plaintiff TCC has been engaged in the ready mix concrete, concrete products and sand and gravel (also referred to as "aggregate") business for many years.  In 1996, Plaintiff TCC expanded into the Montgomery, Alabama, area by purchasing an existing ready mix concrete

162061.1                                              2

business in Montgomery. At about the same time, Plaintiff TCC negotiated leases to mine aggregate from property in the Montgomery area. The aggregate would be used in Plaintiff TCC's business and sold to the public.

8.

MMC Holdings, Inc. ("MMC Holdings") was organized in 1996 and was engaged in aggregate mining from leased property (hereinafter referred to as the "City Pit") in Montgomery, Alabama.

9.

Plaintiff TCC was, and is, controlled by Frank D. Foley, III ("Foley").

10.

MMC Holdings was, at all pertinent times hereto, controlled by Defendant Harry Lambert.

11.

Foley and Defendant Harry Lambert decided to go into the aggregate mining business together. Foley caused Plaintiff TCC, and Defendant Harry Lambert caused MMC Holdings, to form a new Alabama limited liability company on June 5, 1997 named "Montgomery Materials Company, LLC" ("Montgomery Materials"). Plaintiff TCC and MMC Holdings each owned 50% of Montgomery Materials. Plaintiff TCC, in return for its 50% interest, contributed $300,000.00 in cash. Defendant MMC Holdings, in return for its 50% interest, contributed a substantial part of its assets, including the leasehold interest in the City Pit and mining equipment, subject to certain liabilities. Montgomery Materials hired Defendant Harry Lambert as General Manager. As a result of these transactions, Montgomery Materials began mining sand and gravel from the City Pit in June 1997.

B.    *The Anderson Pit*

12.

Defendant Harry Lambert and Foley desired to expand Montgomery Materials' source of aggregate by obtaining additional mining leases. Defendant Harry Lambert proposed that Montgomery Materials lease property in Montgomery County, Alabama, from Anderson Farms, LLC ("Anderson Farms"). Defendant Harry Lambert told Foley that Anderson Farms would lease the property (hereinafter referred to as the "Anderson Pit") to Montgomery Materials only so long as Defendant Harry Lambert was employed by Montgomery Materials, since Anderson Farms was unwilling to entrust the mining of their property to anyone other than Defendant Harry Lambert. In May 1999, Foley agreed that Montgomery Materials should enter into a lease (hereinafter referred to as the "Anderson Lease") for the Anderson Pit which contained terms allowing Anderson Farms to terminate the Anderson Lease if Defendant Harry Lambert's employment by Montgomery Materials was terminated. Montgomery Materials spent about $600,000 on equipment, prepaid royalties and costs of stripping overburden to prepare the Anderson Pit for mining. Substantially all of these funds were advanced by Plaintiff TCC. Montgomery Materials did not repay the advances as promised.

C.    *Defendant Harry Lambert's Failed South Alabama Business*

13.

In late 1999, a large aggregate business (hereinafter referred to as the "South Alabama Business") became available for purchase in south Alabama. Foley and Defendant Harry Lambert considered causing Montgomery Materials to purchase the South Alabama Business. But, after investigation, Foley felt that the price was too high and was not willing for Montgomery Materials to purchase it.

14.

Defendant Harry Lambert proposed that he, Defendant Harry Lambert, together with others, might purchase the South Alabama Business if Foley were unwilling for Montgomery Materials to purchase it. Foley advised Defendant Harry Lambert not to do so because he thought the price was too high and because he thought it would divert Defendant Harry Lambert's attention from the management of Montgomery Materials. The Employment Agreement between Defendant Harry Lambert and Montgomery Materials provided that Defendant Harry Lambert "will not engage in any business activities other that those of [Montgomery Materials]." Foley waived this provision only as it pertained to the South Alabama Business because Defendant Harry Lambert felt so strongly that the South Alabama Business offered an exceptional opportunity. In early 2000, Defendant Harry Lambert and others purchased the South Alabama Business.

15.

In the summer of 2000, Defendant Harry Lambert told Foley that the South Alabama Business was in financial difficulty and that he, Defendant Harry Lambert, might have to obtain the value of his interest in Montgomery Materials (i.e., the 50% membership interest in Montgomery Materials owned by MMC Holdings, which in turn was wholly owned by Defendant Harry Lambert) to pay debts of the South Alabama Business. Defendant Harry Lambert said that he might have to use his interest as collateral for a loan or even sell his interest to Foley or others to raise cash. Defendant Harry Lambert asked Foley to also consider dividing up the assets of Montgomery Materials between its two equal owners, Plaintiff TCC and MMC Holdings. Defendant Harry Lambert also asked Foley to consider putting Montgomery Materials as a whole "on the market" to see how much it could be sold for.

**D.    *The Agreement And Buy-Sell Provision***

16.

Foley was reluctant to take any of these actions. Although Foley felt that Montgomery

Materials had suffered when Defendant Harry Lambert's attention was diverted by the South

Alabama Business, Foley also felt that Montgomery Materials had potential to be a very good

business.

17.

Despite his reluctance, Foley, because of the pressure on Defendant Harry Lambert from

the South Alabama Business, agreed to consider Defendant Harry Lambert's requests. A

professional consulting firm, FMI, was contacted to evaluate Montgomery Materials and

determine what price it might be sold for, although it was never engaged. A third party

expressed an interest in buying Montgomery Materials, and Foley agreed to allow Montgomery

Materials to furnish confidential financial information to the prospective purchaser. Defendant

Harry Lambert proposed that Montgomery Materials be split into two operations. MMC

Holdings would receive the Anderson Pit, and Plaintiff TCC would receive the City Pit.

Defendant Harry Lambert proposed that Plaintiff TCC buy MMC Holding's 50% interest in

Montgomery Materials. Foley considered these and other proposals during the summer and fall

of 2000, but he and Defendant Harry Lambert could not agree on what to do.

18.

The terms of the Anderson Lease were a complicating factor in these negotiations. The

Anderson Pit had proven to contain a substantial deposit of sand and gravel, and it was probably

more valuable than the City Pit. But, the Anderson Lease could be terminated if Defendant

Harry Lambert did not remain employed by the lessee. Therefore, it was important that

6

Defendant Harry Lambert remain employed by the lessee after the transaction so the Anderson Lease would remain in effect for the new owner. But, this meant that Defendant Harry Lambert had to remain involved with (i.e., employed by) the lessee after the sale. Defendant Harry Lambert approached Anderson Farms about amending the Anderson Lease to eliminate or at least substantially modify the requirement that Defendant Harry Lambert remain employed by the lessee. Initially it appeared that Anderson Farms might allow such an amendment.

19.

By September 2000, Foley was doubtful that he and Defendant Harry Lambert would be able to agree on what to do with Montgomery Materials. Foley had considered Defendant Harry Lambert's numerous proposals, and none seemed to be acceptable to he and Defendant Harry Lambert. The South Alabama Business continued to pull Defendant Harry Lambert's attention away from Montgomery Materials. In addition, Foley and Defendant Harry Lambert differed on the management of Montgomery Materials, and their disagreements became more frequent and serious.

20.

Foley decided that he and Defendant Harry Lambert had to either resolve their differences and continue in business together or one had to buy out the other. A previously executed agreement (hereinafter referred to as the "Agreement"), a copy of which is attached hereto as Exhibit A, dated June 10, 1997, among Montgomery Materials, Plaintiff TCC, MMC Holdings, Foley and Defendant Harry Lambert, provided a mechanism (hereinafter referred to as the "Buy-Sell") in Section 5.3. On September 25, 2000, Plaintiff TCC delivered to Defendant Harry Lambert, as President of MMC Holdings, notice that Plaintiff TCC was invoking Section 5.3 of the Agreement.

21.

The Section 5.3 Notice set forth a "Cash Price" for Montgomery Materials of $1 million
and an "adjustment" to the Cash Price in the form of an increase of $3 million if the Anderson
Lease was not subject to termination after the sale. The "Cash Price" was the price for all
interests in Montgomery Materials; since Plaintiff TCC and MMC Holdings each owned a 50%
interest, the seller would receive 50% of the $1 million cash price, which is $500,000, at closing,
and 50% of the $3 million "adjustment," which is $1.5 million, when the conditions for the
adjustment were satisfied.

22.

Representatives of Plaintiff TCC who delivered the Section 5.3 Notice to MMC Holdings
at Montgomery Materials office in Montgomery, Alabama, told Defendant Harry Lambert that
Foley wanted to keep trying to work out the differences between Foley and Defendant Harry
Lambert despite the Section 5.3 Notice. But, if they were unsuccessful by the end of the 120 day
period for MMC Holdings to respond, Foley intended to enforce the Buy-Sell. Before delivering
the Section 5.3 Notice to MMC Holdings, Plaintiff TCC's representatives, to show good faith,
allowed Montgomery Materials to consolidate the various overdue notes for the money spent to
develop the Anderson Pit into a single $600,000 note payable over five years.

23.

MMC Holdings acknowledged receipt of the Section 5.3 Notice by letter dated October
11, 2000.

24.

Foley and Defendant Harry Lambert continued to consider alternatives to one purchasing
the other's interest through December 2000. Defendant Harry Lambert told Foley that he was

not able to get Anderson Farms to remove the provisions of the Anderson Lease which allowed

Anderson Farms to terminate it if Defendant Harry Lambert were not employed by the lessee.

Therefore, the Anderson Lease could only be preserved if Defendant Harry Lambert remained an

employee of the lessee. As a result, Defendant Harry Lambert told Foley that he had decided

that he, Defendant Harry Lambert (actually MMC Holdings) would buy out the 50% interest of

Foley (actually Plaintiff TCC) in Montgomery Materials. Defendant Harry Lambert told Foley

that he had arranged for $2.6 million in financing, of which $2 million would be used to pay for

Plaintiff TCC's 50% interest in Montgomery Materials, and $600,000 would be used by

Montgomery Materials to repay Plaintiff TCC the $600,000 it had loaned Montgomery Materials

to fund the development of the Anderson Pit which was restructured immediately before the

Section 5.3 Notice was delivered.

25.

Despite these representations, on January 2, 2001, MMC Holdings notified (hereinafter

referred to as "MMC Holdings' Response") Plaintiff TCC that MMC Holdings would purchase

Plaintiff TCC's 50% interest in Montgomery Materials for $500,000, not $2 million.  MMC

Holdings' Response attempted to select the parts of Plaintiff TCC's Section 5.3 Notice which

MMC Holdings liked and ignore the parts which MMC Holdings disliked. The "offer" that

MMC Holdings claimed to be accepting appears nowhere in Plaintiff TCC's Section 5.3 Notice.

26.

MMC Holdings could not create a bargain which Plaintiff TCC did not propose.

Alabama Courts have long held that any response other than "unqualified acceptance" does not

give rise to a contract.

27.

Since MMC Holdings' Response was not identical with the terms of Plaintiff TCC's offer, it was a rejection of Plaintiff TCC's offer. As a result, Plaintiff TCC was relieved from liability on the offer. In effect, MMC Holdings failed to make an election. Section 5.3 of the Buy-Sell provided that "[a]n Electing Member who fails to make an election shall be deemed to have sold its Interest to the Activating Members." Therefore, MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to Plaintiff TCC.

E.    *The Declaratory Judgment Action And The Resulting Summary Judgment Ruling In Favor Of Plaintiff TCC*

28.

The above facts resulted in Plaintiff TCC filing a declaratory judgment action against MMC Holdings on January 12, 2001. The case was captioned *The Concrete Company v. MMC Holdings, Inc.* (United States District Court for the Middle District of Alabama, Northern Division; Civil Action No. 2001-D-54-N).

29.

Plaintiff TCC obtained summary judgment in its favor with the trial court ruling, in pertinent part, by Order dated September 7, 2001, that:

> the Buy-Sell provision was properly "activated" within the meaning of the Agreement inasmuch as TCC's Notice included a price formula contemplated by the parties. Consequently, MMC had 120 days to elect which it failed to do. Therefore the court must give effect to the default provision of Section 5.3 and conclude that Montgomery Materials has been deemed sold to TCC. TCC's formula presumed that Anderson [Farms] would terminate the lease and the record indicates as much. As such, the court finds that the adjustment of $3,000,000 is inapplicable to the sale, so TCC has purchased Montgomery Materials for $1,000,000."

30.

This Order was affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002.

31.

The result of the summary judgment Order, as affirmed, is that MCC Holdings was

deemed to have sold its 50% interest in Montgomery Materials to Plaintiff TCC on January 2,

2001.

F.    *The Closing Between Plaintiff TCC and MMC Holdings*

32.

On April 9, 2002, Plaintiff TCC and MMC Holdings conducted the closing with respect

to that sale, which was effective January 2, 2001. The closing resulted in a net cash payment of

$303,739.94 to MMC Holdings by Plaintiff TCC.

G.    *The Post-Closing Covenant Not To Compete*

33.

Before the closing, via a March 26, 2002 letter, MMC Holdings and Defendant Harry

Lambert were reminded of their obligations with respect to the June 10, 1997 Agreement's Non-

Competition Provisions, which state, in pertinent part, as follows:

> 8.1.    Territory. The parties hereto acknowledge that
> Montgomery, LLC [Montgomery Materials] presently operates and
> sells Product in all locations which are within 60 miles (measured
> in a straight line by air) from the present limits of the City of
> Montgomery, Alabama (the area contained within 60 miles of the
> present limits of Montgomery, Alabama is herein called the
> "Territory").

> \*            \*            \*            \*

> 8.3.    Montgomery, Inc. [MMC Holdings]; Concrete
> [TCC]. If either Montgomery, Inc. [MMC Holdings] or Concrete
> [TCC] transfers all its Membership Interest in Montgomery, LLC
> [Montgomery Materials] to the other or to any third party, then

11

162061.1

except as otherwise provided in Section 8.6, during the five-year period beginning with the transfer (the "Period") such transferring party shall not:

(1)    engage in the Territory in the business of excavating, mining, distributing, delivering, selling, or otherwise disposing of any Product at wholesale or retail, (such business is herein referred to as the "Prohibited Activity");

(2)    in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity;

(3)    in the Territory induce a Customer (as defined below): (i) to purchase any Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC [Montgomery Materials] or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC [Montgomery Materials].  As used in this subsection, "Customer" means any actual customer who purchased any Product from Montgomery, LLC [Montgomery Materials] in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. or Concrete [TCC] of its Membership Interest in Montgomery, LLC [Montgomery Materials];

8.4.    Lambert.  If Montgomery, Inc. [MMC Holdings] transfers its entire Membership Interest in Montgomery, LLC [Montgomery Materials] to Concrete [TCC] or any other party, Lambert agrees that during the Period he will not:

(1)    engage, as an employee or otherwise, in the Territory in the Prohibited Activity;

(2)    in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity;

(3)    in the Territory induce a Customer (as defined below): (i) to purchase Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC [Montgomery Materials] or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC [Montgomery Materials].  As used in this subsection, "Customer" means any actual customer who purchased Product from Montgomery, LLC [Montgomery Materials] in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. [MMC Holdings] of its Membership Interest in Montgomery, LLC [Montgomery Materials] . . ..

## II.    Plaintiff TCC's Provides Aggregate To Simcala, Inc., And To Customers In The Territory Covered By The Non-Competition Provisions

34.

Plaintiff TCC began selling aggregate materials to Simcala, Inc. ("Simcala") in 1999. Plaintiff TCC has sold more than $1 million in aggregate materials to Simcala.

35.

Before and after the closing, Plaintiff TCC sold aggregate to Simcala and to other businesses and individuals within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.  Plaintiff TCC has contractual and business relations with Simcala and these other businesses and individuals.

36.

After the closing, Plaintiff TCC sold aggregate to Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions, within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.  Plaintiff TCC has contractual and business relations with Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions for the provision of aggregate

materials within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

**III.**    **Defendants, Acting Individually And In Concert With Each Other, Engage In Improper Competition**

37.

Defendant Alabama Gravel was organized on March 24, 2005. Its principal place of business is located at 541 Gunnells Road, Deatsville, Alabama, 36022. Alabama Gravel is organized in and operates within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

38.

Defendant Harry Lambert resides at 541 Gunnells Road, Deatsville, Alabama, 36022. This is within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

39.

Defendant Carol's Contracting operates a trucking/hauling business out of 541 Gunnells Road, Deatsville, Alabama, 36022. This is within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

40.

Defendants, acting individually and in concert with each other, operate an aggregate business out of an aggregate mining operation (hereinafter referred to as the "Gentry Pit") in Independence, Alabama, which is within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

41.

Defendants, acting individually and in concert with each other, sell aggregate out of the Gentry Pit.

42.

Defendants, acting individually and in concert with each other, sell aggregate out of the Gentry Pit to Simcala, to other businesses and individuals and to Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions.

43.

Defendants, acting individually and in concert with each other, market aggregate out of the Gentry Pit to Simcala, to other businesses and individuals and to Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions.

## COUNT I

### (Breach Of Contract By Defendant Harry Lambert)

44.

The allegations set forth in paragraphs 1 through 43 are incorporated herein by reference.

45.

On June 10, 1997, Plaintiff TCC and Defendant Harry Lambert entered an Agreement (Exhibit A hereto) containing, among other things, Non-Competition Provisions.

46.

Plaintiff TCC has substantially performed its obligations under the Agreement.

47.

Defendant Harry Lambert has failed to perform his obligations under the Agreement and has materially breached the Agreement by violating the terms of the Non-Competition Provisions.

48.

Plaintiff TCC has suffered substantial damages for which it is entitled to recover as a result of Defendant Harry Lambert's material breach of the Agreement.

## COUNT II

### (Attorneys' Fees To Be Paid By Defendant Harry Lambert)

49.

The allegations set forth in paragraphs 1 through 48 are incorporated herein by reference.

50.

The June 10, 1997 Agreement contained the following provision with respect to attorneys' fees:

> 21.    Attorney Fees.  The prevailing party in any litigation with respect to this Agreement shall be reimbursed by the opposing parties for its reasonable attorneys fees and expenses incurred in connection with such litigation.

51.

Pursuant to the terms of this provision, Plaintiff TCC is entitled to recover its reasonable attorneys' fees and expenses incurred in connection with this litigation.

## COUNT III

### (Tortious Interference With Business Relations By All Defendants)

52.

The allegations set forth in paragraphs 1 through 51 are incorporated herein by reference.

162061.1

16

53.

Plaintiff TCC has contractual and business relations with Simcala, other businesses and individuals and Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions, for the provision of aggregate materials within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

54.

At all pertinent times hereto, Defendants have had knowledge of Plaintiff TCC's contractual and business relations with Simcala, other businesses and individuals and Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions, for the provision of aggregate materials within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

55.

Defendants, acting individually and in concert with each other and without justification, intentionally interfered with Plaintiff TCC's contractual and business relations with Simcala, other businesses and individuals and Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions, for the provision of aggregate materials within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

56.

Plaintiff TCC has suffered substantial damages for which it is entitled to recover as a result of Defendants' intentional interference with Plaintiff TCC's contractual and business relations with Simcala, other businesses and individuals and Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions, for the provision of

aggregate materials within the Territory defined and covered by the June 10, 1997 Agreement's

Non-Competition Provisions.

## COUNT IV

### (Tortious Interference With Business Relations By
### Defendants Carol's Trucking And Alabama Gravel)

57.

The allegations set forth in paragraphs 1 through 56 are incorporated herein by reference.

58.

Plaintiff TCC has contractual and business relations with Defendant Harry Lambert

pertaining to the June 10, 1997 Agreement.

59.

At all pertinent times hereto, Defendants Carol's Trucking and Alabama Gravel have had

knowledge of Plaintiff TCC's contractual and business relations with Defendant Harry Lambert

pertaining to the June 10, 1997 Agreement.

60.

Defendants Carol's Trucking and Alabama Gravel, acting individually and in concert

with each other and without justification, intentionally interfered with Plaintiff TCC's

contractual and business relations with Defendant Harry Lambert pertaining to the June 10, 1997

Agreement.

61.

Plaintiff TCC has suffered substantial damages for which it is entitled to recover as a

result of Defendants Carol's Trucking's and Alabama Gravel's intentional interference with

Plaintiff TCC's contractual and business relations with Defendant Harry Lambert pertaining to

the June 10, 1997 Agreement.

## COUNT V

### (Conspiracy By All Defendants)

62.

The allegations set forth in paragraphs 1 through 61 are incorporated herein by reference.

63.

Defendants conspired with each other to intentionally interfere with Plaintiff TCC's contractual and business relations with Simcala, other businesses and individuals and Customers as the term, "Customer," is defined by the June 10, 1997 Agreement's Non-Competition Provisions, for the provision of aggregate materials within the Territory defined and covered by the June 10, 1997 Agreement's Non-Competition Provisions.

64.

Defendants have conspired with each other to do something that is unlawful, oppressive and/or immoral.

65.

Plaintiff TCC has suffered substantial damages for which it is entitled to recover as a result of Defendants' conspiracy.

## COUNT VI

### (Conspiracy By Defendants Carol's Trucking And Alabama Gravel)

66.

The allegations set forth in paragraphs 1 through 65 are incorporated herein by reference.

162061.1

19

67.

Defendants Carol's Trucking and Alabama Gravel conspired with each other to intentionally interfere with Plaintiff TCC's contractual and business relations with Defendant Harry Lambert pertaining to the June 10, 1997 Agreement.

68.

Defendants Carol's Trucking and Alabama Gravel have conspired with each other to do something that is unlawful, oppressive and/or immoral.

69.

Plaintiff TCC has suffered substantial damages for which it is entitled to recover as a result of Defendant Carol's Trucking's and Alabama Gravel's conspiracy.

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

(a)     appropriate compensatory and punitive damages in an amount to be shown at trial;

(b)     attorneys' fees, plus the costs of these proceedings; and

(c)     whatever additional relief the Court deems just and proper.

Respectfully submitted this 25th day of October, 2005.

Robin G. Laurie (LAU006)
Attorney for The Concrete Company

OF COUNSEL:
Balch & Bingham, LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Telefax: (334) 269-3115
rlaurie@balch.com

162061.1

20