IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**FILED**
SEP 7 2001
CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| THE CONCRETE COMPANY, INC., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CIVIL ACTION 01-D-54-N |
| MMC HOLDINGS, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are cross-motions for summary judgment. Plaintiff and Counter-Defendant, The Concrete Company, Inc. ("TCC"), filed a Motion For Summary Judgment on May 24, 2001 along with a supporting brief ("TCC Brief"). Defendant and Counter-Plaintiff, MMC Holdings, Inc. ("MMC"), filed a Response on July 19, and additionally filed a Motion For Partial Summary Judgment ("MMC Brief"). TCC issued a Reply and a Response on August 8, whereupon MMC issued a Reply on August 15. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that TCC's Motion is due to be granted, and that MMC's Motion is due to be denied.

EOD 9/7/01

21

## I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). The parties do not contest personal jurisdiction or venue.

## II.  SUMMARY JUDGMENT STANDARD

The court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

This determination involves applying substantive law to the facts that are established. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. See id. at 248; Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989). The moving party

2

bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The burden then shifts to the non-moving party, which must designate specific facts remaining for trial and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. See id. at 587.

### III.  FACTUAL BACKGROUND

TCC is a Georgia corporation engaged in the concrete business, and MMC is an Alabama corporation engaged in the mining of sand and gravel. (Compl. ¶¶ 6, 7.) The parties decided to go into the mining business together, so they formed an Alabama limited liability company in 1997 named Montgomery Materials Company, L.L.C. ("Montgomery Materials"). (Id. ¶ 10.) TCC provided the initial capital for the venture, and MMC provided a significant amount of its assets, thereby giving each party a fifty-percent ownership interest in Montgomery Materials. (Id.) The Agreement included a Buy-Sell provision in Section 5.3 under which either party can name a price, thereby requiring the other

party to elect within 120 days to either buy or sell its share of Montgomery Materials at that named price. (Agreement at 8.)

In time Montgomery Materials acquired a lease to mine on the property belonging to Anderson Farms, L.L.C. ("Anderson"). (Compl. ¶ 11.) The Anderson pit was a rich source of gravel, but Anderson was selective about who mined there; as such, it had negotiated a clause in its lease giving it the right to terminate if ever one Lambert, the sole shareholder of MMC, was no longer employed by Montgomery Materials. (Id. ¶¶ 11, 17.) Due to the unique clause, in addition to the value of the lease, it became a point of contention when the relationship between TCC and MMC began to sour. (Id. ¶¶ 16, 17.) Finally on September 25, 2000, after having failed to negotiate a mutually agreeable dissolution of Montgomery Materials, TCC sent MMC a notice ("Notice"), informing it that it was activating the Buy-Sell provision. (Id. ¶ 19.)

The price set forth in the notice was $1,000,000, but there was to be an adjustment of an additional $3,000,000 if, at the time of closing, Anderson could not presently exercise its right to terminate the lease. (Id. ¶ 20.) According to Section 5.3 of the Agreement, MMC had 120 days to either purchase Montgomery Materials according to the price proposed by TCC or to permit TCC to buy its share-failure to do either would be deemed an election

4

to sell. (Agreement at 8.) On January 2, 2001, after an unsuccessful attempt to persuade Anderson to waive the provision in the lease, MMC informed TCC that it elected to purchase Montgomery Materials for $1,000,000. (Compl. ¶ 23.)

TCC subsequently brought this action seeking a declaratory judgment that MMC did not make an election under 5.3 of the Agreement, and, consequently, it was deemed to have sold its interest. TCC argues that, because Anderson would have no right to terminate the lease if MMC purchased Montgomery Materials, the $3,000,000 adjustment applies to any MMC purchase. Therefore, TCC alleges, MMC merely made a counteroffer, not contemplated by the Agreement. MMC asserts that the $3,000,000 adjustment applied only if the Anderson lease could be modified. As such, it filed a counterclaim seeking specific performance of the $1,000,000 sale.

## IV. DISCUSSION

This action sounds in breach of contract, and, since the court asserts jurisdiction based on the diversity of the parties, it is bound by Alabama contract law under the Erie doctrine. See Twin City Fire Ins. Co. v. Colonial Life and Accident Ins. Co., 124 F. Supp.2d 1243, 1247 (M.D. Ala. 2000). The parties do not contest the above-discussed facts (Answer ¶¶ 1-2, 5-6), nor do

they dispute that the relevant contract provisions are unambiguous. (MMC Brief at 9; TCC Brief at 9.) Consequently, the court's ruling on the cross-motions for summary judgment will turn solely upon the interpretation of the Agreement and the Notice. Cf. Steward v. Champion Int'l Corp., 987 F.2d 732, 734 (11th Cir. 1993) ("Having concluded that the [contract] is unambiguous, the construction and effect of the agreement are questions of law which may be decided by summary judgment.")

Section 5.3 of the Agreement provides that either party (the "Activating Members") "may at any time require that the other" party (the "Electing Members") "either (i) purchase all of the Activating Members' Interests in the company or (ii) sell all of the Electing Members' Interests in the company to the Activating Members." (Agreement at 8.) There is no contention that TCC "activated" the Buy-Sell provision on September 25, 2000, thereby giving MMC until January 22, 2001 to elect. MMC responded to TCC's Notice on January 2, 2001, within the 120 days allowed under the Agreement. The parties dispute, however, whether MCC's response constituted a proper election "to either purchase all of the Interests owned by the Activating Members or to sell to the Activating Members all of the Interests owned by the Electing Members, at the price so set forth by the Activating Members." (Id.)

6

The Agreement required that TCC's Notice "set forth a 'Cash Price'" that "include[d] a formula and/or components established with reference to items which cannot be definitely determined until or after closing." (Id.) Since the eventual status of the Anderson lease was an indeterminate item, TCC attempted to construct a price formula taking into account this contingency. The relevant portion of the formula reads as follows:

> The Cash Price . . . is: (i) One Million Dollars . . . plus (ii) An adjustment (increase) of Three Million Dollars . . . if, (A) immediately after closing, Anderson . . . would have no right under Paragraph 16(b)(iii) of the Anderson Lease, assuming that it had received actual knowledge of the closing, to terminate the Anderson Lease as a result of the termination of Lambert's employment with Montgomery Materials, because either (i) Anderson . . . waived such right to terminate in writing or (ii) no such right to terminate arose because [MMC] elected to purchase the Interests of [TCC] . . .

(Notice at 2.)[1] The record does not specifically discuss the effect that MMC's election to sell would have had upon Lambert's employment. The obvious presumption implicit in the parties' briefs is that, since Lambert is the sole shareholder of MMC, his employment would terminate upon sale of MMC's interest.

---

[1] The relevant portion of Paragraph 16(b)(3) of the Anderson lease reads: "the Lessor shall have the right to immediately terminate this Lease . . . at any time within thirty (30) days after it has received actual knowledge of . . . the event that Harry Lambert's employment with the Lessor shall have been terminated for reasons other than his death or disability[.]"

7

Indeed the parties merely contest the effect of said termination upon the Anderson lease in the context of the proper interpretation of the Notice. Since it is agreed that Anderson would not waive its right to terminate the lease, MMC was essentially left with two options under the Notice. It could elect to sell its share to TCC for $500,000, or it could elect to purchase TCC's share for $2,000,000.[2] MMC argues that this interpretation is unfair in that it allows TCC to purchase the same entity for less than the price for which MMC could purchase it. It argues by analogy that the court could not feasibly allow TCC to purchase Montgomery Materials for one dollar but to sell its share for four million.

TCC disputes this reasoning, arguing that, under the Notice, the same entity was not available to both parties. Since Anderson was not going to modify the lease, it had the right to terminate whenever Montgomery Materials was no longer associated with Lambert and MMC. On the other hand, no such right would arise if MMC elected to purchase. TCC plainly estimated the value of the Anderson lease as a $3,000,000 asset to Montgomery Materials. TCC recognized that, as written, the lease would not

---

[2] Although the Notice prices were one million and four million dollars, since the parties will merely sell their half-ownership interest, they will simply pay the other half the Notice price.

8

survive TCC's purchase of MMC's share, and it drafted the adjustment clause accordingly. The court finds that this adjustment clause unambiguously expresses this intention. At the very least then, TCC never offered to sell its share to MMC without the adjustment price.

MMC insists, however, that the risk of whether Anderson terminates the lease should be borne by the eventual purchaser of Montgomery Materials. There is nothing in the contract to support the assertion that such a shifting of risk was contemplated. If the value of the lease were anywhere near 75% of the assets as is suggested by TCC's proffered formula, the court would be loathe to infer that the parties intended to assume any such risk with respect to the lease. See Commercial Union Ins. Co. v. Rose's Stores, 411 So.2d 122, 124 (Ala. 1982). This is especially true when it is clear that the parties realized that the valuable lease would remain with Montgomery Materials only so long as Lambert remained. Therefore, the court refuses to find that MMC had the option to purchase Montgomery Materials for $1,000,000. As such, MMC's response to TCC's Notice did not constitute a contract, so there is no specific performance for the court to enforce. Thus, MMC's motion for partial summary judgment must be denied.

Since MMC did not properly elect within 120 days of TCC's Notice, TCC insists that, according to the plain terms of the Agreement, MMC is deemed to have sold its share of Montgomery Materials.[3] MMC contests such a result on the grounds of fairness because of the disparity between prices at which the parties could purchase Montgomery Materials. The thrust of its argument is that, even assuming that the Anderson lease merits an adjustment of $3,000,000, there is little to ensure that the price of $1,000,000 is a fair one given the structure of the price formula.[4] In other words, nothing would have prevented TCC

---

[3] The court need not address whether MMC's response constituted a counteroffer or not, for, as will be discussed, MMC failed to make an election according to the express terms of the Agreement. Although MMC still had twenty days to make a proper election under the Agreement at the time of its response to TCC's Notice, it failed to do so. The Agreement provides no mention of tolling the relevant period in the case of a misunderstanding as to the formula. Nor did MMC ever request any such extension. Likewise, the Agreement provides no mention of tolling the relevant period in the case of the filing of a declaratory judgment; nor is the court authorized to toll such period. See Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889-91 (2d Cir. 1990) ("Where the parties have expressly agreed that the availability of a cure period shall be temporally limited, the court does not give effect to the parties intention by removing the time limitation.").

[4] One of the advantages of a buy-sell provision is to ensure a fair price on a transfer of ownership interests. See, e.g., John C. Coates IV, "Fair Value as an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions, 147 U. Pa. L. Rev. 1251, 1288 (1999) (observing that buy-sell provisions are efficient means of determining the fair value of a corporation). Given the nature of the provision in question, fairness is ensured since, when one party names the price, the other can

10

from offering to purchase Montgomery Materials for one dollar since any purchase by MMC would have included the adjustment.

The crucial shortcoming in this line of reasoning is that the pre-adjustment Notice price was not one dollar, it was one million dollars. There is nothing in the record to indicate that one million dollars is not a fair price, nor does MMC ever allege as much. Indeed its counterclaim seeks the enforcement of a sale of Montgomery Materials *with* the Anderson lease for that very price. However, even had MMC deemed the non-adjustment price to be too low, it could have avoided any potentially unfair result by electing to purchase Montgomery Materials since the adjustment value option was, in theory, available to both parties.

The court finds that the adjustment price was "a formula . . . established with reference to items which cannot be definitely determined until or after closing." (Agreement at 8.) As such it is a proper "Cash Price" as contemplated by Section 5.3 of the Agreement. The parties negotiated and drafted the sophisticated Agreement, including the Buy-Sell provision, and left as much in effect even after obtaining the Anderson lease. A buy-sell provision is a risky means of resolving ownership

---

elect whether it wishes to sell or buy at *that* price. MCC wishes the court to conclude that, since TCC's formula does not give MMC the option to elect to purchase Montgomery Materials for $1,000,000, there is no means of ensuring that such a price is fair.

conflicts, but the parties agreed to abide by such an arrangement. It is the duty of this court to effectuate the intentions expressed therein; it must not shirk from this duty simply because MMC may not like the conclusion. See Wheelan v. Sessions, 50 F. Supp.2d 1168, 1172 (M.D. Ala. 1999).

The court finds that the Buy-Sell provision was properly "activated" within the meaning of the Agreement inasmuch as TCC's Notice included a price formula contemplated by the parties. Consequently, MMC had 120 days to elect which it failed to do. Therefore the court must give effect to the default provision of Section 5.3 and conclude that Montgomery Materials has been deemed sold to TCC. TCC's formula presumed that Anderson would terminate the lease and the record indicates as much. As such, the court finds that the adjustment of $3,000,000 is inapplicable to the sale, so TCC has purchased Montgomery Materials for $1,000,000.[5]

---

[5] The court's ruling is based upon the presumption implicit in the parties' briefs, namely that 1) Lambert will not stay with Montgomery Materials upon a sale to TCC, and 2) Anderson will terminate the lease as a consequence. If, however, Anderson fails to terminate the lease within the time provided therein, the provision will be deemed waived. In that case, the adjustment would apply to the sale in accordance with the express language of the Notice. According to the lease, Anderson has thirty days to terminate after learning that Lambert is no longer with Montgomery Materials. See supra note 1.

## V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that TCC's Motion For Summary Judgment be and the same is hereby GRANTED. Furthermore, it is CONSIDERED and ORDERED that MMC's Motion For Partial Summary Judgment be and the same is hereby DENIED. A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

DONE this 7th day of September, 2001.

                                           /s/ Ira De Ment
                                       UNITED STATES DISTRICT JUDGE

1. **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

   **Appeals from Final Orders Pursuant to 28 U.S.C. § 1291:** Only final judgments or orders of district courts (or final orders of bankruptcy courts which have been affirmed by a district court under 28 U.S.C. § 158) generally are appealable. A "final" order is one which ends the litigation on its merits and leaves nothing for the district court to do but execute the judgment. A magistrate's report and recommendation is not usually final until judgment thereon is entered by a district court judge. Compare Fed.R.App.P. 3.1, 28 U.S.C. § 636(c).

   In cases involving multiple parties or multiple claims, a judgment as to fewer than all parties or all claims is not a final, appealable decision. Fed.R.Civ.P. 54(b) does permit the district court to expressly direct entry of judgment as to fewer than all of the claims or parties. See Pitney Bowes, Inc. v. Mestre, 701 F.2d 1365, 1368 (11th Cir. 1983), cert. denied 464 U.S. 893 (1983). Certain matters, such as attorney's fees and costs, are collateral and do not affect the time for appealing from the judgment on the merits. Buchanan v. Stanships, Inc., 485 U.S. 265, 108 S.Ct. 1130, 99 L.Ed 2d 289 (1988); Budinich v. Becton, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed 2d 178 (1988).

   **Appeals Pursuant to 28 U.S.C. § 1292(b) and FRAP 5:** The certificate specified in 28 U.S.C. § 1292(b) must be obtained before an application for leave to appeal is filed in the Court of Appeals. Denial or refusal by the district court to issue the certificate is not itself appealable.

   **Appeals Pursuant to 28 U.S.C. § 1292(a):** Pursuant to this statute, appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions ..." This statute does not permit appeals from temporary restraining orders.

   **Appeals pursuant to Judicially Created Exceptions to the Finality Rule:** These limited exceptions are discussed in many cases, including (but not limited to): Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed 2d 1528 (1949); Forgay v. Conrad, 6 How. (47 U.S.) 201 (1848); Gillespie v. United States Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 311, 13 L.Ed 2d 199 (1964); Atlantic Federal Savings & Loan Ass. Of Ft. Lauderdale v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371 (11th Cir. 1989). Compare Coopers and Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed 2d 351 (1978); Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed 2d 296 (1988).

2. **Time for Filing:** To be effective a notice of appeal must be timely filed. Timely filing is jurisdictional. In civil cases FRAP 4(a) and 4(c) set the following time limits:

   **FRAP 4(a)(1):** The notice of appeal required by FRAP 3 "must be <u>filed with the clerk of the district court</u> within 30 days after the date of entry of the judgment or order appealed from; but if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by <u>any party</u> within 60 days after such entry ..." (Emphasis added) To be effective, the notice of appeal generally must be filed in the district court clerk's office within the time permitted. If a notice of appeal is mailed, it must be timely received and filed by the district court to be effective. FRAP 4(c) establishes special filing provisions for notices of appeal filed by an inmate confined in an institution, as discussed below.

   **FRAP 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the <u>first</u> notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period last expires." (Emphasis added)

   **FRAP 4(a)(5) and FRAP 4(a)(6):** The <u>district</u> court has power to extend the time to file a notice of appeal. Under FRAP 4(a)(5) the time may be extended if a motion for extension is filed within 30 days after expiration of the time otherwise permitted to file notice of appeal. Under FRAP 4(a)(6) the time may be extended if the district court finds upon motion that a party has not received notice of entry of the judgment or order and that no party would be prejudiced by an extension.

   **FRAP 4(c):** "If an inmate confined in an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a notarized statement or by a declaration in compliance with 28 U.S.C. § 1746 setting forth the date of deposit and stating that first-class postage has been prepaid."

3. **Format of Notice of Appeal:** Form 1, FRAP Appendix of Forms, is a suitable format. See also FRAP 3(c).
   A single notice of appeal may be filed from a single judgment or order by two or more persons whose "interests are such as to make joinder practicable ..." (FRAP 3(b))

4. **Effect of Notice of Appeal:** A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction (see Fed.R.Civ.P. 60) or to rule on a timely motion of the type specified in FRAP 4(a)(4).