# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

THE CONCRETE COMPANY,              )
                                   )
    Plaintiff,            )
                                   )
v.                                 )  Case No.:  2:05-CV-1026
                                   )
HARRY E. LAMBERT, et al.           )
                                   )
    Defendants.           )


STATE OF ALABAMA       )
                       :
MONTGOMERY COUNTY)

### AFFIDAVIT OF DAVE TUTEN

Before me, the undersigned authority in and for said State and County, personally appeared Dave Tuten who, after being first duly sworn under oath, doth depose and say as follows:

1.  My name is Dave Tuten. I am over the age of nineteen (19) years and make this affidavit based upon personal knowledge.

2.  I am one of the three members of Alabama Gravel, LLC ("Alabama Gravel"). Alabama Gravel was organized on March 24, 2005. The other members of Alabama Gravel are Robert Alexander and Rex Dysinger.

3.  Alabama Gravel has been engaged in the gravel business since April 2005. Alabama Gravel made its first shipment of gravel on or about April 10, 2005.

4.  Harry E. Lambert has never been a member or employee of Alabama Gravel. Mr. Lambert received no payment or compensation from Alabama Gravel during the time period involved in this case.

5.  Alabama Gravel has never been a party to any agreement involving Mr. Lambert and The Concrete Company.  Prior to the filing of this lawsuit, neither The Concrete Company nor Mr. Lambert furnished Alabama Gravel with a copy of their Agreement dated June 10, 1997.  In fact the first time that any member of Alabama Gravel received or reviewed that Agreement was after Alabama Gravel was served with the Summons and Complaint in this lawsuit in late October 2005.

6.  Alabama Gravel has never used fraud, force or coercion in selling gravel to customers.  To the contrary, each of Alabama Gravel's three customers (Simcala, Globe Metallurgical, and Maddox Sand & Gravel) were looking for additional suppliers of white oversize gravel when Alabama Gravel started its business operations.


_____
DAVE TUTEN


SWORN TO and subscribed before me on this the 11⁴ᵗʰ day of May, 2006.

_____
Notary Public
My Commission Expires: 6/08

(SEAL)

# EXHIBIT B

# FREEDOM COURT REPORTING

1       IN THE UNITED STATES DISTRICT COURT OF

2           MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4   CASE NUMBER:  2:05-CV-1026-D

5   THE CONCRETE COMPANY,                    COPY

6           Plaintiff,

7           VS.

8   HARRY E. LAMBERT, CAROL'S CONTRACTING,

9   INC., AND ALABAMA GRAVEL, LLC,

10          Defendants.

11          S T I P U L A T I O N

12          IT IS STIPULATED AND AGREED by

13  and between the parties through their

14  respective counsel, that the deposition of

15  FRANK FOLEY may be taken before RENA'

16  MESSICK LANIER, Court Reporter and Notary

17  Public for the State of Alabama at Large,

18  at the offices of Balch & Bingham at 105

19  Tallapoosa Street, Montgomery, Alabama

20  36104, on the 18th day of April, 2006.

21          IT IS FURTHER STIPULATED AND

22  AGREED that the signature to and the

23  reading of the deposition by the witness

# FREEDOM COURT REPORTING [233]

1      Q.      Were letters sent to the

2  companies that those salesmen or former

3  employees went to work for to advise the

4  companies of the former employees'

5  noncompete obligations?

6      A.      I don't remember whether

7  they were sent to the individual.  I think

8  they were sent to the individual.

9      Q.      Are you -- strike that.  To

10  your knowledge, has either The Concrete

11  Company or Foley Materials ever had a

12  contract or agreement with Alabama Gravel?

13      A.      The Concrete Company?

14      Q.      Either The Concrete Company

15  or Foley Materials.  Have either one of

16  your companies ever had a contract or

17  agreement with Alabama Gravel, LLC?

18      A.      No.

19      Q.      Has Alabama Gravel, LLC,

20  ever entered into a noncompete agreement

21  with The Concrete Company?

22      A.      No.

23      Q.      Has Alabama Gravel, LLC,

# FREEDOM COURT REPORTING [234]

1  ever entered into an noncompete agreement

2  with Foley Materials?

3       A.     No.

4       Q.     Is it true that Alabama

5  Gravel, LLC, was not a party to the June

6  10, 1997 agreement between The Concrete

7  Company and Harry Lambert?

8       A.     That's right.

9       Q.     And do you have any evidence

10  that anyone associated with Alabama Gravel

11  even saw a copy of the June 10, 1997

12  agreement until after The Concrete Company

13  filed this lawsuit?

14            MR. LAURIE:  Object to the

15  form.  You can answer.

16       A.     I don't have any evidence to

17  that.

18       Q.     You testified earlier that

19  you became aware in the spring of 2005

20  that Mr. Lambert was doing things in the

21  sand and gravel business.  Is that --

22       A.     Yes.

23       Q.     -- your recollection?

# FREEDOM COURT REPORTING  241

1    went way back.  I assumed that they would

2    know that.  I mean --

3         Q.     Did you seek -- without

4    going into any details of any legal advice

5    that you might have received, did you seek

6    legal advice in the spring or summer of

7    2005 when you became aware of this

8    potential situation as to whether you

9    should contact Alabama Gravel to advise it

10   of the terms of Mr. Lambert's agreement?

11        A.     No, we didn't.

12        Q.     When was the first time that

13   you sought legal advice concerning the

14   situation with Alabama Gravel?

15        A.     Seems like late in the

16   summer was -- it might have been July or

17   August.  Somewhere around there.

18             You know, we were continuing

19   to gather information just to make sure

20   that we had our information correct.

21        Q.     And after the time that you

22   sought legal advice in the summer of 2005

23   concerning this matter, did you or anyone

# FREEDOM COURT REPORTING 242

1   else from any of your companies ever

2   contact Alabama Gravel either by telephone

3   or by writing to advise them of the terms

4   of the noncompete agreement?

5        A.    I don't believe so.

6        Q.    To your knowledge, did

7   either you or anyone from any of your

8   companies ever tell Alabama Gravel that

9   Harry Lambert was possibly violating an

10  agreement with your companies by driving a

11  truck?

12       A.    No, we didn't.

13       Q.    Did you or to your knowledge

14  anyone from any of your companies ever

15  advise Alabama Gravel that Harry Lambert

16  was possibly violating an agreement by

17  hauling gravel for his wife's company?

18       A.    No.

19       Q.    Did you or to your knowledge

20  anyone from any of your companies ever

21  advise Alabama Gravel that Harry Lambert

22  was possibly violating an agreement by

23  providing advice or answering questions

# FREEDOM COURT REPORTING 243

1    without receiving any compensation?

2              MR. LAURIE:  Object to the

3    form.

4         A.    All of these questions are

5    did we talk to anybody at Alabama Gravel

6    about that, right?

7         Q.    Right.

8         A.    No, we didn't.

9         Q.    Do you know Mike Gentry?

10        A.    Vaguely.

11        Q.    How do you know him?

12        A.    We were both in the Redi-Mix

13   business.  And at some point many years

14   ago, we had some very, very brief

15   discussions about buying his business.

16        Q.    Have you made any inquiry

17   about mining in Mr. Gentry's pit in

18   Independence, Alabama?

19        A.    No.  I haven't talked to

20   Mike about it.

21        Q.    Have you ever made any

22   direct or indirect inquiries or overtures

23   about possibly mining in one of

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **THE CONCRETE COMPANY,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )  **Case No.:  2:05-CV-1026** |
| | ) |
| **HARRY E. LAMBERT, et al.,** | ) |
| | ) |
|     **Defendants.** | ) |

**STATE OF ALABAMA**    )
                       :
**MONTGOMERY COUNTY** )

## AFFIDAVIT OF RICHARD WYMER

Before me, the undersigned authority in after said State and County, personally appeared

Richard Wymer who, after being first duly sworn under oath, doth depose and say as follows:

1.      My name is Richard Wymer. I am over the age of nineteen (19) years and make

this affidavit based upon personal knowledge.

2.      I am employed by Simcala Inc. ("Simcala") as its Purchasing Manager.  In that

position, I purchase gravel for delivery to the Simcala plant in Mt. Meigs, Alabama.  Simcala

purchases substantial quantities of oversize gravel for use in the manufacture of silicon metal.

Gravel is an essential raw material in the manufacture of silicon metal, and Simcala must have

access to a steady supply of oversize gravel for our continuous smelting operations.

3.    Simcala purchased large amounts of oversize gravel from The Concrete Company prior to 2005. It is my understanding based on documentation supplied to me by The Concrete Company that approximately half of the oversize gravel delivered to Simcala came from The Concrete Company's Ward plant, and the other half came from a pit located in Phoenix City. Simcala needed both Ward and Phoenix City gravel from The Concrete Company to blend together to meet our quality needs. The Concrete Company's other plants in this area produced oversize gravel that often failed to meet Simcala's quality requirements.

4.    I anticipated that Simcala would once again purchase a large amount of oversize gravel from The Concrete Company in 2005 assuming agreement could be reached on price, until I received a telephone call from a representative of The Concrete Company on January 4, 2005. During that telephone call, I was told that The Concrete Company was running extremely low on oversize gravel from the Ward plant and would be substantially reducing its shipments to Simcala. I was further advised that Simcala would receive only 500 tons of oversize gravel from the Ward plant each month for the foreseeable future. The Concrete Company's Ward plant was previously supplying Simcala approximately 2,000 tons of oversize gravel each month and also was supplying 2000 tons from the Phoenix City plant. On April 8, 2005, Hugh Sorrell of The Concrete Company visited the Simcala plant and told me that The Concrete Company Phoenix City plant was not making much oversize gravel and shipments to Simcala would be reduced.

5.    Thus, I believed that it was essential to find additional suppliers of oversize gravel in the event that The Concrete Company was unable to meet Simcala's needs for that product. A day or two after I learned that Simcala may not have a secure source for this raw material, I saw Harry Lambert driving a truck at Simcala's plant. I knew that Harry was knowledgeable of the

gravel industry in Alabama and that he might know of other sources of oversized gravel which met the necessary quality standard. I asked Harry if he knew anyone that Simcala could get oversize gravel from. Harry replied that he would see if he could find someone. Subsequently, I received a telephone call from Robert Alexander who was considering starting a new gravel operation in this area. Simcala eventually negotiated for Alabama Gravel to provide oversize gravel to our plant beginning in April 2005.

6. Simcala purchased a small amount of oversize gravel from The Concrete Company in early 2005 based upon the limited quantities of suitable oversize gravel that The Concrete Company made available for purchase. My subsequent conversations with Don Triplett, Hugh Sorrell and Gene Talley of The Concrete Company during the spring and summer of 2005 indicated that The Concrete Company had only a small amount of acceptable oversize gravel available for purchase and that the prices would be much higher.

7. Alabama Gravel did not solicit or induce Simcala to purchase less oversize gravel from The Concrete Company. Likewise, Alabama Gravel did not interfere in any business relationship between Simcala and The Concrete Company. Rather, in my position as Purchasing Manager for Simcala, I made the unilateral decision to seek out other suppliers, including Alabama Gravel, when I received information which led me to believe that The Concrete Company might be unable to supply Simcala with adequate quantities of suitable oversize gravel.

8.    Further affiant saith not.

_Richard Wymer_

Richard Wymer

**SWORN TO** and subscribed before me on this the ___10___ day of ___May___,
2006.

_Ruslyn D McBee_
Notary Public
My Commission Expires: _____

(SEAL)

My Commission Expires August 8, 2007

# EXHIBIT D

# FREEDOM COURT REPORTING

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5  THE CONCRETE COMPANY,

6              Plaintiff,                    COPY

7     versus                          2:05-CV-1026-D

8  HARRY E. LAMBERT, et al.,

9              Defendants.

10

11

12

13

14        *   *   *   *   *   *   *   *   *   *   *   *

15

16        DEPOSITION OF HORALD SORRELL,

17  taken pursuant to stipulation and agreement

18  before Jackie Parham, Certified Shorthand

19  Reporter and Commissioner for the State of

20  Alabama at Large, in the law offices of Balch

21  & Bingham, 105 Tallapoosa Street, Montgomery,

22  Alabama, on Tuesday, the 28th day of March,

23  2006, commencing at approximately 9:00 a.m.

## FREEDOM COURT REPORTING

Page 336

1       lot less than I thought it was going to

2       be.  I was still using a high percentage

3       of our production as being oversize

4       production at that point in time.

5  Q.   And you called Dick Wymer in early January

6       of 2005 to tell him about this shortage,

7       didn't you?

8  A.   That's correct.

9  Q.   Did it take Mr. Wymer by surprise that you

10      had this shortage?

11 A.   Yes, it seemed to.

12 Q.   What did he say when you called him in

13      early January to tell him about this

14      shortage?

15 A.   I don't recall his exact words.  But I

16      recall him saying that would create

17      problems for them.

18 Q.   He was upset, wasn't he?

19 A.   Yeah, I'm sure he was.  Yes.

20 Q.   And as a matter of fact, let's look at

21      Defendant's Exhibit 6, the note that is

22      marked as TCC 1916 dated January 4, 2004.

23 A.   That should be 2005 I stated earlier.

# FREEDOM COURT REPORTING

1   Q.   Okay.  We'll say January 4, 2005.  Does

2        this reflect the substance of what you

3        discussed when you called Mr. Wymer?

4   A.   Yes.

5   Q.   And did you call him on or about January

6        4, 2005?

7   A.   That's correct.

8   Q.   And as a matter of fact, there's a

9        telephone number and the word "Simcala."

10  A.   "Dick."

11  Q.   And then is that the word "Dick" --

12  A.   Yes.

13  Q.   -- underneath that?

14  A.   Yes.

15  Q.   And there are three exclamation marks by

16       Dick's name.  Is that Dick Wymer?

17  A.   Yes.

18  Q.   Why did you put three exclamation marks by

19       his name?

20  A.   Just that I needed to call him and tell

21       him what was going on.

22  Q.   You knew it was going to be important for

23       him to know that you were facing this

# FREEDOM COURT REPORTING

1           shortage of white oversize gravel?

2   A.      That's correct.

3   Q.      Did Mr. Wymer during that telephone call

4           tell you that Simcala was going to have to

5           look to other suppliers?

6   A.      Yeah, I'm sure he did.  I don't remember

7           the exact words.  But I'm sure he

8           indicated that, yes, that they would have

9           to look for some other suppliers to help

10          them through this time frame.

11  Q.      And I believe you testified that a month

12          or two prior to this telephone call there

13          had been discussions with Simcala about

14          supplying even more white oversize gravel

15          than you had been supplying to them; isn't

16          that correct?

17  A.      Is that the document there that shows

18          that?  I don't recall whether that

19          conversation took place or not.  But if

20          it's in there, then it did.

21  Q.      I know you had had discussions with Globe

22          about supplying an increased amount.

23  A.      There was discussions that Globe would

# FREEDOM COURT REPORTING

Page 339

1    like to have more.  And then we had to

2    make a decision as to whether we would

3    give Globe more or whether we would

4    continue on a half and half basis.

5    Q.   Had Simcala asked you for additional

6    amounts of white oversize gravel?

7    A.   I believe they may have.

8    Q.   And that's prior to January of 2005?

9    A.   Yes.

10   Q.   Have you ever offered Simcala a supply of

11   white oversize gravel that met their

12   quality standards that Simcala has refused

13   to purchase from you?

14   A.   Repeat that, please.

15   Q.   Have you ever offered Simcala a supply of

16   white oversize gravel that met Simcala's

17   quality standards that Simcala refused or

18   failed to buy from you?

19   A.   Not that I'm aware of.

20        (Off-the-Record discussion)

21        MR. GRISTINA:  I don't know how

22        much more you've got.  It's

23        5:20.  I'm not keeping a