THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE CONCRETE COMPANY, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Case No.: 2:05-cv-01026-CSC |
| | * |
| HARRY E. LAMBERT, CAROL'S | * |
| CONTRACTING, INC. and | * |
| ALABAMA GRAVEL, LLC, | * |
| | * |
| Defendants. | * |

**OPPOSITION TO DEFENDANTS HARRY LAMBERT'S AND
CAROL'S CONTRACTING, INC.'S SUMMARY JUDGMENT MOTIONS**

**INTRODUCTION**

Defendants Harry Lambert's and Carol's Contracting's summary judgment motions are predicated on the inaccurate allegation that The Concrete Company ("TCC") has removed itself from the sand and gravel business and cannot enforce the non-compete that Lambert has breached. In fact, TCC remains actively engaged in the sand and gravel business both in its own name and via its wholly owned subsidiary Foley Materials Company.

Carol's Contracting's motion is further predicated on the also inaccurate allegation that Carol's Contracting's aggregate hauling operations cannot tortiously interfere with TCC's contractual relations. Carol's Contracting, however, is not sued solely because it operates an aggregate hauling operation. It is sued because it operates this business with Mr. Lambert. This amounts to tortious interference with the non-compete agreement and with TCC's contractual relations with its customers.

For these and other reasons, and as more specifically set forth below, Mr. Lambert's and

168374.1

Carol's Contracting's summary judgment motions should be denied in their entireties.

## DISPUTED FACTS

**I.   Preliminary Statement**

Mr. Lambert's and Carol's Contracting's separate "Statements of Undisputed Facts" respectively consist of 13 and 30 numbered paragraphs. TCC responds to a number of those paragraphs that it disputes below.[1]

**II.   Individual Paragraphs Of Mr. Lambert's And Carol's Contracting's "Statements of Undisputed Facts"**

    A.   *Mr. Lambert's "Statement of Undisputed Facts"*

        (1)   Paragraphs 1 & 10

Mr. Lambert asserts, in paragraph 1, that "TCC is a Georgia corporation *formerly* engaged in the concrete and sand a gravel business" and, in paragraph 10, that since April 1, 2005, "TCC has operated *solely* as a holding company and has not been engaged in the sand and gravel business in the Montgomery area or anywhere else." (Emphasis added). TCC disputes these allegations. TCC sold its ready-mix concrete business to Lafarge Corporation effective March 31, 2004. TCC, however, remains actively engaged in the aggregate business, which includes among other things, the sale of sand and gravel, through its wholly owned operating subsidiary Foley Materials Company ("FMC"). TCC is also actively engaged in the pre-cast concrete products business through its wholly owned operating subsidiary Foley Products Company ("FPC"). FMC and FPC were formed on April 1, 2005.

According to Eric Nix, TCC's Vice-President of Finance, as of April 1, 2004, TCC's business was precast concrete products and aggregates. *See* Transcript from Deposition of Eric Nix ("Nix Tr."), taken March 29, 2006, copies of pertinent portions of which are attached as

Exhibit A hereto, at 5.20-6.12 & 9.1-10.13. On April 1, 2005, TCC became a holding company after forming two operating entities, FMC and FPC. *Id*. at 10.14-12.20. As part of this transaction, certain TCC assets were transferred to FMC and FPC. *Id*. at 12.21-13.8.

"[F]rom a business standpoint," FMC and FPC were formed because some of the concrete plants Lafarge acquired continued to purchase supplies in TCC's name. *Id*. at 11.1-12.11. Lafarge's plants did not pay their bills timely, and FMC's and FPC's "ongoing businesses" were getting hurt. *Id*.

Mr. Nix was asked "what is The Concrete Company in the business of right now?" *Id*. at 13.17-.18. He responded, "[t]he primary operating businesses are" FMC and FPC. *Id*. at 13.19-.21. TCC owns 100 percent of FMC's and FPC's stock. *Id*. at 13.11-14.12. TCC, FMC and FPC have separate employees, but some employees, like Mr. Nix, are employees of all three entities. *Id*. All of Mr. Nix's salary is paid by TCC. *Id*. at 15.1-.6. In addition to being a holding company for FMC and FPC and owning and managing real property, TCC provides administrative services to its two operating companies, FMC and FPC. *Id*. at 14.13-.23. Accounting, invoicing, payables, payroll and human resources are all centralized with TCC. *Id*. FMC and FPC reimburse TCC for these services. *Id*.[2]

TCC's President Frank Foley provided additional facts on this point during his deposition. He confirmed that FMC was formed to address Lafarge's plants' late payments. *See* Transcript from Deposition of Frank Foley ("Foley Tr."), taken April 18, 2006, copies of

---

[1] In addition to those paragraphs specifically addressed below, TCC disputes all the paragraphs to the extent they suggest any potential liability against TCC.

[2] TCC holds 16 aggregate leases in Montgomery, Macon and Russell Counties, Alabama, its own name. It also owns three pieces of land in Montgomery and Maconn Counties, Alabama, and one piece of land in Taylor County, Georgia, which will be used for aggregate mining. *See* Affidavit of Horald "Hugh" Sorrell ("Sorrell Aff."), dated May 23, 2006, a copy of which is attached as Exhibit B hereto, at ¶¶3-4. In addition, FMC and FPC employees share in common retirement and health plans with TCC employees, both of which are administered by TCC. *See id.* at ¶5.

168374.1                                   3

pertinent portions of which are attached as Exhibit C hereto, at 41.20-42.19. He added that the operating entities were formed from a liability standpoint given the previous sale of TCC's assets and to address customer confusion resulting from the sale. *Id*. He then testified as follows:

> Q. Prior to Foley Materials existing, had The Concrete Company had any problems with producing the quantities of white oversized gravel that were being requested by customers for that product?
>
> A. The fact that Foley Materials was set up, I mean, it's a wholly-owned subsidiary, Foley Materials. So there's no –
>
> Q. So it's a legal entity that doesn't mean anything?
>
>     MR. LAURIE: I object to that.
>
> A. It's – it's an LLC subsidiary.
>
> Q. But it is a legal entity?
>
> A. Yeah.
>
> Q. It exists?
>
> A. Right.
>
> Q. It is the name of the company that operates aggregates now?
>
> A. And it's a hundred percent owned by The Concrete Company.
>
> Q. And you set that up for legal purposes?
>
> A. For the reasons I told you.
>
> Q. One of them being liability issues?
>
> A. Yeah.
>
> Q. You didn't want The Concrete Company to be liable for legal problems that Foley Materials might have?
>
> A. That – that could be.

*Id*. at 43.4-44.18.

Mr. Lambert's allegation is based on brief quotes from Eric Nix's deposition and from Hugh Sorrell's deposition. Mr. Sorrell is FMC's Vice-President and General Manager. The Nix testimony Mr. Lambert cites simply establishes that when he went to work for TCC in 1998, it was in the ready-mix concrete, precast concrete products and aggregates business; that TCC operated those businesses via divisions; and that in April 2005, TCC became a holding company. *See* Nix Tr., Exhibit A, at 7.11-8.7 & 10.9-.19. Mr. Lambert fails to cite the additional testimony set forth above which places context around FMC's and FPC's formation and interrelationship with TCC. More importantly, Mr. Lambert fails to cite any testimony from Mr. Nix that TCC ever left the aggregates business. In fact, as Mr. Nix's testimony demonstrates, the only thing that changed in April 2005 was that TCC's precast concrete and aggregate operating divisions became wholly owned operating companies. TCC remained in the aggregate business via its operating division, FMC.

Mr. Sorrell's testimony is similarly taken out of context. Mr. Sorrell was asked whether TCC is in the aggregate business in the territory covered by the non-compete agreement at issue. *See* Transcript from Deposition of Horald Sorrell ("Sorrell Tr."), taken March 28, 2006, copies of pertinent portions of which are attached as Exhibit D hereto, at 21.10-.16. He responded, "The Concrete Company is not." *Id*. Mr. Sorrell was asked what business TCC is in. *Id*. at 14.16-15.4. He said TCC now serves as a holding company that owns FMC and FPC. *Id*. He had previously testified that FMC is in the business of excavating, mining, distributing, delivering, selling or otherwise disposing of aggregate at wholesale or retail. *Id*. at 13.10-.15. He later added that TCC was involved in the sale of aggregate "[t]hrough its ownership of" FMC. *Id.* at 133.19-134.7. Taken in context, therefore, Mr. Sorrell's testimony actually describes TCC's extensive relationship and involvement in the aggregate business via FMC. In

any event, these facts were appropriately covered by Mr. Nix and Mr. Foley. Considering all the testimony, there is no doubt that TCC is still engaged in the aggregate business, including, but not limited to, sand and gravel.

(2)     Paragraph 9

Mr. Lambert asserts in paragraph 9 that "TCC transferred *all* of its assets *(i.e., sand and gravel operations in the Montgomery area)* to Foley Materials on April 1, 2005." (Emphasis added). TCC disputes this unsupported allegation as well.

First, the portions of Mr. Sorrell's deposition Mr. Lambert cites – Sorrell Tr., Exhibit D, at 17.13-21.1 – do not support the allegation. In the cited testimony, Mr. Sorrell describes the aggregate plants FMC has owned and operated since April 1, 2005 in the territory covered by the non-compete. He states he was aware of the transaction that resulted in the FMC's formation but did not participate in it. *Id.* at 19.21-20.2. Finally, he states TCC assets were transferred to FMC; but he does not describe the assets or say that *all* TCC assets were transferred. *Id.* at 20.22-21.1.

Second, the Bill of Sale From A Parent To Wholly Owned Subsidiary ("Bill of Sale") Mr. Lambert cites does not support his allegation. The Bill of Sale states TCC transferred "all the personal property used in the Aggregates Division, including all finished goods, work in process, raw materials, machinery, equipment, and vehicles." *See* Bill of Sale, a copy of which is attached as Exhibit E hereto, at "Whereas" clause, p.1. The Bill of Sale does not transfer all assets. Rather, only specified personalty was transferred. This specified personalty is not described as, and does not constitute, TCC's *"sand and gravel operations in the Montgomery area."* This is because TCC retained all of its assets not listed, including, but not limited to, its

168374.1                                                6

leases, owned real estate and contractual rights and obligations, and specifically including the contract containing the non-compete. TCC also retained 100 percent ownership of FMC.

      **B.**     *Carol's Contracting's "Statement of Undisputed Facts"*

          (1)     <u>Paragraphs 1, 9 &10</u>

Paragraphs 1, 9 and 10 of Carol's Contracting's purported Statement of Undisputed Facts are identical to paragraphs 1, 9 and 10 of Lambert's purported Statement of Undisputed Facts. These paragraphs are untrue and disputed on the same bases set forth above.

        *            *           *           *           *

All of the above disputed facts unequivocally demonstrate that Mr. Lambert and Carol's Contracting are not entitled to summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "material" if it is a legal element of a claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law, the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor. *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985). In

deciding whether an inference is reasonable, the court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 493 (5th Cir. Unit B 1982). The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. *Id.* at 495. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one. *Id.*

In keeping with the above, "summary judgment may only be decided upon an adequate record." *WSB-TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir. 1988). Indeed, the Eleventh Circuit has held that this is the "common denominator" of the Supreme Court's three seminal summary judgment cases. *Id.*[3] "[S]ummary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery." *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988); *e.g.*, *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1145 (5th Cir.)(en banc), *cert. denied*, 414 U.S. 1116 (1973); *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir.), *cert. denied*, 449 U.S. 820 (1979)("[s]ummary [j]udgment should not, therefore, ordinarily be granted before discovery has been completed"). The opposing party has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery to determine whether it can furnish opposing affidavits. *Snook*, 859 F.2d at 870.

### ARGUMENT AND CITATION OF AUTHORITY

In accordance with this standard, Mr. Lambert's and Carol's Contracting's purported arguments in support of summary judgment will be addressed and refuted separately below.

---

[3] *Citing generally Celotex Corp.*, 477 U.S. 317 (1986), *Anderson*, 477 U.S. 242 (1986), and *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

I.      **Mr. Lambert's Arguments**

   A.     *TCC Has Standing To Enforce The Non-Compete*

Mr. Lambert argues that TCC lacks standing to enforce the non-compete because it is purportedly attempting to do so "in place" of Montgomery Materials Company, LLC ("Montgomery Materials"). This argument is, however, based on the false predicate claimed by Mr. Lambert that the non-compete was designed to prevent MMC Holdings, Inc. ("MMC") and TCC from competing with Montgomery Materials after a buy-out of the other's interest in Montgomery Materials. Mr. Lambert cites no authority for this claim. This is because, again, it is false. In accordance with the plain language of the non-competition provisions, they were intended to, and in fact, inured to the benefit of TCC after a buy-out by TCC.

Pursuant to the 1997 Agreement ("Agreement"), TCC and MMC each owned 50 percent of Montgomery Materials. *See* Agreement, a copy of which is attached as Exhibit F hereto, at § 1(b). After the buy-out, TCC owned 100 percent of Montgomery Materials. As full owner, and as a party to the Agreement, it has every right to enforce the terms of the Agreement's non-competition provisions. Any other conclusion would run contrary to the language of the non-competition provisions. Mr. Lambert's non-compete was not even triggered until MMC transferred its ownership to TCC. *See id.* at § 8.4. Moreover, there is no language in the Agreement stating that *only* Montgomery Materials had the right to enforce the non-compete.

Again, Mr. Lambert cites no authority actually supporting his position. He only cites *Clark Substations, L.L.C. v. Ware*, 838 So. 2d 360 (Ala. 2002), for the general proposition that purchase assets did not automatically transfer the right to enforce non-compete agreements to the purchased corporation. *Clark Substations* is totally inapplicable. The plaintiff purchased the operating assets of a company that had non-competes with two employees. *Id.* at 361. One of

the non-competes specifically prohibited assignment and the other required prior written consent for assignment. *Id*. The court found that merely purchasing a corporation's assets, without a valid assignment of specific contract rights, does not give the purchaser all the seller's rights in those assets. *Id*. at 365. Thus, the purchasing corporation was not a successor entitled to enforce the non-competes. *Id*. The non-competes' assignment restrictions also prohibited their enforcement by the purchaser. *Id*.

Here, however, ***TCC was a party to the non-competes***. In addition, TCC simply acquired the 50 percent of Montgomery Materials that it did not already own. The 50 percent transfer had no impact on TCC's right to enforce the non-compete. It simply triggered Mr. Lambert's non-compete and TCC's pre-existing enforcement right.[4]

### B.   *The Non-Compete Was Mutually Binding*

Mr. Lambert next argues that TCC is estopped from pursuing its claims because the non-compete provisions were allegedly not mutually binding at the time this suit was filed. Again, he is wrong, and his argument is based on a false predicate.

Mr. Lambert insists that TCC is no longer in the sand and gravel business. That is simply not the case. As shown above, TCC is actively engaged in the aggregate business via its own real estate leasing and ownership, its 100 percent ownership of FMC and its administrative control and management of FMC operations. TCC and FMC also have common retirement and

---

[4]   The buy-out was not an operating asset purchase like *Clark Substations*, but rather akin to a merger of the remaining half of Montgomery Materials, a limited liability company, entirely into TCC. *Clark Substations* specifically recognizes that mergers have a different effect on non-competes than asset purchases. *Id*. "[W]hen a merger takes effect . . .the surviving corporation thereupon and thereafter possesses all the rights . . . of a public as well as of a private nature, of every corporation party to the merger." *Id*., *quoting* Code of Ala. § 10-2B-11.06 (1995). A "successor corporation can enforce nonsolicitation agreements that are otherwise valid and enforceable." *Clark Substations*, 838 So. 2d at 364, *quoting Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham*, 711 So. 2d 995, 1000 (Ala. 1998); *First Ala. Bancshares, Inc. v. McGahey*, 355 So. 2d 681, 683-84 (Ala. 1977)(non-compete enforceable by successor corporation after merger).

health plans. TCC is, therefore, actively in the aggregated business, including, but not limited to, sand and gravel. Moreover, Mr. Lambert has not cited a case for the proposition that a company structure like TCC's precludes TCC from enforcing a non-compete to which it is a party. Nor has Mr. Lambert cited a case for the proposition that setting up operating entities entirely removes a holding company from a business for purposes of enforcement of a non-compete.[5]

### C. *TCC Is Entitled To Damages Suffered After April 1, 2005*

Mr. Lambert next argues that even if TCC is not estopped from pursuing its claims, TCC should not be able to recover damages suffered after April 1, 2005. Mr. Lambert alleges that TCC was not in the sand and gravel business and that co-defendants Alabama Gravel and Carol's Contracting never combined on any sale or shipment of gravel until after that date. TCC has already demonstrated why April 1, 2005 has no significance in terms of its standing. The same argument applies to damages after that date. TCC was in the sand and gravel business and can pursue damages before and after that date.

### D. *TCC's Tortious Interference And Conspiracy Claims Remain Viable*

Mr. Lambert's final argument is that TCC's tortious interference with contractual and business relations claim (Count III) and conspiracy claim (Count V) fail because the non-compete is not enforceable. As shown above, TCC has the right to enforce the non-compete. As a result, Mr. Lambert is not entitled to summary judgment on the tortious interference or conspiracy claims.

---

[5] Instead, Mr. Lambert cites *ISS Int'l Serv. Sys., Inc. v. Ala. Motor Express, Inc.*, 686 So. 2d 1184 (Ala. Civ. App. 1996), for its very fact specific holding affirming the refusal to enforce non-solicitation agreements where the plaintiff was no longer in the waste collection business after an asset sale. That case is as clearly distinguishable as it is fact specific. The plaintiff's operations had ceased, it had sold its customer contracts, abandoned the waste removal business and no longer employed a staff in the defendants' departments. *Id.* at 1189. By contrast, TCC only transferred some specified personalty to

     *    *    *    *    *

Consequently, in absence of a single sustainable argument, Mr. Lambert's summary judgment motion should be denied in its entirety.

**II.** **Carol's Contracting's Arguments**

 **A.** *The Non-Compete Is Enforceable*

Carol's Contracting's first argument is that the non-compete is unenforceable and, therefore, no tortious interference claims predicated on the non-compete can exist. Carol's Contracting incorporates by reference the arguments raised in Mr. Lambert's summary judgment brief. For the same reasons set forth above in opposition to Mr. Lambert's motion, this is not a basis for summary judgment because TCC has the right to enforce the non-compete.

 **B.** *Carol's Contracting's Actions Constitute Tortious Interference*

Carol's Contracting next suggests that it cannot be liable for tortious interference because its hauling operations do not compete with TCC and because Carol's Contracting is not providing a service that any other trucking business would not be able to provide. In other words, someone is going to haul aggregate for TCC's and FMC's competitors, so it might as well be Carol's Contracting. This argument misses the point of TCC's claims against Carol's Contracting.

Carol's Contracting is not sued solely because it operates an aggregate hauling operation. It is sued because it operates this business with Mr. Lambert. This amounts to tortious interference with the non-compete agreement and with TCC's contractual relations with its customers. Mr. Lambert's non-compete prevents him from, among other things, distributing, delivering, selling or otherwise disposing of aggregates. *See* Agreement, Exhibit F, at §§ 8.3(1)

---

a wholly owned and totally controlled subsidiary. It cannot be argued that TCC "abandoned" the aggregate business.

& 8.4. His driving trucks for Carol's Contracting, a fact that he and Carol's Contracting admit, is just one of the his blatant violations of the non-compete. *See* Defendant Harry E. Lambert's Responses to First Interrogatories ("Lambert Int. Resp."), a copy of which is attached as Exhibit G hereto, at No. 7; *see also* Defendant Carol's Contracting, Inc.'s Brief In Support Of Motion For Summary Judgment, at p. 10.

Mr. Lambert has also admitted that he referred Simcala, Inc., a TCC customer to Robert Alexander, who later formed Alabama Gravel, when Mr. Lambert was contacted by Simcala about acquiring white oversize gravel. *See* Lambert Int. Resp., Exhibit G, at No. 7. This resulted in Simcala purchasing extensive aggregate materials from Alabama Gravel and terminating their relationship with TCC. Alabama Gravel's product was hauled to Simcala by Carol's Contracting and Lambert.

Mr. Lambert also admits to answering telephone calls on behalf of Carol's Contracting when Simcala and Alabama Gravel have called requesting aggregate hauls. *See id.* He also admits to speaking with Jim Maddox, another TCC customer about loading rail cars with aggregate and using Carol's Contracting as a trucking company. *See id.* at No.8. He also hauled aggregate to Mr. Maddox in a Carol's Contracting truck. *See id.* He also admits to speaking with two representatives from Globe Metallurgical, another major TCC customer, about quantities of white oversize gravel they wanted Carol's Contracting to haul. *See id.* at No.11.

Carol's Contracting's argument also over-simplifies its business and its relationship with Mr. Lambert. It is clear from the above admissions from Mr. Lambert, that there is at least a fact dispute as to the true interrelationship between Mr. Lambert and Carol's Contracting. Similarly, Mr. Lambert's admissions suggest that Carol's Contracting was much more that a trucking company. Carol's Contracting was actually a supplier and direct competitor of TCC. Mr.

Lambert brokered deals and used Carol's Contracting as a delivery vehicle.[6][7]

It should also be recognized that TCC has not had the opportunity to depose Mr. Lambert or anyone from Carol's Contracting or Alabama Gravel.  Discovery does not close until October 6, 2006.  These depositions and related additional discovery will yield even more information about Carol's Contracting's improper actions.[8]

    **C.**    *Carol's Contracting's Actions Have Not Been "Minimal"*

Carol's Contracting appears to also argue that it has only had "minimal interactions" with TCC's customers and could not, therefore, tortiously interfere.  This argument ignores the fact that Carol's Contracting hired Mr. Lambert to drive trucks and facilitated Mr. Lambert's constant interaction with TCC's customers.  With Carol's Contracting's assistance, it is becoming increasingly apparent that Mr. Lambert may never have left the sand and gravel business in the

---

[6] Carol's Contracting also takes the position that it cannot tortiously interfere because, it alleges, TCC has never been in the trucking business.  Carol's Contracting therefore claims it cannot be a competitor of TCC.  There are several reasons this argument fails.  It ignores the fact that TCC is and has been in the trucking business.  TCC owned a trucking subsidiary that hauled aggregates that was sold to Lafarge along with the ready-mix business in April 2004.  *See* Foley Tr., Exhibit C, at 32.8-35.19.  TCC remains involved in the trucking business in that it hires hauling companies to deliver aggregate to its customers.  *Id*.  Carol's Contracting also ignores the fact that TCC delivers large quantities of aggregate via rail.  *See* Transcript from Deposition of Danny Luster ("Luster Tr."), taken March 29, 2006, copies of pertinent portions of which are attached as Exhibit H hereto, at 56.4-.14.  Trucking aggregate competes with this form of delivery.  Finally, Carol's Contracting incorrectly assumes that it is not a supplier.  Mr. Lambert's admissions contradict this.

[7] Carol's Contracting also implies in its motion that TCC is trying to improperly stifle competition.  This has become a repeated inaccuracy during the course of Defendants' deposition taking.  In fact, TCC is doing nothing more than seeking the benefit of the bargain it reached with Mr. Lambert.  TCC is entitled to all the protections afforded by law with respect to this bargain, including the rights to have the contract enforced and not to have its contractual relations improperly impaired.

[8] TCC does not consider these depositions and additional discovery "essential" to opposing Carol's Contracting's motion.  But, to the extent the Court does not consider it at least a question of fact as to the true nature of Carol's Contracting's business and its interrelationship with Mr. Lambert, TCC hereby certifies, in accordance with the Court's May 2, 2006 Order, that the additional discovery is necessary to opposing the motion, that TCC has, through no fault of its own, been unable to gather this discovery in the form of affidavit or other sworn testimony, and that it should be given until October 6, 2006 to collect this discovery.  *See* Sorrell Aff. at ¶6.  "[S]ummary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery."  *Snook*, 859 F.2d at 870; *e.g.*, *Littlejohn*, 483 F.2d at 1145; *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d at

territory at issue as he was contractually obligated to do so.  By his own admissions, he stayed in contact with customers and put them in touch with suppliers and a hauling operation.[9]

Carol's Contracting also improperly assumes that its hauling to Simcala, Globe and Mr. Maddux, all TCC customers is "minimal."  In fact, this interaction involving Mr. Lambert was a critical factor in TCC losing Simcala as a customer entirely and in losing business to Globe and Mr. Maddux.

### D. *TCC Is Entitled To Damages Suffered After April 1, 2005*

Carol's Contracting next argues that at a minimum, TCC should not be able to recover damages suffered after April 1, 2005.  This is a repetition of Mr. Lambert's argument that TCC was not in the sand and gravel business and that Alabama Gravel and Carol's Contracting never combined on any sale or shipment of gravel after that date.  Again, TCC has already demonstrated why April 1, 2005 has no significance in terms of standing.  The same argument applies for damages after April 1, 2005.  TCC was in the sand and gravel business and is entitled to pursue damages before and after that date.

### E. *TCC's Conspiracy Claims Remain Viable*

Carol's Contracting's final argument is that TCC's conspiracy claims (Counts V and VI) allegedly fail because there is no tortious interference claim.  As shown above, summary judgment would be inappropriate on the tortious interference claim.  As a result, Carol's Contracting's argument against the conspiracy claims fails as well.

---

609 ("[s]ummary [j]udgment should not, therefore, ordinarily be granted before discovery has been completed").

[9]  It is worth noting that the most frustrating thing about this case is the way Mr. Lambert and Carol's Contracting attempt to "spin" their interactions.  The bottom line is that Mr. Lambert used Carol's Contracting and Carol's Contracting used Mr. Lambert to remain active in the aggregate business so that Carol's Contracting would have increased profits during the time the covenant was in effect and so that Mr. Lambert would have an improper head start in opening his aggregate production business after the covenant expired.  All this denies TCC of the benefit of its bargain.

   *    *    *    *    *

In summary, Carol's Contracting has cited no arguments entitling it to summary judgment. Its motion should be denied in its entirety.

## CONCLUSION

For the foregoing reasons, TCC respectfully submits that Mr. Lambert's and Carol's Contracting's summary judgment motions should be denied in their entirety.

This the 23rd day of May, 2006.

                  /s/Robin G. Laurie
                  Robin G. Laurie (ASB-4217-U64R)
                  One of the Attorneys for Plaintiff The
                  Concrete Company
                  BALCH & BINGHAM LLP
                  P. O. Box 78
                  Montgomery, Alabama 36101
                  Telephone: (334) 834-6500
                  Facsimile: (334) 269-3115
                  rlaurie@balch.com

Thomas F. Gristina, Esquire
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
1043 Third Avenue
P.O. Box 1199
Columbus, GA 31902-1199

William L. Tucker, Esquire
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
1111 Bay Avenue, Third Floor, Synovus Centre
Columbus, Georgia 31901

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 23rd day of May, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Dennis R. Bailey, Esquire
Rushton, Stakely, Johnston & Garrett
P. O. Box 270
Montgomery, Alabama 36101-0270

James N. Walter, Jr., Esquire
Capell & Howard, P.C.
P. O. Box 2069
Montgomery, Alabama 36102-2069

Chad W. Bryan, Esquire
Capell & Howard, P.C.
P. O. Box 2069
Montgomery, Alabama 36102-2069

                 /s/Robin G. Laurie
                 OF COUNSEL