# EXHIBIT B

# FREEDOM COURT REPORTING

### Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
 5   THE CONCRETE COMPANY,
 6        Plaintiff,
 7   versus            2:05-CV-1026-D
 8   HARRY E. LAMBERT, et al.,
 9        Defendants.
10
11
12
13
14           * * * * * * * * * * * *
15
16      DEPOSITION OF DANNY LUSTER,
17   taken pursuant to stipulation and agreement
18   before Jackie Parham, Certified Shorthand
19   Reporter and Commissioner for the State of
20   Alabama at Large, in the law offices of Balch
21   & Bingham, 105 Tallapoosa Street, Montgomery,
22   Alabama, on Wednesday, the 29th day of March,
23   2006, commencing at approximately 1:30 p.m.
```

### Page 2

```
 1           APPEARANCES
 2   APPEARING ON BEHALF OF THE PLAINTIFF:
 3   THOMAS F. GRISTINA, ESQUIRE
 4   Page, Scrantom, Sprouse,
 5     Tucker & Ford
 6   1111 Bay Avenue
 7   Third Floor
 8   Columbus, Georgia 31901
 9
10   ROBIN LAURIE, ESQUIRE
11   Balch & Bingham
12   105 Tallapoosa Street
13   Montgomery, Alabama 36104
14
15   APPEARING ON BEHALF OF THE DEFENDANTS:
16   DENNIS R. BAILEY, ESQUIRE
17   Rushton, Stakely, Johnston
18     & Garrett
19   184 Commerce Street
20   Montgomery, Alabama 36104
21
22   Also present: Harry and Carol Lambert
23
```

### Page 3

```
 1   JAMES N. WALTER, JR., ESQUIRE
 2   Capell & Howard
 3   150 South Perry Street
 4   Montgomery, Alabama 36104
 5
 6   Also present: Dave Tuton
 7
 8           * * * * * * * * * * * *
 9              STIPULATION
10      It is hereby stipulated and agreed by
11   and between counsel representing the parties
12   that the deposition of
13              DANNY LUSTER
14   may be taken before Jackie Parham, Certified
15   Shorthand Reporter and Commissioner for the
16   State of Alabama at Large, without the
17   formality of a commission, and all formality
18   with respect to other procedural requirements
19   is waived; that objections to questions, other
20   than objections as to the form of the question,
21   need not be made at this time, but may be
22   reserved for a ruling at such time as the said
23   deposition may be offered in evidence or used
```

### Page 4

```
 1   for any other purpose, by either party, as
 2   provided for by the Federal Rules of Civil
 3   Procedure.
 4      It is further stipulated and agreed by
 5   and between the parties hereto and the witness
 6   that the signature of the witness to this
 7   deposition is hereby waived.
 8
 9
10           * * * * * * * * * * * *
11           INDEX OF EXAMINATION
12
13   MR. BAILEY ............................ 5
14   MR. WALTER ............................ 79
15   MR. BAILEY ............................ 95
16
17
18
19
20
21
22
23
```

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 9

1  Q.  Okay. What does he do?
2  A.  He works for Arvin Maritor (phonetic).
3  Q.  Was your father Clyde Luster?
4  A.  Clyde Luster, Junior, yes, sir.
5  Q.  Did he go to Forest Avenue School in
6      Cloverdale?
7  A.  I think he did. Yes, sir.
8  Q.  All right. I think I knew your father.
9  A.  Probably did.
10 Q.  Is he still alive?
11 A.  No, sir.
12     (Off-the-Record discussion)
13 Q.  Where did you say your brother, Clyde the
14     Third, lives?
15 A.  Here in Montgomery.
16 Q.  On Arlington?
17 A.  No, sir.
18 Q.  Where does he live?
19 A.  He works at Arvin Maritor. He lives on
20     Beechdale Drive.
21 Q.  Art America?
22 A.  Arvin Maritor.
23 Q.  All right. What does he do for them?

Page 10

1  A.  He's a warehouse manager, I believe.
2  Q.  Does he have a wife?
3  A.  Yes, sir.
4  Q.  Her name?
5  A.  Jennifer.
6  Q.  Does she work outside of the home?
7  A.  Yes, sir.
8  Q.  Where does she work?
9  A.  Wachovia.
10 Q.  Do you have any other brothers and sisters
11     in those counties?
12 A.  I have a sister. Yes.
13 Q.  Name?
14 A.  Freida Luster Margarite. Don't ask me how
15     to spell it.
16 Q.  What does she do?
17 A.  She works for Alabama Power Company.
18 Q.  And where does she live?
19 A.  She lives in Millbrook. Lillian Hill, I
20     believe is the street. Lillian Court.
21     Excuse me.
22 Q.  What's her husband's name?
23 A.  Rick.

Page 11

1  Q.  Where does he work?
2  A.  He works for -- I think it used to be --
3      It's Classic Cobb Pontiac. I don't know
4      if that's what the name of it still is.
5  Q.  Is he a salesman or a mechanic?
6  A.  He's a service manager.
7  Q.  Any other brothers or sisters?
8  A.  No, sir.
9  Q.  Who is your employer right now?
10 A.  Foley Materials Company.
11 Q.  How long have you been employed by them?
12     And I don't want to confuse you. I've
13     been told by Mr. Sorrell that that company
14     came into existence April 1st, 2005.
15 A.  All right. Let me see if I can clarify
16     that a little bit better. I started work
17     in the mining industry, if you want to
18     say, with Mr. Harry Lambert with
19     Montgomery Materials.
20 Q.  Okay.
21 A.  That was in January of 2001, I believe.
22 Q.  Now, it's my understanding that Harry
23     Lambert had a business called Montgomery

Page 12

1      Holdings and it formed an L.L.C. called
2      Montgomery Materials, L.L.C., which is the
3      name on this Exhibit 11, that did -- in
4      '97 that would have been in operation in
5      January of 2001. So with that
6      information, assuming it's true, would you
7      have been most likely employed by
8      Montgomery Materials, L.L.C.?
9  A.  Yes, sir. Because I don't know anything
10     about Montgomery Holdings or whatever.
11 Q.  You haven't ever heard of that one?
12 A.  No, sir.
13 Q.  Okay. And Harry Lambert hired you?
14 A.  Not directly, no, sir.
15 Q.  Who hired you?
16 A.  Actually, Jerry Walls is the one that
17     actually hired me.
18 Q.  What led you to seek employment or become
19     employed by Montgomery Materials?
20 A.  I had a high school friend of mine that
21     was helping me work on race cars at the
22     time by the name of Ray Rogers. And in
23     conversation it came up that they needed

3 (Pages 9 to 12)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

### Page 13

```
 1     somebody to drive a water truck that had a
 2     CDL, and I had a CDL.
 3  Q. A or B Class?
 4  A. Class A.
 5  Q. All right. Prior to that what had you
 6     done for a living?
 7  A. I had worked for my father's company,
 8     which was also my grandfather's company,
 9     Clyde's Potatoes, L.L.C.
10  Q. Is that a farming company or --
11  A. No, sir. We purchased potatoes bulk by
12     the truckload. And we brought them in and
13     we cleaned them up and processed them and
14     then bagged them and packaged them and
15     sent them -- shipped them out to places
16     like Winn-Dixie and Sunday Dinner.
17  Q. How far did you go in school? Did you
18     finish college, high school?
19  A. I finished high school and I have some
20     college.
21  Q. Where did you finish high school?
22  A. Robert E. Lee.
23  Q. Year?
```

### Page 14

```
 1  A. 1994.
 2  Q. And what college did you attend?
 3  A. Troy State in Montgomery.
 4  Q. What course of study did you pursue there?
 5  A. Business management.
 6  Q. How many years or quarters, semesters?
 7  A. Just a little over halfway.
 8  Q. And then you went into your family
 9     business?
10  A. I was already in my family business at the
11     time. Yes, sir.
12  Q. You left school to go full-time into the
13     business?
14  A. Yes, sir.
15  Q. Any military?
16  A. No, sir.
17  Q. When did you first meet Harry Lambert?
18  A. I can't give you an exact time, date. It
19     would have been sometime, I guess,
20     probably within a couple of months after I
21     started working for Montgomery Materials.
22  Q. I think you said that happened sometime in
23     January of 2001?
```

### Page 15

```
 1  A. Yes, sir.
 2  Q. And when you started you would have been
 3     driving a water truck?
 4  A. A water truck. Yes, sir.
 5  Q. And what is a water truck used for on a
 6     job like that?
 7  A. Used for dust suppression on haul roads
 8     and customer roads.
 9  Q. By haul roads and customer roads, what do
10     you mean?
11  A. Roads that we transport materials on.
12     Haul roads, we transport material from the
13     pit to the plant. And the customer roads
14     would be like our front entrance road that
15     the customers actually come off the
16     highway, come into the plant and get
17     loaded.
18  Q. Okay. When you began working with
19     Montgomery Materials, L.L.C., was
20     Montgomery Materials, L.L.C. in the
21     business of operating trucks for the
22     delivery of product to customers?
23  A. I don't think so. But that wasn't -- I
```

### Page 16

```
 1     mean, I drove a water truck. It wasn't my
 2     place to find out where all the material
 3     went or anything like that.
 4  Q. Based on the way it was operated at the
 5     time, is it true that most of the time the
 6     customer would come to the location where
 7     the product was stored over the customer
 8     road on Montgomery Materials' property and
 9     pick up the material there and haul it
10     either in their own trucks or trucks they
11     hired to do that?
12  A. Or possibly trucks that we hired to do
13     that. I mean, I'm not -- Again, I'm not
14     real sure.
15  Q. How that worked?
16  A. Because I wasn't involved in that.
17  Q. How long were you involved basically in
18     keeping the dust suppression down on the
19     pit roads?
20  A. Three or four months.
21  Q. What was your next job?
22  A. Jerry Walls left, and when he left, Ray
23     Rogers, which was at that time the current
```

**FREEDOM COURT REPORTING**

Page 29

1  Q.  Mr. Sorrell.
2  A.  No, sir. Not to my knowledge.
3  Q.  Tell me what you can remember saying to
4      Harry Lambert or him saying to you when he
5      was there operating a truck.
6  A.  There's no way I can -- I mean, that's too
7      far back for me to remember exact
8      conversations.
9  Q.  Fine. Is there anything about that you do
10     remember?
11 A.  I do remember seeing Mr. Harry and I do
12     remember speaking with him.
13 Q.  Was it just casual conversation?
14 A.  Yes, sir. Just casual conversation.
15 Q.  Has anyone from Foley Materials or The
16     Concrete Company asked you about Harry
17     Lambert driving trucks other than their
18     lawyers?
19 A.  Me and Mr. Talley talked about it before.
20 Q.  When Mr. Talley was the manager?
21 A.  Yes, sir.
22 Q.  What did you and he talk about?
23 A.  We talked about that Mr. Talley had

Page 30

1      actually seen Mr. Harry over at the Dozier
2      plant before hauling materials.
3  Q.  And did Mr. Talley indicate or say to you
4      that he thought that there's something
5      wrong with Harry driving a truck to haul
6      materials?
7  A.  No, sir.
8  Q.  I think you testified that, to the best of
9      your recollection, you saw Harry at the
10     City Pit within a month or two after the
11     sale occurred. Would that be fair?
12 A.  That'd be fair. Yes, sir.
13 Q.  So that would have been sometime in 2002.
14     Had you seen him at the City Pit as a
15     truck driver or otherwise after 2002?
16 A.  At the City Pit, no, sir.
17 Q.  Had you seen him as a truck driver
18     anywhere else after 2002?
19 A.  As a truck driver, no, sir.
20 Q.  When was the first time that you were
21     told, rumor or otherwise, that Mr. Lambert
22     had some kind of a Non-Compete Agreement
23     with The Concrete Company?

Page 31

1  A.  That would have been, I guess, sometime in
2      -- I don't know -- '03, '04. Somewhere in
3      there.
4  Q.  Who first brought that to your attention?
5  A.  I really can't recall that. I mean, I
6      don't remember that.
7  Q.  Do you recall what triggered that
8      conversation? Was there any event that
9      caused that discussion to --
10 A.  I can't recall any of that. No, sir.
11 Q.  Since you talked to Harry Lambert in 2002
12     when he was there delivering material and
13     prior to today, had you had any
14     conversations with him about anything
15     related to what he was doing for a living
16     or to make a living or --
17 A.  Not making a living, no, sir. But I did
18     speak with Mr. Harry Lambert on one other
19     occasion. Yes, sir.
20 Q.  When was that, approximately?
21 A.  Approximately January of '04 -- '05.
22     Excuse me.
23 Q.  Where was that conversation?

Page 32

1  A.  At our Shorter plant.
2  Q.  And what was the context?
3  A.  It was on a Saturday. He come in. We was
4      doing some work there at Shorter. And I
5      was in the office doing some paperwork.
6      And he come in and asked me if I knew who
7      I was shaking hands with, because he
8      extended his hand just as friendly as he
9      always had been. And I said, "Yes, sir, I
10     sure do." And he said that it wouldn't be
11     long and that he had a few surprises for
12     some people.
13 Q.  Wouldn't be long what?
14 A.  He didn't specify what. But I took that
15     to mean that he would be getting back in
16     the business.
17 Q.  At the point in time you had that
18     conversation with him were you aware that
19     there was any Non-Compete Agreement in
20     existence?
21 A.  I had heard mumblings of that. Yes, sir.
22 Q.  Prior to that conversation?
23 A.  Yes, sir. Prior to that conversation.

8 (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 33

1  Q.  Was there anything else said that you can
2      remember, other than what you've just
3      said?
4  A.  There was an unflattering comment made.
5      Yes, sir.
6  Q.  What was that?
7  A.  About one of my bosses. He said, you
8      know, that there's going some surprises.
9      And he didn't care if I told the four-eyed
10     F'er --
11         MR. GRISTINA:  Say exactly what
12             he said on the Record. It's
13             okay.
14 A.  He said he didn't care if I told the
15     four-eyed fucker.
16 Q.  What?
17 A.  That he had some surprises for some folks.
18 Q.  When in January do you recall this
19     happening?
20 A.  In January.
21 Q.  When in January?
22 A.  I can't remember the exact day.
23 Q.  It was a Saturday?

Page 34

1  A.  Yes, sir. I know it was a Saturday.
2  Q.  Was the plant operating?
3  A.  I think it was.
4  Q.  Or was just maintenance being done?
5  A.  I think we were operating. I think we was
6      rewashing some material.
7  Q.  All right. Now, at this plant, the Dozier
8      plant, who else was present when that
9      conversation --
10 A.  This was not at the Dozier plant.
11 Q.  Okay. Where was it?
12 A.  This was at the Shorter plant.
13 Q.  Who was at the Shorter plant in the
14     vicinity where you were having this
15     conversation with Harry?
16 A.  It was just me and Mr. Harry and some
17     other gentleman that was riding with
18     Mr. Harry.
19 Q.  Do you know who that was?
20 A.  No, sir.
21 Q.  At that point in time what plants were you
22     managing?
23 A.  At that point in time I was still in

Page 35

1      charge of 512, which is City Pit, 503,
2      which is Tysonville, and 502, which is
3      Shorter.
4  Q.  Which one of those plants, if any, were
5      producing quantities of white oversize
6      gravel?
7  A.  That would be our Shorter plant.
8  Q.  502, right?
9  A.  Yes, sir.
10 Q.  Do you recall a problem with producing
11     sufficient quantities of white oversize
12     gravel occurring at that plant around
13     January of 2005?
14 A.  No, sir. I've never had a problem
15     producing material at that plant.
16 Q.  Have you ever told anyone that you were
17     running out of white oversize gravel?
18 A.  We've never run out of white oversize
19     gravel. No, sir.
20 Q.  Have you ever been advised by anyone that
21     you had quotas on the amount of white
22     oversize gravel you could sell to a
23     particular customer?

Page 36

1  A.  No, sir. I don't handle sales.
2  Q.  Were you ever made aware that a customer
3      buying white oversize gravel was told they
4      could not purchase as much as they wanted?
5  A.  No, sir. Again, that's not anything in my
6      department.
7  Q.  As the manager of those pits you don't get
8      involved in sales?
9  A.  No, sir. My job is to put it on the
10     ground.
11 Q.  And when somebody wants to buy it they
12     don't even contact you?
13 A.  From time to time people will contact me.
14     But if they do, I'll pass them on to my
15     salesman, Leroy Bush. I'll give them his
16     telephone number and tell them to call
17     him.
18 Q.  Are you even knowledgeable as to what
19     price the particular materials are being
20     sold for?
21 A.  No, sir.
22 Q.  Do you make any arrangements for delivery
23     of material?

**FREEDOM COURT REPORTING**

Page 45

1  A.  Not that I can recall straight off my
2      head. No, sir.
3  Q.  Tell me what leads you to the belief that
4      Harry Lambert is building a sand and
5      gravel plant in Deatsville.
6  A.  Well, I had actually heard rumors of it,
7      that the no-compete clause was getting
8      close to being over with and that it
9      wouldn't be long that he would be back in
10     it. And then I heard from Denny -- and I
11     can't remember his last name. He's the
12     Alabama State DOT guy --
13 Q.  Okay.
14 A.  -- that goes around and makes sure
15     everybody is testing, you know, the gravel
16     to make sure that it meets DOT specs --
17     that he was going to be getting back in it
18     somewhere in the Deatsville area.
19 Q.  Okay. Is there anything else about that
20     you've heard?
21 A.  Other than he's getting back in it, no,
22     sir.
23 Q.  And you heard that from Denny who checks

Page 46

1      gravel for DOT?
2  A.  Yes, sir.
3  Q.  Alabama DOT?
4  A.  Yes, sir. Alabama DOT.
5  Q.  Have you been able to confirm whether or
6      not that's true by any investigation or
7      any source?
8  A.  I haven't confirmed that it's actually
9      Mr. Lambert, but I have confirmed that
10     there is a plant being built there.
11 Q.  Tell me how you did that.
12 A.  I went and rode around and found what
13     looked to be like a sand and gravel plant
14     going into operation.
15 Q.  And when did you do that?
16 A.  I guess it would have been fall of last
17     year.
18 Q.  Did anyone go with you?
19 A.  Yes, sir.
20 Q.  Who?
21 A.  Billy Ammons.
22 Q.  What led you to want to find the location
23     of this rumored plant? Were you

Page 47

1      instructed to do that by anybody or was
2      that just your own --
3  A.  I just wanted to go see. I wanted to see
4      if it was a rumor or if it was true.
5  Q.  Okay. This rumor, did it include a
6      precise enough location for you to know
7      where to go or did you have to search
8      around?
9  A.  I pretty much -- It was pretty much
10     specific where it was. Yes, sir.
11 Q.  What was the rumor as to the location?
12 A.  It was right there -- right there by the
13     railroad tracks in downtown Deatsville
14     right by the post office.
15 Q.  Is that where you found something?
16 A.  Yes, sir.
17 Q.  How far from the post office would it be?
18 A.  Less than a mile from the post office.
19 Q.  Were there any signs or any indications as
20     to who was engaging in any operations on
21     that property?
22 A.  No, sir.
23 Q.  What did you find and what did you see

Page 48

1      when you got there?
2  A.  I found a road. I drove down the road,
3      and I saw what looked like some people
4      were building a hopper. And at that point
5      I turned around and left.
6  Q.  Who did you -- How many people were
7      building the hopper?
8  A.  It looked to be about two people.
9  Q.  Did you know either one of them?
10 A.  Yes, sir.
11 Q.  Who were they?
12 A.  One of them was a fellow by the name of
13     Sean. I don't know his last name. And
14     the other guy, I've seen him before but I
15     don't know his name.
16 Q.  Where have you seen him?
17 A.  I've seen him doing some work at some of
18     our plants.
19 Q.  For what company does he work, if you
20     know?
21 A.  He works for a private contractor. Allan
22     King.
23 Q.  And who do you understand Sean works for?

12 (Pages 45 to 48)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 49

1  A.  Allan King.
2  Q.  And you knew Sean how?
3  A.  Because he's done work for us through
4      Allan King at some of our other plants.
5  Q.  Did you talk to Sean or this other guy
6      about who had hired them to do the work on
7      that property?
8  A.  I didn't talk to any one of them at that
9      time, no, sir. I just turned around and
10     drove back out.
11 Q.  Have you ever talked to either one of them
12     to ask them, "Who are you working for?"
13 A.  I've talked to Allan King before.
14 Q.  When did you do that?
15 A.  Along about that same time.
16 Q.  When you recognized that they worked for
17     Allan King, did you pick up the phone and
18     call him? Is that what you did?
19 A.  Call Allan?
20 Q.  Yeah.
21 A.  No.
22 Q.  What did you do?
23 A.  From time to time we'll call Allan to come

Page 50

1      out to work on different things for us,
2      electrical matters and whatnot.
3  Q.  Well, at some point in time when you were
4      calling him to do something for your
5      plant, did you ever engage him in any
6      conversation about what was going on at
7      Deatsville?
8  A.  I had asked him, yes, sir, what was going
9      on.
10 Q.  Tell me what he told you in as much detail
11     as you remember.
12 A.  He told me they was building a plant. He
13     would not specifically say for who, but
14     that I did know the person that he was
15     building a plant for.
16 Q.  Did he tell you anything else?
17 A.  Not that I can recall. No, sir.
18 Q.  Now, whenever you went out to Deatsville
19     with Billy Ammons and saw what you saw,
20     did you report that information to anyone
21     at Foley Materials?
22 A.  I did let Mr. Hugh Sorrell know shortly
23     after that I had seen.

Page 51

1  Q.  What did you tell him?
2  A.  I told him that they was putting up --
3      looked to me like they was putting up a
4      sand and gravel plant right there at
5      Deatsville.
6  Q.  And who did you tell him was putting it
7      up?
8  A.  I told him that I had seen, you know,
9      somebody there that I had recognized and I
10     told him that I thought that might be
11     Mr. Lambert's place.
12 Q.  What made you think that was Mr. Lambert's
13     place at that point?
14 A.  Well, because I had heard rumors that
15     that's who it was and had heard rumors
16     that that was going to be a plant there.
17     And it was just kind of through the
18     grapevine that that was going to be his
19     plant.
20 Q.  Can you give me any specifics on who gave
21     you that information?
22 A.  I can't recall exactly who said what. No,
23     sir.

Page 52

1  Q.  When you went out and looked at what was
2      going on in Deatsville at that time, had
3      you been already made aware by Mr. Sorrell
4      or anyone else that they were looking to
5      take some kind of legal action or they
6      were suspicious that Harry was in
7      violation of some Non-Compete Agreement?
8  A.  No.
9          MR. GRISTINA: Hang on a second
10         before you answer that. I'm
11         going to object to that
12         question because I believe
13         it's based on the
14         attorney-client e-mail that
15         was inadvertently produced.
16         Go ahead, though.
17     MR. BAILEY: He's already
18         answered.
19     MR. GRISTINA: What was your
20         answer?
21     THE WITNESS: No.
22 Q.  When you reported what you saw to
23     Mr. Sorrell, did he tell you to do

13 (Pages 49 to 52)

Page 57

1  form. You may answer.
2  A. I guess not.
3  Q. Have you ever seen --
4  A. I've never seen a truck with Foley
5  Materials' name on the side of it. No,
6  sir.
7  Q. And the trucks that do haul are usually
8  contract carriers or owned by the customer
9  who's picking up?
10 A. I'd say so. Yes, sir.
11 Q. When Harry was the owner of the company,
12 was he a truck driver?
13 A. You've already asked me that question
14 before.
15 Q. I thought I asked you a little different.
16 But I just wanted to ask you if --
17 A. I don't -- Depends on how you define the
18 word "truck driver." Does he have a CDL?
19 I don't know the answer to that question.
20 I do know I've never seen him drive a
21 truck when he was the owner of Montgomery
22 Materials.
23 Q. Okay. Was the first time you had ever

Page 58

1  seen him driving a truck loaded with -- or
2  maybe about to be loaded with sand or
3  gravel was when you saw him at Montgomery
4  Materials back in 2002?
5  A. Yes, sir.
6  Q. Do you know anything about a company
7  called Alabama Gravel?
8  A. I've heard the name before. Yes, sir.
9  Q. Other than through lawyers where have you
10 heard the name?
11 A. That's been just about it.
12 Q. Leroy Bush is a salesperson?
13 A. Leroy Bush, yes, sir.
14 Q. Have you talked to Leroy Bush about
15 anything he has to offer relating to Harry
16 Lambert and some claims against Harry
17 Lambert by The Concrete Company?
18 A. Not that I can recall.
19 Q. Has he provided you any information that
20 indicated that Harry Lambert was violating
21 a Non-Compete Agreement?
22 A. Not that I can recall.
23 Q. Do you know whether you've ever seen a

Page 59

1  Carol's Contracting truck?
2  A. I know I've seen the truck that Mr. Harry
3  drove and the truck that the other two
4  drove.
5  Q. Did it appear to be for the same company,
6  those trucks you're talking about?
7  A. I know Mr. Harry was driving the truck.
8  Q. Right. What I mean is, were the trucks
9  similar enough in color or configuration
10 to lead you to believe they were owned by
11 the same company or person?
12 A. I can't say that I got that from looking
13 at the trucks.
14 Q. What did you get that from?
15 A. I got that from the fact that Mr. Harry
16 was in one and the two employees that said
17 they were working for Mr. Harry driving
18 the trucks. So I just kind of figured
19 that if they say they're working for him
20 and he's driving a truck and they're
21 driving trucks, they're his trucks.
22 Q. Okay. The two employees had worked with
23 you at Montgomery Materials?

Page 60

1  A. Yes, sir.
2  Q. What had they done for Montgomery
3  Materials when they worked there?
4  A. Grady Parker was a loader operator, and
5  John Parker drove one of our dump trucks
6  from the pit to the plant as well as run a
7  loader for us and an excavator.
8  Q. Do you know why they left Montgomery
9  Materials?
10 A. I don't know specifically why they left.
11 But I know as soon as they did leave they
12 were working for Mr. Harry driving trucks.
13 Q. And how do you know that?
14 A. Because that's what they said.
15 Q. Were they terminated, or were they asked
16 to leave, or did they leave on their own?
17 A. They left on their own.
18 Q. Did they have CDLs?
19 A. As far as I know, yes, sir.
20 Q. Did they have any Non-Compete Agreements,
21 to your knowledge?
22 A. To my knowledge, no, sir.
23 Q. Have you been asked to sign a Non-Compete

15 (Pages 57 to 60)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 77

1  A. Five, six hundred acres.
2  Q. Of that five or six hundred acres, in your
3     judgment, how much -- how many acres
4     should be mined for the purpose of getting
5     material or is minable?
6  A. We can pretty much mine all of it.
7  Q. Okay. On a normal day how many acres or
8     portions of acres are mined?
9  A. I couldn't tell you how many in acres. I
10    could tell you in a normal day we produce
11    3400 tons.
12 Q. If you're going to fully mine that
13    property, at some point it's going to be
14    exhausted, right?
15 A. That property will be. Yes, sir.
16 Q. You would have mined it all?
17 A. Yes.
18 Q. And at what percentage of that process, in
19    your judgment, are you halfway through
20    mining that whole property or just getting
21    started or a few years from being --
22 A. We've got at least three to five more
23    years of minable property.

Page 78

1  Q. And how long has that property been mined,
2     if you know?
3  A. Well, there's been different properties
4     that have been mined. But I think that
5     plant has been there since '94, '95,
6     somewhere in that neighborhood.
7  Q. Now, if you went to seven-day-a-week
8     operation, the period of time it would
9     take to exhaust the property would be
10    shorter, wouldn't it?
11 A. Yes, sir.
12 Q. So your estimation of three to five years
13    is based upon operating how often?
14 A. Based on 3400 tons a day, probably four
15    days a week.
16 Q. Based on your knowledge of the business,
17    if a customer wanted you to increase
18    production of white oversize gravel at
19    Shorter, do you know of any reason that
20    you wouldn't do that that's based on
21    mining issues?
22 A. Not that I'm aware of. No, sir.
23 Q. Do you keep tabs on the fluctuation of the

Page 79

1     prices of white oversize?
2  A. No, sir. That's not my part.
3  Q. Who are the competitors, if you know, for
4     white oversize gravel in this area?
5  A. I'm not sure.
6  Q. Do you consider the trucking companies
7     that come to the plant to pick up material
8     for customers to be competitors of Foley
9     Materials?
10 A. I wouldn't think so. No, sir. I would
11    think they're just what you said,
12    customers.
13 Q. Or trucking companies for customers,
14    right?
15 A. I would think they would be customers.
16 Q. Let me take a break and talk to my client.
17    (Brief recess)
18 A. One other thing I'd like to add. On Allan
19    King, he did tell me that it was my former
20    boss. He didn't name specific names, but
21    he did tell me it was my former boss.
22    EXAMINATION
23 BY MR. WALTER:

Page 80

1  Q. All right. Mr. Luster, my name is Jimmy
2     Walter. We met a little while ago when
3     you came in.
4  A. Yes, sir.
5  Q. And this is Mr. Dave Tuton with Alabama
6     Gravel. Let me ask you some general
7     questions. You said earlier that -- I
8     think that you had just heard of Alabama
9     Gravel; is that correct?
10 A. Yes, sir.
11 Q. Do you know anyone who works for Alabama
12    Gravel?
13 A. No, sir.
14 Q. Have you ever met Dave Tuton before today?
15 A. No, sir.
16 Q. Do you know a Mr. Robert Alexander?
17 A. I've heard the name before, but I do not
18    know him.
19 Q. Who have you heard his name from?
20 A. I can't recall. I just know I've heard
21    that name.
22 Q. Do you recall anything about him or what
23    you were told about him, other than just

20 (Pages 77 to 80)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1  Q. Now, there's a note down here that says --
2     appears to say "Dick wants 900 to 1000
3     tons per week." Do you recall him
4     discussing someone named Dick wanting 900
5     to 1000 tons per week?
6  A. I've heard the name Dick before in
7     relation with Globe, I believe it is. But
8     I don't know as far as whatever that is.
9     These aren't my notes. So, I mean, I
10    wasn't privy to them.
11 Q. Have you heard a discussion about someone
12    wanting 900 to 1000 tons per week from
13    your plant?
14 A. As far as what, I mean, I don't know.
15    That could be anything. I've heard 900 or
16    1000 tons per week. I've heard that
17    before. I've heard wants 40,000 tons of
18    sand for this job. I've heard "X" amount
19    of tons of gravel for this job. So, I
20    mean, I can't tell you what that says.
21 Q. Have you heard a reference to someone
22    wanting 900 to 1000 tons of white oversize
23    gravel per week?

Page 94

1  A. Not that I can recall.
2  Q. And have you ever heard of Dick Wymer?
3  A. Yes, sir.
4  Q. And he's with Simcala, isn't he?
5  A. I don't -- Simcala, Globe. I mean, I
6     don't know.
7  Q. One of those two?
8  A. Yes, sir.
9  Q. Have you had any discussions with
10    Mr. Sorrell about Dick Wymer or Dick Wymer
11    wanting certain product?
12 A. Not that I know of.
13 Q. Have you attended any meetings with people
14    from either Simcala or Globe?
15 A. No, sir. Again, like I told him earlier,
16    you know, that's not what I do.
17 Q. Where was Montgomery Materials' office
18    located here in Montgomery? What was the
19    physical address?
20 A. It was located on Oliver Road.
21 Q. 739 Oliver Road?
22 A. I guess that's the address. Yes, sir.
23 Q. And how long has that office been shut

Page 95

1     down?
2  A. That's a good question. I guess it would
3     have been shut down shortly after the
4     split-up between Montgomery -- you know,
5     Mr. Harry and Mr. Foley.
6  Q. So about 2002, right in that area?
7  A. I couldn't argue with that.
8  Q. Do you know who's in that location now?
9  A. No, sir.
10 Q. I think I've asked you this. But when did
11    production start up at the Tysonville
12    plant?
13 A. First part of this year.
14    (Brief recess)
15    MR. WALTER: That's all I have.
16    MR. BAILEY: I have a few more.
17    REEXAMINATION
18 BY MR. BAILEY:
19 Q. Mr. Luster, do you have any knowledge as
20    to the general reputation of Foley
21    Materials in this area as a business?
22 A. I'm not sure what you mean.
23 Q. What is the reputation of that company, if

Page 96

1     you know, in this area?
2  A. As far as I know, everybody knows that we
3     have good, clean material.
4  Q. All right. Do you know the reputation of
5     Mr. Foley in this area?
6  A. Again, you know, that he runs Foley
7     Materials, The Concrete Company and Foley
8     Products. And they would be about the
9     same, I would imagine.
10 Q. You referenced a conversation you had with
11    Mr. Lambert where he said something
12    derogatory about a person who wore
13    glasses, like four-eyed somebody.
14 A. Yes, sir.
15 Q. Who did you think he was talking about?
16 A. Well, it couldn't have really been too
17    many people that he was talking about.
18 Q. Well, who did you assume?
19 A. I assumed he was talking about Mr. Foley.
20 Q. That's the first person you've ever heard
21    say something like that about Mr. Foley?
22 A. I'd have to say so. Yes, sir.
23 Q. And the only person you've ever heard say

24 (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660