# EXHIBIT C

# FREEDOM COURT REPORTING

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THE CONCRETE COMPANY,
    Plaintiff,
versus    2:05-CV-1026-D
HARRY E. LAMBERT, et al.,
    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF HORALD SORRELL, taken pursuant to stipulation and agreement before Jackie Parham, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, in the law offices of Balch & Bingham, 105 Tallapoosa Street, Montgomery, Alabama, on Tuesday, the 28th day of March, 2006, commencing at approximately 9:00 a.m.

### Page 2

APPEARANCES
APPEARING ON BEHALF OF THE PLAINTIFF:
THOMAS F. GRISTINA, ESQUIRE
WILLIAM L. TUCKER, ESQUIRE
Page, Scrantom, Sprouse,
  Tucker & Ford
1111 Bay Avenue
Third Floor
Columbus, Georgia 31901

ROBIN LAURIE, ESQUIRE
Balch & Bingham
105 Tallapoosa Street
Montgomery, Alabama 36104

APPEARING ON BEHALF OF THE DEFENDANTS:
DENNIS R. BAILEY, ESQUIRE
Rushton, Stakely, Johnston
 & Garrett
184 Commerce Street
Montgomery, Alabama 36104

Also present: Harry and Carol Lambert

### Page 3

JAMES N. WALTER, JR., ESQUIRE
Capell & Howard
150 South Perry Street
Montgomery, Alabama 36104

Also present: Dave Tuton

\* \* \* \* \* \* \* \* \* \* \* \*

STIPULATION

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of
    HORALD SORRELL
may be taken before Jackie Parham, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission, and all formality with respect to other procedural requirements is waived; that objections to questions, other than objections as to the form of the question, need not be made at this time, but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used

### Page 4

for any other purpose, by either party, as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby waived.

\* \* \* \* \* \* \* \* \* \* \* \*

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 21

1  A.  Yes.
2  Q.  Was Exhibit A in your mind considered an
3      asset of The Concrete Company?
4  A.  I would — I personally don't think it
5      would be an asset. No.
6  Q.  Is it your understanding that The Concrete
7      Company retained the rights with regard to
8      Exhibit A to the Complaint?
9  A.  I do not know that.
10 Q.  But The Concrete Company is not currently
11     in the business of aggregate in the
12     territory, is it?
13 A.  The Concrete Company is not.
14 Q.  And that's been true since April 1st,
15     2005, correct?
16 A.  Yes.
17 Q.  One of the first items that you have
18     indicated that you would be able to speak
19     for The Concrete Company about pertains to
20     the claim that Harry Lambert violated the
21     Non-Competition Agreement referenced in
22     the Complaint; is that correct?
23 A.  Yes.

Page 22

1  Q.  Let me show you a copy of the Complaint
2      and ask you whether or not this document
3      was approved by you for filing based upon
4      the information you had at the time that
5      led you to believe that Harry Lambert had
6      violated the Non-Competition Agreement
7      that was attached to this document.
8  A.  Okay.
9  Q.  And was it approved by you?
10 A.  Yes.
11 Q.  As of the time you filed this Complaint
12     for The Concrete Company through counsel,
13     what information did you have that led you
14     to believe that there had been a breach of
15     the non-competition provisions in Exhibit
16     A to the Complaint?
17 A.  We were aware that Mr. Lambert had
18     delivered materials to customers within
19     the area and had sold materials to
20     customers within the area. We were aware
21     that a mining operation was in the process
22     of being built in the Deatsville, Alabama
23     area and that Mr. Lambert was

Page 23

1      participating in overseeing the
2      construction of that plant. We were aware
3      that Mr. Lambert had visited a customer,
4      and that customer did not buy from us
5      after that visit. We were aware that
6      customers were calling Mr. Lambert either
7      on his cell phone or on an office phone to
8      Carol's Trucking and placing orders for
9      materials — aggregate materials. We were
10     aware that Carol's Trucking Company and
11     Alabama Sand and Gravel had the same
12     address as Mr. Lambert's home address.
13     That's the basic points.
14 Q.  Let me go through these with you. First
15     was, you said you were aware Mr. Lambert
16     delivered materials to customers within
17     the territory. When were you aware of
18     that?
19 A.  I would say sometime in September or
20     October.
21 Q.  Of what year?
22 A.  '05.
23 Q.  How did you become aware of that?

Page 24

1  A.  After we heard rumors that Mr. Lambert was
2      back in business again, I had two
3      customers tell me that.
4  Q.  Who were the two customers?
5  A.  Maddox Sand and Gravel and Willingham
6      Stone.
7  Q.  And who were the individuals?
8  A.  Jim Maddox and Randy Willingham.
9  Q.  What did Jim Maddox tell you?
10 A.  He told me when he needed gravel, that he
11     called Harry either on his cell phone or
12     Carol's phone — Carol's Trucking, I
13     believe is the name of the company, and
14     spoke with Harry and told him he needed
15     materials, and that the materials were
16     delivered based on that phone call.
17 Q.  Is that all he told you about that?
18 A.  That's all he told me.
19 Q.  Is there anything else you can remember
20     about that?
21 A.  No.
22 Q.  Did you make notes of that conversation?
23 A.  Yes, I did.

**Page 25**

1  Q. Have you turned those notes over to
2     counsel?
3  A. Yes, I have.
4  Q. What did Randy Willingham tell you?
5  A. He told me that he called Harry on his
6     cell phone and placed orders for materials
7     and the materials were delivered.
8  Q. What else did he tell you, if anything?
9  A. That's all he told me regarding that.
10 Q. Did you make notes of that conversation?
11 A. Yes, I did.
12 Q. And is it your best recollection that
13    these conversations occurred in September
14    or October of 2005?
15 A. That's my best recollection.
16 Q. You said you had heard rumors prior to
17    that of Harry being back in the business,
18    as you said.
19 A. Yes.
20 Q. Well, tell me what you had heard.
21 A. I had heard that Harry was opening up
22    again, which I assumed to be in
23    Deatsville, or he was in the business of

**Page 26**

1     selling. I mean, that's what I had heard.
2  Q. From whom had you heard that?
3  A. I do not recall who I heard that from.
4  Q. When had you heard that?
5  A. Toward the -- around that same time.
6  Q. Based upon the information you received
7     from Maddox and Willingham in that time
8     frame, what did you understand Mr. Lambert
9     to have been doing that would represent
10    going back into the sand and gravel
11    business?
12 A. Well, when they told me that they placed a
13    call and told him they needed materials
14    and he made the arrangements for them to
15    receive those materials, that indicated to
16    me that he was in the sand and gravel
17    business.
18 Q. When you say someone is in the sand and
19    gravel business, what do you mean?
20 A. Well, to me someone is in the sand and
21    gravel business in one of two -- Well, to
22    me, if they are taking orders and
23    delivering materials, that is in the sand

**Page 27**

1     and gravel business.
2  Q. When you say someone is in the sand and
3     gravel business, do you mean someone who
4     is in the business of buying and selling
5     aggregate?
6  A. Someone could be in the sand and gravel
7     business either in the business of buying
8     and selling gravel or buying and
9     extracting and selling gravel. Either
10    way.
11 Q. Foley Materials is in the sand and gravel
12    business?
13 A. Yes.
14 Q. Is it in the business in the sense that
15    you mean it? Is it in that business in
16    the sense you mean it when you describe
17    someone being in the business?
18 A. We are in the mining and excavating and
19    selling of gravel.
20 Q. Business?
21 A. Yes.
22 Q. Which means you sell it and obtain a
23    payment for it in most cases?

**Page 28**

1  A. Correct.
2  Q. All right. Does Foley Materials haul the
3     product to customers?
4  A. No.
5  Q. Foley Products -- Foley Materials, does it
6     haul product to customers?
7  A. Did you say Foley Products first?
8  Q. I think I did. If I did, I didn't mean
9     to. But I'm asking it now for Foley
10    Materials.
11 A. We do not haul materials to customers.
12 Q. Okay. Why not?
13 A. We have never elected to get into the
14    business of hauling product.
15 Q. With regard to the sales of product at
16    Foley Materials, who hauls the product
17    from the plants?
18 A. In some cases the customers furnish their
19    own trucks to pick up the materials. In
20    other cases what I would refer to as an
21    independent contract carrier would haul
22    the material.
23 Q. But who makes the arrangement for the

Page 29

1  hauling of material from Foley --
2  A. The customer normally makes that
3     arrangement, in fact, always does.
4     Because we sell our materials FOB plant.
5  Q. That means what?
6  A. What means what?
7  Q. FOB plant means what.
8  A. That means that we have a price at our
9     plant and the customer pays that price.
10    And then the customer pays the trucker for
11    any charges of hauling that material.
12 Q. So Foley Materials does not own trucks for
13    the purpose of hauling material for
14    delivery to customers?
15 A. That is correct.
16 Q. It probably owns some trucks that relate
17    to the mining operations, correct?
18 A. That is correct.
19 Q. But it doesn't employ over-the-road truck
20    drivers?
21 A. That's correct.
22 Q. Now, you mentioned that you were aware
23    Mr. Lambert delivered materials to

Page 30

1  customers within the territory. When you
2  say "he delivered," what do you mean? Did
3  he arrange for it or did he actually drive
4  a truck?
5  A. I mean he arranged. I do not know whether
6     he drove the truck or not. I was told he
7     arranged for the delivery of the material.
8  Q. Were you aware prior to September or
9     October 2005 that Mr. Lambert was driving
10    trucks for an independent trucking
11    company?
12 A. No, not before 2 -- I would say October --
13    September or October 2005. I became aware
14    of it at that point in time.
15 Q. How did you become aware of that?
16 A. That he was driving?
17 Q. Yes.
18 A. I heard it from one of our plant managers.
19 Q. Which one?
20 A. Danny Luster.
21 Q. What did Daniel tell you?
22 A. He told me that he had heard Mr. Lambert
23    was driving trucks delivering material.

Page 31

1  Q. For who?
2  A. That he was delivering material.
3  Q. Did he tell you for whom he was driving?
4  A. I think he -- I believe he told me that
5     Mr. Lambert had been in to our plants at
6     some time in the past.
7  Q. Did he ever tell you for whom he was
8     driving the trucks?
9  A. No.
10 Q. Did he tell you what customers he was
11    taking material to?
12 A. I'm --
13    MR. GRISTINA: Wait for him to
14       finish the question.
15    THE WITNESS: I'm sorry.
16    MR. GRISTINA: That's all right.
17 Q. Did you want to add to a prior answer?
18 A. I would ask you to -- if you could repeat
19    the question prior to the one that you
20    just started.
21 Q. I'll try to.
22 A. Okay.
23 Q. Did Mr. Luster tell you for whom

Page 32

1  Mr. Lambert was driving trucks?
2  A. Are you speaking of a customer or maybe a
3     trucking company?
4  Q. Trucking company.
5  A. Mr. Luster told me that he had heard that
6     Mr. Lambert had two trucks which
7     Mr. Lambert had on lease -- at one time
8     had had on lease with Foshee. He did make
9     that statement to me at some point
10    earlier.
11 Q. Did Mr. Luster or anyone at TCC advise you
12    as to who Mr. Lambert was delivering
13    product to that had been picked up at a
14    plant owned or operated by The Concrete
15    Company or Foley Materials?
16 A. No.
17 Q. Foshee Trucking, is that a firm you're
18    familiar with?
19 A. I've heard of them. I know of them. Yes.
20 Q. Are they a company that customers of your
21    firm utilize to haul material from
22    operations here in this area?
23 A. Yes. I'm sure they do. To what extent I

8 (Pages 29 to 32)

Page 77

1  A. Yes.
2  Q. And did they say they were calling Harry
3     Lambert on his cell phone? Did they tell
4     you that?
5  A. That's correct.
6  Q. And what office phone were they telling
7     you they used?
8  A. I understood it to be Carol's Trucking
9     or --
10 Q. Carol's Contracting Company?
11 A. Yes.
12 Q. Were you aware that Carol's Contracting
13    was in the trucking business before
14    September, October of 2005?
15 A. I did not know that. No. I could have
16    heard that in passing. But I could not
17    speak to that.
18 Q. Were you ever employed when Carol was a
19    bookkeeper for Montgomery Materials?
20 A. I was a consultant or independent
21    contractor, as you phrased it, to The
22    Concrete Company at that point in time.
23 Q. What did Carol do when you came to -- What

Page 78

1     was Carol doing and who was she working
2     for when you became the consultant for The
3     Concrete Company or whoever you were
4     consulting in June '04?
5  A. Are you asking me who she was working for
6     in June of '04?
7  Q. Well, you said you started in June '04 as
8     a consultant. Am I right?
9  A. No. I was a consultant to The Concrete
10    Company from approximately January 1 of
11    2000.
12 Q. Okay.
13 A. And prior to that I was an employee of The
14    Concrete Company.
15 Q. So you've been with The Concrete Company
16    how long on and off?
17 A. Since October 1 of 1995.
18 Q. All right. When did you first meet Carol
19    Lambert?
20 A. I have never officially met Carol. I've
21    heard of Carol, but I've never officially
22    met Carol Lambert.
23 Q. What was Carol Lambert doing in the

Page 79

1     aggregate business when you became
2     familiar with the operations in Montgomery
3     that would have involved The Concrete
4     Company?
5  A. I do not know, because I was not involved
6     in the aggregates at that point in time.
7  Q. Were you aware that she worked as the
8     bookkeeper for the joint venture between
9     The Concrete Company?
10 A. I probably heard that. But I do not know
11    that specifically.
12 Q. You said you had heard that Carol's
13    Trucking and Alabama Gravel had the same
14    address. Had you sent anyone out to look
15    at that address, to see where the home of
16    the Lamberts was in relation to this
17    office?
18 A. No. I did not send anyone out to look at
19    that.
20 Q. Do most sand and gravel businesses have an
21    office of some sort?
22 A. Yes, I would say they do.
23 Q. Do most sand and gravel businesses have a

Page 80

1     bookkeeper?
2  A. They need one. I would say they do.
3  Q. And do most sand and gravel businesses
4     that you compete with have somebody who'll
5     answer the phone and take orders?
6  A. I would say so. Yes.
7  Q. How did you learn that Carol's Trucking
8     and Alabama Gravel had the same address?
9  A. When we looked -- I looked on the
10    Secretary of State of Alabama's
11    corporations and saw that Carol's was in
12    -- had the address in Deatsville.
13 Q. When did you do that?
14 A. When did I do that?
15 Q. Yes.
16 A. I believe in August or September.
17 Q. Okay.
18 A. I can't recall exactly, now. But I know I
19    did it.
20 Q. Did you send anyone to the address in
21    Deatsville or to the mining operations for
22    Alabama Gravel to monitor what they were
23    doing, who was picking up the equipment

20 (Pages 77 to 80)