# EXHIBIT O

Page 1

1
2       IN THE UNITED STATES DISTRICT COURT
3       FOR THE MIDDLE DISTRICT OF ALABAMA
4               NORTHERN DIVISION
5
6    THE CONCRETE COMPANY,
7           Plaintiff,
8       vs.          CIVIL ACTION NO.
                 2005-CV-1026-CSC
9
     HARRY E. LAMBERT, CAROL'S
10   CONTRACTING, INCORPORATED, and
     ALABAMA GRAVEL, LLC,
11
           Defendants.
12
13       * * * * * * * * * * * * *
14
15       DEPOSITION OF DAVID TUTEN, taken
16   pursuant to stipulation and agreement before Tracye
17   Sadler, Certified Shorthand Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Balch & Bingham, Suite 200, 105
20   Tallapoosa Street, Montgomery, Alabama, on July 13,
21   2006, commencing at approximately 9:05 a.m.
22
23       * * * * * * * * * * * * *

Page 2

1        APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF:
4   Mr. Thomas F. Gristina
     PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, P.C.
5   Attorneys at Law
     Synovus Centre
6   1111 Bay Avenue
     Third Floor
7   Columbus, Georgia 31901
8   Mr. G. Lane Knight
     BALCH & BINGHAM
9   Attorneys at Law
     Suite 200
10  105 Tallapoosa Street
     Montgomery, Alabama 36104
11
12  ON BEHALF OF THE DEFENDANT HARRY E. LAMBERT:
13  Mr. Dennis R. Bailey
     RUSHTON, STAKELY, JOHNSTON & GARRETT
14  Attorneys at Law
     184 Commerce Street
15  Montgomery, AL 36104
16
    ON BEHALF OF ALABAMA GRAVEL, LLC:
17
    Mr. James N. Walter, Jr.
18  CAPELL & HOWARD
     Attorneys at Law
19  150 South Perry Street
     Montgomery, Alabama 36104
20
21  ALSO PRESENT:
22  Mr. Harry Lambert
     Mr. Hugh Sorrell
23

Page 3

1            EXAMINATION INDEX
2
       BY MR. GRISTINA . . . . . . . . 6
3      BY MR. BAILEY . . . . . . . . . . 261
4
       PLAINTIFF'S EXHIBITS
5
6    1  Articles of Organization of Alabama        49
        Gravel, LLC
7
     2  UCC Filings                    171
8
     3  4-21-06 E-mail from Jimmy Walter with      199
9       Consulting Agreement Attached
10   4  Composite of Electric Bills for Gentry     206
        Pit
11
     5  Composite of Invoices to Simcala           209
12
     6  Composite of Invoices to Globe             217
13      Metallurgical
14   7  Composite of Invoices to Maddox Sand &     224
        Gravel
15
     8  Composite of 5-1-06 Letter from Jimmy      226
16      Walter with Production of Alabama Gravel
        Documents Attached
17
     9  Composite of Documents Received from       242
18      Pearce Pump South, Inc., Via Subpoena
19   10 Composite of Documents Received from       243
        Maddox Stone & Gravel Via Subpoena
20
     11 Composite of Documents Received from       246
21      Southern Wire Enterprises, Inc., Via
        Subpoena
22
23       (Index continued on next page)

Page 4

1      PLAINTIFF'S EXHIBITS (CONTINUED)
2
3    12  Composite of Documents Received from      248
         Simcala Via Subpoena
4    13  5-4-05 Letter to Robert Alexander from    251
         Eddie Boardwine
5
6    14  6-20-05 Letter to Eddie Boardwine from    257
         Robert Alexander
7
8        * * * * * * * * * * * *
9
10           STIPULATIONS
11       It is hereby stipulated and agreed by and
12  between counsel representing the parties that the
13  deposition of DAVID TUTEN is taken pursuant to the
14  Federal Rules of Civil Procedure and that said
15  deposition may be taken before Tracye Sadler,
16  Certified Shorthand Reporter and Commissioner for
17  the State of Alabama at Large, without the
18  formality of a commission, that objections to
19  questions other than objections as to the form of
20  the question need not be made at this time but may
21  be reserved for a ruling at such time as the said
22  deposition may be offered in evidence or used for
23  any other purpose by either party provided for by

Deposition of David Tuten                                            July 13, 2006

Page 13

1      in Alabama was gravel. And I'm trying to
2      think here. There was a company we used to
3      buy material from -- Crosby Carmichael was
4      one, Martin Marietta. I can't remember.
5  Q.  All right. I'm not asking you to guess,
6      and I know it was a long time ago.
7          At some point I presume that you
8      developed a contact with Mr. Harry Lambert;
9      is that correct?
10 A.  Yes.
11 Q.  And when was that?
12 A.  It would have been about 1987, '88,
13     somewhere in there.
14 Q.  And at that time were you still in
15     purchasing for Globe?
16 A.  Yes.
17 Q.  And how did you come to meet Mr. Lambert?
18 A.  We were buying gravel through another guy,
19     through a broker that was selling gravel
20     for Mr. Lambert.
21 Q.  Who was the broker?
22 A.  A fellow by the name of Pete Gibbs.
23 Q.  How did that relationship develop with

Page 14

1      Mr. Gibbs and Mr. Lambert?
2  A.  It had already -- I mean, I don't know.
3  Q.  Maybe I can rephrase it a little bit.
4          How did the broker aspect of that
5      relationship work? Did you go to the
6      broker and then he would get you in touch
7      with Mr. Lambert? Could you explain that a
8      little --
9          MR. WALTER: Are you asking about
10             the broker relationship
11             between Globe and Mr. Gibbs?
12         MR. GRISTINA: Well, I'll start
13             over.
14 Q.  Was Mr. Gibbs a broker?
15 A.  Yes.
16 Q.  What did he do as a broker?
17 A.  If we needed material, we would just
18     contact him and he'd get it. He'd supply
19     it.
20 Q.  In your role as a purchaser for Globe did
21     you frequently deal with brokers of
22     aggregate materials?
23 A.  No.

Page 15

1  Q.  Is Mr. Gibbs the only one?
2  A.  Yes.
3  Q.  In terms of suppliers that Mr. Gibbs put
4      you in touch with, was Mr. Lambert one of
5      those suppliers?
6  A.  Yes.
7  Q.  Were there other suppliers that he put you
8      in touch with?
9  A.  Yes.
10 Q.  Who were the other ones?
11 A.  There was Pete Gibbs. He represented three
12     or four, maybe more, gravel people. One of
13     them was -- I think was Ingram. I can't
14     remember.
15 Q.  Was Ingram a company or a man?
16 A.  I think that was the guy's last name, but
17     it was called Ingram Gravel.
18 Q.  Did you pay the broker or did you pay the
19     supplier directly for the product that you
20     got through Mr. Gibbs?
21 A.  I believe we paid the broker directly.
22 Q.  Were you familiar with how much of that
23     purchase price would go to the supplier?

Page 16

1  A.  No.
2  Q.  Were you familiar with what the commission
3      the broker received was?
4  A.  No.
5  Q.  How long after 1985 did you stay in
6      purchasing with Globe?
7  A.  Until I was -- I was involved in it until I
8      left there in 2003 in some capacity.
9  Q.  So, then, you were in purchasing for 18
10     years with Globe approximately?
11 A.  Approximately.
12 Q.  And in your 18 years was -- and I may have
13     asked this, but was Mr. Gibbs the only
14     broker you ever dealt with?
15 A.  Yes.
16 Q.  And it's through Mr. Gibbs that you
17     developed a relationship with Mr. Lambert;
18     is that correct?
19 A.  Yes.
20 Q.  Other than -- well, how long did that
21     relationship with Mr. Lambert last?
22 A.  I've known Mr. Lambert ever since.
23 Q.  Did you eventually begin to purchase

Deposition of David Tuten                                                                July 13, 2006

Page 49

1    when it was completed was March 24th, 2005;
2    is that correct?
3    A.  Yes.
4    Q.  Now, going back to where we were a little
5        while ago.  Shortly thereafter I believe
6        you testified that Alabama Gravel began
7        using Carol's Contracting to haul aggregate
8        product; is that correct?
9    A.  Yes.
10   Q.  And did you learn at that time that
11       Mr. Lambert was driving trucks for Carol's
12       Contracting that contained aggregate
13       product?
14   A.  I -- let me answer that.  I knew that Harry
15       Lambert was driving a truck, and I knew
16       that -- at that time, you know, that he had
17       trucked in the past, you know, all kinds of
18       things.  But what was the question, now?
19   Q.  Well, when you hired -- when Alabama Gravel
20       hired Carol's Contracting to haul
21       aggregate --
22   A.  Right.
23   Q.  -- did you know at that time that

Page 50

1    Mr. Lambert was going to be driving some of
2    those trucks?
3    A.  Yes.
4    Q.  And was it your intention at that time that
5        by hiring Carol's Contracting to haul
6        aggregate that Mr. Lambert would be able to
7        do that?
8    A.  Yes.
9    Q.  Were you intending at that time to
10       compensate Mr. Lambert for hauling that
11       aggregate product?
12          MR. BAILEY: Object to the form.
13          MR. WALTER: Well, when you say
14             compensate Mr. Lambert, are
15             you -- the contract was with
16             Carol's Contracting.
17          MR. GRISTINA: I understand that.
18   Q.  Were you intending that Mr. Lambert receive
19       payment for driving those trucks?
20   A.  No.
21   Q.  Who was supposed to be paid for that?
22   A.  Carol's Contracting.
23   Q.  And did you have any knowledge of any

Page 51

1    relationship between Mr. Lambert and
2    Carol's Contracting that would have kept
3    him from receiving compensation for the
4    work he was doing for Carol's Contracting?
5          MR. BAILEY: Object to the form,
6             but go ahead.
7    A.  One more time, please.
8          MR. GRISTINA: Can you repeat
9             that?
10          (Requested portion of record was
11             read by the court reporter.)
12   A.  Was he getting paid for hauling the rock
13       from Carol's Contracting?  Is that --
14   Q.  That's not my question, but that's another
15       question.
16   A.  Okay.
17   Q.  But what I'm --
18   A.  I had no idea.
19   Q.  So you didn't know one way or the other if
20       he was getting paid by Carol's Contracting
21       for driving trucks?
22   A.  I did not know.
23   Q.  Did he ever tell you he was not getting

Page 52

1    paid?
2    A.  I believe he did, yes.
3    Q.  All right.  So that's different.  So you
4        understood, then, that he was not getting
5        paid because he told you?
6    A.  After the fact, yes.  I mean, after he had
7        already started hauling for us, it come up
8        in conversation.
9    Q.  And what did he say?
10   A.  Just said that, you know, he doesn't get
11       paid anything for driving the truck.  He
12       just does it to help out his wife.
13   Q.  Did he say why he didn't get paid?
14   A.  No, he did not.
15   Q.  Did he say he didn't want to receive
16       compensation because it would conflict with
17       his noncompete?
18   A.  No, he did not.
19   Q.  Did you ever -- before hiring Carol's
20       Contracting to deliver aggregate or haul
21       aggregate for Alabama Gravel did you ever
22       read Mr. Lambert's noncompete agreement?
23   A.  No.

Deposition of David Tuten                                              July 13, 2006

Page 53

1   Q.  Did you ever see that agreement before the
2      litigation was filed in this case?
3   A.  No.
4   Q.  Have you seen it since the litigation?
5   A.  Yes.
6   Q.  Now, in 2003 you left Globe -- and we
7      talked about that -- and you formed the
8      consulting business. What were the
9      companies in 2003 that you were consulting
10     with?
11  A.  The company I was consulting for in 2003
12     was a company called Simcala.
13  Q.  Where is Simcala located?
14  A.  Mount Meigs, Alabama.
15  Q.  Is Simcala a producer of silicon and
16     ferrosilicon?
17  A.  Just silicon.
18  Q.  Just silicon?
19  A.  Uh-huh (positive response).
20  Q.  How do you spell ferro?
21  A.  F-E-R-R-O.
22  Q.  Ferro. Okay. F-E-R-R-O-silicon?
23  A.  Correct.

Page 54

1   Q.  How did you come to meet or have any
2      contacts with Simcala?
3   A.  The guy that owned Simcala at the time or
4      was president of Simcala I had known for --
5      well, he had actually known my father for
6      many, many, many years. They were in the
7      business together. And they had contacted
8      me through an independent party about --
9      you know, looking for some help. They were
10     having some operation -- operational
11     issues. And so that's kind of how we
12     hooked up.
13  Q.  Who was the contact at Simcala?
14  A.  It was actually a person that supplies them
15     with coal that also supplied coal to Globe
16     in the past who knew that I was, you know,
17     wanting to start a consulting company and
18     had mentioned it to Simcala, and it kind of
19     went back and forth that way.
20  Q.  What was his name?
21  A.  It actually was a woman.
22  Q.  What was her name?
23  A.  Her name was Sandy Todd.

Page 55

1   Q.  Sandy Todd. She's still -- or she's a
2      supplier; is that correct?
3   A.  That's correct.
4   Q.  Where is she located?
5   A.  Knoxville, Tennessee.
6   Q.  And you stated that another person put you
7      in touch with Simcala. Who was that
8      independent person?
9   A.  It was Sandy Todd.
10  Q.  So Sandy Todd put you in touch with the
11     person at Simcala whom your father had
12     worked with?
13  A.  Yeah, had known.
14  Q.  Who was that?
15  A.  Mr. Ed Boardwine.
16  Q.  How long had your father been friends with
17     Ed Boardwine for?
18  A.  Probably 40 years.
19  Q.  Is Mr. Boardwine still with Simcala?
20  A.  No, he is not.
21  Q.  Is he retired?
22  A.  I -- that's a relative term. I think he
23     has another business. He does other

Page 56

1      things. He does consulting work and stuff
2      like that.
3   Q.  Do you know when he left Simcala?
4   A.  Shortly after -- it was in 2003. They were
5      purchased -- Simcala was bought out by Dow
6      Corning.
7   Q.  I've seen that name different ways. Is it
8      Broadwine or Boardwine?
9   A.  Boardwine.
10  Q.  B-O-A-R-D-W-I-N-E?
11  A.  That's correct.
12  Q.  But he left Simcala in 2003?
13  A.  Yes.
14  Q.  Mr. Boardwine?
15  A.  Yes.
16  Q.  I'm looking at Alabama Gravel's initial
17     disclosures, and his address as of
18     December 27, 2006, was still listed as an
19     Ed Broadwine at Simcala, Inc. Is that
20     different than Mr. --
21  A.  No.
22  Q.  Now, that will help me.
23     So, then, Ed Boardwine is the senior,

Page 57

1    the man that your father knew who had the
2    relationship with the coal supplier that
3    helped you begin to consult with Simcala;
4    is that correct?
5    A.  Yes.
6    Q.  And does he have a son who's still with
7      Simcala?
8    A.  Yes.
9    Q.  And that's Ed Boardwine, Jr.?
10   A.  Yes.
11   Q.  Is he still with Simcala?
12   A.  Yes.
13   Q.  Does Mr. Ed Boardwine, Sr., know anything
14     about this dispute that we have here
15     between the parties?
16   A.  I don't know.
17   Q.  But certainly his son does.  Ed Boardwine,
18     Jr., knows something about this dispute?
19   A.  Yes.
20   Q.  All right.  So then you began at some point
21     shortly after you left Globe consulting for
22     Simcala; is that correct?
23   A.  Yes.

Page 58

1    Q.  And what did you assist them with?
2    A.  Mainly operational issues, melting
3      furnaces.
4    Q.  And did that relationship develop into
5      something else over the past three years?
6          MR. BAILEY:  Object to the form.
7    A.  I'm not sure I understand.
8    Q.  Have you begun to provide more advice in
9      different areas?
10   A.  No.
11   Q.  So your advice is limited to operations to
12     Simcala?
13   A.  It was.  I'm no longer working with them.
14   Q.  When did that stop?
15   A.  It was in 2005.
16   Q.  At any time did you help them with supply
17     or purchasing issues?
18   A.  No.
19        Let me rephrase that.  They would ask
20     me, you know, questions from time to time,
21     but I never had any input into that, no.
22     Mainly they would ask me about, you know,
23     what did Globe do or that sort of thing.

Page 59

1    Q.  Did they ask you for assistance in locating
2      suppliers of white oversized gravel in the
3      Montgomery area?
4    A.  They asked me if I knew anybody different,
5      but they already knew, you know, who all
6      the suppliers were.  I didn't know anybody
7      any different.
8    Q.  Were you aware of any relationship between
9      Mr. Harry Lambert and Simcala during that
10     period?
11   A.  No.
12   Q.  Other than Simcala who did you consult
13     with?
14   A.  That was the only one.  Well, also I do a
15     little work for a guy -- I do some work for
16     a guy in China.
17   Q.  What sort of work is that?
18   A.  Same, along the same lines.
19   Q.  They have a plant in China?
20   A.  They have many plants in China, yeah.
21   Q.  Do they produce white oversized gravel in
22     China?
23   A.  No.  This is the production of ferroalloys,

Page 60

1    silicon type thing.
2    Q.  And you consult with that company from time
3      to time?
4    A.  Right.
5    Q.  Do you do any consulting work for Globe?
6    A.  No.
7    Q.  Have you attempted to?
8    A.  No.
9    Q.  Since 2003 the only local company that
10     you've consulted with is Simcala?
11   A.  Correct.
12   Q.  And at some point you went into business, I
13     guess, with Mr. Robert Alexander and Rex
14     Dasinger; is that correct?
15   A.  Yes.
16   Q.  And when did you first meet Mr. Robert
17     Alexander?
18   A.  It was late 2004, early 2005.
19   Q.  How did you meet him?
20   A.  I was introduced to Robert through
21     Mr. Lambert.
22   Q.  Do you recall that meeting?
23   A.  Yeah.

Page 61

1   Q.   Where was that meeting?
2   A.   It was here in town.
3   Q.   And do you know how that meeting was
4        conceived or why it took place?
5   A.   I had mentioned to Mr. Lambert about
6        because of the situation at Simcala, with
7        them running out of white oversized and
8        also with contacts I had at Globe, that,
9        you know, there was a need for white
10       oversized gravel and that I would have an
11       interest in getting in the gravel business
12       mainly as an outside investor more than
13       anything else.  And I had asked
14       Mr. Lambert, you know, if he knew of
15       anyone, you know, that I could maybe get
16       involved with, and he put me in touch with
17       Mr. Alexander.
18  Q.   So that was in 2004.  Do you recall what
19       month of 2004?
20       And you may have said it, but I don't
21       remember.
22  A.   It had --
23       MR. WALTER:  Let me object just to

Page 62

1        the extent that I think he
2        said it was late 2004 or early
3        2005.
4        MR. GRISTINA:  Okay.
5   A.   It was cold.  I remember that.
6   Q.   All right.  Sometimes I'll repeat myself,
7        and I apologize for that.
8        So late 2004, early 2005 --
9   A.   Uh-huh (positive response).
10  Q.   -- as best you can recall is when this
11       meeting took place?
12  A.   Yes.
13  Q.   And you recall that it was cold?
14  A.   Yes.
15  Q.   And where did the meeting take place?
16  A.   It was here in town.
17  Q.   Where in town?
18  A.   We met at -- Mr. Alexander was staying in a
19       hotel here in town, and I met him at his
20       hotel.
21  Q.   If you know, did Mr. Alexander come to town
22       just for that meeting?
23  A.   I don't know if it was just for that

Page 63

1        meeting or not.
2   Q.   And you stated earlier that -- and I'm not
3        trying to rephrase what you stated, so
4        correct me if I'm wrong -- that you were
5        aware that Simcala was having some sort of
6        problem with oversized supply?
7   A.   Yes, sir.
8   Q.   And was that through your consulting work
9        and things that you had learned?
10  A.   Yeah.
11  Q.   What was the problem that Simcala was
12       having?
13  A.   They were running out of material.
14  Q.   And this was in the late 2004 period?
15  A.   Yes.
16  Q.   Did they say or identify any suppliers that
17       they were having problems with at that
18       time?
19  A.   Yes.
20  Q.   And who did they identify?
21  A.   The Concrete Company.
22  Q.   What did they say about The Concrete
23       Company?

Page 64

1   A.   Just said that they were having problems
2        with the material from the Ward plant.
3        They couldn't -- you know, wasn't getting
4        what they wanted.
5   Q.   What problems specifically did they say
6        they were having with the material?
7   A.   Just that it was -- the chemistry of the
8        material had changed and it was -- you
9        know, wasn't -- it wasn't as pure as what
10       it had been in the past.
11  Q.   And you at Globe had purchased from that
12       same plant and had not had chemistry
13       problems while you were at Globe at least?
14  A.   While I was at Globe, that's correct.
15  Q.   And then at some point after you left Globe
16       you learned from Simcala that they alleged
17       some chemistry problems?
18  A.   Yes.
19  Q.   Did you hear that from anybody at Globe
20       ever after you left Globe?
21  A.   Yes.
22  Q.   Who?
23  A.   From a fellow by the name of Bobby Becker.

Deposition of David Tuten                                                July 13, 2006

Page 69

1    in a book? Was it in loose paper?
2    A.   Mostly on a -- just on a computer screen.
3    Q.   And so you saw the Simcala computer screen
4         that contained that data?
5    A.   Yes.
6    Q.   And were you aware of Simcala's practice
7         with respect to keeping that data aside
8         from in the computer?
9    A.   I knew they did. I didn't know -- I didn't
10        know what their quality program was, how
11        they did their paperwork, no.
12   Q.   At Globe when you were there would you keep
13        that data in hard copy form?
14   A.   No.
15            Well, hard copy -- it was kept on a
16        hard disk on a computer, filed in that way,
17        but on paper, no.
18   Q.   How long was it preserved?
19   A.   Oh, boy. I don't recall.
20   Q.   And do you know whether or not Simcala
21        printed out that data or saved it on a disk
22        outside of its hard drives?
23   A.   I know that they would print it out from

Page 70

1    time to time, yes, but whether they saved
2    it on a hard drive and all that, I do not
3    know.
4    Q.   And so then at some point after you began
5         consulting with Simcala you learned that
6         they had chemistry complaints about The
7         Concrete Company as well as quantity
8         complaints. Is that true?
9    A.   Yes.
10   Q.   And then at some point around that same
11        time you decided to investigate going into
12        the oversized business yourself. Is that
13        true?
14   A.   Yes.
15   Q.   What was it that caused you to come to that
16        decision?
17   A.   Well, I saw an opportunity in the
18        marketplace that -- with my background in
19        metallurgical oversized and with my
20        contacts at Globe -- I knew, you know, they
21        were having some issues -- that, you know,
22        it would be a good time to look into that.
23   Q.   Were you aware of another location in the

Page 71

1    Montgomery area where you could get white
2    oversized?
3    A.   Not at that time.
4    Q.   So that when you decided to investigate
5         that new line of business you didn't have
6         any idea of where you could actually get
7         the product that you were hoping to sell?
8    A.   That's correct.
9    Q.   Where did you think that you would get the
10        information as to how to locate that
11        product?
12   A.   I asked when I called Mr. Lambert and said,
13        you know, I was looking to -- would like to
14        investigate getting into the sand and
15        gravel business. And he, you know,
16        informed me that he could not get in the
17        sand and gravel business, but he had been
18        doing some consulting work for a guy that
19        also wanted to get into the sand and gravel
20        business. And, you know, he -- and he
21        said, well, you know, you two should get
22        together. So that was Mr. Alexander.
23   Q.   So Mr. Lambert told you at that time he

Page 72

1    couldn't get in the sand and gravel
2    business but he had been doing some work --
3    consulting work for a guy who also wanted
4    to get in the business?
5    A.   That's correct.
6    Q.   Did he describe that consulting work he had
7         been doing for Mr. Alexander?
8    A.   Not in detail, no.
9    Q.   Did he describe it generally?
10   A.   Yeah. He just said he was doing some
11        consulting work for a guy up in north
12        Alabama, looking at a sand plant or
13        something.
14   Q.   In north Alabama?
15   A.   Yes.
16   Q.   Did he say any other location that he was
17        doing consulting work for?
18   A.   No.
19   Q.   Do you know where in north Alabama he was
20        speaking of?
21   A.   No, sir.
22   Q.   Was that the conversation that you were
23        referring to earlier where he told you he

Deposition of David Tuten

July 13, 2006

Page 77

```
1     conversation that you can recall between
2     you and Mr. Lambert that dealt with his
3     noncompete?
4  A.  Yeah. Yes.
5  Q.  So there's no other conversations that you
6     can recall?
7  A.  You know, I had conversations with Harry,
8     but we never talked about that. I didn't
9     have any interest in that.
10 Q.  So, now, going to the meeting that took
11    place in late 2004, early 2005 here in
12    Montgomery with Mr. Alexander. What hotel
13    was that at?
14 A.  It was one of the ones over there at
15    Prattville, on the Prattville exit. I
16    can't remember if it was -- which exit it
17    was. I don't remember if it was the
18    Hampton Inn or the Best Western. It was on
19    that side of the road. I remember that.
20    It was one of those -- one of those hotels.
21 Q.  Before that meeting was arranged had you
22    ever had any conversations with Mr. Lambert
23    about going into the white oversized
```

Page 78

```
1     business?
2  A.  The only conversation I had was, you know,
3     when I called him up that one time. But,
4     no, I had not.
5  Q.  Had he ever told you before or mentioned to
6     you before that he wanted to go into the
7     white oversized business?
8  A.  No.
9  Q.  And so is it your testimony that it was you
10    that first contacted Mr. Lambert about
11    going into the business and not the other
12    way around?
13 A.  That's correct.
14 Q.  Now, the meeting with Mr. Alexander was
15    scheduled. Was it Mr. Lambert who
16    contacted Mr. Alexander, or did you contact
17    Mr. Alexander?
18 A.  He contacted Mr. Alexander, because I
19    didn't know the man.
20 Q.  So you had never met Mr. Alexander before?
21 A.  Never.
22 Q.  And did Harry then call you back and say,
23    okay, he's ready to meet and give you a
```

Page 79

```
1     time, or how did that work?
2  A.  Yeah. He called -- just said that he's
3     going to be in town, you know, at this date
4     and this is where he's going to be staying,
5     and that's how it was set up.
6  Q.  Did he tell you to go there at a certain
7     time or did you contact Mr. Alexander when
8     he got to town?
9  A.  He gave me his phone number and I called
10    him.
11 Q.  Do you know what Harry's cell phone number
12    is -- excuse me -- Mr. Lambert's cell phone
13    number is?
14 A.  Yes.
15 Q.  What is that?
16 A.  Can I look it up?
17 Q.  Sure.
18 A.  Because I've got it on automatic here.
19    It's 334. I can tell you that much.
20    (334) 202-7177.
21 Q.  Now, as best you can recall is that the
22    only cell phone number you've ever had for
23    Mr. Lambert?
```

Page 80

```
1  A.  Yes.
2  Q.  What's your cell phone number?
3  A.  Mine is (740) 525-9396.
4  Q.  Have you had that number for a while?
5  A.  Yes.
6  Q.  How long?
7  A.  Couple of years.
8  Q.  And over the last couple of years if
9     someone wanted to reach you is that the
10    number they would call you at?
11 A.  Either that or my home number, yes.
12 Q.  And what's that?
13 A.  It's (740) 568-0797.
14    (Brief interruption.)
15 Q.  And do you still recall what your number
16    was at Globe before you left?
17 A.  Let me think. It was (740) 984-8 -- I
18    think it's 8633.
19 Q.  And many companies have the same prefix for
20    all the numbers inside.
21 A.  Yes. That's the way that is.
22 Q.  So Globe -- if you're calling Globe --
23    somewhere in Globe, you're going to be
```

Deposition of David Tuten                                                July 13, 2006

Page 81

1    doing a 984 prefix?
2    A.   Yeah.  They've got like a general number
3         and then like all the extensions are
4         8-something.
5    Q.   And except for -- in the Ohio, I guess,
6         plant?
7    A.   That's the Ohio plant, yes.
8    Q.   What about in Selma?  Do you know the
9         prefix there still?
10   A.   I used to know that.
11        MR. WALTER:  Don't guess.
12   A.   Well, I -- I used to know it, but I
13        don't -- I can't remember.
14   Q.   All right.  Now, other than the home number
15        and the cell phone number and the work
16        number you gave me, over the last five
17        years is there another number that you
18        could have been commonly reached at?
19   A.   Huh-uh (negative response).
20   Q.   No?
21        MR. WALTER:  You need to answer.
22   A.   I'm sorry.  No.
23   Q.   Going back, then, to the meeting at the

Page 82

1         hotel.  Did Mr. Lambert attend that
2         meeting?
3    A.   Yes.
4    Q.   Who else was there besides Mr. Lambert,
5         you, and Mr. Alexander?
6    A.   No one.
7    Q.   And I assume it was -- was it in
8         Mr. Alexander's room or was it --
9    A.   Yes.
10   Q.   And what time was that?
11   A.   It was in the evening.
12   Q.   And if you could tell me everything that
13        you recall about that meeting, please.
14   A.   Just basically he introduced us, you know,
15        who he was.  And we kind of gave each
16        other, you know, background, you know, who
17        we were.  I told him that, you know, I had
18        been involved in the metallurgical business
19        for a long time and I didn't know -- you
20        know, I didn't know nothing about the sand
21        and aggregate business.  But, you know, I
22        was looking to -- you know, just as a small
23        investor, you know, would be interested in

Page 83

1         working with somebody, getting the
2         business, and maybe I could just help them
3         on, you know, selling the oversized.
4              And Robert -- of course, his thing
5         is -- he owns a -- or owns part of a couple
6         of companies, I guess, in Atlanta, and he
7         has an interest in sand and aggregate.  And
8         so, you know, between the two of us, we --
9         you know, we had an interest in different
10        areas of the sand and gravel business, but
11        together, you know, we kind of covered all
12        of it.
13   Q.   And did you tell him specifically that you
14        were interested in going into business with
15        him as to white oversized gravel?
16        MR. WALTER:  When you say him, who
17        are you referring to?
18        MR. GRISTINA:  Mr. Alexander.
19   A.   Yes.
20   Q.   And --
21   A.   Yeah.  That's the only interest I had.
22        Because, like I said, I don't know anything
23        about any of the other stuff.

Page 84

1    Q.   What did Harry say during that meeting?
2    A.   Nothing.
3    Q.   You can't recall Mr. Lambert saying
4         anything at all during that meeting?
5    A.   You know, he basically introduced us and,
6         you know, told Robert how he knew me and
7         told me how he knew Robert, and that was
8         it.
9    Q.   Was there any discussion about any role for
10        Mr. Lambert in any new business venture
11        between you and Mr. Alexander?
12   A.   No.
13   Q.   Was there a discussion that that role could
14        not exist?
15        MR. BAILEY:  Object to the form.
16   A.   Yes.
17   Q.   And what was that discussion?
18   A.   Well, just Harry said -- you know, he said,
19        I can't be involved.  I can't get in the
20        sand and gravel business.  So, you know,
21        that was that.
22   Q.   Did The Concrete Company's name come up
23        during that conversation?

Deposition of David Tuten                                                          July 13, 2006

Page 85

1    A.   I don't know.  I mean, it might have.
2    Q.   You can't recall?
3    A.   I cannot recall.
4    Q.   Mr. Alexander, as far as you know did he
5         have any -- did Mr. Alexander as far as you
6         know have any business dealings in the
7         Montgomery area at that time?
8    A.   I did not know.
9    Q.   Was there a discussion during that meeting
10        as to how you all would locate a pit for
11        white oversized?
12   A.   Mr. Alexander had had some contacts with --
13        talked to a Mike Gentry, and he had -- you
14        know, he had been talking to him about
15        mining his pit.
16   Q.   And was that the first time that you
17        learned of Mr. Alexander's discussion with
18        Mr. Gentry?
19   A.   Yes.
20   Q.   And so what specifically did Mr. Alexander
21        say that he could mine from Mr. Gentry's
22        pit?
23   A.   He didn't say specifically at that

Page 86

1         meeting.  He just said that he had been
2         talking to this guy, that we might be able
3         to, you know, mine some aggregate in his
4         pit.
5    Q.   Did he indicate how he came to learn of
6         Mr. Gentry's pit?
7    A.   Yeah.  He -- he had been introduced to
8         Mr. Gentry through Mr. Lambert.
9    Q.   Do you know when that introduction took
10        place?
11   A.   I do not.
12   Q.   But it was before this meeting that you all
13        had at the hotel?
14   A.   Yes.
15   Q.   And during the meeting -- well, was there
16        anything else you can recall about the
17        discussion with Mr. Alexander during that
18        meeting?
19   A.   We talked for probably -- I don't know --
20        hour, hour and a half maybe and, you know,
21        just kind of left it that -- at that time I
22        kind of said, well, you know, I'll think it
23        over or whatever and, you know, get back

Page 87

1         with you, stay in touch, that sort of
2         thing, so ...
3    Q.   Now, I realize that you've given me a time
4         frame a couple of times when you said late
5         2004, early 2005.
6    A.   Right.
7    Q.   Was this meeting before you had -- well, at
8         some point after that did you have any
9         contact with Simcala that also involved
10        Mr. Alexander?
11   A.   At some time what?
12   Q.   After your meeting with Mr. Alexander did
13        you all have dealings with Simcala
14        together?
15             MR. WALTER:  You're referring to
16                 Mr. Alexander and Mr. Tuten?
17             MR. GRISTINA:  And Mr. Tuten.
18   A.   After that?
19   Q.   Yes.
20   A.   Yeah.  Sometime after that we did, yeah.
21   Q.   All right.  And how long after that
22        meeting?
23             MR. WALTER:  Now, I guess the

Page 88

1         reason I'm a little confused,
2         are you asking about dealings
3         that Mr. Tuten was involved in
4         or things that Mr. Alexander
5         might have done that Mr. Tuten
6         knows about?
7             MR. GRISTINA:  Well, I'll ask it
8         both --
9    Q.   I'm not speaking now about you exclusively
10        dealing with Simcala.
11   A.   Okay.
12   Q.   So what I'm trying to figure out is after
13        this meeting at the hotel took place, did
14        there come a time when you and
15        Mr. Alexander met with anybody from
16        Simcala?
17   A.   After that point, yes.
18   Q.   And how long after that?
19   A.   Two, three months.
20   Q.   Had you ever met -- you and Mr. Alexander,
21        had you ever met with anybody from Simcala
22        before that meeting?
23   A.   No.

Deposition of David Tuten                                                            July 13, 2006

Page 89

1   Q.  Now, going back to the meeting in the
2       hotel, was there any discussion about
3       Mr. Lambert going into business with you
4       and Mr. Alexander after his covenant --
5       noncompete expired or after he got out of
6       jail?
7   A.  No.
8   Q.  Do you ever recall Mr. Lambert using the
9       term get out of jail as a reference to his
10      noncompete?
11  A.  Yes.
12  Q.  Is that the way that he would frequently
13      describe it?
14  A.  Yes.
15  Q.  So at that time when you all met in the
16      hotel there was no discussion whatsoever
17      about Mr. Lambert coming to work with you
18      all after he got out of jail?
19  A.  It was not discussed.
20  Q.  Did you contemplate that?
21  A.  Personally?
22  Q.  Yes.
23  A.  I thought, you know, after he got out of

Page 90

1       jail, it, you know, might be something
2       worth pursuing, but at that time, no.
3   Q.  Had you ever talked to Mr. Lambert about
4       that concept before the meeting?
5   A.  No.
6   Q.  And had he ever mentioned it to you?
7   A.  No.
8   Q.  Other than Mr. Gentry's pit, were there any
9       other sites -- mining sites discussed
10      during the hotel meeting?
11  A.  No.
12  Q.  Is there anything else that you can recall
13      about that meeting that we haven't
14      discussed?
15          MR. WALTER:  Referring to the
16          meeting at the hotel?
17          MR. GRISTINA:  At the hotel.
18  A.  We talked about, you know, if we were to --
19      you know, if Robert and I were to go into
20      business, I couldn't -- you know, I
21      couldn't be -- I'm not a day-to-day person
22      as far as the company is concerned and I
23      couldn't be, that, you know, we needed

Page 91

1       somebody that could kind of run the thing
2       for us.  And, you know, we talked about
3       Mr. Dasinger at that time also.
4   Q.  That's Rex Dasinger?
5   A.  Yes.
6   Q.  D-A-S-I-N-G-E-R?
7   A.  I'm not -- I don't know the spelling.
8   Q.  And so you told Mr. Alexander I can't be
9       the day-to-day guy --
10  A.  Right.
11  Q.  -- but maybe this Dasinger guy can be?
12  A.  Right.  Well, that we talked about it and
13      actually Mr. Lambert recommended him as
14      a -- would be a good person to, you know,
15      like be a foreman or what have you to run
16      the thing.  And we discussed that as well.
17  Q.  So was that recommendation from
18      Mr. Lambert -- was that during that hotel
19      meeting?
20  A.  Yes.
21  Q.  So then at least one conversation did take
22      place that involved Mr. Lambert and that
23      was him recommending Mr. Dasinger as a

Page 92

1       foreman type person?
2   A.  Well, we asked him, you know -- we asked
3       him if, you know, he knew of somebody we
4       could get or that, you know, could do that,
5       and he recommended Rex.
6   Q.  And did you know Rex before then?
7   A.  No.
8   Q.  At that time did Mr. Lambert tell you what
9       his relationship with Mr. Dasinger was?
10  A.  He -- yeah.  He -- I mean, he said that he
11      drove a truck for Carol's Contracting and
12      he had been in the gravel -- you know,
13      worked in gravel pits before and stuff and
14      he felt that, you know, he would be a good
15      guy to have.
16  Q.  Now, over the time period you came to know
17      Mr. Lambert before this meeting he was
18      somebody, wasn't he, that you understood
19      had extensive knowledge of the sand and
20      gravel business; is that correct?
21  A.  Yes.
22  Q.  And he's somebody that you understood knew
23      how to locate different types of sand and

Deposition of David Tuten                                                July 13, 2006

Page 97

1    operation?
2    A.  No.
3    Q.  Now, Alabama Gravel was formed in March
4        2004; correct?
5    A.  Yes.
6    Q.  Since that time Alabama Gravel has done
7        extensive construction on a mining
8        operation in Deatsville; isn't that
9        correct?
10   A.  Yes.
11   Q.  Were you aware at that time that you met
12       with Mr. Alexander as to whether he had any
13       experience in constructing a mining
14       operation?
15   A.  I learned that at that meeting, yes.
16   Q.  What did he tell you?
17   A.  Just --
18            MR. WALTER:  Tom, let me -- you
19            said a minute ago that Alabama
20            Gravel was formed in March of
21            2004, and I think maybe you
22            misspoke.  It was March of
23            2005.

Page 98

1            MR. GRISTINA:  I apologize.  March
2            24th, 2005.  I'm sorry.
3    Q.  Now, if you can tell me what Mr. Alexander
4        said about his experience in constructing a
5        mining operation.
6    A.  I don't recall.  He, you know, just said
7        that he had put up plants before in the
8        past and his history with, you know, AgTran
9        and -- I can't think -- Sand Rock, the two
10       companies he's involved with and his
11       partner Randy Willingham and places they
12       had done work, and you know, had sand pits
13       and stuff, Georgia and all over different
14       places.
15   Q.  So how was it contemplated during that
16       meeting or was it discussed who would be in
17       charge of constructing Alabama Gravel's
18       mining operation?
19   A.  Mr. Alexander, he's the -- I don't know
20       what you would call him.  He's the managing
21       member of the company and that -- you know,
22       the day-to-day stuff, that all would
23       fall -- went to him.

Page 99

1    Q.  So it was contemplated that Mr. Alexander
2        would be the one setting up the day-to-day
3        operations and purchasing the equipment and
4        building the plant?
5    A.  That's correct.
6    Q.  Did Mr. Alexander have any contacts with
7        equipment suppliers in the Montgomery
8        area?  Did you all discuss that?
9    A.  Did not discuss that, no.
10   Q.  Are you aware of him having any such
11       contacts?
12   A.  I'm not -- I wasn't aware at that time.
13   Q.  A mining plant consists of extensive
14       amounts of equipment and involves trucks,
15       bulldozers; isn't that correct?
16   A.  Yes.
17   Q.  Classifiers, is that one of the things they
18       have?
19   A.  Yes.
20   Q.  And sifters?  Is that another thing, a
21       sifter?
22            MR. SORRELL:  Shaker.
23   Q.  Shaker.  Shaker.  Is that correct?

Page 100

1    A.  Yes.
2    Q.  And you have to get permits to do all this
3        stuff; isn't that right?
4    A.  Yes.
5    Q.  And there are environmental issues; is that
6        correct?
7    A.  Yes.
8    Q.  And these are things that you've learned
9        since that meeting?
10   A.  Yes.
11   Q.  At that meeting was there any discussion
12       about who would hire all of the consultants
13       and builders and inspectors to do all that
14       construction?
15   A.  We didn't talk in detail about it.  But, I
16       mean, Robert was going to -- I mean, he
17       runs it.  It was going to be his thing.
18   Q.  Did Mr. Lambert ever say I know who all
19       these people are in the Montgomery area and
20       I can help you out with that?
21   A.  We asked him for his, you know, opinion,
22       you know, who would be a good person or
23       something like that.

Deposition of David Tuten                                          July 13, 2006

Page 101

1    Q.  So Mr. Lambert had the information and the
2        specific individuals who could help you all
3        construct this plant?
4            MR. BAILEY:  Object to the form.
5    A.  Yes.
6    Q.  And at that time had you located a place
7        where you all thought you would build this
8        plant?
9            You mentioned Gentry.  Was there
10       another location?
11   A.  No.
12   Q.  At that time had you identified the
13       Deatsville site?
14   A.  No.
15   Q.  And when I say the Deatsville site, do you
16       understand what I'm talking about?
17   A.  Yes.
18   Q.  And where is that site located?
19   A.  It's just -- it's just outside the little
20       town of Deatsville.
21   Q.  And is that the first -- well, is that the
22       only site that Alabama Gravel has built so
23       far?

Page 102

1    A.  Yes.
2    Q.  When did you first locate that site?
3    A.  Well, Mr. Dasinger acquired the lease on
4        that property sometime early in 2005.
5    Q.  You say Mr. Dasinger acquired the lease.
6        Did he sign the lease and pay for the lease
7        or did -- individually?
8    A.  I don't know -- I don't know about paying
9        for the lease, but, I mean, he signed for
10       the lease, yes.
11   Q.  And you said early 2005.  So that would
12       make it before Alabama Gravel was actually
13       formed according to its articles of
14       organization?
15   A.  Right.  It was around -- yeah, right before
16       that, yes.
17   Q.  And do you know who that lease was obtained
18       from?
19   A.  The name on the lease is Cruise.
20   Q.  Could you -- C-R-U-Z or U-I-S-E?
21   A.  I think it's C-R-U-I-S-E, but I'm not sure.
22   Q.  You don't know the first name?
23   A.  No, I do not.

Page 103

1    Q.  Do you know how Mr. Dasinger located the
2        Deatsville site?
3    A.  No, I do not.
4    Q.  Do you know of any testing that was done on
5        the Deatsville site before the lease was
6        done?
7    A.  I know that he said he had tested it
8        himself.
9    Q.  Mr. Dasinger said that?
10   A.  Yes.
11   Q.  Did he say that he went there with
12       Mr. Lambert and bored holes to see if there
13       was white oversized gravel at that site?
14   A.  He did not say.
15   Q.  Are you aware of whether Mr. Lambert went
16       to the Deatsville site in 2004 before the
17       hotel meeting and did some testing to
18       determine if white oversized gravel could
19       be mined in the Deatsville site?
20   A.  I'm not aware of that.
21   Q.  You think that did not happen or --
22   A.  I don't know.
23   Q.  So you trusted Mr. Dasinger at some point

Page 104

1        to tell you that's where we can get this
2        product?
3    A.  Yes.
4    Q.  The only product at this time that you all
5        were interested in locating was white
6        oversized; is that correct?
7    A.  That's all I was interested in.
8    Q.  And that's a very scarce product in the
9        area; is that correct?
10   A.  Yes.
11   Q.  And you trusted Mr. Dasinger to tell you
12       the Deatsville site is where we need to be
13       to get that?
14           MR. BAILEY:  Object to the form.
15           Go ahead.
16   A.  Yes.
17   Q.  Without any knowledge of whether or not
18       Mr. Dasinger had worked with Mr. Lambert to
19       determine if in fact that would be a good
20       place to get white oversized?
21           MR. WALTER:  I'm not sure I quite
22           understand.  You can answer it
23           if you understand it.  I'm a

26 (Pages 101 to 104)

Deposition of David Tuten                                                                July 13, 2006

Page 109

1    know, decided we would do it. Then it was
2    just a matter of, you know, getting an
3    attorney and getting the thing put
4    together.
5  Q.  Is that the same cell phone you had at that
6    time?
7  A.  Yes, uh-huh (positive response).
8  Q.  Do you have Mr. Alexander's number in
9    there?
10  A.  Uh-huh (positive response).
11  Q.  And what's that number?
12  A.  It's (706) 825-9896.
13  Q.  That's Robert Alexander's -- is that his
14    cell phone?
15  A.  Yes.
16  Q.  Is that the only number you have for him?
17  A.  Actually I have his personal home phone
18    number.
19  Q.  What's that?
20  A.  It's (706) 733-989 -- wait a minute.
21    That's the same -- no, it's not. 9896 as
22    well. Just a different prefix.
23  Q.  All right. And you said that you talked to

Page 110

1    Robert Alexander after you came to the
2    decision to pursue the business. Before
3    you talked to Mr. Alexander again about
4    pursuing the business did you talk to Harry
5    Lambert again about it?
6  A.  I don't recall if I talked to Harry between
7    those -- you know, between the meeting and
8    with Robert. But, you know, I did talk to
9    Harry when I, you know, made the decision
10    to -- you know, that I was going to do it,
11    you know, that -- get involved in it, you
12    know, just to let him know that I was going
13    to do that.
14  Q.  What else can you recall about that
15    conversation?
16  A.  Nothing. I mean, he was, you know -- you
17    know, he thought -- he said, well, Robert's
18    a good guy and, you know, I think you guys
19    would get along good. So that was about
20    it.
21  Q.  Any discussion at that time about any role
22    Mr. Lambert would play in the new business
23    that was going to be formed?

Page 111

1  A.  No.
2  Q.  And then anything else you can recall about
3    that?
4  A.  Nothing.
5  Q.  And then you talked to Mr. Alexander, and
6    how did things proceed from there?
7  A.  Well, when Robert -- you know, when we
8    decided to do it, we got ahold of an
9    attorney here in town and told him, you
10    know, what we wanted to do and to form the
11    company.
12  Q.  All right. And when you touched something,
13    that was Exhibit 1 which was the articles
14    of organization?
15  A.  Yes.
16  Q.  And those were done by Rushton-Stakely, I
17    believe; is that correct?
18    I'm not going to ask you about the
19    specifics of it.
20    MR. WALTER:  Yeah.  Be careful not
21    to get into things that you
22    discussed with the attorney or
23    anything like the

Page 112

1    attorney-client privilege as
2    far as Alabama Gravel is
3    concerned.
4  Q.  I don't want to know any specific
5    discussions, but was it done -- was the law
6    firm that you used Rushton-Stakely?
7  A.  Yes.
8  Q.  And that's the same law firm that's
9    representing Mr. Lambert in this
10    litigation; is that correct?
11  A.  Yes.
12  Q.  Now, at some point between your discussions
13    at the hotel, during that meeting, you met
14    Mr. Dasinger, I presume?
15  A.  Yes.
16  Q.  When was that?
17  A.  I'm going to say it was probably February
18    or March.
19  Q.  Of 2005?
20  A.  Of 2005, yes.
21  Q.  And how did you first meet?
22  A.  I was -- happened to be in town and
23    Robert -- Mr. Alexander was in town, and we

Deposition of David Tuten

July 13, 2006

Page 113

1    met -- we decided if we was going to have
2    Rex do something, you know, we needed to
3    all three of us sit down and get together
4    and figure out what was -- you know, who
5    was going to do what and, you know, kind of
6    line things up.
7    Q.   How did you get in touch with
8         Mr. Dasinger?
9    A.   Through Mr. Lambert.
10   Q.   And did you call Mr. Lambert to get to
11        Mr. Dasinger or did Mr. Alexander?
12   A.   Robert did that.
13   Q.   And where did you all first meet?
14   A.   We met over at where our office is.
15   Q.   And where is that office?
16   A.   I don't know what the address is.
17   Q.   Is it Gunnels Road?
18   A.   It's Gunnels Road, yes.
19   Q.   And is that office on the same property
20        where Mr. Lambert lives?
21   A.   Yes, that's correct.
22   Q.   I want to get a description of that
23        property.  I assume there's a house on the

Page 114

1    property?
2    A.   Yes.
3    Q.   How big is the property?
4    A.   Oh, it's -- it's big.
5    Q.   Is it like a farm?
6    A.   Well, I wouldn't call it a farm, but, I
7         mean, it's probably ten acres anyway.
8    Q.   And is the Alabama Gravel office located in
9         Mr. Lambert's house?
10   A.   No.
11   Q.   Where on the property is it located?
12   A.   It's -- it's separate.  I mean, the house
13        is clear up on one end and the office
14        building is down on the other end.
15   Q.   So on the approximately ten acres there is
16        a house and then there is an office
17        building.  Is that the way you described
18        it?
19   A.   Well, it's a building that -- it's like
20        part garage for his trucks and then there's
21        like an office in there.  It's got an
22        apartment in there and, you know, a kitchen
23        and all that kind of stuff.

Page 115

1    Q.   All right.  At that point had it been
2         decided that that was going to be Alabama
3         Gravel's office?
4    A.   Yeah.  We met there and we talked to Harry
5         about, you know -- because we were just
6         starting up and obviously didn't have a lot
7         of money or anything and if we could rent
8         that from him.  Because it had the
9         apartment that Robert stays in and --
10        Mr. Alexander still stays there today.
11        And, of course, it had an office in there.
12        Kind of had everything, you know, we
13        needed.  And so we talked about renting
14        that and using that for an office.
15   Q.   Mr. Alexander stays in that apartment?
16   A.   Yes.
17   Q.   Did he live there?
18   A.   Well, yeah, through the week, yes.
19   Q.   Through the week?
20   A.   Yeah.
21   Q.   And then where does he go after that?
22   A.   He goes home.  When we first started the
23        company, I think he lived in Augusta, but

Page 116

1    now he lives in -- somewhere in South
2    Carolina.
3    Q.   All right.  Now, before that meeting had
4         you discussed with Mr. Alexander -- or
5         Mr. Lambert the use of that space as the
6         office or did it take place during that
7         meeting?
8    A.   No.  It took place during that meeting.  I
9         had never been there until then.
10   Q.   And was Mr. Lambert present throughout the
11        meeting with you and Mr. Alexander and
12        Mr. Dasinger?
13   A.   He was there in the beginning and then he
14        left.
15   Q.   Did he say why he was leaving?
16   A.   Because he didn't need to be there.
17   Q.   He specifically said I don't need to be
18        here and I'm leaving?
19   A.   Right.
20   Q.   And the meeting proceeded just with you,
21        then, and Mr. Dasinger and Mr. Alexander?
22   A.   That's correct.
23   Q.   And what did you all discuss?

29 (Pages 113 to 116)

Page 125

1    I personally have a long history with the
2    Mims property, and I've always referred to
3    it as the Mims property.
4    Q.  What's your history with the Mims property?
5    A.  Back in the early '80s Globe was involved
6        with the Mims pit through an English
7        company that was mining gravel out of
8        there. And it went on for several years,
9        and then they -- Globe and this English
10       company had a little bit of a falling-out.
11       And they went out of business. And I don't
12       recall the specific dates and time of all
13       this. It's kind of ancient history. And
14       they, you know, supplied a lot of material
15       to our Selma plant. And then when this
16       English company went out of business, it
17       kind of -- the property sat there and
18       nobody used it for a long time.
19       And then Cecil Cash is a fellow that
20       produces some gravel and had produced some
21       gravel for Globe. He had some property of
22       his own, also, on Swift Creek close to the
23       Mims property. And he -- when Globe went

Page 126

1    bankrupt, unfortunately he was a casualty
2    in that, and Elchem bought all his
3    equipment and had him operate the Mims
4    property.
5    Q.  And you dealt with him when he was there
6        when you were with Globe?
7    A.  I didn't deal with him so much. That was
8        done with the purchasing guy located at
9        Selma. Each plant kind of had their own
10       purchasing guy and they kind of just
11       reported to me what they were doing, who
12       they were dealing with.
13   Q.  Now, at the meeting that you all had before
14       Alabama Gravel was formed at the Gumels
15       Road location, what course of action was
16       decided to be taken after that meeting with
17       respect to moving the company forward?
18   A.  Just, you know, get an attorney and get
19       these -- this articles of organization
20       drawed up.
21   Q.  Now, the financing for the company, who was
22       it that put up the money to form the
23       company?

Page 127

1    A.  Robert and myself.
2    Q.  So you put up your own money and
3        Mr. Alexander put up money. Did
4        Mr. Dasinger put up any money?
5    A.  No.
6    Q.  Where does Mr. Dasinger live?
7    A.  I have no idea.
8    Q.  Somewhere near the -- is it in Alabama?
9    A.  Yes. Yes.
10   Q.  Is it near the Deatsville operation?
11       If you don't know --
12   A.  I don't know.
13   Q.  And was there a discussion at that time as
14       to how compensation would work with the
15       company?
16   A.  No.
17   Q.  Did you discuss Mr. Dasinger drawing a
18       salary?
19   A.  Yeah. We talked about Rex being -- since
20       he was going to be like the foreman for the
21       thing, we talked about his salary and what
22       it should be.
23   Q.  What was that going to be?

Page 128

1    A.  I want to think it's about a thousand
2        dollars a week.
3    Q.  Was there any discussion about any
4        compensation to Mr. Lambert at that time?
5    A.  No.
6    Q.  Was there any discussion about who Alabama
7        Gravel would use to haul its product?
8    A.  Yes.
9    Q.  And what was that discussion?
10   A.  We just -- you know, we talked, you know,
11       that we need somebody to haul the material
12       and that we had Carol's Contracting haul
13       the material for us.
14   Q.  And how did you come to consider Carol's
15       Contracting to do the hauling?
16   A.  Well, just more as a, you know, favor than
17       anything else. Just let them haul it for
18       us.
19   Q.  Did you talk to Harry about them doing the
20       hauling for you?
21   A.  Yes, I believe we did
22   Q.  Did you ever talk to Mrs. Lambert about
23       doing the hauling for you?

Page 129

1  A.  Yes, we talked to her as well.
2  Q.  Who did you talk to first, Harry or
3     Mrs. Lambert?
4  A.  Harry.
5  Q.  And how much -- how many -- well, when you
6     talked to Mrs. Lambert, was there anything
7     new discussed that you hadn't already
8     talked to Harry about?
9  A.  Alls we really -- alls we asked was, you
10    know, would it be okay if we got Carol's
11    Contracting to haul it.  We never discussed
12    rates or prices or anything of that -- not
13    at that time we didn't, because it was, you
14    know, irrelevant at that point, but just
15    could you haul this for us.
16  Q.  And during those meetings did you talk
17    about other potential -- during that
18    meeting did you talk about other potential
19    haulers?
20  A.  No.
21  Q.  Did you talk about any other role that
22    Mrs. Lambert would play in Alabama Gravel?
23  A.  Yeah.  We talked that we needed some other

Page 130

1     people.  We needed -- you know, primarily
2     the first thing we needed was, you know, a
3     bookkeeper and that she had experience in
4     that area, being a bookkeeper, and we could
5     get her cheap.  And so we -- you know, we
6     talked about seeing if she would do the
7     books for us.
8  Q.  Did you talk to Mr. Lambert about that
9     before you talked to Mrs. Lambert?
10  A.  Yes.  Yes.
11  Q.  Did Harry -- did Mr. Lambert recommend
12    Mrs. Lambert to be the bookkeeper?
13  A.  He didn't recommend her.  We asked him if
14    she would be interested in doing it.  And
15    he said that he'd ask her, but he was sure
16    she probably would because, you know, she
17    was needing something to do.
18  Q.  He said she was needing something to do?
19  A.  Yeah.
20  Q.  Do you know when Carol's Contracting, Inc.,
21    was formed?
22  A.  I do not.
23  Q.  Have you ever heard of a company called

Page 131

1     Carol's Trucking, Inc.?
2  A.  No.
3  Q.  So then at that meeting you -- well, is
4     there anything else that was discussed at
5     that meeting that we haven't talked about?
6  A.  Not that I can recall, no.
7  Q.  Was there a discussion about where you were
8     going to acquire the equipment and the
9     vehicles necessary to begin the Deatsville
10    operation?
11  A.  Robert was going to handle all that.
12  Q.  What about the -- with respect to beginning
13    operations out of Gentry, what course of
14    action was put in place to deal with that?
15  A.  Robert -- again, Robert would handle that.
16  Q.  And what eventually did take place to get
17    the hauling out of Gentry, the mining of
18    Gentry undertaken?
19  A.  Robert met with Mr. Gentry and, you know,
20    they worked out a deal.
21  Q.  Did you ever go visit the Gentry site?
22  A.  Yes.
23  Q.  And was that before or after that meeting?

Page 132

1  A.  After.
2  Q.  And was it before Alabama Gravel was
3     incorporated?
4  A.  It was about the same time.
5  Q.  And what was the purpose of that visit?
6  A.  I just wanted to see it.  You know, I had
7     never been there and didn't know anything
8     about it.  Just wanted to see it, you know,
9     wanted to see, you know, what -- well, what
10    it looked like.
11  Q.  Now, I understand Mr. Alexander -- you've
12    told me about what Mr. Alexander was going
13    to do for the company and what Mr. Dasinger
14    was going to do for the company.  What role
15    were you going to play moving forward with
16    the company?
17  A.  Really the only role I had was just, you
18    know, with all my contacts in the
19    metallurgical industry was being able to
20    move the oversized material.
21  Q.  So you were going to deal with the buyers?
22  A.  Right.
23  Q.  And was there a discussion at that meeting

Deposition of David Tuten                                                July 13, 2006

Page 145

1    and Globe -- Simcala would call me or
2    sometimes they would call Robert. Globe
3    would call me. And Jim Maddox would call
4    Robert.
5    Q. And if you got a call from one of the three
6       customers that you mentioned -- and those
7       were the only customers you all ever sold
8       to before you shut down?
9    A. That is correct.
10   Q. If you got a call from one of those
11      customers, what would you then do to
12      arrange to make sure that the product got
13      there?
14   A. I would just turn around and call Robert,
15      Mr. Alexander.
16   Q. All right. And so then you would call
17      Robert. And to your knowledge what would
18      Robert do to facilitate the shipment of the
19      product to the customer?
20   A. I would just call Robert and I'd, you know,
21      say, you know, customer A wants -- you
22      know, wants material, do we have it and,
23      you know, this is when they want it by.

Page 146

1       And then I'd leave it in his lap.
2    Q. You don't know if Robert then called
3       Carol's Contracting, or do you know how
4       that worked?
5    A. No, I do not know.
6    Q. Did you ever put a customer in touch with
7       Mr. Lambert to haul product to the
8       customer?
9    A. No.
10   Q. So you never got a call from a customer and
11      then called Mr. Lambert and said,
12      Mr. Lambert, here, this customer needs "X"
13      tons, go get it at Gentry and take it to
14      him?
15   A. No.
16   Q. Do you know if Mr. Alexander ever handled
17      it that way?
18   A. I do not know.
19   Q. Have you ever called Carol's Contracting?
20   A. I've talked to Carol, yes.
21   Q. So if you called Carol's Contracting, what
22      number would you dial?
23   A. I don't know what the number is. I've got

Page 147

1    it on a card, but I don't -- I don't know
2    what it is. 290-something.
3    Q. So you don't have the Carol's Contracting
4       number in your cell phone?
5    A. No, I do not.
6    Q. But you have Mr. Lambert's number in your
7       cell phone?
8    A. That's correct.
9    Q. And so if you were going to call Carol's
10      Contracting, wouldn't you call Mr. Harry
11      Lambert?
12   A. No. I've -- no, would not.
13   Q. And so have you had times when you needed
14      to deal with Carol's Contracting?
15   A. No.
16   Q. So have you ever called Carol's
17      Contracting?
18   A. Yeah, I've called her. But I've never had
19      an issue, you know, where a customer would
20      call -- what you're asking for I've never
21      had to deal with.
22   Q. What have you called Carol's Contracting
23      about?

Page 148

1    A. Just call her and ask a question about
2       something, you know, how many loads have we
3       hauled here or there. That would be it.
4    Q. So if you wanted to find out the load
5       history, then you would call Carol's
6       Contracting?
7    A. Right.
8    Q. And, again, you don't have that number, but
9       it's on a card somewhere?
10   A. I've got it, yeah, on a card.
11   Q. Where would that card be?
12   A. Probably in my briefcase.
13   Q. Did you bring it with you?
14   A. No, I did not.
15   Q. Is it in Ohio?
16   A. It's in my hotel room.
17   Q. But somewhere there's a card that you have
18      that says Carol's Contracting, Inc., on it,
19      or what does it say?
20   A. Yeah, Carol's Contracting and just a phone
21      number written on it.
22   Q. Now, going on to the Deatsville pit. When
23      did you all begin construction on that pit?

Deposition of David Tuten                                                    July 13, 2006

Page 149

1   A.  Would have been sometime in 2005.  Probably
2       the latter half of the year 2005.
3   Q.  You didn't start before the second half of
4       the year 2005?
5   A.  I can't -- I can't recall.  I didn't have
6       much to do with that, so I don't recall.
7   Q.  Would Mr. Alexander be the one to talk to
8       about that?
9   A.  Yes, he would.
10  Q.  Do you recall going to the Deatsville pit
11      with Mr. Lambert in -- or the Deatsville
12      site with Mr. Lambert in 2004?
13  A.  Me and Mr. Lambert went to the Deatsville
14      site, but it had been -- it would have been
15      in 2005.  It would have been after -- right
16      around the time the company was formed.  It
17      might have been January, February 2005.  I
18      remember it was -- we rode up there one
19      time.
20  Q.  At some point, then, you all went to the
21      Deatsville site together?
22  A.  Yes.
23  Q.  Why did you do that?

Page 150

1   A.  Just out riding around and I wanted to, you
2       know, see where this place was that
3       Mr. Dasinger had talked about -- that he
4       had talked about and so we just -- he took
5       me up there.
6   Q.  Mr. Lambert knew where the Deatsville site
7       was?
8   A.  Yes.
9   Q.  And why were you out riding around with
10      Mr. Lambert?
11  A.  Because he knew where the site was and he
12      took me up there.
13  Q.  Did you call him to take you to the site?
14  A.  Yes, I did.
15  Q.  Why didn't you call Mr. Dasinger to take
16      you to it?
17  A.  Because he was working.
18  Q.  At Gentry?
19  A.  At the -- at that time I -- we hadn't
20      started the Gentry pit yet.  I don't know
21      where he was.
22  Q.  So, then, you all visited the Deatsville
23      site before you all began mining at Gentry?

Page 151

1   A.  Oh, yeah.
2   Q.  And when you went to the site, what did you
3       all do?
4   A.  We just drove around it, you know, rode
5       around in there.  It's kind of a swamp.
6   Q.  Did you take any soil samples when you were
7       there?
8   A.  I took some samples, yes.
9   Q.  So how did you do that?
10  A.  I just put them in a bag.  Picked up some
11      rocks, put them in a bag.
12  Q.  So is that something that you had
13      experience with before?
14  A.  Well, I've taken, you know, samples of rock
15      before, but, I mean, I'm not no expert.  I
16      just wanted to get them tested for
17      chemistry.
18  Q.  Were these rocks on top of the ground or
19      were they down under the ground?
20  A.  There was some existing holes where
21      Mr. Dasinger had went in there and dug,
22      some old holes.
23  Q.  Dug --

Page 152

1   A.  It was an existing pit.  You know, somebody
2       had mined that before.  It was the old
3       Ingram gravel pit.  So there was some, you
4       know, exposed areas where there was rock
5       and stuff.
6   Q.  So there were also some holes that
7       Mr. Dasinger had dug?
8   A.  Right.
9   Q.  Do you know how big those holes were that
10      Mr. Dasinger had dug?  I mean, were they
11      dug with a bulldozer, or how were they --
12  A.  With a backhoe.
13  Q.  So Mr. Dasinger had dug with a backhoe, and
14      you knew these spots that he had dug?
15  A.  I mean, just drove around and found them.
16  Q.  How did you know those were the ones that
17      Mr. Dasinger had dug and not from the old
18      Ingram operation?
19  A.  Because they looked pretty new.  I mean,
20      you know, the Ingram operation hadn't been
21      in there for probably ten years or longer
22      and you could tell by looking.
23  Q.  Did Mr. Lambert know where those holes

Page 153

1      were?
2   A.  I think he knew the holes were in there,
3      but I don't know if he knew specifically
4      where they were.
5   Q.  So he knew that Mr. Dasinger had dug some
6      holes there?
7   A.  Yes.
8   Q.  But you can't recall if he specifically
9      knew where they were?
10  A.  No.
11  Q.  And, again, is it your testimony that
12     Mr. Lambert didn't dig those holes?
13  A.  That is correct.
14  Q.  And the rocks that you took, did
15     Mr. Lambert help you take soil samples?
16  A.  No.
17  Q.  What did you do with those samples?
18  A.  I took them home with me and had them
19     tested.
20  Q.  Where were they tested?
21  A.  At Globe.
22  Q.  You still had contacts there at Globe that
23     would help you?

Page 154

1   A.  Yes.
2   Q.  And what did those test results yield?
3   A.  The chemistry of the product was good.
4   Q.  So could you see at that point holes --
5      well, strike that.
6         Did you take the rock samples from the
7      holes that you say Mr. Dasinger dug?
8   A.  Yes.
9   Q.  And not from the old Ingram area?
10  A.  Both.
11  Q.  Both.  And could you see at that time that
12     it looked like white oversized material?
13  A.  Yes.
14  Q.  And so that's why you had it tested?
15  A.  Yes.
16  Q.  And you were pleased with the chemistry?
17  A.  Yes.
18  Q.  Was this before the meeting at
19     Mr. Lambert's property had gone through the
20     first time with Mr. Dasinger and
21     Mr. Alexander?
22  A.  It was around that same time, yes.
23  Q.  And then what was the next involvement you

Page 155

1      had, if any, with the construction of the
2      Deatsville operation?
3   A.  I had nothing -- very little to do with the
4      Deatsville.  I mean, I don't know anything
5      about constructing a sand and gravel
6      plant.  So I had been out there, you know,
7      and watched them or whatever, but I haven't
8      had any input into anything.
9   Q.  Were you out there when they were
10     constructing the Deatsville operation?
11  A.  Yes.
12  Q.  Other than this time you spoke about with
13     you and Harry driving out there where you
14     took the soil samples, do you recall going
15     out to the Deatsville operation with
16     Mr. Lambert again?
17  A.  No.
18  Q.  Do you recall speaking with Mr. Lambert
19     again about the construction of the
20     Deatsville site?
21         MR. BAILEY:  Object to the form.
22         You mean anytime or prior to
23         January 2nd, 2006?

Page 156

1   Q.  This would be after your meeting with
2      Mr. Dasinger and Mr. Alexander at the
3      Gunnels Road property just before you were
4      incorporated.  Do you recall talking to
5      Mr. Lambert after that time about the
6      construction of the Deatsville site?
7   A.  No, I do not.
8   Q.  Do you know if Mr. Alexander talked to him
9      about it?
10  A.  I don't -- I have no knowledge of that.
11  Q.  Did you talk to Mr. Dasinger about that
12     construction?
13  A.  No.
14  Q.  When you went -- how many times have you
15     been to the Deatsville site?
16  A.  Since ...
17  Q.  Since the time with Mr. Lambert.
18  A.  Till today?
19  Q.  Yes.
20  A.  Maybe a dozen or so.
21  Q.  All right.  With respect to the product
22     that was sold from the Gentry site, did you
23     receive some sort of a cash distribution

Deposition of David Tuten

July 13, 2006

Page 169

1    A.  No, sir.
2    Q.  The apartment on Mr. Lambert's property
3        that you spoke of that Mr. Alexander was
4        using, is that rented separately from the
5        rent that Alabama Gravel pays to use the
6        office space?
7    A.  No, sir.
8    Q.  So it's all part of the same approximately
9        $1,000 a month?
10   A.  Yes, sir.
11   Q.  When you all formed Alabama Gravel was
12       there a percentage of ownership agreed to
13       between you and Mr. Dasinger and
14       Mr. Alexander?
15   A.  Yes, sir.
16   Q.  And what is that percentage?
17   A.  Mr. Dasinger has 5 percent.  I have 25
18       percent, and Mr. Alexander has 70 percent.
19   Q.  And, again, was there any percentage of
20       ownership contemplated at the formation of
21       Alabama Gravel for Mr. Lambert?
22   A.  No, sir.
23   Q.  Since that time has any percentage of

Page 170

1        ownership in Alabama Gravel been
2        contemplated?
3    A.  No, sir.
4    Q.  You mentioned earlier that you had only
5        purchased one item for Alabama Gravel, and
6        I guess that was the scales that you talked
7        about; is that correct?
8    A.  Yes, sir.
9            (Plaintiff's Exhibit 2 was marked
10           for identification.)
11   Q.  All right.  Will you take a look at that,
12       please.
13   A.  Uh-huh (positive response).
14   Q.  Do you recognize any of those documents?
15   A.  I know I signed some documents for
16       Caterpillar.  Robert and I both signed some
17       documents for Caterpillar, but I don't know
18       if these are them or not.
19   Q.  What address is 123 Petunia Drive,
20       Deatsville, Alabama?
21           MR. GRISTINA:  And for the record,
22           that's reflected on the first
23           page of Defendant's (sic)

Page 171

1        Exhibit 2 — the first page.
2        It's probably on the other
3        page too.  Let me see.  Yeah,
4        it's actually on -- it's
5        listed on all three pages.
6    A.  I do not have any idea.
7    Q.  Do you recall Mr. Lambert ever purchasing
8        any equipment for Alabama Gravel?
9    A.  No, sir.
10   Q.  Do you recall Mr. Lambert ever pointing you
11       in the right direction of a place to get
12       any equipment for Alabama Gravel?
13   A.  No, sir.
14   Q.  I have the binder of exhibits that we dealt
15       with in the earlier depositions.  I'm going
16       to look at this particular --
17           MR. GRISTINA:  I didn't photocopy
18           these again.  I apologize,
19           gentlemen.
20   Q.  But the first one is Defendant's Exhibit 5.
21           MR. GRISTINA:  Did I call the
22           earlier one -- Plaintiff's
23           Exhibit 2.  I'm sorry.

Page 172

1    Q.  All right.  Now, we are on Defendant's
2        Exhibit 5 from the previous depositions.
3            MR. GRISTINA:  And for the record,
4            this is the D & B sheet that
5            we talked about.
6    Q.  Do you see the address listed below Alabama
7        Gravel, LLC, on the first page?
8    A.  Yes.
9    Q.  Did you have any contact with anybody at
10       Dun & Bradstreet regarding that address?
11   A.  No.
12   Q.  And, again, we talked about how you all
13       came to use that address.
14           Now, the telephone number that's listed
15       for Alabama Gravel, do you recognize that
16       number, (334) 290-1454?
17   A.  Yes.
18   Q.  What number is that?
19   A.  That's Alabama Gravel.  That's our phone
20       number.
21   Q.  And where does that phone ring?
22   A.  In our office.
23   Q.  So that phone is in that structure on

Page 173

1    Mr. Lambert's property?
2    A.   Yes.
3         MR. BAILEY:  Object to the form.
4    Q.   And that's not inside the Lambert
5    household?
6    A.   No, sir.
7    Q.   They list the line of business as
8    construction sand and gravel.  Is that
9    consistent with your understanding of
10   Alabama Gravel's business?
11   A.   That's a pretty broad -- that's a pretty
12   broad title there, construction sand and
13   gravel.  I don't know what that means
14   exactly.
15   Q.   Well, I understand.  And you didn't have
16   any contact with Dun & Bradstreet preparing
17   this?
18   A.   No, sir.
19   Q.   But at least as it was originally
20   conceived, wasn't it Alabama Gravel's plan
21   to focus on the white oversized product?
22   A.   Yes, sir.
23   Q.   And as far as you know is that used in

Page 174

1    construction?
2    A.   I would hope not.
3    Q.   It wouldn't be very efficient?
4    A.   No, I wouldn't think.
5    Q.   And I apologize if I asked you this
6    before.  But are you aware of what
7    Mrs. Lambert's compensation is from Alabama
8    Gravel?
9         MR. WALTER:  You mean Carol's
10        Contracting?
11        MR. GRISTINA:  Well, that's a fair
12        clarification.
13   Q.   There will be two aspects of it, the first
14   being as a bookkeeper.  Are you aware of
15   what her compensation is?
16   A.   I think it's about $500 a week.
17   Q.   And that's as the bookkeeper for Alabama
18   Gravel?
19   A.   Yes, sir.
20   Q.   Now, separately, focusing on Carol's
21   Contracting, Inc., are you aware of any
22   compensation to Mrs. Lambert other than
23   monies that are paid to Carol's

Page 175

1    Contracting, Inc., in exchange for
2    hauling?
3         MR. BAILEY:  Object to the form.
4         He's already talked about a
5         lease.
6    A.   Repeat that one more time, please.
7    Q.   Well, Alabama Gravel pays Carol's
8    Contracting, Inc., hauling fees, doesn't
9    it?
10   A.   Yes.
11   Q.   And they pay -- well, who do they pay -- is
12   the rent for the office space to Carol's
13   Contracting, Inc., or is it to Carol
14   Lambert?
15   A.   It's to Carol Lambert.
16   Q.   So other than those two items of
17   compensation, one going directly to
18   Mrs. Lambert that you testified and the
19   other being the hauling charges to Carol's
20   Contracting, Inc., are you aware of any
21   other compensation that is paid to Carol
22   Lambert by Alabama Gravel?
23   A.   Other than what we pay her to do the books,

Page 176

1    too, the bookkeeping.
2    Q.   Anything else?
3    A.   No.
4    Q.   Do you pay any commissions to anybody in
5    terms of brokerage fees -- does Alabama
6    Gravel pay anybody any brokerage fee
7    commissions in exchange for setting Alabama
8    Gravel up with customers for white
9    oversized gravel?
10   A.   No, sir.
11   Q.   Have you ever paid Mr. Lambert any
12   commission for arranging deals between
13   Alabama Gravel and purchases of white
14   oversized gravel?
15   A.   No, sir.
16   Q.   Has that ever been discussed?
17   A.   No, sir.
18   Q.   Has he ever asked for any commissions?
19   A.   No, sir.
20   Q.   Isn't it true that Alabama Gravel wouldn't
21   exist today if it were not for Harry
22   Lambert?
23        MR. BAILEY:  Object to the form.

Deposition of David Tuten                                                        July 13, 2006

Page 177

1   A.  I wouldn't be involved in it.
2   Q.  So at least you would not be involved in
3       that company if it were not for
4       Mr. Lambert?
5   A.  Yes, probably.
6   Q.  Do you know how Mr. Alexander first got in
7       touch with Simcala?
8   A.  I believe they called -- I believe they
9       called Mr. Lambert and then Mr. Lambert
10      told them to call Mr. Alexander.
11  Q.  All right. Okay. Back to my earlier
12      question. You stated that you would not be
13      involved with Alabama Gravel. Wasn't it
14      your original concept? Wasn't Alabama
15      Gravel your concept originally?
16  A.  Well, I wanted to, you know, be involved in
17      the gravel business. And if, you know,
18      Mr. Lambert hadn't hooked me up with
19      Mr. Alexander, then I probably wouldn't
20      have, you know, pursued it any further than
21      that.
22  Q.  Do you think the company would have been
23      formed without you?

Page 178

1   A.  Oh, it's quite possible.
2   Q.  Do you have any reason to believe that
3       other than that possibility?
4   A.  Well, I mean, Mr. Alexander was -- you
5       know, he was wanting to get in the
6       business, you know, for himself for --
7       because of his business situation. So I
8       think he would have got in the business
9       anyway.
10  Q.  But certainly as it exists today with you
11      as a member it would not have existed?
12          MR. BAILEY: Object to the form.
13          MR. WALTER: I think that's a
14          mischaracterization. Go ahead
15          and answer it.
16  Q.  Were it not for your dealings with
17      Mr. Lambert, the company wouldn't exist in
18      the form it is today; isn't that correct?
19          MR. BAILEY: Object to the form.
20  A.  I don't know.
21  Q.  But you wouldn't be a part of it?
22  A.  But I wouldn't be a part of it.
23  Q.  Now, in speaking about Mr. Gentry, I assume

Page 179

1       that you've had conversations with him over
2       the course of dealing between Alabama
3       Gravel and his plant; is that correct?
4   A.  I have met Mr. Gentry two, three times.
5   Q.  All right. In response to -- in Alabama
6       Gravel's initial disclosures there is an
7       entry for Mr. Gentry, and I'm showing that
8       to you. You didn't sign these, but did you
9       participate in the drafting of these?
10          And I'm not asking you questions about
11      your -- you may have had with Mr. Walter or
12      his firm.
13  A.  Yeah. I might have, yes.
14  Q.  All right. Looking at the entry from Mike
15      Gentry, below his name it says Mr. Gentry
16      is expected to have information concerning
17      his dealings with the parties to this case
18      and why he would not be interested in doing
19      business with plaintiff, the plaintiff
20      being The Concrete Company.
21  A.  Uh-huh (positive response).
22  Q.  Is that a true statement as far as you
23      know?

Page 180

1           MR. WALTER: Well, I'm going to
2           object and instruct him not to
3           answer because that gets into
4           work product. He can testify
5           as to any conversations he
6           might have had with
7           Mr. Gentry, but I think for
8           him to otherwise answer that
9           question he would have to rely
10          upon communications with
11          counsel and work product.
12          MR. GRISTINA: And I don't want to
13          get into that. Let me ask it
14          this way and see if it's all
15          right.
16  Q.  Other than information you received from
17      your attorneys, have you had discussions
18      independent with Mr. Gentry about why he
19      would or would not want to do business with
20      The Concrete Company?
21  A.  No, I have not.
22  Q.  Has anybody else other than your attorneys
23      told you why he would not want to do

Deposition of David Tuten                                          July 13, 2006

Page 197

1    6th, 2005, date -- do you see where I'm
2    pointing?
3    A.  Uh-huh (positive response).
4    Q.  And it looks like they have an entry on
5    here.  It says around one o'clock, Harry
6    Lambert and then in brackets below it
7    Robert Alexander.  Then I have to turn it
8    so I can read it.  But it said, I
9    believe -- right below Robert Alexander is
10   an arrow pointed down and says called me on
11   1-10-05.  Will get back when he has some
12   more info.  Can reach him at (706)
13   733-9896, home, (706) 706-9896, cell.  But
14   I'm probably reading that wrong.  It's
15   probably 786, but it's the quality of the
16   copy.
17        All right.  Do you recall any
18   discussion with Mr. Alexander about that
19   time frame and any discussions he had with
20   Dick Wymer?
21   A.  I know that Dick had called or that Robert
22   had talked to Dick.
23   Q.  And were you involved in any of these

Page 198

1    discussions around January 6th, 2005?
2    A.  No, sir.
3    Q.  Do you know if in fact Mr. Alexander went
4    to Simcala's offices on January 6th, 2005?
5    A.  I have no idea.
6    Q.  All right.  Mr. Wymer, is he located out of
7    Mount Meigs?
8    A.  Yes.
9    Q.  And do you know if Mr. Lambert and
10   Mr. Alexander went to Mr. Wymer's office on
11   that day?
12   A.  I have no idea.
13   Q.  Were you aware of any discussions during
14   this same period, either shortly before or
15   shortly after, between Simcala and The
16   Concrete Company regarding production and
17   supply of white oversized from the Ward
18   plant to Simcala?
19   A.  No, I was not.
20   Q.  Had you ever talked to Mr. Wymer at that
21   time frame about The Concrete Company's
22   negotiations with him?
23   A.  No.

Page 199

1    (Plaintiff's Exhibit 3 was marked
2    for identification.)
3    MR. GRISTINA:  This is -- for the
4    record it's going to be
5    Alabama Gravel's documents
6    00098 through 105 with a cover
7    e-mail from Mr. Walter to
8    counsel.  It's a production --
9    it's the consulting agreement.
10   Q.  Have you seen that document before,
11   Mr. Tuten?
12   A.  Yes, sir.
13   Q.  Now, I want to be sure because I think you
14   mentioned earlier that this was drafted
15   with the assistance of counsel.  So none of
16   my questions are intended to elicit any
17   information that you conveyed to counsel or
18   they conveyed to you.
19        You state in the first page that
20   Alabama Gravel -- well, it states on the
21   first page that Alabama Gravel first began
22   selling such gravel from said pit after
23   April 1 of 2005.  Is it your contention

Page 200

1    that Alabama Gravel sold no gravel before
2    that date?
3    A.  That is correct.
4    Q.  Now, it also states that the company --
5    right above that it says that the company
6    was formed initially to mine and sell only
7    white oversized metallurgical gravel at the
8    Gentry pit near Independence, Alabama,
9    primarily for customers who were unable to
10   obtain sufficient supplies from The
11   Concrete Company.  Now, is that what the
12   initial plan for Alabama Gravel was?
13   A.  The initial plan was to sell white
14   oversized metallurgical gravel, yeah.
15   That's all we had.
16   Q.  But at that time weren't you also
17   contemplating opening the Deatsville
18   operation?
19   A.  Yes.
20   Q.  So, then, your initial plan wasn't just
21   limited to the Gentry pit?
22   A.  Well, in that time frame, but we knew the
23   Deatsville -- I mean, that was a long ways

Page 221

1    Q.  So Keith Tuten. Is he in the purchasing
2        wing?
3    A.  No, he is not.
4    Q.  What wing is he in?
5    A.  He's customer service.
6    Q.  All right. And what did you hear from --
7        who else besides Keith Tuten?
8    A.  A lot of guys that worked for me still work
9        there, a lot of guys in operations,
10       different -- you know, different people.
11       Even guys that work out in the plant that,
12       you know, I'd run into on the street or
13       what have you.
14    Q.  It sounds like a lot of people were talking
15       about The Concrete Company white
16       oversized?
17    A.  No. I mean, I was just talking about all
18       the contacts I have.
19    Q.  Well, I'm interested in who it was
20       specifically that told you about white
21       oversized from The Concrete Company.
22    A.  Mr. Becker.
23    Q.  And what did he tell you about it?

Page 222

1    A.  That The Concrete Company had cut them way
2       back on supply and raised the price.
3    Q.  Let me ask you this: If Simcala -- if
4       Alabama Gravel had not begun selling white
5       oversized to Simcala and Globe from the
6       Gentry plant, do you believe that Simcala
7       and Globe would have continued to buy from
8       The Concrete Company?
9           MR. BAILEY: Object to the form.
10    A.  I wouldn't have any idea what they would
11       do.
12    Q.  Well, if you hadn't formed your company and
13       begun to sell from that plant, would they
14       have had any choice but to continue to keep
15       buying from The Concrete Company?
16           MR. BAILEY: Object to the form.
17    A.  Again, I don't know what their -- what they
18       would have done.
19    Q.  I mean, the only other major supplier in
20       the area was who?
21    A.  Well, you had Elmore Sand & Gravel in the
22       area.
23    Q.  And do you have any knowledge as to whether

Page 223

1       or not Simcala could have met its supply
2       needs simply from Elmore Sand & Gravel and
3       the mom-and-pop operations in the area?
4    A.  I don't have any knowledge whether they
5       could or not.
6    Q.  What about Globe?
7    A.  I don't know.
8           (Plaintiff's Exhibit 7 was marked
9           for identification.)
10    Q.  Do you recognize this document?
11    A.  Yes, sir.
12    Q.  And what is that?
13    A.  It's an invoice from Alabama Gravel to
14       Maddox Stone & Gravel.
15    Q.  All right. This is Plaintiff's 7, Alabama
16       Gravel 39 through 49. It's the same form
17       invoice as we were dealing with before. It
18       looks like, however, that the prices per
19       ton are approximately 18.50; is that right?
20    A.  Yes.
21    Q.  So, now, Maddox -- where did Maddox pick up
22       its stone from?
23       Well, is it oversized?

Page 224

1    A.  Yes.
2    Q.  All right. Where did Maddox pick up its
3       stone?
4    A.  At the Gentry pit.
5    Q.  And it looks like this was shipped to the
6       rail yard, the CSX rail yard. Is that
7       true?
8    A.  Yes.
9    Q.  So did Carol's Contracting simply ship from
10       Gentry to the rail yard?
11    A.  Yes.
12    Q.  And is that the reason why the price is
13       18.50 as opposed to the higher prices to
14       Globe and Simcala?
15    A.  Well, yeah.
16    Q.  So I assume the rail yard is closer to
17       Gentry than Selma or Mount Meigs; is that
18       right?
19    A.  Yes.
20    Q.  And were you involved in any way in
21       negotiations with Mr. Maddox?
22    A.  No, sir.
23    Q.  Would that have been Mr. Alexander?

Deposition of David Tuten                                                                July 13, 2006

Page 225

1  A.  Yes, sir.
2        MR. GRISTINA:  I'm going to leave
3        all these together as one
4        exhibit so it's easier.
5        (Plaintiff's Exhibit 8 was marked
6        for identification.)
7  Q.  All right.  You obviously don't recognize
8        the front page because it's a letter from
9        Mr. Walter to me.
10       MR. GRISTINA:  But for the record,
11       this is a production from
12       Alabama Gravel, Alabama Gravel
13       documents 106 through 152.
14  Q.  Let me ask you to look at the first page,
15       Alabama Gravel 106, if you would, please.
16       Do you recognize that?
17  A.  I've never seen it before.
18  Q.  All right.  For the record, it's a copy of
19       an ADEM national pollutant discharge
20       elimination system individual permit.
21       Now, you haven't seen it before.  Let
22       me ask you this:  Do you know who assisted
23       Alabama Gravel in obtaining this permit?

Page 226

1  A.  Yeah.  Larry Speaks.
2  Q.  Did you get into contact with Mr. Speaks to
3        arrange that?
4  A.  I talked to his -- not to him directly.  I
5        talked to one of the guys that worked for
6        him occasionally.  Just asked him, you
7        know, what's the latest on the permit.
8  Q.  Do you know what's involved in obtaining
9        one of these permits?
10  A.  No, I do not.
11  Q.  Did you first contact Mr. Speaks or his
12       organization about helping Alabama Gravel
13       get this permit?
14  A.  No.
15  Q.  Do you know who did?
16  A.  Robert.
17  Q.  Do you know how Robert got Mr. Speaks'
18       name?
19  A.  No, I don't know.
20  Q.  Is that one of the names that you all ran
21       by Harry?
22  A.  I don't know.
23  Q.  If you look at the next page of Alabama

Page 227

1        Gravel, 10007, it looks like some sort of
2        figures done in bookkeeping.  Did you have
3        any involvement in these?
4  A.  I have no idea what that is.
5  Q.  That's a receipt of some sort.
6        I think that it's the total of the
7        pages that follow, but for purposes of
8        today, we'll focus on the next page.  This
9        is an invoice -- this is Alabama Gravel
10       00108.  This is an invoice dated September
11       22nd, 2005, from Southern Steel & Pipe to
12       Alabama Gravel.
13  A.  Uh-huh (positive response).
14  Q.  Do you recognize this document?
15  A.  No.  The first time I've seen it.
16  Q.  All right.  And this is where I got that
17       address from earlier, P.O. Box 1006,
18       Millbrook, Alabama 36054.
19  A.  Yes.
20  Q.  Do you recognize that address?
21  A.  Yes.
22  Q.  What is that address?
23  A.  That's our company post office box.

Page 228

1  Q.  All right.  And have you ever had any
2        contact with anybody at Southern Steel &
3        Pipe?
4  A.  No, I have not.
5  Q.  Do you know who -- below it says -- in the
6        middle it says net 30 and then it says rep
7        RKB.  Do you know who RKB is?
8  A.  I'm sorry.  You've lost me.
9  Q.  Up under --
10  A.  Oh, right here?
11  Q.  Yes, sir.
12  A.  No, I do not.
13  Q.  It appears to be initials for somebody.
14  A.  Yeah.
15  Q.  Were you aware of what Southern Steel was
16       doing for Alabama Gravel in September of
17       2005?
18  A.  Alls I knew is, you know, we were buying
19       steel from them to help build the plant.
20  Q.  So at least in terms of this invoice it
21       looks like in September you were purchasing
22       steel for plant construction.  Is that in
23       Deatsville?

Deposition of David Tuten                                                                July 13, 2006

Page 229

1    A.  Yes, it would be.
2    Q.  But you didn't have any contact directly
3         with Southern Steel?
4    A.  No, sir.
5    Q.  Do you know who was constructing things
6         with the steel at Deatsville?
7    A.  Yeah.  Mr. Alan King.
8    Q.  So these would have been supplies that
9         Mr. King needed to build the Deatsville
10        plant or part of it?
11   A.  Yes, sir.
12   Q.  And these invoices -- there's a number of
13        them, but it looks to me -- if you could
14        take a look at all the Southern Steel ones
15        and see if you agree with me -- that -- I
16        want to get to the earliest one.  I think
17        that the September one is the earliest one,
18        but I want to be sure.  They go up to AG
19        00122.
20             Are you aware of any work by Southern
21        Steel at Deatsville before September of
22        2005?
23   A.  No, sir.

Page 230

1    Q.  And am I right that the dates on these
2         invoices appear to range from September of
3         2005 to April of 2006?
4    A.  That's what it says, yes.
5    Q.  And so that's approximately seven months;
6         is that correct?
7    A.  I guess so.
8    Q.  So at least in terms of what was being done
9         at Deatsville, it took Mr. King seven
10        months of invoicing and building to get you
11        guys to where it was the end of the
12        invoicing in April at least?
13   A.  It appears that way, yes.
14   Q.  And so certainly a production operation --
15        a mining operation isn't something you can
16        put together in less than seven months, is
17        it?
18   A.  Well --
19             MR. BAILEY:  Object to the form.
20   A.  -- I think if you had enough people in
21        doing it, yeah, you could probably go a
22        little faster than that.
23   Q.  But that's how long at least it's taken

Page 231

1         Alabama Gravel?
2    A.  That's correct.
3    Q.  Do you know who was telling Mr. King where
4         at the Deatsville site to put the plant?
5    A.  Yeah.  Robert.
6    Q.  So Robert, was he the only one who decided
7         the location of the plant, where it was
8         going to actually be put in the ground?
9    A.  Pretty much, yes.
10   Q.  Did you have any role in that?
11   A.  No.
12   Q.  Do you know where in proximity to the holes
13        that we talked about earlier that you and
14        Mr. Lambert went to -- do you know where in
15        proximity to those holes the plant was put?
16   A.  No.
17   Q.  Do you know if Mr. Lambert advised
18        Mr. Alexander on where to put that
19        plant?
20   A.  I do not know.
21   Q.  To your knowledge is the location of the
22        plant on the property to be mined an
23        important decision to be made?

Page 232

1    A.  I wouldn't have any idea.
2    Q.  Okay.  Looking at page 123 that's after all
3         of these invoices, Pond River Steel, Inc.
4         That's an invoice that looks to be dated
5         October 25th, 2005.  Do you know who Pond
6         River Steel, Inc., is?
7    A.  Yeah.  It looks like we bought some
8         conveyers off of them.
9    Q.  Did you have any involvement with them?
10   A.  No, sir.
11   Q.  I see where it says requested by Robert in
12        the upper right-hand corner.  Do you know
13        if that's Robert Alexander?
14   A.  I would assume so, yes.
15   Q.  And did you ever talk to somebody named
16        Kathy at Pond River Steel, Inc.?
17   A.  No, sir.
18   Q.  It looks like it's in Kentucky.  Did you
19        have any -- you didn't have any contact
20        with them in Kentucky?
21   A.  No, sir.
22   Q.  Do you know what contact or why Alabama
23        Gravel would be purchasing from the

Deposition of David Tuten                                                July 13, 2006

Page 233

1    Kentucky operation?
2  A.  Like I say, Robert bought it.  I have no
3       idea.
4  Q.  It says issued to Alabama Sand & Gravel in
5       the upper left-hand corner.  Do you think
6       that's just a mistake and it should be
7       Alabama Gravel?
8  A.  Yeah, I'd say that's a mistake.
9  Q.  Do you know if Mr. Alexander has another
10      entity named Alabama Sand & Gravel?
11  A.  No, he does not.
12  Q.  Are you aware of another company called
13      that?
14  A.  Yes, I am.
15  Q.  Well, what's that company?
16  A.  That was the name of the company that
17      Elchem had that now Globe owns up on the
18      old Mims property.
19  Q.  But that company doesn't exist anymore as
20      far as you know?
21  A.  No.  It still exists, yes.
22  Q.  It does exists.  But Mr. Alexander hasn't
23      had any involvement with it, has he?

Page 234

1  A.  No.
2  Q.  The "334" number, 1454, is that the Alabama
3       Gravel phone number?
4  A.  Yes, sir.
5  Q.  And do you recognize that below number as
6       the Alabama Gravel fax number?
7  A.  Yes, sir.
8  Q.  And would these supplies as best you can
9       tell be the same things that Mr. King was
10      needing to build the plant?
11  A.  These are radial stackers.  Part of the
12      plant, yeah.
13  Q.  All right.  Looking at, I guess, the
14      invoices pages 125 through 129.  Have you
15      seen those before?
16  A.  No, sir.
17  Q.  Those are from Larry Speaks & Associates.
18      Is that the Mr. Speaks that we were
19      speaking about earlier?
20  A.  Yes, sir.
21  Q.  It looks like the earliest invoice from
22      Mr. Speaks' operation is dated May of '05;
23      is that correct?

Page 235

1  A.  It looks -- yeah.
2  Q.  So at least according to this you all began
3       to use Mr. Speaks for permit assistance in
4       May of 2005?
5  A.  Yes.
6  Q.  And then that permit was obtained in April
7       of '06; is that right?
8  A.  Yes.  It looks like he didn't do a very
9       good job, does it?
10  Q.  I don't know.  In your experience does it
11      take that long to get a permit?
12  A.  I wouldn't think it'd take a year, but it
13      did.
14  Q.  Do you have previous experience to indicate
15      that obtaining a permit such as this can be
16      done in less than a year?
17  A.  No.  I mean, I -- I -- we were told that it
18      would only take like four months is what we
19      were told.
20  Q.  He told you that?
21  A.  Well, he told Robert that.
22  Q.  And then Robert told you that?
23  A.  Yes.

Page 236

1  Q.  Was this a bone of contention in the
2       company as to why the permit was taking so
3       long?
4  A.  It was a topic of conversation.
5  Q.  Did you ever talk to Mr. Lambert about it?
6  A.  No.
7  Q.  So you just talked to Mr. Alexander about
8       it?
9  A.  Yeah, me and Robert.
10  Q.  What about Dasinger?  Did you speak to him
11      about it?
12  A.  No, sir.
13  Q.  Now, looking at invoice 131 through 133.
14      They appear to be from a Pearce Pump South,
15      Inc.  Do you know that company?
16  A.  I know of them, yes.
17  Q.  They're actually in Columbus, Georgia;
18      correct?
19  A.  Yes.
20  Q.  Have you talked to them before?
21  A.  No.  I mean, I know the guy from Pearce
22      Pump.  I've met him like twice, but that's
23      all.

Deposition of David Tuten                                                                July 13, 2006

Page 237

1  Q.  Where did you meet him?
2  A.  I met him up at the gravel pit.
3  Q.  Do you know who hired Pearce Pump to do
4      work for Alabama Gravel?
5  A.  Robert is the one that's dealing with him.
6      He had done business with him before, I
7      guess.
8  Q.  Do you know if Mr. Lambert had any dealings
9      with Pearce Pump?
10 A.  I don't know.
11 Q.  There's a rep indication on here. It's
12     AL. Do you know anybody by the initials of
13     AL?
14 A.  No, sir.
15 Q.  And it looks like the first invoice from
16     them was April 4th, 2005. Does that seem
17     correct?
18 A.  Yes, sir.
19 Q.  Now, look at page 00134, please.
20 A.  Uh-huh (positive response).
21 Q.  What does this appear to you to be?
22         It looks like a deposit for Georgia
23     Power; is that correct?

Page 238

1  A.  For Alabama Power, yes.
2  Q.  I'm sorry.
3  A.  That's what it looks like.
4  Q.  Alabama Power. Now, do you know when this
5      deposit was paid by Alabama Gravel?
6  A.  I know it's not been that long ago. It
7      just says at the bottom delinquent after
8      March 26th.
9  Q.  Did you have any involvement with this
10     deposit?
11 A.  Not with this deposit, no.
12 Q.  Did you have any involvement with setting
13     up the power for the -- is this for the
14     Deatsville plant?
15 A.  Yes.
16 Q.  There is a service address that says 283
17     Cypress Road. Do you recognize that
18     address?
19 A.  Yes.
20 Q.  What is that address?
21 A.  That is the physical address that was given
22     to us for the Deatsville plant.
23 Q.  And below service it says old plant?

Page 239

1  A.  Yes.
2  Q.  Do you know why it says old plant?
3  A.  Well, there used to be an old plant there.
4  Q.  But no other reason?
5  A.  No.
6  Q.  Now, looking at the next invoice, 136, from
7      Turner Scale. Is that the product that you
8      purchased?
9  A.  Yes, sir.
10 Q.  That number -- voice number (334) 271-3232,
11     is that the Turner Scale number?
12 A.  I'm sorry. Where is it again?
13 Q.  Just above sold to Alabama Gravel there's
14     two phone numbers.
15 A.  I would say so, yeah.
16 Q.  That's not your --
17 A.  That's not -- no.
18 Q.  Oh, do you have Mr. Dasinger's cell phone
19     number?
20 A.  No, I do not.
21 Q.  How do you reach him?
22 A.  I have no need to talk to him.
23 Q.  So you've never called Rex Dasinger?

Page 240

1  A.  No. I talk to Robert.
2  Q.  Do you and Mr. Dasinger not get along or
3      something?
4  A.  No. Just he takes his orders from Robert,
5      so -- like I said, I'm not involved in the
6      day-to-day operation or nothing, so I
7      really don't have a need to talk to him.
8      When I visit, I see him and, you know,
9      speak to him, but, I mean, we don't
10     converse, no.
11 Q.  So you don't have his cell phone number?
12 A.  No.
13 Q.  And I've got to ask the question again.
14     This is the scale that you bought?
15 A.  Yes.
16 Q.  Now, going to Alabama Gravel 139. It's
17     invoices from Southern Wire Enterprises,
18     Inc.
19 A.  Uh-huh (positive response).
20 Q.  Do you know who they are?
21 A.  Southern Wire, yes.
22 Q.  What do they provide?
23 A.  Screen cloth.

Page 249

1     believe they sold that much white
2     oversized?
3     A.  Yeah.  Possibly, yeah.
4     Q.  Do you know what your net profit on that
5         sale was?
6     A.  I have no idea.
7     Q.  You have an accounting background, don't
8         you?
9     A.  Yes, sir.
10    Q.  But you don't have any involvement with the
11        books of Alabama Gravel?
12    A.  No, sir.
13    Q.  Do you believe that that number has been
14        calculated, the net profit on the sales
15        from the Gentry pit to Simcala?
16    A.  No.
17    Q.  Do you think it's possible that Alabama
18        Gravel sold more than $1.56 million in
19        white oversized to Simcala?
20             MR. BAILEY:  Object to the form.
21    A.  Yeah.
22    Q.  How much do you think they sold?
23    A.  I don't know what we had sold to Simcala in

Page 250

1     total.
2     Q.  What about to Globe?  Do you know how much
3         white oversized you sold to Globe?
4     A.  No, sir.  We haven't sold to Globe for
5         quite some time.
6     Q.  Is it a number anywhere approaching 1.56
7         million?
8     A.  I doubt it.
9     Q.  Did you pay Mr. Gentry any money for the
10        white oversized that you mined at his pit?
11    A.  No, sir.
12    Q.  So the arrangement was still the power and
13        operating his plant?
14    A.  And he got to keep all the sand and the
15        smaller gravel.
16    Q.  Do you know if anything was put in writing
17        to Mr. Gentry on that?
18    A.  There was nothing in writing.
19    Q.  Do you know who negotiated the terms of
20        that arrangement?
21    A.  Robert.
22             (Plaintiff's Exhibit 13 was marked
23             for identification.)

Page 251

1     Q.  Now, have you seen this letter before?
2     A.  Yes, sir.
3     Q.  When did you first see it?
4     A.  Just right after it was written we got a
5         copy of it.
6     Q.  And for the record, it's a letter from W.
7         Eddie Boardwine, vice president of Simcala,
8         to Mr. Robert Alexander, Alabama Gravel,
9         LLC.  And it states, Dear Mr. Alexander, I
10        would like to confirm our interest in
11        Alabama Gravel Company becoming a long-term
12        supplier of metallurgical grade quartz for
13        Simcala.  Is that another word for white
14        oversized?
15    A.  Yes, sir.
16    Q.  Picking up with the letter again, our
17        interest in contractual negotiations would
18        be based on our volume requirements, price
19        competitiveness, and quartz quality.  We
20        would like to begin discussions in the near
21        future for a contractual agreement between
22        our companies beginning no later than
23        January 1, 2006.  Our volume requirements

Page 252

1     and positive long-term business plan will
2     provide a mutually beneficial agreement.
3     We look forward to forming a more formal
4     relationship with Alabama Gravel in the
5     near future.  Sincerely, Mr. Boardwine.
6          Now, this letter -- did you ever enter
7     into a contractual agreement between the
8     companies?
9     A.  No, sir.
10    Q.  Do you recall why or not?
11    A.  We didn't -- just never had -- we haven't
12        got around to it.
13    Q.  Does Simcala have a problem with Alabama
14        Gravel now that the Gentry pit is not
15        producing?
16    A.  No, sir.
17    Q.  Were they aware -- at any time did you let
18        them know that the Gentry pit was running
19        low?
20    A.  Yes, sir.
21    Q.  What step do you know, if any, that they
22        took to go to other suppliers at that
23        point?