# EXHIBIT P

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 2 of 21

Deposition of Carol Lambert    The Concrete Company vs. Lambert    August 22, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

THE CONCRETE COMPANY,

    Plaintiff,

Vs.    CIVIL ACTION NO.
    2:05-cv-1026-C

HARRY E. LAMBERT,
CAROL'S CONTRACTING, INC.,
and ALABAMA GRAVEL, LLC,

    Defendants.

* * * * * * * * * * * *

DEPOSITION OF CAROL LAMBERT, taken

pursuant to stipulation and agreement before

Patricia G. Starkie, Registered Diplomate Reporter,

CRR, and Commissioner for the State of Alabama at

Large, in the Law Offices of Rushton, Stakely,

Johnston & Garrett, 184 Commerce Street,

Montgomery, Alabama, on Tuesday, August 22, 2006,

commencing at approximately 9:05 a.m.

* * * * * * * * * * * *

Page 2

APPEARANCES

FOR THE PLAINTIFF:

Mr. Thomas F. Gristina
PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, P.C.
Attorneys at Law
Synovus Centre
1111 Bay Avenue
Third Floor
Columbus, Georgia 31901

Mr. Robin G. Laurie
BALCH & BINGHAM
Attorneys at Law
Suite 200
105 Tallapoosa Street
Montgomery, Alabama

FOR THE DEFENDANT:
Mr. Dennis R. Bailey
RUSHTON, STAKELY, JOHNSTON & GARRETT
Attorneys at Law
184 Commerce Street
Montgomery, Alabama

ALSO PRESENT:  Mr. Harry Lambert
    Mr. Hugh Sorrell

* * * * * * * * * * * *

EXAMINATION INDEX

CAROL LAMBERT

BY MR. GRISTINA . . . . . . . . .  4

BY MR. BAILEY . . . . . . . . . 159

Page 3

EXHIBIT INDEX
PLAINTIFF'S EXHIBITS
15  Articles of Incorporation - Carol's
    Contracting, Inc.    18

16  List of telephone numbers    112

17  Composite - Carol's Contracting,
    Inc. invoices    123
18  Documents produced by Foshee -
    handwritten calculations, driver
    pay lists, etc.    136
19  Documents produced by Foshee    136
20  Carol's Contracting's
    Second Supplemental Response to
    First Interrogatories    151
21  Carol's Contracting's Responses
    to First Interrogatories    151

22  Carol's Contracting's Responses
    to First Request for Production    151

* * * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and

between counsel representing the parties that the

deposition of:

CAROL LAMBERT

is taken pursuant to the Federal Rules of Civil

Procedure and that said deposition may be taken

Page 4

Reporter, CRR, and Commissioner for the State of
Alabama at Large, without the formality of a
commission;

    That objections to questions other than
objections as to the form of the question need not
be made at this time but may be reserved for a
ruling at such time as the said deposition may be
offered in evidence or used for any other purpose
by either party provided for by the Statute.

    It is further stipulated and agreed by and
between counsel representing the parties in this
case that the filing of said deposition is hereby
waived and may be introduced at the trial of this
case or used in any other manner by either party
hereto provided for by the Statute regardless of
the waiving of the filing of the same.

    It is further stipulated and agreed by and
between the parties hereto and the witness that the
signature of the witness to this deposition is
hereby waived.

* * * * * * * * * * * *

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 3 of 21

Deposition of Carol Lambert        The Concrete Company vs. Lambert        August 22, 2006

Page 5

1           CAROL LAMBERT
2       The witness, after having first been duly
3   sworn to speak the truth, the whole truth and
4   nothing but the truth testified as follows:
5           EXAMINATION
6   BY MR. GRISTINA:
7   Q.  Good morning, Mrs. Lambert.  My name is
8       Thomas Gristina.
9   A.  Good morning.
10  Q.  Good morning.
11      I'm here with Hugh Sorrell on behalf of
12      The Concrete Company with Robin Laurie in
13      this litigation that we've all been part of
14      for the last several months.
15      You've been to a number of depositions
16      in the case as a party, so I assume that
17      you are familiar with sort of the rules and
18      guidelines of a deposition.  If you'd like
19      me to go through them again, I can do
20      that.  Otherwise, I'll assume that you kind
21      of understand what we're going to be doing
22      today.
23  A.  I think I understand.

Page 6

1   Q.  All right.
2   A.  Yes.
3   Q.  And if I ask you a question, I'll assume
4       that you understand it.  But if you don't,
5       let me know and I'll repeat it.  But if you
6       do answer it, I'll assume that you
7       understood it and are answering it to the
8       best of your knowledge as you sit here
9       today.
10  A.  All right.
11  Q.  Mrs. Lambert, what is your full name,
12      please?
13  A.  Carol Lambert.
14  Q.  And where do you live?
15  A.  I live at 541 Gunnells Road, Deatsville.
16  Q.  And what is your date of birth?
17  A.  November the 27th, 1945.
18  Q.  And you are currently married --
19  A.  Yes.
20  Q.  -- to Mr. Harry Lambert?
21  A.  Yes, I am.
22  Q.  How long have you-all been married?
23  A.  Thirty-nine years.

Page 7

1   Q.  If you could, please, take me back to high
2       school and give me your educational
3       background.
4   A.  I graduated from high school in Abingdon,
5       Virginia, where I was born and raised, and
6       I went from there to live with my
7       grandmother.  From there I married my
8       husband.
9           MR. BAILEY:  Did you want to know
10          educational --
11  A.  Or personal or what?
12  Q.  Well, I would like to know about your
13      education.  I appreciate it.
14  A.  I've had no formal training for
15      bookkeeping.  Everything I know has been
16      self-taught.
17  Q.  Okay.  I appreciate that, and I'll ask some
18      questions about your employment background
19      now.  And I appreciate that.
20      With respect to your educational
21      background, then, you completed high school
22      and did not pursue formal schooling beyond
23      that?

Page 8

1   A.  That's right.
2   Q.  In terms of your work history, starting,
3       again, with I guess right after high
4       school, could you tell me what you have
5       done for a living
6   A.  I actually didn't start work until I
7       married my husband.  We owned a company,
8       and I kept the books for it.
9   Q.  And what year were you-all married?
10  A.  1967, I believe.
11  Q.  And what company did you work for as a
12      bookkeeper at that time?
13  A.  We were co-owners in a company called
14      Interstate Drilling.
15  Q.  Where was that company located?
16  A.  It was in Griffin, Georgia.
17  Q.  And what was the business of Interstate
18      Drilling?
19  A.  We were in the business of drilling blast
20      holes in rock quarries.
21  Q.  And you became bookkeeper for that company?
22  A.  Yes, I was.
23  Q.  I realize that bookkeeping -- bookkeeper is

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 4 of 21

Deposition of Carol Lambert          The Concrete Company vs. Lambert          August 22, 2006

Page 9

1  a descriptive term, but could you tell me
2  in general what your duties were as
3  bookkeeper.
4  A.  I kept up with the receivables, I did the
5  invoicing, I did the payables, and I did
6  the payroll.
7  Q.  How many people worked for Interstate
8  Drilling?
9  A.  At one time, we had about 10.
10 Q.  When did you-all stop running or owning
11 Interstate Drilling?
12 A.  We sold it -- I don't remember the exact
13 year. I'm wanting to say 1990. I wouldn't
14 know without looking back, but in the late
15 1990s.
16 Q.  Am I correct, then, that you-all were
17 involved with Interstate Drilling from 1967
18 until the late 1990s?
19 A.  I wouldn't know without looking back. I
20 could not say without looking at the
21 records.
22 Q.  Before you stopped with Interstate
23 Drilling, were you involved in any other

Page 10

1  business ventures?
2  A.  We owned a company called Lambert Sand and
3  Gravel. We were co-owners in that.
4  Q.  When was that formed?
5  A.  I don't remember the exact date. I think
6  in the eighties possibly.
7  Q.  What duties did you have, if any, as an
8  employee of Lambert Sand and Gravel?
9  A.  The same duties I had with Interstate
10 Drilling: The receivables, the payables,
11 the invoicing, payroll.
12 Q.  And then at some point, I believe that you
13 became the bookkeeper for Montgomery
14 Materials; is that correct?
15 A.  That's right.
16 Q.  Do you recall when that was?
17 A.  Montgomery Materials was formed in --
18 sometime in the 1990s. I don't remember
19 the exact day. And I did the same duties
20 for that company as I did for the others.
21 Q.  Other than for Interstate Drilling, Lambert
22 Sand and Gravel, and Montgomery Materials
23 Company -- and I understand what you're

Page 11

1  doing today, but leading up to when you
2  went to work with Montgomery Materials --
3  had you been a bookkeeper for anybody else
4  other than Interstate Drilling and Lambert
5  Sand and Gravel?
6  A.  Not that I can recall, no.
7  Q.  Had you had any other form of employment
8  aside from being a bookkeeper for those
9  companies?
10 A.  Not that I can recall.
11 Q.  Had you had up to that time any experience
12 in the trucking business?
13 A.  Well, I don't know if you would consider
14 the drills. You know, drills are big,
15 heavy pieces of equipment, like a big
16 truck, and that could be possible, I
17 suppose.
18 Q.  The drills are located on a truck-like
19 device to haul them around?
20 A.  They are.
21 Q.  Were you responsible as bookkeeper for
22 Interstate Drilling with selecting the
23 drills for purchase that were used?

Page 12

1  A.  No, I was not.
2  Q.  Who did that?
3  A.  I believe my husband, Harry Lambert, and
4  his partner.
5  Q.  And who was his partner in Interstate
6  Drilling?
7  A.  His name was Russell Thornton, and he's
8  deceased.
9  Q.  With respect to Lambert Sand and Gravel,
10 could you tell me what the business of
11 Lambert Sand and Gravel was.
12 A.  They were in the business of producing and
13 selling sand and gravel.
14 Q.  Where was Lambert Sand and Gravel located
15 out of?
16 A.  It was located out of McDonough, Georgia.
17 Q.  Did Lambert Sand and Gravel operate its own
18 gravel pits?
19 A.  I think they only had one pit that I knew
20 of, and they did operate their own.
21 What do you mean by operate their own?
22 Q.  Well, were they the ones responsible that
23 building, maintaining, and running that

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 5 of 21

Deposition of Carol Lambert    The Concrete Company vs. Lambert    August 22, 2006

Page 13

1    pit?
2    A.  Yes.
3    Q.  All right.  Who were the partners or other
4        members of Lambert Sand and Gravel besides
5        you and your husband?
6            MR. BAILEY:  Object to the form.
7            I don't know if she was a
8            partner or not, but go ahead.
9    Q.  I believe you said you were a part owner of
10       Lambert Sand and Gravel?
11   A.  My husband.  Not me personally, no.
12   Q.  So you had no ownership in Lambert Sand and
13       Gravel?
14   A.  No.
15   Q.  Other than your husband, Mr. Lambert, did
16       anyone else have any ownership in Lambert
17       Sand and Gravel?
18   A.  He had a cousin that was a co-owner and an
19       uncle.
20   Q.  And what were their names?
21   A.  Ray Lambert, Sr. and Ray Lambert, Jr.
22   Q.  And they also had ownership interest in the
23       company?

Page 14

1    A.  They did.
2    Q.  Whatever happened to Lambert Sand and
3        Gravel?
4    A.  I have no idea.
5    Q.  Are you aware of litigation related to
6        Lambert Sand and Gravel?
7    A.  Am I aware of --
8    Q.  A court proceeding or a litigation, a
9        lawsuit that related to Lambert Sand and
10       Gravel?
11   A.  Currently?
12   Q.  In the past.
13   A.  I'm familiar with some of it, yes.
14   Q.  And are you speaking of a dispute between
15       your husband and his uncle and cousin?
16   A.  That's right.
17   Q.  What was the nature of that lawsuit to the
18       best of your knowledge?
19   A.  I have no idea.  I do not know without
20       looking back at a lot of records.
21   Q.  Are you aware that that lawsuit involved --
22       are you aware of whether that lawsuit
23       involved a noncompete agreement?

Page 15

1    A.  No, I do not.
2    Q.  Are you aware of how that lawsuit ended up?
3    A.  I think they settled out of court, but I'm
4        not sure.
5    Q.  In your involvement with Lambert Sand and
6        Gravel as a bookkeeper, did you have any
7        experience or duties with respect to
8        selecting the trucks that were used as part
9        of that business?
10   A.  No.
11   Q.  Up to the time you went to work for
12       Montgomery Materials, had you gained any
13       experience in the purchase of trucks for
14       hauling aggregate product?
15   A.  No.
16   Q.  When you went to --
17       Well, how did you become employed by
18       Montgomery Materials?
19   A.  How did I become employed?
20   Q.  Yes, ma'am.
21   A.  Montgomery Materials -- my husband was
22       co-owner with -- I think he had Mike
23       Phillips as a partner at one time and

Page 16

1    Mr. Foley.  I just happened to be available
2    to do their work and they asked me to do it
3    and I did it.
4    Q.  And you went to work as the bookkeeper for
5        Montgomery Materials?
6    A.  I did.
7    Q.  And you continued as bookkeeper until your
8        husband's separation from the company; is
9        that correct?
10   A.  Well, it changed from Montgomery Materials
11       to Montgomery Materials, LLC, so I retained
12       my position as bookkeeper in that company.
13   Q.  And when did you leave Montgomery
14       Materials, LLC?
15   A.  I believe it was when the court awarded the
16       company to Mr. Foley, which was in early
17       2002, I believe.
18   Q.  With Montgomery Materials and the
19       Montgomery Materials, LLC, were your duties
20       limited to bookkeeping?
21   A.  Yes.
22   Q.  And did they involve the same bookkeeping
23       duties that you described earlier with

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 6 of 21

Deposition of Carol Lambert          The Concrete Company vs. Lambert                August 22, 2006

Page 17

1     respect to Lambert Sand and Gravel and
2     Interstate Drilling?
3 A. Yes.
4 Q. As bookkeeper for these three entities that
5     we spoke of, Interstate Drilling, Lambert
6     Sand and Gravel, Montgomery Materials and
7     then Montgomery Materials, LLC -- I believe
8     that's four entities -- did you have
9     experience with respect to managing the
10    payroll?
11 A. Yes, I did.
12 Q. And as part of that payroll management, did
13    you become experienced in handling worker's
14    compensation insurance?
15        MR. BAILEY: Object to the form.
16        Answer as best you can.
17 A. I didn't get involved with claims for
18    worker's comp. All I did was pay the
19    premium each month.
20 Q. Did you have responsibilities related to
21    payroll that dealt with withholding taxes
22    for employees?
23 A. Yes.

Page 18

1 Q. And so if an employee of one of those
2    companies -- or rather, when an employee of
3    one of those companies was paid, was it
4    part of your duties to withhold taxes out
5    of that paycheck?
6 A. Yes, it was.
7 Q. And after the court awarded Montgomery
8    Materials, LLC to The Concrete Company,
9    where did you go to work?
10       MR. BAILEY: You mean immediately
11     following?
12       MR. GRISTINA: Yes.
13 A. I didn't do anything immediately.
14 Q. Did you go to work afterwards at some
15    point?
16 A. I went to work for Alabama Gravel.
17 Q. And when did you do that?
18 A. In early 2005.
19 Q. Well, at some point before the
20    deposition --
21       (Plaintiff's Exhibit 15 was marked
22     for identification.)
23 Q. Mrs. Lambert, what I've marked as

Page 19

1     Plaintiff's Exhibit 15 is an articles of
2     incorporation for Carol's Contracting,
3     Inc. It was provided to me today before
4     the deposition. Have you seen this
5     document before?
6 A. Yes, I have.
7 Q. When was the first time you recall seeing
8    that?
9 A. Well, it's dated April the 26th, 2002.
10 Q. And it bears your signature; is that
11    correct?
12 A. It does.
13 Q. All right. When did you --
14     Well, we were talking about your
15    employment after Montgomery Materials,
16    LLC. You presumably were part of the
17    formation of Carol's Contracting, Inc.; is
18    that correct?
19       MR. BAILEY: Object to the form.
20       Go ahead and answer if you
21     understand.
22 A. Was I part of it? I was the only part of
23    it.

Page 20

1 Q. Why did you form Carol's Contracting,
2    Inc.?
3 A. We had to have income. I did it to make a
4    living.
5 Q. All right. And when did you decide to form
6    Carol's Contracting, Inc.?
7 A. Along about the time this is signed.
8 Q. The articles of incorporation were endorsed
9    by you on April 26th, 2002. Do you recall
10    how long before April 26th, 2002 you
11    decided to form Carol's Contracting?
12 A. No, I don't.
13 Q. What was the nature of business that
14    Carol's Contracting, Inc. was formed to
15    pursue?
16 A. It was formed to be a trucking company.
17 Q. And what was your duty going to be with
18    respect to this trucking company?
19 A. I was the owner.
20 Q. Were you going to be -- other than being
21    owner, were you going to be employed by
22    this trucking company?
23 A. Yes.

Page 21

1   Q.  And were you, in fact, later after it was
2       formed employed by Carol's Contracting,
3       Inc.?
4           MR. BAILEY:  Object to the form.
5               Go ahead and answer as best
6               you can.
7   A.  I guess so.  I drew a paycheck from that
8       company, so if that's employed, yes.
9   Q.  What was your job title at Carol's
10      Contracting, Inc.?
11  A.  I was owner of the company.
12  Q.  Was Mr. Lambert employed at the time of its
13      formation by Carol's Contracting, Inc.?
14  A.  No, he was not.
15  Q.  You had stated earlier that we needed to
16      earn a living.
17  A.  That's right.
18  Q.  And when you say we, do you mean you and
19      Mr. Lambert?
20  A.  Yes, I do.
21  Q.  And did Mr. Lambert have any ownership
22      interest in Carol's Contracting, Inc. when
23      it was formed?

Page 22

1   A.  No, he did not.
2   Q.  It still exists today, doesn't it?
3   A.  It does.
4   Q.  Yes, ma'am.  Since its inception, has
5       Mr. Lambert ever had any ownership interest
6       in Carol's Contracting, Inc.?
7   A.  No.
8   Q.  Has he ever been employed by Carol's
9       Contracting, Inc.?
10  A.  No.
11  Q.  Who are the other officers, if any, of
12      Carol's Contracting, Inc.?
13  A.  There are no others.
14  Q.  You are the sole owner and sole officer of
15      Carol's Contracting, Inc.?
16  A.  Yes, I am.
17  Q.  Have there ever been any other officers of
18      Carol's Contracting, Inc.?
19  A.  Not that I know of, no.
20  Q.  Who were the initial employees of Carol's
21      Contracting, Inc.?
22  A.  The initial employees were me and two other
23      truck drivers.

Page 23

1   Q.  Who were the truck drivers?
2   A.  One's name was John Parker and the other
3       one was Grady Parker.
4   Q.  Are they brothers?
5   A.  They are.
6   Q.  Where did they work before Carol's
7       Contracting, Inc.?
8   A.  I think they worked for Montgomery
9       Materials.
10  Q.  Would that be the Montgomery Materials,
11      LLC?
12  A.  Yes, I suppose so.
13  Q.  And were they drivers for Montgomery
14      Materials?
15  A.  I don't know.
16  Q.  In the deposition, if I refer to CCI as
17      Carol's Contracting, Inc., would that be
18      okay?
19  A.  Yes.
20  Q.  Okay.  How did CCI locate John and Grady
21      Parker to become truck drivers?
22  A.  They came to me and asked for a job, and I
23      gave it to them.

Page 24

1   Q.  Did Mr. Lambert ask John or Grady Parker to
2       come to CCI to ask for employment?
3   A.  Not to my knowledge.
4   Q.  Do you recall when they came to you to ask
5       for a job?
6   A.  No, I don't.
7   Q.  Do you recall that meeting?
8   A.  I do part of it, yes.
9   Q.  And what do you recall about that?
10  A.  I remember they came to my home and said
11      they wanted to go to work driving a truck,
12      and we negotiated salary and I hired them.
13  Q.  They were paid on a salary basis; is that
14      correct?
15  A.  They were paid on a percentage basis.
16  Q.  How does a percentage basis of payment work?
17  A.  Well, I paid 25 percent of the gross of
18      what they hauled each week.
19  Q.  When you say the gross of what they hauled,
20      what do you mean?
21  A.  If the truck brought in $1,000, they got
22      paid 250.
23  Q.  Were they offered health insurance?

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 8 of 21

Deposition of Carol Lambert          The Concrete Company vs. Lambert          August 22, 2006

Page 25

1   A.   They were.
2   Q.   Were they given worker's compensation
3        benefits?
4   A.   I was not required to have that.
5   Q.   Are you familiar with another entity,
6        Carol's Trucking?
7   A.   I am not, no.
8   Q.   Have you ever heard CCI referred to as
9        Carol's Trucking?
10  A.   It's possible, but I don't recall at this
11       moment.
12  Q.   You had mentioned so that, as you said, we
13       could earn a living. Why did you select a
14       trucking company for that purpose?
15  A.   It's just what I chose to do. No specific
16       reason.
17  Q.   If I may, Mrs. Lambert, we were speaking
18       earlier about your prior experience, and I
19       believe I heard you correctly that you did
20       not have any experience related to trucking
21       other than the drilling relationship you
22       mentioned. Why did you choose a business
23       that you had that level of experience with?

Page 26

1   A.   It's just what I chose to do.
2   Q.   Did your husband recommend that business to
3        you?
4   A.   No.
5   Q.   Were you concerned about going into a
6        business in which you had such little
7        experience?
8   A.   No.
9   Q.   Did the formation of CCI require you to
10       purchase trucks?
11  A.   It did.
12  Q.   Where did you purchase those trucks?
13  A.   Some were bought in Montgomery and some in
14       Birmingham.
15  Q.   How did you locate those trucks to purchase
16       them?
17  A.   I got in the phone book and found the name
18       of a company and went to them, talked to
19       them about it.
20  Q.   What company was that, the first one you
21       called?
22  A.   The first trucks I bought were Macks, and I
23       forget the name of that company. And then

Page 27

1        I traded those for Peterbilts.
2   Q.   The first trucks, the Mack trucks, what
3        kind of trucks were they?
4   A.   Dump trucks, triaxle trucks.
5   Q.   How did you select that particular type of
6        dump truck?
7   A.   Because it would suit what I wanted to do.
8        I wanted to haul material.
9   Q.   There are different sizes of trucks that
10       haul material, are there not?
11  A.   Yes, there are.
12  Q.   How did you decide what size truck you were
13       going to purchase?
14  A.   Well, to begin with, the Mack trucks were
15       the cheapest I could get. I had to choose
16       something that wasn't expensive. I
17       couldn't get a tractor and trailer. I had
18       to get a dump truck with as little amount
19       of money as possible. My funds were
20       limited.
21  Q.   Other than your discussions with the Mack
22       truck dealers, did anyone else give you
23       recommendations with respect to what type

Page 28

1        of truck to purchase?
2   A.   No.
3   Q.   So, then, you went on your own to the Mack
4        truck dealer and picked out the trucks that
5        you wanted to purchase for your hauling
6        business?
7   A.   Yes.
8   Q.   And you relied exclusively on the
9        recommendations of that dealer to tell
10       you -- to help you in deciding what kind of
11       truck to get?
12  A.   I did.
13  Q.   How much did those initial trucks cost?
14  A.   I don't know. Without looking back at the
15       records, I really could not say.
16  Q.   Did you buy or lease those trucks
17       initially?
18  A.   They were bought.
19  Q.   And, again, how many Macks did you
20       initially purchase?
21  A.   I think I bought two.
22  Q.   Are those trucks described by the ton in
23       terms of the way they describe them to

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 9 of 21

Deposition of Carol Lambert         The Concrete Company vs. Lambert              August 22, 2006

Page 29

1   people purchasing them, like a 10-ton truck
2   or a 5-ton truck?
3   A.  I wouldn't think so, no.
4   Q.  Do you recall how much -- how many tons of
5   product the two trucks that you purchased
6   initially were able to haul?
7         MR. BAILEY:  Together, singly,
8         or --
9         MR. GRISTINA:  I'm sorry?
10        MR. BAILEY:  Each or both?
11        MR. GRISTINA:  Each.
12  A.  Each separately?  Probably about 27 tons.
13  Q.  Did you buy the trucks before you hired
14  John and Grady Parker?
15  A.  I don't remember.
16  Q.  When you decided to form CCI, were you
17  aware of the noncompete that your husband
18  had signed with The Concrete Company?
19  A.  I knew he had an agreement not to go back
20  in the sand and gravel business.
21  Q.  Had you ever read that agreement?
22  A.  No, never did.
23  Q.  Do you consider -- well, did you consider

Page 30

1   at that time CCI to be in the sand and
2   gravel business?
3   A.  No, I did not.
4   Q.  Do you consider trucking or hauling
5   aggregate to be part of the sand and gravel
6   business?
7   A.  I would say yes, in a way, it's -- if you
8   haul the material, yes.
9   Q.  At some point, did Mr. Lambert drive trucks
10  for CCI?
11  A.  He did.
12  Q.  Under what circumstances did he come to
13  drive those trucks?
14  A.  What do you mean?
15  Q.  Did you ask him to drive the trucks or did
16  he say, I will drive trucks for CCI?
17  A.  I don't remember.
18  Q.  Do you recall when Mr. Lambert first began
19  driving trucks for CCI?
20  A.  Sometime in 2002.
21  Q.  And, again, did you have -- you began with
22  two trucks; is that correct?
23  A.  That's right.

Page 31

1   Q.  At some point did you purchase a third
2   truck?
3   A.  At one time, yes, but I don't remember the
4   exact date.
5   Q.  When you purchased the third truck, did you
6   have three trucks operating at that time
7   for CCI?
8   A.  Yes, at one time I did.
9   Q.  And what type of truck was the third truck?
10  A.  I'm thinking it was another triaxle,
11  Peterbilt triaxle.
12  Q.  Did Mr. Lambert go with you to the Mack
13  truck dealer to buy those first two trucks?
14  A.  I don't remember if he did or not.
15  Q.  Did he go with you to buy the third truck?
16  A.  I don't remember if he did or not.
17  Q.  Did anybody else go with you to buy those
18  trucks?
19  A.  Not that I recall.
20  Q.  When Mr. Lambert began to drive trucks for
21  CCI, did you pay him for that?
22  A.  No.
23  Q.  At the time that you-all started the

Page 32

1   company, were you involved with the
2   company -- at the time -- excuse me.  At
3   the time that you started CCI, were you-all
4   involved with a company called Foshee
5   Trucking?
6         MR. BAILEY:  Object to the form.
7         Go ahead and answer.
8   A.  Can you repeat it, please?
9   Q.  Did CCI ever come to do business with a
10  company called Foshee Trucking?
11  A.  Yes.  I leased the trucks to Foshee.
12  Q.  Could you describe for me how that lease
13  situation works.
14  A.  Well, it's renewed yearly.  There's an
15  agreement to pay them a certain percent.
16  They dispatch your trucks.
17  Q.  Do you use CCI drivers or Foshee drivers?
18  A.  I use my own drivers.
19  Q.  So you would lease the trucks with Foshee,
20  they would obtain jobs for you, and then
21  you were responsible to pay them back a
22  percentage of the haul; is that correct?
23  A.  I lease the trucks to them.  Their

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 10 of 21

Deposition of Carol Lambert          The Concrete Company vs. Lambert                    August 22, 2006

Page 33

1    dispatcher dispatched the truck to where it
2    needed to go pick up material and deliver
3    it wherever they wanted it delivered, and
4    that's the way it was done.
5    Q.  Did Foshee Trucking pay CCI for the use of
6    those trucks?
7    A.  They paid me to haul the material.
8    Q.  When the CCI trucks were dispatched by
9    Foshee, did the purchasers of the aggregate
10   product or whatever product CCI was hauling
11   pay Foshee or did they pay CCI?
12   A.  They didn't pay me. The only compensation
13   I ever received was from Foshee Trucking to
14   do the hauling.
15   Q.  All right. So, for example, if a purchaser
16   of aggregate called Foshee and said, I need
17   some aggregate, and they then dispatched a
18   CCI truck, that purchaser would pay Foshee?
19   A.  I suppose so. I have no idea how that
20   works.
21   Q.  And then Foshee would pay CCI?
22   A.  To haul it, yes.
23   Q.  And how did you arrive at a rate with

Page 34

1    Foshee for the hauling?
2    A.  They'd just say, you can haul for us, but
3    we get 10, 12 percent of what you haul.
4    Q.  Did they handle other bookkeeping functions
5    for you?
6    A.  No.
7    Q.  And did Foshee pay CCI or did it pay the
8    drivers?
9    A.  It paid CCI.
10   Q.  Did Foshee have any involvement with
11   worker's compensation issues for CCI?
12   A.  Not that I'm aware of.
13   Q.  Who did you deal with at Foshee?
14   A.  Well, I knew Crum Foshee, and I knew a girl
15   by the name of Peggy. She was their
16   bookkeeper. I knew a guy by the name of
17   Chad something. He was the dispatcher.
18   And they had another guy in there named
19   Ricky. That's all I can remember at the
20   moment.
21   Q.  How did you come to locate Foshee Trucking
22   to form that business relationship with
23   them?

Page 35

1    A.  Well, when I worked for Montgomery
2    Materials, I was familiar with Foshee. I
3    was familiar with Godwin. I was familiar
4    with several trucking companies. So I just
5    called them and asked them if I could lease
6    some trucks to them.
7    Q.  Did anyone recommend Foshee Trucking to you
8    as someone you could lease trucks to?
9    A.  Not that I recall.
10   Q.  Did Mr. Lambert recommend Foshee Trucking
11   as someone you could lease trucks to?
12   A.  Not that I recall.
13   Q.  When Foshee reimbursed you or paid you for
14   hauls by your drivers, did CCI then pay the
15   drivers on a percentage basis that you
16   described before?
17   A.  Yes.
18   Q.  And with respect to Mr. Lambert, what
19   happened to the hauling funds that were
20   received from Foshee?
21          MR. BAILEY:  You mean when Lambert
22       was driving?
23          MR. GRISTINA:  Yes.

Page 36

1    A.  What happened to those funds?
2    Q.  Yes, ma'am.
3    A.  They were deposited in the bank account for
4    CCI.
5    Q.  And were they ever disbursed to Mr. Lambert
6    individually?
7    A.  No.
8    Q.  You drew a salary from CCI; is that
9    correct?
10   A.  I did.
11   Q.  How did you determine your salary from CCI?
12   A.  Well, it just depended on how much I needed
13   to make; what it took for me to live.
14   Q.  Did you use an accounting firm to handle
15   the salaries and other accounting issues
16   for CCI?
17   A.  I did.
18   Q.  What accounting firm was that?
19   A.  Wilson, Price.
20   Q.  Is that here in the Montgomery area?
21   A.  It is.
22   Q.  All right. And let's just take the year --
23   the financial year 2002, the tax year

Page 37

1    2002. Did you file a tax return that year?
2    A.  Yes.
3    Q.  Do you recall if you reported income from
4        CCI that year?
5    A.  I don't recall.
6    Q.  Do you know, did you file a joint tax
7        return with your husband that year?
8    A.  I don't recall.
9    Q.  Do you know if Mr. Lambert filed a separate
10       tax return that year?
11   A.  I don't recall.
12   Q.  In the years that followed leading up to
13       the end of 2005, did you file a joint tax
14       return with your husband or a single tax
15       return?
16   A.  I don't recall. I'd have to look back.
17   Q.  Do you know if your husband filed an
18       independent tax return?
19   A.  No, I don't.
20   Q.  Did CCI ever -- did CCI issue W-2 forms to
21       John Parker and Grady Parker?
22   A.  They did, yes.
23   Q.  And did it issue a W-2 to you as well?

Page 38

1    A.  It did.
2    Q.  Did it ever issue a W-2 to Mr. Harry
3        Lambert?
4    A.  No.
5    Q.  Do you know if Foshee Trucking was ever
6        responsible for withholding any taxes from
7        payments made to CCI?
8    A.  Not that I can recall.
9    Q.  Are you aware of any payments directly from
10       Foshee Trucking to any CCI driver?
11   A.  Not that I can recall.
12   Q.  How did you determine the rate that Foshee
13       would pay CCI for hauling?
14   A.  I didn't determine that. Foshee determined
15       that.
16   Q.  Did you negotiate with Foshee on that rate?
17   A.  They just told me what it would be, and I
18       agreed to it.
19   Q.  How did you know if that was a good deal or
20       not?
21   A.  I was grateful to get it. I wasn't -- I
22       wasn't in the market to make a deal. I
23       wasn't in a position to be making deals.

Page 39

1    Q.  Do you know if the rate was determined on a
2        per-ton or per-hour basis?
3    A.  Per ton.
4    Q.  Was it ever based on the hour?
5    A.  Not that I can recall.
6    Q.  To your knowledge, has CCI ever paid out
7        any worker's compensation benefits to any
8        of its drivers?
9    A.  Not that I know of. Not that I can recall.
10   Q.  When Mr. Lambert was driving trucks for
11       CCI, was he eligible for worker's
12       compensation benefits?
13   A.  I didn't have worker's compensation
14       benefits.
15   Q.  Has CCI ever provided worker's compensation
16       benefits?
17   A.  I wasn't required to do that. No.
18   Q.  When Mr. Lambert was driving trucks for
19       CCI, did he have a commercial driver's
20       license?
21   A.  He did.
22   Q.  Do you know when he obtained that?
23   A.  Not without looking back at the records,

Page 40

1        no.
2    Q.  Did CCI maintain a policy of insurance for
3        its drivers?
4            MR. BAILEY: Object to the form.
5            Go ahead and answer as best
6            you can.
7    Q.  I'll be more specific. Did it maintain a
8        liability policy for its drivers while they
9        were driving the trucks?
10   A.  Yes.
11   Q.  Did that require you to identify who was
12       driving the trucks for your company?
13   A.  It did.
14   Q.  And did you identify Mr. Lambert as
15       somebody who would be driving trucks?
16   A.  At one time I did, yes.
17   Q.  In order to keep the -- in order to have a
18       CDL, did CCI pay for John Parker or Grady
19       Parker to have that license?
20   A.  I don't remember. I don't think so, but I
21       really don't remember.
22   Q.  How about for Mr. Lambert? Did CCI pay for
23       Mr. Lambert to get that license?

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 12 of 21

Deposition of Carol Lambert          The Concrete Company vs. Lambert                    August 22, 2006

Page 41

1    A.  I don't remember that either.
2    Q.  In the years that followed the formation of
3         CCI, we've spoken about three drivers:
4         John Parker, Grady Parker, and
5         Mr. Lambert.  Who else leading up to today
6         has driven trucks for CCI?
7    A.  I've had drivers come and go.  I would have
8         to look at all my records.  I couldn't give
9         you an accurate answer without looking
10        back.
11   Q.  Can you tell me the ones that you recall?
12   A.  I had a guy by the name of Oliver Coleman.
13        He totaled a truck, and he was let go.  And
14        then I had another guy, and I forget what
15        his name was, and he turned -- he was
16        supposed to be a temporary driver while my
17        husband was sick with cancer, and I can't
18        remember his name.  And right now I have --
19        his name is James Griffin and Grady
20        Parker.  They're the only two I have right
21        now.
22   Q.  James Griffin and Grady Parker are your two
23        drivers right now?

Page 42

1    A.  Uh-huh (positive response).
2    Q.  Mrs. Lambert, you mentioned your husband's
3         cancer.  We have interposed an objection in
4         the court record and, in fact, moved to
5         strike reference to that in pleadings.  I'm
6         not intending to waive my objection to that
7         by asking these questions, but I want to
8         follow up on that.  When was your husband
9         diagnosed with cancer?
10   A.  In 2002.
11   Q.  What type of cancer is that?
12   A.  He had bladder cancer.
13   Q.  Any other metastases, or is it located
14        solely to the bladder?
15   A.  We have been fortunate in that we -- he
16        would go into the hospital every three
17        months.  The doctor would go into his
18        bladder.  The cancer has come back on him
19        several times, and we've been fortunate in
20        that we've caught it before it invaded the
21        bladder wall.
22   Q.  Has he undergone surgeries for that?
23   A.  It's a form of surgery, yes.

Page 43

1    Q.  And at this time, is it in remission as far
2         as you know?
3    A.  He was in the hospital about a month, maybe
4         two months ago for it, and it was in
5         remission at that time.  And he's gone
6         through some treatments, cancer
7         treatments.  It's been a very difficult
8         time for him and me.
9    Q.  I understand.  But at this time, it has not
10        spread beyond the bladder?
11   A.  It wasn't when he was in the hospital.
12   Q.  Okay.  Does CCI offer -- I may have asked
13        you this, but I apologize.  Does CCI offer
14        health insurance?
15   A.  Yes.
16   Q.  Did it provide John Parker with health
17        insurance?
18   A.  It did, yes.
19   Q.  And Grady Parker?
20   A.  Yes.
21   Q.  And James Griffin?
22   A.  Yes.
23   Q.  Do you purchase your health insurance

Page 44

1         through CCI?
2    A.  I do.
3    Q.  And is Mr. Lambert insured through CCI?
4    A.  He is.
5    Q.  Is he listed individually, insured through
6         CCI?
7    A.  He is.
8    Q.  So you pay a premium for yourself separate
9         from his?
10   A.  I do.
11   Q.  And then a premium is paid on Mr. Lambert's
12        behalf through CCI?
13   A.  It is.  I felt that was the least I could
14        do with him driving a truck and not getting
15        paid for it.
16   Q.  CCI pays Mr. Lambert's premium?
17   A.  Health insurance, that's right.
18   Q.  When Foshee had a job, a hauling job, who
19        did they call at CCI in order to get a
20        truck?
21   A.  They didn't call me for hauling jobs.  The
22        drivers would check in with the
23        dispatcher.  The dispatcher would dispatch

Page 45

1  them.
2  Q.  And so am I correct, then, that there would
3      have been times that Mr. Lambert would have
4      simply called Foshee to find out if there
5      was a job?
6  A.  To find out if there was a job?
7  Q.  Yes, ma'am.
8  A.  He would have called to find -- to get the
9      truck dispatched, yes, he would have
10     probably talked to the dispatcher.
11 Q.  Other than James Griffin, is it John or
12     Grady that's still driving for you?
13 A.  Grady.
14 Q.  And other than John and -- James Griffin
15     and Grady Parker, are there any other
16     employees besides yourself currently of CCI?
17 A.  No, there's not.
18 Q.  Where is CCI's office?
19 A.  It's in my home.
20 Q.  Is it in a study of some sort?
21 A.  It is.  I have a room upstairs that I use
22     as an office.
23 Q.  And do you also manage Alabama Gravel

Page 46

1  bookkeeping out of that office?
2  A.  No, I don't.
3  Q.  Do they have a separate office?
4  A.  Yes, they do.
5  Q.  And where is that located?
6  A.  It's on my property.  It's a shop building
7      with a guest house attached, and in the
8      guest house it had -- the people we bought
9      it from originally used it as an office.
10     He lived there for a while and he had
11     his -- he had a cabinet shop or something,
12     builds houses, and he did his book work out
13     of that little guest house.
14 Q.  What is the telephone number for Carol's
15     Contracting, Inc.?
16 A.  It's the same as my home number, 290-0444.
17 Q.  All right.  Do you maintain a cell phone?
18 A.  I do.
19 Q.  What's that number?
20 A.  It's 318-1222.
21 Q.  Has that always been your cell phone
22     number?
23 A.  For several years, yes.

Page 47

1  Q.  Are you familiar with a cell phone number
2      318-1265?
3  A.  That is one of my drivers that I just
4      recently had to let him go.  Had to sell a
5      truck.
6  Q.  What driver was that?
7  A.  His name was Terry White.  I believe, now.
8      That may have been James Griffin's number.
9      I'm not sure.  I'd have to look back.
10 Q.  Did your drivers each have cell phones
11     provided?
12 A.  They did.
13 Q.  And were they provided by the company?
14 A.  They were.
15 Q.  And so 1265 was one of those numbers?
16 A.  It was.  It was for one of my drivers, but
17     I don't remember which one.
18 Q.  And yours is now 1222?
19 A.  It is.
20 Q.  Before that number, can you recall what
21     your cell phone number was?
22 A.  No.  I've had that number for years.
23 Q.  Are you familiar with a number 318-1648?

Page 48

1  A.  That's another one of my drivers.
2  Q.  And the number 318-4300?
3  A.  That's another one of my drivers.
4  Q.  So, then, that's three drivers' cell phones
5      for CCI that we've talked about.  Are there
6      any other CCI cell phone numbers?
7  A.  Harry's.
8  Q.  Harry's cell phone is a CCI number?
9  A.  It is.
10 Q.  All right.
11 A.  Well, I believe all these are in my name
12     personally; not in CCI, but in my name
13     personally.
14 Q.  Does CCI pay Harry's cell phone bill?
15 A.  It does.
16 Q.  Any other numbers besides the three --
17     well, excuse me -- yours and the three that
18     we talked about for the drivers and
19     Mr. Lambert's?  Are there any other CCI
20     cell phone numbers?
21 A.  Active, that's all currently active.
22 Q.  Are there some that you recently shut down?
23 A.  We shut some down -- I think some in 2002,

Page 49

```
 1       some in 2003. Finally in 2004 they came up
 2       with what they call a family plan. I could
 3       get five phones at a certain rate, and
 4       that's the phones that are active now.
 5   Q.  So you've got yours, Mr. Lambert's, and
 6       three for the drivers?
 7   A.  Right.
 8           MR. BAILEY: Ms. Lambert's taking
 9               depression medicine, and we
10               need to take breaks. Is this
11               a good stopping point for
12               you?
13           MR. GRISTINA: Yes, but since you
14               mentioned that, I want to make
15               sure that -- that's one
16               question about that.
17   Q.  I apologize for probing into your health
18       issues.
19   A.  That's all right.
20   Q.  This medication, does it make it difficult
21       for you to understand or are you
22       understanding me clearly today?
23   A.  I'm doing the best I can.
```

Page 50

```
 1   Q.  All right.
 2   A.  I believe I understand you, yes.
 3   Q.  Okay.
 4           MR. GRISTINA: We can take a break
 5               now, Dennis, if you want.
 6           (Brief recess.)
 7   Q.  (Mr. Gristina continuing) Ms. Lambert, the
 8       two first trucks that you bought for CCI,
 9       do you recall how much you paid for those
10       each?
11   A.  No, I don't.
12   Q.  Do you recall what sort of mileage those
13       trucks got?
14           MR. BAILEY: Got or had on them?
15               Object to the form.
16   Q.  Do you recall how many miles per gallon
17       those trucks got?
18   A.  Not without looking back, no.
19   Q.  Were they new trucks?
20   A.  They were.
21   Q.  Was CCI set up for the purpose of obtaining
22       a profit?
23   A.  Hopefully.
```

Page 51

```
 1   Q.  What sort of factors did you consider when
 2       forming CCI to make sure that it would be
 3       profitable?
 4           MR. BAILEY: Object to the form.
 5               I don't know how you can be
 6               sure of that, but go ahead and
 7               answer as best you can.
 8   A.  Well, I hoped after I paid the driver,
 9       bought the fuel, and got paid to haul the
10       material that I would have enough left over
11       that would be a little profit.
12   Q.  Did you finance those two first trucks?
13   A.  I don't remember without looking back.
14   Q.  Have you financed any of the trucks that
15       you bought since that time?
16   A.  Yes.
17   Q.  When was the first one that you financed
18       that you recall?
19   A.  I don't remember without looking back.
20   Q.  Who did you finance it through?
21   A.  I believe I had one financed with PACCAR.
22       Another one with -- I believe FCC, I
23       believe it's called. That's all I recall.
```

Page 52

```
 1   Q.  Did you say FCC?
 2   A.  I believe. I could be wrong.
 3   Q.  Have you ever factored in mileage per
 4       gallon in your decision process when
 5       selecting a truck for purchase?
 6   A.  No.
 7   Q.  The initial trucks that you purchased, the
 8       Mack trucks, did you get a warranty on
 9       those trucks?
10   A.  I believe they did have a warranty, yes.
11   Q.  Do you recall the terms of that warranty?
12   A.  No, I don't.
13   Q.  And you subsequently purchased Peterbilt
14       trucks; is that correct?
15   A.  Yes.
16   Q.  Did you get a warranty on those trucks?
17   A.  I don't remember.
18   Q.  Have you sold any trucks since you've run
19       CCI?
20           MR. BAILEY: Object to the form.
21               Other than trade in, you mean?
22   Q.  Well, we can ask it that way. You've
23       parted with some of the trucks, I would
```

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 15 of 21

Deposition of Carol Lambert          The Concrete Company vs. Lambert          August 22, 2006

Page 53

1  imagine, in some way, shape, or form.
2  A.  Yes.  They were traded.
3  Q.  All right.  When was the first one you
4     traded?
5  A.  I don't remember.  I don't remember.
6  Q.  Do you remember what you got for that truck
7     when you traded it?
8  A.  No, I don't.
9  Q.  Can you tell me how many trucks CCI has
10    purchased over the last four years?
11 A.  No.
12 Q.  Can you tell me the purchase price for any
13    one of those trucks?
14 A.  No.  Not exactly, no.
15 Q.  Can you tell me approximately?
16 A.  I don't want to do that.  That would be
17    speculation.
18 Q.  Okay.  Did the trucks that you purchased,
19    the first trucks, the Mack trucks, did they
20    come with dump bodies?
21 A.  They did.
22 Q.  And what is that?
23 A.  It's the back part of a truck.  The bed

Page 54

1  raises up and dumps the material out.
2  Q.  What brand were the dump bodies?
3  A.  I don't recall.
4  Q.  Were they purchased separately from the
5     Mack trucks?
6  A.  I don't recall.
7  Q.  Have you ever purchased a dump body
8     separately from one of the trucks that
9     you've purchased?
10 A.  I don't recall without looking back.
11 Q.  Are you aware of the brand of any of the
12    dump bodies on any of the CCI trucks?
13 A.  Right now we have what they call a Travis
14    trailer.  We have -- did have a Ram
15    trailer, and we have a TrailStar trailer.
16 Q.  And are those part of the trucks that you
17    currently own?
18        MR. BAILEY:  Object to the form.
19        They're trailers.  Part of
20        the --
21 A.  They're trailers that can be disconnected
22    from the truck.
23 Q.  So do the trucks themselves have any sort

Page 55

1  of a dumping device on them, or is it just
2  these trailers?
3  A.  Just the trailers.
4  Q.  And did you purchase those three types of
5     trailers separately from the trucks?
6  A.  Yes.
7  Q.  How much did you pay for those?
8  A.  I couldn't tell you without looking back.
9  Q.  Do you know when you purchased them?
10 A.  I don't know the exact date, no.
11 Q.  And do you know how much you paid for them?
12 A.  Not without looking at the records, no.
13 Q.  Carol's Contracting has an office in your
14    house where you keep records; is that
15    correct?
16 A.  That's right.
17 Q.  All right.  And in those records, am I
18    correct, would be receipts or records
19    related to all of these purchases?
20 A.  Some, I would think so, yes.
21 Q.  Do you depreciate those trucks?
22 A.  You'd have to talk to my accountant about
23    that.

Page 56

1  Q.  The two trucks, the original Mack trucks,
2     were those dump trucks or did they have
3     trailer dumps?
4  A.  They were dump trucks.
5  Q.  How did you come to decide to purchase the
6     trucks that were trailer dumps instead?
7  A.  Well, they could haul more material.
8  Q.  How did you learn that?
9  A.  You can tell by looking at it.  The trailer
10    is 35 feet long -- my trailers are 35 feet
11    long.
12 Q.  Did someone recommend that to you?
13 A.  No.
14 Q.  Do you recall when you decided to change
15    from dump trucks to trailer dumps?
16 A.  No, I don't.
17 Q.  Do you know a man named Alan King?
18 A.  I do.
19 Q.  How do you know Alan?
20 A.  He is currently setting up the Deatsville
21    plant.
22 Q.  And have you talked to Alan about the
23    Deatsville plant?

Deposition of Carol Lambert          The Concrete Company vs. Lambert          August 22, 2006

Page 73

1    what hauls they were going to do; is that
2    correct?
3    A.  That's right.
4    Q.  And with Foshee from time to time they
5        would haul aggregate product; is that
6        correct?
7    A.  That's correct.
8    Q.  And do you know what I mean when I say
9        aggregate product?  I mean sand and gravel.
10   A.  Right.
11   Q.  Assuming that I mean sand and gravel when I
12       talk about aggregate product, during the
13       time when you were working with Foshee,
14       were there ever instances where a purchaser
15       of aggregate would simply call CCI directly
16       and request a load of aggregate be
17       delivered?
18   A.  I think we hauled some for Willingham
19       Stone.
20   Q.  And how did that business relationship
21       work?
22   A.  What do you mean?
23   Q.  Did Willingham contact CCI directly?

Page 74

1    A.  Yes.
2    Q.  Who did they call?
3    A.  They called me.
4    Q.  Who from Willingham Stone called you?
5    A.  Randy Willingham, and I spoke with somebody
6        else.  I forget who.
7    Q.  What product did they purchase?
8            MR. BAILEY:  Object to the form.
9            Go ahead and answer if you
10           understood.
11   A.  What did they purchase?
12   Q.  Yes, ma'am.
13   A.  They purchased some type of roofing
14       material that we hauled into Florida.
15   Q.  Did they ever purchase aggregate product
16       from CCI?
17   A.  From CCI?
18   Q.  I'll ask it a different way.  Did Randy
19       Willingham ever contact CCI directly in
20       order to obtain aggregate product?
21   A.  They called CCI to deliver roofing material
22       for BellSouth jobs in Florida, Louisiana.
23   Q.  Other than those roofing materials, did

Page 75

1    they ever contact CCI about delivering sand
2    or gravel?
3    A.  Not that I can recall.
4    Q.  Did anybody -- before the Alabama Gravel
5        relationship was formed, did anybody
6        contact CCI directly about delivering
7        aggregate product?
8    A.  Not that I can recall.
9    Q.  So am I correct when I say that all of the
10       aggregate product that was delivered by CCI
11       trucks leading up to the Alabama Gravel
12       relationship was done via lease
13       arrangements with Foshee or Fuller Five?
14   A.  We didn't do any with Fuller Five that I
15       can recall.  With Foshee, yes.
16   Q.  After you stopped with Foshee and before
17       you began to deal with Alabama Gravel, did
18       you haul any aggregate product?
19   A.  Can you repeat that?
20   Q.  After you stopped leasing to Foshee and
21       before you began your relationship with
22       Alabama Gravel, did CCI trucks haul any
23       aggregate product?

Page 76

1    A.  Not that I can recall.
2    Q.  Would there be records at CCI of all hauls
3        made during the last four years?
4    A.  I'm not sure.
5    Q.  Would there be receipts maintained that
6        would indicate every haul that CCI has
7        performed?
8    A.  I'm not sure without looking back.
9    Q.  CCI charges when they haul product; is that
10       correct?  If they haul something, they
11       charge, don't they?
12   A.  Not until we hauled for Alabama Gravel.  I
13       was not in a position to do that.
14   Q.  CCI was paid for the hauling operations it
15       did before the Alabama Gravel relationship;
16       is that correct?
17   A.  Can you repeat that?
18   Q.  What I'm trying to understand is if CCI
19       maintains a record or records indicating
20       each and every job that it was involved in
21       before the Alabama Gravel relationship.
22           MR. BAILEY:  Object to the form.
23   A.  I'm not sure what records I've kept.  I

Page 77

1    really don't know.
2    Q. Have you disposed of any records related to
3       CCI since this litigation started?
4    A. No, sir.
5    Q. When CCI was hauling roofing product or
6       roofing material, rather, for Willingham,
7       what was that material?
8    A. I believe it was called number seven brown
9       or something like that.
10   Q. And that is a form of --
11   A. Gravel.
12   Q. -- gravel. So that is an aggregate
13      product, is it not?
14   A. I would think so, yes.
15   Q. Where did you get the roofing --
16      May I call that aggregate, roofing
17      aggregate for today? May I call it that?
18   A. (Witness nods head up and down.)
19   Q. All right. Where did CCI obtain that
20      roofing aggregate?
21      MR. BAILEY: Object to the form.
22         Go ahead and answer if you
23         can.

Page 78

1    A. Where did we obtain it?
2    Q. Where did you pick it up?
3    A. The one place I remember we picked it up
4       from was Elmore Sand and Gravel.
5    Q. And did Mr. Willingham tell you where to
6       obtain that product?
7    A. He did.
8    Q. Do you know Billy Stanley?
9    A. I think I saw him during the depositions.
10      Is he one of the ones that was at the
11      depositions? Other than that, if he
12      wasn't, I don't know him.
13   Q. No, ma'am. Mr. Stanley, I believe, runs
14      Elmore Sand and Gravel. Does that make you
15      more familiar with that name now?
16   A. (Witness shakes head from side to side.)
17      MR. BAILEY: You need to say yes
18         or no.
19   A. Oh, okay. No, I'm not familiar with him,
20      no.
21   Q. Okay. What criteria do you use at CCI in
22      selecting truck drivers?
23   A. What do you mean?

Page 79

1    Q. How do you pick a truck driver to come to
2       work at CCI?
3    A. If he asks for a job, I check out his
4       driving license. He gets a health card,
5       takes a drug test, and he's hired.
6    Q. Do you use any outside companies to assist
7       in selecting truck drivers?
8    A. No.
9    Q. Other than you personally, do you ask
10      anybody else for advice when it comes to
11      picking a truck driver?
12      MR. BAILEY: Object to the form.
13         Go ahead and answer as best
14         you can.
15   A. Unless I check some references, that would
16      be the only way I would know.
17   Q. And have you from time to time checked
18      references on prospective drivers?
19   A. Not that I remember at this time.
20   Q. So none of the drivers -- you've never
21      checked, on any of the drivers you've
22      hired, references?
23   A. I don't remember if I have or not.

Page 80

1    Q. Have you ever ridden a truck with them to
2       see if they're competent drivers?
3    A. I don't remember if I have or not.
4    Q. Did Mr. Lambert ever assist you in
5       selecting drivers?
6    A. Not that I recall.
7    Q. Do you know if Mr. Lambert ever went on
8       rides with these drivers to see if they
9       were competent drivers?
10   A. Not that I know of.
11   Q. Were you asked at some point to become a
12      bookkeeper for Alabama Gravel?
13   A. I was.
14   Q. Who asked you to do that?
15   A. Robert Alexander.
16   Q. And was that at the same time you-all
17      discussed CCI hauling for Alabama Gravel?
18   A. I don't remember.
19   Q. Were you later employed as a bookkeeper for
20      Alabama Gravel?
21   A. Yes.
22   Q. Where is Alabama Gravel's office?
23   A. It's in a building on my property.

Case 2:05-cv-01026-CSC    Document 77-17    Filed 09/19/2006    Page 18 of 21

Deposition of Carol Lambert        The Concrete Company vs. Lambert        August 22, 2006

Page 93

1    to haul, but go ahead if you
2        knew.
3  A.  Not that I know of. Not that I recall.
4  Q.  When you were paid by Alabama Gravel for
5        hauling aggregate for them, did you
6        disburse any of those funds to
7        Mr. Lambert?
8  A.  No.
9  Q.  Those funds paid for the hauling charges,
10       were they paid exclusively to CCI?
11  A.  That's right, yes.
12  Q.  Did you have any discussions with Mr. Dick
13       Wymer at Simcala about hauling to Simcala?
14  A.  Not that I recall.
15  Q.  Have you ever spoken to a Mr. Dick Wymer at
16       Simcala?
17  A.  I spoke with somebody over there about
18       hauling coal back out of Kentucky at one
19       time.
20  Q.  Other than the discussion about coal, did
21       you ever talk to Mr. Wymer?
22       MR. BAILEY: Object to the form.
23       She didn't say she talked to

Page 94

1        him, but go ahead and answer.
2  Q.  Did you talk to Mr. Wymer about anything?
3  A.  Not that I recall.
4  Q.  Are you aware of the substance of any
5        negotiations between Alabama Gravel and
6        Simcala to arrange for hauling of white
7        oversized material to Simcala?
8  A.  Can you repeat that?
9  Q.  Are you aware of the substance of any
10       negotiations between Alabama Gravel and
11       Simcala concerning the provision of white
12       oversized gravel to Simcala?
13  A.  No.
14  Q.  Did you ever speak with Mr. Gentry about
15       hauling white oversized material from the
16       Independence pit to Simcala?
17  A.  No.
18  Q.  Do you know how Alabama Gravel formed its
19       relationship with the Independence pit?
20  A.  No.
21  Q.  Have you ever spoken to Mr. Gentry at all?
22  A.  I don't know.
23  Q.  Has Simcala, to your knowledge, ever

Page 95

1    contacted Carol's Contracting directly for
2    loads of white oversized gravel?
3  A.  Not to my knowledge.
4  Q.  How does CCI buy fuel for its trucks?
5  A.  It's bought in bulk.
6  Q.  And in what quantities do you buy it?
7  A.  Usually about 2,000 gallons.
8  Q.  Do you know what the current cost of fuel
9        is?
10  A.  Last I bought was about 2.96 a gallon.
11  Q.  And how have you factored in the increased
12       cost of fuel into your hauling price?
13  A.  I've not.
14  Q.  We may have talked about this before. You
15       said that CCI is now hauling for Couch; is
16       that correct?
17  A.  That's right.
18  Q.  Are you hauling at all for Alabama Gravel?
19  A.  Not presently.
20  Q.  When did that stop?
21  A.  As I said before, I think two or three
22       months ago.
23  Q.  Do you know why that stopped?

Page 96

1  A.  There wasn't anything to haul.
2  Q.  Was that because the Gentry pit had
3        completed its production of white
4        oversized?
5  A.  I don't know that.
6  Q.  Does Alabama Gravel pay rent for the office
7        space on your property?
8  A.  They do.
9  Q.  Let me go back a little bit further. Are
10       you compensated by Alabama Gravel?
11       MR. BAILEY: You, her
12           individually?
13       MR. GRISTINA: Yes, sir.
14  A.  I get a payroll check.
15  Q.  And what is that compensation?
16  A.  What do you mean?
17  Q.  How much are you paid?
18  A.  It's about 50 a year.
19  Q.  $50,000 a year?
20  A.  (Witness nods head up and down.)
21  Q.  And who does Alabama Gravel pay rent to?
22  A.  To me personally.
23  Q.  Is the property that that office, the

Deposition of Carol Lambert          The Concrete Company vs. Lambert          August 22, 2006

---

Page 117

1    for Alabama Gravel?
2    A.  After being told by Mr. Alexander, yes.
3    Q.  And who was responsible, if you know, for
4        supervising the construction of the
5        Deatsville operation?
6    A.  As far as I know, it's Mr. Alexander.
7    Q.  Was Mr. Lambert involved in the
8        construction of the Deatsville plant before
9        January 1, 2006?
10   A.  Not that I know of.
11   Q.  Are you aware of the payment terms in
12       Mr. Lambert's agreement with Alabama Gravel
13       that was memorialized in April 2006?
14   A.  Not without looking at it.
15   Q.  Do you consider those payments to be
16       compensation for services performed before
17       January 1, 2006?
18   A.  No.
19          MR. GRISTINA: Dennis, this is the
20             binder for the Tuten
21             deposition.
22   Q.  Mrs. Lambert, I'm putting before you what's
23       been previously marked as Plaintiff's

---

Page 118

1    Exhibit Number 4. Do you recognize that?
2    A.  It looks like one of the electric bills
3        that was sent to Alabama Gravel from
4        Gentry.
5    Q.  Were you involved in any of the discussions
6        between Alabama Gravel and Gentry involving
7        Alabama Gravel's sale of the white
8        oversized material from the Gentry pit?
9    A.  Repeat that?
10   Q.  Were you involved in Alabama Gravel's
11       negotiations with Mr. Gentry?
12   A.  No, no.
13   Q.  Were you aware that Alabama Gravel was
14       paying Mr. Gentry's electric bill related
15       to that pit?
16   A.  Yes, because I made out the checks.
17   Q.  Okay. Going forward to Plaintiff's Exhibit
18       8, these are documents that were produced
19       to us by Alabama Gravel's counsel earlier
20       in the case. I'm specifically interested
21       in, for example, document AG00107. It has
22       looks like an adding machine piece of paper
23       photocopied. Is that from your adding

---

Page 119

1    machine?
2    A.  I have no idea.
3    Q.  Do you recognize those calculations that
4        are on this page?
5    A.  No.
6    Q.  Well, let me ask you this. Would you mind
7        looking through this exhibit? And my
8        question is, are these invoices that you
9        would have maintained and paid for Alabama
10       Gravel?
11          MR. BAILEY: And you're referring
12             to invoices attached to
13             Exhibit 8?
14          MR. GRISTINA: Yes, sir.
15   A.  Is this all you wanted me to go through?
16   Q.  Yes, ma'am. Well, I want you to look at
17       the whole exhibit. And my question is, are
18       these -- what I'm -- to kind of cut to the
19       chase, what I'm trying to understand is if
20       you made these calculations.
21   A.  I believe I did, yes.
22   Q.  So, then, in this exhibit where we have
23       what looks to be adding paper strips,

---

Page 120

1    those -- is that from your machine?
2    A.  It's possible.
3    Q.  All right. That's my question.
4        Now, staying with this exhibit, there
5    is, for example, an invoice here from Pond
6    River Steel. Do you know what Pond River
7    Steel was doing for Alabama Gravel? This
8    invoice is AG00123, and it's dated
9    10/25/05. Do you know what Pond River
10   Steel was doing for Alabama Gravel?
11          MR. BAILEY: Object to the form.
12             I don't know if it's dated --
13             Okay. It's also invoice
14             10/25/05.
15   A.  Not without asking Robert.
16   Q.  Okay. And, again, are you aware of any
17       involvement Mr. Lambert had with respect to
18       the construction of the Deatsville plant
19       before January 1, 2006?
20   A.  No.
21   Q.  Were you aware of any contact he may have
22       had with Pond River Steel before that time?
23   A.  No.

---

Deposition of Carol Lambert        The Concrete Company vs. Lambert        August 22, 2006

Page 121

1   Q.  Did CCI have any reason to contact Pond
2       River Steel before January 1, 2006?
3   A.  I wouldn't think so, no.
4   Q.  Are you aware of any business that your
5       husband was in before January 1, 2006 that
6       would have required him to contact a
7       company named Pond River Steel, Inc.?
8   A.  No.
9   Q.  Are you aware of any business ventures or
10      business projects your husband was involved
11      in that would have required him to retain
12      the services of Alan King before January 1,
13      2006?
14  A.  What time frame are you talking about?
15      Before, from, when --
16  Q.  That's a fair question for clarification.
17      Let's say in the year 2005, are you aware
18      of any reason your husband --
19  A.  No.
20  Q.  Let me finish. I appreciate it.
21      In the year 2005, are you aware of any
22      business dealings your husband may have had
23      that would have required him to contact

Page 122

1       Pond River Steel or Alan King to retain
2       their services?
3   A.  No.
4   Q.  The same question for Southern Wire. Any
5       reason your husband would need to contact
6       Southern Wire in the year 2005 to hire them
7       for services?
8   A.  No.
9   Q.  Same question for a man named Sam Estock.
10      Is there any reason why your husband would
11      need to call and hire Mr. Sam Estock for
12      services in 2005?
13  A.  No.
14  Q.  CCI is not in the business of mining
15      aggregate, is it?
16  A.  No, and it never has been. It hauls
17      material. And that -- I think I stated
18      earlier that if it's involved with sand and
19      gravel operations, the only way it's
20      involved with the sand and gravel operation
21      is by hauling the material. It does not
22      dig material out of the ground or put
23      material through a processing plant. The

Page 123

1       only thing it does, it drives into a
2       location, the material is loaded on the
3       truck, and it's delivered to wherever it
4       needs to go. It is not in no way related
5       to a sand and gravel business.
6   Q.  Are you aware of any business ventures that
7       your husband was involved in between the
8       court order related to the Montgomery
9       Materials, LLC matter that gave the company
10      to The Concrete Company and January 1,
11      2006?
12  A.  Any companies he had what?
13  Q.  That question got so long, I forgot it.
14      Are you aware of any business
15      involvement in construction of a sand and
16      gravel mining operation that your husband
17      was involved with between the date of the
18      court order that gave Montgomery Materials,
19      LLC to The Concrete Company and January 1,
20      2006?
21  A.  No.
22          (Plaintiff's Exhibit 17 was marked
23          for identification.)

Page 124

1   Q.  Ms. Lambert, I've put before you a
2       document, Plaintiff's Exhibit 17. Could
3       you take a look at that and tell me if you
4       recognize it.
5   A.  The one on top I do, yes.
6   Q.  All right. And what is the document on
7       top?
8   A.  It's an invoice from Carol's Contracting to
9       Alabama Gravel to haul material to Simcala
10      at Mt. Meigs, Alabama.
11  Q.  And this is Bates stamped CCI0001. Is this
12      a document that's maintained by CCI?
13          MR. BAILEY: It was at the time.
14          I mean, do you want to know if
15          it's still there or does this
16          come from their records or
17          what?
18  Q.  Does this document come from CCI's business
19      records?
20  A.  It came from there, yes.
21  Q.  And do you recognize this particular --
22      This is a series of invoices. And if you
23      could look through them, what I want to

Case 2:05-cv-01026-CSC   Document 77-17   Filed 09/19/2006   Page 21 of 21

Deposition of Carol Lambert   The Concrete Company vs. Lambert   August 22, 2006

Page 137

1    Q. Let me show you, Ms. Lambert, what's been
2        marked as Plaintiff's Exhibits 18 and 19.
3    A. Okay.
4    Q. And let me represent to you that these were
5        documents that were provided to The
6        Concrete Company and have been produced to
7        your attorney. They were provided to us by
8        Foshee Trucking. Let me just direct your
9        attention to the first page, Bates stamped
10       TCC0001521. That first page that you've
11       got your finger on.
12   A. Okay. Do I need to take this apart?
13   Q. No, not yet, unless you want to. I just
14       want you to look at the first page, but you
15       can look at it all.
16   A. Okay.
17   Q. My question right now is on the first page,
18       it appears to say Carol's Trucking. Do you
19       see that? Let me point you right there.
20   A. Yes.
21   Q. Do you know why Foshee would have produced
22       a document -- and it appears to me to be
23       some part of a file, but we don't know what

Page 138

1        it is. But do you know why Foshee Trucking
2        would list you-all potentially as Carol's
3        Trucking?
4    A. I have no idea. It might have been shorter
5        for her to write down. This was probably
6        done by their bookkeeper.
7    Q. Her name is Peggy; is that right?
8    A. At that time it was, I believe, yes.
9    Q. Okay. Now, if you could turn to the next
10       sheet of paper in there.
11   A. What sheet are you talking about?
12   Q. 1522 right there. You're on the right
13       page. Do you recognize this piece of
14       paper?
15   A. It looks like something that Foshee's
16       bookkeeper would have done, yes.
17   Q. And it says at the top, Carol's
18       Contracting.
19   A. That's right.
20   Q. And then below that it puts
21       occupational/accident insurance. Do you
22       see that?
23   A. I do.

Page 139

1    Q. Now, this document, this is not your
2        handwriting, is it?
3    A. It is not, no.
4    Q. And had you ever been provided a copy of
5        this by Foshee?
6    A. I don't remember. It's possible, but I
7        don't remember.
8    Q. All right. Looking at the top of the -- of
9        that sheet, it has Roman numeral one,
10       January 1, '02 through April 30th, '03. It
11       says, premium equals $125 per month per
12       driver. Do you know what that relates to?
13   A. Foshee Trucking runs, from what I
14       understand, somewhere between 50 and 100
15       trucks. They have to carry worker's comp
16       for anybody that's leased to them. They
17       charged us worker's comp for my drivers.
18       That's what that's for.
19   Q. And so you paid Foshee for worker's
20       compensation for your drivers?
21   A. It was withheld from the amount due Carol's
22       Contracting.
23   Q. And did you identify by name the drivers

Page 140

1        that were driving for you to Foshee?
2    A. I believe so, yes.
3    Q. So, then, when Mr. Lambert was driving for
4        CCI and your trucks were leased to Foshee,
5        would you have identified him to Foshee as
6        a driver with respect to whom worker's
7        compensation needed to be paid by them?
8    A. Probably.
9    Q. You list the number of drivers -- the
10       drivers --
11       Well, excuse me. The sheet of paper
12       lists the drivers -- rather -- well, it has
13       number 201, 202, 202, 203, 204. Do you see
14       that?
15   A. I do.
16   Q. Do you know what those numbers refer to?
17   A. They appear to be my truck numbers.
18   Q. All right. Do you know why they list -- do
19       you know why they list number 202 twice?
20   A. It appears to have different dates.
21   Q. Do you see where it says below, deducted
22       26.25 -- I'm going to put my finger on it
23       right there. It says, undercharged 260 per