# EXHIBIT Q

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

THE CONCRETE COMPANY,

    Plaintiff,

Vs.        CIVIL ACTION NO.
        2:05-cv-1026-C

HARRY E. LAMBERT,
CAROL'S CONTRACTING, INC.,
and ALABAMA GRAVEL, LLC,

    Defendants.

* * * * * * * * * * * *

DEPOSITION OF HARRY E. LAMBERT, taken

pursuant to stipulation and agreement before

Patricia G. Starkie, Registered Diplomate Reporter,

CRR, and Commissioner for the State of Alabama at

Large, in the Law Offices of Rushton, Stakely,

Johnston & Garrett, 184 Commerce Street,

Montgomery, Alabama, on August 29, 2006, commencing

at approximately 9:25 a.m.

* * * * * * * * * * * * *

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
Mr. Thomas F. Gristina
PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, P.C.
Attorneys at Law
Synovus Centre
1111 Bay Avenue
Third Floor
Columbus, Georgia 31901
Mr. Robin G. Laurie
Mr. G. Lane Knight
BALCH & BINGHAM
Attorneys at Law
Suite 200
105 Tallapoosa Street
Montgomery, Alabama
FOR THE DEFENDANT:
Mr. Dennis R. Bailey
RUSHTON, STAKELY, JOHNSTON & GARRETT
Attorneys at Law
184 Commerce Street
Montgomery, Alabama

ALSO PRESENT: Ms. Carol Lambert
    Mr. Hugh Sorrell

* * * * * * * * * * * * *

EXAMINATION INDEX

HARRY E. LAMBERT

BY MR. GRISTINA . . . . . . . . . 5

BY MR. BAILEY . . . . . . . . . 262

**Page 3**

EXHIBIT INDEX
PLAINTIFF'S EXHIBITS
23  Amended Counterclaim       182
24  Verizon phone records       6
25  List of phone numbers       7
26  Agreement       53
27  Defendant Harry Lambert's
    Responses to First Interrogatories       183

28  Harry Lambert's Responses to
    First Request for Production       192
29  Harry Lambert's Initial Disclosures       192

* * * * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and

between counsel representing the parties that the

deposition of:

HARRY E. LAMBERT

is taken pursuant to the Federal Rules of Civil

Procedure and that said deposition may be taken

before Patricia G. Starkie, Registered Diplomate

Reporter, CRR, and Commissioner for the State of

Alabama at Large, without the formality of a

**Page 4**

That objections to questions other than

objections as to the form of the question need not

be made at this time but may be reserved for a

ruling at such time as the said deposition may be

offered in evidence or used for any other purpose

by either party provided for by the Statute.

It is further stipulated and agreed by and

between counsel representing the parties in this

case that the filing of said deposition is hereby

waived and may be introduced at the trial of this

case or used in any other manner by either party

hereto provided for by the Statute regardless of

the waiving of the filing of the same.

It is further stipulated and agreed by and

between the parties hereto and the witness that the

signature of the witness to this deposition is

hereby waived.

* * * * * * * * * * * * *

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 3 of 35

Deposition of Harry E. Lambert    The Concrete Company vs. Lambert    August 29, 2006

Page 45

1  Q. Yes.
2  A. No.
3  Q. Now, we've talked about the litigation with
4     your cousin and your uncle, and you were
5     again involved in litigation in 2001, 2002,
6     is that correct, with Mr. Foley?
7  A. I don't think it was with Mr Foley. I
8     believe it was with The Concrete Company,
9     the best of my recollection.
10 Q. Were you deposed in the litigation between
11    you and your cousins and uncle?
12 A. That's been a long time ago. I don't
13    remember.
14 Q. You were deposed in the litigation with The
15    Concrete Company, were you not?
16 A. Yes.
17 Q. And other than today and that deposition,
18    have you ever had your deposition taken
19    before?
20 A. One other time.
21 Q. And what was that related to?
22 A. That was related to a dispute between a gas
23    company and a landowner, and I gave my

Page 46

1     deposition on behalf of the gas company.
2     They was taking over a piece of property,
3     putting a gas line through.
4  Q. How long ago was that?
5  A. It's been some time back. I don't remember
6     exactly.
7  Q. Was it before the litigation with your
8     cousins and uncle?
9  A. No, it would have been after, I think.
10 Q. Was it after the litigation between you and
11    The Concrete Company that we were speaking
12    of a minute ago?
13 A. Yes, I believe it would have been.
14 Q. So is it some point between that litigation
15    and the litigation we're in now?
16 A. Right.
17 Q. And what were you doing for the gas company
18    that caused you to be involved in that
19    litigation?
20 A. They called me and wanted to know if I
21    would be a witness as to what the sand and
22    gravel may be worth that they were going
23    across.

Page 47

1  Q. And where was that located?
2  A. I'd have to go back and look and see. It
3     was somewhere north of Montgomery.
4  Q. Do you know how far north of Montgomery?
5  A. No, I don't.
6  Q. Was it more than 60 miles?
7  A. I don't know.
8  Q. And were you paid as an expert witness in
9     that case?
10    MR. BAILEY: Object to the form.
11       If you understand, go ahead
12       and answer it.
13 A. I don't know what expert really consists
14    of, but I was paid for my time, yes.
15 Q. And did you have any involvement with the
16    land they were talking about before they
17    called you to be a witness?
18 A. No.
19 Q. And what did you do for them in addition to
20    testifying?
21 A. I looked at some drill samples they had is
22    all.
23 Q. Did you take some soil samples?

Page 48

1  A. No.
2  Q. And do you recall how much you were paid
3     for that?
4  A. No.
5  Q. Do you file your own tax returns?
6     MR. BAILEY: Object to the firm.
7        Answer if you understand.
8  A. I don't file them, no.
9  Q. You were here when I was deposing
10    Mrs. Lambert last week, were you not?
11 A. That's right.
12 Q. And I asked a series of questions about tax
13    returns, and I'll go through them now. How
14    do you file -- how do you file your taxes?
15 A. I don't understand that.
16 Q. Do you use an accountant to handle your
17    taxes?
18 A. Yes.
19 Q. And who is that?
20 A. Richard Stabler with Wilson and Price.
21 Q. And do you file an individual tax return or
22    do you file jointly with your wife?
23 A. I don't know.

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 4 of 35

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 49

1   Q. Do you sign a tax return every year?
2   A. Yeah.
3   Q. Do you keep copies of that?
4   A. My wife does.
5   Q. And so you don't know whether or not it's
6      an individual or joint return?
7   A. I have no idea.
8   Q. Did you report individual income between
9      January 2nd, 2006 and the end of the
10     litigation with The Concrete Company that
11     we were speaking of?
12         MR. BAILEY: Object to the form.
13  A. Say that again.
14  Q. You were in litigation with The Concrete
15     Company involving Montgomery Materials,
16     LLC. Do you recall that?
17  A. Right.
18  Q. Do you recall how that ended?
19  A. That they wound up getting the company.
20  Q. And there was a closing related to that,
21     was there not?
22  A. There was.
23  Q. And after that, you were separated from

Page 50

1      Montgomery Materials, LLC; is that right?
2   A. That's right.
3   Q. From that date until January 2nd, 2006, did
4      you report any income for tax purposes?
5   A. I don't think so.
6   Q. Did you do anything to earn money during
7      that period?
8   A. I don't -- I don't think so, no. I don't
9      remember.
10  Q. Well, you were paid for being a witness in
11     that case.
12  A. That would be the only thing, and I don't
13     know if I billed them directly or through
14     an entity or -- I don't remember how that
15     was billed.
16  Q. What entity could you have billed them
17     through?
18  A. I wouldn't know. I'd have to look and see.
19  Q. Did you form an entity during the time
20     period that we're speaking of?
21  A. No.
22  Q. So you have no recollection of how you
23     billed them for that?

Page 51

1   A. No, I don't.
2   Q. And you don't recall if you reported any of
3      that income for tax purposes?
4   A. I don't, no.
5   Q. Do you recall reporting any other income
6      during that time period for tax purposes?
7   A. No.
8   Q. At some point, you and Mr. Foley and The
9      Concrete Company went into business
10     together and formed Montgomery Materials,
11     LLC; is that correct?
12  A. That's right.
13  Q. And why did you go into business with
14     Mr. Foley?
15  A. Lord only knows.
16  Q. You don't recall?
17  A. No, not -- not really.
18  Q. Did you contact him or did he contact you
19     about going into business?
20  A. I don't know.
21  Q. What was the benefit -- well, I assume --
22     did you think there would be some benefit
23     to you in going into business with The

Page 52

1      Concrete Company at that time?
2   A. I'm sure that's what I thought, or I
3      wouldn't have done it. I don't remember
4      the -- all the reasons for doing it, no.
5   Q. Did you-all enter into some sort of
6      negotiations with each other before you
7      formed Montgomery Materials, LLC?
8   A. I'm sure we did, but I don't really recall
9      them. It's been a long time ago.
10  Q. Were you represented by counsel in those
11     negotiations?
12  A. Yes, I was.
13  Q. What law firm was that? I don't want to
14     know what you talked to them about, but I'd
15     like to know what firm it was.
16  A. I don't remember the name of the firm.
17     It's -- Jeff Cohn was the lawyer.
18  Q. And the business negotiations, did they
19     result in formal written documents with The
20     Concrete Company?
21  A. Yes, it did.
22  Q. And you had an attorney who helped you
23     negotiate those documents?

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 5 of 35

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 65

1          MR. BAILEY: Object to the form.
2     Go ahead.
3  A.  She would check it out. She's got a lot of
4     good common sense.
5  Q.  Did you participate in the decision to form
6     CCI with her?
7  A.  Did I participate?
8  Q.  Yes, sir.
9  A.  No.
10 Q.  Did you give her any advice on how to form
11    the company?
12 A.  No.
13 Q.  Did you give her any advice on what trucks
14    to buy for the company?
15 A.  Not in a business sense.
16 Q.  What sense did you give her that advice in?
17 A.  In a -- she might ask me at the supper
18    table, you know, if I thought she maybe
19    ought to buy what kind of truck, and it
20    would be the same thing as if she asked me
21    if she wanted to buy a different lawn mower
22    or what. It was in a husband and wife is
23    any talk that we would have. But in a

Page 66

1     business sense, no.
2  Q.  Did you have any communications with any
3     truck dealers about trucks CCI was going to
4     purchase?
5  A.  I don't recall at this time, no.
6  Q.  Did you drive trucks for CCI immediately
7     after it was formed?
8          MR. BAILEY: Object to the form.
9          Immediately is not defined.
10         But go ahead and answer.
11 A.  I drove trucks sometime after it was
12    formed, yes.
13 Q.  And those were trucks that your wife had
14    purchased?
15 A.  Yes.
16 Q.  And is it your testimony that you didn't
17    participate in discussions with the truck
18    dealers about those trucks before they were
19    purchased?
20 A.  Not that I recall.
21 Q.  Is it possible that you participated in
22    those?
23 A.  Anything's possible.

Page 67

1  Q.  So you might have talked to those truck
2     dealers about those trucks?
3  A.  I don't recall.
4  Q.  Do you think that –
5          Well, let me ask you this. I think you
6     testified earlier that you didn't think
7     that your owning a trucking company such as
8     CCI would be in violation of the
9     noncompete. Is that what you said earlier?
10 A.  That's what I said, yes.
11 Q.  So if you didn't think it was going to
12    violate the noncompete, then why didn't you
13    help her with the company?
14 A.  Because she chose to do it. That's what we
15    chose to do.
16 Q.  You say we. You chose to do it with her?
17         MR. BAILEY: Object to the form.
18 A.  What?
19 Q.  Did I hear you correctly, you said, that's
20    what we chose to do?
21 A.  Well, we as a husband and wife, yes. She
22    chose to do it individually.
23 Q.  And yet it's your testimony that you didn't

Page 68

1     communicate with -- or that you can't
2     recall communicating with the truck dealers
3     from where CCI purchased its initial
4     trucks?
5  A.  That's right.
6  Q.  Do you know if the trucks were leased or if
7     they were purchased?
8  A.  I don't know.
9  Q.  Do you know if the trucks were financed?
10 A.  I don't know.
11 Q.  Do you know what kind of trucks they were,
12    the first trucks?
13 A.  I believe -- I don't know.
14 Q.  Were they Mack trucks?
15 A.  They could have been, yes.
16 Q.  And did there come a time when CCI
17    purchased Peterbilt trucks?
18 A.  Yes. Yes.
19 Q.  And did you have any communications with
20    the Peterbilt dealers?
21 A.  Not that I recall.
22 Q.  During the time period up to January 2nd,
23    2006, were you involved in the maintenance

Page 69

1    issues related to CCI trucks?
2        MR. BAILEY: Object to the form.
3        Answer as best you can.
4  A.  When you say maintenance issues, that
5      covers a lot of ground. What are you --
6  Q.  Did you assist CCI in making sure the
7      trucks were up -- were kept up well?
8  A.  I assisted CCI in some of the work that was
9      done on the trucks, yes.
10 Q.  And what was that? How did you assist
11     them?
12 A.  Helped change tires, put brakes on, such as
13     that.
14 Q.  All right. Have you done that -- did you
15     do that after CCI began hauling for Alabama
16     Gravel?
17 A.  Yes.
18 Q.  And did you do that when CCI was hauling
19     other aggregate products before it went to
20     haul for Alabama Gravel?
21     MR. BAILEY: Object to the form.
22     If you understood, go ahead.
23 A.  Yes.

Page 70

1  Q.  And, in fact, have you offered that
2      assistance throughout the life of CCI?
3  A.  Yes.
4  Q.  Have you been paid anything for that?
5  A.  No.
6  Q.  Have you received any payment at all from
7      CCI for your services?
8  A.  Just a roof over -- Not from CCI, no.
9  Q.  Did you get paid by somebody else for your
10     services to CCI?
11 A.  I wasn't paid any money. I was furnished a
12     roof over my head and food to eat.
13 Q.  And are you aware of your wife drawing a
14     salary from CCI?
15 A.  I'm not aware of that, no.
16 Q.  Did you participate in discussions about
17     how much of a salary she was going to draw
18     from CCI?
19 A.  No.
20 Q.  How did CCI locate its first drivers?
21 A.  I don't know.
22 Q.  Do you know who the first drivers were?
23 A.  I believe that one of them was Grady

Page 71

1      Parker, and the other one was his brother,
2      John Parker.
3  Q.  And do you know how they came to drive for
4      CCI?
5  A.  I don't remember -- I don't know exactly,
6      no. I can't answer that.
7  Q.  Did you know the Parker brothers before
8      that time?
9  A.  Yes, I did.
10 Q.  How did you know them?
11 A.  They worked for me at Montgomery Materials.
12 Q.  Did you, in fact, solicit them to come work
13     for CCI?
14 A.  No.
15 Q.  You did not offer them a job at CCI?
16 A.  No.
17 Q.  And were you here when we were talking to
18     Mr. Danny Luster on deposition when your
19     lawyer was deposing him?
20 A.  Yes.
21 Q.  And do you recall Mr. Luster saying that
22     they told you that they went to work for
23     you -- they told him that they went to work

Page 72

1      for you?
2  A.  I don't know what Mr. Luster -- all that
3      Mr. Luster said, no. I don't know that.
4  Q.  You know Danny Luster pretty well, though,
5      don't you?
6  A.  Not real well.
7  Q.  Do you know him to be a good man?
8        MR. BAILEY: Object to the form.
9  A.  You know, I -- he was an employee. That's
10     all I can say.
11 Q.  And do you know him to be an honest person?
12 A.  He was an employee. That's all I can say.
13 Q.  Do you think he's a dishonest person?
14 A.  He was an employee. That's all I can say.
15 Q.  And you can't comment on his honesty?
16 A.  I don't know his honesty.
17 Q.  Let me ask you to look at section 8.32 --
18     I'm sorry -- 8.42 of the noncompete on page
19     11. So that it reads smoothly, it says --
20     I'll start in the bottom of section 8.4.
21     Lambert agrees that during the period, he
22     will not, and then picking up with
23     subsection two --

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 7 of 35

Deposition of Harry E. Lambert    The Concrete Company vs. Lambert    August 29, 2006

Page 81

1  Q.  When you began driving trucks for CCI, was
2      Mrs. Lambert aware of the noncompete
3      agreement that you had with The Concrete
4      Company?
5          MR. BAILEY:  Object to the form.
6          Answer as best you can.
7  A.  She knew that I wasn't supposed to go back
8      in the sand and gravel business.  That's
9      basically all she knew.
10 Q.  Had you showed her a copy of the buy/sell
11     agreement?
12 A.  No.
13 Q.  Did you keep a copy of it?
14 A.  I think so.
15 Q.  And where did you keep it?
16 A.  Oh, I don't know.  I don't know.
17 Q.  Do you have an office in your house that
18     you've maintained for your documents?
19 A.  No.
20 Q.  So you don't know if you still have a copy
21     of the buy/sell agreement?
22 A.  I don't know, no.
23 Q.  Were you aware of when CCI began to lease

Page 82

1      its trucks on with Foshee Trucking?
2          MR. BAILEY:  Object to the form.
3          Do you mean was he aware that
4          happened or is he aware of the
5          date?  Is that what you're
6          trying to get?
7          MR. GRISTINA:  I'll ask it both
8          ways.
9  Q.  Are you aware that that happened at some
10     point?
11 A.  Yes.
12 Q.  And do you know when that happened?
13 A.  Not the exact date, no.
14 Q.  Was it within a year of the closing that
15     we've been speaking of?
16 A.  Yes.
17 Q.  And do you know how CCI came to enter into
18     that business relationship with Foshee
19     Trucking?
20 A.  No.
21 Q.  Do you know how CCI located Foshee
22     Trucking?
23 A.  No.

Page 83

1  Q.  Had you had dealings with Foshee Trucking
2      before?
3          MR. BAILEY:  Object to the form.
4  A.  Had I?
5  Q.  Yes, sir.
6          MR. BAILEY:  Object to the form.
7          Go ahead and answer.
8  A.  Personally?  Are you talking about me
9      personally or a company I was affiliated --
10     I don't know.  I don't understand.
11 Q.  Well, why don't I ask it both ways?
12 A.  Why don't you?
13 Q.  Had you personally had dealings with them?
14 A.  Have I personally had dealings with Foshee
15     Trucking?
16 Q.  At that time.
17 A.  Business dealings?
18 Q.  Yes, sir.
19 A.  No.  Not business dealings, no.
20 Q.  Had a company that you were affiliated with
21     had any dealings with Foshee Trucking?
22 A.  Yes.
23 Q.  And what company was that?

Page 84

1  A.  Montgomery Materials.
2  Q.  And how did they deal with Foshee Trucking?
3  A.  They hired the trucks to haul some
4      oversized aggregate to the barge.
5  Q.  And were you responsible for arranging that
6      relationship with Foshee Trucking?
7  A.  Partly, yes.
8  Q.  And you knew some people at Foshee Trucking
9      when you were with Montgomery Materials,
10     LLC?
11 A.  Yes.
12 Q.  And is it your testimony that you did not
13     put CCI in touch with Foshee Trucking?
14 A.  Not that I recall, no.
15 Q.  Could it have happened?
16 A.  Anything's possible.
17 Q.  But you just can't recall?
18 A.  I can't recall.
19 Q.  And do you know how CCI negotiated its
20     arrangement with Foshee Trucking?
21 A.  No.
22 Q.  And do you know if they had a good deal
23     with Foshee Trucking?

Deposition of Harry E. Lambert   The Concrete Company vs. Lambert   August 29, 2006

Page 89

1    Q.   From the time period that CCI began to deal
2       with Alabama Gravel, who was in charge of
3       determining what CCI would charge for
4       shipping?
5          MR. BAILEY: Object to the form.
6    A.   Say that again.
7    Q.   Who at CCI decided what rate you-all would
8       charge for shipping aggregate once you
9       began to deal with Alabama Gravel?
10   A.   Carol.
11   Q.   And what experience did Carol have in
12      determining what a good shipping charge
13      would be?
14   A.   She had good common sense and could figure
15      it out.
16   Q.   Had she had any experience like that before
17      she began to deal with CCI?
18         MR. BAILEY: Object to the form.
19         Go ahead and answer.
20   A.   She is a very fast learner. And, no, she
21      didn't, because she had been keeping books
22      of the sand and gravel operation and didn't
23      have any trucks.

Page 90

1    Q.   Did Foshee negotiate the hauling rate with
2       purchasers of aggregate, or was it
3       you-all -- Excuse me. Was it CCI that
4       negotiated that rate when you were leasing
5       on with Foshee?
6    A.   Say that again.
7    Q.   Well, when CCI was leasing on with Foshee,
8       who determined what the customers would pay
9       for hauling at that time?
10   A.   I don't know.
11   Q.   And do you know if that was a rate that was
12      negotiated between CCI and Foshee or
13      between Foshee and the customers?
14   A.   I don't know.
15   Q.   How were the CCI drivers compensated?
16   A.   I don't know exactly.
17   Q.   Do you know what benefits they received?
18   A.   No.
19   Q.   From January 1, 2005 until the end of the
20      year 2005, do you know who CCI delivered
21      aggregate product to?
22         MR. BAILEY: Object to the form.
23         Answer as best you can.

Page 91

1    A.   Not everybody, no.
2    Q.   Can you give me the ones you know of?
3    A.   From January the first --
4    Q.   During the year 2005.
5    A.   They delivered for or to?
6    Q.   To.
7    A.   Who they delivered to?
8    Q.   Yes, sir.
9    A.   Well, the only one that I can really think
10      of for sure would be to Simcala, to Globe,
11      to Maddox. That's the only ones that I can
12      say for sure, but there was several others.
13   Q.   From July 2005 until the end of 2005, do
14      you recall having conversations with Jim
15      Maddox?
16         MR. BAILEY: Object -- okay. Go
17         ahead.
18   A.   Do I recall any conversations with Jim
19      Maddox?
20   Q.   Yes.
21   A.   Yes.
22   Q.   And what were the reasons for those
23      conversations?

Page 92

1    A.   It could be a lot of things.
2    Q.   Did Mr. Maddox contact you about arranging
3       the shipment of white oversized material to
4       his operation?
5    A.   Say that again.
6    Q.   Did Mr. Maddox contact you about arranging
7       shipment of white oversized material to
8       him?
9    A.   When you say arrange, what do you mean?
10   Q.   Did he call you looking for white oversized
11      material?
12   A.   Did he call me looking for white oversized
13      material?
14   Q.   Yes.
15   A.   That's -- no.
16   Q.   Did he call you to purchase white oversized
17      material from Alabama Gravel?
18   A.   No.
19   Q.   Did he call CCI to purchase white oversized
20      material?
21   A.   No.
22   Q.   Then what were the conversations between
23      you and Mr. Maddox during that time period?

23 (Pages 89 to 92)

Page 93

1    A.  Me and Mr. Maddox are close friends.
2        He's -- we've been close friends for
3        years.  It could be many things.  It could
4        be a casual conversation.  It could be
5        talking about fishing.  It could be talking
6        about several things.
7            One of the things that it could be
8        talking about is he had made
9        arrangements -- when he called me and told
10       me he had made arrangements to buy material
11       from Alabama Gravel, and would there be
12       trucks available to load two, three, four
13       or ever how many railroad cars he had.
14       Would there be trucks available to do that
15       since CCI was doing the hauling.  He would
16       either call myself or he would call my
17       wife, and my wife would call me to see what
18       the availability of the trucks were.
19   Q.  Did he call you -- did you put Mr. Maddox
20       in touch with Alabama Gravel for the first
21       time?
22   A.  I don't remember.  I don't remember.
23   Q.  Was he aware of Alabama Gravel at the time

Page 94

1        he first contacted you about getting
2        aggregate shipped?
3            MR. BAILEY:  Object to the form.
4            You would have to look in his
5            head, but answer as best you
6            can.
7    A.  I don't remember.
8    Q.  Was CCI contacted -- Well, let's do a time
9        period on that.  During the year 2005, are
10       you aware of CCI being contacted directly
11       by purchasers who were looking to obtain
12       aggregate product?
13   A.  Am I aware of it?
14   Q.  Yes.
15   A.  No.
16   Q.  Do you know if Simcala contacted CCI
17       directly about obtaining white oversized?
18   A.  Did they contact -- I don't know.  I
19       don't -- no, I don't know.
20   Q.  I understand that you had done some
21       consulting work for Robert Alexander after
22       the closing and before January 2nd, 2006;
23       is that correct?  Did you do some

Page 95

1        consulting work for him during that time
2        period?
3    A.  Say the time period again.
4    Q.  After the closing that we've been speaking
5        of and up to January 2nd, 2006.
6    A.  Yes.
7    Q.  And what was the nature of that consulting
8        work?
9    A.  He wanted me to help him look at a sand and
10       gravel operation in north Alabama to see
11       if -- it was for sale, and he wanted to see
12       if he wanted to buy it.
13   Q.  Where in north Alabama?
14   A.  It was up around Gadsden.
15   Q.  Did you do any other consulting work for
16       Mr. Alexander during that time period?
17   A.  No.
18   Q.  Did you do any work with Mr. Alexander
19       related in any way to a sand and gravel
20       business between the closing and January
21       2nd, 2006?
22   A.  Not other than what I just told you about,
23       the consulting in north Alabama, no.

Page 96

1    Q.  How did you come to meet Dave Tuten?
2    A.  I really don't remember.
3    Q.  Do you recall when it was?
4    A.  No.
5    Q.  Do you recall having a relationship with
6        Mr. Tuten when he was a purchaser for
7        Globe?
8    A.  At any time?
9    Q.  Yes.
10   A.  Yes.
11   Q.  And do you recall dealings with Mr. Tuten
12       between the closing and January 2nd, 2006?
13           MR. BAILEY:  Object to the form,
14           dealings, but go ahead and
15           answer.
16   A.  What do you mean, dealings?
17   Q.  Let me ask you this.  Do you recall hauling
18       or being a driver for the hauling of
19       aggregate product from Elmore Sand and
20       Gravel to Globe between the time frame of
21       the closing and January 2nd, 2006?
22   A.  I don't recall any specific instances, but
23       I'm sure I did.

Deposition of Harry E. Lambert    The Concrete Company vs. Lambert    August 29, 2006

Page 101

1    operations?
2    A.  I don't recall talking to Dave a whole
3    lot.  Most of the time it was casual
4    conversation.  And to talk about Alabama
5    Gravel, what do you mean talking about
6    Alabama Gravel?
7    Q.  Were you talking to him about Alabama
8    Gravel's operations during that time
9    period?
10    MR. BAILEY:  Object to the form.
11    A.  What do you consider the operations?  Are
12    you talking about if we was hauling any
13    rock or if Carol's Contracting was hauling
14    any rock or what?
15    Q.  Let's take it in part.
16    A.  Okay.
17    Q.  Were you talking to him about Carol's
18    Contracting's assistance to Alabama Gravel
19    during that time period?
20    A.  He may have called me and wanted to know
21    how many loads had been hauled over a
22    specific time.
23    Q.  So Mr. Tuten would call you to find out how

Page 102

1    many loads CCI had delivered for Alabama
2    Gravel?
3    A.  He could have.  Not me specifically, but he
4    could have, yes.
5    Q.  Would you have spoken to him during that
6    time period about the construction of the
7    Deatsville plant?
8    A.  No.
9    Q.  Do you know what I'm talking about when I
10    say the Deatsville plant?
11    A.  Yes.
12    Q.  And is it true that you're now under a
13    consulting agreement related to the
14    construction of the Deatsville plant?
15    A.  Yes.
16    Q.  And can you recall discussions with
17    Mr. Tuten between January 1, 2005 and the
18    end of 2005 related to the construction of
19    the Deatsville plant?
20    A.  Not that I can recall, no.
21    Q.  When did you first meet Mr. Rex Dasinger?
22    A.  I don't know.
23    Q.  How long have you known him for?

Page 103

1    A.  I don't know.
2    Q.  Have you known him for more than five
3    years?
4    A.  I don't know.
5    Q.  What is Mr. Dasinger's experience in the
6    sand and gravel business, if you know?
7    A.  I really don't know what all his experience
8    is.  I don't know.
9    Q.  Did there come a time when he drove trucks
10    for CCI?
11    A.  Yes, there was.
12    Q.  When was that?
13    A.  I don't know exact dates.  I don't know.
14    Q.  Is he currently a driver for CCI?
15    A.  No.
16    Q.  Do you know when he stopped being a driver
17    for CCI?
18    A.  No.  Not exactly, no.
19    Q.  Do you know how he got hired by CCI?
20    A.  Do I know how he got hired?  No.
21    Q.  Do you recall working with Mr. Dasinger
22    during the Ivan hurricane cleanup?
23    MR. BAILEY:  Object to the form.

Page 104

1    Go ahead.
2    A.  What do you mean, working with him?  I -- I
3    remember him being down there with us.  I
4    mean, not with us, but I remember him being
5    down there, yes.
6    Q.  What was CCI doing as part of the Ivan
7    hurricane cleanup?
8    A.  They were hauling debris.
9    Q.  And were you driving trucks at that time?
10    A.  Yes, I was.
11    Q.  Were you being paid for that hauling?
12    A.  No, I wasn't.
13    Q.  And how did you come to have contact with
14    Mr. Dasinger down there?
15    A.  He was working -- he was loading for -- he
16    was loading the trucks.  He was running a
17    log loader type thing, loading the trucks.
18    Q.  Do you know who holds the lease for the
19    land on which the Deatsville site is
20    located?
21    A.  No.
22    Q.  Do you know if it's Mr. Dasinger?
23    A.  I don't know.

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert                    August 29, 2006

| Page 105 | Page 107 |
|---|---|

**Page 105**

1   Q.   Do you know how Alabama Gravel determined
2      where to put the mining operation on the
3      Deatsville site?
4   A.   No.
5   Q.   Do you know if Mr. Dasinger participated in
6      that?
7   A.   I don't know.
8   Q.   Do you know how Alabama Gravel got in touch
9      with Mr. Dasinger?
10   A.   I don't remember.
11   Q.   Did you put Alabama Gravel in touch with
12      Rex Dasinger?
13   A.   I said I didn't remember.
14   Q.   Before January 2nd, 2006, did you ever take
15      soil samples at the Deatsville site?
16   A.   No.
17   Q.   Did you ever take a backhoe out there and
18      dig some holes to take soil samples?
19   A.   No.
20   Q.   Do you know if Mr. Dasinger did?
21   A.   I don't know.
22   Q.   Do you know how Alabama Gravel decided to
23      open up a mining operation at the

**Page 106**

1      Deatsville site?
2   A.   No. I don't know.
3   Q.   Is it your testimony that you did not
4      participate in that decision?
5   A.   That's right.
6   Q.   Before January 2nd, 2006, had you ever been
7      out to the Deatsville site?
8   A.   Before January the 2nd, 2006?
9   Q.   Yes.
10   A.   Yes.
11   Q.   And under what circumstances was that?
12   A.   I don't remember.
13   Q.   You don't know why you went out there?
14   A.   I went out there three or four times, I'm
15      sure. I don't remember exactly how many
16      times. And I don't know why I went out
17      there, no.
18   Q.   Who did you go out there with?
19   A.   Most of the time I just rode out there by
20      myself.
21   Q.   And you don't know why you went there?
22   A.   Curiosity.
23   Q.   What were you curious about?

**Page 107**

1   A.   Just being curious. See what's going on.
2   Q.   And you said most of the time you went out
3      there by yourself. Did you ever go out
4      there with anybody else?
5   A.   It's possible.
6   Q.   Do you know who was constructing the
7      Deatsville plant?
8        MR. BAILEY: Prior to January 2nd,
9        2006?
10        MR. GRISTINA: Yes.
11   A.   I know that Alan King was working out
12      there, yes.
13   Q.   Who hired Alan King?
14   A.   I don't know.
15   Q.   During 2005, did you have opportunity to
16      speak with Alan King?
17   A.   Say that again?
18   Q.   Did you speak with Alan King during the
19      year 2005?
20   A.   Oh, I'm sure I did.
21   Q.   What did you speak with him about?
22   A.   Oh, just -- Alan and I have been friends
23      for many, many years, and we could have

**Page 108**

1      talked about hunting, fishing, drinking
2      liquor. We could talk about a lot of
3      things. I don't know.
4   Q.   How often did you speak with Alan King
5      during 2005?
6   A.   I have no idea.
7   Q.   Did you ever talk to him about his work on
8      the Alabama Gravel site at Deatsville?
9   A.   I'm sure that that was brought up during
10      conversation, just like I would ask him how
11      he was getting along or what have you. But
12      any specifics on the construction of it,
13      no.
14   Q.   Do you know who --
15        Again, you were here for Danny Luster's
16      deposition, were you not?
17   A.   Yes, I was.
18   Q.   Do you recall when Danny said that Alan
19      King told him he was working for Danny's
20      old boss at the Deatsville site?
21   A.   I don't recall what Danny said.
22   Q.   Did you hire Alan King to build the
23      Deatsville site for Alabama Gravel?

Case 2:05-cv-01026-CSC   Document 77-18   Filed 09/19/2006   Page 12 of 35

Deposition of Harry E. Lambert   The Concrete Company vs. Lambert   August 29, 2006

Page 109

1   A.  Did I hire Alan King?
2   Q.  Yes.
3   A.  No.
4   Q.  Did Alabama Gravel hire Alan King with your
5       assistance to build that site?
6   A.  With my assistance?
7   Q.  Yes.
8   A.  No.
9   Q.  Did they ask you about Alan King before he
10      went to build that site?
11  A.  Did Alabama Gravel?
12  Q.  Yes.
13  A.  No.
14  Q.  Did you recommend Alan King to Alabama
15      Gravel for construction of the Deatsville
16      site?
17  A.  For construction of the Deatsville site?
18  Q.  Yes, sir.
19  A.  No.
20  Q.  Did you recommend Alan King for any purpose
21      with respect to the Deatsville site?
22  A.  No.
23  Q.  Do you know who Sam Estock is?

Page 110

1   A.  Yes, I do.
2   Q.  Who is he?
3   A.  He's a good close personal friend of mine.
4   Q.  What business is he in?
5   A.  He's -- sells screen cloth and screens and
6       different things like that --
7   Q.  Does he work --
8   A.  -- for sand and gravel and for the
9       aggregate industry.
10  Q.  Excuse me.  I interrupted you.  I
11      apologize.
12          Does he work for a company called
13      Southern Wire?
14  A.  I believe he owns Southern Wire, but I'm
15      sure he's probably an employee, too.
16  Q.  Have you ever talked to him about the
17      Deatsville site?
18  A.  Sam and I talked about a lot of things.  To
19      say that I -- I don't know.  I don't know.
20  Q.  Did Robert Alexander or Dave Tuten ask you
21      about hiring Alan King for the Deatsville
22      site?
23  A.  For the Deatsville site?

Page 111

1   Q.  Yes.
2   A.  No.
3   Q.  Did they ask you --
4   A.  Not that I recall.
5   Q.  Did they ask you about hiring him for any
6       purpose with respect to Alabama Gravel's
7       business?
8   A.  For Alabama Gravel?
9   Q.  Yes.
10  A.  Not that I recall.
11  Q.  Have you ever talked to Robert Alexander or
12      Dave Tuten about using Alan King for
13      anything?
14  A.  That's a two-part question.  Which one do
15      you want to know?
16  Q.  Have you ever talked to Dave Tuten or
17      Robert Alexander about Alan King?
18  A.  No.  That's two people.  I don't know.  You
19      ask me one person and I'll answer you.
20  Q.  All right.  Have you talked to Robert
21      Alexander about Alan King?
22  A.  Yes.
23  Q.  All right.  And what was the context of

Page 112

1       that?
2   A.  When I was a consultant for Robert in north
3       Alabama, there was a lot of work that
4       needed to be done on that plant in north
5       Alabama.  He wanted to know if I knew
6       anyone that was capable of doing that, and
7       I recommended Alan King to him at that
8       time.
9   Q.  Did he end up working for Robert Alexander
10      on that plant?
11  A.  Robert didn't buy that plant.  No.
12  Q.  So Alan King didn't do any work for Robert
13      Alexander based on that recommendation?
14      That was a bad question.
15          Alan King did not work on that plant
16      for Robert Alexander?
17  A.  On that -- on that plant, no.
18  Q.  Do you know if he had done any other work
19      for Robert Alexander before he went to work
20      on the Deatsville site?
21  A.  I don't know.
22  Q.  Now, the second part of the question,
23      second person.  Did you ever talk to Dave

Page 113

1  Tuten about Alan King?
2  A.  No, that I recall.
3  Q.  Did you talk to Dave Tuten about Alan King
4     with respect to any issue whatsoever?
5  A.  That covers a lot of territory.  I don't
6     recall any.
7  Q.  Now Mr. Estock.  Are you aware of his work
8     on the Deatsville site?
9  A.  What do you mean by work?
10  Q.  Are you aware of Southern Wire providing
11     services with respect to the Deatsville
12     site?
13  A.  Before 2006?
14  Q.  Yes, sir.
15  A.  Am I aware -- aware of any services?  Not
16     specifically, no.
17  Q.  Are you aware of it generally?
18  A.  I could have heard it in conversation, yes.
19  Q.  Who would you have heard it with?
20  A.  I don't know.
21  Q.  Did you ever speak to Sam Estock about
22     going to work on the Deatsville site?
23     MR. BAILEY:  At any time up to the

Page 114

1     present, you mean?
2     MR. GRISTINA:  Up to 2006.
3  A.  Up to 2006 did I talk to Sam about working
4     on the -- not that I recall, no.
5  Q.  Southern Wire provides equipment, isn't
6     that correct?
7  A.  I'm sure they did, yes.
8  Q.  All right.  And, in fact, they're a company
9     that specializes in providing equipment for
10     mining operations, isn't that right?
11  A.  Yes.
12  Q.  And Sam Estock is the one you would call if
13     you wanted to get equipment for a mining
14     operation, wouldn't you?
15  A.  He would be one of the people that you
16     would call, I would think, yes.
17  Q.  Did you recommend Sam Estock to Alabama
18     Gravel for construction of the Deatsville
19     site?
20  A.  To Alabama Gravel?
21  Q.  Yes.
22  A.  Not that I recall.
23  Q.  Did you recommend him to Robert Alexander?

Page 115

1  A.  Yes.
2  Q.  For what purpose?
3  A.  Robert asked me when I was consulting for
4     him in north Alabama -- again, that he was
5     going to have to buy some equipment, sand
6     and gravel equipment for that, and he was
7     wanting -- he asked me who would be a good
8     person to get a price from and who would be
9     a good person to buy that type of equipment
10     from in Alabama.  And I recommended Sam
11     Estock as much as a friend to Sam Estock as
12     it was to recommend him to Robert
13     Alexander.  It was a two-way
14     recommendation.
15  Q.  Other than that recommendation, had you
16     recommended Sam Estock to Robert Alexander
17     for any other purpose?
18  A.  Not that I can recall.
19  Q.  Do you know how Southern Wire ended up
20     providing services for the Deatsville -- or
21     providing equipment for the Deatsville
22     site?
23  A.  No, I don't recall.  I mean, I don't know.

Page 116

1  Q.  Did you recommend Sam Estock to Dave Tuten?
2  A.  Not that I recall.
3  Q.  Did you ever discuss Sam Estock with Dave
4     Tuten?
5  A.  I'm sure I could have.
6  Q.  Under what circumstances?
7  A.  I don't know.
8  Q.  What about discussions with Mr. Tuten about
9     Southern Wire?  Did you discuss Southern
10     Wire with Dave Tuten?
11  A.  Not any specific discussions that I
12     recall.  I'm sure I probably could have.
13     That's possible.
14  Q.  And what about discussions with
15     Mr. Dasinger about Sam Estock?  Do you
16     recall that?
17  A.  I don't recall any specific discussions
18     about Sam, no.
19  Q.  When you went out to the Deatsville site,
20     do you know who was responsible for
21     overseeing its construction up to January
22     2nd, 2006?
23  A.  Do I know?

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert                    August 29, 2006

Page 117

1    Q.  Yes.
2    A.  No.  Not that I can recall, no.
3    Q.  Do you know about Mr. Dasinger's previous
4         employment with Elmore Sand and Gravel?
5    A.  Not that I -- not that I remember, no.
6    Q.  About how often would you speak with
7         Mr. Estock from July 1, 2005 to the end of
8         the year 2005?
9    A.  Oh, I don't know.  Me and Sam talked very
10        frequently.  Sam is Bobby Bowden's
11        brother-in-law, and we both like football,
12        we both like fishing, we both like
13        hunting.  And Sam has been a very close
14        personal friend for many years, so we just
15        talk, casual conversations.
16   Q.  And is it your testimony that none of those
17        conversations related to the construction
18        at the Deatsville site?
19   A.  They could have been mentioned casually.
20        Businesswise, I don't recall any.
21   Q.  Do you know who at Alabama Gravel had the
22        experience to oversee the construction of
23        the Deatsville site?

Page 118

1    A.  I would say Robert Alexander.
2    Q.  And was Robert Alexander the one who dealt
3         with Sam Estock, Alan King?
4    A.  I don't know.
5    Q.  They never talked to you about that?
6    A.  Who?
7    Q.  Sam Estock or Alan King.
8    A.  Sam Estock or Alan King talk to me about
9         it --
10   Q.  Yes, sir.
11   A.  -- or Robert Alexander --
12   Q.  Did they talk to you about their dealings
13        with Robert Alexander?
14   A.  I'm sure they probably mentioned it.  I --
15        you know, we had a lot of conversations.  I
16        don't recall any specific conversations
17        related to that, no.
18   Q.  Do you know where Alabama Gravel located
19        equipment from for the construction of the
20        Deatsville site?
21            MR. BAILEY:  Object to the form.
22            Answer if you can.
23   A.  Are you talking about prior to 2006?

Page 119

1    Q.  Yes.
2    A.  You know, I don't know everywhere, no.
3    Q.  Do you know any of the places?
4    A.  Well, I know Southern Wire furnished some
5         of the equipment that went in there, and I
6         know that Pearce Pump furnished some.
7         That's basically all I know.
8    Q.  Do you know who works at Pearce Pump?
9    A.  Bernie Ostermeyer or something like that.
10        I can't say his name.
11   Q.  Did you have discussions with Bernie
12        Ostermeyer or whatever his name is during
13        2005?
14   A.  Oh, I'm sure I did.  Bernie's a very close
15        personal friend of mine, too.
16   Q.  But you don't know his last name?
17   A.  Well, Carol has a driver that I can't tell
18        you his last name.  I always call him
19        Bernie.
20   Q.  And how many conversations do you think you
21        had with Bernie Ostervelt during 2005?
22   A.  I have no idea.  I don't have a clue.
23   Q.  How long have you known each other?

Page 120

1    A.  Fifteen, 20 years.
2    Q.  And under what circumstances did you-all
3         come to meet?
4    A.  Oh, I can't remember.
5    Q.  Would you have talked to him frequently
6         during 2005?
7    A.  Oh, I'm sure I have, yes.
8    Q.  Any business purposes for those calls?
9    A.  Not that I can think of, no.
10   Q.  When you were with Montgomery Materials,
11        LLC, did you ever have any experience
12        running a mining pit more than four days a
13        week?
14   A.  I don't remember, really.  I could have.
15   Q.  I mean, you've heard a lot of testimony in
16        I think all of the depositions in this case
17        about increasing the production at pits
18        from four to five to four to six -- or four
19        to six days a week.  Do you recall hearing
20        that testimony?
21   A.  I don't really recall, no.
22   Q.  Do you have an opinion about whether or not
23        it's a good idea in general to increase

Page 129

1     some of that desires, and it may be a good
2     thing for them to meet.
3     Q.  And, in fact, you -- did you give -- did
4         you call Mr. Alexander and put him in touch
5         with Mr. Tuten?
6     A.  I don't remember exactly how I did that,
7         no. I don't know exactly.
8     Q.  Do you recall when Mr. Tuten and
9         Mr. Alexander first met?
10    A.  I believe it was at a hotel or motel in
11        Prattville.
12    Q.  Were you present at that meeting?
13    A.  I was there at the start of that meeting,
14        the best I recall.
15    Q.  Did you participate in the discussions at
16        that meeting?
17    A.  No, I don't think so.
18    Q.  What did you say, if anything, at that
19        meeting?
20    A.  I just -- I don't recall what I said
21        specifically. I recall introducing them,
22        and I don't recall any other specifics that
23        I actually said.

Page 130

1     Q.  Was there a discussion at that time as to
2         any particular form of aggregate that
3         Mr. Alexander and Mr. Tuten were looking to
4         sell?
5     A.  What Dave was interested in would be a
6         metallurgical grade gravel is the best of
7         my recollection.
8     Q.  And would that include white oversized
9         gravel?
10    A.  That would include white oversized, yes.
11    Q.  Were you aware of at that time any supply
12        issues that Simcala was having with respect
13        to white oversized?
14    A.  You know, I don't know -- all that time
15        frame was kind of together. It could have
16        been right after that or it could have been
17        right before that. I don't remember. But
18        it was along that same time, yes.
19    Q.  How did you learn about that?
20    A.  Simcala had called me and wanted me to come
21        in and meet with them.
22    Q.  What did you tell them?
23    A.  I said, okay.

Page 131

1     Q.  And did you go and meet with Simcala?
2     A.  I met with, yeah, two representatives of
3         Simcala.
4     Q.  And who were they?
5     A.  One of them was Dick Wymer, and the other
6         one was Ed Boardwine, the best of my
7         recollection.
8     Q.  What was the date of that meeting?
9     A.  I don't know the exact date.
10    Q.  But was it in late 2004?
11    A.  I would think that it was early 2005 is
12        what I would think, very early.
13    Q.  And were you the only one present at that
14        meeting with the Simcala folks?
15    A.  Yes.
16    Q.  All right. And what did you-all talk
17        about?
18    A.  They wanted to know when -- you know, I
19        don't remember the exact sequence of how
20        things were talked about, but, you know,
21        the basic things, they wanted to know if I
22        could go in the sand and gravel business,
23        and I told them I was in jail; that I

Page 132

1     couldn't go in, and I couldn't even attempt
2     to go in until January the 2nd of 2006.
3     Also they told me that they were having a
4     supply problem; that The Concrete Company
5     could not supply their needs. That they
6     had gone up on the price and they had cut
7     them way back, and that they were going to
8     run out of oversized -- white oversized
9     gravel or have to make arrangements to rail
10    it in or truck it in or what have you and
11    was there any way I could help them.
12    Q.  And what did you tell them?
13    A.  I told them me personally, no.
14    Q.  All right. Did you recommend somebody
15        else?
16    A.  I told them I was working with Robert
17        Alexander up in north Alabama, and that he
18        could possibly be interested in doing
19        something.
20    Q.  Did you have any idea where Robert
21        Alexander would get white oversized to
22        provide to Simcala at that time?
23    A.  No, I -- no. Not that I recall, no.

Page 133

1   Q.  Then how did you think that Robert
2        Alexander was going to be able to help
3        them?
4   A.  I didn't know.
5   Q.  So did you give them Robert Alexander's
6        number?
7   A.  I don't remember if I gave them Robert
8        Alexander's number or I told them that I
9        would have Robert Alexander call them. It
10       was probably one or the other.
11  Q.  Anything else you recall about that
12       discussion with Dick Wymer and --
13          I believe you said Mr. Boardwine? Did
14       you say that?
15  A.  Yes.
16          It was several things discussed. It
17       was kind of a -- you know, 30 or 45-minute
18       meeting probably. They were -- that's all
19       I can recall being discussed, you know,
20       specifically recall, but I'm sure we talked
21       about other things. I don't know.
22  Q.  Now, at that time, am I correct that in
23       early January 2005 that there were two

Page 134

1        major providers of white oversized material
2        in the Montgomery area, The Concrete
3        Company and Elmore Sand and Gravel? Is
4        that accurate?
5   A.  I don't know.
6   Q.  Do you know if there were other suppliers
7        of white oversized at that time?
8   A.  I don't know. I would guess that Martin
9        Marietta was, too.
10  Q.  Martin Marietta was a supplier or purchaser
11       of white oversized?
12  A.  They would have been a supplier.
13  Q.  Do you know what pit they supply white
14       oversized out of?
15  A.  To my knowledge, I think the only pit they
16       had at that time was the Shorter pit, but,
17       now, they could have had the Waugh pit open
18       at that time. I don't know.
19  Q.  Do you know if Shorter pit produces white
20       oversized?
21  A.  It had in the past. I don't know if it was
22       producing white oversized then or not, no.
23       I don't know.

Page 135

1   Q.  At that time, did you have knowledge of who
2        were the largest suppliers of white
3        oversized in the area?
4   A.  No.
5   Q.  Were you aware that at that time Elmore was
6        supplying white oversized to Simcala?
7   A.  I wasn't specifically aware of it. I knew
8        they had provided white oversized in the
9        past, but whether they was providing white
10       oversized that day or right then, I don't
11       know.
12  Q.  Had you ever met Dick Wymer before that
13       meeting?
14  A.  Yes.
15  Q.  When did you first meet Dick Wymer?
16  A.  I don't remember.
17  Q.  How long before that meeting?
18  A.  Oh, it's some time before that meeting. A
19       long time before that meeting.
20  Q.  More than five years?
21  A.  I don't remember.
22  Q.  And would you consider him to be a friend
23       of yours?

Page 136

1   A.  A business acquaintance. I don't know if
2        you -- that's not a friend. He wasn't an
3        enemy. He was -- we were friendly, but I
4        wouldn't consider him a close friend.
5   Q.  Had you delivered white oversized to
6        Simcala before that meeting?
7          MR. BAILEY: Object to the form.
8   A.  I don't recall doing it. I don't know. I
9        can't remember.
10  Q.  Do you recall ever driving a truck that
11       contained white oversized that you dropped
12       off at Simcala at any time before that
13       meeting?
14  A.  That's the same question. I don't
15       remember.
16  Q.  True.
17          Do you recall meeting Mr. Boardwine
18       before that meeting?
19  A.  I'm sure I have, but I don't recall it.
20  Q.  Is he a friend of yours?
21  A.  He's an acquaintance.
22  Q.  Was it Ed Boardwine, Jr. who was at that
23       meeting or Ed Boardwine, Sr.?

Page 137

1   A.  Junior.
2   Q.  Is Mr. Boardwine, Sr. still with Simcala in
3       any way?
4   A.  I don't know. I don't have any idea.
5   Q.  Have you ever met him before?
6   A.  Oh, yes.
7   Q.  When did you meet him?
8   A.  Long time ago.
9   Q.  Before 2000?
10   A.  Oh, I don't remember if it was before 2000
11      or after 2000. I don't know. Or both.
12   Q.  How much time do you consider to be a long
13      time? You've said that a lot today. How
14      much is a long time?
15         MR. BAILEY: Object to the form.
16   A.  I don't know how much a long time is. I'd
17      say a long time is anything more than two
18      or three years, you know. Depends on how
19      old you are as to how long is a long time.
20   Q.  Anything else you can recall about that
21      conversation with Mr. Boardwine and
22      Mr. Wymer?
23   A.  Not any specifics, no.

Page 138

1   Q.  Do you know how Simcala decided to call
2      you?
3   A.  You would have to ask them. I don't know.
4   Q.  Did they tell you?
5   A.  No, they didn't tell me that I recall.
6   Q.  Do you know if Dave Tuten was working as a
7      consultant for Simcala at that time?
8   A.  I don't know.
9   Q.  Did you talk to Dave Tuten about your
10      meeting with Simcala?
11   A.  I really don't remember. I don't know.
12   Q.  The initial conversation with Dave Tuten
13      where he expressed interest of going into
14      the sand and gravel business, did you have
15      that conversation with him before you met
16      with Simcala?
17   A.  I don't remember.
18   Q.  Did you have it after?
19   A.  If I'd remembered before, I would
20      remember. I don't know.
21   Q.  Did the hotel meeting in Prattville between
22      Tuten and Alexander take place before or
23      after you met with Dick Wymer and Ed

Page 139

1      Boardwine?
2   A.  It took place after.
3   Q.  How long after?
4   A.  I don't recall. I don't remember exactly.
5      It wasn't a long time.
6   Q.  Do you know how -- did Alabama Gravel
7      eventually begin to sell Simcala white
8      oversized material out of the Gentry pit?
9   A.  Say that again.
10   Q.  Did Alabama Gravel eventually begin to sell
11      white oversized material to Simcala out of
12      the Gentry pit?
13   A.  Yes.
14   Q.  All right. Do you know how they located
15      the Gentry pit?
16         MR. BAILEY: Object to the form.
17         Who located it?
18         MR. GRISTINA: Alabama Gravel.
19   A.  Not really, no.
20   Q.  Forgive me, sir, but "not really" and "no"
21      are different answers. Is it no or --
22   A.  I don't know.
23   Q.  Did Dave Tuten ask you where he could find

Page 140

1      white oversized in the Montgomery area to
2      supply to Simcala?
3   A.  Not that I recall.
4   Q.  Did Robert Alexander ask you that?
5   A.  Not that I recall.
6   Q.  And is it your testimony that you didn't
7      put them in touch with Mr. Gentry for that
8      purpose?
9   A.  For that purpose? Is that what you're
10      saying?
11   Q.  That's my question.
12   A.  I didn't put them in touch with Mr. Gentry
13      for that purpose. I didn't put Dave Tuten
14      in touch with Mr. Gentry at all, and I put
15      Robert Alexander in touch with Mr. Gentry
16      the way I described it earlier about the
17      sand screws.
18   Q.  And that was the only purpose you put
19      Robert Alexander in touch with Mr. Gentry?
20   A.  That's right.
21   Q.  At the meeting that you had or that you
22      were present for between Mr. Tuten and
23      Mr. Alexander in the hotel in Prattville,

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 18 of 35

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert                    August 29, 2006

Page 145

1    A.   Yes, I own some tools.
2    Q.   Where do you keep your tools?
3    A.   I usually keep them in my pickup truck.
4    Q.   And you don't keep --
5    A.   Well, it's not my pickup truck, actually.
6         I keep them in the pickup truck.
7    Q.   And who owns the pickup truck?
8    A.   I think Carol's Contracting owns the pickup
9         truck.
10   Q.   And that's a truck you drive?
11   A.   The pickup truck, yes.
12   Q.   So your vehicle is owned by Carol's
13        Contracting?
14   A.   I think so.
15   Q.   Now, were you aware of how Mr. Alexander,
16        Mr. Tuten, and Mr. Dasinger came to meet in
17        your wife's shop as you describe it?
18   A.   I don't really remember the specifics of
19        how they got together, no.
20   Q.   Did they call you about having a meeting
21        there?
22   A.   I don't remember.
23   Q.   Did they schedule that meeting through your

Page 146

1         wife?
2    A.   I don't think so.  I don't -- I don't
3         remember.
4    Q.   And you were present for part of that
5         meeting, weren't you?
6    A.   I was there at the start of that meeting.
7    Q.   Why did you leave?
8    A.   I didn't have no business in it.  It wasn't
9         none of my business.
10   Q.   What did you say during the meeting?
11   A.   I probably said, hey, you fellows -- spoke
12        and told them to sit down there and enjoy
13        theirselves or whatever.  And then I
14        probably left and went and got a Coca-Cola
15        or something.
16   Q.   Did you offer that space as an office for
17        Alabama Gravel at that time?
18   A.   I never did offer that space to Alabama
19        Gravel, because it wasn't my space to
20        offer.
21   Q.   Who offered it to them?
22   A.   I would -- don't know if Carol asked or
23        they asked her.  I don't know.

Page 147

1    Q.   But it's your testimony you didn't
2         participate in that at all?
3    A.   I didn't, no.
4    Q.   Did you recommend Mrs. Lambert as a
5         bookkeeper to Alabama Gravel?
6    A.   If Robert had asked me, which I don't
7         remember whether he did or didn't, I would
8         have gave her a good recommendation.  But I
9         don't remember whether he asked me or not.
10   Q.   You can't recall you telling them that she
11        needed something to do and making that
12        recommendation?
13   A.   No, I don't recall that.
14   Q.   If Mr. Tuten said that, is he wrong?
15   A.   I don't know whether he's wrong.  I said I
16        don't recall it.  He could very well be
17        right or he could be wrong, but I don't
18        recall it.
19   Q.   Do you recall how they decided to pay rent
20        for the use of the office at Alabama
21        Gravel?
22   A.   No, I don't -- I don't know how.
23   Q.   Do you know how much they paid?

Page 148

1    A.   I don't know.  No, I don't.
2    Q.   Do you recall any of the other specifics or
3         any specifics about what you talked about
4         with Mr. Tuten, Mr. Dasinger, and
5         Mr. Alexander at that meeting in the shop?
6    A.   Not that I recall.
7    Q.   Do you know how they got in touch with
8         Mr. Dasinger?
9    A.   When I was consulting for Robert in north
10        Alabama, he had asked me if I knew of
11        anyone that would be a person that he could
12        get to work with him in that location.  And
13        I told him that Mr. Dasinger drove a truck
14        for my wife, and that he might be
15        interested in doing that.  And so I think
16        that -- that's all I remember about
17        recommending Rex or anything, which is
18        Mr. Dasinger.
19   Q.   And that was you recommended him with
20        respect to the work that you were
21        consulting on in north Alabama?
22   A.   That's right.
23   Q.   So, then, the recommendation of Mr. King,

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

---

Page 161

1  Q.  Are you aware of how much Alabama Gravel
2      paid CCI per ton to haul white oversized
3      from Gentry to Simcala?
4  A.  Yes.
5  Q.  How much was it?
6  A.  $6 a ton.
7  Q.  All right.  Do you know how that rate was
8      arrived at?
9  A.  Carol came up with it, I'm sure.
10  Q.  Did you participate in the discussions that
11      led to the arrival at that rate?
12  A.  Not that I recall.  She maybe mentioned it
13      to me privately, but in a business sense,
14      no.
15  Q.  Do you recall her mentioning it to you
16      privately?
17  A.  I don't really recall it, but she could
18      have.
19  Q.  Did you give Mrs. Lambert information that
20      she used to formulate that rate?
21  A.  Ask that again.
22  Q.  Did you give Mrs. Lambert information that
23      she used in order to come up with the $6 a

Page 162

1      ton rate?
2  A.  You're talking about any information?
3  Q.  Yes, sir.
4  A.  I would say I did, yes.
5  Q.  What information was that?
6  A.  I don't -- I don't remember it, but I'm
7      sure I did.
8  Q.  And are you aware that that rate is grossly
9      disproportionate to what other hauling
10      companies charge for that?
11  A.  No, I'm not aware.
12  Q.  Are you aware that it's two to three
13      dollars a ton more than what Elmore Sand
14      and Gravel can charge to deliver to
15      Simcala?
16  A.  Elmore Sand and Gravel would be closer, so
17      it would be less.  But, no, I think that
18      you're wrong in that.
19  Q.  So if Mr. Stanley testifies that $6 a ton
20      was grossly disproportionate to the market
21      for hauling, he wouldn't be telling the
22      truth?
23  A.  I would tell you that Mr Stanley would

Page 163

1      give you his opinion, probably, so his
2      opinion and my opinion may be different.
3  Q.  Well, are you aware to what it's
4      disproportionate to what The Concrete
5      Company was able to charge to deliver from
6      Shorter to Simcala?
7  A.  That's way closer.  That's way closer.
8  Q.  Is it half as close?
9  A.  I don't know exactly, but it's a lot
10      closer.
11  Q.  Can you justify Carol's Contracting
12      charging $6 a ton for that haul when the
13      other companies were only able to charge $3
14      and $4 a ton to haul that?
15          MR. BAILEY:  Object.  You don't
16          have to answer it.  You don't
17          have to justify anything.
18          MR. GRISTINA:  There's nothing
19          wrong with that question.
20          MR. BAILEY:  It's not even a
21          question.
22          MR. GRISTINA:  It is a question.
23          MR. BAILEY:  It's argumentative.

Page 164

1  Q.  How do you justify the rate?
2  A.  I don't have to.
3  Q.  Is it justified as compensation to you for
4      those hauls?
5  A.  Say that again.
6  Q.  Isn't that rate compensation to you,
7      Mr. Lambert, for those hauls?
8  A.  Mr. Gristina, it is not.
9  Q.  So you derived no benefit from that $6 a
10      ton rate?
11  A.  Me personally?
12  Q.  Yes, sir.
13  A.  No, sir.
14  Q.  And so charging the $6 a ton wasn't a
15      convenient way to make up for your
16      allegedly not being paid for your hauling
17      services?
18          MR. BAILEY:  Object to the form.
19  A.  Say that again.
20  Q.  Wasn't it a convenient way to make up for
21      your allegedly not being paid for hauling
22      to charge $6 a ton to haul?
23          MR. BAILEY:  Objection.

Page 169

1    this agreement, correct?
2    A.  My attorney helped draft this agreement,
3    and Alabama Gravel's attorney helped draft
4    this agreement.  Did I actually write it?
5    No, I didn't write it.
6    Q.  But you reviewed it and you agreed to the
7    terms of it?
8    A.  Yes.
9    Q.  Before this consulting -- well, before
10   January 2nd, 2006, did you engage in any
11   conversations with Alabama Gravel about
12   getting back into the sand and gravel
13   business with them?
14   A.  Say that again.
15   Q.  Before January 2nd, 2006, did you engage in
16   any conversations with Alabama Gravel about
17   getting back into the sand and gravel
18   business with them?
19   A.  Before?
20   Q.  Yes, sir.
21   A.  Not that I can recall.
22   Q.  Do you know who Randy Willingham is?
23   A.  Yes.

Page 170

1    Q.  Who's that?
2    A.  He's a fellow that lives over around
3    Atlanta, Georgia.
4    Q.  He's in the sand and gravel business, isn't
5    he?
6    A.  He sells sand and gravel.  He don't
7    manufacture it.  He sells it.
8    Q.  Does he also purchase sand and gravel?
9    A.  Yes, he does.
10   Q.  And in fact, he has purchased sand and
11   gravel that was delivered by CCI trucks,
12   has he not?
13   A.  Say that again.
14   Q.  He has purchased sand and gravel that was
15   delivered by CCI trucks, has he not?
16   A.  He purchased it from someone else, not from
17   CCI.
18   Q.  That's right.  And it was delivered by CCI
19   trucks, isn't that right?
20   A.  Yes, that's right.
21   Q.  In fact, you've had conversations with him
22   about that, haven't you?
23   A.  Yeah.  Yes.

Page 171

1    Q.  Would he call you looking -- and ask you
2    where he could locate white oversized
3    gravel?
4    A.  Say that again.
5    Q.  Did Randy Willingham call you and ask you
6    where he could locate some white oversized
7    gravel to purchase?
8    A.  Not that I recall.
9    Q.  So prior to January --
10   A.  Wait a minute.  Wait a minute.  After I
11   left Montgomery Materials and after the
12   sellout, I don't recall him calling and
13   asking me.  Prior to the sellout, he very
14   well could have called me because I was in
15   the sand and gravel business.
16   Q.  So between the closing and January 2nd,
17   2006, do you recall him ever calling you
18   and asking you where he could obtain some
19   white oversized gravel?
20   A.  Not that I recall.
21   Q.  What about other sizes of gravel and sand?
22   A.  He never did call me to ask where he could
23   obtain them, no, that I recall.

Page 172

1    Q.  You are familiar in your experience in the
2    sand and gravel business, are you not, with
3    the way a mining operation works?
4    A.  I mean, that's -- covers a lot of ground.
5    Explain what you mean.
6    Q.  Well, you've run sand and gravel mining
7    operations, haven't you?
8    A.  Yes, I have.
9    Q.  You ran the city pit, I believe --
10   A.  Yes, I did.
11   Q.  -- when you were with Montgomery
12   Materials?
13       Did you ever run the Shorter pit?
14   A.  Which Shorter pit?
15   Q.  The Concrete Company's Shorter pit.
16   A.  Did I ever look after it?
17   Q.  Yes, sir.  Did you ever run that one?
18   A.  Not that I recall, no.
19   Q.  But you agree with me that the process of
20   producing aggregate necessarily involves
21   variations in the types of aggregate that
22   you get out of the ground?
23   A.  No, I don't understand.

Page 177

1   got out of jail.
2   Q.  That was my next question.  Did you talk to
3       him about the possibility of supplying him
4       with sand and gravel after you got out of
5       jail?
6   A.  I'm sure I told him I would love to do
7       that, but -- you know, when I got out of
8       jail.  I'm sure I mentioned it.
9   Q.  You know Don Triplett?
10  A.  Yeah, I know Don.
11  Q.  When was the last time you talked to Don?
12  A.  Oh, I don't remember.
13  Q.  Do you talk to him very often?
14  A.  Not very often, no.
15  Q.  Have you ever talked to him about this
16      case?
17  A.  I don't remember.  I don't know.
18  Q.  Did you talk to Dave Tuten about this case
19      after his deposition?
20  A.  I'm sure we've mentioned it, yeah.
21  Q.  What did y'all talk about?
22  A.  I'm sure he asked me what's going on or
23      what have you.  I mean, just casual

Page 178

1       conversation about a lawsuit if there is
2       such a thing.
3   Q.  Does Don Triplett have any relationship now
4       with Alabama Gravel?
5   A.  Not that I know of.
6   Q.  Do you have any sort of a business
7       relationship with Don Triplett?
8   A.  Not me, no.
9   Q.  Do you know what he does for a living now?
10  A.  I have no idea.
11  Q.  Do you know how much CCI was paid to haul
12      Alabama Gravel white oversized to Globe?
13          MR. BAILEY:  Object to the form.
14          Answer as best you can.
15  A.  You talking about Globe in Selma?
16  Q.  Yes, sir.
17  A.  I think $5 a ton, I believe.  Now, I think
18      that.
19  Q.  And did you participate in the discussions
20      that led to that price being arrived at?
21  A.  I could have supplied some mileage
22      information to Carol.  I don't know.  I
23      don't remember.

Page 179

1   Q.  Which is furthest away from Globe?  Gentry,
2       Shorter, or Elmore?
3   A.  I think you asked that before, and I think
4       I said Shorter probably would be the
5       furthest away.
6   Q.  We were talking about -- maybe I wasn't
7       clear before, but I think I was talking
8       about Simcala before.  Now we're talking
9       about Globe.
10  A.  I think you asked me about Globe, too.
11  Q.  I think I -- maybe I did.  You're right.
12  A.  But I -- I think my answer then and my
13      answer now is I believe Shorter is the
14      furthest away, but, you know, the way you
15      have to go, it could be a close tie with
16      Elmore.
17  Q.  Did Dick Wymer or anybody else at Simcala
18      receive any money back from CCI in exchange
19      for CCI being able to haul white oversized
20      through Alabama Gravel to Simcala?
21          MR. BAILEY:  Object to the form.
22          Answer if you understood it.
23  A.  That's kind of a long question.  Say it one

Page 180

1       more time.
2   Q.  Was any money paid by CCI to Dick Wymer or
3       Ed Boardwine at Simcala in exchange for CCI
4       being able to haul white oversized to
5       Simcala?
6   A.  Not that I'm aware of.
7   Q.  Have you ever heard of that happening in
8       the industry, where a purchaser receives
9       money back from a hauler or supplier in
10      exchange for the right to deliver to that
11      purchaser?
12  A.  Not that I'm aware of, no.
13  Q.  And you're not aware of any of that
14      happening with respect to Simcala?
15  A.  Not that I'm aware of, no.
16  Q.  How about with respect to Globe?
17  A.  Not that I'm aware of.
18  Q.  Did you receive any compensation outside of
19      moneys paid to CCI for hauling related to
20      white oversized from Alabama Gravel to
21      Simcala?
22  A.  Did I receive any money?
23  Q.  Yes, sir.

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 22 of 35

Deposition of Harry E. Lambert    The Concrete Company vs. Lambert    August 29, 2006

Page 193

1  that?
2  A. Yeah.
3  Q. Am I correct, again, you were not making a
4  claim against The Concrete Company at this
5  time for lost income?
6  A. You have to talk to my counsel about that.
7  I don't think I am, no. I don't believe
8  so.
9  Q. All right. And is it your position that
10  the noncompete in this case was
11  unreasonable in length?
12  A. Yeah.
13  Q. And what would have been a reasonable time?
14  A. For what I was compensated, a year.
15  Q. Did you know how long the noncompete was
16  going to be when you signed the 1997
17  agreement?
18  A. Yes.
19  Q. And you knew at that time it was to last
20  for five years?
21  A. I'm sure I did, yes.
22  Q. Let me show you what's been marked and used
23  as an exhibit before. I believe this is,

Page 194

1  in fact, Defendant's Exhibit 3. Have you
2  ever seen that before?
3  MR. BAILEY: At a deposition or
4  prior to this case?
5  MR. GRISTINA: Prior to this case.
6  Q. Have you ever seen it before?
7  A. I don't remember seeing it prior to this
8  case, no.
9  Q. Have you ever heard of Crest Capital
10  before?
11  A. Never have.
12  Q. Have you ever spoken to a man named Mike
13  Hong, H-O-N-G?
14  A. Not that I recall. Now, if it ever was, it
15  would have been for Montgomery Materials,
16  LLC, is what this thing says. And it says
17  739 Oliver Road, which was Montgomery
18  Materials, LLC's address. Now, while I was
19  manager for Montgomery Materials, LLC, I
20  don't recall speaking to him, but that is
21  possible. But after I left Montgomery
22  Materials, LLC, I -- well, I don't remember
23  it before and I don't remember it after.

Page 195

1  Q. Were you speaking to any finance companies
2  about financing equipment in December of
3  2005?
4  A. No, I was not.
5  Q. Are you aware that this document was faxed
6  to The Concrete Company in December of
7  2005?
8  A. I remember something about that in
9  deposition. I don't remember the exact
10  date, but I remember they said it was faxed
11  to them. I don't know for a fact that it
12  was. I don't know for a fact whether they
13  made it up or not. I don't know.
14  Q. Do you see where it says on the document --
15  someone's handwritten, Harry, if you have
16  the invoice, dash, descriptions for the
17  equipment, send those, too, and I'll take
18  care of it before the holidays. Thanks,
19  Mike. Do you see that?
20  A. I see that.
21  Q. And do you have any idea why Mike wrote
22  that to you?
23  A. I'm not saying -- I'm not -- I don't think

Page 196

1  he wrote that to me, so I wouldn't have no
2  idea why he wrote it. But I don't think he
3  wrote it to me.
4  Q. Were you purchasing any equipment in
5  December 2005?
6  A. I already said no.
7  Q. Was CCI purchasing any equipment in
8  December of 2005?
9  A. I don't know.
10  Q. Was Alabama Gravel to your knowledge
11  purchasing any equipment in December 2005?
12  A. Is that December 2005?
13  Q. Bad question. Because they didn't exist --
14  yeah, they did exist.
15  Was Alabama Gravel purchasing any
16  equipment in December 2005?
17  A. I have no idea.
18  Q. Now, were you involved with them purchasing
19  any equipment in December 2005?
20  A. Not I.
21  Q. You've been at the depositions, and I'm
22  sure you've seen Plaintiff's 10,
23  specifically the page out of there --

Page 197

1   excuse me -- Defendant's 10, specifically
2   the page out of there that's labeled
3   TCC000995. From what we understand, that
4   is a portion of Dick Wymer's calendar. Do
5   you see what's on Tuesday, January 6th,
6   2005?
7   A. That's Thursday.
8   Q. It is. I apologize. I'm reading upside
9   down.
10  A. Okay. Yeah, I see that.
11  Q. Do you see your name on that calendar?
12  A. Yes, I do.
13  Q. Is that the day that you think you may have
14  met with Dick Wymer and Ed Boardwine?
15  A. It very well could be. It was early 2005,
16  and that's January the 6th that this says
17  it is, so that very well could be.
18  Q. And that meeting took place at Simcala's
19  offices, correct?
20  A. Yeah. They called me.
21  Q. I understand. And you drove up there?
22  A. (Witness nods head up and down.)
23  Q. How did you get there?

Page 198

1   A. Well, I drove. I don't remember if it was
2   up or over or down, but I got there.
3   Q. All right. Do you know why you would have
4   called Southern Steel and Pipe in September
5   of 2005?
6        MR. BAILEY: Object to the form.
7        You can go ahead and answer.
8   A. I don't know that I did call them.
9   Q. Have you reviewed the phone records that we
10  subpoenaed and were produced to your
11  attorney?
12  A. I thumbed through them very briefly.
13  Q. Would it surprise you to know that you
14  called Southern Steel and Pipe four times
15  in September 2005?
16  A. I don't know that I did call them. I don't
17  recall calling them.
18  Q. Do you recall speaking to them for 19.6
19  minutes on September 26th, 2005?
20  A. No, I don't recall that.
21  Q. Are you aware that in September 2005,
22  Southern Steel and Pipe was doing work for
23  Alabama Gravel at the Deatsville site?

Page 199

1   A. No, I'm not aware of that.
2   Q. In fact, are you aware that they invoiced
3   Alabama Gravel on September 22nd and
4   October 3rd and October 25th, among other
5   dates, in 2005?
6   A. I couldn't have no way of knowing that.
7   Q. Do you know what Southern Steel and Pipe
8   does?
9   A. They sell steel, I think.
10  Q. And would your business ventures in
11  September of 2005 require for you to deal
12  with a steel company?
13  A. Not me, no.
14  Q. And your cell phone number is (334)
15  202-7177, isn't it?
16  A. That's right.
17  Q. And you don't have any recollection of
18  talking to them four times where you called
19  them in September 2005?
20  A. I don't have any recollection of me calling
21  them, no.
22  Q. Did you let somebody else use your cell
23  phone?

Page 200

1   A. Occasionally.
2   Q. How often?
3   A. Oh, I don't know.
4   Q. Do you think somebody else could have used
5   your cell phone to call Southern Steel?
6   A. They could have.
7   Q. Who do you think that could have been?
8   A. It could have been Robert Alexander. It
9   could have been Rex Dasinger. It could
10  have been -- you know, I've loaned my phone
11  to some of the truck drivers. So it could
12  have been numerous people.
13  Q. All right. And so you don't recall calling
14  them in September, and is it your testimony
15  that the call could have been placed by
16  somebody you loaned your phone to?
17  A. Yeah, that's true.
18  Q. Four times? September 21, September 26,
19  September 27, September 28? On those four
20  separate days, is it your testimony you
21  could have loaned your phone to somebody to
22  call Southern Steel?
23  A. I don't know that I would have loaned it to

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 24 of 35

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

Page 201

1   them specifically to call Southern Steel.
2       I could have loaned them my phone, yes. I
3       do that occasionally.
4   Q.  And are you aware that Southern Steel was
5       involved with the construction of the
6       Deatsville site?
7   A.  No, not really.
8   Q.  Have you seen, Mr. Lambert, what's been
9       Bates stamped AG00108?
10  A.  Have I seen it?
11  Q.  Yes, sir.
12  A.  I don't recall seeing it.
13  Q.  Well, let me represent to you that's an
14      invoice from Southern Steel to Alabama
15      Gravel dated September 22nd, 2005. Do you
16      recognize the types of items described on
17      that invoice?
18  A.  Channel iron, angle iron, some green rags,
19      angle iron, channel iron, plate, channel
20      iron, used pipe. Yeah.
21  Q.  And those are the kinds of equipment that
22      are used in the construction of a mining
23      operation, are they not?

Page 202

1   A.  They could be, yes.
2   Q.  And, again, you have no idea how a call
3       could have been placed from your phone to
4       Southern Steel the day before this invoice
5       was generated on September 21, 2005?
6   A.  No, not that I can recall.
7   Q.  Do you know who W.G. Ward is?
8   A.  W.G. Ward? I guess that sounds like Bill
9       Ward by being a W, I would think.
10  Q.  And who is Bill Ward?
11  A.  Bill Ward is the -- or was or -- I don't
12      know if he still is -- he was a landowner
13      where The Concrete Company were mining
14      there in Shorter.
15  Q.  And would you have had any reason to
16      telephone him in August of 2005?
17  A.  Bill and I have been friends. I could have
18      called him for numbers of reasons. I don't
19      recall why I would have called him, no.
20  Q.  Do you recall speaking to him for 22.6
21      minutes on that day?
22  A.  If I don't remember calling him, I don't
23      remember speaking to him.

Page 203

1   Q.  Do you know what the Christian Associates
2       Testing Labs is?
3   A.  Christian Associates -- yeah, they're a
4       testing laboratory.
5   Q.  What do they test?
6   A.  They test just about anything. Soils or
7       engineering or what have you.
8   Q.  Do they test white oversized?
9   A.  I don't know.
10  Q.  Do you know why you called them on January
11      3rd, 2006?
12          MR. BAILEY:  Object to the form.
13              Go ahead and answer.
14  A.  January the 3rd, 2006?
15  Q.  Yes, sir.
16  A.  No, I don't remember it specifically, why I
17      would have called them.
18  Q.  Do you know if you sent them any soil
19      samples for testing?
20  A.  I don't think I did.
21  Q.  Do you know the Dennis Welding Supply
22      Company?
23  A.  Yes, I do.

Page 204

1   Q.  And what do they do?
2   A.  They supply welding and oxygen, acetylene,
3       welding supplies.
4   Q.  Did you use those types of supplies in your
5       activities in life between the closing and
6       January 2nd, 2006?
7   A.  Yes.
8   Q.  And what did you use those for?
9   A.  In the maintenance on the trucks.
10  Q.  And so is it -- do you recall doing
11      business with Dennis Welding Supply Company
12      during that period?
13  A.  Yeah, I recall doing some business with
14      them. I don't remember the specifics, but
15      I remember doing some, yeah.
16  Q.  And was that related to repairing the
17      trucks?
18  A.  I'm sure it was. That's what I would think
19      it was.
20  Q.  Do you know who are Johnson and Sons Steel,
21      Incorporated?
22  A.  Johnson and Sons? Not that I can recall,
23      no.

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 25 of 35

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 205

1  Q.  Do you know why you would have called them
2     on October 27th, 2005?
3  A.  I don't know that I did call them.
4  Q.  If your phone records indicate that you
5     did, would they be wrong?
6  A.  It indicates that -- probably that a call
7     was made from that phone.
8  Q.  But, again, it would have been somebody you
9     loaned your phone to?
10  A.  It could be.  It could be.  I don't know.
11  Q.  What is the company CTE Lawn Equipment?
12  A.  CTE Lawn Equipment?  I think they sell lawn
13     mowers.
14  Q.  Do you recall doing business with them in
15     2005?
16  A.  I don't recall any specifics of it, no.
17  Q.  You apparently called them approximately a
18     dozen times in August 2005.  Do you recall
19     that?
20  A.  I don't remember -- I don't recall calling
21     them that many times, no.
22  Q.  Do you recall calling them for anything?
23  A.  We bought a lawn mower at some point in

Page 206

1     time, and I don't remember exactly when.
2     It could have been at that time.  I don't
3     know.
4  Q.  All right.
5  A.  My answer is I don't know.
6  Q.  Do you recall having dealings with a
7     company called Moody Tire Services or Moody
8     Tire Service?
9  A.  Not myself personally, no.  I know Carol's
10     Contracting has had some dealings with
11     them.
12  Q.  Did they provide tires for CCI trucks?
13  A.  They have in the past, yes.
14  Q.  And would you have been responsible to call
15     Moody Tire Service from time to time to
16     deal with them for those tires?
17  A.  I could have, yes.
18  Q.  All right.  And so if that number appears
19     repeatedly in your phone records in 2005,
20     would that have been related to calls you
21     placed?
22  A.  I would -- I think so, but, again, you
23     know, I loaned my phone, and it could have

Page 207

1     been somebody else.
2  Q.  Do you know a company Alcon Machinery and
3     Equipment Company?
4  A.  I don't recognize that name, no.
5  Q.  Do you recall placing phone calls to them?
6  A.  I don't recognize the name, so I wouldn't
7     recall placing any phone calls to them.
8  Q.  What about receiving calls from them?
9  A.  I don't -- I don't recall any, no.
10  Q.  Do you know Trey Holley?
11  A.  Yeah, I know Trey Holley.
12  Q.  What does Trey do for a living?
13  A.  He works I think for the Volvo store.
14  Q.  And does CCI use trucks from the Volvo
15     store?
16  A.  They have --
17        Does CCI use trucks from the Volvo
18     store?  No.  No.
19  Q.  Do you know if the Deatsville operation
20     uses Volvo trucks?
21  A.  They have one out there, yes.
22  Q.  Do you recall speaking to Mr. Holley about
23     getting a Volvo truck for the Deatsville

Page 208

1     operation before January 2006?
2  A.  For the Deatsville operation?
3  Q.  Yes, sir.
4  A.  No, I don't recall that.
5  Q.  Do you recall speaking to Mr. Holley before
6     January 2006 about Volvo trucks?
7  A.  No, I don't really recall speaking to him.
8  Q.  What does the company Russell Petroleum
9     Corporation do?
10  A.  They supply fuel to Carol's Contracting.
11  Q.  And do you recall speaking to them a number
12     of times in August 2005?
13  A.  I could have, but I don't recall.
14  Q.  Would you have been responsible to get fuel
15     for some of the CCI trucks?
16  A.  I could have.  I don't remember.  That's
17     possible.
18  Q.  Do you know the company Cohn Equipment
19     Rental Company, Inc.?
20  A.  Not right offhand, no.
21  Q.  Do you recall speaking to them in November
22     and December 2005 about renting some
23     equipment?

Page 209

1  A.  I don't recall that, no.
2  Q.  Do you know the company Alabama Trailer and
3       Truck Parts?
4  A.  I -- no.  I mean, I think I've heard of
5       them, but I really don't know of them.
6  Q.  Do you know Bobby and Nancy Harvey?
7  A.  Bobby Harvey?
8  Q.  Yes, sir.
9  A.  Yes, I know Bobby Harvey.
10 Q.  Who is Bobby Harvey?
11 A.  Bobby Harvey used to own Elmore Sand and
12      Gravel.
13 Q.  Do you know why you were speaking to him in
14      December 2005?
15 A.  I have no idea.  I've known Bobby Harvey
16      for a long time, and it was probably
17      personal.
18 Q.  We spoke of Mr. Maddox.  You know who that
19      is, I guess.
20 A.  Yes, I do.
21 Q.  And my question is do you know why you
22      would have been calling Jim Maddox in
23      August of 2005 and in July 2005?

Page 210

1  A.  If it was me, to talk to him, I guess.
2       I've known Jim for a long time.  Jim used
3       to work for a company that I ran and, you
4       know, I talk to Jim every now and again.
5  Q.  Would it have been about coordinating
6       shipments of Alabama Gravel white oversized
7       to Mr. Maddox?
8  A.  It could have been, yes.
9  Q.  So you would have spoken to him about
10      coordinating?
11 A.  I could have.  I could have.
12 Q.  Do you know the company Webb Concrete and
13      Building Materials?
14 A.  Yeah.  I think they're up around Oxford,
15      Alabama.  I believe they are.
16 Q.  What do they do?
17 A.  They're in the concrete business.
18 Q.  What dealings would you have had with them
19      in August 2005?
20 A.  I don't know.
21 Q.  Don't know why you would have called them?
22 A.  I don't know that I did.
23 Q.  Do you know who Dave Jones is?

Page 211

1  A.  Dave Jones?
2  Q.  Yes, sir.
3  A.  Not right offhand, no.
4  Q.  Don't know why you would have received a
5       call from Dave Jones?
6  A.  I have no idea.
7  Q.  Birmingham Peterbilt.  Have you dealt with
8       them before?
9  A.  For truck maintenance, yes.
10 Q.  And would they contact you from time to
11      time about CCI truck maintenance?
12 A.  Would they call me?
13 Q.  Yes, sir.
14 A.  I would -- I don't know.  They could have.
15 Q.  If I told you that Dave Jones was a Martin
16      Marietta sales manager, would that refresh
17      your recollection on him?
18 A.  Yeah.  I know a Dave Jones that's a Martin
19      Marietta sales manager, yes.
20 Q.  All right.  Do you know why he would have
21      been calling you in November 2005?
22 A.  He maybe was calling me to see when I got
23      out of jail.  I don't know.  I don't

Page 212

1       remember.
2  Q.  Is he a good friend of yours?
3  A.  I wouldn't say that Dave was a friend, no.
4       I -- he's an acquaintance.
5  Q.  You said he might be calling you to find
6       out when you got out of jail.  Do you know
7       how he would have known about your
8       noncompete?
9  A.  I have no idea.  It was pretty common
10      knowledge in the industry.
11 Q.  Do you know why Sam Estock would have
12      called you 29 times between August 16th,
13      2005 and December 28th, 2005?
14 A.  I would say -- August the 16th to
15      December?  I would say during football
16      season, we probably talked about football,
17      I would think.
18 Q.  And so you think 29 times he called about
19      football?
20 A.  Well, I don't know exactly.  It could have
21      been.  It could have been various
22      personal -- Sam and I have a close personal
23      relationship, and it could have been a lot

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 27 of 35

Deposition of Harry E. Lambert    The Concrete Company vs. Lambert    August 29, 2006

Page 213

1    of personal reasons.
2    Q.   Could it have also been the fact that he
3          was doing work on the Deatsville site and
4          wanted to talk to you about that?
5    A.   That wouldn't be why he would call me, no.
6    Q.   Is it your testimony that you all didn't
7          talk about that when he called you?
8    A.   Not that I recall.
9    Q.   What is it Mr. Estock does for a living?
10   A.   Mr. Estock sells sand and gravel and screen
11         cloth, sand and gravel equipment.
12   Q.   His company is?
13   A.   Southern Wire.
14   Q.   Southern Wire. That's right.
15         Are you aware that Southern Wire was
16         doing work for Alabama Gravel or providing
17         equipment to Alabama Gravel in July,
18         September -- July and September 2005?
19         MR. BAILEY: Object to the form.
20         Go ahead and answer.
21   A.   That could have been mentioned in casual
22         conversation. Do I have direct knowledge
23         of that? No.

Page 214

1    Q.   They were also invoicing Alabama Gravel in
2          October 2005. Were you aware of that?
3    A.   I'm not aware when they invoiced Alabama
4          Gravel, no.
5    Q.   There is an invoice dated October 27th,
6          2005. In fact, you had a 25-minute
7          conversation with Mr. Estock the next day.
8          Do you recall that conversation?
9    A.   No, I don't recall any specifics on the
10         conversations. What date was it?
11   Q.   You talked to him on October the 28th,
12         2005. You talked to him twice that day,
13         once for 25 minutes and one for .4
14         minutes. The day before, Alabama Gravel
15         was invoiced for $1,700 by Southern Wire.
16   A.   I don't recall. It could have been, you
17         know -- like I said, again, we talked about
18         many personal things.
19   Q.   Have you dealt with Mr. Estock on the
20         Deatsville site since January 2nd, 2006?
21   A.   I've talked to Mr. Estock on the Deatsville
22         site. I don't know if I've dealt with
23         him. I don't -- I don't think -- I've

Page 215

1    talked to him.
2    Q.   But he's been providing equipment since
3          after January 2nd, 2006, hasn't he?
4    A.   Well, he could have been, yes.
5    Q.   Do you recall Mr. Maddox calling you more
6          than a dozen times in July and August 2005?
7    A.   I don't recall how many times Mr. Maddox
8          called me, but I remember him calling me.
9    Q.   And we've talked about some of those calls
10         might have been related to coordinating
11         white oversized?
12   A.   Yeah. He could have asked if trucks were
13         available or what have you.
14   Q.   Do you know who a Pete Long is?
15   A.   Pete Long? Not right off. Not right
16         offhand.
17   Q.   Do you know any reason why you would have
18         been talking to him in October '05?
19   A.   Again, I don't -- I don't know and I don't
20         know that I did.
21   Q.   What about Pond River Steel? Do you know
22         that company?
23   A.   Pond River Steel? They's -- a couple of

Page 216

1    conveyors out there at Deatsville that's
2    got that name on it.
3    Q.   In fact, Pond River Steel is an
4          out-of-state company, isn't it?
5    A.   I think so.
6    Q.   Do you have any idea how Deatsville would
7          have gotten hooked up with Pond River
8          Steel?
9    A.   Are you talking about Alabama Gravel?
10   Q.   Yes, sir.
11   A.   No, I don't.
12   Q.   Did you place Alabama Gravel in touch with
13         Pond River Steel?
14   A.   No, I did not.
15   Q.   Do you know why they called you on October
16         12th and October 17th, 2005?
17   A.   I have no idea.
18   Q.   Would it surprise you to know that they
19         invoiced Alabama Gravel on October 25th,
20         2005?
21   A.   I don't know.
22   Q.   So it's your testimony that you didn't
23         coordinate between Pond River Steel and

Page 217

1      Alabama Gravel?

2  A.  No.

3  Q.  And you don't know how or why they called

4      you?

5  A.  I don't have any idea.

6  Q.  Do you know why Simcala was calling you on

7      July 26th, 2005 and August 22nd, 2005?

8  A.  I don't know.

9  Q.  Were they calling you to coordinate

10     shipments of white oversized?

11  A.  It could have been.

12  Q.  So would they have called you to tell you

13     they needed more white oversized?

14  A.  I don't remember. I don't know.

15  Q.  Do you know why Southern Steel would have

16     called you more than a dozen times between

17     September 2005 and October 25th, 2005?

18  A.  I don't know.

19  Q.  And those calls, it's your testimony those

20     calls had nothing to do with the Deatsville

21     construction?

22  A.  No, they wouldn't have.

23  Q.  Despite the fact that they were working on

Page 218

1      the Deatsville site at that time?

2  A.  They wouldn't have been calling me about

3     the Deatsville site.

4  Q.  What would they have been calling you

5     about?

6  A.  I don't know.

7  Q.  Did you have any business ventures at that

8     time that would have required you to use

9     the services of Southern Steel and Pipe,

10     Inc.?

11  A.  No.

12  Q.  Do you know who Larry Speaks is?

13  A.  Yes, I do.

14  Q.  What does he do?

15  A.  He's in the engineering business.

16  Q.  Do you know why Larry Speaks --

17     Let me ask you this. Did you talk to

18     Larry Speaks at all in 2005?

19  A.  I could have. I don't remember.

20  Q.  Did you recommend Larry Speaks to Alabama

21     Gravel to do the permit work on the

22     Deatsville site?

23  A.  I don't remember whether I did or did not.

Page 219

1  Q.  So it's your testimony -- do you know how

2     Larry Speaks came to do the work on the

3     Deatsville site?

4  A.  No, I do not.

5  Q.  Are you aware that he did do the permit

6     work on that site?

7  A.  I'm not really aware of that. I got aware

8     of that after 2006, but I wasn't aware of

9     it before that.

10  Q.  Do you know what Cowin Equipment Company

11     is?

12  A.  They are an equipment dealer.

13  Q.  What kind of equipment do they deal in?

14  A.  They sell about everything. They sell

15     excavators, trucks, just a little bit of

16     everything.

17  Q.  Do they sell over-the-road trucks?

18  A.  Not that I know of.

19  Q.  So in the mining operation, you would use

20     excavators; is that correct?

21  A.  Yes.

22  Q.  And you use trucks that are --

23  A.  Off-road trucks.

Page 220

1  Q.  -- off-road trucks?

2  A.  Yes.

3  Q.  And that's the kind of equipment that Cowin

4     Equipment Company provides, is it not?

5  A.  Yes. They sell air compressors. They sell

6     all kinds of stuff.

7  Q.  All kinds of things that you could use in a

8     mining operation?

9  A.  Yeah, things that you could move -- or use

10     in a lot of things.

11  Q.  Do you know why they called you a dozen

12     times or more from July to December 2005?

13  A.  I don't remember. They might have been

14     calling me to see if I was going back in

15     business or whatever reason. I don't know

16     why they would call me.

17  Q.  Weren't they calling you about equipment

18     that was being used in Deatsville?

19  A.  No.

20  Q.  It's your testimony that you had no

21     dealings with Cowin Equipment Company

22     related to the Deatsville site before

23     January 2nd, 2006?

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 29 of 35

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

Page 221

1   A.  That's right.
2   Q.  Do you know what Alabama Machinery and
3       Supply Company does?
4   A.  Not right offhand, no.
5   Q.  You don't have any idea of whether or not
6       they do things related to the mining
7       business?
8   A.  Not right offhand.
9   Q.  L.L. Hodge Machine Works.  Do you know who
10      that is?
11  A.  No, not right offhand, no.
12  Q.  Do you know a guy named Nelson Abdulla?
13  A.  Nelson Abdulla?
14  Q.  Yes, sir.
15  A.  Not right offhand.  You'd think that if I
16      had heard that name, I would remember it,
17      but I don't remember that offhand.
18  Q.  Now, I can understand a number of phone
19      calls between my wife's number and your
20      cell phone, the hundreds I see here.  What
21      I'm curious about is why there is almost an
22      equal number of phone calls made from
23      Alabama Gravel to your cell phone between

Page 222

1       July 2005 and the end of 2005.
2   A.  I'm sure it was my wife calling me.
3   Q.  So would she have been calling you from the
4       Alabama Gravel office?
5   A.  She could have been.  I guess so.
6   Q.  Anybody else from Alabama Gravel call you
7       during that time period?
8   A.  No.
9   Q.  Well, I mean, except for Dave Tuten.  You
10      talked to Dave Tuten during that time
11      period, didn't you?
12  A.  Oh, I talked -- yeah, I talked to Dave
13      Tuten and I talked to Robert Alexander
14      during that time period, but I thought you
15      was talking about from Alabama Gravel's
16      office.
17  Q.  That's what I was just clarifying.  All
18      right.
19          Do you know why Mr. Alan King called
20      you 104 times from July 2005 to December
21      2005?
22  A.  Me and Alan King are long-time friends,
23      and -- I don't know what all them

Page 223

1       conversations would have been for, no.
2   Q.  And you're aware that during that same time
3       period, Mr. King was providing services to
4       Alabama Gravel?
5   A.  That's right.
6   Q.  Do you know under what name Mr. King bills
7       for those services?
8   A.  I don't know.
9   Q.  What company does he work for?
10  A.  He works for his own company.  I don't know
11      what the name of it is.
12  Q.  And isn't it a company that he would be
13      invoicing Alabama Gravel for?
14  A.  What?
15  Q.  He would be invoicing Alabama Gravel for
16      work, wouldn't he?
17  A.  I'm sure he would.
18  Q.  Is it your testimony that during those 104
19      conversations you guys stayed away from --
20      excuse me -- during the 104 times he called
21      you, you guys stayed away from talking
22      about the Deatsville site and what he was
23      doing there?

Page 224

1   A.  Oh, I'm sure that he has mentioned the
2       Deatsville site to me in casual
3       conversation, but, you know, any specifics
4       about it, I don't recall any specifics.
5   Q.  Aren't you coordinating his construction
6       work on that site during those phone calls?
7   A.  Am I coordinating?
8   Q.  Weren't you doing that when you were
9       talking to him?
10  A.  No.
11  Q.  It's your testimony you weren't instructing
12      him on what to do on that site during that
13      time?
14  A.  That's right.
15  Q.  And the 104 conversations that you had when
16      he called you had nothing to do with that?
17  A.  No.
18  Q.  The phone records reveal literally hundreds
19      of calls between you and the other CCI cell
20      phone numbers.  Can you explain to me how
21      and why you placed so many of those calls?
22  A.  No.
23  Q.  Under what circumstances would you need to

Page 225

1    talk to the other drivers that many times?
2    A.   Under what circumstances would I need to
3    talk to the drivers that many times? I
4    don't know.
5    Q.   Weren't you dispatching those drivers for
6    CCI, hauling jobs?
7    A.   Direct dispatch, sometimes I did, yes.
8    Q.   Did you have any business dealings with
9    Neil Fuller from July to December 2005?
10   A.   Carol's Contracting did. Me personally,
11   no.
12   Q.   And in what way did Carol's Contracting
13   deal with Neil Fuller?
14   A.   Well, wait. I may have my dates mixed up.
15   In 2005, Carol had one or two trucks.
16   Carol's Contracting had one or two. 2004
17   and 2005, she had one or two trucks leased
18   on with Fuller Five Trucking.
19   Q.   In July of 2005 while CCI was hauling for
20   Alabama Gravel, they also were dealing with
21   Neil Fuller?
22   A.   They could have been, yes.
23   Q.   Under what --

Page 226

1    A.   Because there was a period of time that
2    they left and went to hauling other
3    material in 2005.
4    Q.   Under what circumstances would you have
5    dispatched drivers for CCI in 2005?
6    A.   Is that the drivers would ask me how many
7    loads to haul, and I would tell them, lots
8    of times on a daily basis, to haul X amount
9    of loads to Globe, X amount of loads to
10   Simcala per truck. So I talked to them on
11   a daily basis to see how many loads that
12   they hauled. I'd call them and ask them if
13   they -- how many loads that they had
14   hauled. Just different reasons.
15   Q.   And am I correct that the Gentry pit is no
16   longer producing white oversized?
17   A.   You're right.
18   Q.   In fact, that pit's been -- the lease there
19   has been depleted; is that correct?
20   A.   I don't know that, no. I don't know that.
21   Q.   Wasn't Alabama Gravel running around the
22   clock, hauling white oversized out of that
23   pit to Simcala and Globe?

Page 227

1    A.   Was Alabama Gravel running around --
2    Q.   Well, CCI hauling around the clock out of
3    that pit?
4    A.   No. No, not necessarily around the clock.
5    Some of the drivers, to avoid traffic,
6    would start at two o'clock in the morning
7    and go until two o'clock in the evenings,
8    and some of them would want to be off and
9    things like that, so they were allowed to
10   haul when they wanted to.
11   Q.   And you coordinated that with them?
12   A.   I coordinated some of that, yeah. They
13   would call me or I would call them and ask
14   them what hours they were going to run and
15   what have you.
16   Q.   Do you know who Hardy Taylor is?
17   A.   He's a Caterpillar salesman.
18   Q.   Do you know why he would have called you
19   more than a dozen times from July 2005 to
20   the end of 2005?
21   A.   Hardy and I are good friends. We stay in
22   touch.
23   Q.   And Caterpillar is not something that makes

Page 228

1    over-the-road trucks, does it?
2    A.   No, but they make over-the-road engines,
3    and they service them from a Caterpillar
4    store.
5    Q.   Do they service any of the CCI trucks?
6    A.   Yes, they did.
7    Q.   And is it your testimony those calls could
8    have related to CCI trucks needing service?
9    A.   It could have related to that. It could
10   have been a friendship call. It could have
11   been for various reasons.
12   Q.   Could it also have been for obtaining
13   equipment for the Deatsville site?
14   A.   No.
15   Q.   Is there any Caterpillar equipment on the
16   Deatsville site?
17   A.   Yes, there is.
18   Q.   What sort of equipment is there?
19   A.   There's a bulldozer and a couple excavators
20   and I think a Caterpillar truck.
21   Q.   And do you know how the Deatsville site
22   obtained that equipment?
23   A.   I guess that they purchased it from the

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

Page 229

1      Caterpillar store.
2    Q.  From Hardy Taylor's place?
3    A.  I would think so. I don't know if they
4        come from there or from Birmingham or from
5        Georgia.
6    Q.  Do you know Bubba's Materials?
7    A.  Bubba's Materials? I know of them. I
8        don't know them.
9    Q.  What do they do?
10   A.  They haul crusher run, they haul sand and
11       gravel, they haul topsoil, they haul all
12       kinds of products like that.
13   Q.  What about Johnny Harland? Do you know
14       him?
15   A.  Johnny Harland? Not offhand, no.
16   Q.  Any reason you would have -- he would have
17       called you?
18   A.  I don't know.
19   Q.  We were speaking of Trey Holley earlier, I
20       believe. What did you say about Trey?
21       Where does he work?
22   A.  He works at the Volvo store.
23   Q.  And are you aware that he called you from

Page 230

1        August -- called you in August and
2        September 2005?
3    A.  I'm not aware of when he called me or what
4        have you. He has called me.
5    Q.  And it's your testimony that you didn't
6        coordinate with him about getting some
7        Volvo trucks for the Deatsville site?
8    A.  That's right.
9    Q.  Do they have any Volvo -- one Volvo truck?
10       Is that what you said?
11   A.  I think that's -- yeah, that's what they
12       had.
13   Q.  You know Mr. O.G. Pinkston, don't you?
14   A.  Yes, I do.
15   Q.  And do you know why you would have been
16       speaking to Mr. Pinkston in August and
17       November and December 2005?
18   A.  I speak with Mr. Pinkston pretty
19       frequently.
20   Q.  Do you know what you would have been
21       speaking to him about?
22   A.  Just -- I talk to O.G. -- we're friends. I
23       talk to him a lot.

Page 231

1    Q.  Would you have talked to him about getting
2        a lease at that time?
3    A.  No, because I was in jail.
4    Q.  Did you talk to him about your being in
5        jail?
6    A.  Oh, I'm sure I did.
7    Q.  Do you know Frank Thomas?
8    A.  Frank Thomas? The name kind of rings a
9        bell, but I don't really recall.
10   Q.  Do you know why Fuller Five Enterprises
11       would have been calling you in August --
12       excuse me -- July, August, and September
13       2005?
14   A.  They might have been calling to see if any
15       trucks were available. Various reasons. I
16       don't know.
17   Q.  I think I asked you about Cohn Equipment
18       Rental. Did you tell me you know who that
19       was?
20   A.  No, I can't remember -- I don't know who
21       that is.
22   Q.  Do you know why Sand Rock Transit would
23       have been calling you in September and

Page 232

1        November 2005?
2    A.  Randy Willingham could have been calling me
3        to talk to me. I don't know why.
4    Q.  You don't know why Randy would have called
5        you?
6    A.  I have no idea.
7    Q.  Was it about obtaining white oversized?
8    A.  I'm sure it was not, but Randy and I are
9        friends, too. I had many friends in this
10       business.
11   Q.  Well, I mean, in fact, in July, August,
12       September, October, November 2005, you also
13       received calls from Willingham Stone
14       Company. Do you think that was Randy
15       Willingham?
16   A.  I would think that it was. I'm not sure.
17   Q.  Also received calls from Randy Willingham
18       on his -- I don't know what number this is,
19       but in August, October, November 2005. And
20       it's your testimony that none of that dealt
21       with the sand and gravel business?
22           MR. BAILEY: Object to the form.
23   A.  He could have been calling to see if we

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 32 of 35

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

Page 233

1   could have delivered some for him. That
2   would have been the only connection with
3   the sand and gravel business.
4   Q.  How often do you think you talked to Bernie
5       Ostervelt?
6   A.  Quite often.
7   Q.  When he called you in August, September,
8       October, and November of 2005, your
9       testimony was that had nothing to do with
10      the work Pearce Pump was doing on the
11      Deatsville site?
12  A.  That's right.
13  Q.  And it's your testimony you had no dealings
14      with Pearce Pump coordinating between them
15      and Alabama Gravel with respect to the
16      Deatsville site?
17  A.  That's right.
18  Q.  And the fact that they were working or
19      providing materials for the Deatsville site
20      during that time period is just a
21      coincidence?
22  A.  I would say so, yes.
23  Q.  Mr. Lambert, the phone records indicate

Page 234

1   hundreds of phone calls in 2005 between you
2   and Dave Tuten. Is it your testimony that
3   none of those phone calls related to work
4   you were doing at the Deatsville site for
5   Alabama Gravel?
6   A.  That's right.
7   Q.  What were y'all talking about?
8   A.  I don't remember.
9   Q.  You don't recall any of those phone calls?
10  A.  I don't recall any specific phone call, no.
11  Q.  There are phone calls here that lasted
12      anywhere from two minutes to 30. You don't
13      recall specifics on any of these phone
14      calls?
15  A.  No, I don't.
16  Q.  There were days where you talked to
17      Mr. Tuten three and four times, and you
18      don't recall any of the specifics of those
19      phone calls?
20  A.  No, I don't.
21  Q.  And you don't recall discussing with him
22      the Deatsville operation?
23  A.  If -- Dave could have brought it up in

Page 235

1   casual conversation, but I don't recall any
2   specifics.
3   Q.  Texas Crusher System, Inc. Do you know who
4       that is?
5   A.  Not really. I'd say they sell crusher.
6   Q.  Crusher's used in the sand and gravel
7       business?
8   A.  Well, they could sell -- crusher's used in
9       any kind of aggregate business.
10  Q.  Do you know why they would have called you
11      in November of 2005?
12  A.  I have no idea.
13  Q.  Did you consider Dave Tuten to be a better
14      friend than Alan King?
15          MR. BAILEY:  Object to the form.
16          Answer as best you can.
17  A.  I don't know. They're both good friends.
18  Q.  Is there a reason why you spoke to Dave
19      Tuten much more in the same time period
20      than Alan King?
21  A.  I wouldn't know.
22  Q.  And can you tell me -- I may have asked
23      this, but I have to ask it again -- why you

Page 236

1   would have spoken to Dave Tuten so many
2   times during that time period?
3   A.  We were good friends. We just talked about
4       a lot of stuff.
5   Q.  Nearly every day?
6   A.  That's right.
7   Q.  Do you know who FCC Equipment Financing is?
8   A.  Not right offhand, no.
9   Q.  Do you know why they would have called you
10      in September 2005?
11  A.  I don't know.
12  Q.  Were you financing any equipment in
13      September 2005?
14  A.  Was I?
15  Q.  Yes, sir.
16  A.  No.
17  Q.  Was any company you were affiliated with?
18  A.  Not that I know of.
19  Q.  You may have said your brother's name, but
20      I don't think it was Lee. Who is Lee
21      Lambert?
22  A.  That's the meanest man in the world. He's
23      my first cousin.

Case 2:05-cv-01026-CSC    Document 77-18    Filed 09/19/2006    Page 33 of 35

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 237

1   Q.  All right.  Now, was Lee Lambert one of the
2       guys we spoke of earlier involved in the
3       litigation?
4   A.  No.
5   Q.  It's a different cousin?
6   A.  No.  No.  Oh, it's -- he's the meanest man
7       in the world.
8   Q.  Well, you only talked to him for two
9       minutes.
10  A.  You don't talk to the meanest man in the
11      world for long.
12  Q.  Do you recall having conversations with
13      Foshee Trucking in July 2005?
14  A.  I don't recall, no.
15  Q.  Do you know why they would have called you
16      in July of 2005?
17  A.  I have -- I don't have a clue, no.
18  Q.  What about October 2005?
19  A.  I don't know.
20  Q.  Do you know if CCI had an amicable
21      separation from Foshee Trucking?
22  A.  I think they did, yeah.
23  Q.  Did you ever have any -- you personally

Page 238

1       ever have any disputes with anybody at
2       Foshee Trucking while CCI was leasing on
3       with them?
4   A.  No, not that I can recall.
5   Q.  Do you recall any disputes that you're
6       aware of between Foshee Trucking and CCI?
7   A.  Not that I'm aware of.
8   Q.  Do you know who Carl King is?
9   A.  That is probably the same as Alan King.
10  Q.  Are you as good a friends with him?
11  A.  Well, the Alan King and Carl King is one
12      and the -- I think his name is C.A. or
13      A.C. King or something like that, Carl Alan
14      or Alan Carl.
15  Q.  And that's your friend, Carl Alan King?
16  A.  Well, it's the same person.  Alan King and
17      Carl King is the same person.
18  Q.  Is there an Alan J. King that you're aware
19      of?
20  A.  I think that's all Alan King, but I --
21      that's my recollection of that.
22  Q.  Have you ever had any dealings with Capitol
23      Volvo Truck and Trailer?

Page 239

1   A.  Yeah.  Carol's Contracting buys truck parts
2       from them.
3   Q.  Do you recall them phoning you in August
4       2005?
5   A.  I don't recall any specifics of it, no.
6   Q.  Do you know what the company Meco, Inc. is?
7   A.  Meco?  No, I don't know who that is.
8   Q.  Are you aware that Meco, Inc. sells
9       refurbished used equipment for the sand and
10      gravel business?
11  A.  No, I'm not aware of that.
12  Q.  Do you know why they would have called you
13      in October 2005?
14  A.  I have no idea.
15  Q.  Was that related to the stuff that was
16      going on in Deatsville?
17  A.  I don't have any idea.
18  Q.  Do you think that they would have called
19      somebody else who was borrowing your cell
20      phone?
21  A.  I don't have any idea.
22  Q.  Do you know what Montgomery Rubber and
23      Gasket Company is?

Page 240

1   A.  Yeah.  They sell rubber and gaskets.
2   Q.  Is it for use in the mining industry?
3   A.  Some of it can be.
4   Q.  Would you ever have any use for that in
5       repairing over-the-road trucks for CCI?
6   A.  Yes.
7   Q.  Do you think that that's the reason why you
8       called them in July of 2005?
9   A.  It could have been.  I don't recall any
10      specifics of that.
11  Q.  Do you know who Davey's DR Contractor is?
12  A.  Davey's DR Contractor?  No, I don't.
13      That -- not that I can recall.
14  Q.  What about David Davey's Contracting?  Does
15      that ring a bell?
16  A.  No, not really, not that I can recall.
17  Q.  I have another extensive list of dozens and
18      dozens of phone calls from you to Sam
19      Estock.  Again, is it your testimony that
20      your calls to him in 2005 were not related
21      to the Deatsville operation?
22  A.  That's true.
23  Q.  Do you know who Charles Crane is?

Page 241

1  A.  Charles Crane?
2  Q.  Yes, sir.
3  A.  No, not offhand.
4  Q.  You can't recall why you would have called
5      him?
6  A.  Not that I know of.
7  Q.  What about TrailStar Manufacturing Company?
8  A.  They manufacture dump trailers.
9  Q.  And do you know why you would have called
10     them in August of 2005?
11 A.  No, I don't know why.
12 Q.  Does CCI have any TrailStar dump trailers?
13 A.  Yes, they do.
14 Q.  Is that what you use on an over-the-road
15     truck?
16 A.  That's right.
17 Q.  And would you have called them for CCI?
18 A.  I don't know.
19 Q.  Does TrailStar manufacture dump trailers
20     that are used for off the road?
21 A.  Not that I know of, no.
22 Q.  Again, the number (334) 202-3983.  Does
23     that number ring a bell?

Page 242

1  A.  No, it don't.
2  Q.  You called that number 324 times.  You
3      don't recognize it?
4  A.  No.
5      MR. GRISTINA:  It's 3:30.  Why
6        don't we take a little break?
7      (Brief recess.)
8  Q.  (Mr. Gristina continuing)  Mr. Lambert, we
9      talked a little about Caterpillar trucks --
10     excuse me -- Caterpillar lift trucks, and
11     I'm looking at summaries of phone records
12     that indicate that you called them
13     literally dozens of times in July until the
14     end of 2005.  Is it your testimony that
15     none of that related to equipment at the
16     Deatsville site?
17 A.  That's correct.
18 Q.  And what could that have possibly related
19     to?
20 A.  I don't recall.
21 Q.  So you don't recall the reason you called
22     Caterpillar on those many occasions?
23 A.  No, I don't recall.  I don't recall why.

Page 243

1  Q.  Do you know why you were calling Simcala in
2      July and August and November and December
3      2005?
4  A.  No, I don't.
5  Q.  Could that have related to coordinating
6      Alabama Gravel's shipments to Simcala?
7  A.  It's possible.
8  Q.  And I asked earlier about calls to Southern
9      Steel and Pipe.  I'm looking again at
10     literally dozens of calls from your cell
11     phone to Southern Steel and Pipe.  Again,
12     it's your testimony that you had no
13     business dealings with Southern Steel and
14     Pipe in 2005?
15 A.  That's right.  They could have been when I
16     loaned my phone out.
17 Q.  About how often would you say you loaned
18     your phone out?
19 A.  I don't remember exactly.
20 Q.  Where would you have been when you loaned
21     your phone out to somebody who had dealings
22     with Southern Steel and Pipe?
23 A.  I don't know.  It could have been out at

Page 244

1      the Gentry pit.
2  Q.  Were they doing work at the Gentry pit when
3      you were out there?
4  A.  Was who doing work?
5  Q.  Southern Steel and Pipe.
6  A.  Not that I know of.
7  Q.  Do you know what Tire Centers, LLC is?
8  A.  They're a truck tire dealer.
9  Q.  And would you have had reason to call them
10     for CCI trucks?
11 A.  Yes, I would.
12 Q.  Peterbilt of Montgomery.  Are you familiar
13     with them?
14 A.  Yes, I am.
15 Q.  And would you have reason to call them in
16     2005?
17 A.  Yes, I would.
18 Q.  What would you have called them for?
19 A.  About maintenance items for CCI.
20 Q.  Do you know the company Industrial
21     Supplies, Inc.?
22 A.  Not right offhand, no.
23 Q.  Do you know why you would have called them

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

Page 249

1   Q.  Do you know why you would have been talking
2       to him?
3   A.  Again, Skip's an old friend of mine. I've
4       known Skip for years and years. I have no
5       idea what I would have been talking to him
6       about.
7   Q.  Is Thompson the same as Caterpillar Lift
8       Trucks?
9   A.  I would think so. I don't know how it
10      would be listed.
11  Q.  Did you talk to O.G. Pinkston in October,
12      November, December 2005 about leasing land
13      from him?
14  A.  No, I didn't.
15  Q.  Does he have property that is leased for
16      aggregate mining?
17  A.  I don't know that for sure.
18  Q.  Someone in his family does, I presume.
19  A.  I would say so.
20  Q.  Do you recall why you called Couch Ready
21      Mix in December 2005?
22  A.  No, I don't.
23  Q.  Do you know a guy named Steve Shaw?

Page 250

1   A.  Yes, I do.
2   Q.  How well do you know Steve?
3   A.  Very well.
4   Q.  And do you talk to him from time to time?
5   A.  Yes, I do.
6   Q.  Have you talked to him about going back
7       into the sand and gravel business?
8   A.  Since 2006?
9   Q.  Before 2006.
10  A.  I'm sure I've mentioned to Steve that I
11      want to go back in the sand and gravel
12      business, but any specifics about going
13      back into it before 2006 I don't recall.
14  Q.  Do you know the bank Security Federal Bank?
15  A.  No, not offhand, no.
16  Q.  Do you know why you would have called them
17      in September 2005?
18  A.  No. I have no idea if I did call them.
19  Q.  Were you arranging financing for equipment
20      through Security Federal Bank?
21  A.  Not me.
22  Q.  Do you know who Bob Becker is?
23  A.  Bobby Becker?

Page 251

1   Q.  Yes.
2   A.  Yes, he's a purchasing agent for Globe.
3   Q.  And do you know why you called the
4       purchasing agent for Globe in July,
5       August -- July and August 2005?
6   A.  I don't know specifics, no.
7   Q.  All right. Were you selling anything to
8       Globe at that time?
9   A.  Not me, no.
10  Q.  And you don't know why you would have
11      called them?
12  A.  Not any specifics, no.
13  Q.  And you know that Globe is a purchaser of
14      white oversized material, correct?
15  A.  That's right.
16  Q.  And that's what -- and they were purchasing
17      white oversized from Alabama Gravel at that
18      time, were they not?
19  A.  That's right.
20  Q.  And you were delivering white oversized in
21      CCI trucks at that time, weren't you?
22  A.  That's correct.
23  Q.  Were you the one who connected Globe with

Page 252

1       Alabama Gravel?
2   A.  No, I was not.
3   Q.  Who did that, do you know?
4   A.  I don't know.
5   Q.  Who is Garland Rice?
6   A.  Garland Rice? That name don't ring a bell.
7   Q.  Do you know the company K&L Trailer Sales
8       and Leasing?
9   A.  Yeah. They sell TrailStar trailers, to the
10      best of my recollection.
11  Q.  Do you know why you would have called them,
12      looks like about two dozen times between
13      July and November 2005?
14  A.  I would suspect it would be regarding
15      maintenance on the TrailStar trailer for
16      Carol's Contracting. That's what I would
17      think. I don't know for sure.
18  Q.  From July 2005 to the end of 2005, did you
19      pay any personal visits to O.G. Pinkston?
20  A.  I don't know. I could have.
21  Q.  You don't recall?
22  A.  I don't really recall any specifics, but we
23      could have met for lunch. We do that