IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE CONCRETE COMPANY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: 2:05-cv-01026-CSC |
| | * | |
| HARRY E. LAMBERT AND CAROL'S | * | |
| CONTRACTING, INC., | * | |
| | * | |
| Defendants. | * | |

## PLAINTIFF'S MOTION FOR ADDITIONAL DISCOVERY

At the August 8, 2006 hearing in this matter, the Court stayed discovery except to the extent Plaintiff The Concrete Company ("TCC") was permitted to depose Defendant Harry Lambert ("Lambert") and a corporate representative of Defendant Carol's Contracting, Inc. ("CCI"). The Court further ordered that TCC could file a motion if it wanted to conduct additional depositions after Lambert's and CCI's. CCI's corporate representative and Lambert were deposed on August 22 and 30, 2006, respectively. TCC wishes to, and respectfully, should be allowed to, conduct additional depositions and written discovery and, therefore, hereby moves as follows for such an order.

## INTRODUCTION

Lambert and CCI have gone to great lengths to try to portray themselves as victims in and of this litigation – **which they are not.** They have wrongfully accused TCC of filing suit for purely anti-competitive purposes and have perpetuated this baseless theme to try to limit TCC's discovery. They have done this because the more discovery that takes place, the more relevant evidence TCC obtains substantiating its well-founded allegations that Lambert breached his non-

competition agreement with TCC and, in conspiracy with CCI, tortiously interfered with TCC's business relations.

TCC has responded fully to all written discovery and has produced nearly **3000** pages of documents. By contrast, Lambert has produced **zero** documents and CCI, despite being in the sand and gravel business with Lambert's assistance since 2002, has produced only 97 pages of invoices and its Articles of Incorporation. TCC also made six of its officers and employees available for deposition last spring.[1] Again by contrast, Lambert and CCI were made available for deposition in August and only after the Court ruled on their motion to stay all discovery.

Alabama Gravel was more cooperative in discovery and produced invoices regarding its sales to TCC customers and certain documents related the construction of its Deatsville, Alabama, sand and gravel operation ("Deatsville Operation"). Alabama Gravel also made Dave Tuten, one of its three members, available for deposition in July. As part of the consideration for the pro tanto settlement and dismissal of claims against Alabama Gravel only, it also agreed to make its other two members, Robert Alexander and Rex Dasinger, available for deposition and to participate in additional reasonable discovery in the continuing litigation against Lambert and CCI. Neither these depositions, nor any additional written discovery emanating therefrom, have taken place in light of the Court's ruling on the motion to stay.

TCC, therefore, has not been afforded full discovery from Lambert, CCI or Alabama Gravel. TCC has also been denied follow-up depositions of third-parties subpoenaed for further investigation of liability and damages issues. TCC should be allowed to conduct such discovery.

---

[1] TCC produced its witnesses in advance of anticipated depositions of Lambert, CCI and the three members of former Defendant Alabama Gravel, LLC ("Alabama Gravel"). TCC's intent to take those depositions was known to all parties. In retrospect, TCC should have interspersed its depositions with those taken by Defendants. TCC could not, however, have anticipated that Lambert and CCI would object to such fundamental depositions.

There is substantial evidence against Lambert and CCI. There is also substantial reason to believe that additional discovery will further solidify TCC's case.[2]

TCC should not be denied full discovery simply because, and this motion demonstrates that, TCC already has a strong case. TCC submits that it has the right to conduct full discovery to allow and ensure acquisition of all available information to support a summary judgment motion, if necessary, to defend one, and to prevail at trial. Discovery is also, in part, designed to avoid unfair surprise by otherwise discoverable testimonial and documentary evidence.

Consequently, and as more specifically demonstrated below, TCC respectfully submits that this motion should be granted and that it should be allowed to conduct the following additional discovery:

(1)     depositions of Alabama Gravel members Robert Alexander and Rex Dasinger;

(2)     depositions of third-party fact witnesses Alan King, Sam Estock, Larry Speaks, Jim Maddox, Randy Willingham, Dick Wymer, Ed Boardwine, Bobby Becker, Mike Hong, Bernie Ostervold and Mike Gentry;

(3)     *Fed. R. Civ. P.* 30(b)(6) depositions of Southern Steel & Pipe, Inc., Pond River Steel, Inc., Pearce Pump South, Inc., Southern Wire Enterprises, Inc. and Caterpillar Lift Truck;

(4)     requests for production to Lambert, Mrs. Lambert and CCI for copies of 2002, 2003, 2004 and 2005 tax returns;

(5)     a complete response by CCI to TCC's request for production; and

(6)     a subpoena to former Defendant Alabama Gravel for copies of all checks written and all Form 1099s and W-2s issued in 2005 and for invoices issued for sand and gravel sales up to the present.

---

[2]     Taking just one dramatic example, despite Lambert's testimony that he cannot recall the substance of conversations related to, and his denial that he had anything to do with, the Deatsville Operation, his telephone records reveal collectively ***hundreds*** of conversations during the time the construction was taking place with numerous contractors who participated in the construction. TCC would like to depose these third-parties to confirm what Lambert claims he cannot recall.

## PERTINENT FACTS AND PROCEDURAL HISTORY

The facts and results of discovery summarized and then detailed below establish the basis, context and justification for all the additional discovery requested above and below.

**I.     Factual Summary**

Immediately after the non-compete between Lambert and TCC was triggered in 2002, Mrs. Carol Lambert formed CCI, a trucking company predominantly focused on delivering sand and gravel. Up to that point, Mrs. Lambert's work experience was as a bookkeeper. Lambert, her husband, therefore, who had extensive experience in the sand and gravel business, including mining, sales and delivery, began driving trucks for CCI. He also admits coordinating deliveries for other CCI drivers and to CCI customers and handling CCI truck maintenance issues. Lambert attempts to justify this blatant breach of his non-compete, claiming that he was not "paid" for his work other than being provided food and a place to live. This is in fact compensation, and Lambert was also compensated with health insurance, workman's compensation benefits, a cellular telephone and a company vehicle. Lambert was also the beneficiary of the salary Mrs. Lambert drew during the duration of the non-compete on hundreds of thousands of dollars of CCI sand and gravel delivery charges.

Lambert and CCI appear to have focused their operations on obtaining and delivering sand and gravel and to have stayed out of sand and gravel mining until late 2004. At that time, Lambert coordinated the formation of Alabama Gravel as a new white oversize gravel source for at least three major TCC customers – Simcala, Inc. ("Simcala"), Globe Metallurgical, Inc. ("Globe"), and Maddox Stone & Gravel, LLC ("Maddox Stone & Gravel"). He brought Dave Tuten ("Tuten"), Robert Alexander ("Alexander") and Rex Dasinger ("Dasinger") together and

provided them an office on his family land[3] from which to operate. Tuten, a Simcala consultant and former Globe purchaser, had the customer contacts, Alexander provided financial backing and Dasinger had a mining rights lease and the ability to supervise day-to-day operations. Lambert also placed Alabama Gravel in touch with Mike Gentry, who had a readily available white oversize gravel source that could be used until Alabama Gravel's Deatsville Operation on Dasinger's leased land was complete. Lambert then made sure that Alabama Gravel hired Mrs. Lambert for bookkeeping services and CCI to deliver sand and gravel. Finally, Lambert gave his time and expertise in the construction of the Deatsville Operation.

Again Lambert claims this was all acceptable since he allegedly was not paid for these services. Lambert wrongly refuses to acknowledge any benefit or compensation from the nearly *$500,000* in Alabama Gravel delivery payments to CCI in 2005 or the *$1,000 per month* office rent and approximately *$50,000 annual salary* Alabama Gravel pays Mrs. Lambert. He also refuses to acknowledge that the rich consulting agreement he signed with Alabama Gravel just months after his non-compete expired is blatant deferred compensation.

## II.    The Non-Compete Agreement

On June 10, 1997, TCC and Lambert entered into an Agreement ("Agreement"), a copy of which is attached as Exhibit A hereto, related to their shared ownership in Montgomery Materials Company, LLC ("MMC"). MMC was "formed for the purpose of acquiring the business of Montgomery, Inc. and excavating, mining, selling and distributing sand, gravel, clay and/or topsoil" in the Montgomery, Alabama, area. *See* Agreement, at § 1(b). Lambert was President of Montgomery, Inc., otherwise known as MMC Holdings, Inc. ("MMC Holdings").

---

[3]    The land appears to be technically listed in Carol Lambert's name as a result of a November 2, 2000 statutory warranty deed transferring the property from Harry and Carol Lambert to just Carol Lambert for $10.00 in consideration.

The Agreement contained a non-competition provision applicable to Lambert stating, in pertinent part:

> 8.4.   Lambert.  If Montgomery, Inc. transfers its entire Membership Interest in Montgomery, LLC [MMC] to Concrete [TCC] or any other party, Lambert agrees that during the Period he will not:
>
> (1)    engage, as an employee or otherwise, in the Territory in the Prohibited Activity;
>
> (2)    in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity;
>
> (3)    in the Territory induce a Customer (as defined below): (i) to purchase Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC [Montgomery Materials] or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC [Montgomery Materials].  As used in this subsection, "Customer" means any actual customer who purchased Product from Montgomery, LLC [Montgomery Materials] in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. [MMC Holdings] of its Membership Interest in Montgomery, LLC [Montgomery Materials] . . ..

*See id.* at § 8.4.  The "Period," or duration, of the non-compete was five years from the date of the transfer described in the first paragraph of the non-compete.  *See id.* at §§ 8.3 & 8.4.  The "Prohibited Activity" is engaging "in the Territory in the business of excavating, mining, distributing, delivering, selling or otherwise disposing of any Product at wholesale or retail."  *See id.*  The "Territory" is "the area contained within the 60 miles of the present [then] limits of Montgomery, Alabama."  *See id.* at § 8.1.  "Product" is "sand, gravel, clay and/or topsoil."  *See id.* at § 1(b).

TCC filed a declaratory judgment action against MMC Holdings related to the Agreement on January 12, 2001.[4]  Summary judgment was entered for TCC on September 7, 2001 and affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002.  MMC Holdings was thereby deemed to have sold its 50% interest in MMC to TCC on January 2, 2001.

On April 9, 2002, TCC and MMC Holdings conducted the closing with respect to that sale.  TCC made a $303,739.94 net cash payment to MMC Holdings.  Before the closing, via a March 26, 2002 letter, Lambert was reminded of his obligations with respect to the Agreement's non-compete provisions, which were triggered by the closing and effective as of January 2, 2001 and ran until January 2, 2006.

## III.    Lambert's Violation Of The Non-Compete And Lambert's And CCI's Tortious Interference And Conspiracy

By the fall of 2005, Lambert had materially violated – and was continuing to materially violate – the non-compete.  *See* Transcript of Deposition of Horald Sorrell ("Sorrell Tr."), dated March 28, 2006, copies of pertinent portions of which are attached as Exhibit B hereto, at 22.11-23.13.

(1)     Lambert was selling and delivering aggregate to TCC customers;[5]

(2)     Lambert was participating in the construction of the Deatsville Operation;[6]

---

[4]     The case was captioned *The Concrete Company v. MMC Holdings, Inc.* (United States District Court for the Middle District of Alabama, Northern Division; Civil Action No. 2001-D-54-N).

[5]     In September or October 2005, Danny Luster ("Luster"), one of TCC's plant managers, informed TCC representative, Hugh Sorrell ("Sorrell"), that Lambert was driving trucks delivering aggregate.  *See id.* at 30.8-.23.  Luster had previously been told by two former MMC employees that they were working for Lambert driving trucks.  *See* Transcript of Deposition of Danny Luster ("Luster Tr."), dated March 29, 2006, copies of pertinent portions of which are attached as Exhibit C hereto, at 58.23-60.14.

[6]     Luster saw a mining plant being built in Deatsville and was told by Allan King ("King") that King was building the plant in Deatsville for Luster's "former boss."  *See id.* at 45.3-50.15 & 79.18-.21.  Luster worked for Lambert at MMC before the 2002 transfer and closing and stayed on with TCC, eventually becoming a plant manager.  *See id.* at 11.11-13.4 &14.17-20.5.  Earlier, in January 2005, Lambert had stopped-in on Luster at TCC's Shorter, Alabama, mining operation and told Luster that "it wouldn't be long and that he had a few surprises for some people."  *See id.* at 31.17-32.12.  Luster took that to mean that Lambert would be getting back into the aggregate business.  *See id.* at 32.13-.16.  After

(3)    Lambert had visited major TCC customer Simcala, and Simcala stopped purchasing aggregate from TCC after that visit;[7]

(4)    TCC customers were calling Lambert on his cellular telephone or a CCI office telephone and placing orders for sand and gravel;[8] and

(5)    Lambert, CCI and Alabama Gravel had the same address, which was Lambert's home address.[9]

*See id.* at 22.11-23.13.

## IV.    <u>The Complaint And Written Discovery</u>

TCC filed its Complaint on October 27, 2005.  Naming Lambert, CCI and Alabama Gravel as defendants, TCC alleged breach of contract by Lambert and tortious interference with business relations and conspiracy by Lambert, CCI and Alabama Gravel.  TCC served interrogatories and requests for production on Lambert, CCI and Alabama Gravel.  To further determine the scope of Lambert's non-compete violation and Lambert's and CCI's tortious interference and conspiracy, TCC also served third party document subpoenas on 21 other companies[10] involved in the sand and gravel business.

---

mentioning there would be some surprises, Lambert also told Luster that he "didn't care if he told the four-eyed f__ker." *See id.* at 33.1-.15 (redacted).  Luster understood Lambert as referring to Frank Foley ("Foley"), TCC's President.  *See id.* at 96.15-.19.

[7]    TCC had sold Simcala more than ***$1 million*** in aggregate since 1999.  *See* Complaint at ¶34.

[8]    Jim Maddox of Maddox Stone & Gravel, and Randy Willingham of Willingham Stone Company ("Willingham Stone") and related entities told TCC that they would place orders directly with Lambert.  *See* Sorrell Tr., Exhibit B, at 24.4-25.9.

[9]    *See* D&B Business Information Report, a copy of which is attached as Exhibit D hereto. This report lists Alabama Gravel's address as 541 Gunnells Road, Deatsville, Alabama 36022, which is also Lambert's home address.  Sorrell confirmed on the Alabama Secretary of State website that this was CCI's address as well.  *See id.* at 80.7-.12.

[10]    These companies include (1) Agg-Tran, LLC; (2) Crest Capital & Leasing ("Crest Capital"); (3) Maddox Stone & Gravel; (4) Sand-Rock Transit, Inc.; (5) Simcala; (6) Alabama Sand & Gravel; (7) Anderson Road Materials; (8) Couch Ready Mix, USA; (9) Elmore Sand & Gravel; (10) 5 Sand & Gravel, Inc.; (11) Foshee Trucking; (12) Gentry Ready Mix, Inc.; (13) Hodgson Concrete Co, Inc.; (14) National Cement Co. of AL; (15) North Montgomery Materials, LLC; (16) Pierce Pump South, Inc.; (17) Ready Mix USA, Inc.; (18) Southern Wire Enterprises; (19) Waugh Properties, LLC; (20) Capitol Materials, LLC; and (21) Globe.

**V.    Lambert's, CCI's And Alabama Gravel's Responses To The Complaint And Written Discovery**

    **A.    *Lambert's Response***

In response to the Complaint and written discovery, Lambert admits driving a truck for CCI, that CCI is owned by Lambert's wife, that CCI hauls sand and gravel for Alabama Gravel and that Alabama Gravel sold material to Simcala.  *See* Answer And Counterclaim Of Defendant Harry E. Lambert, at Counterclaim ¶¶16, 17 & 20-22.  Lambert further admits to driving trucks for CCI to help his wife in her business.  *See id.* at ¶17.  Lambert claims to have driven CCI trucks for free "to have something to do" while waiting for the non-compete to expire.  *See* Defendant Harry E. Lambert's Responses to First Interrogatories, a copy of which is attached as Exhibit E hereto, at Response No. 7.  Also, according to Lambert:

    (1)    he had numerous discussions with persons at Alabama Gravel relating to their use of CCI as a trucking firm which caused him to be at Alabama Gravel's location regularly;

    (2)    he answered the telephone when Alabama Gravel and Simcala called CCI requesting hauls;

    (3)    he placed Simcala in touch with Alabama Gravel principal Robert Alexander after Simcala contacted Lambert in early 2005 seeking white oversize gravel;

    (4)    he had conversations with Maddox Stone & Gravel about loading rail cars with white oversize gravel using CCI, and he drove CCI trucks to the Maddox Stone & Gravel rail yard; and

    (5)    he talked with Globe about quantities of Alabama Gravel white oversize gravel Globe wanted CCI to haul.

*See* Defendant Harry E. Lambert's Responses to First Interrogatories, Exhibit E, at Response Nos. 6-8 & 11.

Despite all of the above, Lambert denies any "business or employment relationship with Alabama Gravel."  *See* Answer And Counterclaim Of Defendant Harry E. Lambert, at

Counterclaim at ¶15.  He claims he made it clear to the Alabama Gravel owners and to Simcala

that he was in "jail" until January 2, 2006 as far as operating a sand and gravel business so they

avoided talking about or taking any action that would involve Lambert engaging in the sand and

gravel business.  *See id.* at Response Nos. 6 & 7.  Lambert further claims that he has not violated

the non-compete or engaged in the "business of excavating, mining, distributing, delivering,

selling or otherwise disposing of any Product at wholesale or retail."  *See id.* at ¶14.  As Lambert

tries to put it, no one "received" any Product from him and he has not sold any Product.  *See*

Defendant Harry E. Lambert's Responses to First Interrogatories, Exhibit E, at Response Nos.

14.

   **B.**     ***CCI's Response***

   Lambert's wife, Carol Lambert, admits that, in addition to being CCI's President, she

worked as a bookkeeper for and rented office space to Alabama Gravel.  *See* Defendant Carol's

Contracting's Responses to First Interrogatories, a copy of which is attached as Exhibit F hereto,

at Response No. 6.  She confirms that CCI delivered sand and gravel for Alabama Gravel.  *See*

*id.* at Response No. 1.

   In fact, the 97 pages of invoices produced by CCI in response to TCC's request for

production confirm that from April 10, 2005 until December 25, 2005, CCI was paid at least

***$478,929.37*** by Alabama Gravel for hauling while oversize gravel to TCC customers Simcala,

Globe and Maddox Stone & Gravel.[11]  *See* Carol's Contracting, Inc. Invoices ("CCI Invoices"),

copies of which are collectively attached as Exhibit H hereto, at Bates Stamp Nos. CCI0001-

CCI0086.  These invoices indicate that CCI was paid $6.00 per ton to haul white oversize gravel

---

[11]     CCI has not produced any invoices related to delivering product for Alabama Gravel or
any other entity after December 25, 2005.  Other than its Articles of Incorporation, it has produced no
additional documents regarding its operations.  These documents were requested by TCC in its requests
for production.  *See* Plaintiff's First Request for Production to Defendant Carol's Contracting, Inc., a copy
of which is attached as Exhibit G hereto, at Requests Nos. 7, 8 & 10.

to Simcala, $5.00 per ton to haul white oversize material to Maddox Stone & Gravel and $5.00 per ton to haul white oversize material to Globe. *See id.* In July 2005, CCI was also paid at least ***$10,787.04*** directly by Simcala for hauling white oversize gravel to Marietta, Ohio. *See id.* at CCI0087, CCI0090, CCI0091 & CCI0093. Finally, in October and November 2005, CCI was also paid ***$8,617.65*** directly by Willingham Stone (again, another TCC customer) for hauling aggregate to Florida. *See id.* at CCI0095-CCI0097.

In total, therefore, based on documents produced by CCI to date, in 2005, while the non-compete was in effect, CCI was paid at least ***$498,334.06*** to deliver white oversize gravel and other aggregate to and for TCC customers. There is solid evidence, through Lambert's admissions and these customers' statements to TCC, that Lambert was involved with these deliveries as a driver, coordinator and/or broker. Irrespective of his claim that he was not paid – ***which TCC disputes*** – Lambert, via his marital relationship, was also the direct beneficiary of payments to CCI.

## C.    *Alabama Gravel Response*

Alabama Gravel, whose members include Alexander, Tuten and Dasinger, admit to operating a sand and gravel business in Independence, Alabama, since April 2005. *See Defendant Alabama Gravel, LLC's Responses And Objections To Plaintiff's First Interrogatories*, a copy of which is attached as Exhibit I hereto, at Response Nos. 1 & 17. According to Alabama Gravel, Alexander and Tuten have known Lambert "for years and previously purchased sand and gravel from" Lambert's companies. *See id.* at Response No. 6. Dasinger has also known Lambert for years and previously worked for CCI. *See id.* In late 2004 or early 2005, Tuten, a former Simcala consultant, mentioned to Lambert that Simcala was looking for aggregate. *See id.* at Response Nos. 6 & 7. Lambert suggested that Tuten should

meet Alexander and helped set up a meeting between the two.  *See id.* at Response No. 6.

Lambert also mentioned that Mike Gentry was looking to sell oversize gravel.  *See id.*  Mike

Gentry owns the Independence, Alabama, pit ("Gentry pit") out of which Alabama Gravel began

operating in April 2005.  *See id.* at Response No. 12.

Alabama Gravel also admits that in the late summer or early fall of 2005, Lambert and

Tuten drove out to the site of the Deatsville Operation.  *See* Defendant Alabama Gravel, LLC's

Supplemental Responses And Objections To Plaintiff's First Interrogatories, a copy of which is

attached as Exhibit J hereto, at Response No. 6.  Alabama Gravel also admits to numerous

conversations with Lambert related to the "sand and gravel business in general," but provided no

specifics of these conversations.  *See id.*

Alabama Gravel also produced a number of documents related to the 2005 Deatsville

Operation construction.  These documents include, in pertinent part, invoices from (1) Southern

Steel & Pipe, Inc. ("Southern Steel"); (2) Pond River Steel, Inc. ("Pond River Steel"); (3) Larry

E. Speaks & Associates, Inc.; (4) Pearce Pump South, Inc. ("Pearce Pump"); and (5) Southern

Wire Enterprises, Inc. ("Southern Wire").  The Documents also include an April 10, 2006

Consulting Agreement, a copy of which is attached as Exhibit K hereto, between Lambert and

Alabama Gravel.[12]

---

[12]    The Consulting Agreement confirms that Alabama Gravel was formed to target TCC's white oversize gravel customers and to mine out of the Gentry pit.  *See id.* at p.1.  Despite the hundreds of thousands of dollars paid to CCI, it also states that Lambert had "received absolutely not compensation from Alabama Gravel of any kind."  *See id.* at p.2.  The Consulting Agreement also states that on April 5, 2006, Alabama Gravel and Lambert "met and discussed a possible business relationship for the first time."  *See id.* at p.4.  The Consulting Agreement then states that Lambert would be hired to "provide consulting services required to supervise and set up a sand and gravel plant located in Deatsville."  *See id.* Lambert was to begin what was dubbed "Stage *One*" of the Deatsville Operation.  *See id.* at pp.4-5 (emphasis added).  Stage One is an obvious misnomer or an attempt to obscure the fact that invoices and other evidence referenced herein indicate that the Deatsville Operation had been in construction for more than a year.  Lambert was also to be paid a $350 per day and a $90,000.00 bonus for his work on the Deatsville Operation.  *See id.* at p.6.

VI.     **Pertinent Documents Obtained By TCC**

      A.     ***Simcala Documents***

      In response to its subpoena to Simcala, TCC received a portion of Simcala employee Dick Wymer's ("Wymer") calendar indicating that Lambert met with Wymer on January 6, 2005.  *See* Document Bearing Bates Stamp No. TCC000995, a copy of which is attached as Exhibit L hereto.  Alexander's name and telephone numbers appear directly below Lambert's with the notation that Alexander called Wymer and would get back to him when he had more information.  *See id.*  These documents, some of which have been redacted for unknown reasons, also include weekly totals of white oversize gravel ordered by Simcala from TCC and Alabama Gravel.  The documents also appear to indicate a purchase order inquiry showing that Simcala purchased ***$1.56 million*** in white oversize gravel from Alabama Gravel.

      Simcala has also produced testing documentation comparing, in pertinent part, white oversize gravel purchased from TCC, Alabama Gravel and, another competitor, Elmore Sand & Gravel ("Elmore").  While TCC has not had a chance to question Simcala about these – or any other documents – it appears that TCC's white oversize was the best in the market.[13]

      B.     ***Globe Documents***

      Like Simcala, Globe has produced testing documents comparing white oversize gravel purchased from TCC to other suppliers' white oversize gravel.

      C.     ***Willingham Stone Documents***

      Documents subpoenaed from Willingham Stone indicate that during 2003 and 2004, Lambert delivered ***dozens*** of loads of aggregate material to Willingham Stone.  These deliveries

---

[13]     This relates to damages and directly refutes Lambert's and CCI's contention that TCC lost customers because of quality issues unrelated to Lambert or CCI actions.

were made when CCI leased its trucks on with Foshee Trucking Company, Inc. ("Foshee Trucking").[14]

### D.    *Southern Wire Documents*

In response to its subpoena, TCC received invoices from Southern Wire related to construction work at the Deatsville Operation.  Southern Wire produced at least 15 invoices not previously produced by Alabama Gravel.  These new invoices indicate Southern Wire providing material for the Deatsville Operation as early as March 31, 2005.

### E.    *Foshee Trucking Documents*

As referenced above, CCI leased its trucks on with Foshee Trucking.  Under this arrangement, Foshee Trucking would obtain delivery jobs for CCI trucks, invoice the purchasers directly and then pay CCI for the deliveries.  According to subpoenaed documents produced by Foshee Trucking, it issued Form 1099s to CCI in 2002 for *$79,993.72*, in 2003 for over *$400,000.00*[15] and in 2004 for *$401,568.97.*  The Foshee Trucking documents also indicate that Foshee Trucking paid for Workman's Compensation benefits for CCI drivers, including Lambert, and deducted these amounts from payments to CCI.

### F.    *Crest Capital Document*

On December 6, 2005, TCC received an unsolicited facsimile from Crest Capital employee Mike Hong.  *See* Crest Capital Facsimile, a copy of which is attached as Exhibit M hereto.  The facsimile appears to be an equipment finance application.  *See id.*  While the facsimile appears addressed to "Montgomery Materials Co. LLC," it bears a handwritten note

---

[14]    As shown below, CCI appears to have been paid nearly *$900,000.00* by Foshee Trucking from 2002 to 2004.

[15]    There appear to be two 1099's for 2003 and both are difficult to read in the form transmitted by Foshee Trucking to TCC.  CCI has not produced any of its tax documents.

stating "Harry[,] If you have the Invoice – Descriptions for the Equipment – send those too and I'll take care of it before the Holidays.  Thanks, Mike."  *See id.*

### G.     *Lambert Telephone Records*

TCC subpoenaed Lambert's cellular telephone records from Verizon.  Those records are replete with evidence of ***dozens and dozens*** of telephone calls in 2005 between Lambert and Southern Steel, Pond River Steel, Larry E. Speaks & Associates, Inc., Pearce Pump and Southern Wire.  All of these companies invoiced Alabama Gravel during the exact same time period for construction materials and activity associated with the Deatsville Operation.  The records also indicate numerous telephone calls with Pete Long, who brokers machinery used in construction of mining operations.  Long states that in September and October 2005, he brokered a deal through Lambert that resulted in Alabama Gravel purchasing used mining equipment from a Georgia dealer.[16]  The records also indicate ***hundreds*** of telephone calls between Lambert and other CCI drivers.  Finally, the records indicate ***hundreds*** of telephone calls between Lambert and Alabama Gravel, Tuten and Alexander.  Many of the telephone calls to Tuten and Alexander took place before and in and around the time Lambert referred Simcala to Alexander and the time Alabama Gravel was formed.

## VII.     Deposition Testimony Obtained By TCC

TCC has been permitted to take only three depositions, those of Tuten, CCI corporate representative Carol Lambert and Lambert.

---

[16]     *See* Declaration of William P. Long, a copy of which is attached as Exhibit N hereto. Long states that Lambert told him the equipment was not for him but for Alabama Gravel and not to mention Lambert's name since he was under a non-compete with Frank Foley.  *See id.*  Lambert stated that Lambert could talk to anybody he wanted to and could give advice.  *See id.*  Long was paid approximately $200 by Alabama Gravel for this deal.  *See id.*

A.    *July 13, 2006 Tuten Testimony*

Tuten was involved in Globe's aggregate martial purchasing for 18 years before he left in 2003.  *See* Transcript of Deposition of David Tuten ("Tuten Tr."), copies of pertinent portions of which are collectively attached as Exhibit O hereto, at 16.5-.11.  In 2003, he formed a consulting business and consulted with Simcala until 2005.  *See id.* at 53.6-.14 & 57.20-59.7.  He met Alexander for the first time in late 2004 early 2005 when he was introduced by Lambert.  *See id.* at 60.16-.23.  Tuten testified as follows about how that meeting took place:

> I had mention to Mr. Lambert about because of the situation at
> Simcala, with them running out of white oversized and also with
> contacts I had at Globe, that you know, there was a need for white
> oversized gravel and that I would have an interest in getting in the
> gravel business mainly as an outside investor more than anything
> else.  And I had asked Mr. Lambert, you know, if he knew of
> anyone, you know, that I could maybe get involved with, and he
> put me in touch with Mr. Alexander.

*See id.* at 61.3-.17.  At that time, Tuten was not aware of another location in the Montgomery area where he could get white oversize gravel and did not have any idea where he could get the white oversize gravel he was hoping to sell.  *See id.* at 70.10-71.8.  He asked Lambert this.  *See id.* at 71.9-.22.

Tuten ended up meeting Alexander in a hotel in Montgomery in late 2004/early 2005. *See id.* at 62.6-.20.  Lambert had called Alexander, found out when he would be in town and gave Tuten that information and Alexander's telephone number.  *See id.* at 78.14-79.10.  Mr. Lambert attended the meeting as well.  *See id.* at 81.23-82.6.  During the meeting, Tuten and Alexander discussed obtaining white oversize gravel from the Gentry pit.  *See id.* at 85.9-86.11. Tuten testified that Alexander told him he had been introduced to Gentry by Lambert, but Tuten did not know when.  *See id.*

During the same meeting, Lambert recommended Dasinger to Alexander and Tuten as a good person to be a foreman and run operations. *See id.* at 90.12-92.15. Lambert was also asked who they could use to construct their operation. *See id.* 100.11-101.5. Lambert had the specific information and the specific individuals who could help Tuten and Alexander construct a plant. *See id.* Tuten also admits that Dasinger acquired the lease for the Deatsville Operation in early 2005. *See id.* at 101.6-103.3. He claims not to know how Dasinger acquired the lease. *See id.* Right around the time Alabama Gravel was formed, Tuten admits that Lambert drove him to the Deatsville site where Tuten took rock samples from holes he says Dasinger dug. *See id.* at 149.10-153.10. He claims that Lambert knew Dasinger had dug the holes. *See id.* Tuten could not recall when construction started on the Deatsville Operation and stated that Alexander would be the one to ask about this. *See id.* at 148.22-149.9.

In February or March 2005, Tuten, Alexander and Dasinger met at the Gunnells Road address that eventually became Alabama Gravel's office.[17] *See id.* at 112.12-113.21. This office is on the same property where Lambert lives. *See id.* They got in touch with Dasinger through Lambert. *See id.* They talked to Lambert about renting the office. *See id.* at 115.1-.14. Lambert was present for the beginning of the meeting, but then left, claiming he did not need to be there. *See id.* at 116.10-.19.

Nevertheless, at the meeting, Tuten, Dasinger and Alexander discussed CCI hauling white oversize for Alabama Gravel. *See id.* at 128.6-129.4. They talked to Lambert about CCI doing this hauling before they talked to Carol Lambert about it. *See id.* Tuten admits that when Alabama Gravel hired CCI to haul aggregate, it was his intention at that time that by hiring CCI to do that, Lambert would be able to drive some of those trucks. *See id.* at 49.19-50.8. Tuten,

---

[17]    Alabama Gravel pays Carol Lambert $1,000 per month to rent that office. *See id.* at 169.2-.10.

Alexander and Dasinger also talked about Mrs. Lambert doing Alabama Gravel's bookkeeping. *See id.* at 129.21-130.19. They talked to Lambert about this first and he said he was sure Carol Lambert would be interested in this because, as Tuten says Lambert put it, "she was needing something to do."[18]  *See id.*

Tuten testified that he would not be involved with Alabama Gravel were it not for Lambert. *See id.* at 176.20-177.5. Tuten says that if Lambert had not hooked him up with Alexander, he would not have pursued it any further. *See id.* at 177.11-.21.

Tuten says he was not part of the January 2005 discussions involving Lambert, Alexander and Simcala. *See id.* at 197.4-198.23. Tuten also did not participate in Alexander's discussions with Maddox Stone & Gravel. *See id.* at 224.20-225.1. Alexander was also responsible for hiring Larry Speaks to assist Alabama Gravel in obtaining a permit for the Deatsville Operation; but he does no know how Alexander got that name. *See id.* at 226.11-.19. Alexander was also responsible for telling Allan King where to place the plant on the Deatsville Operation site. *See id.* 231-.20. Alexander was also responsible for purchasing from Pond River Steel, and Tuten does not know why Alexander was purchasing from Pond River Steel, which is located in Kentucky. *See id.* at 232.2-233.3. According to Tuten, Alexander is also the Alabama Gravel person who deals with Pearce Pump with respect to the Deatsville Operation. *See id.* at 237.3.10. Tuten says Alexander was also the person who allegedly negotiated Alabama Gravel's arrangement with Mike Gentry for the Gentry pit. *See id.* at 250.9-.21.

### B.     *August 22, 2006 CCI (Carol Lambert) Testimony*

Carol Lambert first worked as a bookkeeper in 1967 for Interstate Drilling, a company she owned with Lambert that was in the business of drilling blast hole in rock quarries. *See* Transcript of Deposition of Carol Lambert ("C. Lambert Tr."), dated August 22, 2006, copies of

---

[18]     This, despite the fact that she was purportedly running CCI.

pertinent portions of which are collectively attached as Exhibit P hereto, at 8.9-.20. She was then a bookkeeper for Lambert Sand & Gravel, a company she owned with Lambert in the business of producing sand and gravel. *See id.* at 9.22-10.11 & 12.9-.13. She went to work as a bookkeeper for MMC in the 1990s. *See id.* at 10.12-.20. Up to that point, she had no other work experience aside from being a bookkeeper.[19] *See id.* at 10.21-11.10. Up to the time she went to work for MMC, she had not gained any experience in the purchase of trucks for hauling aggregate. *See id.* at 15.11-.15. She had the same duties as a bookkeeper with MMC that she had with the past companies. *See id.* at 16.18-17.3.

Carol Lambert formed CCI on April 26, 2002. She claims it was formed to be a trucking company. *See id.* at 20.8-.16. When asked why she formed CCI, Mrs. Lambert responded "[w]e had to have income. I did it to make a living." *See id.* at 20.1-.4. As she later agreed, "we," meaning her and Lambert, "needed to earn a living." *See id.* at 21.15-.20. Mrs. Lambert says she is CCI's sole owner and officer. *See id.* at 22.14-.16. She claims the first two other employees of CCI were brothers Grady and John Parker who had, immediately before that, worked for MMC. *See id.* at 22.20-23.12. When asked why given her work experience, she chose to form a trucking company, Mrs. Lambert simply testified "it's just what I chose to do. No specific reason." *See id.* at 25.12-26.1.

Mrs. Lambert claims that she located CCI's initial trucks for purchase by finding the name of a sales company in the telephone book and going to talk to the company. *See id.* at 26.9-.19. She claims she relied exclusively on the truck dealer for advice and did not get

---

[19] When asked if she had any experience in the trucking business up to that point, she responded, "[w]ell, I don't know if you would consider the drills. You know, drills are big, heavy pieces of equipment, like a big truck, and that could be possible, I suppose." *See id.* at 11.11-.17. But, she admitted that while at Interstate Drilling, she was not responsible for selecting drills for purchase. *See id.* at 11.21-12.1. Similarly, when she worked for Lambert Sand & Gravel, she did not have any experience or duties with respect to selecting trucks that were used. *See id.* at 15.5-.10.

recommendations from anyone else. *See id.* at 27.21-28.12. That stated, she could not recall how much she paid for the first trucks. *See id.* at 28.13-.18. She could not recall what mileage the trucks got. *See id.* at 50.7-.18. She cannot recall the terms of the warranties on those initial trucks, nor can she recall whether she got warranties on subsequently purchased trucks. *See id.* at 52.7-.17. Mrs. Lambert cannot recall when CCI traded in its first truck, what she got for it, how many trucks CCI has purchased over the past four years, or the purchase price for any of those trucks. *See id.* at 52.18-54.10. She knows that she purchased separate dump trailers for the trucks CCI currently owns, but she does not know how much CCI paid or when it purchased them. *See id.* at 54.11-55.12.

Mrs. Lambert claims she does not recall Lambert ever assisting her in selecting CCI drivers. *See id.* at 78.21-80.10. She does not recall ever checking references on any of her drivers or going on any rides with prospective drivers to see if they were competent. *See id.*

At the time she formed CCI, Mrs. Lambert was aware that Lambert had an agreement not to go back into the sand and gravel business. She then testified:

> Q.    Do you consider – well, did you consider at that time CCI
>        to be in the sand and gravel business?
>
> A.    No, I did not.
>
> Q.    Do you consider trucking or hauling aggregate to be part of
>        the sand and gravel business?
>
> A.    I would say yes, in a way, it's – if you haul material, yes.

*See id.* at 29.23-30.8.[20]

---

[20]    Later in her deposition, after a break, Mrs. Lambert unsuccessfully attempted to qualify this clear testimony when she was asked if CCI was in the business of mining aggregate. As she put it:

> No, and it never has been. It hauls material. And that – I think I stated
> earlier that if it's involved with sand and gravel operations, the only way
> it's involved with the sand and gravel operation is by hauling the

Mrs. Lambert states that she can not recall whether someone recommended Foshee Trucking to her as someone she could lease CCI trucks to. *See id.* at 35.7-.12. She could not recall if Lambert made this recommendation. *See id.* But, she did state that there were times when Lambert would call the Foshee dispatcher to see if a hauling job was available. *See id.* at 45.2-.10.

Mrs. Lambert admits that Willingham Stone called CCI directly to arrange for hauling gravel used as roofing material to Florida and Louisiana. *See id.* at 73.11-75.1 & 77.5-.14.

Mrs. Lambert says she used the accounting firm Wilson, Price to handle CCI's salaries and other accounting issues. *See id.* at 36.11-37.18. But, she could not recall whether she reported income for CCI in 2002 or whether she filed a joint tax return with husband or whether they filed separately. *See id.* Mrs. Lambert is paid approximately $50,000 per year in salary by Alabama Gravel. *See id.* at 96.9-.20.

Mrs. Lambert acknowledges that CCI listed Lambert as a driver on its liability policy. *See id.* at 40.7-.16. CCI also pays Lambert's health insurance, and he is separately listed and has a separate premium from Mrs. Lambert. *See id.* at 43.23-44.17. CCI also pays Lambert's cellular telephone bill. *See id.* at 48.4-.15. CCI also "probably" listed Lambert as a driver for whom worker's compensation premiums needed to be paid. *See id.* at 139.8-140.8. Foshee Trucking paid these premiums and then withheld that amount from checks to CCI. *See id.*

Mrs. Lambert is not aware of any business reason Lambert would have to have contacted Pond River Steel, Alan King, Southern Wire or Sam Estock in 2005. *See id.* at 120.16-122.13.

---

material. It does not dig material out of the ground or put material through a processing plant. The only thing it does, it drives into a location, the material is loaded on the truck, and it's delivered to wherever it needs to go. It is not in no way related to a sand and gravel business.

*See id.* at 122.14-123.5.

C.    *August 29, 2006 Lambert Testimony*

Lambert said Carol Lambert keeps copies of his tax returns, but he does not know whether he files an individual or a joint tax return with his wife.  *See* Transcript of Deposition of Harry Lambert ("Lambert Tr."), dated August 29, 2006, copies of pertinent portions of which are collectively attached as Exhibit Q hereto, at 48.21-49.7.  When asked about his income during the period of the non-compete, Lambert testified as follows:

> Q.    From that date until January 2nd, 2006, did you report any
>        income for tax purposes?
>
> A.    I don't think so.
>
> Q.    Did you do anything to earn money during that period?
>
> A.    I don't – I don't think so, no.  I don't remember.
>
> Q.    Well, you were paid for being a witness in that case.[21]
>
> A.    That would be the only thing, and I don't know if I billed
>        them directly or through an entity or – I don't remember
>        how that was billed.
>
> Q.    What entity could you have billed them through?
>
> A.    I wouldn't know.  I'd have to look and see.
>
> Q.    Did you form an entity during the time period that we're
>        speaking of?
>
> A.    No.
>
> Q.    So you have no recollection of how you billed them for
>        that?
>
> A.    No, I don't.
>
> Q.    And you don't recall if you reported any of that income for
>        tax purposes?

---

[21]    Lambert previously testified that he had been paid for his time associated with consulting work on litigation involving a gas company and the value of the sand and gravel the company was "going across."  *See id.* at 45.17-47.14.

A.    I don't, no.[22]

*See id.* at 50.3-51.7.

Lambert claims that he did not give Mrs. Lambert advice "in a business sense" on what

trucks CCI should by.  *See id.* at 65.13-.15.  As he describes the sense in which he gave advice,

> [i]n a – she might ask me at the supper table, you know, if I
> thought she maybe ought to buy what kind of truck, and it would
> be the same thing as if she asked me if she wanted to buy a
> different lawn mower or what.  It was in a husband and wife is any
> talk that we would have.  But in a business sense, no.

*See id.* at 65.16-66.1.  Then when asked about any communications he had with truck dealers, he

replied, "I don't recall at this time, no."  *See id.* at 66.2-.5.  Asked if it was possible if he

participated in discussions with truck dealers before CCI trucks were purchased, he replied

"[a]nything's possible."  *See id.* at 66.16-.23.

Throughout CCI's existence, Lambert has assisted CCI with truck maintenance, such as

changing tires and putting on brakes.  *See id.* at 68.22-70.3.  He tries to deny being paid for those

services.  *See id.* 70.4-.5.  He states "I wasn't paid any money.  I was furnished a roof over my

head and food to eat."  *See id.* at 70.9-.12.  Lambert's pick-up truck is actually owned by CCI.

*See id.* at 145.2-.14.  When asked if he put CCI in touch with Foshee Trucking, he stated that he

could not recall, but again stated "[a]nything's possible."  *See id.* at 84.12-.18.

Lambert admits speaking with Jim Maddox of Maddox Stone & Gravel about the

availability of CCI trucks to haul Alabama Gravel white oversize gravel.  *See id.* at 92.2-93.18.

Lambert further admits that Jim Maddox would call either him or Mrs. Lambert about this, and

that when Jim Maddox called Mrs. Lambert, she would call Lambert "to see what the availability

---

[22]    This testimony, as well as Mrs. Lambert's testimony, supports TCC's request that CCI,
Lambert and Mrs. Lambert produce their tax returns.  It is also indicative of the evasiveness and
obfuscation that Lambert has engaged in before and during this litigation to try to hide his malfeasance.
Similarly evasive responses are cited below and, indeed, were present throughout Lambert's deposition.

of the trucks were." *See id.* Lambert claims he does not remember if he put Jim Maddox in touch with Alabama Gravel for the first time. *See id.* at 93.19-94.7.

Lambert cannot "recall" Randy Willingham of Willingham Stone calling between when he left MMC and January 2, 2006 to obtain white oversize gravel. *See id.* at 171.5-.20.

Despite the Consulting Agreement under which Lambert is managing construction of the Deatsville Operation, he claims not to know who holds the land lease for that site. *See id.* at 104-18-.23. He also claims not to remember how Alabama Gravel first got in touch with Dasinger. *See id.* at 105.8-.13. Similarly, he cannot recall when he met Dasinger, how long he has known him or Dasinger's experience in the sand and gravel business. *See id.* at 102.21-103.8.

Lambert knows Alan King was working on the Deatsville site during 2005, but says he does not know who hired him. *See id.* at 107.6-.14. Lambert cannot "recall" speaking with Sam Estock ("Estock") about work on the Deatsville Operation before January 2, 2006. *See id.* at 113.21-114.4. Lambert did, however, conveniently claim to have recommended both King and Estock to Alexander when Lambert was doing some consulting work for Alexander in north Alabama. *See id.* at 111.20-112.8 & 114.23-115.14. Lambert also claims that any of his conversations with King about the Deatsville operation in 2005 would not related to the specifics of the construction but would have been limited to asking King "how he was getting along or what have you." *See id.* at 108.4-.13. Similarly, his conversations with Estock about the Deatsville Operation during that period would have been casual, and Lambert cannot "recall" any "[b]usinesswise" conversations. *See id.* at 117.16-.20. Lambert states that Alexander would have been the person at Alabama Gravel with the experience to oversee the Deatsville Operation construction. *See id.* at 117.16-118.1. He claims King and Estock probably mentioned dealing with Alexander, but again he could not "recall" any specific conversations. *See id.* at 118.2-.17.

Lambert admits to having a 30-45 minute meeting with Simcala employees Dick Wymer and Ed Boardwine, Jr. in early 2005 and to recommending Alexander to Simcala during that meeting when they expressed a need to obtain additional white oversize gravel. *See id.* at 130.11-133.21.

Lambert claims not to know how Alabama Gravel located the Gentry pit as a source of white oversize gravel to sell to Simcala. *See id.* at 139.10-.22. Nor could he "recall" Tuten or Alexander asking him where they could find white oversize gravel in the Montgomery area. *See id.* at 84.12-.18.

Lambert admits to giving Mrs. Lambert information she used to arrive at the $6.00 per ton rate CCI charged to haul white oversize gravel to Simcala. *See id.* at 161.10-162.7. He also stated that he could have supplied some mileage information to Mrs. Lambert to assist in determining the $5.00 per ton shipping charge to Globe, but he does not "remember." *See id.* at 178.11-.23.

Lambert could not "remember" ever seeing the Crest Capital document before the litigation and could not "recall" ever speaking with Mike Hong from Crest Capital. *See id.* at 193.22-194.23.

Lambert was asked a series of questions about his telephone records. The following highlights this testimony.

> (1)     Lambert called Southern Steel four times in September 2005 – a time when Southern Steel was doing work for Alabama Gravel on the Deatsville Operation – but does not recall speaking with them. *See id.* 198.9-199.13. In fact, the records indicate dozens of telephone calls from Lambert to Southern Steel in 2005. *See id.* at 243.8-.16. Lambert said he had no business ventures that would have required him to call Southern Steel during that time. *See id.* at 198.9-199.13. Lambert then testified that it could have been someone he loaned his telephone to, like Alexander or Dasinger, that placed those calls. *See id.* at 199.22-201.3 & 243.15-244.1. He does not know why Southern Steel called him more than a dozen times between September and October 25, 2005. *See id.* at 217.15-218.11.

He says that Southern Steel would not have been calling him about the Deatsville Operation, but that he had no business ventures at that time that would have required him to use Southern Steel. *See id.*

(2)   The records show telephone calls between Lambert and Trey Holley of a Volvo truck Dealership. Lambert stated that CCI did not use Volvo trucks, but he knew there was a Volvo truck at the Deatsville Operation. *See id.* at 207.10-208.7. Nevertheless, he could not "really recall" speaking with Mr. Holley before January 2006 about Volvo trucks. *See id.*

(3)   Lambert admits that his telephone calls with Jim Maddox in July and August 2005 "could" have been about coordinating shipments of white oversize gravel. *See id.* at 209.18-210.11.

(4)   Estock called Lambert 29 times between August 16, 2005 and December 28, 2005. Lambert says they might have mentioned Estock's company [Southern Wire] providing equipment to Alabama Gravel in "casual conversation." *See id.* at 212.11-213.23. But, he added that he does not have "direct knowledge of that." *See id.* Lambert called Estock dozens and dozens of times in 2005, but says the calls were unrelated to the Deatsville Operation. *See id.* at 240.17-.22.

(5)   The records show King calling Lambert 104 times between July 2005 and December 2005. Lambert claims the only discussion of King's work on the Deatsville Operation would have been "casual." *See id.* at 222.17-224.17.

(6)   Lambert does not recall "right offhand" who Pete Long is or speaking with Pete Long or any reason he would have talked to him in October 2005. *See id.* at 21514-.20.

(7)   Lambert knew there were conveyers at the Deatsville Operation with the name Pond River Steel on them, but he had no idea how Alabama Gravel got connected with them. *See id.* at 215.21-217.5. He denies placing Pond River Steel in touch with Alabama Gravel despite the fact that Pond River Steel called him on October 12 and 17, 2005 and invoiced Alabama Gravel on October 25, 2005. *See id.* He has no idea why Pond River Steel called him. *See id.*

(8)   He does not know why Simcala called him on July 26 and August 22, 2005. *See id.* at 217.6-.11. Nor could he recall why he called Simcala in July, August, November and December, 2005. *See id.* at 243.1-.7. It "could" have been calls to coordinate shipments of white oversize gravel. *See id.* at 217.6-.11 & 243.1-.7.

(9)   Lambert knows Bobby Becker as a Globe Purchasing agent, but does not "know specifics" of why he called Becker in July and August 2005. *See id.* at 250.22-.6-251.12.

(10)   Lambert does not remember speaking with Larry Speaks in 2005 despite the telephone records showing numerous calls between the two. *See id.* at 218.12-219.9  He claims he learned that Larry Speaks was working on the Deatsville Operation only after January 2, 2006. *See id.*

(11)   Lambert know Cowin Equipment Company as a company that sells excavators and off-road trucks used in mining operations, but does not remember why they called him more than a dozen times between July and December 2005. *See id.* at 219.10-221.1.

(12)   Lambert could not explain how or why he placed hundreds of telephone calls to the other CCI cellular numbers, but sometimes he directly dispatched the drivers for CCI hauling jobs. *See id.* at 224.18-225.7.  When asked under what circumstances, he dispatched CCI drivers in 2005, Lambert admitted:

> [i]s that the drivers would ask me how many loads to haul, and I would tell them, lots of times on a daily basis, to haul X amount of loads to Globe, X amount of loads to Simcala per truck.  So I talked to them on a daily basis to see how many loads that they hauled.  I'd call them and ask them if they – how many loads that they had hauled.  Just different reasons.

*See id.* at 226.4-.14.

(13)   Lambert added that the CCI drivers were allowed to haul when they wanted to and that he coordinated "some of that." *See id.* at 226.21-227.15.  They would call Lambert or he would call them and "ask them what hours they were going to run and what have you." *See id.*

(14)   Hardy Taylor called Lambert more than a dozen times from July 2005 until the end of 2005.  Lambert knows Taylor as a Caterpillar salesman. *See id.* at 227.16-229.5.  He added that the calls could have been related to servicing CCI trucks, a friendship call or for "various reasons." *See id.*  He denies the calls were related to the Deatsville Operation, but admits there are a Caterpillar bulldozer, a "couple" of Caterpillar excavators and a Caterpillar truck on the Deatsville site. *See id.*  Lambert called Caterpillar dozens of times from July until the end of 2005, but again denies it was related to equipment at the Deatsville Operation. *See id.* at 242.8-.23.  He does not "recall" why he called them. *See id.*

(15)   Lambert says that telephone calls from Pearce Pump employee Bernie Ostervold between August and November 2005 had nothing to do with the work Pearce Pump was doing on the Deatsville Operation. *See id.* at 233.4-.22.

(16)   Lambert says that none of the hundreds of telephone calls between him and Tuten in 2005 related to work by Lambert at the Deatsville Operation. *See id.* at 233.23-

235.2.  He could not recall the specifics of any of those conversations, but said the Deatsville Operation may have come up in "casual conversation."  *See id.*

(17)    Lambert does not "really" know Texas Crusher System, Inc., but would say they sell crushers.  *See id.* at 235.3-.12.  He admits that crushers are used in the aggregate business but has no idea why they called him in November 2005.  *See id.*

(18)    Meco, Inc. sells refurbished used equipment in the sand and gravel business. Lambert denies knowing them or why they called him in October 2005.  *See id.* at 239.6-.17.

(19)    Lambert called one telephone number 324 times, but he was unable to recognize the number.  *See id.* at 241.22-242.4.

## ARGUMENT

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.  *Fed. R. Civ. P.* 26(b)(1).  Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  *Id.*  "The discovery provisions of the Federal Rules of Civil Procedure allow the parties to develop fully and crystallize concise factual issues for trial.  Properly used, they prevent prejudicial surprises and conserve precious judicial energies."  *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973).  "The rules are designed . . . to give the parties mutual knowledge of all relevant facts, thereby preventing surprise."  *Shelak v. White Motor Co.*, 581 F.2d 1155, 1159 (5th Cir. 1978).

Applying the above standard, the facts and results of discovery detailed above justify all the following additional discovery:

(1)    depositions of Alabama Gravel members Alexander and Dasinger;

(2)    depositions of third-party fact witnesses Alan King, Sam Estock, Larry Speaks, Jim Maddox, Randy Willingham, Dick Wymer, Ed Boardwine, Bobby Becker, Mike Hong, Bernie Ostervold and Mike Gentry;

(3)     *Fed. R. Civ. P.* 30(b)(6) depositions of Southern Steel, Pond River Steel, Pearce Pump, Southern Wire and Caterpillar Lift Truck;

(4)     requests for production to Lambert, Mrs. Lambert and CCI for copies of 2002, 2003, 2004 and 2005 tax returns;

(5)     a complete response by CCI to TCC's request for production; and

(6)     a subpoena to Alabama Gravel for copies of all checks written and all Form 1099s and W-2s issued in 2005 and for invoices issued for sand and gravel sales up to the present.

## I.    **Alabama Gravel Member Depositions**

Alabama Gravel members Alexander and Dasinger were actively involved with Lambert and CCI during Alabama Gravel's formation and operation.  Yet, they appear to have had different roles.  Alexander appears to have dealt more with the Mike Gentry and the construction of the Deatsville Operation while Dasinger provided the lease for the Deatsville Operation and day to day foreman activities.  TCC is entitled to inquire into Alexander's and Dasinger's activities and to determine how they correlated with those of Lambert and CCI.  This information is relevant to liability in that it shows Lambert's engagement in the sand and gravel business in conspiracy with CCI to obtain TCC customers.

Moreover, as demonstrated above, the testimony from Lambert and Tuten on these issues was less than clear.  Tuten and Lambert either did not know or claimed not to know many important things.  TCC should not have to take Lambert's word on any important issue in this case.  His evasiveness on deposition, including, but not limited to, his obvious word games and his failure to disclose his relationship with Pete Long, more than justify TCC's right to independently question critical fact witnesses like Alexander and Tuten.

II.     **Third-Party Fact Witness Depositions**

The same justification exists for depositions of third-party fact witnesses Alan King, Sam Estock, Larry Speaks, Jim Maddox, Randy Willingham, Dick Wymer, Ed Boardwine, Bobby Becker, Mike Hong, Bernie Ostervold and Mike Gentry.  These third parties have discoverable information related to liability and/or damages.  They were either involved in Alabama Gravel's mining operations and construction of the Deatsville Operation (King, Estock, Speaks, Ostervold, Gentry and Hong) or in Lambert's and CCI's servicing TCC customers (Maddox, Willingham, Wymer, Boardwine and Becker).  Lambert's testimony regarding his discussions with them in and around the time of the alleged malfeasance was amorphous at best.

With more particular respect to Simcala employees Dick Wymer and Ed Boardwine and Globe employee Bobby Becker, TCC is entitled to information from them explaining how they came to buy from Alabama Gravel.  Alabama Gravel, before being dismissed, tendered an affidavit from Dick Wymer purporting to address this issue in part.  TCC is also entitled to cross-examination on this affidavit.  Finally, TCC has subpoenaed Simcala and Globe testing documents supporting the quality of its white oversize gravel by comparison to Alabama Gravel's and others'.  TCC would like to question Globe and Simcala about these results.  All this is relevant to Lambert's and CCI's claim that they were not the cause of TCC's damages.[23]

III.    ***Fed. R. Civ. P.* 30(b)(6) Depositions**

*Fed. R. Civ. P.* 30(b)(6) depositions of Southern Steel, Pond River Steel, Pearce Pump, Southern Wire and Caterpillar Lift Truck are warranted to explain what Lambert apparently could not – why he called all of these companies while they were working for or providing equipment or materials to the Deatsville Operation.  This is relevant to liability.  Lambert could

---

[23]     TCC also plans to address document authentication issues in these depositions.

not "recall" much at his deposition.  Pete Long's declaration proves that what Lambert claims

not to "recall" may, in fact, be highly relevant or, at a minimum, discoverable.[24]

## IV.    Requests For Production Of Tax Returns

Lambert's, Mrs. Lambert's and CCI's 2002 through 2005 tax returns are relevant to

Lambert's claim that he has not been compensated.  Lambert and Mrs. Lambert could not

remember much of anything about these returns or if they filed jointly or separately.  TCC would

also like to determine if 1099s or W-2s were issued indicating compensation to Lambert for

activities in violation of his non-compete.

## V.    Complete Response By CCI To TCC's Request For Production

CCI has only produced 97 pages of invoices and its Articles of Incorporation.  CCI has

not produced any invoices for its delivery or provision of sand and gravel after December 25,

2005.  TCC requested these documents, and they should be provided because they are relevant to

damages in that they demonstrate shipments to TCC customers.  The mere fact that they took

place after the expiration of the non-compete does not mean that they are not discoverable.

Damages after the non-compete expired stem from the prior non-compete violations and tortious

activities.

Nor has CCI produced any dispatch records, call logs or weigh slips with respect to its

operations.  All of these documents are relevant to liability to the extent they demonstrate

Lambert's involvement with CCI.  To the extent not covered by section IV above, TCC is also

entitled to CCI's pay records and employee reimbursement slips to further test Lambert's bogus

claim that he was not compensated.

---

[24]     Document authentication issues would be addressed in these depositions as well, and
depending on the depositions of Sam Estock and Bernie Ostervold, depositions may not be necessary of
their companies Southern Wire and Pearce Pump.

**VI.**     <u>**Subpoena To Alabama Gravel**</u>

      TCC should be able to subpoena Alabama Gravel for copies of all checks written and all Form 1099s and W-2s issued in 2005. TCC wishes to determine everyone being paid for work on or reimbursed with respect to the Deatsville Operation and Alabama Gravel's other operations. Payments or reimbursements to Lambert or those dealing with Lambert – like Pete Long – relate to liability. For the same reasons set forth above with respect to CCI, Alabama Gravel's sales invoices up to the present are also relevant to damages.

**CONCLUSION**

      For the foregoing reasons, and based on the entire record herein, TCC respectfully requests that this motion be granted in its entirety.

      Respectfully submitted this the 19th day of September, 2006.

  /s/ G. Lane Knight
G. Lane Knight (ASB-6748-I72K)
One of the Attorneys for Plaintiff The
Concrete Company
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
Email: lknight@balch.com

OF COUNSEL:
Robin G. Laurie (ASB-4217-U64R)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
rlaurie@balch.com

Thomas F. Gristina
William L. Tucker

32

Page, Scrantom, Sprouse, Tucker & Ford, P.C.
1111 Bay Avenue, Third Floor, Synovus Centre
Columbus, Georgia  31901

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 19th day of September, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Dennis R. Bailey, Esquire
Rushton, Stakely, Johnston & Garrett
P. O. Box 270
Montgomery, Alabama 36101-0270

James N. Walter, Jr., Esquire
Capell & Howard, P.C.
P. O. Box 2069
Montgomery, Alabama 36102-2069

Chad W. Bryan, Esquire
Capell & Howard, P.C.
P. O. Box 2069
Montgomery, Alabama 36102-2069

/s/ G. Lane Knight
G. Lane Knight (ASB-6748-I72K)
One of the Attorneys for Plaintiff The
Concrete Company
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
Email: lknight@balch.com