IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE CONCRETE COMPANY, | \| |
|    PLAINTIFF, | \| |
| vs. | \|    CASE NO. 2:05-CV-1026-ID-CSC |
| HARRY E. LAMBERT, CAROL'S CONTRACTING, INC., and ALABAMA GRAVEL, LLC, | \| |
|    DEFENDANTS. | \| |

EXHIBIT A

### AFFIDAVIT

STATE OF ALABAMA     |
COUNTY OF MONTOMERY     |

HARRY LAMBERT, being duly sworn, deposed and says:

1.    My name is Harry Lambert. I am over the age of 19 years and make this affidavit in support of a joint motion for summary judgment for myself and my wife's company: Carol's Contracting, Inc.

2.    Prior to ever having any dealings with Frank Foley I had essentially been in the business of mining rock, sand and gravel my entire work life as my father had before me. I started in the business as a laborer and eventually became a

supervisor and then an owner of my own company. Finding and mining aggregates like sand and gravel is really the only work I am really good at. As such, before I met Foley I already knew where the most likely places there would be deposits of sand and gravel and the owners of those properties. I knew all of the companies in this area which sold sand and gravel. I knew all of the companies which bought large quantities of sand and gravel—like Simcala and Globe for example.

3. Over the years I have met a lot of good people in the business. For example, I have known men like Jim Maddox, Sam Estock, Alan King, Bernie Ostervold, Dave Tuten, Rex Dasinger, Neal Labovitz and Mike Gentry for years and before I first met Frank Foley of The Concrete Company ("TCC"). The sand and gravel business is a rather close-knit group in Montgomery.

4. One of the worst mistakes I ever made in the business was to allow my business to partner with Frank Foley and TCC in 1997 when I was about 54-years-old. At that time I had my own business mining sand and gravel in Montgomery known as MMC Holdings, Inc. operating out of the City Pit. For an investment of $300,000, Frank Foley and TCC acquired a 50% interest in the business. Unfortunately for me, they also insisted on a buy-sell and non-compete agreement which at the time I did not consider important.

5.     I began managing the day to day operations of the new company, Montgomery Materials Company, LLC ("Montgomery Materials") from its beginning. That company operated as a sand and gravel mining operation.

6.     Montgomery Materials never functioned as a trucking company or as a common carrier. The reason is that companies in the sand and gravel business do not want to have to manage an over the road trucking operation. So every company I am aware of in the sand and gravel business does not usually even haul its product off the property. Almost all sales are F.O.B. the plant. Customers either come to the pit where the sand and gravel is loaded on their vehicles by our front end loaders or they arrange for a commercial trucking company to do so at their own expense. Occasionally, a customer would ask Montgomery Materials to arrange to haul the materials and include the price of hauling as a delivered price. In those instances Montgomery Materials would hire a commercial trucking company at a per ton rate and include that cost in the amount charged for the material when we billed the customer. As manager of Montgomery Materials from 1997 until 2002 when MMC Holdings was bought-out and I was fired by Frank Foley, I can state that Montgomery Materials was never in the trucking business as a common carrier. I can also say that persons in the sand and gravel business in the Montgomery area view trucking companies as being in different businesses from them. The equipment the company owned stayed on the site because we

trucks or commercial trucks on site with our loaders. The trucks Montgomery Materials owned were only utilized to move sand and gravel around at the Pits so that it would be in a central location for loading on commercial carriers or customer trucks.

7. My role with Montgomery Materials was to manage where it mined at the City Pit, Anderson Pit and the amount of material mined and stored. I also arranged some sales.

8. I hired my wife, Carol, to serve as bookkeeper of Montgomery Materials because she was already serving as the bookkeeper for MMC Holdings at the same location when Montgomery Materials was formed. She would invoice our customers.

9. Simcala, Inc. and Maddox Stone & Gravel were never customers of Montgomery Materials prior to my being fired in April 2002. In fact, Maddox Stone had not even gone into business at that time to my knowledge.

10. It did not take long after Montgomery Materials was formed for Foley to create the situation that lead to him taking the company away from MMC Holdings. He told me on several occasions that I was incompetent to manage the company and he refused to allow me to take action that I thought would increase the value of the company. In hindsight, I can see how he planned to trigger the buy-sell at the precise time Montgomery Materials would have the lowest value on

paper but the highest value in reality. When TCC triggered the buy-sell it offered MMC Holdings $2 million if a particular lease I had negotiated with Foley's approval remained with Montgomery Materials when he knew that Anderson Farms—the lessor—had stipulated that they would only allow mining on their property if I was supervising them. TCC offered only $500,000 if the lease was cancelled. Since Foley never intended for me to work for him after the buy-sell, I viewed this as an attempt by Foley to get MCC Holdings to pay TCC $2 million for its interest whereas TCC would only have to pay MCC Holdings $500,000 for its interest. With legal advice, MMC Holdings offered TCC $500,000 for its interest as I felt that one half of Montgomery Materials was worth more than $500,000 with or without the Anderson Farms lease. I was shocked when the courts declared that the offer was null and void and that MMC Holdings was deemed to have accepted TCC's $500,000 offer.

11.   I was not aware at the time that while a lawsuit was pending over that buy-sell Foley and/or TCC made a $100,000 plus loan to a competitor of Montgomery Materials named Michael Phillips. I knew that Phillips was in the sand and gravel business in the Montgomery area and the 1997 Agreement forming Montgomery Materials forbid both I and Foley and TCC from competing with Montgomery Materials in this area.

12. I worked at Montgomery Materials as manager during our appeal. My salary was $120,000 per year. At some point TCC tried to have me removed as manager claiming I was incompetent to run the business. Actually, the profits of Montgomery Materials increased during that period but I received no bonuses or portion of that profit.

13. When the closing took place in April 2002 MMC Holdings received a little over $300,000 for its share due to "adjustments". Since the "effective date" of the sale was January 1, 2001, MMC Holdings received no credit for the increase in value of the company while I managed it for the fifteen months from that date to April 2002. MMC Holdings received less than the true value of ½ of Montgomery Materials and I received nothing in exchange for the non-compete agreement applicable to me.

14. Of course, after TCC bought MMC Holdings out the Anderson Lease was cancelled as expected. However, TCC sold the Montgomery Material's plant and inventories Montgomery Materials had amassed on that property back to Anderson Farms for a sum of $1.2 million within six months of my being forced out. MMC Holdings received nothing from that sale of assets.

15. In any event, Carol and I were advised we were out of jobs the day of the closing and I had been reminded of the non-compete provision. At the time, I was not aware that Foley and TCC had already violated it by making loans to a

competitor of Montgomery Materials in Montgomery. But I understood that I had to stay out of the sand and gravel business in the Montgomery area. I understood that to mean not to do what I had done for Montgomery Materials including not trying to solicit any of Montgomery Materials customers for a competitor. I figured that since the effective date of the sale was January 1, 2001, I would be "in jail" until January 2, 2006 and I was devastated at the thought of having to stay out of the only business I really knew how to earn a living in until then. We had just lost our livelihood and health benefits.

16.    Carol and I had been married 35 years at the time and I was almost 59-years-old. Carol owned our home in Deatsville, AL. and we did not want to leave it after living there 4 years. We decided to stay. Carol had the idea of going into the trucking business and hauling freight. So shortly after we were fired from Montgomery Materials she formed Carol's Contracting which bought some trucks and trailers and got a hauling certificate from the PSC shortly after we were fired from Montgomery Materials. Neither Carol nor I had any thought of competing with Montgomery Materials since Montgomery Materials never operated over the road trucks. We viewed the trucking business as being totally separate from the sand and gravel business operated by Montgomery Materials.

17. Carol leased her trucks and trailers to Foshee Trucking which did all the dispatching. Her trucks hauled all types of goods in the trucks including coal, alloy, bean meal, corn, fertilizer and hazardous-materials.

18. After I got my CDL, it made sense for me to help out by driving a truck if her regular driver was out. I remember how embarrassed I was to be seen driving a truck in June 2002 to pick up a load at Montgomery Materials—now operated by TCC—by some of my Montgomery Materials employees. The job had been dispatched by Foshee Trucking. I was picking up a load for a customer of Foshee Trucking who wanted sand or gravel they had purchased from TCC. Several of the TCC employees who I had formerly supervised saw me as I made no attempt to hide that I was now driving a truck and I had no idea anyone would contend that was somehow wrong. No one at TCC ever said anything to me about it.

19. I contracted bladder cancer in 2002 and had to stop driving for Carol's Contracting for a time.

20. While I was "in jail" I was prohibited from conducting any sand and gravel business within 60 miles of Montgomery. However, on two occasions I served as a consultant for companies having business clearly outside that territory. Once I was hired by a law firm in Birmingham to assess the value of a deposit of gravel that was being condemned.

21.     The other time I consulted with anyone was in late December 2004 or early January 2005 when I was contacted by Robert Alexander of Georgia to look at a plant in Gadsden, Alabama that Alexander was considering purchasing. The plant was old and would have needed a lot of work to become productive.

22.     As part of my consulting for Alexander in north Alabama I recommended several persons I already knew who I thought could provide the materials and services he would need to get the plant up and running if Alexander purchased it. For example, I recommended Sam Estock, Alan King and others whom I had known for years. I also introduced Alexander to Mike Gentry, who was in the ready-mix business in Prattville; because I knew Gentry had some used equipment that Alexander could use at the Gadsden plant.

23.     As it turns out, Alexander never bought the Gadsden plant.

24.     Sometime in January 2005, Richard Wymer with Simcala called me and set up a meeting. I met with Richard and Ed Bordwine at Simcala's office as they requested. They asked me if I knew where they could get a steady supply of white oversize gravel for their smelting operation in Mt. Meigs. I informed them I was under a non-compete and would be "in jail" until January 2, 2006 and that I could not help them but I may know someone who was looking to start an operation. I advised Robert Alexander of this and he took it from there. He formed Alabama

Gravel with Dave Tuten and Rex Dasinger to mine white oversize from some of Mike Gentry's property in Independence, Alabama.

25. I have never been an officer, member, owner or employee of Alabama Gravel. Prior to a consulting agreement in April 2006, I received no compensation of any kind from Alabama Gravel. In fact, other than the two consulting jobs mentioned above, I received no compensation from anyone for any work during the non-compete term.

26. Between April 2002 and January 2, 2006 I did not engage in the sand and gravel business or in any business similar to the business of Montgomery Materials in the Montgomery area or within 60 miles of Montgomery.

27. During that time I did not solicit any old customers of Montgomery Materials. In fact, during that time I did not solicit any customers of TCC for myself or for anyone else.

28. During that time I did not act as a broker or agent for Alabama Gravel or any other company.

29. Knowing Foley as I do, I am convinced that he is pursuing this case to try to slow my re-entry into the sand and gravel business by draining my assets in attorney's fees and holding this lawsuit over the head of those who are considering doing business with me now that I am free to go back into the sand and gravel business. The existence of this suit and the fact that it is well-know in this area

that Foley sued Alabama Gravel and cost them thousands of dollars in attorney's fees and even has sued my wife's trucking company for letting me drive a truck, has definitely had an adverse impact on my ability to get back into business with people who are also afraid of being falsely sued by Foley.

_____
HARRY LAMBERT

SWORN TO and subscribed before me this 24th day of October, 2006.

(Seal)

_____
Notary Public
My Commission Expires: 10/29/06