# DEPOSITION OF HARRY E. LAMBERT

## August 29, 2006

## Pages 1 through 264

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

```
 1

 2
               IN THE UNITED STATES DISTRICT COURT
 3
              FOR THE MIDDLE DISTRICT OF ALABAMA
 4
                     NORTHERN DIVISION
 5

 6
THE CONCRETE COMPANY,
 7
        Plaintiff,
 8
Vs.                                CIVIL ACTION NO.
 9                                  2:05-cv-1026-C
HARRY E. LAMBERT,
10 CAROL'S CONTRACTING, INC.,
   and ALABAMA GRAVEL, LLC,
11
        Defendants.
12
13          * * * * * * * * * * *
14
            DEPOSITION OF HARRY E. LAMBERT, taken
15
pursuant to stipulation and agreement before
16
Patricia G. Starkie, Registered Diplomate Reporter,
17
CRR, and Commissioner for the State of Alabama at
18
Large, in the Law Offices of Rushton, Stakely,
19
Johnston & Garrett, 184 Commerce Street,
20
Montgomery, Alabama, on August 29, 2006, commencing
21
at approximately 9:25 a.m.
22
            * * * * * * * * * * * *
23
```

Case 2:05-cv-01026-CSC    Document 86-3    Filed 10/24/2006    Page 3 of 68

Deposition of Harry E. Lambert                The Concrete Company vs. Lambert                August 29, 2006

---

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Thomas F. Gristina
PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, P.C.
Attorneys at Law
Synovus Centre
1111 Bay Avenue
Third Floor
Columbus, Georgia 31901
Mr. Robin G. Laurie
Mr. G. Lane Knight
BALCH & BINGHAM
Attorneys at Law
Suite 200
105 Tallapoosa Street
Montgomery, Alabama
FOR THE DEFENDANT:
Mr. Dennis R. Bailey
RUSHTON, STAKELY, JOHNSTON & GARRETT
Attorneys at Law
184 Commerce Street
Montgomery, Alabama

ALSO PRESENT:  Ms. Carol Lambert
               Mr. Hugh Sorrell

* * * * * * * * * * * * *

EXAMINATION INDEX

HARRY E. LAMBERT

BY MR. GRISTINA . . . . . . . . .  5

BY MR. BAILEY . . . . . . . . .  262

---

Page 3

EXHIBIT INDEX
PLAINTIFF'S EXHIBITS
23  Amended Counterclaim           182
24  Verizon phone records            6
25  List of phone numbers            7
26  Agreement                       53
27  Defendant Harry Lambert's
    Responses to First Interrogatories      183

28  Harry Lambert's Responses to
    First Request for Production     192
29  Harry Lambert's Initial Disclosures   192

* * * * * * * * * * * * *

STIPULATION

It is hereby stipulated and agreed by and

between counsel representing the parties that the

deposition of:

HARRY E. LAMBERT

is taken pursuant to the Federal Rules of Civil

Procedure and that said deposition may be taken

before Patricia G. Starkie, Registered Diplomate

Reporter, CRR, and Commissioner for the State of

Alabama at Large, without the formality of a

---

Page 4

1    That objections to questions other than
2  objections as to the form of the question need not
3  be made at this time but may be reserved for a
4  ruling at such time as the said deposition may be
5  offered in evidence or used for any other purpose
6  by either party provided for by the Statute.
7    It is further stipulated and agreed by and
8  between counsel representing the parties in this
9  case that the filing of said deposition is hereby
10 waived and may be introduced at the trial of this
11 case or used in any other manner by either party
12 hereto provided for by the Statute regardless of
13 the waiving of the filing of the same.
14    It is further stipulated and agreed by and
15 between the parties hereto and the witness that the
16 signature of the witness to this deposition is
17 hereby waived.
18         * * * * * * * * * * * * *

---

Page 5

1          HARRY E. LAMBERT
2    The witness, after having first been duly
3  sworn to speak the truth, the whole truth and
4  nothing but the truth testified as follows:
5              EXAMINATION
6  BY MR. GRISTINA:
7  Q.  Good morning, Mr. Lambert.
8  A.  Good morning.
9  Q.  You know my name.  I'm Thomas Gristina.  I
10    represent The Concrete Company in this
11    litigation.  We're here for your
12    deposition.
13       If you could, state your full name for
14    the record, please.
15 A.  Harry E. Lambert.
16 Q.  Mr. Lambert, you've been deposed before as
17    I understand it?
18 A.  Yes, sir.
19 Q.  And so you've also heard sort of the rules
20    and guidelines that people have been
21    through in each of the depositions so far,
22    so unless you need me to, I won't go
23    through those again.  Does that sound all

Page 6

1  right?
2  A.  Yeah, that'll be fine.
3  Q.  So if you don't understand the question,
4      ask me to rephrase it and I'll try to do
5      so.  But if you do answer it, I'll assume
6      you understood it and are answering it to
7      the best of your knowledge and truthfully
8      as you sit here today.
9  A.  Yes.
10         MR. GRISTINA:  I would like to
11         have this marked as
12         Plaintiff's 24.
13         (Plaintiff's Exhibit 24 was marked
14         for identification.)
15         MR. GRISTINA:  For the record,
16         this is a copy of the
17         documents received from
18         Verizon via the subpoena that
19         we served on them.  They're
20         Bates stamped TCC0002518
21         through TCC0002822.
22  Q.  Mr. Lambert, you were present during your
23      wife's deposition last week, and I'm going

Page 7

1  to do a similar exercise to what I did
2      then.  I want to present you with a
3      document that we can mark as Plaintiff's
4      25.
5         (Plaintiff's Exhibit 25 was marked
6         for identification.)
7  Q.  It's a list of numbers that came off --
8      that I took off the phone records that we
9      received via a subpoena and that I would
10     like to see if you can help me identify.
11     If you could, take your time and look at
12     each of these numbers.  And I guess if you
13     prefer, you can write who their names are,
14     or you can tell me and I'll write it on my
15     copy.  But beginning at the first one...
16  A.  This number right here is my brother's
17     number.
18  Q.  On the second page, (606) 549-6254?
19  A.  528-6580.
20  Q.  And what's your brother's first name?
21  A.  It's Clay.
22  Q.  Clay Lambert?
23  A.  Yeah.

Page 8

1  Q.  Okay.
2  A.  This number is a fax number for the house.
3  Q.  That's (334) 290-0440?
4  A.  Right.
5  Q.  All right.
6  A.  That's all I recognize.
7  Q.  All right.  Mr. Lambert, if you could look
8      on the first page there, you'll see the
9      number (334) 202-3983.  Do you see that
10     number?
11  A.  This one?
12  Q.  Yes, sir.  Do you have trouble seeing
13     things that small from a distance?
14  A.  No.
15  Q.  Do you need bifocals or anything?
16  A.  I've got on glasses.
17  Q.  So you're able to read those numbers today?
18  A.  Right.  Right.
19  Q.  The records that have been marked as
20     Plaintiff's Exhibit 24 show that you called
21     that number 326 times between -- on or
22     before December 31st, 2005, and that number
23     called your cell phone number 184 times.

Page 9

1  Does that jog your recollection as to who
2      that number is?
3  A.  No.  I'm not -- I'm not good with numbers.
4      They just don't stay up here.  I just don't
5      remember numbers.
6  Q.  When you say "stay up here," you were
7      pointing to your head?
8  A.  That's right.
9  Q.  Do you carry a cell phone?
10  A.  Yes, I do.
11  Q.  And in fact, the cell phone that you carry
12     has the number that we subpoenaed; is that
13     correct?  It's (334) 202-7177.  Is that
14     your cell phone number?
15  A.  Yeah, I believe it is.
16  Q.  All right.  And does that cell phone have
17     numbers programmed into it with names
18     identified with what --
19  A.  It's got some, yes.
20  Q.  So you're able to speed dial off that?
21  A.  I speed dial off of it some, yes.
22         MR. GRISTINA:  I'm going to ask
23         for the records and -- that

Page 10

1        you use that cell phone to the
2        extent you can to identify
3        these numbers. And we can do
4        a supplemental discovery
5        request if you need it, but
6        we'll put that on the record
7        now. And as well --
8    Q.  Let me ask you this. Would you have any
9        objection to me calling any of these people
10       on this list and asking them who they are?
11   A.  No.
12   Q.  So you have no problem with me doing that?
13   A.  No.
14   Q.  And, again, other than the two numbers that
15       you've identified, you don't recognize any
16       of these other numbers on this list?
17   A.  No.
18   Q.  Okay. Mr. Lambert, could you give us your
19       address, please.
20   A.  541 Gunnells Road, Deatsville.
21   Q.  And you reside there with whom?
22   A.  With my wife.
23   Q.  And who owns that property?

Page 11

1    A.  My wife.
2    Q.  It's deeded solely in your wife's name?
3    A.  Yes.
4    Q.  The entire property?
5    A.  Yes.
6    Q.  Does it consist of one lot and one deed, or
7        are there multiple lots?
8    A.  I don't know.
9    Q.  And on that property there's a home, and
10       there's also, I understand, an office; is
11       that correct?
12   A.  Yes, that is correct.
13   Q.  Is that office also in your wife's name?
14   A.  Yes.
15   Q.  Other than the house, and focusing
16       exclusively on the office, is there a
17       garage that's part of that office as well?
18   A.  Yes.
19   Q.  What type of garage is that? Is it a truck
20       garage or a car garage?
21   A.  It could be either one. It's a shop,
22       really. I call it a shop.
23   Q.  Does it house Carol's Contracting, Inc.'s

Page 12

1        Trucks?
2    A.  No.
3    Q.  Where is Carol's Contracting, Inc.'s
4        office?
5    A.  It's in Carol's house.
6    Q.  And is that the same house that you reside
7        in?
8    A.  That's right.
9    Q.  Where do the Carol's Contracting, Inc.'s
10       trucks stay when they're not on the road?
11   A.  They stay at various locations.
12   Q.  What locations are those?
13   A.  They'll stay at the driver's house.
14   Q.  And who are the current drivers for --
15       I'm going to refer to Carol's
16       Contracting as CCI. Is that okay?
17   A.  That's fine.
18   Q.  Who are the current drivers for CCI?
19   A.  Grady Parker is one. And I call him
20       Channel Cat. It's Tony somebody. I don't
21       remember what his last name is.
22   Q.  Any other drivers?
23   A.  Not at this time.

Page 13

1    Q.  Are you currently driving for CCI?
2    A.  Occasionally.
3    Q.  How often do you drive?
4    A.  It depends. Just varies.
5    Q.  In any given month, can you give me a
6        number of runs that you'll take for CCI?
7    A.  I can't -- I don't know.
8    Q.  Is it something that you do every week?
9    A.  Sometimes.
10   Q.  And since -- do you know when Carol's
11       Contracting, Inc. was formed?
12   A.  Not without looking at the documents, no.
13   Q.  Was it formed after you separated from
14       Montgomery Materials, LLC?
15   A.  Without looking at the documents, I don't
16       know.
17   Q.  So you don't recall when CCI was formed?
18   A.  Without looking at the documents, no.
19   Q.  And did you play any part in the formation
20       of that company?
21   A.  No.
22   Q.  Why don't we talk about your background.
23       Where were you born?

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 14

1  A.  I was born in Maryville, Tennessee.
2  Q.  What year was that?
3  A.  October 30th is the month, 1943.
4  Q.  And if you could take me through your
5      educational background.  Did you complete
6      high school?
7  A.  Yes.
8  Q.  And where was that?
9  A.  Various high schools.  We moved around a
10     lot.
11 Q.  Why was that?
12 A.  That's what my dad did.
13 Q.  What did he do for a living?
14 A.  He worked in rock quarries.
15 Q.  And do you recall what high school you got
16     your degree from?
17 A.  Lyons Township High School.
18 Q.  Where is Lines Township?
19 A.  In LaGrange, Illinois.
20 Q.  And what year was that?
21 A.  It was in the early sixties.
22 Q.  And do you have brothers and sisters?
23 A.  Yes, I do.

Page 15

1  Q.  How many siblings do you have?
2  A.  I have one brother and one sister.
3  Q.  Where does your brother live?
4  A.  He lives in Corbin, Kentucky.
5  Q.  And where does your sister live?
6  A.  She lives in Illinois.  I'm not sure of the
7      town.
8  Q.  Do you have frequent contacts with your
9      brother?
10 A.  Yes.
11 Q.  Do you call him frequently?
12 A.  It depends on what you classify as
13     frequently.  I -- you know, I call him
14     every now and again.
15 Q.  Let me go further back into your
16     background.  After high school, did you
17     pursue any further education?
18 A.  No.
19 Q.  What did you do for work after that?
20 A.  I worked in rock quarries.
21 Q.  Where was the first rock quarry that you
22     worked in?
23 A.  I believe it was in -- well, I'm not

Page 16

1      supposed to guess.  I don't recall.
2  Q.  What sort of work did you do in the rock
3      quarries when you started?
4  A.  Worked as a laborer.
5  Q.  All right.  And you said you graduated high
6      school in the early sixties.  Did there
7      come a time when you moved to Georgia?
8  A.  Well, I had lived in Georgia several times
9      during my life, so I don't know when you
10     mean was there a time when I moved to
11     Georgia.  I had lived in Georgia several
12     times.
13 Q.  When did you meet your wife, Mrs. Lambert?
14 A.  I met her in the sixties.
15 Q.  She's from -- I believe she said Abingdon,
16     Virginia?
17 A.  That's right.
18 Q.  Where did you meet her?
19 A.  I met her in Abingdon, Virginia.
20 Q.  What were you doing there?
21 A.  I was working in a rock quarry.
22 Q.  What was your role in that quarry?
23 A.  I was a supervisor.

Page 17

1  Q.  And what were your duties as supervisor in
2      that quarry?
3  A.  Looking after the operations.
4  Q.  And was that an aggregate mining operation?
5  A.  Yes.  It was crushed limestone.
6  Q.  And was that the only form of aggregate
7      that it produced?
8  A.  Yes.
9  Q.  And how long after you met your wife were
10     you married?
11 A.  I don't recall.  I don't know.
12 Q.  When were you married?
13 A.  In the sixties.
14 Q.  Do you know what day you were married on?
15 A.  It was August the 1st.
16 Q.  And do you recall what year?
17 A.  No.
18 Q.  And --
19 A.  That's a date I better not forget is August
20     the 1st.
21 Q.  And so you and your wife were married.
22     Where did you-all live when you were first
23     married?

Page 18

1   A.  Maryville, Tennessee, I believe.
2   Q.  And what did you do there?
3   A.  I worked in a rock quarry.
4   Q.  What was your job there?
5   A.  Supervisor.
6   Q.  What sort of quarry was that in Maryville?
7   A.  It was a limestone quarry.
8   Q.  After that job, what was your next job?
9   A.  It was working in a rock quarry, you know.
10      I don't really remember where I went to
11      from place to place, you know.
12  Q.  Where did you live when you would move
13      between these rock quarries?  Did you live
14      in homes or was it in a trailer or how did
15      you live?
16  A.  We lived in a trailer house.
17  Q.  So it was a house that you would take with
18      you when you moved from quarry to quarry?
19  A.  That's right.
20  Q.  And at some point you and your wife -- or
21      at some point, I understand that you were
22      involved in a drilling operation in
23      Georgia; is that correct?

Page 19

1   A.  That's right.
2   Q.  And when was that?
3   A.  I don't remember the exact date when all
4       that happened.  I don't.
5   Q.  Who owned that company?
6   A.  I did, and I had a partner, Russell
7       Thornton.
8   Q.  Anybody else have an ownership interest in
9       that company?
10  A.  When we first started it, there was another
11      person, and I don't remember what his name
12      is.
13  Q.  And do you know why he left the company at
14      some point?
15  A.  Russell and I bought his interests out.
16  Q.  Do you know what year that was?
17  A.  No.
18  Q.  So you don't recall his name?
19  A.  No.  It -- we called him -- I just remember
20      we called him Doc, and for me to remember
21      his name, I don't remember.
22  Q.  And where was that drilling operation
23      based?

Page 20

1   A.  It was based in -- the address was Orchard
2       Hill, Georgia, and it was based -- the
3       offices was just south of Griffin, Georgia.
4   Q.  And if you could tell me, please, what was
5       the nature of the drilling business?  What
6       is it that company did?
7   A.  We drilled blast holes in rock quarries.
8   Q.  Did you work in one specific rock quarry,
9       or were there a number of different ones?
10  A.  Several different ones.
11  Q.  How did you get experience to know how to
12      drill blast holes in quarries?
13  A.  Working in rock quarries.
14  Q.  So in your past, you had gained some
15      experience working with dynamite and other
16      things necessary to do blast holes?
17  A.  That's right.
18  Q.  And how long did you-all have that company
19      for?
20  A.  I don't remember how long it was.
21  Q.  What was the next business venture that you
22      formed?
23  A.  I don't understand -- you know, I didn't

Page 21

1       exclusively form another business venture,
2       so I really don't understand your question.
3   Q.  I understand.  All right.  So you were
4       involved in a drilling business with
5       Mr. Thornton.  Were you doing anything else
6       for employment during that time?
7   A.  You need to specify the time.  You know,
8       that -- we were in business together for 15
9       years.  Part of it yes and part of it no,
10      so...
11  Q.  All right.  During that 15 years, what else
12      did you do with him?
13  A.  And I'm guessing at 15 years.  You know, I
14      don't want to tie it down to exactly 15
15      years.  I don't know exactly how long, but
16      about 15 years.
17  Q.  During that approximate 15 years, did you
18      do anything else to make money besides the
19      drilling operation?
20  A.  Yes.
21  Q.  What other things did you do?
22  A.  Sand and gravel.
23  Q.  And what part of that 15-year business were

Page 22

1   you involved in the sand and gravel
2   operation?
3   A.  I don't know exactly.
4   Q.  Was this in the seventies or the eighties?
5   A.  This would have been in the late eighties
6       or early nineties.
7   Q.  And so you had the drilling operation and
8       you were also involved to some degree in a
9       sand and gravel business; is that correct?
10  A.  Towards the end of the -- when I was in the
11      drilling business, now.  Not at the first,
12      no, but during part of it, yes.
13  Q.  All right.  So towards the end, then you
14      also got into the sand and gravel
15      business.  Before you did that and you were
16      still in the drilling business, did you do
17      anything else for employment?
18  A.  Not that I can recall, no.
19  Q.  All right.  Who did you form the sand and
20      gravel business with?
21  A.  With Russell Thornton.  He was a partner.
22      My uncle, Ray Lambert, Sr., was a partner;
23      my cousin, Ray Lambert, Jr., was a partner;

Page 23

1   and his sister, Deann somebody, was a
2   partner.  I forget her last name.
3   Q.  All right.  So was that called Lambert Sand
4       and Gravel?
5   A.  That's right.
6   Q.  And Lambert Sand and Gravel, am I correct
7       that the owners were you, Mr. Thornton;
8       your uncle, Ray Lambert; your cousin, Ray
9       Lambert, Jr., and Ray Lambert, Jr.'s
10      sister, Deann?
11  A.  Yeah.
12  Q.  Any other owners in that company?
13  A.  No.
14  Q.  Is Deann -- was it also Deann Lambert?
15      That's Ray's sister, so she's your cousin,
16      too, right?
17  A.  Yeah, but she got married and had another
18      name, and I don't remember what it was.
19      I'm not good at names either.
20  Q.  But she's also your cousin?
21  A.  That's right.
22  Q.  And where did Lambert Sand and Gravel
23      operate out of?

Page 24

1   A.  McDonough, Georgia.
2   Q.  Did it have a pit there?
3   A.  It had -- it mined sand out of a river or
4       dredged sand out of the river close to
5       there.
6   Q.  Do you recall what types of aggregate it
7       dredged out of the river?  You said sand,
8       but I know there are --
9   A.  It was primarily sand.
10  Q.  Who did you-all sell to?
11  A.  I don't recall who all it was.
12  Q.  And were there formal partnerships or
13      incorporation documents related to Lambert
14      Sand and Gravel?
15  A.  Yes, I'm sure there was.
16  Q.  At some point, am I correct that you ended
17      up in litigation with your uncle and
18      cousins?
19  A.  Yes.
20  Q.  And who was it that sued who?
21  A.  They sued me.
22  Q.  Were the plaintiffs in that lawsuit Ray
23      Lambert, Ray Lambert, Jr., and Deann?  All

Page 25

1   three of them sued you?
2   A.  I think they just sued me -- you know, I
3       don't know.  I don't know.
4   Q.  But were you the only defendant?
5   A.  Yes.
6   Q.  Do you know why they sued you?
7   A.  Without going back and looking, it was --
8       it could have been two or three things.  I
9       don't remember.
10  Q.  What were those two or three things that
11      you can --
12  A.  I said I didn't remember.
13  Q.  Was it for usurpation of a corporate
14      opportunity?
15  A.  Was it what?
16  Q.  Was it for taking a corporate opportunity
17      from them?
18  A.  I don't remember exactly what it was.
19  Q.  Do you recall it being linked to what is
20      now referred to as the city pit?
21  A.  No, it was not.
22  Q.  Had nothing to do with the city pit?
23  A.  No.

Page 26

1  Q.  You know Mr. Laurie who is sitting here
2     next to me today?
3  A.  Yes, I do.
4  Q.  You're seen him before?
5  A.  Yes, I have.
6  Q.  And before this current litigation, you've
7     seen him before?
8  A.  Yes.
9  Q.  Do you remember Mr. Laurie taking your
10    deposition?
11 A.  Yes.
12 Q.  You remember it was related to a previous
13    dispute with The Concrete Company?
14 A.  Yes.
15 Q.  And do you remember him talking to you
16    during that deposition about Lambert Sand
17    and Gravel and about the litigation with
18    Lambert Sand and Gravel?
19 A.  I don't remember it, no.
20 Q.  And you testified truthfully during that
21    deposition?
22 A.  I'm sure I did, yes.
23 Q.  So as you sit here today, you can't recall

Page 27

1     anything about the litigation between you
2     and your uncles and your cousin?
3           MR. BAILEY:  Object to the form.
4           Go ahead and answer.
5  A.  I don't know -- I can't recall all the
6     details, and I can't recall everything, no,
7     I don't.
8  Q.  What details do you recall?
9  A.  I really don't recall any of the details,
10    you know.
11 Q.  Do you remember when the litigation ended?
12 A.  Do I remember --
13 Q.  When it ended?
14 A.  I don't remember the exact date, no.
15 Q.  Do you know how it ended?
16 A.  Yeah, they wrote me a check.
17 Q.  For how much?
18 A.  I was bound -- I remember that -- that I'm
19    not supposed to speak about that to the end
20    of time.
21 Q.  So do you recall that -- that's the one
22    thing you remember is you're not supposed
23    to speak about how much that check was?

Page 28

1  A.  I ain't supposed to speak about what the
2     settlement was.
3  Q.  Okay.
4  A.  I just got a check.
5  Q.  And you don't remember when that was?
6  A.  The date, no, sir.
7  Q.  Or the year?
8  A.  No, I don't actually remember the year.
9  Q.  And you don't remember being sued in that
10    case for usurpation of a corporate
11    opportunity?
12 A.  I know they sued me.  I know that.  And I
13    know that they wound up paying me.  I know
14    that.  And what they sued me for, no, I
15    don't know.
16 Q.  And at the time you were sued, you were
17    operating the city pit, weren't you?
18 A.  No.
19 Q.  The city pit hadn't been formed yet?
20 A.  No.
21 Q.  Had you obtained a lease for the city pit?
22 A.  I don't recall exactly when I retained that
23    lease.

Page 29

1  Q.  Who did you get the lease from for the city
2     pit?
3  A.  They call him Mister.  It's Mr. Smith.
4  Q.  Mr. Smith?
5  A.  Yes.
6  Q.  And he's the one who owns the land on which
7     the city pit is located?
8  A.  At that time, yes.
9  Q.  Has it since been sold?
10 A.  I don't know.
11 Q.  And were you the one who obtained the
12    initial mining lease for what is now termed
13    the city pit?
14          MR. BAILEY:  Him individually?
15 A.  Yes, sir.
16          MR. GRISTINA:  I'll get to that.
17 Q.  Was it in your name?
18 A.  I don't know.  I don't -- I'd have to look
19    back and see.
20 Q.  Do you have a copy of that lease?
21 A.  No, I don't think so.
22 Q.  Did you have another corporate entity that
23    you had formed to handle that lease?

Page 30

1    A.   I had a corporate entity called Beaver
2         Rock.
3    Q.   And does that entity still exist?
4    A.   No.
5    Q.   Why was Beaver Rock formed?
6    A.   To go in the sand and gravel business.
7    Q.   When did you form Beaver Rock?
8    A.   I don't recall.
9    Q.   Who were the owners of Beaver Rock?
10   A.   I'd have to look back at the documents, and
11        I don't even think I've got the documents.
12        I don't remember how we had it set up.
13   Q.   And was it Beaver Rock that was formed to
14        handle the city pit?
15   A.   No.
16   Q.   What mining operations was Beaver Rock
17        formed to handle?
18   A.   It was in -- I -- well, it was close to
19        Tuskegee.
20   Q.   Was there a single pit there?
21   A.   Yes.
22   Q.   What was that pit called?
23   A.   I don't remember.

Page 31

1    Q.   Does it still exist?
2    A.   The hole in the ground exists, but as an
3         operation, no.
4    Q.   And how far is Tuskegee from Montgomery?
5              MR. BAILEY:  Talking about where
6              the pit was or where the city
7              is?
8              MR. GRISTINA:  That's fair.
9    Q.   How far from the center of Montgomery was
10        that pit?
11   A.   I would have to guess, and I'm not supposed
12        to guess.  I don't know.
13   Q.   Are you pretty familiar with the roads and
14        geography around the Montgomery area?
15   A.   Fairly familiar.
16   Q.   Pretty familiar with the distances from one
17        point to the next?
18   A.   I'm pretty familiar, but, you know, to
19        swear to it, you know, I -- I don't know.
20   Q.   I mean, that's important to know how far it
21        is from one point to another when you're in
22        the sand and gravel business, isn't it?
23   A.   It's real important, but to swear for a

Page 32

1         certain distance on oath when I don't know,
2         I don't know.
3    Q.   And you know how -- you need to know those
4         distances, because that's how you determine
5         what the rates are for when you're hauling
6         sand and gravel, isn't it?
7              MR. BAILEY:  Object to the form.
8              Go ahead and answer it if you
9              can.
10   A.   If you can remember them after a long
11        period of time, yes.  At the time that
12        you're doing it, you'll know it, but you
13        have to remember it to answer it ten or 12
14        years later.
15   Q.   And the distances between where you will
16        haul product is probably the single most
17        factor that you consider in determining a
18        rate for that haul, isn't it?
19             MR. BAILEY:  Object to the form.
20             Go ahead.
21   A.   No.
22   Q.   How do you determine the rate you'll charge
23        to haul aggregate?

Page 33

1    A.   You get ahold of a trucker and you ask him
2         to give you a rate, and that's how you
3         determine what the rate is if you're not in
4         the trucking business.
5    Q.   How do you know if the trucker is giving
6         you a good rate?
7    A.   You have to probably check the rate or --
8         I'm sure there is several different ways to
9         do that.
10   Q.   What are the several ways?
11   A.   Well, one is to get a price from another
12        trucker.  Another is to look at the
13        distance that you were talking about and at
14        that time what the freight rate would
15        probably be, whether it's a rural haul,
16        whether it's a city type haul, whether it's
17        a real traffic heavy haul or -- there's
18        several considerations that you'd have to
19        consider in that rate.
20   Q.   Have you listed those for me, the several
21        that you're speaking of?
22   A.   I would think so.  Probably not all of
23        them.

Page 34

1  Q.  Are there others that you can think of?
2  A.  Not that I can think of, or I'd have said
3      them.
4  Q.  Now, you said you had Beaver Rock, and you
5      had a pit near Tuskegee.  Any other pits
6      that Beaver Rock ever operated?
7  A.  Not that I can recall, no.
8  Q.  And why was Beaver Rock -- was Beaver Rock
9      dissolved?  Did it go out of business?
10 A.  Yes.
11 Q.  Why did it do that?
12 A.  Because we shut down that -- because I shut
13     down that operation.
14 Q.  Why did you shut it down?
15 A.  Because I moved to the city pit.
16 Q.  And why did you decide to move to the city
17     pit?
18 A.  I thought it was a better opportunity.
19 Q.  Do you know if Mr. O.G. Pinkston --
20     Do you know Mr. O.G. Pinkston?
21 A.  Yes, I do.
22 Q.  Do you talk to him from time to time?
23 A.  Yes, I do.

Page 35

1  Q.  About how often would you say you talked to
2      Mr. Pinkston in 2005?
3  A.  Oh, I have no idea.
4  Q.  Would it be a lot?
5  A.  I have no idea.
6  Q.  Are you aware of Mr. Pinkston having a
7      lease at some point back when you were in
8      the sand and gravel -- in the litigation
9      with Lambert Sand and Gravel in Shorter,
10     Alabama?
11         MR. BAILEY:  Object to the form.
12         Answer if you understand it.
13 A.  Repeat that again.
14 Q.  Did Mr. Pinkston have anything to do with
15     the litigation between you and your
16     cousins?
17         MR. BAILEY:  Object to the form.
18         Answer as best you can.
19 A.  What do you mean by involved in the
20     litigation?
21 Q.  Well, did they sue you for taking a lease
22     from O.G. Pinkston in Shorter, Alabama?
23 A.  No.

Page 36

1  Q.  That lease had nothing to do with it?
2  A.  I don't recall ever having a lease from
3      O.G. Pinkston in Shorter, Alabama.  I don't
4      think I ever said I did have one.
5  Q.  Do you know if Mr. Pinkston has land in
6      Shorter, Alabama?
7  A.  I'm sure he does, yes.
8  Q.  Do you know if he has any land that's
9      leased out for sand and gravel?
10 A.  Without looking at it, I wouldn't know.
11 Q.  Do you currently have a lease between you
12     and Mr. Pinkston?
13 A.  Do I have a lease with -- between --
14 Q.  Yes.
15 A.  No.
16 Q.  Does any company that you're affiliated
17     with have a lease with Mr. Pinkston?
18         MR. BAILEY:  Object.  Don't answer
19         anything that's occurred after
20         January 2nd, 2006.
21         MR. GRISTINA:  Hang on a second,
22         Dennis.  What was the court's
23         ruling on that?  Was it that

Page 37

1      he can't answer the questions,
2      or that I can't follow up with
3      the people?
4      MR. BAILEY:  I'm just telling --
5      you've asked the question,
6      I've told him not to answer.
7      You've got a record.  I want
8      you to find out what he's
9      doing right now.
10     MR. GRISTINA:  So you're
11     instructing him not to answer
12     that question on -- the
13     objection of relevance?  I
14     mean, what is it?
15     MR. BAILEY:  He said he didn't
16     have a lease, and now you're
17     asking about any companies
18     affiliated might have a
19     lease?
20     MR. GRISTINA:  Yes.
21     MR. BAILEY:  Answer with regard to
22     anything prior to January 2nd,
23     2006.

Deposition of Harry E. Lambert        The Concrete Company vs. Lambert        August 29, 2006

Page 38

1      MR. GRISTINA: So you're
2          instructing him not to answer
3          questions after that?
4      MR. BAILEY: I told him to answer
5          with regard to anything that
6          existed prior to January 2nd,
7          2006.
8      MR. GRISTINA: Is it your position
9          that that instruction is
10         consistent in any way with the
11         results of the motion to
12         compel hearing that we had?
13     MR. BAILEY: You can keep talking.
14     MR. GRISTINA: I'm just curious
15         because I want to have a good
16         record so when we have to go
17         back to the judge when I've
18         been told again why I can't
19         get discovery in this case.
20     MR. BAILEY: Keep talking. Put
21         anything you want on the
22         record. I've made my
23         objection. He can answer the

Page 39

1          question up to January 2nd,
2          2006.
3      MR. GRISTINA: And you're not
4          going to comment on what that
5          has to do with the court's
6          ruling on the motion to
7          compel?
8      MR. BAILEY: I don't comment on
9          court rulings. Go ahead.
10 A.  You're going to have to answer the
11     question. I'm lost. I mean, ask the
12     question again.
13 Q.  And my question is, so we have a clear
14     record, are you aware -- is any company
15     that you're affiliated with in a lease with
16     O.G. Pinkston?
17 A.  No.
18 Q.  Prior to January 2nd, 2002, have you or any
19     company you've been affiliated with been in
20     a lease with O.G. Pinkston?
21 A.  No.
22     MR. GRISTINA: Did I say 2002?
23     THE COURT REPORTER: Yes.

Page 40

1  Q.  2006. Apologize.
2  A.  Now, wait a minute. Say that again.
3  Q.  Yes. I'll be clear.
4         Prior to January 2nd, 2006, have you or
5      any company that you're affiliated with
6      ever had a lease for sand and gravel
7      operations with O.G. Pinkston?
8  A.  Now, you're talking about before January
9      the 2nd when you say prior?
10 Q.  Yes.
11 A.  That's what that means, right?
12 Q.  Yes.
13 A.  No.
14 Q.  What about before January 2nd, 2006, have
15     you or any company that you're affiliated
16     with had a lease with Nancy Williamson?
17 A.  Prior to January the 6th -- I mean, January
18     2nd, 2006?
19 Q.  Yes.
20 A.  No.
21 Q.  What about after that?
22        THE WITNESS: Should I answer that
23        after --

Page 41

1         MR. BAILEY: Go ahead.
2  A.  Yes.
3  Q.  And who holds that lease?
4  A.  Lambert Materials.
5  Q.  And it's a company that you formed
6      recently, Lambert Materials?
7  A.  No.
8  Q.  When was Lambert Materials formed?
9  A.  I'd have to look back at the documents.
10 Q.  Was it formed before January 2nd, 2006?
11 A.  Before January the 2nd, 2006? No, I don't
12     think so.
13 Q.  And so Lambert Materials has a lease with
14     Nancy Williamson; is that correct?
15 A.  I would have to look at the document to see
16     who it's with. Nancy Williams would be
17     involved in it, but it may be under a
18     different company.
19 Q.  Where is that property located?
20 A.  It's located in Tysonville.
21 Q.  Do you recall if your cousins or uncle
22     bought you out of a lease as a result of
23     the litigation you-all were in?

Page 42

1   A.  I don't recall.  I don't recall that, and
2       I'm not supposed to talk about it if I did.
3   Q.  Does Lambert Sand and Gravel still exist?
4   A.  I don't know.
5   Q.  Is your Uncle Ray and cousin still -- are
6       they still in the sand and gravel business?
7   A.  I wouldn't think Uncle Ray is.  He's in his
8       box.
9   Q.  He's dead?
10  A.  So -- now, his estate may be, yeah.
11  Q.  When did your uncle Ray die?
12  A.  I don't know.
13  Q.  Is his son, Ray Lambert, Jr., still in the
14      sand and gravel business?
15  A.  I don't know.
16  Q.  Do you have frequent contact with them?
17  A.  No.
18  Q.  Obviously, you don't with Ray, Sr., but
19      with Ray, Jr., do you have frequent contact
20      with him?
21  A.  No, I don't.  Not on a regular basis, no.
22  Q.  Prior to January 2nd, 2006, did you ever --
23      did you or any company that you were

Page 43

1       affiliated with ever have a lease with an
2       A.J. McLemore?
3   A.  Prior to January the 2nd, 2006, did a
4       company -- Say that again.
5   Q.  Prior to January 2nd, 2006, did you or any
6       company that you're affiliated with have a
7       lease with A.J. McLemore?
8   A.  Yes.
9   Q.  And what lease was that?
10  A.  I don't know what the lease was called.
11  Q.  What property was it for?
12  A.  It was adjacent to the city pit.
13  Q.  When was that lease signed?
14  A.  I would -- I don't even have a copy of the
15      lease, but -- I'd have to see the lease to
16      see.  I don't know.
17  Q.  And was it in your name?
18  A.  Again, I'd have to look at the lease to
19      see, but I don't think so.
20  Q.  Do you know whose name it might have been
21      in if it wasn't in your name?
22  A.  It was probably in Montgomery Materials,
23      LLC's name.

Page 44

1   Q.  And is there a pit on that property?
2   A.  There's several pits.  There's several
3       holes that sand and gravel's been dug out
4       of on that property.
5   Q.  Were you involved in the mining of sand and
6       gravel prior to January 2nd, 2006 on that
7       property?
8   A.  When I had my involvement with Montgomery
9       Materials is the only time.
10  Q.  So after you separated from Montgomery
11      Materials and up to January 2nd, 2006, did
12      you have any involvement in mining on that
13      property?
14  A.  No.
15  Q.  And are you currently involved in a lease
16      for property owned by A.J. McLemore?
17  A.  Say that again.
18  Q.  Are you currently involved in a lease with
19      property owned by A.J. McLemore?
20  A.  No.
21  Q.  Is any company you're affiliated with
22      involved in that?
23  A.  In a lease?

Page 45

1   Q.  Yes.
2   A.  No.
3   Q.  Now, we've talked about the litigation with
4       your cousin and your uncle, and you were
5       again involved in litigation in 2001, 2002,
6       is that correct, with Mr. Foley?
7   A.  I don't think it was with Mr. Foley.  I
8       believe it was with The Concrete Company,
9       the best of my recollection.
10  Q.  Were you deposed in the litigation between
11      you and your cousins and uncle?
12  A.  That's been a long time ago.  I don't
13      remember.
14  Q.  You were deposed in the litigation with The
15      Concrete Company, were you not?
16  A.  Yes.
17  Q.  And other than today and that deposition,
18      have you ever had your deposition taken
19      before?
20  A.  One other time.
21  Q.  And what was that related to?
22  A.  That was related to a dispute between a gas
23      company and a landowner, and I gave my

Page 46

1    deposition on behalf of the gas company.
2    They was taking over a piece of property,
3    putting a gas line through.
4  Q.  How long ago was that?
5  A.  It's been some time back.  I don't remember
6    exactly.
7  Q.  Was it before the litigation with your
8    cousins and uncle?
9  A.  No, it would have been after, I think.
10  Q.  Was it after the litigation between you and
11    The Concrete Company that we were speaking
12    of a minute ago?
13  A.  Yes, I believe it would have been.
14  Q.  So is it some point between that litigation
15    and the litigation we're in now?
16  A.  Right.
17  Q.  And what were you doing for the gas company
18    that caused you to be involved in that
19    litigation?
20  A.  They called me and wanted to know if I
21    would be a witness as to what the sand and
22    gravel may be worth that they were going
23    across.

Page 47

1  Q.  And where was that located?
2  A.  I'd have to go back and look and see.  It
3    was somewhere north of Montgomery.
4  Q.  Do you know how far north of Montgomery?
5  A.  No, I don't.
6  Q.  Was it more than 60 miles?
7  A.  I don't know.
8  Q.  And were you paid as an expert witness in
9    that case?
10        MR. BAILEY:  Object to the form.
11            If you understand, go ahead
12            and answer it.
13  A.  I don't know what expert really consists
14    of, but I was paid for my time, yes.
15  Q.  And did you have any involvement with the
16    land they were talking about before they
17    called you to be a witness?
18  A.  No.
19  Q.  And what did you do for them in addition to
20    testifying?
21  A.  I looked at some drill samples they had is
22    all.
23  Q.  Did you take some soil samples?

Page 48

1  A.  No.
2  Q.  And do you recall how much you were paid
3    for that?
4  A.  No.
5  Q.  Do you file your own tax returns?
6        MR. BAILEY:  Object to the form.
7            Answer if you understand.
8  A.  I don't file them, no.
9  Q.  You were here when I was deposing
10    Mrs. Lambert last week, were you not?
11  A.  That's right.
12  Q.  And I asked a series of questions about tax
13    returns, and I'll go through them now.  How
14    do you file -- how do you file your taxes?
15  A.  I don't understand that.
16  Q.  Do you use an accountant to handle your
17    taxes?
18  A.  Yes.
19  Q.  And who is that?
20  A.  Richard Stabler with Wilson and Price.
21  Q.  And do you file an individual tax return or
22    do you file jointly with your wife?
23  A.  I don't know.

Page 49

1  Q.  Do you sign a tax return every year?
2  A.  Yeah.
3  Q.  Do you keep copies of that?
4  A.  My wife does.
5  Q.  And so you don't know whether or not it's
6    an individual or joint return?
7  A.  I have no idea.
8  Q.  Did you report individual income between
9    January 2nd, 2006 and the end of the
10    litigation with The Concrete Company that
11    we were speaking of?
12        MR. BAILEY:  Object to the form.
13  A.  Say that again.
14  Q.  You were in litigation with The Concrete
15    Company involving Montgomery Materials,
16    LLC.  Do you recall that?
17  A.  Right.
18  Q.  Do you recall how that ended?
19  A.  That they wound up getting the company.
20  Q.  And there was a closing related to that,
21    was there not?
22  A.  There was.
23  Q.  And after that, you were separated from

Page 50

1     Montgomery Materials, LLC; is that right?
2  A.  That's right.
3  Q.  From that date until January 2nd, 2006, did
4     you report any income for tax purposes?
5  A.  I don't think so.
6  Q.  Did you do anything to earn money during
7     that period?
8  A.  I don't -- I don't think so, no.  I don't
9     remember.
10 Q.  Well, you were paid for being a witness in
11    that case.
12 A.  That would be the only thing, and I don't
13    know if I billed them directly or through
14    an entity or -- I don't remember how that
15    was billed.
16 Q.  What entity could you have billed them
17    through?
18 A.  I wouldn't know.  I'd have to look and see.
19 Q.  Did you form an entity during the time
20    period that we're speaking of?
21 A.  No.
22 Q.  So you have no recollection of how you
23    billed them for that?

Page 51

1  A.  No, I don't.
2  Q.  And you don't recall if you reported any of
3     that income for tax purposes?
4  A.  I don't, no.
5  Q.  Do you recall reporting any other income
6     during that time period for tax purposes?
7  A.  No.
8  Q.  At some point, you and Mr. Foley and The
9     Concrete Company went into business
10    together and formed Montgomery Materials,
11    LLC; is that correct?
12 A.  That's right.
13 Q.  And why did you go into business with
14    Mr. Foley?
15 A.  Lord only knows.
16 Q.  You don't recall?
17 A.  No, not -- not really.
18 Q.  Did you contact him or did he contact you
19    about going into business?
20 A.  I don't know.
21 Q.  What was the benefit -- well, I assume --
22    did you think there would be some benefit
23    to you in going into business with The

Page 52

1     Concrete Company at that time?
2  A.  I'm sure that's what I thought, or I
3     wouldn't have done it.  I don't remember
4     the -- all the reasons for doing it, no.
5  Q.  Did you-all enter into some sort of
6     negotiations with each other before you
7     formed Montgomery Materials, LLC?
8  A.  I'm sure we did, but I don't really recall
9     them.  It's been a long time ago.
10 Q.  Were you represented by counsel in those
11    negotiations?
12 A.  Yes, I was.
13 Q.  What law firm was that?  I don't want to
14    know what you talked to them about, but I'd
15    like to know what firm it was.
16 A.  I don't remember the name of the firm.
17    It's -- Jeff Cohn was the lawyer.
18 Q.  And the business negotiations, did they
19    result in formal written documents with The
20    Concrete Company?
21 A.  Yes, it did.
22 Q.  And you had an attorney who helped you
23    negotiate those documents?

Page 53

1  A.  Yes, I did.
2  Q.  And you signed those documents?
3  A.  Yes, I did.
4  Q.  Did you feel like you had a binding
5     contract with The Concrete Company?
6  A.  What do you mean by binding contract?
7        (Plaintiff's Exhibit 26 was marked
8        for identification.)
9  Q.  Well, let me see here.  Let me ask you to
10    look at Plaintiff's 26.  Tell me if you
11    recognize that.
12       MR. BAILEY:  Can we take a break?
13       MR. GRISTINA:  Sure.
14       (Brief recess.)
15 MR. GRISTINA CONTINUING:
16 A.  What was your question?
17 Q.  Do you recognize that?
18 A.  Yes.
19 Q.  What is that document?
20 A.  It appears to be the agreement that I had
21    with The Concrete Company.
22 Q.  If you would keep it in front of you, I'm
23    going to ask you a series of questions

Page 54

1  about it.
2       It looks like it's also -- the parties
3  to this agreement include Montgomery
4  Materials Company, LLC --
5       It's the first page, the first
6  paragraph.
7       -- The Concrete Company, MMC Holdings,
8  Inc., Frank B. Foley III, and Harry
9  Lambert.
10 A.  Yes.
11 Q.  Are those the parties to the agreement as
12  you understood it?
13         MR. BAILEY:  Object to the form.
14         Agreements speaks for itself.
15         Go ahead.
16 A.  Yeah, that's what I was going to say.
17 Q.  Do you -- are you familiar with the company
18  MMC Holdings, Inc.?
19 A.  Yes.
20 Q.  What company was that?
21 A.  That was a company that was formed that was
22  operating the city pit.
23 Q.  And was that a company that you formed?

Page 55

1  A.  That I formed?
2  Q.  Yes, sir.
3         MR. BAILEY:  Object to the form.
4         Go ahead and answer.
5  A.  I was part of it.
6  Q.  Who were the other owners in that company?
7  A.  Mike Phillips.
8  Q.  Other than you and Mr. Phillips, were there
9  any other owners in MMC Holdings, Inc.?
10 A.  I would have to look at the documents to be
11  sure, but I don't think so.
12 Q.  And it looks like in the first recital,
13  1-A, it says on or about June 4th, 1997,
14  Montgomery, Inc. acquired by merger all
15  assets and liabilities of Beaver Rock,
16  Inc.  Is that consistent with your
17  recollection of how Beaver Rock, Inc. went
18  out of existence?
19         MR. BAILEY:  Where are you reading
20         from?
21         MR. GRISTINA:  1-A.
22         MR. BAILEY:  Okay.
23 A.  I think so, yes.

Page 56

1  Q.  Okay.  Is it fair if I call this a buy/sell
2  agreement?
3         MR. BAILEY:  Object to the form.
4  A.  I don't -- it's fair with me if you want to
5  call it that.
6  Q.  All right.  This agreement that we're
7  talking about here, you had an attorney who
8  negotiated this on your behalf, did you
9  not?
10 A.  Yes.
11 Q.  And you had had a chance to review the
12  terms of this agreement before you signed
13  it, did you not?
14 A.  Yes, I did.
15 Q.  And you agreed to all these terms, did you
16  not?
17 A.  That's right.
18 Q.  Now, this agreement also has the noncompete
19  agreement that we're involved in this
20  litigation about today, does it not?
21 A.  What page is that on?  I'll turn to it and
22  see.
23 Q.  If you could turn to page ten, section

Page 57

1  eight.
2  A.  Yes, it does.
3  Q.  And did you participate in the negotiation
4  of section eight of this agreement?
5         MR. BAILEY:  Object to the form.
6         Answer as best you can.
7  A.  My attorney did.
8  Q.  Did you agree to these terms?
9  A.  I signed it, yes.
10 Q.  Does your signature on this document mean
11  that you agreed to it?
12         MR. BAILEY:  Object to the form.
13 A.  Yes.
14 Q.  And you wouldn't have signed it if you
15  didn't agree to it, right?
16 A.  No.
17 Q.  If you'll look at section 8.4 on page 11.
18  Do you see that?
19 A.  Yeah.
20 Q.  All right.  Now, it reads, if Montgomery,
21  Inc. transfers its entire membership
22  interest in Montgomery, LLC to Concrete or
23  any other party, Lambert agrees that during

Page 58

1    the period he will not, and then sub
2    section one, it says, engage as an employee
3    or otherwise in the Territory in the
4    prohibited activity.
5        Do you see that?
6    A.  Yeah.
7    Q.  And do you know what -- and the Territory
8    is spelled with a capital T.  Do you know
9    what the Territory was defined as?
10   A.  It was 60 miles of Montgomery.
11   Q.  And do you know what the prohibited
12   activity was?
13   A.  That would be going into the business of
14   mining sand and gravel, the way I
15   understand.
16   Q.  So you understood that to mean going into
17   the --
18       Say that again.
19   A.  Going into the business of mining sand and
20   gravel and selling sand and gravel.
21   Q.  So you would include mining and selling
22   gravel as part of the prohibited activity?
23   A.  Yes.

Page 59

1    Q.  Do you consider hauling aggregate to be
2    part of the prohibited activity?
3    A.  No.
4    Q.  Why not?
5    A.  Because it's not in the business that I --
6    the way I see it.
7    Q.  All right.  Let me ask you to look at page
8    ten, section 8.3, subsection 1.  Do you see
9    that?
10   A.  Page ten, 8.3, sub -- yeah.
11   Q.  That's the second to last paragraph on page
12   ten.
13   A.  Uh-huh (positive response).
14   Q.  And it says, engage in the territory in the
15   business of excavating, mining,
16   distributing, delivering, selling, or
17   otherwise disposing of any product at
18   wholesale or retail.  Such business is
19   herein referred to as the prohibited
20   activity.
21       Do you see that?
22   A.  Yes, I see that.
23   Q.  And is it your contention that hauling

Page 60

1    aggregate is not included in that activity?
2    A.  That's right.
3    Q.  Is hauling aggregate different than
4    distributing aggregate?
5    A.  Yes, it is.
6    Q.  What's the difference?
7    A.  In my opinion, if you're distributing
8    aggregate, you're acting as a broker; that
9    you're selling, actually selling the
10   aggregate.  If you're hauling the aggregate
11   or -- as it said, if you're hauling the
12   aggregate, you're hauling it.  You're
13   hauling it for someone.  You're not in the
14   business of distributing the aggregate or
15   the sand and gravel, you're hauling it for
16   someone.
17   Q.  Do you believe that brokering aggregate
18   would be included in the prohibited
19   activity?
20   A.  Well, it don't say it, I don't think, does
21   it?  But I guess it would be what it says.
22   Q.  So is that yes or no?  I mean --
23   A.  I said, it don't say that it is, so I

Page 61

1    don't -- I don't -- I don't know.
2    Q.  You stated that you thought that
3    distributing was akin to selling.  Do you
4    see that selling is listed separately as
5    part of the prohibited activity?
6    A.  Yes, I see that.
7    Q.  All right.  What about delivering?  How is
8    that different than hauling?
9    A.  Hauling is hauling aggregate.  That's the
10   way -- that's the way I conceive it, you
11   know.  And delivering, I don't know how
12   delivering it different.  I don't know.
13   Q.  Is delivering aggregate different than
14   hauling aggregate?
15   A.  In my opinion, yes.
16   Q.  All right.  And what's the difference?
17   A.  Hauling it is hauling it and delivering is
18   delivering it.
19   Q.  And those are different things?
20   A.  In my opinion.
21   Q.  Gravel is moved from one place to another.
22   If it's taken from a pit --
23   A.  Are you trying to put words in my mouth?

Deposition of Harry E. Lambert                The Concrete Company vs. Lambert                August 29, 2006

Page 62

1  Q.  I'm trying to ask you questions.
2  A.  I answered your question.
3  Q.  And I'm going to follow up on it, sir.
4  A.  Okay.
5  Q.  When you take aggregate from a pit and it
6      goes from the pit to the customer who has
7      purchased it, and you move it there in a
8      truck, what is that?
9          MR. BAILEY:  Go ahead and answer
10             that as best you can.
11 A.  Ask that again.
12 Q.  Is that hauling aggregate when you take it
13     from the pit where it's been purchased from
14     and take it to the customer?
15 A.  If you're being paid by a trucking company
16     to haul that aggregate, and the trucking
17     company is paying the trucker, that's
18     hauling the aggregate.
19 Q.  And so --
20 A.  So a leased truck, you know, if a truck is
21     leased onto a trucking company, a leased
22     truck is hauling aggregate.
23 Q.  All right.  And let me ask you this.  If

Page 63

1      you owned a business that was -- that owned
2      trucks that were leased on with a company
3      like Foshee Trucking, would that be
4      prohibited by this agreement?  You
5      personally.
6  A.  If I personally owned -- I wouldn't think
7      so, no.  I wouldn't think so.
8  Q.  That would not be a violation?
9  A.  In my opinion -- you're asking me to make
10     an opinion on this, and I'm giving you my
11     opinion.  And my opinion is no, it would
12     not be a violation of this agreement.  If I
13     owned trucks that were leased on to Foshee
14     Trucking Company and they were delivering
15     or hauling aggregate, no, that wouldn't be
16     a violation in my opinion.
17 Q.  When you separated from Montgomery
18     Materials, LLC, your wife formed --
19         Well, let me ask you this.  Do you know
20     the circumstances under which CCI was
21     formed?
22 A.  What do you mean, circumstances?
23 Q.  Do you know why that company was formed?

Page 64

1  A.  My wife wanted to generate income is what I
2      would think that it's formed for.
3  Q.  Now, up to that point -- we spoke to your
4      wife on deposition, but up to that point,
5      did your wife have any experience in the
6      trucking business?
7          MR. BAILEY:  Object to the form.
8             Answer as best you can.
9  A.  I think so.  She had been around trucks,
10     yes.
11 Q.  Over-the-road trucks?
12 A.  She didn't have any direct involvement with
13     over-the-road trucks, because she was a
14     bookkeeper for a sand and gravel business
15     that did not have any trucks.
16 Q.  And you are aware, though, that she --
17     Strike that.
18         Were you concerned that your wife was
19     going to form CCI without experience with
20     over-the-road trucks?
21 A.  No.
22 Q.  How was your wife going to find out what
23     kind of trucks to buy or lease?

Page 65

1          MR. BAILEY:  Object to the form.
2             Go ahead.
3  A.  She would check it out.  She's got a lot of
4      good common sense.
5  Q.  Did you participate in the decision to form
6      CCI with her?
7  A.  Did I participate?
8  Q.  Yes, sir.
9  A.  No.
10 Q.  Did you give her any advice on how to form
11     the company?
12 A.  No.
13 Q.  Did you give her any advice on what trucks
14     to buy for the company?
15 A.  Not in a business sense.
16 Q.  What sense did you give her that advice in?
17 A.  In a -- she might ask me at the supper
18     table, you know, if I thought she maybe
19     ought to buy what kind of truck, and it
20     would be the same thing as if she asked me
21     if she wanted to buy a different lawn mower
22     or what.  It was in a husband and wife is
23     any talk that we would have.  But in a

Page 66

1    business sense, no.
2    Q.  Did you have any communications with any
3        truck dealers about trucks CCI was going to
4        purchase?
5    A.  I don't recall at this time, no.
6    Q.  Did you drive trucks for CCI immediately
7        after it was formed?
8            MR. BAILEY:  Object to the form.
9            Immediately is not defined.
10           But go ahead and answer.
11   A.  I drove trucks sometime after it was
12       formed, yes.
13   Q.  And those were trucks that your wife had
14       purchased?
15   A.  Yes.
16   Q.  And is it your testimony that you didn't
17       participate in discussions with the truck
18       dealers about those trucks before they were
19       purchased?
20   A.  Not that I recall.
21   Q.  Is it possible that you participated in
22       those?
23   A.  Anything's possible.

Page 67

1    Q.  So you might have talked to those truck
2        dealers about those trucks?
3    A.  I don't recall.
4    Q.  Do you think that --
5            Well, let me ask you this.  I think you
6        testified earlier that you didn't think
7        that your owning a trucking company such as
8        CCI would be in violation of the
9        noncompete.  Is that what you said earlier?
10   A.  That's what I said, yes.
11   Q.  So if you didn't think it was going to
12       violate the noncompete, then why didn't you
13       help her with the company?
14   A.  Because she chose to do it.  That's what we
15       chose to do.
16   Q.  You say we.  You chose to do it with her?
17           MR. BAILEY:  Object to the form.
18   A.  What?
19   Q.  Did I hear you correctly, you said, that's
20       what we chose to do?
21   A.  Well, we as a husband and wife, yes.  She
22       chose to do it individually.
23   Q.  And yet it's your testimony that you didn't

Page 68

1    communicate with -- or that you can't
2    recall communicating with the truck dealers
3    from where CCI purchased its initial
4    trucks?
5    A.  That's right.
6    Q.  Do you know if the trucks were leased or if
7        they were purchased?
8    A.  I don't know.
9    Q.  Do you know if the trucks were financed?
10   A.  I don't know.
11   Q.  Do you know what kind of trucks they were,
12       the first trucks?
13   A.  I believe -- I don't know.
14   Q.  Were they Mack trucks?
15   A.  They could have been, yes.
16   Q.  And did there come a time when CCI
17       purchased Peterbilt trucks?
18   A.  Yes.  Yes.
19   Q.  And did you have any communications with
20       the Peterbilt dealers?
21   A.  Not that I recall.
22   Q.  During the time period up to January 2nd,
23       2006, were you involved in the maintenance

Page 69

1    issues related to CCI trucks?
2            MR. BAILEY:  Object to the form.
3            Answer as best you can.
4    A.  When you say maintenance issues, that
5        covers a lot of ground.  What are you --
6    Q.  Did you assist CCI in making sure the
7        trucks were up -- were kept up well?
8    A.  I assisted CCI in some of the work that was
9        done on the trucks, yes.
10   Q.  And what was that?  How did you assist
11       them?
12   A.  Helped change tires, put brakes on, such as
13       that.
14   Q.  All right.  Have you done that -- did you
15       do that after CCI began hauling for Alabama
16       Gravel?
17   A.  Yes.
18   Q.  And did you do that when CCI was hauling
19       other aggregate products before it went to
20       haul for Alabama Gravel?
21           MR. BAILEY:  Object to the form.
22           If you understood, go ahead.
23   A.  Yes.

Page 70

1  Q.  And, in fact, have you offered that
2      assistance throughout the life of CCI?
3  A.  Yes.
4  Q.  Have you been paid anything for that?
5  A.  No.
6  Q.  Have you received any payment at all from
7      CCI for your services?
8  A.  Just a roof over -- Not from CCI, no.
9  Q.  Did you get paid by somebody else for your
10     services to CCI?
11 A.  I wasn't paid any money.  I was furnished a
12     roof over my head and food to eat.
13 Q.  And are you aware of your wife drawing a
14     salary from CCI?
15 A.  I'm not aware of that, no.
16 Q.  Did you participate in discussions about
17     how much of a salary she was going to draw
18     from CCI?
19 A.  No.
20 Q.  How did CCI locate its first drivers?
21 A.  I don't know.
22 Q.  Do you know who the first drivers were?
23 A.  I believe that one of them was Grady

Page 71

1      Parker, and the other one was his brother,
2      John Parker.
3  Q.  And do you know how they came to drive for
4      CCI?
5  A.  I don't remember -- I don't know exactly,
6      no.  I can't answer that.
7  Q.  Did you know the Parker brothers before
8      that time?
9  A.  Yes, I did.
10 Q.  How did you know them?
11 A.  They worked for me at Montgomery Materials.
12 Q.  Did you, in fact, solicit them to come work
13     for CCI?
14 A.  No.
15 Q.  You did not offer them a job at CCI?
16 A.  No.
17 Q.  And were you here when we were talking to
18     Mr. Danny Luster on deposition when your
19     lawyer was deposing him?
20 A.  Yes.
21 Q.  And do you recall Mr. Luster saying that
22     they told you that they went to work for
23     you -- they told him that they went to work

Page 72

1      for you?
2  A.  I don't know what Mr. Luster -- all that
3      Mr. Luster said, no.  I don't know that.
4  Q.  You know Danny Luster pretty well, though,
5      don't you?
6  A.  Not real well.
7  Q.  Do you know him to be a good man?
8          MR. BAILEY:  Object to the form.
9  A.  You know, I -- he was an employee.  That's
10     all I can say.
11 Q.  And do you know him to be an honest person?
12 A.  He was an employee.  That's all I can say.
13 Q.  Do you think he's a dishonest person?
14 A.  He was an employee.  That's all I can say.
15 Q.  And you can't comment on his honesty?
16 A.  I don't know his honesty.
17 Q.  Let me ask you to look at section 8.32 --
18     I'm sorry -- 8.42 of the noncompete on page
19     11.  So that it reads smoothly, it says --
20     I'll start in the bottom of section 8.4.
21     Lambert agrees that during the period, he
22     will not, and then picking up with
23     subsection two --

Page 73

1  A.  Wait a minute.  You've lost me already.
2          MR. GRISTINA:  Dennis, do you
3          mind?
4          MR. BAILEY:  Yes.
5  Q.  I'll start right there with the last phrase
6      in section 8.4:  Lambert agrees that
7      during --
8  A.  All right.
9  Q.  See where we are?
10 A.  Yes.
11 Q.  Lambert agrees that during the period he
12     will not, and then picking up with
13     subsection two.  Do you see that?
14 A.  Yes.
15 Q.  In the territory -- it's a (i) -- have any
16     interest in, whether as a shareholder,
17     partner, member or otherwise, (ii), act as
18     an agent, broker, or distributor for or
19     advisor or consultant to, or (iii), in any
20     way assist, whether by solicitation of
21     customers or employees or otherwise, any
22     person, firm, corporation, or business
23     entity which is engaged or which he

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert                    August 29, 2006

Page 74

1   reasonably knows is undertaking to become
2   engaged in the territory in the prohibited
3   activity. Do you see that?
4   A. Yes, I did.
5   Q. And you agreed to that term, did you not?
6   A. Yes, I did.
7   Q. Now, from the date of the closing that
8   followed the litigation between you and The
9   Concrete Company and up to January 2nd,
10  2006, did you abide by the terms of that?
11  A. Yes, I did.
12  Q. All right. Do you --
13      One second.
14      MR. BAILEY: Ten-minute break?
15      MR. GRISTINA: Sure.
16      (Brief recess.)
17  MR. GRISTINA CONTINUING:
18  Q. Mr. Lambert, do you recall if pursuant to
19  the agreement that we've been talking
20  about, the June 10th, 1997 agreement, there
21  was a lockout period contemplated whereby
22  The Concrete Company wouldn't operate out
23  of the Dozer pit until 2001?

Page 75

1   A. I don't recall it. I'd have to be -- I'd
2   have to look at it and see.
3   Q. But do you remember that one of the things
4   that you-all were agreeing on was that The
5   Concrete Company would hold off on mining
6   at Dozer so that you could mine at the city
7   pit?
8   A. I -- you know, I'd have to -- you'd have to
9   point it out to me to see. I don't
10  remember. I don't recall.
11  Q. Do you believe that The Concrete Company
12  lived up to its terms of the buy/sell
13  agreement?
14      MR. BAILEY: Object to the form.
15  A. As far as I know, I guess.
16      Wait a minute. I don't know. I don't
17  know. I'll change that to I don't know.
18  Q. Well, do you believe that The Concrete
19  Company -- this agreement, the June 10th,
20  1997 agreement, that The Concrete Company
21  honored its obligations under it?
22  A. Its obligations?
23  Q. Yes, sir.

Page 76

1   A. Does that mean everything about it?
2   Q. Do you believe The Concrete Company has
3   abided by its obligations under this
4   contract?
5   A. I don't know.
6   Q. Do you have any evidence The Concrete
7   Company has not?
8   A. I don't have any evidence, no.
9   Q. What's your opinion of Frank Foley's
10  reputation in the business community?
11  A. My dad always said if you can't say
12  something good about somebody, don't say
13  nothing at all, so I don't have an
14  opinion.
15  Q. All right. Have you said bad things about
16  Mr. Foley to people in the Montgomery area?
17  A. Not that I recall, because my daddy said
18  that if you can't say something good about
19  somebody, don't say nothing.
20  Q. Was there a time when you were with
21  Montgomery Materials, LLC that you went
22  into a separate business venture in south
23  Alabama?

Page 77

1   A. Yes, I think so.
2   Q. And that was an aggregate business down
3   there?
4   A. It was a sand and gravel business.
5   Q. And before you did that, you discussed it
6   with Mr. Foley, did you not?
7   A. I don't recall.
8   Q. Do you recall The Concrete Company
9   consenting to your going into that
10  business?
11  A. Specifically consenting, I don't recall,
12  but I would assume that they did consent to
13  that.
14  Q. Do you recall Mr. Foley telling you he
15  thought it would be a bad idea for you to
16  do that?
17  A. I don't remember.
18  Q. What was the result of that south Alabama
19  business venture you went into?
20  A. It was sold.
21  Q. And did you lose money on that deal?
22  A. Did I lose money?
23  Q. Yes.

Page 78

1    A.  No.
2    Q.  Did a business that you were affiliated
3         with lose money on that deal?
4    A.  I'd have to go back and look and see.  I
5         don't know.
6    Q.  And you don't recall any discussions with
7         Mr. Foley about that south Alabama
8         business?
9    A.  Not right offhand, no.
10   Q.  You have a commercial driver's license, do
11        you not?
12   A.  Yes, I do.
13   Q.  And you also have health insurance?
14   A.  Yes, I do.
15   Q.  And you were here during your wife's
16        deposition.  Do you know if you've reported
17        any of the insurances that you have as
18        income on your taxes?
19   A.  I -- my CPA does that.  I don't know.
20   Q.  Now, going back to the time period between
21        the closing that we spoke of with The
22        Concrete Company related to Montgomery
23        Materials, LLC, and January 2nd, 2006 --

Page 79

1    A.  Now, are you talking about the closing of
2         the buy/sell?
3    Q.  Yes, sir.  After the litigation was over.
4    A.  Okay.
5    Q.  So I'm speaking about that approximate
6         four-year period.
7    A.  Okay.
8    Q.  You drove trucks from time to time for CCI,
9         did you not?
10   A.  Yes, I did.
11   Q.  And those trucks from time to time
12        contained aggregate product, did they not?
13   A.  They contained a lot of things, yes.
14   Q.  But some loads dealt with aggregate, didn't
15        they?
16   A.  Yes.  You know, aggregate in the industry
17        is considered as limestone or granite.
18        Most of the time you consider sand and
19        gravel as separate commodities.  So, you
20        know, if you'll -- if you want to really
21        get specific, well, you can -- down to
22        that -- but it hauled aggregate as I
23        determine aggregate, yes.

Page 80

1    Q.  Haul sand and gravel?
2    A.  Yes.
3    Q.  Do you consider CCI to be in the sand and
4         gravel business?
5    A.  No.
6    Q.  And why is that?
7    A.  Because they're not.
8    Q.  And you deem the hauling to be separate
9         from the sand and gravel business?
10   A.  Oh, definitely, yes.
11   Q.  Do you know how, if ever, your driving for
12        CCI is accounted for on CCI's records?
13   A.  I have no idea.  I don't know.
14   Q.  Do you think that mining sand and gravel is
15        part of the sand and gravel business?
16   A.  That mining sand and gravel is part of the
17        sand and gravel business?
18   Q.  Yes.
19   A.  Yes.
20   Q.  Do you think that selling sand and gravel
21        is part of the sand and gravel business?
22   A.  Selling sand and gravel part of the sand
23        and gravel business?  Yes.

Page 81

1    Q.  When you began driving trucks for CCI, was
2         Mrs. Lambert aware of the noncompete
3         agreement that you had with The Concrete
4         Company?
5              MR. BAILEY:  Object to the form.
6         Answer as best you can.
7    A.  She knew that I wasn't supposed to go back
8         in the sand and gravel business.  That's
9         basically all she knew.
10   Q.  Had you showed her a copy of the buy/sell
11        agreement?
12   A.  No.
13   Q.  Did you keep a copy of it?
14   A.  I think so.
15   Q.  And where did you keep it?
16   A.  Oh, I don't know.  I don't know.
17   Q.  Do you have an office in your house that
18        you've maintained for your documents?
19   A.  No.
20   Q.  So you don't know if you still have a copy
21        of the buy/sell agreement?
22   A.  I don't know, no.
23   Q.  Were you aware of when CCI began to lease

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 82

1   its trucks on with Foshee Trucking?
2           MR. BAILEY:  Object to the form.
3           Do you mean was he aware that
4           happened or is he aware of the
5           date?  Is that what you're
6           trying to get?
7           MR. GRISTINA:  I'll ask it both
8           ways.
9   Q.  Are you aware that that happened at some
10      point?
11  A.  Yes.
12  Q.  And do you know when that happened?
13  A.  Not the exact date, no.
14  Q.  Was it within a year of the closing that
15      we've been speaking of?
16  A.  Yes.
17  Q.  And do you know how CCI came to enter into
18      that business relationship with Foshee
19      Trucking?
20  A.  No.
21  Q.  Do you know how CCI located Foshee
22      Trucking?
23  A.  No.

Page 83

1   Q.  Had you had dealings with Foshee Trucking
2       before?
3           MR. BAILEY:  Object to the form.
4   A.  Had I?
5   Q.  Yes, sir.
6           MR. BAILEY:  Object to the form.
7           Go ahead and answer.
8   A.  Personally?  Are you talking about me
9       personally or a company I was affiliated --
10      I don't know.  I don't understand.
11  Q.  Well, why don't I ask it both ways?
12  A.  Why don't you?
13  Q.  Had you personally had dealings with them?
14  A.  Have I personally had dealings with Foshee
15      Trucking?
16  Q.  At that time.
17  A.  Business dealings?
18  Q.  Yes, sir.
19  A.  No.  Not business dealings, no.
20  Q.  Had a company that you were affiliated with
21      had any dealings with Foshee Trucking?
22  A.  Yes.
23  Q.  And what company was that?

Page 84

1   A.  Montgomery Materials.
2   Q.  And how did they deal with Foshee Trucking?
3   A.  They hired the trucks to haul some
4       oversized aggregate to the barge.
5   Q.  And were you responsible for arranging that
6       relationship with Foshee Trucking?
7   A.  Partly, yes.
8   Q.  And you knew some people at Foshee Trucking
9       when you were with Montgomery Materials,
10      LLC?
11  A.  Yes.
12  Q.  And is it your testimony that you did not
13      put CCI in touch with Foshee Trucking?
14  A.  Not that I recall, no.
15  Q.  Could it have happened?
16  A.  Anything's possible.
17  Q.  But you just can't recall?
18  A.  I can't recall.
19  Q.  And do you know how CCI negotiated its
20      arrangement with Foshee Trucking?
21  A.  No.
22  Q.  And do you know if they had a good deal
23      with Foshee Trucking?

Page 85

1   A.  They had a standard deal, I would say, I
2       guess.
3   Q.  What were the terms of that deal?
4   A.  I don't know.
5   Q.  You said it was standard.  How do you know
6       it was standard?
7   A.  I said I guess it was standard.  I assume
8       that it was standard.
9   Q.  And did you as a driver have phone calls
10      with Foshee Trucking?
11  A.  Yes, I called dispatch.
12  Q.  And how is it that Foshee would provide CCI
13      with routes to haul aggregate on?
14          MR. BAILEY:  Object to the form.
15          Go ahead and answer.
16  A.  You would call the dispatcher either by
17      SouthernLINC or by telephone, and he would
18      tell you where to go.
19  Q.  Were you here -- you were here during the
20      deposition of Mrs. Lambert when we were
21      speaking about the cell phone numbers that
22      CCI provides to its drivers.
23  A.  Yes.

Page 86

1  Q.  And one of those cell phone numbers was
2     your cell phone number.
3  A.  That's right.
4  Q.  When you drive for CCI, do you have
5     frequent contact with other drivers with
6     CCI?
7         MR. BAILEY:  Object to the form.
8         Answer as best you can.
9  A.  It just depends.
10  Q.  Would you have a reason -- would you
11     personally have a reason to call the other
12     CCI drivers?
13  A.  Other than to chitchat, you know, that's
14     the main reason.
15  Q.  And specifically from July 2005 to January
16     2nd, 2006, would you have any reason to
17     call the other drivers with CCI?
18         MR. BAILEY:  Object to the form.
19         Go ahead and answer.
20  A.  I'm sure I would have, yes.
21  Q.  About how often would you talk to them?
22  A.  I have no idea.
23  Q.  Every day?

Page 87

1  A.  I don't know.
2  Q.  Was it related to the business of CCI?
3  A.  I don't know.
4  Q.  You can't recall any of the conversations
5     you had with other drivers?
6  A.  Not any specific conversations, no.
7  Q.  Do you know where the first CCI trucks were
8     bought?
9  A.  Not that I recall, no.
10  Q.  Do you know where they were serviced?
11         MR. BAILEY:  Object to the form.
12         Go ahead and answer.
13  A.  Are you saying the first ones?
14  Q.  Yes, sir.
15  A.  I don't remember, no.
16  Q.  And were the first trucks Mack trucks?
17  A.  I don't recall, you know, how -- what the
18     order that they were.
19  Q.  Were they later Peterbilt trucks?
20  A.  Some of them were, yes.
21  Q.  Can you recall any conversations that you
22     had with the Peterbilt truck dealer between
23     July 2005 and January 2nd, 2006?

Page 88

1         MR. BAILEY:  Object to the form.
2         Go ahead and answer.
3  A.  I don't recall any specific conversations,
4     no.
5  Q.  Would you have any reason to call the
6     Peterbilt dealer during that time period?
7  A.  I could have.  I don't know.
8  Q.  And what would the reason be?
9  A.  I don't -- I just got through saying I
10     don't know.
11  Q.  Do you know anybody personally at the
12     Peterbilt dealership?
13  A.  Personally, I know the service manager.
14     His name is Jerry.  And you're talking
15     about the Peterbilt dealership in
16     Montgomery?
17  Q.  Yes, sir.
18  A.  I know the service man.  His name is Jerry.
19  Q.  And were you responsible for making sure
20     that the CCI trucks were properly
21     maintained by the Peterbilt dealership?
22  A.  I don't think I was absolutely responsible,
23     but I helped look after that, yes.

Page 89

1  Q.  From the time period that CCI began to deal
2     with Alabama Gravel, who was in charge of
3     determining what CCI would charge for
4     shipping?
5         MR. BAILEY:  Object to the form.
6  A.  Say that again.
7  Q.  Who at CCI decided what rate you-all would
8     charge for shipping aggregate once you
9     began to deal with Alabama Gravel?
10  A.  Carol.
11  Q.  And what experience did Carol have in
12     determining what a good shipping charge
13     would be?
14  A.  She had good common sense and could figure
15     it out.
16  Q.  Had she had any experience like that before
17     she began to deal with CCI?
18         MR. BAILEY:  Object to the form.
19         Go ahead and answer.
20  A.  She is a very fast learner.  And, no, she
21     didn't, because she had been keeping books
22     of the sand and gravel operation and didn't
23     have any trucks.

Page 90

1  Q.  Did Foshee negotiate the hauling rate with
2      purchasers of aggregate, or was it
3      you-all -- Excuse me.  Was it CCI that
4      negotiated that rate when you were leasing
5      on with Foshee?
6  A.  Say that again.
7  Q.  Well, when CCI was leasing on with Foshee,
8      who determined what the customers would pay
9      for hauling at that time?
10 A.  I don't know.
11 Q.  And do you know if that was a rate that was
12     negotiated between CCI and Foshee or
13     between Foshee and the customers?
14 A.  I don't know.
15 Q.  How were the CCI drivers compensated?
16 A.  I don't know exactly.
17 Q.  Do you know what benefits they received?
18 A.  No.
19 Q.  From January 1, 2005 until the end of the
20     year 2005, do you know who CCI delivered
21     aggregate product to?
22         MR. BAILEY:  Object to the form.
23         Answer as best you can.

Page 91

1  A.  Not everybody, no.
2  Q.  Can you give me the ones you know of?
3  A.  From January the first --
4  Q.  During the year 2005.
5  A.  They delivered for or to?
6  Q.  To.
7  A.  Who they delivered to?
8  Q.  Yes, sir.
9  A.  Well, the only one that I can really think
10     of for sure would be to Simcala, to Globe,
11     to Maddox.  That's the only ones that I can
12     say for sure, but there was several others.
13 Q.  From July 2005 until the end of 2005, do
14     you recall having conversations with Jim
15     Maddox?
16         MR. BAILEY:  Object -- okay.  Go
17         ahead.
18 A.  Do I recall any conversations with Jim
19     Maddox?
20 Q.  Yes.
21 A.  Yes.
22 Q.  And what were the reasons for those
23     conversations?

Page 92

1  A.  It could be a lot of things.
2  Q.  Did Mr. Maddox contact you about arranging
3      the shipment of white oversized material to
4      his operation?
5  A.  Say that again.
6  Q.  Did Mr. Maddox contact you about arranging
7      shipment of white oversized material to
8      him?
9  A.  When you say arrange, what do you mean?
10 Q.  Did he call you looking for white oversized
11     material?
12 A.  Did he call me looking for white oversized
13     material?
14 Q.  Yes.
15 A.  That's -- no.
16 Q.  Did he call you to purchase white oversized
17     material from Alabama Gravel?
18 A.  No.
19 Q.  Did he call CCI to purchase white oversized
20     material?
21 A.  No.
22 Q.  Then what were the conversations between
23     you and Mr. Maddox during that time period?

Page 93

1  A.  Me and Mr. Maddox are close friends.
2      He's -- we've been close friends for
3      years.  It could be many things.  It could
4      be a casual conversation.  It could be
5      talking about fishing.  It could be talking
6      about several things.
7          One of the things that it could be
8      talking about is he had made
9      arrangements -- when he called me and told
10     me he had made arrangements to buy material
11     from Alabama Gravel, and would there be
12     trucks available to load two, three, four
13     or ever how many railroad cars he had.
14     Would there be trucks available to do that
15     since CCI was doing the hauling.  He would
16     either call myself or he would call my
17     wife, and my wife would call me to see what
18     the availability of the trucks were.
19 Q.  Did he call you -- did you put Mr. Maddox
20     in touch with Alabama Gravel for the first
21     time?
22 A.  I don't remember.  I don't remember.
23 Q.  Was he aware of Alabama Gravel at the time

Page 94

1   he first contacted you about getting
2   aggregate shipped?
3       MR. BAILEY: Object to the form.
4       You would have to look in his
5       head, but answer as best you
6       can.
7 A. I don't remember.
8 Q. Was CCI contacted -- Well, let's do a time
9   period on that. During the year 2005, are
10   you aware of CCI being contacted directly
11   by purchasers who were looking to obtain
12   aggregate product?
13 A. Am I aware of it?
14 Q. Yes.
15 A. No.
16 Q. Do you know if Simcala contacted CCI
17   directly about obtaining white oversized?
18 A. Did they contact -- I don't know. I
19   don't -- no, I don't know.
20 Q. I understand that you had done some
21   consulting work for Robert Alexander after
22   the closing and before January 2nd, 2006;
23   is that correct? Did you do some

Page 95

1   consulting work for him during that time
2   period?
3 A. Say the time period again.
4 Q. After the closing that we've been speaking
5   of and up to January 2nd, 2006.
6 A. Yes.
7 Q. And what was the nature of that consulting
8   work?
9 A. He wanted me to help him look at a sand and
10   gravel operation in north Alabama to see
11   if -- it was for sale, and he wanted to see
12   if he wanted to buy it.
13 Q. Where in north Alabama?
14 A. It was up around Gadsden.
15 Q. Did you do any other consulting work for
16   Mr. Alexander during that time period?
17 A. No.
18 Q. Did you do any work with Mr. Alexander
19   related in any way to a sand and gravel
20   business between the closing and January
21   2nd, 2006?
22 A. Not other than what I just told you about,
23   the consulting in north Alabama, no.

Page 96

1 Q. How did you come to meet Dave Tuten?
2 A. I really don't remember.
3 Q. Do you recall when it was?
4 A. No.
5 Q. Do you recall having a relationship with
6   Mr. Tuten when he was a purchaser for
7   Globe?
8 A. At any time?
9 Q. Yes.
10 A. Yes.
11 Q. And do you recall dealings with Mr. Tuten
12   between the closing and January 2nd, 2006?
13       MR. BAILEY: Object to the form,
14       dealings, but go ahead and
15       answer.
16 A. What do you mean, dealings?
17 Q. Let me ask you this. Do you recall hauling
18   or being a driver for the hauling of
19   aggregate product from Elmore Sand and
20   Gravel to Globe between the time frame of
21   the closing and January 2nd, 2006?
22 A. I don't recall any specific instances, but
23   I'm sure I did.

Page 97

1 Q. Do you know Billy Stanley?
2 A. I know of him.
3 Q. Do you know him to be a good man?
4 A. I know of him. That's all.
5 Q. Do you recall -- and this is any time
6   frame. Do you recall ever having an
7   arrangement whereby Elmore Sand and Gravel
8   would have to pay you a dollar for every
9   ton of aggregate shipped to Globe?
10       MR. BAILEY: Object to the form.
11       Go ahead.
12 A. At any time period, paying me a dollar for
13   every ton? I don't remember, no.
14 Q. Do you recall that being a requirement that
15   Mr. Tuten put on Elmore Sand and Gravel,
16   that they pay you personally a dollar for
17   every ton that was shipped from Elmore to
18   Globe?
19 A. I don't remember that, no.
20 Q. Would that --
21 A. I mean, I don't recall that.
22 Q. Is that possible?
23 A. Anything's possible.

Deposition of Harry E. Lambert     The Concrete Company vs. Lambert     August 29, 2006

Page 98

1   Q.  Is that something that's common in the
2      industry?
3   A.  I don't know.
4   Q.  And do you recall that that arrangement
5      existed during the time that your
6      noncompete was in effect?
7   A.  You know, when I say I don't recall, I
8      don't recall.
9   Q.  Did you ever report that dollar per ton as
10     income for income tax purposes?
11  A.  I don't recall getting it, so I don't --
12     definitely don't recall reporting it.
13  Q.  Do you recall visiting Mr. Stanley after
14     Hugh Sorrell's deposition?
15  A.  No.
16  Q.  You don't recall that?
17  A.  Visiting Mr. Stanley?
18  Q.  Yes, sir.
19  A.  No.
20  Q.  You don't recall going to Elmore Sand and
21     Gravel and talking to Mr. Stanley and
22     Mr. Gaddy after Hugh Sorrell's deposition?
23  A.  I remember going by and talking to

Page 99

1      Mr. Gaddy.
2   Q.  What did you say to Mr. Gaddy about --
3   A.  I don't remember.
4   Q.  Do you remember saying something to him
5      about Mr. Sorrell's deposition?
6   A.  I don't remember.
7   Q.  You don't remember the substance of any of
8      that conversation?
9   A.  Not really, no.
10  Q.  Do you know Mr. Gaddy?
11  A.  I know of him.
12  Q.  Do you know him to be a truthful person?
13  A.  I know of him.
14  Q.  Back to Mr. Tuten.  About how often would
15     you say you spoke to Mr. Tuten between July
16     1, 2005 and the end of 2005?
17  A.  I have no idea.
18  Q.  Was it frequently?
19  A.  I don't know.
20  Q.  Could it have been literally dozens and
21     dozens of times during that period?
22  A.  I don't know.
23  Q.  You don't recall having dozens and dozens

Page 100

1      of conversations with Dave Tuten between
2      July 1, 2005 and December 31, 2005?
3   A.  I don't remember.
4   Q.  Do you know what you-all were speaking
5      about during that time?
6   A.  It could have been many things.  Dave has
7      been a personal friend of mine for 15, 20
8      years, and it could have been talking about
9      hunting, fishing, baseball.  It could have
10     been many, many, many things.
11  Q.  And would you call somebody that you had
12     those discussions with on an almost daily
13     basis during that time period?
14  A.  What's that?
15  Q.  Would you call somebody to have those
16     discussions on an almost daily basis during
17     that time period?
18  A.  Would I call someone?
19  Q.  Would you call Dave Tuten daily during that
20     time period?
21  A.  I don't recall.  I don't know.
22  Q.  Were you speaking to Mr. Tuten during that
23     time period about Alabama Gravel's

Page 101

1      operations?
2   A.  I don't recall talking to Dave a whole
3      lot.  Most of the time it was casual
4      conversation.  And to talk about Alabama
5      Gravel, what do you mean talking about
6      Alabama Gravel?
7   Q.  Were you talking to him about Alabama
8      Gravel's operations during that time
9      period?
10         MR. BAILEY:  Object to the form.
11  A.  What do you consider the operations?  Are
12     you talking about if we was hauling any
13     rock or if Carol's Contracting was hauling
14     any rock or what?
15  Q.  Let's take it in part.
16  A.  Okay.
17  Q.  Were you talking to him about Carol's
18     Contracting's assistance to Alabama Gravel
19     during that time period?
20  A.  He may have called me and wanted to know
21     how many loads had been hauled over a
22     specific time.
23  Q.  So Mr. Tuten would call you to find out how

Page 102

1    many loads CCI had delivered for Alabama
2    Gravel?
3    A.  He could have.  Not me specifically, but he
4    could have, yes.
5    Q.  Would you have spoken to him during that
6    time period about the construction of the
7    Deatsville plant?
8    A.  No.
9    Q.  Do you know what I'm talking about when I
10    say the Deatsville plant?
11    A.  Yes.
12    Q.  And is it true that you're now under a
13    consulting agreement related to the
14    construction of the Deatsville plant?
15    A.  Yes.
16    Q.  And can you recall discussions with
17    Mr. Tuten between January 1, 2005 and the
18    end of 2005 related to the construction of
19    the Deatsville plant?
20    A.  Not that I can recall, no.
21    Q.  When did you first meet Mr. Rex Dasinger?
22    A.  I don't know.
23    Q.  How long have you known him for?

Page 103

1    A.  I don't know.
2    Q.  Have you known him for more than five
3    years?
4    A.  I don't know.
5    Q.  What is Mr. Dasinger's experience in the
6    sand and gravel business, if you know?
7    A.  I really don't know what all his experience
8    is.  I don't know.
9    Q.  Did there come a time when he drove trucks
10    for CCI?
11    A.  Yes, there was.
12    Q.  When was that?
13    A.  I don't know exact dates.  I don't know.
14    Q.  Is he currently a driver for CCI?
15    A.  No.
16    Q.  Do you know when he stopped being a driver
17    for CCI?
18    A.  No.  Not exactly, no.
19    Q.  Do you know how he got hired by CCI?
20    A.  Do I know how he got hired?  No.
21    Q.  Do you recall working with Mr. Dasinger
22    during the Ivan hurricane cleanup?
23    MR. BAILEY:  Object to the form.

Page 104

1    Go ahead.
2    A.  What do you mean, working with him?  I -- I
3    remember him being down there with us.  I
4    mean, not with us, but I remember him being
5    down there, yes.
6    Q.  What was CCI doing as part of the Ivan
7    hurricane cleanup?
8    A.  They were hauling debris.
9    Q.  And were you driving trucks at that time?
10    A.  Yes, I was.
11    Q.  Were you being paid for that hauling?
12    A.  No, I wasn't.
13    Q.  And how did you come to have contact with
14    Mr. Dasinger down there?
15    A.  He was working -- he was loading for -- he
16    was loading the trucks.  He was running a
17    log loader type thing, loading the trucks.
18    Q.  Do you know who holds the lease for the
19    land on which the Deatsville site is
20    located?
21    A.  No.
22    Q.  Do you know if it's Mr. Dasinger?
23    A.  I don't know.

Page 105

1    Q.  Do you know how Alabama Gravel determined
2    where to put the mining operation on the
3    Deatsville site?
4    A.  No.
5    Q.  Do you know if Mr. Dasinger participated in
6    that?
7    A.  I don't know.
8    Q.  Do you know how Alabama Gravel got in touch
9    with Mr. Dasinger?
10    A.  I don't remember.
11    Q.  Did you put Alabama Gravel in touch with
12    Rex Dasinger?
13    A.  I said I didn't remember.
14    Q.  Before January 2nd, 2006, did you ever take
15    soil samples at the Deatsville site?
16    A.  No.
17    Q.  Did you ever take a backhoe out there and
18    dig some holes to take soil samples?
19    A.  No.
20    Q.  Do you know if Mr. Dasinger did?
21    A.  I don't know.
22    Q.  Do you know how Alabama Gravel decided to
23    open up a mining operation at the

Page 106

1    Deatsville site?
2    A.  No.  I don't know.
3    Q.  Is it your testimony that you did not
4        participate in that decision?
5    A.  That's right.
6    Q.  Before January 2nd, 2006, had you ever been
7        out to the Deatsville site?
8    A.  Before January the 2nd, 2006?
9    Q.  Yes.
10   A.  Yes.
11   Q.  And under what circumstances was that?
12   A.  I don't remember.
13   Q.  You don't know why you went out there?
14   A.  I went out there three or four times, I'm
15       sure.  I don't remember exactly how many
16       times.  And I don't know why I went out
17       there, no.
18   Q.  Who did you go out there with?
19   A.  Most of the time I just rode out there by
20       myself.
21   Q.  And you don't know why you went out there?
22   A.  Curiosity.
23   Q.  What were you curious about?

Page 107

1    A.  Just being curious.  See what's going on.
2    Q.  And you said most of the time you went out
3        there by yourself.  Did you ever go out
4        there with anybody else?
5    A.  It's possible.
6    Q.  Do you know who was constructing the
7        Deatsville plant?
8        MR. BAILEY:  Prior to January 2nd,
9        2006?
10       MR. GRISTINA:  Yes.
11   A.  I know that Alan King was working out
12       there, yes.
13   Q.  Who hired Alan King?
14   A.  I don't know.
15   Q.  During 2005, did you have opportunity to
16       speak with Alan King?
17   A.  Say that again?
18   Q.  Did you speak with Alan King during the
19       year 2005?
20   A.  Oh, I'm sure I did.
21   Q.  What did you speak with him about?
22   A.  Oh, just -- Alan and I have been friends
23       for many, many years, and we could have

Page 108

1    talked about hunting, fishing, drinking
2    liquor.  We could talk about a lot of
3    things.  I don't know.
4    Q.  How often did you speak with Alan King
5        during 2005?
6    A.  I have no idea.
7    Q.  Did you ever talk to him about his work on
8        the Alabama Gravel site at Deatsville?
9    A.  I'm sure that that was brought up during
10       conversation, just like I would ask him how
11       he was getting along or what have you.  But
12       any specifics on the construction of it,
13       no.
14   Q.  Do you know who --
15       Again, you were here for Danny Luster's
16       deposition, were you not?
17   A.  Yes, I was.
18   Q.  Do you recall when Danny said that Alan
19       King told him he was working for Danny's
20       old boss at the Deatsville site?
21   A.  I don't recall what Danny said.
22   Q.  Did you hire Alan King to build the
23       Deatsville site for Alabama Gravel?

Page 109

1    A.  Did I hire Alan King?
2    Q.  Yes.
3    A.  No.
4    Q.  Did Alabama Gravel hire Alan King with your
5        assistance to build that site?
6    A.  With my assistance?
7    Q.  Yes.
8    A.  No.
9    Q.  Did they ask you about Alan King before he
10       went to build that site?
11   A.  Did Alabama Gravel?
12   Q.  Yes.
13   A.  No.
14   Q.  Did you recommend Alan King to Alabama
15       Gravel for construction of the Deatsville
16       site?
17   A.  For construction of the Deatsville site?
18   Q.  Yes, sir.
19   A.  No.
20   Q.  Did you recommend Alan King for any purpose
21       with respect to the Deatsville site?
22   A.  No.
23   Q.  Do you know who Sam Estock is?

Page 110

1   A.  Yes, I do.
2   Q.  Who is he?
3   A.  He's a good close personal friend of mine.
4   Q.  What business is he in?
5   A.  He's -- sells screen cloth and screens and
6       different things like that --
7   Q.  Does he work --
8   A.  -- for sand and gravel and for the
9       aggregate industry.
10  Q.  Excuse me.  I interrupted you.  I
11      apologize.
12          Does he work for a company called
13      Southern Wire?
14  A.  I believe he owns Southern Wire, but I'm
15      sure he's probably an employee, too.
16  Q.  Have you ever talked to him about the
17      Deatsville site?
18  A.  Sam and I talked about a lot of things.  To
19      say that I -- I don't know.  I don't know.
20  Q.  Did Robert Alexander or Dave Tuten ask you
21      about hiring Alan King for the Deatsville
22      site?
23  A.  For the Deatsville site?

Page 111

1   Q.  Yes.
2   A.  No.
3   Q.  Did they ask you --
4   A.  Not that I recall.
5   Q.  Did they ask you about hiring him for any
6       purpose with respect to Alabama Gravel's
7       business?
8   A.  For Alabama Gravel?
9   Q.  Yes.
10  A.  Not that I recall.
11  Q.  Have you ever talked to Robert Alexander or
12      Dave Tuten about using Alan King for
13      anything?
14  A.  That's a two-part question.  Which one do
15      you want to know?
16  Q.  Have you ever talked to Dave Tuten or
17      Robert Alexander about Alan King?
18  A.  No.  That's two people.  I don't know.  You
19      ask me one person and I'll answer you.
20  Q.  All right.  Have you talked to Robert
21      Alexander about Alan King?
22  A.  Yes.
23  Q.  All right.  And what was the context of

Page 112

1       that?
2   A.  When I was a consultant for Robert in north
3       Alabama, there was a lot of work that
4       needed to be done on that plant in north
5       Alabama.  He wanted to know if I knew
6       anyone that was capable of doing that, and
7       I recommended Alan King to him at that
8       time.
9   Q.  Did he end up working for Robert Alexander
10      on that plant?
11  A.  Robert didn't buy that plant.  No.
12  Q.  So Alan King didn't do any work for Robert
13      Alexander based on that recommendation?
14      That was a bad question.
15          Alan King did not work on that plant
16      for Robert Alexander?
17  A.  On that -- on that plant, no.
18  Q.  Do you know if he had done any other work
19      for Robert Alexander before he went to work
20      on the Deatsville site?
21  A.  I don't know.
22  Q.  Now, the second part of the question,
23      second person.  Did you ever talk to Dave

Page 113

1       Tuten about Alan King?
2   A.  No, that I recall.
3   Q.  Did you talk to Dave Tuten about Alan King
4       with respect to any issue whatsoever?
5   A.  That covers a lot of territory.  I don't
6       recall any.
7   Q.  Now Mr. Estock.  Are you aware of his work
8       on the Deatsville site?
9   A.  What do you mean by work?
10  Q.  Are you aware of Southern Wire providing
11      services with respect to the Deatsville
12      site?
13  A.  Before 2006?
14  Q.  Yes, sir.
15  A.  Am I aware -- aware of any services?  Not
16      specifically, no.
17  Q.  Are you aware of it generally?
18  A.  I could have heard it in conversation, yes.
19  Q.  Who would you have heard it with?
20  A.  I don't know.
21  Q.  Did you ever speak to Sam Estock about
22      going to work on the Deatsville site?
23          MR. BAILEY:  At any time up to the

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 114

1      present, you mean?
2      MR. GRISTINA:  Up to 2006.
3   A.  Up to 2006 did I talk to Sam about working
4      on the -- not that I recall, no.
5   Q.  Southern Wire provides equipment, isn't
6      that correct?
7   A.  I'm sure they did, yes.
8   Q.  All right.  And, in fact, they're a company
9      that specializes in providing equipment for
10     mining operations, isn't that right?
11  A.  Yes.
12  Q.  And Sam Estock is the one you would call if
13     you wanted to get equipment for a mining
14     operation, wouldn't you?
15  A.  He would be one of the people that you
16     would call, I would think, yes.
17  Q.  Did you recommend Sam Estock to Alabama
18     Gravel for construction of the Deatsville
19     site?
20  A.  To Alabama Gravel?
21  Q.  Yes.
22  A.  Not that I recall.
23  Q.  Did you recommend him to Robert Alexander?

Page 115

1   A.  Yes.
2   Q.  For what purpose?
3   A.  Robert asked me when I was consulting for
4      him in north Alabama -- again, that he was
5      going to have to buy some equipment, sand
6      and gravel equipment for that, and he was
7      wanting -- he asked me who would be a good
8      person to get a price from and who would be
9      a good person to buy that type of equipment
10     from in Alabama.  And I recommended Sam
11     Estock as much as a friend to Sam Estock as
12     it was to recommend him to Robert
13     Alexander.  It was a two-way
14     recommendation.
15  Q.  Other than that recommendation, had you
16     recommended Sam Estock to Robert Alexander
17     for any other purpose?
18  A.  Not that I can recall.
19  Q.  Do you know how Southern Wire ended up
20     providing services for the Deatsville -- or
21     providing equipment for the Deatsville
22     site?
23  A.  No, I don't recall.  I mean, I don't know.

Page 116

1   Q.  Did you recommend Sam Estock to Dave Tuten?
2   A.  Not that I recall.
3   Q.  Did you ever discuss Sam Estock with Dave
4      Tuten?
5   A.  I'm sure I could have.
6   Q.  Under what circumstances?
7   A.  I don't know.
8   Q.  What about discussions with Mr. Tuten about
9      Southern Wire?  Did you discuss Southern
10     Wire with Dave Tuten?
11  A.  Not any specific discussions that I
12     recall.  I'm sure I probably could have.
13     That's possible.
14  Q.  And what about discussions with
15     Mr. Dasinger about Sam Estock?  Do you
16     recall that?
17  A.  I don't recall any specific discussions
18     about Sam, no.
19  Q.  When you went out to the Deatsville site,
20     do you know who was responsible for
21     overseeing its construction up to January
22     2nd, 2006?
23  A.  Do I know?

Page 117

1   Q.  Yes.
2   A.  No.  Not that I can recall, no.
3   Q.  Do you know about Mr. Dasinger's previous
4      employment with Elmore Sand and Gravel?
5   A.  Not that I -- not that I remember, no.
6   Q.  About how often would you speak with
7      Mr. Estock from July 1, 2005 to the end of
8      the year 2005?
9   A.  Oh, I don't know.  Me and Sam talked very
10     frequently.  Sam is Bobby Bowden's
11     brother-in-law, and we both like football,
12     we both like fishing, we both like
13     hunting.  And Sam has been a very close
14     personal friend for many years, so we just
15     talk, casual conversations.
16  Q.  And is it your testimony that none of those
17     conversations related to the construction
18     at the Deatsville site?
19  A.  They could have been mentioned casually.
20     Businesswise, I don't recall any.
21  Q.  Do you know who at Alabama Gravel had the
22     experience to oversee the construction of
23     the Deatsville site?

Page 118

1  A.  I would say Robert Alexander.
2  Q.  And was Robert Alexander the one who dealt
3      with Sam Estock, Alan King?
4  A.  I don't know.
5  Q.  They never talked to you about that?
6  A.  Who?
7  Q.  Sam Estock or Alan King.
8  A.  Sam Estock or Alan King talk to me about
9      it --
10 Q.  Yes, sir.
11 A.  -- or Robert Alexander --
12 Q.  Did they talk to you about their dealings
13     with Robert Alexander?
14 A.  I'm sure they probably mentioned it.  I --
15     you know, we had a lot of conversations.  I
16     don't recall any specific conversations
17     related to that, no.
18 Q.  Do you know where Alabama Gravel located
19     equipment from for the construction of the
20     Deatsville site?
21         MR. BAILEY:  Object to the form.
22             Answer if you can.
23 A.  Are you talking about prior to 2006?

Page 119

1  Q.  Yes.
2  A.  You know, I don't know everywhere, no.
3  Q.  Do you know any of the places?
4  A.  Well, I know Southern Wire furnished some
5      of the equipment that went in there, and I
6      know that Pearce Pump furnished some.
7      That's basically all I know.
8  Q.  Do you know who works at Pearce Pump?
9  A.  Bernie Ostermeyer or something like that.
10     I can't say his name.
11 Q.  Did you have discussions with Bernie
12     Ostermeyer or whatever his name is during
13     2005?
14 A.  Oh, I'm sure I did.  Bernie's a very close
15     personal friend of mine, too.
16 Q.  But you don't know his last name?
17 A.  Well, Carol has a driver that I can't tell
18     you his last name.  I always call him
19     Bernie.
20 Q.  And how many conversations do you think you
21     had with Bernie Ostervelt during 2005?
22 A.  I have no idea.  I don't have a clue.
23 Q.  How long have you known each other?

Page 120

1  A.  Fifteen, 20 years.
2  Q.  And under what circumstances did you-all
3      come to meet?
4  A.  Oh, I can't remember.
5  Q.  Would you have talked to him frequently
6      during 2005?
7  A.  Oh, I'm sure I have, yes.
8  Q.  Any business purposes for those calls?
9  A.  Not that I can think of, no.
10 Q.  When you were with Montgomery Materials,
11     LLC, did you ever have any experience
12     running a mining pit more than four days a
13     week?
14 A.  I don't remember, really.  I could have.
15 Q.  I mean, you've heard a lot of testimony in
16     I think all of the depositions in this case
17     about increasing the production at pits
18     from four to five to four to six -- or four
19     to six days a week.  Do you recall hearing
20     that testimony?
21 A.  I don't really recall, no.
22 Q.  Do you have an opinion about whether or not
23     it's a good idea in general to increase

Page 121

1      production from four to six days a week in
2      a mining operation?
3          MR. BAILEY:  Object to the form.
4              Answer if you can.
5  A.  You know, it just -- there's a lot of
6      circumstances.  I don't know.
7  Q.  If you were going to increase production
8      from four to six days a week, would you
9      make sure that you were getting paid more
10     dollars a ton for that?
11         MR. BAILEY:  Object to the form.
12 A.  I don't know.  It's a lot of
13     considerations, like I said.
14 Q.  What are the considerations?
15 A.  Well, there's a lot of them.  I don't know
16     all of them it would be.  It would be
17     the -- one of them would be your price of
18     materials.  One of them would be how much
19     you had stripped, would you want to strip
20     six days a week and run your pit, would you
21     want to run out of the pit or run off of
22     the hill if you stockpiled it.  I mean,
23     there's just -- there's just all kinds

Deposition of Harry E. Lambert                The Concrete Company vs. Lambert                          August 29, 2006

Page 122

1    of -- it's endless what all the
2    considerations are.
3  Q.  Do you know Mike Gentry?
4  A.  Yes.
5  Q.  How do you know Mike?
6  A.  I've known Mike for years.
7  Q.  Do you know how Alabama Gravel got in touch
8    with Mike Gentry?
9  A.  The specifics?
10 Q.  Do you know in general?  Do you know at
11    all?
12 A.  Not really, no.  I don't know any of the
13    specifics, no.
14 Q.  Did you put Alabama Gravel in touch with
15    Mike Gentry?
16 A.  Alabama Gravel?
17 Q.  Yes.
18 A.  No.
19 Q.  Did you put Robert Alexander in touch with
20    Mike Gentry?
21 A.  When Robert was wanting to buy the plant in
22    north Alabama, like I stated before, he was
23    going to have to add some equipment.  He

Page 123

1    wanted -- he asked me if I knew where any
2    used sand screws were at and -- or any
3    used equipment, and I told him that Mike
4    Gentry had a set of double 36 used sand
5    screws, and he wanted to come by and look
6    at them and talk to Mike Gentry about
7    that.  The best of my recollection -- I
8    don't know the exact way it was done, but
9    Robert had came by here.  We went out to
10    Mike Gentry's Prattville plant, the one he
11    calls plant number two, I think.  I'm not
12    sure.  But we went out there to where the
13    sand screws were stored at, and I
14    introduced him to Mike, Mike took us out to
15    look at the sand screws, and Mike and
16    Robert started talking at that time.
17 Q.  When was that?
18 A.  That was -- I believe it was in January of
19    '05, I think.  It could have been in
20    December of '04, but it was somewhere in
21    that time frame.
22 Q.  Gentry has another pit, doesn't he, that
23    produces white oversized?

Page 124

1            MR. BAILEY:  Object to the form.
2            Go ahead and answer.
3  A.  That wasn't a pit there.  When you said
4    another pit, I'm only aware of one location
5    he had.
6  Q.  All right.  And is that the location that
7    Alabama Gravel has produced white oversized
8    gravel for sale to Simcala, Globe, and
9    Maddox Stone?
10 A.  Out of the Gentry pit at Independence?  Is
11    that the one you're talking about?
12 Q.  Yes.
13 A.  That's -- that's where they produced, yes.
14 Q.  And is that the place where Robert -- you
15    testified that Robert Alexander met with
16    Mike Gentry?
17 A.  No.  I said his Prattville concrete plant.
18    That's where the screws were stored at, and
19    we went to the Prattville concrete plant.
20    That's where him and Robert got to talking.
21 Q.  So he has a Prattville concrete plant,
22    which is separate from what we've been
23    referring to as the Gentry pit?

Page 125

1  A.  Yeah.  He's got two or three concrete
2    plants around the Prattville area.
3  Q.  And then do you know how many mining
4    operations he has?
5  A.  I said he had the one that I knew of at
6    Independence.
7  Q.  Do you know how Alabama Gravel came to
8    begin hauling aggregate out of that Gentry
9    pit?
10            MR. BAILEY:  Object to the form.
11 A.  Actually, Alabama Gravel I don't think
12    actually hauled it.  They arranged for the
13    hauling.
14 Q.  Okay.  Who hauled the white oversized
15    material out of the Gentry pit for Alabama
16    Gravel?
17 A.  Carol's Contracting.
18 Q.  Do you know how that relationship came into
19    being where Carol's Contracting became the
20    party responsible for hauling that
21    aggregate?
22 A.  I don't know all the specifics.  I know a
23    couple of them.

Page 126

1  Q.  Okay.  Well, tell me those couple.
2  A.  That same time that Robert came by to look
3      at them sand screws, he came by around
4      lunch time.  He come over to the house, and
5      Carol fed him some cornbread and beans, as
6      a matter of fact, and some Vidalia
7      onions -- no, I don't believe it was
8      Vidalia, but some onions.  And him and her
9      got to talking at that time, and that's
10     where it all -- the him and her
11     relationship came from.
12 Q.  During that meal?
13 A.  Well, that wasn't a meeting.  That was --
14 Q.  I said meal.
15 A.  Meal, right.
16 Q.  And did you participate in that discussion?
17 A.  I participated in the eating the meal, and
18     I was there.  I don't know if I
19     participated or not, you know.  I don't
20     think so.
21 Q.  You didn't say anything about CCI hauling
22     white oversized from the Gentry pit during
23     that lunch?

Page 127

1  A.  The Gentry pit wasn't even talked about at
2      that lunch.  I mean, it wasn't even in
3      existence.  It wasn't even conceived.
4  Q.  Where at that time did Alabama Gravel plan
5      on getting its white oversized?
6  A.  I didn't know that Alabama Gravel even
7      planned to be in existence at that time.
8  Q.  And you hadn't talked to Dave Tuten about
9      that before that time?
10 A.  Hadn't talked to Dave Tuten about what?
11 Q.  About forming a company to distribute white
12     oversized gravel before that time.
13 A.  I never remember talking to Dave Tuten at
14     any time about forming a company.
15 Q.  Were you here for Mr. Tuten's deposition?
16 A.  Yeah.
17 Q.  And do you recall him testifying that he
18     contacted you about setting up a company to
19     distribute white oversized gravel?
20 A.  I remember him contacting me, saying that
21     he would have an interest in going in the
22     sand and gravel business, but I don't
23     remember him talking to me about setting up

Page 128

1      a company or anything like that.  I
2      remember him telling me he had an interest
3      in doing that.
4          I need to take a break, and it's about
5      lunch time.  I don't want to say we go for
6      lunch or what have you, but I need to take
7      a break.
8          MR. BAILEY:  All right.  Be back
9      about one?
10         MR. GRISTINA:  One will be good.
11         (Brief lunch recess.)
12 Q.  (Mr. Gristina continuing)  Mr. Lambert,
13     before the break we were talking about
14     discussions between you and Mr. Tuten.  Do
15     you recall whether you introduced Mr. Tuten
16     to Robert Alexander?
17 A.  I think I did, yes.
18 Q.  And what caused you to do that?
19 A.  Mr. Tuten had expressed some desires to be
20     in the sand and gravel business to me, and
21     he had asked me about it.  And of course, I
22     told him I was covered under a noncompete.
23     I told him that Mr. Robert Alexander had

Page 129

1      some of that desires, and it may be a good
2      thing for them to meet.
3  Q.  And, in fact, you -- did you give -- did
4      you call Mr. Alexander and put him in touch
5      with Mr. Tuten?
6  A.  I don't remember exactly how I did that,
7      no.  I don't know exactly.
8  Q.  Do you recall when Mr. Tuten and
9      Mr. Alexander first met?
10 A.  I believe it was at a hotel or motel in
11     Prattville.
12 Q.  Were you present at that meeting?
13 A.  I was there at the start of that meeting,
14     the best I recall.
15 Q.  Did you participate in the discussions at
16     that meeting?
17 A.  No, I don't think so.
18 Q.  What did you say, if anything, at that
19     meeting?
20 A.  I just -- I don't recall what I said
21     specifically.  I recall introducing them,
22     and I don't recall any other specifics that
23     I actually said.

Page 130

1  Q.  Was there a discussion at that time as to
2      any particular form of aggregate that
3      Mr. Alexander and Mr. Tuten were looking to
4      sell?
5  A.  What Dave was interested in would be a
6      metallurgical grade gravel is the best of
7      my recollection.
8  Q.  And would that include white oversized
9      gravel?
10 A.  That would include white oversized, yes.
11 Q.  Were you aware of at that time any supply
12     issues that Simcala was having with respect
13     to white oversized?
14 A.  You know, I don't know -- all that time
15     frame was kind of together.  It could have
16     been right after that or it could have been
17     right before that.  I don't remember.  But
18     it was along that same time, yes.
19 Q.  How did you learn about that?
20 A.  Simcala had called me and wanted me to come
21     in and meet with them.
22 Q.  What did you tell them?
23 A.  I said, okay.

Page 131

1  Q.  And did you go and meet with Simcala?
2  A.  I met with, yeah, two representatives of
3      Simcala.
4  Q.  And who were they?
5  A.  One of them was Dick Wymer, and the other
6      one was Ed Boardwine, the best of my
7      recollection.
8  Q.  What was the date of that meeting?
9  A.  I don't know the exact date.
10 Q.  But was it in late 2004?
11 A.  I would think that it was early 2005 is
12     what I would think, very early.
13 Q.  And were you the only one present at that
14     meeting with the Simcala folks?
15 A.  Yes.
16 Q.  All right.  And what did you-all talk
17     about?
18 A.  They wanted to know when -- you know, I
19     don't remember the exact sequence of how
20     things were talked about, but, you know,
21     the basic things, they wanted to know if I
22     could go in the sand and gravel business,
23     and I told them I was in jail; that I

Page 132

1      couldn't go in, and I couldn't even attempt
2      to go in until January the 2nd of 2006.
3      Also they told me that they were having a
4      supply problem; that The Concrete Company
5      could not supply their needs.  That they
6      had gone up on the price and they had cut
7      them way back, and that they were going to
8      run out of oversized -- white oversized
9      gravel or have to make arrangements to rail
10     it in or truck it in or what have you and
11     was there any way I could help them.
12 Q.  And what did you tell them?
13 A.  I told them me personally, no.
14 Q.  All right.  Did you recommend somebody
15     else?
16 A.  I told them I was working with Robert
17     Alexander up in north Alabama, and that he
18     could possibly be interested in doing
19     something.
20 Q.  Did you have any idea where Robert
21     Alexander would get white oversized to
22     provide to Simcala at that time?
23 A.  No, I -- no.  Not that I recall, no.

Page 133

1  Q.  Then how did you think that Robert
2      Alexander was going to be able to help
3      them?
4  A.  I didn't know.
5  Q.  So did you give them Robert Alexander's
6      number?
7  A.  I don't remember if I gave them Robert
8      Alexander's number or I told them that I
9      would have Robert Alexander call them.  It
10     was probably one or the other.
11 Q.  Anything else you recall about that
12     discussion with Dick Wymer and --
13     I believe you said Mr. Boardwine?  Did
14     you say that?
15 A.  Yes.
16     It was several things discussed.  It
17     was kind of a -- you know, 30 or 45-minute
18     meeting probably.  They were -- that's all
19     I can recall being discussed, you know,
20     specifically recall, but I'm sure we talked
21     about other things.  I don't know.
22 Q.  Now, at that time, am I correct that in
23     early January 2005 that there were two

Page 134

1      major providers of white oversized material
2      in the Montgomery area, The Concrete
3      Company and Elmore Sand and Gravel?  Is
4      that accurate?
5   A.  I don't know.
6   Q.  Do you know if there were other suppliers
7      of white oversized at that time?
8   A.  I don't know.  I would guess that Martin
9      Marietta was, too.
10   Q.  Martin Marietta was a supplier or purchaser
11      of white oversized?
12   A.  They would have been a supplier.
13   Q.  Do you know what pit they supply white
14      oversized out of?
15   A.  To my knowledge, I think the only pit they
16      had at that time was the Shorter pit, but,
17      now, they could have had the Waugh pit open
18      at that time.  I don't know.
19   Q.  Do you know if Shorter pit produces white
20      oversized?
21   A.  It had in the past.  I don't know if it was
22      producing white oversized then or not, no.
23      I don't know.

Page 135

1   Q.  At that time, did you have knowledge of who
2      were the largest suppliers of white
3      oversized in the area?
4   A.  No.
5   Q.  Were you aware that at that time Elmore was
6      supplying white oversized to Simcala?
7   A.  I wasn't specifically aware of it.  I knew
8      they had provided white oversized in the
9      past, but whether they was providing white
10      oversized that day or right then, I don't
11      know.
12   Q.  Had you ever met Dick Wymer before that
13      meeting?
14   A.  Yes.
15   Q.  When did you first meet Dick Wymer?
16   A.  I don't remember.
17   Q.  How long before that meeting?
18   A.  Oh, it's some time before that meeting.  A
19      long time before that meeting.
20   Q.  More than five years?
21   A.  I don't remember.
22   Q.  And would you consider him to be a friend
23      of yours?

Page 136

1   A.  A business acquaintance.  I don't know if
2      you -- that's not a friend.  He wasn't an
3      enemy.  He was -- we were friendly, but I
4      wouldn't consider him a close friend.
5   Q.  Had you delivered white oversized to
6      Simcala before that meeting?
7          MR. BAILEY:  Object to the form.
8   A.  I don't recall doing it.  I don't know.  I
9      can't remember.
10   Q.  Do you recall ever driving a truck that
11      contained white oversized that you dropped
12      off at Simcala at any time before that
13      meeting?
14   A.  That's the same question.  I don't
15      remember.
16   Q.  True.
17      Do you recall meeting Mr. Boardwine
18      before that meeting?
19   A.  I'm sure I have, but I don't recall it.
20   Q.  Is he a friend of yours?
21   A.  He's an acquaintance.
22   Q.  Was it Ed Boardwine, Jr. who was at that
23      meeting or Ed Boardwine, Sr.?

Page 137

1   A.  Junior.
2   Q.  Is Mr. Boardwine, Sr. still with Simcala in
3      any way?
4   A.  I don't know.  I don't have any idea.
5   Q.  Have you ever met him before?
6   A.  Oh, yes.
7   Q.  When did you meet him?
8   A.  Long time ago.
9   Q.  Before 2000?
10   A.  Oh, I don't remember if it was before 2000
11      or after 2000.  I don't know.  Or both.
12   Q.  How much time do you consider to be a long
13      time?  You've said that a lot today.  How
14      much is a long time?
15          MR. BAILEY:  Object to the form.
16   A.  I don't know how much a long time is.  I'd
17      say a long time is anything more than two
18      or three years, you know.  Depends on how
19      old you are as to how long is a long time.
20   Q.  Anything else you can recall about that
21      conversation with Mr. Boardwine and
22      Mr. Wymer?
23   A.  Not any specifics, no.

Page 138

1   Q.  Do you know how Simcala decided to call
2        you?
3   A.  You would have to ask them.  I don't know.
4   Q.  Did they tell you?
5   A.  No, they didn't tell me that I recall.
6   Q.  Do you know if Dave Tuten was working as a
7        consultant for Simcala at that time?
8   A.  I don't know.
9   Q.  Did you talk to Dave Tuten about your
10       meeting with Simcala?
11  A.  I really don't remember.  I don't know.
12  Q.  The initial conversation with Dave Tuten
13       where he expressed interest of going into
14       the sand and gravel business, did you have
15       that conversation with him before you met
16       with Simcala?
17  A.  I don't remember.
18  Q.  Did you have it after?
19  A.  If I'd remembered before, I would
20       remember.  I don't know.
21  Q.  Did the hotel meeting in Prattville between
22       Tuten and Alexander take place before or
23       after you met with Dick Wymer and Ed

Page 139

1        Boardwine?
2   A.  It took place after.
3   Q.  How long after?
4   A.  I don't recall.  I don't remember exactly.
5        It wasn't a long time.
6   Q.  Do you know how -- did Alabama Gravel
7        eventually begin to sell Simcala white
8        oversized material out of the Gentry pit?
9   A.  Say that again.
10  Q.  Did Alabama Gravel eventually begin to sell
11       white oversized material to Simcala out of
12       the Gentry pit?
13  A.  Yes.
14  Q.  All right.  Do you know how they located
15       the Gentry pit?
16       MR. BAILEY:  Object to the form.
17           Who located it?
18       MR. GRISTINA:  Alabama Gravel.
19  A.  Not really, no.
20  Q.  Forgive me, sir, but "not really" and "no"
21       are different answers.  Is it no or --
22  A.  I don't know.
23  Q.  Did Dave Tuten ask you where he could find

Page 140

1        white oversized in the Montgomery area to
2        supply to Simcala?
3   A.  Not that I recall.
4   Q.  Did Robert Alexander ask you that?
5   A.  Not that I recall.
6   Q.  And is it your testimony that you didn't
7        put them in touch with Mr. Gentry for that
8        purpose?
9   A.  For that purpose?  Is that what you're
10       saying?
11  Q.  That's my question.
12  A.  I didn't put them in touch with Mr. Gentry
13       for that purpose.  I didn't put Dave Tuten
14       in touch with Mr. Gentry at all, and I put
15       Robert Alexander in touch with Mr. Gentry
16       the way I described it earlier about the
17       sand screws.
18  Q.  And that was the only purpose you put
19       Robert Alexander in touch with Mr. Gentry?
20  A.  That's right.
21  Q.  At the meeting that you had or that you
22       were present for between Mr. Tuten and
23       Mr. Alexander in the hotel in Prattville,

Page 141

1        did you discuss the Gentry site as a source
2        of white oversized material?
3   A.  Did I discuss it?
4   Q.  Yes.
5   A.  Not that I recall, no.
6   Q.  Was it discussed at that time?
7   A.  Not that I know of, no.
8   Q.  Was the Deatsville site discussed at that
9        time?
10  A.  Not that I know of.
11  Q.  Do you know if Rex Dasinger already had the
12       Deatsville site located?
13  A.  I don't know.
14  Q.  And is it your testimony that you've never
15       seen the lease for the Deatsville site by
16       which Alabama Gravel operates on it?
17  A.  Not that I recall seeing it, no.
18  Q.  And you don't know whose name that lease is
19       in?
20  A.  I have no idea.
21  Q.  Have you ever been present at the
22       Deatsville site when test holes were dug?
23  A.  Since 2006?

Page 142

1   Q.  Before 2006.
2   A.  Not that I recall, no.
3   Q.  Is it possible that you were there when
4       those were done?
5   A.  Anything's possible, but I don't remember
6       it if I was.
7   Q.  Do you have any knowledge as to whether
8       Mr. Dasinger would have the experience to
9       dig test holes on the Deatsville site?
10  A.  I don't know.
11  Q.  After the hotel meeting, did you discuss
12      setting up Alabama Gravel or any other sand
13      and gravel business with Dave Tuten?
14  A.  Did I?
15  Q.  Yes.
16  A.  Prior to 2006?
17  Q.  That's right.
18  A.  Ask that again.
19  Q.  After the hotel meeting, did you discuss
20      with Dave Tuten before 2006 the
21      possibility -- or discuss further with him
22      the possibility of opening up a sand and
23      gravel operation?

Page 143

1   A.  The possibility covers a lot of territory.
2       And I'm sure that I told him that after I
3       got out of jail that I would probably want
4       to go in the sand and gravel business, but
5       discussing any specifics with him, I don't
6       remember doing that.  But I'm sure I have
7       mentioned that I wanted to do that.
8   Q.  Do you know how it came to be that
9       Mr. Alexander, Mr. Tuten, and Mr. Dasinger
10      met on your property later on in the spring
11      of 2005?
12  A.  They didn't meet on my property.
13  Q.  On your wife's property, Mr. Lambert?  Is
14      that where they met?
15  A.  I remember them meeting sometime in her
16      shop.
17  Q.  That's her shop?  It's not your shop?
18  A.  That's right.
19  Q.  And does she work on the machines in
20      there?
21  A.  She owns it.
22  Q.  Does she go in there and work on those
23      machines in that shop?

Page 144

1                MR. BAILEY:  Object to the form.
2          You mean computers or the --
3          what?
4                Go ahead and answer.
5   Q.  What's in the shop?
6   A.  It's got a table saw, got vices, it's got
7       nuts and bolts.  It's got -- it's too much
8       stuff for me to say.
9   Q.  Truck repairing equipment?  Does it have
10      any stuff like that in there?  Jacks?
11  A.  Yeah.
12  Q.  Does your wife use that equipment?
13  A.  Does she use the jacks?
14  Q.  Yes, sir.
15  A.  No, not that I know of.  Now, she may have
16      used some of the jacks to jack up her lawn
17      mower or something.  For me to say that
18      she's never used any of that, I can't say
19      that, but she don't use it on a regular
20      basis.
21  Q.  Are those your tools?
22  A.  No.  They belong to her.
23  Q.  You don't own any tools?

Page 145

1   A.  Yes, I own some tools.
2   Q.  Where do you keep your tools?
3   A.  I usually keep them in my pickup truck.
4   Q.  And you don't keep --
5   A.  Well, it's not my pickup truck, actually.
6       I keep them in the pickup truck.
7   Q.  And who owns the pickup truck?
8   A.  I think Carol's Contracting owns the pickup
9       truck.
10  Q.  And that's a truck you drive?
11  A.  The pickup truck, yes.
12  Q.  So your vehicle is owned by Carol's
13      Contracting?
14  A.  I think so.
15  Q.  Now, were you aware of how Mr. Alexander,
16      Mr. Tuten, and Mr. Dasinger came to meet in
17      your wife's shop as you describe it?
18  A.  I don't really remember the specifics of
19      how they got together, no.
20  Q.  Did they call you about having a meeting
21      there?
22  A.  I don't remember.
23  Q.  Did they schedule that meeting through your

Page 146

1  wife?
2  A.  I don't think so.  I don't -- I don't
3     remember.
4  Q.  And you were present for part of that
5     meeting, weren't you?
6  A.  I was there at the start of that meeting.
7  Q.  Why did you leave?
8  A.  I didn't have no business in it.  It wasn't
9     none of my business.
10 Q.  What did you say during the meeting?
11 A.  I probably said, hey, you fellows -- spoke
12    and told them to sit down there and enjoy
13    theirselves or whatever.  And then I
14    probably left and went and got a Coca-Cola
15    or something.
16 Q.  Did you offer that space as an office for
17    Alabama Gravel at that time?
18 A.  I never did offer that space to Alabama
19    Gravel, because it wasn't my space to
20    offer.
21 Q.  Who offered it to them?
22 A.  I would -- don't know if Carol asked or
23    they asked her.  I don't know.

Page 147

1  Q.  But it's your testimony you didn't
2     participate in that at all?
3  A.  I didn't, no.
4  Q.  Did you recommend Mrs. Lambert as a
5     bookkeeper to Alabama Gravel?
6  A.  If Robert had asked me, which I don't
7     remember whether he did or didn't, I would
8     have gave her a good recommendation.  But I
9     don't remember whether he asked me or not.
10 Q.  You can't recall you telling them that she
11    needed something to do and making that
12    recommendation?
13 A.  No, I don't recall that.
14 Q.  If Mr. Tuten said that, is he wrong?
15 A.  I don't know whether he's wrong.  I said I
16    don't recall it.  He could very well be
17    right or he could be wrong, but I don't
18    recall it.
19 Q.  Do you recall how they decided to pay rent
20    for the use of the office at Alabama
21    Gravel?
22 A.  No, I don't -- I don't know how.
23 Q.  Do you know how much they paid?

Page 148

1  A.  I don't know.  No, I don't.
2  Q.  Do you recall any of the other specifics or
3     any specifics about what you talked about
4     with Mr. Tuten, Mr. Dasinger, and
5     Mr. Alexander at that meeting in the shop?
6  A.  Not that I recall.
7  Q.  Do you know how they got in touch with
8     Mr. Dasinger?
9  A.  When I was consulting for Robert in north
10    Alabama, he had asked me if I knew of
11    anyone that would be a person that he could
12    get to work with him in that location.  And
13    I told him that Mr. Dasinger drove a truck
14    for my wife, and that he might be
15    interested in doing that.  And so I think
16    that -- that's all I remember about
17    recommending Rex or anything, which is
18    Mr. Dasinger.
19 Q.  And that was you recommended him with
20    respect to the work that you were
21    consulting on in north Alabama?
22 A.  That's right.
23 Q.  So, then, the recommendation of Mr. King,

Page 149

1     Mr. Estock, and Mr. Dasinger all took place
2     while you were doing consulting work with
3     Mr. Alexander up in north Alabama?
4  A.  That's exactly right.
5  Q.  And you recall that real specifically,
6     don't you?
7  A.  I recall telling him that, yes.
8  Q.  And you recall the specifics of that,
9     right?
10 A.  Not all the specifics, no.  I just recall
11    telling him that.
12 Q.  Only with regard to that site up in north
13    Alabama, though, right?
14 A.  That's right.
15 Q.  Pretty convenient, isn't it?
16 A.  I guess that's a matter of opinion, isn't
17    it?
18 Q.  When you met with Mr. Alexander and
19    Mr. Tuten at the Prattville hotel and later
20    met with them at the shop, did you have a
21    plan in your mind at that time of joining
22    Alabama Gravel after your covenant expired?
23 A.  A plan?

Deposition of Harry E. Lambert                The Concrete Company vs. Lambert                August 29, 2006

Page 150

1   Q.  Yes, sir.
2   A.  No.
3   Q.  So you had no intention at that time of
4       going to work for Alabama Gravel after your
5       covenant expired?
6   A.  I maybe had hopes and dreams of it, but I
7       didn't have a plan.
8   Q.  Are you aware of Mr. Tuten's testimony that
9       Alabama Gravel would not have existed with
10      his involvement were it not for you?
11  A.  I don't specifically remember that, no.
12  Q.  Do you remember him saying that the other
13      day when we were -- read his deposition?
14  A.  I just said I don't remember --
15      specifically remember him saying that.  He
16      could have...
17  Q.  Where was the mine that you were consulting
18      with Robert Alexander in northern Alabama
19      located exactly?
20  A.  It was located probably a little east of
21      Gadsden.  It was located close to the -- I
22      believe it was the Coosa River.  But it was
23      within 15, 20 miles probably of Gadsden,

Page 151

1       maybe closer than that.
2   Q.  Did you visit that site?
3   A.  Yes.
4   Q.  How many times?
5   A.  I don't know.
6   Q.  Who else other than Alexander did you meet
7       with at that site?
8   A.  I believe the man's name is -- that owned
9       it was Joe Powell.  I believe that's his
10      name.
11  Q.  And was he present in any of those site
12      visits?
13  A.  Yes.
14  Q.  Anybody else present at those meetings?
15  A.  Well, I wouldn't call them meetings, no.  I
16      mean, they weren't meetings.
17  Q.  Was anybody else present when you were on
18      the site there?
19  A.  Everybody that worked for him.
20  Q.  Any other people's names besides Powell
21      that you recall?
22  A.  No.  They was two or three others there
23      that I knew their names at the time, but I

Page 152

1       don't remember them now.
2   Q.  Did you supply Mr. Alexander with the
3       names -- Well, strike that.
4       Do you recall Mr. Tuten testifying
5       that you supplied Alabama Gravel with the
6       names and opinions of plant builders in the
7       area?
8   A.  Say that again.
9   Q.  Do you recall Mr. Tuten's deposition?  You
10      were present for that, were you not, sir?
11  A.  That's right.
12  Q.  Do you recall when he testified that you
13      supplied them with the names and opinions
14      of plant builders in the area?
15  A.  I don't remember that, no.
16  Q.  Is it your testimony that during either the
17      Prattville meeting -- Strike that.
18      During the Prattville meeting, did you
19      offer your opinions and provide names of
20      people who could help build a mining plant?
21  A.  I didn't that I remember.
22  Q.  Did you provide that information during the
23      meeting later on in the shop?

Page 153

1   A.  Not that I remember, no.
2   Q.  So if Mr. Tuten said you did, he's wrong?
3   A.  I'm saying I don't remember it.
4   Q.  How often after the meeting at the shop
5       would you say that you talked to Dave
6       Tuten?
7   A.  Say that again?
8   Q.  After you had the meeting at the shop that
9       we've been speaking of, how often after
10      that point would you say you had
11      conversations with Dave Tuten?
12  A.  Oh, I don't have a clue.  I don't know.
13  Q.  Do you recall going out to the Deatsville
14      site with Mr. Tuten?
15  A.  I think that we rode out there one time
16      together.
17  Q.  What did y'all do at that time?
18  A.  I -- I don't remember.  We just rode out
19      there together that I remember.  I don't
20      remember a whole lot about it.
21  Q.  Do you recall Mr. Tuten taking some rocks
22      for sampling at that point?
23  A.  Oh, I don't specifically recall that, no.

Page 154

1    Q.   You're pretty familiar with the Swift Creek
2         area where all these plants are located,
3         aren't you?
4    A.   I'm fairly familiar with that area, yes.
5    Q.   Is the Deatsville site that we've been
6         speaking of close to your home?
7    A.   It's -- you know, what do you consider
8         close?
9    Q.   Ten miles?
10   A.   It's probably within ten miles.  It may be
11        a little over, but it's -- ten miles is a
12        good approximate.
13   Q.   How long have you-all lived at the
14        Deatsville address, Gunnells Road?
15   A.   You ain't going to like this, but a long
16        time.  I don't know.
17   Q.   All right.  More than ten years?
18   A.   I would say more than ten years.  I would
19        think.  I don't know.
20   Q.   And so how long have you lived in the
21        Montgomery area?
22   A.   That was the first place that we actually
23        moved into and lived.  I lived in -- I

Page 155

1         won't say -- I stayed in a motor home over
2         here before that.
3    Q.   And would you say you're pretty familiar
4         with the Montgomery area?
5    A.   You know, fairly familiar, yeah.
6    Q.   Do you know where the Elmore Sand and
7         Gravel pit is that produces white
8         oversized?
9    A.   Yes.
10   Q.   And you know where the Gentry pit is that
11        produces white oversized, don't you?
12   A.   Yes, I do.
13   Q.   And you, I'm sure, know where The Concrete
14        Company's Shorter operation is, don't you?
15   A.   Yes, I do.
16   Q.   And that's where the white oversized comes
17        from?
18   A.   Yes, I do.
19   Q.   Now, relative distancewise, which one of
20        those is the furthest away from Simcala?
21   A.   The Gentry pit -- give me the names of the
22        pits again?
23   Q.   Yes, I will.  Elmore Sand and Gravel,

Page 156

1         Gentry, and then The Concrete Company's
2         Shorter pit.
3    A.   I would think the Gentry pit is the
4         furthest away.
5    Q.   About how much further?
6    A.   Oh, I -- you know, I'd have to measure it
7         to see.  I don't know.
8    Q.   How far is the Gentry pit from Elmore's
9         pit?
10   A.   I don't know the specifics.
11   Q.   Let me ask you this.  Would you say that
12        the Gentry pit is twice as far from the
13        Simcala plant as the Elmore pit is?
14   A.   I don't know.  I don't know.
15   Q.   Is that possible?
16   A.   Anything's possible.  You know, I don't
17        know.  I'm not trying to be facetious.  I
18        just don't know.
19   Q.   So you can't -- you think the Gentry pit is
20        the furthest away from Simcala.  And I'll
21        ask it again.  Can you tell me how much
22        further you think it is than the Elmore
23        pit?

Page 157

1    A.   It would just be a guess, and I'm not
2         supposed to guess, so I just don't know.
3    Q.   What about from -- how much further than
4         the Shorter pit?
5    A.   Again, that would be a guess.  I don't
6         know.
7    Q.   Do you know where the Globe plant is
8         here -- is it Selma?  Do you know where
9         that is?
10   A.   Yes, I do.
11   Q.   Of those three, Elmore, Gentry, and
12        Shorter, which one is furthest from Globe?
13   A.   I would think the Shorter pit would be.
14        Now, the Shorter pit and the Elmore pit,
15        depending on how you have to go -- I
16        don't -- I would think the Shorter pit.
17   Q.   All right.  Do you recall Mr. Tuten
18        testifying that he talked to you about CCI
19        hauling aggregate for Alabama Gravel?
20   A.   I don't really recall him testifying to
21        that.  You know, I'd have to look at that
22        to swear to that.  I don't know.
23   Q.   Did he talk to you about CCI hauling for

Page 158

1     Alabama Gravel before he talked to Carol?
2   A.  Oh, I don't know.  I don't know.
3   Q.  When you met with Ed Boardwine and Dick
4     Wymer, did you discuss with them the
5     possibility of CCI hauling aggregate to
6     them?
7   A.  Are you talking about white oversized?
8   Q.  Yes, sir.
9   A.  Not that I recall, no.
10  Q.  More specifically, then -- and I appreciate
11    you asking me to clarify -- did you talk to
12    them about CCI hauling any other form of
13    sand or gravel?
14          MR. BAILEY:  At that time?
15          MR. GRISTINA:  At that time.
16  A.  Sand or gravel?
17  Q.  Sand, gravel, any kind of aggregate
18    material.
19  A.  Not that I recall.
20  Q.  And did you discuss with them at that time
21    once the supplier had been found for white
22    oversized that CCI would be the one to haul
23    that to them?

Page 159

1   A.  No, I don't remember discussing that, no.
2   Q.  Did you discuss at that time -- did you
3     discuss with them at that time any amounts
4     that Simcala would pay CCI to haul white
5     oversized to it?
6   A.  No, I don't remember doing that.
7   Q.  Are you aware of a situation in the past
8     where Mike Phillips would receive a dollar
9     a ton for any white oversized that was
10    shipped to Simcala?
11  A.  No, not that I'm aware of.
12  Q.  Are you aware of Simcala ever conditioning
13    their purchase of white oversized from The
14    Concrete Company on Mike Phillips receiving
15    some compensation?
16  A.  Not that I'm aware of.
17  Q.  You were in business with Mike Phillips for
18    a time, were you not?
19  A.  Yes, I was.
20  Q.  And was that the Beaver Rock business?
21  A.  No, that was the -- I forget what we called
22    that company.  I'd have to look back and
23    see.  But I don't believe it was Beaver

Page 160

1     Rock.
2   Q.  Were you ever at a meeting where Dick Wymer
3     was present and you and Robert Alexander?
4   A.  No, not that I recall, no.
5   Q.  Were you ever at a meeting between Ed
6     Boardwine, Jr., you, and Robert Alexander?
7   A.  Not that I recall, no.
8   Q.  And what about a meeting where you, Dave
9     Tuten, and Dick Wymer were present?
10  A.  Not that I recall.
11  Q.  Same question:  You, Dave Tuten, and Ed
12    Boardwine?
13  A.  Same answer.  Not that I recall.
14  Q.  Is it possible that such a meeting took
15    place?
16  A.  Anything's possible.  I don't recall it.
17  Q.  Are you aware of how much Alabama Gravel
18    paid Carol's Contracting to haul white
19    oversized from the Gentry pit to Simcala?
20          MR. BAILEY:  Total or per load or
21            per ton or what?
22  Q.  Per load -- Sorry.  Excuse me.  Per ton.
23  A.  Say that again.

Page 161

1   Q.  Are you aware of how much Alabama Gravel
2     paid CCI per ton to haul white oversized
3     from Gentry to Simcala?
4   A.  Yes.
5   Q.  How much was it?
6   A.  $6 a ton.
7   Q.  All right.  Do you know how that rate was
8     arrived at?
9   A.  Carol came up with it, I'm sure.
10  Q.  Did you participate in the discussions that
11    led to the arrival at that rate?
12  A.  Not that I recall.  She maybe mentioned it
13    to me privately, but in a business sense,
14    no.
15  Q.  Do you recall her mentioning it to you
16    privately?
17  A.  I don't really recall it, but she could
18    have.
19  Q.  Did you give Mrs. Lambert information that
20    she used to formulate that rate?
21  A.  Ask that again.
22  Q.  Did you give Mrs. Lambert information that
23    she used in order to come up with the $6 a

Page 162

1    ton rate?
2    A.  You're talking about any information?
3    Q.  Yes, sir.
4    A.  I would say I did, yes.
5    Q.  What information was that?
6    A.  I don't -- I don't remember it, but I'm
7    sure I did.
8    Q.  And are you aware that that rate is grossly
9    disproportionate to what other hauling
10   companies charge for that?
11   A.  No, I'm not aware.
12   Q.  Are you aware that it's two to three
13   dollars a ton more than what Elmore Sand
14   and Gravel can charge to deliver to
15   Simcala?
16   A.  Elmore Sand and Gravel would be closer, so
17   it would be less.  But, no, I think that
18   you're wrong in that.
19   Q.  So if Mr. Stanley testifies that $6 a ton
20   was grossly disproportionate to the market
21   for hauling, he wouldn't be telling the
22   truth?
23   A.  I would tell you that Mr. Stanley would

Page 163

1    give you his opinion, probably, so his
2    opinion and my opinion may be different.
3    Q.  Well, are you aware that it's
4    disproportionate to what The Concrete
5    Company was able to charge to deliver from
6    Shorter to Simcala?
7    A.  That's way closer.  That's way closer.
8    Q.  Is it half as close?
9    A.  I don't know exactly, but it's a lot
10   closer.
11   Q.  Can you justify Carol's Contracting
12   charging $6 a ton for that haul when the
13   other companies were only able to charge $3
14   and $4 a ton to haul that?
15         MR. BAILEY:  Object.  You don't
16         have to answer it.  You don't
17         have to justify anything.
18         MR. GRISTINA:  There's nothing
19         wrong with that question.
20         MR. BAILEY:  It's not even a
21         question.
22         MR. GRISTINA:  It is a question.
23         MR. BAILEY:  It's argumentative.

Page 164

1    Q.  How do you justify the rate?
2    A.  I don't have to.
3    Q.  Is it justified as compensation to you for
4    those hauls?
5    A.  Say that again.
6    Q.  Isn't that rate compensation to you,
7    Mr. Lambert, for those hauls?
8    A.  Mr. Gristina, it is not.
9    Q.  So you derived no benefit from that $6 a
10   ton rate?
11   A.  Me personally?
12   Q.  Yes, sir.
13   A.  No, sir.
14   Q.  And so charging the $6 a ton wasn't a
15   convenient way to make up for your
16   allegedly not being paid for your hauling
17   services?
18         MR. BAILEY:  Object to the form.
19   A.  Say that again.
20   Q.  Wasn't it a convenient way to make up for
21   your allegedly not being paid for hauling
22   to charge $6 a ton to haul?
23         MR. BAILEY:  Objection.

Page 165

1         Argumentative.  Go ahead and
2         answer.
3    A.  Say that -- you said for pay for hauling --
4         MR. GRISTINA:  Read it back,
5         please.
6         (The following was read:  Wasn't it
7         a convenient way to make up for
8         your allegedly not being paid for
9         hauling to charge $6 a ton to
10        haul?)
11   A.  Being paid for hauling?  Is that what you
12   said?  Not paid for hauling?  To my
13   knowledge, Carol was paid for hauling.
14   Q.  $6 a ton?
15   A.  That's right.  Carol's Contracting was paid
16   for hauling.
17   Q.  Let me show you, Mr. Lambert.  This is
18   Plaintiff's 3 from a previous deposition.
19   I'll ask you if you recognize that
20   document.
21   A.  This looks like the consulting agreement.
22   Q.  All right.  Do you know Charlie Spencer?
23   A.  Charlie Spencer?  Yeah.

Deposition of Harry E. Lambert                    The Concrete Company vs. Lambert                    August 29, 2006

Page 166

1  Q.  How do you know Mr. Spencer?
2  A.  I've known Mr. Spencer a long time.
3  Q.  Have you talked to him about this case
4     before?
5  A.  About this case?
6  Q.  Yes, sir, this litigation.
7  A.  Before 2006 or after 2006?
8  Q.  Before.
9  A.  I don't know.
10 Q.  Have you talked to him about it after 2006?
11 A.  I'm sure I have.
12 Q.  And in what context was that?
13 A.  You know, I don't remember exactly, but I
14    remember Charlie and I meeting about
15    certain things after 2006, and I'm sure
16    this case was mentioned.
17 Q.  Do you remember specifically what you said
18    about this case to him?
19 A.  Not specifically, no.
20 Q.  Do you consider Mr. Spencer to be somebody
21    who is an honest person?
22 A.  Mr. Spencer is someone I know.
23 Q.  Is he in the sand and gravel business?

Page 167

1  A.  Is he in the sand and gravel business?
2  Q.  Yes, sir.
3  A.  Not that I know of.  Not him personally,
4     no.
5  Q.  What's his business?
6  A.  I don't know that he even has a business.
7  Q.  Is he affiliated with some business in the
8     sand and gravel business?
9  A.  I think so, yes.
10 Q.  Okay.  And what's that?
11 A.  That would be -- there's two or three
12    names.  There's Wade Sand and Gravel,
13    there's Red Bluff, there's -- they have a
14    rock quarry or two.  They got several
15    different companies, and I don't know if
16    he's the owner or manager or what.
17 Q.  Do you think he's somebody who's
18    knowledgeable of the sand and gravel
19    business?
20 A.  By being in the business, I would think he
21    would know something about it, yes.
22 Q.  And familiar with rates for delivering
23    aggregate?

Page 168

1  A.  I don't know.  I don't -- you know, you'd
2     have to ask Charlie.
3  Q.  All right.  Let me ask you this.  Now,
4     looking at the consulting agreement, am I
5     correct that according to this consulting
6     agreement, Alabama Gravel was formed
7     primarily for customers who are unable to
8     obtain sufficient supplies from The
9     Concrete Company?
10        MR. BAILEY:  Agreement speaks for
11           itself.  What's the question?
12           Does it say that in here?  Is
13           that what you're asking him?
14        MR. GRISTINA:  Yes.
15        MR. BAILEY:  What page are you
16           on?
17        MR. GRISTINA:  One.
18        MR. BAILEY:  Where do you see what
19           you just said?
20        MR. GRISTINA:  The third whereas,
21           first page.
22 A.  It says what it says.
23 Q.  And you participated in the drafting of

Page 169

1     this agreement, correct?
2  A.  My attorney helped draft this agreement,
3     and Alabama Gravel's attorney helped draft
4     this agreement.  Did I actually write it?
5     No, I didn't write it.
6  Q.  But you reviewed it and you agreed to the
7     terms of it?
8  A.  Yes.
9  Q.  Before this consulting -- well, before
10    January 2nd, 2006, did you engage in any
11    conversations with Alabama Gravel about
12    getting back into the sand and gravel
13    business with them?
14 A.  Say that again.
15 Q.  Before January 2nd, 2006, did you engage in
16    any conversations with Alabama Gravel about
17    getting back into the sand and gravel
18    business with them?
19 A.  Before?
20 Q.  Yes, sir.
21 A.  Not that I can recall.
22 Q.  Do you know who Randy Willingham is?
23 A.  Yes.

Page 170

1   Q.  Who's that?
2   A.  He's a fellow that lives over around
3       Atlanta, Georgia.
4   Q.  He's in the sand and gravel business, isn't
5       he?
6   A.  He sells sand and gravel.  He don't
7       manufacture it.  He sells it.
8   Q.  Does he also purchase sand and gravel?
9   A.  Yes, he does.
10  Q.  And in fact, he has purchased sand and
11      gravel that was delivered by CCI trucks,
12      has he not?
13  A.  Say that again.
14  Q.  He has purchased sand and gravel that was
15      delivered by CCI trucks, has he not?
16  A.  He purchased it from someone else, not from
17      CCI.
18  Q.  That's right.  And it was delivered by CCI
19      trucks, isn't that right?
20  A.  Yes, that's right.
21  Q.  In fact, you've had conversations with him
22      about that, haven't you?
23  A.  Yeah.  Yes.

Page 171

1   Q.  Would he call you looking -- and ask you
2       where he could locate white oversized
3       gravel?
4   A.  Say that again.
5   Q.  Did Randy Willingham call you and ask you
6       where he could locate some white oversized
7       gravel to purchase?
8   A.  Not that I recall.
9   Q.  So prior to January --
10  A.  Wait a minute.  Wait a minute.  After I
11      left Montgomery Materials and after the
12      sellout, I don't recall him calling and
13      asking me.  Prior to the sellout, he very
14      well could have called me because I was in
15      the sand and gravel business.
16  Q.  So between the closing and January 2nd,
17      2006, do you recall him ever calling you
18      and asking you where he could obtain some
19      white oversized gravel?
20  A.  Not that I recall.
21  Q.  What about other sizes of gravel and sand?
22  A.  He never did call me to ask where he could
23      obtain them, no, that I recall.

Page 172

1   Q.  You are familiar in your experience in the
2       sand and gravel business, are you not, with
3       the way a mining operation works?
4   A.  I mean, that's -- covers a lot of ground.
5       Explain what you mean.
6   Q.  Well, you've run sand and gravel mining
7       operations, haven't you?
8   A.  Yes, I have.
9   Q.  You ran the city pit, I believe --
10  A.  Yes, I did.
11  Q.  -- when you were with Montgomery
12      Materials?
13          Did you ever run the Shorter pit?
14  A.  Which Shorter pit?
15  Q.  The Concrete Company's Shorter pit.
16  A.  Did I ever look after it?
17  Q.  Yes, sir.  Did you ever run that one?
18  A.  Not that I recall, no.
19  Q.  But you agree with me that the process of
20      producing aggregate necessarily involves
21      variations in the types of aggregate that
22      you get out of the ground?
23  A.  No, I don't understand.

Page 173

1   Q.  Well, I'll be more specific.  Speaking of
2       the Shorter pit, The Concrete Company's
3       Shorter pit, you would agree, would
4       not, that the percentages of the various
5       types of aggregate that come out of that
6       pit are going to vary from load to load?
7               MR. BAILEY:  Object to the form.
8   A.  To specifically say the Shorter pits, since
9       I've never run it, I can't swear to that,
10      no.
11  Q.  How about the city pit?  The percentages
12      would vary as to the types of material that
13      would come out?
14  A.  Yes.
15  Q.  And, in fact, aren't all pits the same way
16      in that regard?  There's some variation in
17      the percentages?
18  A.  Is all pits that way?  I can't answer that.
19  Q.  So are some pits consistent?  They produce
20      the exact percentages of white oversized?
21  A.  I don't know.  If I haven't been there, I
22      don't know.
23  Q.  In theoretical terms, is that possible that

Page 174

1   you could have a pit that produced the
2   exact same percentages of aggregate
3   materials every scoopful of dirt you take
4   out of the ground?
5   A.  I don't know whether it's theoretically
6   possible or not.
7   Q.  Do you know if Randy Willingham has
8   partners?
9   A.  I don't know that for a fact.  I think he
10   does, but I don't know.
11   Q.  Who do you think he's partners with?
12   A.  I think he's partners with Robert
13   Alexander.
14   Q.  All right.  Do you know anybody else he's
15   partners with?
16   A.  I have no idea.
17        Randy has two or three businesses, and
18   I don't know if Robert would be partners in
19   all of them businesses or not.  I guess you
20   need to ask me which businesses, and I
21   really don't know which ones that Robert
22   would be partners with.  But I do know he
23   has two or three businesses.

Page 175

1   Q.  I think you answered it.  So you don't know
2   which ones he's partners with Robert on?
3   A.  No.
4   Q.  When you met with Simcala, when it was you
5   and Mr. Wymer, Mr. Boardwine, did they talk
6   to you about quality issues related to
7   Concrete Company white oversized?
8   A.  I don't remember whether they did or not.
9   Q.  Are you aware through your involvement in
10   the industry of the reputation for the
11   quality of the white oversized material out
12   of the Shorter plant?
13   A.  What do you mean by reputation?
14   Q.  Well, isn't it known that the Shorter white
15   oversized is the best white oversized in
16   the area quality-wise?
17   A.  I don't know that for a fact, no.
18   Q.  Do you know what the -- what percentages of
19   iron, aluminum that they look for in white
20   oversized material at Simcala?
21   A.  No, not right offhand, no.
22   Q.  Are you familiar with any -- have you ever
23   seen any test results from Simcala?

Page 176

1   A.  I have seen some, yes.  There was some
2   furnished -- Dennis gave me some.
3   Q.  The ones that we got via subpoena from
4   Simcala, did you interpret those results?
5   I don't want to know about discussions with
6   Mr. Bailey.  Did you study those results?
7   A.  No.
8   Q.  Did you formulate any opinions as to the
9   quality of the Shorter white oversized from
10   those test results?
11   A.  I didn't study them, so, no.
12   Q.  Have you ever discussed before January 2nd,
13   2006 with Randy Willingham the possibility
14   of supplying sand and gravel to him after
15   you got out of jail as you put it?
16   A.  Say that again.
17   Q.  Before January 2nd, 2006 when you met
18   with -- or when you talked with Randy
19   Willingham, did you ever discuss with him
20   your noncompete?
21   A.  I'm sure I said something about it.  I
22   don't remember any specifics, but I'm sure
23   I told him I was -- I would be glad when I

Page 177

1   got out of jail.
2   Q.  That was my next question.  Did you talk to
3   him about the possibility of supplying him
4   with sand and gravel after you got out of
5   jail?
6   A.  I'm sure I told him I would love to do
7   that, but -- you know, when I got out of
8   jail.  I'm sure I mentioned it.
9   Q.  You know Don Triplett?
10   A.  Yeah, I know Don.
11   Q.  When was the last time you talked to Don?
12   A.  Oh, I don't remember.
13   Q.  Do you talk to him very often?
14   A.  Not very often, no.
15   Q.  Have you ever talked to him about this
16   case?
17   A.  I don't remember.  I don't know.
18   Q.  Did you talk to Dave Tuten about this case
19   after his deposition?
20   A.  I'm sure we've mentioned it, yeah.
21   Q.  What did y'all talk about?
22   A.  I'm sure he asked me what's going on or
23   what have you.  I mean, just casual

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 178

1  conversation about a lawsuit if there is
2  such a thing.
3  Q.  Does Don Triplett have any relationship now
4  with Alabama Gravel?
5  A.  Not that I know of.
6  Q.  Do you have any sort of a business
7  relationship with Don Triplett?
8  A.  Not me, no.
9  Q.  Do you know what he does for a living now?
10  A.  I have no idea.
11  Q.  Do you know how much CCI was paid to haul
12  Alabama Gravel white oversized to Globe?
13          MR. BAILEY:  Object to the form.
14          Answer as best you can.
15  A.  You talking about Globe in Selma?
16  Q.  Yes, sir.
17  A.  I think $5 a ton, I believe.  Now, I think
18  that.
19  Q.  And did you participate in the discussions
20  that led to that price being arrived at?
21  A.  I could have supplied some mileage
22  information to Carol.  I don't know.  I
23  don't remember.

Page 179

1  Q.  Which is furthest away from Globe?  Gentry,
2  Shorter, or Elmore?
3  A.  I think you asked that before, and I think
4  I said Shorter probably would be the
5  furthest away.
6  Q.  We were talking about -- maybe I wasn't
7  clear before, but I think I was talking
8  about Simcala before.  Now we're talking
9  about Globe.
10  A.  I think you asked me about Globe, too.
11  Q.  I think I -- maybe I did.  You're right.
12  A.  But I -- I think my answer then and my
13  answer now is I believe Shorter is the
14  furthest away, but, you know, the way you
15  have to go, it could be a close tie with
16  Elmore.
17  Q.  Did Dick Wymer or anybody else at Simcala
18  receive any money back from CCI in exchange
19  for CCI being able to haul white oversized
20  through Alabama Gravel to Simcala?
21          MR. BAILEY:  Object to the form.
22          Answer if you understood it.
23  A.  That's kind of a long question.  Say it one

Page 180

1  more time.
2  Q.  Was any money paid by CCI to Dick Wymer or
3  Ed Boardwine at Simcala in exchange for CCI
4  being able to haul white oversized to
5  Simcala?
6  A.  Not that I'm aware of.
7  Q.  Have you ever heard of that happening in
8  the industry, where a purchaser receives
9  money back from a hauler or supplier in
10  exchange for the right to deliver to that
11  purchaser?
12  A.  Not that I'm aware of, no.
13  Q.  And you're not aware of any of that
14  happening with respect to Simcala?
15  A.  Not that I'm aware of, no.
16  Q.  How about with respect to Globe?
17  A.  Not that I'm aware of.
18  Q.  Did you receive any compensation outside of
19  moneys paid to CCI for hauling related to
20  white oversized from Alabama Gravel to
21  Simcala?
22  A.  Did I receive any money?
23  Q.  Yes, sir.

Page 181

1  A.  No.
2  Q.  And the same question for Globe.  Did you
3  receive any money?
4  A.  No.
5  Q.  When did you first start making plans to go
6  back into the sand and gravel business?
7          MR. BAILEY:  Object to the form.
8          Answer as best you can.
9  A.  What do you mean by plans?
10  Q.  When did you start to develop in your mind
11  what it was you were going to do after you
12  got out of jail?
13          MR. BAILEY:  You're asking him
14          about his mental operations?
15          MR. GRISTINA:  Sure.
16          MR. BAILEY:  Okay.  Do the best
17          you can.
18  A.  You're talking about when did I dream of
19  going back into the sand and gravel
20  business?
21  Q.  Sure.
22  A.  The day that I got in jail.
23  Q.  And what was the first thing that you did

Page 182

1  besides dream about it to actually do
2  that?  What was the first step you took?
3  A.  Sometime in 2006, I got ahold of Polly
4    Williamson to see about testing her
5    property.  That's the first I recall of
6    anything I done to get back in the sand and
7    gravel business.
8      And let's take a break, if you don't
9    mind.
10     (Brief recess.)
11     (Plaintiff's Exhibit 23 was marked
12     for identification.)
13 Q.  (Mr. Gristina continuing)  I show you,
14   Mr. Lambert, what's been marked as
15   Plaintiff's 23.  That's the amended
16   counterclaim that you filed.  Am I correct,
17   Mr. Lambert, that you are not making a
18   claim for money damages against The
19   Concrete Company other than for your
20   attorney's fees?
21     MR. BAILEY:  At this time?
22     MR. GRISTINA:  Sure.
23     MR. BAILEY:  Can I speak for him?

Page 183

1      MR. GRISTINA:  You may.
2      MR. BAILEY:  At this time, that's
3      correct.
4      (Plaintiff's Exhibit 27 was marked
5      for identification.)
6  Q.  Show you, Mr. Lambert, Plaintiff's Exhibit
7    27.  Those are your responses to first
8    interrogatories.  Do you have anything to
9    add to your interrogatory responses as you
10   sit here today, or are they complete?
11     MR. BAILEY:  Object to the form.
12     Improper question.  It's
13     unfair without him going
14     through every one of them.  We
15     will supplement per the
16     rules.  But with that
17     objection, go ahead and
18     answer.
19 A.  I don't know.  You know, I don't...
20   What was the question?
21 Q.  Well, I'm asking you if your responses to
22   these interrogatories are complete; if you
23   have anything you would like to add to

Page 184

1  them.
2      MR. BAILEY:  Look at them, now.
3  A.  You want me to look at each one of them
4    specifically?
5  Q.  Sure.
6  A.  All right.  On number one --
7      MR. BAILEY:  That's not all of it.
8  A.  I hadn't had any involvement with any
9    prohibited activity.  I can't speak for
10   other people.  And I don't have any except
11   while I was managing Montgomery Materials.
12   And as I understand the definition of
13   prohibited activity, I have not.  Number
14   one is correct, except, now, I can't speak
15   for Carol's Contracting or Alabama Gravel.
16 Q.  All right.
17 A.  Number two.
18     MR. BAILEY:  Supplement that since
19     January 11th, 2006.
20 A.  On answer number one also, is that when I
21   answered this is that I'm answering this
22   prior to January the 2nd.
23 Q.  I understand.

Page 185

1  A.  Okay.  All right.  So anything after
2    January the 2nd, I'm not saying that --
3    this is -- all these answers are prior to
4    January the 2nd.
5      Number two is correct.
6      MR. BAILEY:  Do you have any
7      interest in any kind of
8      company involved in the sand
9      and gravel business today?
10     THE WITNESS:  Do I have any
11     interest?  Personally, no.
12 A.  Now, on number three, I don't understand it
13   to be prohibited activity if it's outside
14   of the territory, because it says have I
15   ever acted as a consultant, I think.  Yeah.
16 Q.  And your position is that you didn't do any
17   of that inside the territory other than
18   what you stated?
19 A.  That's right.
20 Q.  All right.
21 A.  Within the territory, number four is right.
22     Number five is right when it says I
23   have not.

Page 186

1    Number six is okay.
2    Number seven is -- I think it's a typo
3  here.  It says Dick Boardwine --
4  Q.  Sure.
5  A.  -- and that's supposed to be Ed.
6  Q.  Okay.
7  A.  Number seven is okay.
8    Number eight is okay.
9    Nine is okay as far as I'm concerned,
10  you know.
11    Ten is okay.  I can't -- again, I can't
12  speak for Carol's Contracting or Alabama
13  Gravel.
14    Number 11 is okay.
15    Number 12 is okay.
16    13's okay.
17    14's okay.
18    15's okay and 16.
19  Q.  16's already been supplemented, I guess.
20    Let me ask you this.  Looking at 13,
21  you say that you have no business
22  involvement with the Gentry pit
23  whatsoever.  However, I do know Mike Gentry

Page 187

1  and have been there many times.
2    Now, let me ask you this.  Mr. Gentry
3  and his pit --
4    Well, what is Mr. Gentry's primary
5  business?
6  A.  You would have to ask Mr. Gentry that.
7  Q.  He's a ready mix manufacturer, isn't he?
8  A.  He is.
9  Q.  And am I right that he used the Gentry pit
10  as a source for concrete sand primarily?
11  A.  I don't know.
12  Q.  And are you aware that the white oversized
13  was a byproduct to that mining operation
14  that he was not selling prior to Alabama
15  Gravel becoming involved in it?
16  A.  I don't know that, no.
17  Q.  So you didn't have any knowledge about an
18  excess inventory of white oversized gravel
19  at the Gentry pit prior to -- Well, strike
20  that.
21    Did you have any knowledge of an excess
22  of white oversized inventory at the Gentry
23  pit before Mr. Tuten called you and said he

Page 188

1  was looking to get back into the -- or get
2  into the sand and gravel business?
3  A.  No.
4  Q.  And you didn't inform Mr. Alexander and
5  Mr. Tuten of that excess inventory?
6  A.  Not that I recall, no, because I didn't
7  know about it.
8  Q.  Despite the fact that, as you say, you had
9  been to the Gentry pit many times?
10  A.  I went to the Gentry pit many times after
11  they started operating it, because I went
12  in there driving a truck and hauling
13  material out to make sure that they had
14  gravel on the ground for the trucks to
15  haul.  It was after Alabama Gravel started
16  operating it was when I went in there
17  numerous times.
18  Q.  Did you know --
19    Oh, it was after Alabama Gravel started
20  to operate it that you went in there
21  numerous times?
22  A.  That's right.
23  Q.  Did you know when you were operating the

Page 189

1  city pit that white oversized material was
2  a more precious aggregate than other
3  materials coming out of the ground?
4  A.  Yes.
5  Q.  And that's common knowledge in the sand and
6  gravel business, isn't it, that the white
7  oversized is the most valuable aggregate
8  that comes out of the mining operations?
9  A.  In this area, yes.
10  Q.  And prior to Alabama Gravel beginning to
11  haul out of the Gentry pit, had you hauled
12  aggregate out of there before?
13  A.  Had I hauled aggregate out of the Gentry
14  pit prior to Alabama Gravel?  Is that the
15  question?
16  Q.  Yes, sir.
17  A.  No.
18  Q.  And had you visited the pit before that
19  time?
20  A.  I don't recall.  I don't know.
21  Q.  And when you would visit aggregate mining
22  operations when you were driving the truck
23  for CCI, did you take note of the inventory

Page 190

1    amounts in those mining operations?
2    A.   Did I take note?
3    Q.   Yes.  Did you notice what their inventory
4         was?
5    A.   Oh, I could have.  I don't have any
6         specific recollection about that.
7    Q.   I mean, isn't that the kind of thing that
8         you would be curious about when you were
9         driving, to see what they had on the
10        ground?
11   A.   Not necessarily, no.
12   Q.   If you noticed an abundance of white
13        oversized on the ground, wouldn't that be
14        something that would stick out in your
15        mind?
16   A.   No.
17   Q.   Do you remember Danny Luster testifying
18        about the discussion he said he had with
19        you during which you referred to Mr. Foley
20        by a derogatory name?
21   A.   I remember him saying something about that,
22        yes.
23   Q.   Did you make that -- well, I could put it

Page 191

1         on the record if you like.  Do you remember
2         what Mr. Luster said you said?
3    A.   Not specifically, no.
4    Q.   I believe he said that you -- I believe he
5         said that you referred to Mr. Foley as a
6         four-eyed fucker.  Did you ever refer to
7         Mr. Foley as that?
8              MR. GRISTINA:  Excuse me, court
9              reporter, and Mrs. Lambert.  I
10             apologize.
11   A.   Not that I recall.
12   Q.   So you're denying that you made that
13        statement?
14   A.   I'm saying I don't recall making that
15        statement.
16   Q.   Do you recall telling him there were going
17        to be some surprises coming?
18   A.   No, I don't recall that.
19   Q.   Have you -- well, to my records, you
20        personally have produced zero documents in
21        response to the document request in this
22        case.
23   A.   I think that's right, yes.

Page 192

1    Q.   And is your document production complete?
2    A.   Yes, I believe it is.
3              (Plaintiff's Exhibit 28 was marked
4              for identification.)
5    Q.   These are your responses to our request for
6         production.  The answer is none to every
7         one of them.  So I'll just ask again, you
8         have no documents responsive to our request
9         for production?
10   A.   No, I don't have any.
11             (Plaintiff's Exhibit 29 was marked
12             for identification.)
13   Q.   Plaintiff's 29 is your initial
14        disclosures.  If you would turn to number
15        two, you said, during the past year, Harry
16        Lambert could have made income in the sand
17        and gravel business in excess of $300,000
18        per year had he not been improperly
19        prohibited from engaging in the business
20        for an unreasonable length of time.
21   A.   Which one is that, the number --
22   Q.   I'm sorry.  It is on the third page,
23        computation of damages, C-2.  Do you see

Page 193

1         that?
2    A.   Yeah.
3    Q.   Am I correct, again, you were not making a
4         claim against The Concrete Company at this
5         time for lost income?
6    A.   You have to talk to my counsel about that.
7         I don't think I am, no.  I don't believe
8         so.
9    Q.   All right.  And is it your position that
10        the noncompete in this case was
11        unreasonable in length?
12   A.   Yeah.
13   Q.   And what would have been a reasonable time?
14   A.   For what I was compensated, a year.
15   Q.   Did you know how long the noncompete was
16        going to be when you signed the 1997
17        agreement?
18   A.   Yes.
19   Q.   And you knew at that time it was to last
20        for five years?
21   A.   I'm sure I did, yes.
22   Q.   Let me show you what's been marked and used
23        as an exhibit before.  I believe this is,

Page 194

1  in fact, Defendant's Exhibit 3. Have you
2  ever seen that before?
3          MR. BAILEY: At a deposition or
4      prior to this case?
5          MR. GRISTINA: Prior to this case.
6  Q.  Have you ever seen it before?
7  A.  I don't remember seeing it prior to this
8  case, no.
9  Q.  Have you ever heard of Crest Capital
10  before?
11  A.  Never have.
12  Q.  Have you ever spoken to a man named Mike
13  Hong, H-O-N-G?
14  A.  Not that I recall. Now, if it ever was, it
15  would have been for Montgomery Materials,
16  LLC, is what this thing says. And it says
17  739 Oliver Road, which was Montgomery
18  Materials, LLC's address. Now, while I was
19  manager for Montgomery Materials, LLC, I
20  don't recall speaking to him, but that is
21  possible. But after I left Montgomery
22  Materials, LLC, I -- well, I don't remember
23  it before and I don't remember it after.

Page 195

1  Q.  Were you speaking to any finance companies
2  about financing equipment in December of
3  2005?
4  A.  No, I was not.
5  Q.  Are you aware that this document was faxed
6  to The Concrete Company in December of
7  2005?
8  A.  I remember something about that in
9  deposition. I don't remember the exact
10  date, but I remember they said it was faxed
11  to them. I don't know for a fact that it
12  was. I don't know for a fact whether they
13  made it up or not. I don't know.
14  Q.  Do you see where it says on the document --
15  someone's handwritten, Harry, if you have
16  the invoice, dash, descriptions for the
17  equipment, send those, too, and I'll take
18  care of it before the holidays. Thanks,
19  Mike. Do you see that?
20  A.  I see that.
21  Q.  And do you have any idea why Mike wrote
22  that to you?
23  A.  I'm not saying -- I'm not -- I don't think

Page 196

1  he wrote that to me, so I wouldn't have no
2  idea why he wrote it. But I don't think he
3  wrote it to me.
4  Q.  Were you purchasing any equipment in
5  December 2005?
6  A.  I already said no.
7  Q.  Was CCI purchasing any equipment in
8  December of 2005?
9  A.  I don't know.
10  Q.  Was Alabama Gravel to your knowledge
11  purchasing any equipment in December 2005?
12  A.  Is that December 2005?
13  Q.  Bad question. Because they didn't exist --
14  yeah, they did exist.
15          Was Alabama Gravel purchasing any
16  equipment in December 2005?
17  A.  I have no idea.
18  Q.  Now, were you involved with them purchasing
19  any equipment in December 2005?
20  A.  Not I.
21  Q.  You've been at the depositions, and I'm
22  sure you've seen Plaintiff's 10,
23  specifically the page out of there --

Page 197

1  excuse me -- Defendant's 10, specifically
2  the page out of there that's labeled
3  TCC000995. From what we understand, that
4  is a portion of Dick Wymer's calendar. Do
5  you see what's on Tuesday, January 6th,
6  2005?
7  A.  That's Thursday.
8  Q.  It is. I apologize. I'm reading upside
9  down.
10  A.  Okay. Yeah, I see that.
11  Q.  Do you see your name on that calendar?
12  A.  Yes, I do.
13  Q.  Is that the day that you think you may have
14  met with Dick Wymer and Ed Boardwine?
15  A.  It very well could be. It was early 2005,
16  and that's January the 6th that this says
17  it is, so that very well could be.
18  Q.  And that meeting took place at Simcala's
19  offices, correct?
20  A.  Yeah. They called me.
21  Q.  I understand. And you drove up there?
22  A.  (Witness nods head up and down.)
23  Q.  How did you get there?

Case 2:05-cv-01026-CSC     Document 86-3     Filed 10/24/2006     Page 52 of 68

Deposition of Harry E. Lambert                The Concrete Company vs. Lambert                August 29, 2006

Page 198

1   A.  Well, I drove.  I don't remember if it was
2       up or over or down, but I got there.
3   Q.  All right.  Do you know why you would have
4       called Southern Steel and Pipe in September
5       of 2005?
6           MR. BAILEY:  Object to the form.
7           You can go ahead and answer.
8   A.  I don't know that I did call them.
9   Q.  Have you reviewed the phone records that we
10      subpoenaed and were produced to your
11      attorney?
12  A.  I thumbed through them very briefly.
13  Q.  Would it surprise you to know that you
14      called Southern Steel and Pipe four times
15      in September 2005?
16  A.  I don't know that I did call them.  I don't
17      recall calling them.
18  Q.  Do you recall speaking to them for 19.6
19      minutes on September 26th, 2005?
20  A.  No, I don't recall that.
21  Q.  Are you aware that in September 2005,
22      Southern Steel and Pipe was doing work for
23      Alabama Gravel at the Deatsville site?

Page 199

1   A.  No, I'm not aware of that.
2   Q.  In fact, are you aware that they invoiced
3       Alabama Gravel on September 22nd and
4       October 3rd and October 25th, among other
5       dates, in 2005?
6   A.  I couldn't have no way of knowing that.
7   Q.  Do you know what Southern Steel and Pipe
8       does?
9   A.  They sell steel, I think.
10  Q.  And would your business ventures in
11      September of 2005 require for you to deal
12      with a steel company?
13  A.  Not me, no.
14  Q.  And your cell phone number is (334)
15      202-7177, isn't it?
16  A.  That's right.
17  Q.  And you don't have any recollection of
18      talking to them four times where you called
19      them in September 2005?
20  A.  I don't have any recollection of me calling
21      them, no.
22  Q.  Did you let somebody else use your cell
23      phone?

Page 200

1   A.  Occasionally.
2   Q.  How often?
3   A.  Oh, I don't know.
4   Q.  Do you think somebody else could have used
5       your cell phone to call Southern Steel?
6   A.  They could have.
7   Q.  Who do you think that could have been?
8   A.  It could have been Robert Alexander.  It
9       could have been Rex Dasinger.  It could
10      have been -- you know, I've loaned my phone
11      to some of the truck drivers.  So it could
12      have been numerous people.
13  Q.  All right.  And so you don't recall calling
14      them in September, and is it your testimony
15      that the call could have been placed by
16      somebody you loaned your phone to?
17  A.  Yeah, that's true.
18  Q.  Four times?  September 21, September 26,
19      September 27, September 28?  On those four
20      separate days, is it your testimony you
21      could have loaned your phone to somebody to
22      call Southern Steel?
23  A.  I don't know that I would have loaned it to

Page 201

1       them specifically to call Southern Steel.
2       I could have loaned them my phone, yes.  I
3       do that occasionally.
4   Q.  And are you aware that Southern Steel was
5       involved with the construction of the
6       Deatsville site?
7   A.  No, not really.
8   Q.  Have you seen, Mr. Lambert, what's been
9       Bates stamped AG00108?
10  A.  Have I seen it?
11  Q.  Yes, sir.
12  A.  I don't recall seeing it.
13  Q.  Well, let me represent to you that's an
14      invoice from Southern Steel to Alabama
15      Gravel dated September 22nd, 2005.  Do you
16      recognize the types of items described on
17      that invoice?
18  A.  Channel iron, angle iron, some green rags,
19      angle iron, channel iron, plate, channel
20      iron, used pipe.  Yeah.
21  Q.  And those are the kinds of equipment that
22      are used in the construction of a mining
23      operation, are they not?

Page 202

1  A.  They could be, yes.
2  Q.  And, again, you have no idea how a call
3      could have been placed from your phone to
4      Southern Steel the day before this invoice
5      was generated on September 21, 2005?
6  A.  No, not that I can recall.
7  Q.  Do you know who W.G. Ward is?
8  A.  W.G. Ward?  I guess that sounds like Bill
9      Ward by being a W, I would think.
10  Q.  And who is Bill Ward?
11  A.  Bill Ward is the -- or was or -- I don't
12      know if he still is -- he was a landowner
13      where The Concrete Company were mining
14      there in Shorter.
15  Q.  And would you have had any reason to
16      telephone him in August of 2005?
17  A.  Bill and I have been friends.  I could have
18      called him for numbers of reasons.  I don't
19      recall why I would have called him, no.
20  Q.  Do you recall speaking to him for 22.6
21      minutes on that day?
22  A.  If I don't remember calling him, I don't
23      remember speaking to him.

Page 203

1  Q.  Do you know what the Christian Associates
2      Testing Labs is?
3  A.  Christian Associates -- yeah, they're a
4      testing laboratory.
5  Q.  What do they test?
6  A.  They test just about anything.  Soils or
7      engineering or what have you.
8  Q.  Do they test white oversized?
9  A.  I don't know.
10  Q.  Do you know why you called them on January
11      3rd, 2006?
12      MR. BAILEY:  Object to the form.
13          Go ahead and answer.
14  A.  January the 3rd, 2006?
15  Q.  Yes, sir.
16  A.  No, I don't remember it specifically, why I
17      would have called them.
18  Q.  Do you know if you sent them any soil
19      samples for testing?
20  A.  I don't think I did.
21  Q.  Do you know the Dennis Welding Supply
22      Company?
23  A.  Yes, I do.

Page 204

1  Q.  And what do they do?
2  A.  They supply welding and oxygen, acetylene,
3      welding supplies.
4  Q.  Did you use those types of supplies in your
5      activities in life between the closing and
6      January 2nd, 2006?
7  A.  Yes.
8  Q.  And what did you use those for?
9  A.  In the maintenance on the trucks.
10  Q.  And so is it -- do you recall doing
11      business with Dennis Welding Supply Company
12      during that period?
13  A.  Yeah, I recall doing some business with
14      them.  I don't remember the specifics, but
15      I remember doing some, yeah.
16  Q.  And was that related to repairing the
17      trucks?
18  A.  I'm sure it was.  That's what I would think
19      it was.
20  Q.  Do you know who are Johnson and Sons Steel,
21      Incorporated?
22  A.  Johnson and Sons?  Not that I can recall,
23      no.

Page 205

1  Q.  Do you know why you would have called them
2      on October 27th, 2005?
3  A.  I don't know that I did call them.
4  Q.  If your phone records indicate that you
5      did, would they be wrong?
6  A.  It indicates that -- probably that a call
7      was made from that phone.
8  Q.  But, again, it would have been somebody you
9      loaned your phone to?
10  A.  It could be.  It could be.  I don't know.
11  Q.  What is the company CTE Lawn Equipment?
12  A.  CTE Lawn Equipment?  I think they sell lawn
13      mowers.
14  Q.  Do you recall doing business with them in
15      2005?
16  A.  I don't recall any specifics of it, no.
17  Q.  You apparently called them approximately a
18      dozen times in August 2005.  Do you recall
19      that?
20  A.  I don't remember -- I don't recall calling
21      them that many times, no.
22  Q.  Do you recall calling them for anything?
23  A.  We bought a lawn mower at some point in

Page 206

1   time, and I don't remember exactly when.
2   It could have been at that time.  I don't
3   know.
4   Q.  All right.
5   A.  My answer is I don't know.
6   Q.  Do you recall having dealings with a
7   company called Moody Tire Services or Moody
8   Tire Service?
9   A.  Not myself personally, no.  I know Carol's
10  Contracting has had some dealings with
11  them.
12  Q.  Did they provide tires for CCI trucks?
13  A.  They have in the past, yes.
14  Q.  And would you have been responsible to call
15  Moody Tire Service from time to time to
16  deal with them for those tires?
17  A.  I could have, yes.
18  Q.  All right.  And so if that number appears
19  repeatedly in your phone records in 2005,
20  would that have been related to calls you
21  placed?
22  A.  I would -- I think so, but, again, you
23  know, I loaned my phone, and it could have

Page 207

1   been somebody else.
2   Q.  Do you know a company Alcon Machinery and
3   Equipment Company?
4   A.  I don't recognize that name, no.
5   Q.  Do you recall placing phone calls to them?
6   A.  I don't recognize the name, so I wouldn't
7   recall placing any phone calls to them.
8   Q.  What about receiving calls from them?
9   A.  I don't -- I don't recall any, no.
10  Q.  Do you know Trey Holley?
11  A.  Yeah, I know Trey Holley.
12  Q.  What does Trey do for a living?
13  A.  He works I think for the Volvo store.
14  Q.  And does CCI use trucks from the Volvo
15  store?
16  A.  They have --
17      Does CCI use trucks from the Volvo
18  store?  No.  No.
19  Q.  Do you know if the Deatsville operation
20  uses Volvo trucks?
21  A.  They have one out there, yes.
22  Q.  Do you recall speaking to Mr. Holley about
23  getting a Volvo truck for the Deatsville

Page 208

1   operation before January 2006?
2   A.  For the Deatsville operation?
3   Q.  Yes, sir.
4   A.  No, I don't recall that.
5   Q.  Do you recall speaking to Mr. Holley before
6   January 2006 about Volvo trucks?
7   A.  No, I don't really recall speaking to him.
8   Q.  What does the company Russell Petroleum
9   Corporation do?
10  A.  They supply fuel to Carol's Contracting.
11  Q.  And do you recall speaking to them a number
12  of times in August 2005?
13  A.  I could have, but I don't recall.
14  Q.  Would you have been responsible to get fuel
15  for some of the CCI trucks?
16  A.  I could have.  I don't remember.  That's
17  possible.
18  Q.  Do you know the company Cohn Equipment
19  Rental Company, Inc.?
20  A.  Not right offhand, no.
21  Q.  Do you recall speaking to them in November
22  and December 2005 about renting some
23  equipment?

Page 209

1   A.  I don't recall that, no.
2   Q.  Do you know the company Alabama Trailer and
3   Truck Parts?
4   A.  I -- no.  I mean, I think I've heard of
5   them, but I really don't know of them.
6   Q.  Do you know Bobby and Nancy Harvey?
7   A.  Bobby Harvey?
8   Q.  Yes, sir.
9   A.  Yes, I know Bobby Harvey.
10  Q.  Who is Bobby Harvey?
11  A.  Bobby Harvey used to own Elmore Sand and
12  Gravel.
13  Q.  Do you know why you were speaking to him in
14  December 2005?
15  A.  I have no idea.  I've known Bobby Harvey
16  for a long time, and it was probably
17  personal.
18  Q.  We spoke of Mr. Maddox.  You know who that
19  is, I guess.
20  A.  Yes, I do.
21  Q.  And my question is do you know why you
22  would have been calling Jim Maddox in
23  August of 2005 and in July 2005?

Deposition of Harry E. Lambert      The Concrete Company vs. Lambert      August 29, 2006

Page 210

1  A.  If it was me, to talk to him, I guess.
2      I've known Jim for a long time.  Jim used
3      to work for a company that I ran and, you
4      know, I talk to Jim every now and again.
5  Q.  Would it have been about coordinating
6      shipments of Alabama Gravel white oversized
7      to Mr. Maddox?
8  A.  It could have been, yes.
9  Q.  So you would have spoken to him about
10     coordinating?
11  A.  I could have.  I could have.
12  Q.  Do you know the company Webb Concrete and
13     Building Materials?
14  A.  Yeah.  I think they're up around Oxford,
15     Alabama.  I believe they are.
16  Q.  What do they do?
17  A.  They're in the concrete business.
18  Q.  What dealings would you have had with them
19     in August 2005?
20  A.  I don't know.
21  Q.  Don't know why you would have called them?
22  A.  I don't know that I did.
23  Q.  Do you know who Dave Jones is?

Page 211

1  A.  Dave Jones?
2  Q.  Yes, sir.
3  A.  Not right offhand, no.
4  Q.  Don't know why you would have received a
5     call from Dave Jones?
6  A.  I have no idea.
7  Q.  Birmingham Peterbilt.  Have you dealt with
8     them before?
9  A.  For truck maintenance, yes.
10  Q.  And would they contact you from time to
11     time about CCI truck maintenance?
12  A.  Would they call me?
13  Q.  Yes, sir.
14  A.  I would -- I don't know.  They could have.
15  Q.  If I told you that Dave Jones was a Martin
16     Marietta sales manager, would that refresh
17     your recollection on him?
18  A.  Yeah.  I know a Dave Jones that's a Martin
19     Marietta sales manager, yes.
20  Q.  All right.  Do you know why he would have
21     been calling you in November 2005?
22  A.  He maybe was calling me to see when I got
23     out of jail.  I don't know.  I don't

Page 212

1     remember.
2  Q.  Is he a good friend of yours?
3  A.  I wouldn't say that Dave was a friend, no.
4     I -- he's an acquaintance.
5  Q.  You said he might be calling you to find
6     out when you got out of jail.  Do you know
7     how he would have known about your
8     noncompete?
9  A.  I have no idea.  It was pretty common
10     knowledge in the industry.
11  Q.  Do you know why Sam Estock would have
12     called you 29 times between August 16th,
13     2005 and December 28th, 2005?
14  A.  I would say -- August the 16th to
15     December?  I would say during football
16     season, we probably talked about football,
17     I would think.
18  Q.  And so you think 29 times he called about
19     football?
20  A.  Well, I don't know exactly.  It could have
21     been.  It could have been various
22     personal -- Sam and I have a close personal
23     relationship, and it could have been a lot

Page 213

1     of personal reasons.
2  Q.  Could it have also been the fact that he
3     was doing work on the Deatsville site and
4     wanted to talk to you about that?
5  A.  That wouldn't be why he would call me, no.
6  Q.  Is it your testimony that you-all didn't
7     talk about that when he called you?
8  A.  Not that I recall.
9  Q.  What is it Mr. Estock does for a living?
10  A.  Mr. Estock sells sand and gravel and screen
11     cloth, sand and gravel equipment.
12  Q.  His company is?
13  A.  Southern Wire.
14  Q.  Southern Wire.  That's right.
15     Are you aware that Southern Wire was
16     doing work for Alabama Gravel or providing
17     equipment to Alabama Gravel in July,
18     September -- July and September 2005?
19     MR. BAILEY:  Object to the form.
20     Go ahead and answer.
21  A.  That could have been mentioned in casual
22     conversation.  Do I have direct knowledge
23     of that?  No.

Page 214

1  Q.  They were also invoicing Alabama Gravel in
2      October 2005.  Were you aware of that?
3  A.  I'm not aware when they invoiced Alabama
4      Gravel, no.
5  Q.  There is an invoice dated October 27th,
6      2005.  In fact, you had a 25-minute
7      conversation with Mr. Estock the next day.
8      Do you recall that conversation?
9  A.  No, I don't recall any specifics on the
10     conversations.  What date was it?
11 Q.  You talked to him on October the 28th,
12     2005.  You talked to him twice that day,
13     once for 25 minutes and one for .4
14     minutes.  The day before, Alabama Gravel
15     was invoiced for $1,700 by Southern Wire.
16 A.  I don't recall.  It could have been, you
17     know -- like I said, again, we talked about
18     many personal things.
19 Q.  Have you dealt with Mr. Estock on the
20     Deatsville site since January 2nd, 2006?
21 A.  I've talked to Mr. Estock on the Deatsville
22     site.  I don't know if I've dealt with
23     him.  I don't -- I don't think -- I've

Page 215

1      talked to him.
2  Q.  But he's been providing equipment since
3      after January 2nd, 2006, hasn't he?
4  A.  Well, he could have been, yes.
5  Q.  Do you recall Mr. Maddox calling you more
6      than a dozen times in July and August 2005?
7  A.  I don't recall how many times Mr. Maddox
8      called me, but I remember him calling me.
9  Q.  And we've talked about some of those calls
10     might have been related to coordinating
11     white oversized?
12 A.  Yeah.  He could have asked if trucks were
13     available or what have you.
14 Q.  Do you know who a Pete Long is?
15 A.  Pete Long?  Not right off.  Not right
16     offhand.
17 Q.  Do you know any reason why you would have
18     been talking to him in October '05?
19 A.  Again, I don't -- I don't know and I don't
20     know that I did.
21 Q.  What about Pond River Steel?  Do you know
22     that company?
23 A.  Pond River Steel?  They's -- a couple of

Page 216

1      conveyors out there at Deatsville that's
2      got that name on it.
3  Q.  In fact, Pond River Steel is an
4      out-of-state company, isn't it?
5  A.  I think so.
6  Q.  Do you have any idea how Deatsville would
7      have gotten hooked up with Pond River
8      Steel?
9  A.  Are you talking about Alabama Gravel?
10 Q.  Yes, sir.
11 A.  No, I don't.
12 Q.  Did you place Alabama Gravel in touch with
13     Pond River Steel?
14 A.  No, I did not.
15 Q.  Do you know why they called you on October
16     12th and October 17th, 2005?
17 A.  I have no idea.
18 Q.  Would it surprise you to know that they
19     invoiced Alabama Gravel on October 25th,
20     2005?
21 A.  I don't know.
22 Q.  So it's your testimony that you didn't
23     coordinate between Pond River Steel and

Page 217

1      Alabama Gravel?
2  A.  No.
3  Q.  And you don't know how or why they called
4      you?
5  A.  I don't have any idea.
6  Q.  Do you know why Simcala was calling you on
7      July 26th, 2005 and August 22nd, 2005?
8  A.  I don't know.
9  Q.  Were they calling you to coordinate
10     shipments of white oversized?
11 A.  It could have been.
12 Q.  So would they have called you to tell you
13     they needed more white oversized?
14 A.  I don't remember.  I don't know.
15 Q.  Do you know why Southern Steel would have
16     called you more than a dozen times between
17     September 2005 and October 25th, 2005?
18 A.  I don't know.
19 Q.  And those calls, it's your testimony those
20     calls had nothing to do with the Deatsville
21     construction?
22 A.  No, they wouldn't have.
23 Q.  Despite the fact that they were working on

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert                    August 29, 2006

Page 218

1  the Deatsville site at that time?
2  A.  They wouldn't have been calling me about
3      the Deatsville site.
4  Q.  What would they have been calling you
5      about?
6  A.  I don't know.
7  Q.  Did you have any business ventures at that
8      time that would have required you to use
9      the services of Southern Steel and Pipe,
10     Inc.?
11 A.  No.
12 Q.  Do you know who Larry Speaks is?
13 A.  Yes, I do.
14 Q.  What does he do?
15 A.  He's in the engineering business.
16 Q.  Do you know why Larry Speaks --
17     Let me ask you this.  Did you talk to
18     Larry Speaks at all in 2005?
19 A.  I could have.  I don't remember.
20 Q.  Did you recommend Larry Speaks to Alabama
21     Gravel to do the permit work on the
22     Deatsville site?
23 A.  I don't remember whether I did or did not.

Page 219

1  Q.  So it's your testimony -- do you know how
2      Larry Speaks came to do the work on the
3      Deatsville site?
4  A.  No, I do not.
5  Q.  Are you aware that he did do the permit
6      work on that site?
7  A.  I'm not really aware of that.  I got aware
8      of that after 2006, but I wasn't aware of
9      it before that.
10 Q.  Do you know what Cowin Equipment Company
11     is?
12 A.  They are an equipment dealer.
13 Q.  What kind of equipment do they deal in?
14 A.  They sell about everything.  They sell
15     excavators, trucks, just a little bit of
16     everything.
17 Q.  Do they sell over-the-road trucks?
18 A.  Not that I know of.
19 Q.  So in the mining operation, you would use
20     excavators; is that correct?
21 A.  Yes.
22 Q.  And you use trucks that are --
23 A.  Off-road trucks.

Page 220

1  Q.  -- off-road trucks?
2  A.  Yes.
3  Q.  And that's the kind of equipment that Cowin
4      Equipment Company provides, is it not?
5  A.  Yes.  They sell air compressors.  They sell
6      all kinds of stuff.
7  Q.  All kinds of things that you could use in a
8      mining operation?
9  A.  Yeah, things that you could move -- or use
10     in a lot of things.
11 Q.  Do you know why they called you a dozen
12     times or more from July to December 2005?
13 A.  I don't remember.  They might have been
14     calling me to see if I was going back in
15     business or whatever reason.  I don't know
16     why they would call me.
17 Q.  Weren't they calling you about equipment
18     that was being used in Deatsville?
19 A.  No.
20 Q.  It's your testimony that you had no
21     dealings with Cowin Equipment Company
22     related to the Deatsville site before
23     January 2nd, 2006?

Page 221

1  A.  That's right.
2  Q.  Do you know what Alabama Machinery and
3      Supply Company does?
4  A.  Not right offhand, no.
5  Q.  You don't have any idea of whether or not
6      they do things related to the mining
7      business?
8  A.  Not right offhand.
9  Q.  L.L. Hodge Machine Works.  Do you know who
10     that is?
11 A.  No, not right offhand, no.
12 Q.  Do you know a guy named Nelson Abdulla?
13 A.  Nelson Abdulla?
14 Q.  Yes, sir.
15 A.  Not right offhand.  You'd think that if I
16     had heard that name, I would remember it,
17     but I don't remember that offhand.
18 Q.  Now, I can understand a number of phone
19     calls between your wife's number and your
20     cell phone, the hundreds I see here.  What
21     I'm curious about is why there is almost an
22     equal number of phone calls made from
23     Alabama Gravel to your cell phone between

Page 222

1    July 2005 and the end of 2005.
2  A.  I'm sure it was my wife calling me.
3  Q.  So would she have been calling you from the
4    Alabama Gravel office?
5  A.  She could have been.  I guess so.
6  Q.  Anybody else from Alabama Gravel call you
7    during that time period?
8  A.  No.
9  Q.  Well, I mean, except for Dave Tuten.  You
10    talked to Dave Tuten during that time
11    period, didn't you?
12  A.  Oh, I talked -- yeah, I talked to Dave
13    Tuten and I talked to Robert Alexander
14    during that time period, but I thought you
15    was talking about from Alabama Gravel's
16    office.
17  Q.  That's what I was just clarifying.  All
18    right.
19        Do you know why Mr. Alan King called
20    you 104 times from July 2005 to December
21    2005?
22  A.  Me and Alan King are long-time friends,
23    and -- I don't know what all them

Page 223

1    conversations would have been for, no.
2  Q.  And you're aware that during that same time
3    period, Mr. King was providing services to
4    Alabama Gravel?
5  A.  That's right.
6  Q.  Do you know under what name Mr. King bills
7    for those services?
8  A.  I don't know.
9  Q.  What company does he work for?
10  A.  He works for his own company.  I don't know
11    what the name of it is.
12  Q.  And isn't it a company that he would be
13    invoicing Alabama Gravel for?
14  A.  What?
15  Q.  He would be invoicing Alabama Gravel for
16    work, wouldn't he?
17  A.  I'm sure he would.
18  Q.  Is it your testimony that during those 104
19    conversations you guys stayed away from --
20    excuse me -- during the 104 times he called
21    you, you guys stayed away from talking
22    about the Deatsville site and what he was
23    doing there?

Page 224

1  A.  Oh, I'm sure that he has mentioned the
2    Deatsville site to me in casual
3    conversation, but, you know, any specifics
4    about it, I don't recall any specifics.
5  Q.  Aren't you coordinating his construction
6    work on that site during those phone calls?
7  A.  Am I coordinating?
8  Q.  Weren't you doing that when you were
9    talking to him?
10  A.  No.
11  Q.  It's your testimony you weren't instructing
12    him on what to do on that site during that
13    time?
14  A.  That's right.
15  Q.  And the 104 conversations that you had when
16    he called you had nothing to do with that?
17  A.  No.
18  Q.  The phone records reveal literally hundreds
19    of calls between you and the other CCI cell
20    phone numbers.  Can you explain to me how
21    and why you placed so many of those calls?
22  A.  No.
23  Q.  Under what circumstances would you need to

Page 225

1    talk to the other drivers that many times?
2  A.  Under what circumstances would I need to
3    talk to the drivers that many times?  I
4    don't know.
5  Q.  Weren't you dispatching those drivers for
6    CCI, hauling jobs?
7  A.  Direct dispatch, sometimes I did, yes.
8  Q.  Did you have any business dealings with
9    Neil Fuller from July to December 2005?
10  A.  Carol's Contracting did.  Me personally,
11    no.
12  Q.  And in what way did Carol's Contracting
13    deal with Neil Fuller?
14  A.  Well, wait.  I may have my dates mixed up.
15        In 2005, Carol had one or two trucks.
16    Carol's Contracting had one or two.  2004
17    and 2005, she had one or two trucks leased
18    on with Fuller Five Trucking.
19  Q.  In July of 2005 while CCI was hauling for
20    Alabama Gravel, they also were dealing with
21    Neil Fuller?
22  A.  They could have been, yes.
23  Q.  Under what --

Deposition of Harry E. Lambert                The Concrete Company vs. Lambert                August 29, 2006

Page 226

1   A.  Because there was a period of time that
2       they left and went to hauling other
3       material in 2005.
4   Q.  Under what circumstances would you have
5       dispatched drivers for CCI in 2005?
6   A.  Is that the drivers would ask me how many
7       loads to haul, and I would tell them, lots
8       of times on a daily basis, to haul X amount
9       of loads to Globe, X amount of loads to
10      Simcala per truck.  So I talked to them on
11      a daily basis to see how many loads that
12      they hauled.  I'd call them and ask them if
13      they -- how many loads that they had
14      hauled.  Just different reasons.
15  Q.  And am I correct that the Gentry pit is no
16      longer producing white oversized?
17  A.  You're right.
18  Q.  In fact, that pit's been -- the lease there
19      has been depleted; is that correct?
20  A.  I don't know that, no.  I don't know that.
21  Q.  Wasn't Alabama Gravel running around the
22      clock, hauling white oversized out of that
23      pit to Simcala and Globe?

Page 227

1   A.  Was Alabama Gravel running around --
2   Q.  Well, CCI hauling around the clock out of
3       that pit?
4   A.  No.  No, not necessarily around the clock.
5       Some of the drivers, to avoid traffic,
6       would start at two o'clock in the morning
7       and go until two o'clock in the evenings,
8       and some of them would want to be off and
9       things like that, so they were allowed to
10      haul when they wanted to.
11  Q.  And you coordinated that with them?
12  A.  I coordinated some of that, yeah.  They
13      would call me or I would call them and ask
14      them what hours they were going to run and
15      what have you.
16  Q.  Do you know who Hardy Taylor is?
17  A.  He's a Caterpillar salesman.
18  Q.  Do you know why he would have called you
19      more than a dozen times from July 2005 to
20      the end of 2005?
21  A.  Hardy and I are good friends.  We stay in
22      touch.
23  Q.  And Caterpillar is not something that makes

Page 228

1       over-the-road trucks, does it?
2   A.  No, but they make over-the-road engines,
3       and they service them from a Caterpillar
4       store.
5   Q.  Do they service any of the CCI trucks?
6   A.  Yes, they did.
7   Q.  And is it your testimony those calls could
8       have related to CCI trucks needing service?
9   A.  It could have related to that.  It could
10      have been a friendship call.  It could have
11      been for various reasons.
12  Q.  Could it also have been for obtaining
13      equipment for the Deatsville site?
14  A.  No.
15  Q.  Is there any Caterpillar equipment on the
16      Deatsville site?
17  A.  Yes, there is.
18  Q.  What sort of equipment is there?
19  A.  There's a bulldozer and a couple excavators
20      and I think a Caterpillar truck.
21  Q.  And do you know how the Deatsville site
22      obtained that equipment?
23  A.  I guess that they purchased it from the

Page 229

1       Caterpillar store.
2   Q.  From Hardy Taylor's place?
3   A.  I would think so.  I don't know if they
4       come from there or from Birmingham or from
5       Georgia.
6   Q.  Do you know Bubba's Materials?
7   A.  Bubba's Materials?  I know of them.  I
8       don't know them.
9   Q.  What do they do?
10  A.  They haul crusher run, they haul sand and
11      gravel, they haul topsoil, they haul all
12      kinds of products like that.
13  Q.  What about Johnny Harland?  Do you know
14      him?
15  A.  Johnny Harland?  Not offhand, no.
16  Q.  Any reason you would have -- he would have
17      called you?
18  A.  I don't know.
19  Q.  We were speaking of Trey Holley earlier, I
20      believe.  What did you say about Trey?
21      Where does he work?
22  A.  He works at the Volvo store.
23  Q.  And are you aware that he called you from

Page 230

1  August -- called you in August and
2  September 2005?
3  A.  I'm not aware of when he called me or what
4  have you.  He has called me.
5  Q.  And it's your testimony that you didn't
6  coordinate with him about getting some
7  Volvo trucks for the Deatsville site?
8  A.  That's right.
9  Q.  Do they have any Volvo -- one Volvo truck?
10  Is that what you said?
11  A.  I think that's -- yeah, that's what they
12  had.
13  Q.  You know Mr. O.G. Pinkston, don't you?
14  A.  Yes, I do.
15  Q.  And do you know why you would have been
16  speaking to Mr. Pinkston in August and
17  November and December 2005?
18  A.  I speak with Mr. Pinkston pretty
19  frequently.
20  Q.  Do you know what you would have been
21  speaking to him about?
22  A.  Just -- I talk to O.G. -- we're friends.  I
23  talk to him a lot.

Page 231

1  Q.  Would you have talked to him about getting
2  a lease at that time?
3  A.  No, because I was in jail.
4  Q.  Did you talk to him about your being in
5  jail?
6  A.  Oh, I'm sure I did.
7  Q.  Do you know Frank Thomas?
8  A.  Frank Thomas?  The name kind of rings a
9  bell, but I don't really recall.
10  Q.  Do you know why Fuller Five Enterprises
11  would have been calling you in August --
12  excuse me -- July, August, and September
13  2005?
14  A.  They might have been calling to see if any
15  trucks were available.  Various reasons.  I
16  don't know.
17  Q.  I think I asked you about Cohn Equipment
18  Rental.  Did you tell me you know who that
19  was?
20  A.  No, I can't remember -- I don't know who
21  that is.
22  Q.  Do you know why Sand Rock Transit would
23  have been calling you in September and

Page 232

1  November 2005?
2  A.  Randy Willingham could have been calling me
3  to talk to me.  I don't know why.
4  Q.  You don't know why Randy would have called
5  you?
6  A.  I have no idea.
7  Q.  Was it about obtaining white oversized?
8  A.  I'm sure it was not, but Randy and I are
9  friends, too.  I had many friends in this
10  business.
11  Q.  Well, I mean, in fact, in July, August,
12  September, October, November 2005, you also
13  received calls from Willingham Stone
14  Company.  Do you think that was Randy
15  Willingham?
16  A.  I would think that it was.  I'm not sure.
17  Q.  Also received calls from Randy Willingham
18  on his -- I don't know what number this is,
19  but in August, October, November 2005.  And
20  it's your testimony that none of that dealt
21  with the sand and gravel business?
22      MR. BAILEY:  Object to the form.
23  A.  He could have been calling to see if we

Page 233

1  could have delivered some for him.  That
2  would have been the only connection with
3  the sand and gravel business.
4  Q.  How often do you think you talked to Bernie
5  Ostervelt?
6  A.  Quite often.
7  Q.  When he called you in August, September,
8  October, and November of 2005, your
9  testimony was that had nothing to do with
10  the work Pearce Pump was doing on the
11  Deatsville site?
12  A.  That's right.
13  Q.  And it's your testimony you had no dealings
14  with Pearce Pump coordinating between them
15  and Alabama Gravel with respect to the
16  Deatsville site?
17  A.  That's right.
18  Q.  And the fact that they were working or
19  providing materials for the Deatsville site
20  during that time period is just a
21  coincidence?
22  A.  I would say so, yes.
23  Q.  Mr. Lambert, the phone records indicate

Page 234

1  hundreds of phone calls in 2005 between you
2  and Dave Tuten. Is it your testimony that
3  none of those phone calls related to work
4  you were doing at the Deatsville site for
5  Alabama Gravel?
6  A. That's right.
7  Q. What were y'all talking about?
8  A. I don't remember.
9  Q. You don't recall any of those phone calls?
10 A. I don't recall any specific phone call, no.
11 Q. There are phone calls here that lasted
12    anywhere from two minutes to 30. You don't
13    recall specifics on any of these phone
14    calls?
15 A. No, I don't.
16 Q. There were days where you talked to
17    Mr. Tuten three and four times, and you
18    don't recall any of the specifics of those
19    phone calls?
20 A. No, I don't.
21 Q. And you don't recall discussing with him
22    the Deatsville operation?
23 A. If -- Dave could have brought it up in

Page 235

1  casual conversation, but I don't recall any
2  specifics.
3  Q. Texas Crusher System, Inc. Do you know who
4    that is?
5  A. Not really. I'd say they sell crusher.
6  Q. Crusher's used in the sand and gravel
7    business?
8  A. Well, they could sell -- crusher's used in
9    any kind of aggregate business.
10 Q. Do you know why they would have called you
11   in November of 2005?
12 A. I have no idea.
13 Q. Did you consider Dave Tuten to be a better
14   friend than Alan King?
15      MR. BAILEY: Object to the form.
16      Answer as best you can.
17 A. I don't know. They're both good friends.
18 Q. Is there a reason why you spoke to Dave
19   Tuten much more in the same time period
20   than Alan King?
21 A. I wouldn't know.
22 Q. And can you tell me -- I may have asked
23   this, but I have to ask it again -- why you

Page 236

1  would have spoken to Dave Tuten so many
2  times during that time period?
3  A. We were good friends. We just talked about
4    a lot of stuff.
5  Q. Nearly every day?
6  A. That's right.
7  Q. Do you know who FCC Equipment Financing is?
8  A. Not right offhand, no.
9  Q. Do you know why they would have called you
10   in September 2005?
11 A. I don't know.
12 Q. Were you financing any equipment in
13   September 2005?
14 A. Was I?
15 Q. Yes, sir.
16 A. No.
17 Q. Was any company you were affiliated with?
18 A. Not that I know of.
19 Q. You may have said your brother's name, but
20   I don't think it was Lee. Who is Lee
21   Lambert?
22 A. That's the meanest man in the world. He's
23   my first cousin.

Page 237

1  Q. All right. Now, was Lee Lambert one of the
2    guys we spoke of earlier involved in the
3    litigation?
4  A. No.
5  Q. It's a different cousin?
6  A. No. Oh, it's -- he's the meanest man
7    in the world.
8  Q. Well, you only talked to him for two
9    minutes.
10 A. You don't talk to the meanest man in the
11   world for long.
12 Q. Do you recall having conversations with
13   Foshee Trucking in July 2005?
14 A. I don't recall, no.
15 Q. Do you know why they would have called you
16   in July of 2005?
17 A. I have -- I don't have a clue, no.
18 Q. What about October 2005?
19 A. I don't know.
20 Q. Do you know if CCI had an amicable
21   separation from Foshee Trucking?
22 A. I think they did, yeah.
23 Q. Did you ever have any -- you personally

Page 238

1   ever have any disputes with anybody at
2   Foshee Trucking while CCI was leasing on
3   with them?
4   A.  No, not that I can recall.
5   Q.  Do you recall any disputes that you're
6   aware of between Foshee Trucking and CCI?
7   A.  Not that I'm aware of.
8   Q.  Do you know who Carl King is?
9   A.  That is probably the same as Alan King.
10  Q.  Are you as good a friends with him?
11  A.  Well, the Alan King and Carl King is one
12  and the -- I think his name is C.A. or
13  A.C. King or something like that, Carl Alan
14  or Alan Carl.
15  Q.  And that's your friend, Carl Alan King?
16  A.  Well, it's the same person.  Alan King and
17  Carl King is the same person.
18  Q.  Is there an Alan J. King that you're aware
19  of?
20  A.  I think that's all Alan King, but I --
21  that's my recollection of that.
22  Q.  Have you ever had any dealings with Capitol
23  Volvo Truck and Trailer?

Page 239

1   A.  Yeah.  Carol's Contracting buys truck parts
2   from them.
3   Q.  Do you recall them phoning you in August
4   2005?
5   A.  I don't recall any specifics of it, no.
6   Q.  Do you know what the company Meco, Inc. is?
7   A.  Meco?  No, I don't know who that is.
8   Q.  Are you aware that Meco, Inc. sells
9   refurbished used equipment for the sand and
10  gravel business?
11  A.  No, I'm not aware of that.
12  Q.  Do you know why they would have called you
13  in October 2005?
14  A.  I have no idea.
15  Q.  Was that related to the stuff that was
16  going on in Deatsville?
17  A.  I don't have any idea.
18  Q.  Do you think that they would have called
19  somebody else who was borrowing your cell
20  phone?
21  A.  I don't have any idea.
22  Q.  Do you know what Montgomery Rubber and
23  Gasket Company is?

Page 240

1   A.  Yeah.  They sell rubber and gaskets.
2   Q.  Is it for use in the mining industry?
3   A.  Some of it can be.
4   Q.  Would you ever have any use for that in
5   repairing over-the-road trucks for CCI?
6   A.  Yes.
7   Q.  Do you think that that's the reason why you
8   called them in July of 2005?
9   A.  It could have been.  I don't recall any
10  specifics of that.
11  Q.  Do you know who Davey's DR Contractor is?
12  A.  Davey's DR Contractor?  No, I don't.
13  That -- not that I can recall.
14  Q.  What about David Davey's Contracting?  Does
15  that ring a bell?
16  A.  No, not really, not that I can recall.
17  Q.  I have another extensive list of dozens and
18  dozens of phone calls from you to Sam
19  Estock.  Again, is it your testimony that
20  your calls to him in 2005 were not related
21  to the Deatsville operation?
22  A.  That's true.
23  Q.  Do you know who Charles Crane is?

Page 241

1   A.  Charles Crane?
2   Q.  Yes, sir.
3   A.  No, not offhand.
4   Q.  You can't recall why you would have called
5   him?
6   A.  Not that I know of.
7   Q.  What about TrailStar Manufacturing Company?
8   A.  They manufacture dump trailers.
9   Q.  And do you know why you would have called
10  them in August of 2005?
11  A.  No, I don't know why.
12  Q.  Does CCI have any TrailStar dump trailers?
13  A.  Yes, they do.
14  Q.  Is that what you use on an over-the-road
15  truck?
16  A.  That's right.
17  Q.  And would you have called them for CCI?
18  A.  I don't know.
19  Q.  Does TrailStar manufacture dump trailers
20  that are used for off the road?
21  A.  Not that I know of, no.
22  Q.  Again, the number (334) 202-3983.  Does
23  that number ring a bell?

Page 242

1   A.  No, it don't.
2   Q.  You called that number 324 times.  You
3       don't recognize it?
4   A.  No.
5           MR. GRISTINA:  It's 3:30.  Why
6               don't we take a little break?
7       (Brief recess.)
8   Q.  (Mr. Gristina continuing)  Mr. Lambert, we
9       talked a little about Caterpillar trucks --
10      excuse me -- Caterpillar lift trucks, and
11      I'm looking at summaries of phone records
12      that indicate that you called them
13      literally dozens of times in July until the
14      end of 2005.  Is it your testimony that
15      none of that related to equipment at the
16      Deatsville site?
17  A.  That's correct.
18  Q.  And what could that have possibly related
19      to?
20  A.  I don't recall.
21  Q.  So you don't recall the reason you called
22      Caterpillar on those many occasions?
23  A.  No, I don't recall.  I don't recall why.

Page 243

1   Q.  Do you know why you were calling Simcala in
2       July and August and November and December
3       2005?
4   A.  No, I don't.
5   Q.  Could that have related to coordinating
6       Alabama Gravel's shipments to Simcala?
7   A.  It's possible.
8   Q.  And I asked earlier about calls to Southern
9       Steel and Pipe.  I'm looking again at
10      literally dozens of calls from your cell
11      phone to Southern Steel and Pipe.  Again,
12      it's your testimony that you had no
13      business dealings with Southern Steel and
14      Pipe in 2005?
15  A.  That's right.  They could have been when I
16      loaned my phone out.
17  Q.  About how often would you say you loaned
18      your phone out?
19  A.  I don't remember exactly.
20  Q.  Where would you have been when you loaned
21      your phone out to somebody who had dealings
22      with Southern Steel and Pipe?
23  A.  I don't know.  It could have been out at

Page 244

1       the Gentry pit.
2   Q.  Were they doing work at the Gentry pit when
3       you were out there?
4   A.  Was who doing work?
5   Q.  Southern Steel and Pipe.
6   A.  Not that I know of.
7   Q.  Do you know what Tire Centers, LLC is?
8   A.  They're a truck tire dealer.
9   Q.  And would you have had reason to call them
10      for CCI trucks?
11  A.  Yes, I would.
12  Q.  Peterbilt of Montgomery.  Are you familiar
13      with them?
14  A.  Yes, I am.
15  Q.  And would you have reason to call them in
16      2005?
17  A.  Yes, I would.
18  Q.  What would you have called them for?
19  A.  About maintenance items for CCI.
20  Q.  Do you know the company Industrial
21      Supplies, Inc.?
22  A.  Not right offhand, no.
23  Q.  Do you know why you would have called them

Page 245

1       in August and September 2005?
2   A.  No.
3   Q.  Have you ever heard of a company called
4       Sabel Steel?
5   A.  Yes.
6   Q.  What do they do?
7   A.  They sell steel, plumbing supplies, all
8       different hardware supplies, all kinds of
9       things.
10  Q.  Do they sell supplies for use in a mining
11      operation?
12  A.  They sell supplies for use in almost every
13      operation.
14  Q.  Do you know why you would have been calling
15      them in September 2005?
16  A.  Specifically, no.
17  Q.  Was it related to any business you were
18      involved in?
19  A.  It could have.  It could have related to
20      Carol's Contracting.
21  Q.  What products does Sabel Steel make that
22      you would have used on a CCI truck?
23  A.  Oh, it could have been any type of pipe

Deposition of Harry E. Lambert          The Concrete Company vs. Lambert          August 29, 2006

Page 246

1  fittings or different type of hardware,
2  bolts, nuts, just all kinds of different
3  things.
4  Q.  And you would have gotten that equipment to
5  repair CCI trucks?
6  A.  That's right.
7  Q.  Do you know who -- what company L.B. Smith,
8  Inc. is?
9  A.  L.B. Smith?
10  Q.  Yes, sir.
11  A.  Not right offhand, no.
12  Q.  Do you have any idea why they were calling
13  you in August, September, October,
14  November, and December 2005?
15  A.  No, I don't.
16  Q.  Isn't that company L.B. Smith -- does it
17  have any dealings with Volvo?
18  A.  They used to have, I think.  I don't know
19  for sure.
20  Q.  I think I asked you this.  Alabama
21  Machinery and Supply.  Do you know that
22  company?
23  A.  They're a big hardware supplier.

Page 247

1  Q.  Do they supply equipment for mining
2  operations?
3  A.  They supply equipment for every kind of
4  operation.
5  Q.  And would you have -- would you know why
6  you had dealings or phone calls to them in
7  August, October, November 2005?
8  A.  It could have been for Carol's Contracting,
9  I would suppose.  I don't know for sure.
10  Q.  Could it have been for the Deatsville site?
11  A.  No.
12  Q.  What about Alabama Bolt and Supply?  What
13  do they do?
14  A.  They sell nuts and bolts.
15  Q.  And what reason would you have had to call
16  them in October and November of 2005?
17  A.  To get nuts and bolts.
18  Q.  Do they sell some specialized kinds of
19  bolts?
20  A.  They sell all kinds of bolts.
21  Q.  For use on trucks?
22  A.  You can use them on cars, trucks,
23  motorcycles, you know, on anything.

Page 248

1  Q.  You have Harley Davidsons, don't you?
2  A.  Do I?
3  Q.  Yes.
4  A.  Yes, I do.
5  Q.  Do you work on those?
6  A.  Some.  Not a whole lot.
7  Q.  How many Harley Davidsons do you have?
8  A.  One.
9  Q.  Do you know who Skip Plumley is?
10  A.  Yeah, he's the -- he's a good friend of
11  mine, yeah.
12  Q.  And what does Skip do?
13  A.  He works for Thompson Tractor.
14  Q.  What kind of tractors does Thompson sell?
15  A.  Caterpillar.
16  Q.  And is that the Caterpillar lift truck
17  company we were talking about earlier or is
18  it a different one?
19  A.  Well, they sell lift trucks.  They sell all
20  kinds of equipment.
21  Q.  And in December 2005, were you buying some
22  equipment from Skip Plumley?
23  A.  No, I was not.

Page 249

1  Q.  Do you know why you would have been talking
2  to him?
3  A.  Again, Skip's an old friend of mine.  I've
4  known Skip for years and years.  I have no
5  idea what I would have been talking to him
6  about.
7  Q.  Is Thompson the same as Caterpillar Lift
8  Trucks?
9  A.  I would think so.  I don't know how it
10  would be listed.
11  Q.  Did you talk to O.G. Pinkston in October,
12  November, December 2005 about leasing land
13  from him?
14  A.  No, I didn't.
15  Q.  Does he have property that is leased for
16  aggregate mining?
17  A.  I don't know that for sure.
18  Q.  Someone in his family does, I presume.
19  A.  I would say so.
20  Q.  Do you recall why you called Couch Ready
21  Mix in December 2005?
22  A.  No, I don't.
23  Q.  Do you know a guy named Steve Shaw?

Page 250

1    A.  Yes, I do.
2    Q.  How well do you know Steve?
3    A.  Very well.
4    Q.  And do you talk to him from time to time?
5    A.  Yes, I do.
6    Q.  Have you talked to him about going back
7        into the sand and gravel business?
8    A.  Since 2006?
9    Q.  Before 2006.
10   A.  I'm sure I've mentioned to Steve that I
11       want to go back in the sand and gravel
12       business, but any specifics about going
13       back into it before 2006 I don't recall.
14   Q.  Do you know the bank Security Federal Bank?
15   A.  No, not offhand, no.
16   Q.  Do you know why you would have called them
17       in September 2005?
18   A.  No.  I have no idea if I did call them.
19   Q.  Were you arranging financing for equipment
20       through Security Federal Bank?
21   A.  Not me.
22   Q.  Do you know who Bob Becker is?
23   A.  Bobby Becker?

Page 251

1    Q.  Yes.
2    A.  Yes, he's a purchasing agent for Globe.
3    Q.  And do you know why you called the
4        purchasing agent for Globe in July,
5        August -- July and August 2005?
6    A.  I don't know specifics, no.
7    Q.  All right.  Were you selling anything to
8        Globe at that time?
9    A.  Not me, no.
10   Q.  And you don't know why you would have
11       called them?
12   A.  Not any specifics, no.
13   Q.  And you know that Globe is a purchaser of
14       white oversized material, correct?
15   A.  That's right.
16   Q.  And that's what -- and they were purchasing
17       white oversized from Alabama Gravel at that
18       time, were they not?
19   A.  That's right.
20   Q.  And you were delivering white oversized in
21       CCI trucks at that time, weren't you?
22   A.  That's correct.
23   Q.  Were you the one who connected Globe with

Page 252

1    Alabama Gravel?
2    A.  No, I was not.
3    Q.  Who did that, do you know?
4    A.  I don't know.
5    Q.  Who is Garland Rice?
6    A.  Garland Rice?  That name don't ring a bell.
7    Q.  Do you know the company K&L Trailer Sales
8        and Leasing?
9    A.  Yeah.  They sell TrailStar trailers, to the
10       best of my recollection.
11   Q.  Do you know why you would have called them,
12       looks like about two dozen times between
13       July and November 2005?
14   A.  I would suspect it would be regarding
15       maintenance on the TrailStar trailer for
16       Carol's Contracting.  That's what I would
17       think.  I don't know for sure.
18   Q.  From July 2005 to the end of 2005, did you
19       pay any personal visits to O.G. Pinkston?
20   A.  I don't know.  I could have.
21   Q.  You don't recall?
22   A.  I don't really recall any specifics, but we
23       could have met for lunch.  We do that

Page 253

1    occasionally, and I'm sure that we probably
2    had met for lunch during that period.
3    Q.  And these were in -- you think you probably
4        met him for lunch sometime in 2005?
5    A.  What's that?
6    Q.  You think you met him sometime for lunch in
7        2005?
8    A.  That is very possible, because we do that
9        periodically.
10   Q.  Did you have any personal visits during
11       2005 with Harold McLemore?
12   A.  No.  That I recall, no.
13   Q.  How about Mike Gentry?
14   A.  Not that I recall.  Well, in 2005, early
15       2005, we went over there to -- I took
16       Robert Alexander to look at them sand
17       screws, and I believe that was early 2005.
18       That's the only time that I personally went
19       to see Mike Gentry.
20   Q.  In 2005 did you have any discussions with
21       Randy Willingham about a proposed contract
22       between Randy's company and The Concrete
23       Company?

Page 254

1   A.  Not that I recall, no.
2   Q.  Do you recall in late October 2005 having
3       discussions with Randy Willingham about a
4       concrete company contract with Randy
5       Willingham?
6   A.  Not that I recall, no.
7   Q.  Do you know who Mack McLeod is?
8   A.  Yes.
9   Q.  Who is Mack McLeod?
10  A.  Mack McLeod is one of the owners of
11      Anderson Road Materials.
12  Q.  Did you have any dealings with him in 2005?
13  A.  Not that I can recall, no.
14  Q.  Have you received your final payments
15      pursuant to the consulting agreement that
16      we talked about earlier today?
17  A.  Final payments -- I would have to go back
18      and look and see what payments I have
19      received, but I think that the final
20      payments are still due.
21  Q.  Do you know of any other compensation paid
22      to CCI for shipments to Simcala other than
23      the $6 a ton that we spoke about?

Page 255

1   A.  I think you've asked that before, but I
2       don't know of any, no, that I can recall.
3   Q.  Do you know how you arrived at the
4       compensation amounts in the consulting
5       agreement?
6   A.  The specifics how I arrived at it, no.
7   Q.  Were those numbers that you asked for?
8   A.  That's right.
9   Q.  And how did you come up with those numbers?
10  A.  I don't remember the specifics. They
11      wanted to know what I would charge, and I
12      told them and they agreed to it.
13  Q.  Do you know when they started the process
14      of applying for the permit for the
15      Deatsville site?
16  A.  No, I do not.
17  Q.  Who was it that helped, if you know,
18      Alabama Gravel get that permit?
19  A.  I do not know.
20  Q.  Was it Larry Speaks?
21  A.  I guess it was, yeah.
22  Q.  Do you recall a number of conversations
23      with Larry Speaks while he was working on

Page 256

1       the Deatsville site getting the permit?
2   A.  Not really, I don't recall any.
3   Q.  Do you recall ever speaking to Larry Speaks
4       about the Deatsville permit?
5   A.  I don't think so. I don't believe I did.
6   Q.  Have you ever recruited any employees from
7       Anderson Farms to work for you on the
8       Deatsville site?
9   A.  Not that I can recall, no.
10  Q.  Do you recall trying to recruit someone in
11      the summer of 2005 to work for you at
12      Deatsville, someone from Anderson Farms?
13  A.  Not that I can recall, no.
14  Q.  We talked about it earlier, but after Hugh
15      Sorrell's deposition, you went to Elmore
16      Sand and Gravel and spoke to Jeff Gaddy,
17      didn't you?
18  A.  I think so, yeah.
19  Q.  And didn't you tell Jeff Gaddy that if
20      Billy Stanley wanted to know anything about
21      your business, he could come and ask you?
22  A.  That's very possible.
23  Q.  You were mad at him, weren't you?

Page 257

1   A.  I don't know if you would use the word mad,
2       no.
3   Q.  Didn't they tell you to get off the
4       property?
5   A.  Not that I recall, no.
6   Q.  Then why did you go ask him that?
7   A.  Because that's what I wanted to tell him.
8       That's what I chose to do.
9   Q.  What caused you to go to Billy Stanley and
10      to -- what caused you to go to Elmore Sand
11      and Gravel and to speak to Jeff Gaddy in
12      that way?
13  A.  In what way?
14  Q.  To comment that if Billy Stanley wanted to
15      know anything about your business, he could
16      come and ask you. What caused you to do
17      that?
18  A.  That's what I chose to do.
19  Q.  Because you were upset that Billy Stanley
20      had the courage to speak to Hugh Sorrell
21      about your business in the sand and gravel
22      operations. Wasn't that it?
23  A.  That's speculation that I would have about

Page 258

1  what Billy Stanley thought or didn't
2  think.  That's what I chose to do, and, you
3  know, there's no need to try to put words
4  in my mouth why --
5  Q.  Well, I'm asking.  And the day before that,
6  you had heard through Hugh Sorrell's
7  deposition testimony that Billy Stanley had
8  been talking about you.
9  A.  I don't know if it was the day before I
10  went to see him or not.  I don't know.
11  Q.  Is the reason you went there because of
12  what you heard during Hugh Sorrell's
13  deposition?
14  A.  No.  The reason I went there is because
15  that's what I chose to do.
16  Q.  And it had nothing to do with Hugh
17  Sorrell's testimony?
18  A.  That's what I chose to do.
19  Q.  You didn't want Mr. Stanley talking about
20  you, did you, in this case?
21  A.  That's what I chose to do.
22  Q.  And are you aware that Mr. Stanley's a
23  potential witness in this case?

Page 259

1  A.  I don't know that, no.
2  Q.  And did they accuse you at that time of
3  counting trucks that were leaving the
4  Elmore pit?
5  A.  I don't know.  I don't know if they did or
6  didn't.
7  Q.  Is that something that you had been doing,
8  counting trucks leaving that pit at that
9  time?
10  A.  No.
11  Q.  Have you ever counted trucks leaving the
12  Elmore pit before?
13  A.  No.
14  Q.  What percentage of completion was the
15  Deatsville plant at on January 2nd, 2006?
16  A.  I don't know.
17  Q.  But you signed a consulting agreement.  You
18  must have known something about the level
19  of completion.
20       MR. BAILEY:  Object.
21          Argumentative.  Answer as best
22          you can.
23  A.  I didn't sign the consulting agreement

Page 260

1  until April, so, you know, I really
2  don't -- I didn't put a percentage to it or
3  anything.
4  Q.  Are you aware of welders coming to the
5  Elmore Sand and Gravel pit and asking where
6  the Harry Lambert pit was before January 1,
7  2006?
8  A.  I'm not aware of that, no.
9  Q.  Have you ever referred to the Deatsville --
10  have you ever heard the Deatsville
11  operation referred to as the Harry Lambert
12  pit?
13  A.  Just when you mentioned it.  That's the
14  only time.
15  Q.  Do you know of any experience Rex Dasinger
16  had prior to going to -- excuse me -- prior
17  to being affiliated with Alabama Gravel in
18  locating sand and gravel?
19  A.  I'm not aware of his experience, no.
20  Q.  That's a unique ability, isn't it, to be
21  able to go to a site and determine what
22  sort of sand and gravel you might be able
23  to mine there?

Page 261

1  A.  Not necessarily, no.
2  Q.  Is that something that you're particularly
3  good at?
4  A.  I don't know.
5  Q.  Aren't you known in the industry as
6  somebody who's got a good nose for where to
7  find sand and gravel?
8  A.  I don't know that.
9  Q.  Is Rex Dasinger known as someone in the
10  industry who has that?
11  A.  I don't know.
12  Q.  Does anybody at Alabama Gravel -- Rex
13  Dasinger, David Tuten, Robert Alexander or
14  Ms. Lambert  -- do any of those people have
15  any experience in locating sand and
16  gravel?
17  A.  I don't know.
18       MR. GRISTINA:  Take a couple
19          minutes.  Very nearly
20          complete.
21       (Brief recess.)
22       MR. GRISTINA:  I don't have
23          anything further.  Thank you.

Page 262

1    THE WITNESS: You're welcome.
2              EXAMINATION
3    BY MR. BAILEY:
4    Q.  Mr. Lambert, during your service as the
5         manager of Montgomery Materials, LLC here
6         in Montgomery, were you familiar with the
7         customers of that organization?
8    A.  Yes, sir, I was.
9    Q.  Was Simcala ever a customer of Montgomery
10        Materials, LLC to your knowledge?
11   A.  Montgomery Materials, LLC?
12   Q.  Right.
13   A.  Not that I can remember. I don't think
14        that they were.
15   Q.  Was Maddox Stone ever a customer of
16        Montgomery Materials, LLC?
17   A.  I don't believe -- the answer is no, and I
18        don't believe Maddox Stone was even formed
19        while Montgomery Materials, LLC was in
20        operation.
21           MR. BAILEY: No further
22        questions.
23

Page 263

1
        FURTHER DEPONENT SAITH NOT
2
        * * * * * * * * * * * * *
3
4        REPORTER'S CERTIFICATE
5    STATE OF ALABAMA:
6    MONTGOMERY COUNTY:
7        I, Patricia G. Starkie, Registered
8    Diplomate Reporter, CRR, and Commissioner for the
9    State of Alabama at Large, do hereby certify that I
10   reported the deposition of:
11          HARRY E. LAMBERT
12   who was first duly sworn by me to speak the truth,
13   the whole truth and nothing but the truth, in the
14   matter of:
15          THE CONCRETE COMPANY,
16          Plaintiff,
17          Vs.
18          HARRY E. LAMBERT, CAROL'S
19          CONTRACTING, INC.,
20          Defendants.
21          In The U.S. District Court
22          For the Middle District of Alabama
23          Northern Division

Page 264

1        Case Number 2:05-cv-1026-C
2    on August 29, 2006.
3        The foregoing 263 computer printed pages
4    contain a true and correct transcript of the
5    examination of said witness by counsel for the
6    parties set out herein. The reading and signing of
7    same is hereby waived.
8        I further certify that I am neither of kin
9    nor of counsel to the parties to said cause nor in
10   any manner interested in the results thereof.
11       This 11th day of September 2006.
12
13
14        _____
          Patricia G. Starkie, Registered
15        Diplomate Reporter, CRR, and
          Commissioner for the State
16        of Alabama at Large
17
18
19
20
21
22
23