# DEPOSITION OF DAVID TUTEN

## July 13, 2006

## Pages 1 through 267

## CONDENSED TRANSCRIPT AND CONCORDANCE PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

```
 1

 2            IN THE UNITED STATES DISTRICT COURT

 3            FOR THE MIDDLE DISTRICT OF ALABAMA

 4                    NORTHERN DIVISION

 5

 6    THE CONCRETE COMPANY,

 7          Plaintiff,

 8       vs.                    CIVIL ACTION NO.
                                2005-CV-1026-CSC
 9

      HARRY E. LAMBERT, CAROL'S
10    CONTRACTING, INCORPORATED, and
      ALABAMA GRAVEL, LLC,

11

            Defendants.

12

13            * * * * * * * * * * * *

14

15            DEPOSITION OF DAVID TUTEN, taken

16    pursuant to stipulation and agreement before Tracye

17    Sadler, Certified Shorthand Reporter and

18    Commissioner for the State of Alabama at Large, in

19    the Law Offices of Balch & Bingham, Suite 200, 105

20    Tallapoosa Street, Montgomery, Alabama, on July 13,

21    2006, commencing at approximately 9:05 a.m.

22

23            * * * * * * * * * * * *
```

Page 2

```
 1                APPEARANCES
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4  Mr. Thomas F. Gristina
    PAGE, SCRANTOM, SPROUSE, TUCKER & FORD, P.C.
 5  Attorneys at Law
    Synovus Centre
 6  1111 Bay Avenue
    Third Floor
 7  Columbus, Georgia  31901
 8  Mr. G. Lane Knight
    BALCH & BINGHAM
 9  Attorneys at Law
    Suite 200
10  105 Tallapoosa Street
    Montgomery, Alabama  36104
11
12  ON BEHALF OF THE DEFENDANT HARRY E. LAMBERT:
13  Mr. Dennis R. Bailey
    RUSHTON, STAKELY, JOHNSTON & GARRETT
14  Attorneys at Law
    184 Commerce Street
15  Montgomery, AL 36104
16
17  ON BEHALF OF ALABAMA GRAVEL, LLC:
18  Mr. James N. Walter, Jr.
    CAPELL & HOWARD
    Attorneys at Law
19  150 South Perry Street
    Montgomery, Alabama  36104
20
21  ALSO PRESENT:
22  Mr. Harry Lambert
    Mr. Hugh Sorrell
23
```

Page 3

```
 1          EXAMINATION INDEX
 2
    BY MR. GRISTINA  . . . . . . . .  6
 3  BY MR. BAILEY  . . . . . . . . .  261
 4
         PLAINTIFF'S EXHIBITS
 5
 6   1  Articles of Organization of Alabama      49
        Gravel, LLC
 7
     2  UCC Filings                     171
 8
     3  4-21-06 E-mail from Jimmy Walter with    199
 9      Consulting Agreement Attached
10   4  Composite of Electric Bills for Gentry   206
        Pit
11
     5  Composite of Invoices to Simcala         209
12
     6  Composite of Invoices to Globe           217
13      Metallurgical
14   7  Composite of Invoices to Maddox Sand &   224
        Gravel
15
     8  Composite of 5-1-06 Letter from Jimmy    226
16      Walter with Production of Alabama Gravel
        Documents Attached
17
     9  Composite of Documents Received from     242
18      Pearce Pump South, Inc., Via Subpoena
19  10  Composite of Documents Received from     243
        Maddox Stone & Gravel  Via Subpoena
20
    11  Composite of Documents Received from     246
21      Southern Wire Enterprises, Inc.,  Via
        Subpoena
22
23       (Index continued on next page)
```

Page 4

```
 1       PLAINTIFF'S EXHIBITS (CONTINUED)
 2
    12  Composite of Documents Received from     248
 3      Simcala  Via Subpoena
 4  13  5-4-05 Letter to Robert Alexander from    251
        Eddie Boardwine
 5
 6  14  6-20-05 Letter to Eddie Boardwine from    257
        Robert Alexander
 7
 8             * * * * * * * * * * * *
 9
10              STIPULATIONS
```
```
11      It is hereby stipulated and agreed by and
12  between counsel representing the parties that the
13  deposition of DAVID TUTEN is taken pursuant to the
14  Federal Rules of Civil Procedure and that said
15  deposition may be taken before Tracye Sadler,
16  Certified Shorthand Reporter and Commissioner for
17  the State of Alabama at Large, without the
18  formality of a commission, that objections to
19  questions other than objections as to the form of
20  the question need not be made at this time but may
21  be reserved for a ruling at such time as the said
22  deposition may be offered in evidence or used for
23  any other purpose by either party provided for by
```

Page 5

```
 1  the Statute.
 2      It is further stipulated and agreed by and
 3  between counsel representing the parties in this
 4  case that the filing of said deposition is hereby
 5  waived and may be introduced at the trial of this
 6  case or used in any other manner by either party
 7  hereto provided for by the Statute regardless of
 8  the waiving of the filing of the same.
 9      It is further stipulated and agreed by and
10  between the parties hereto and the witness that the
11  signature of the witness to this deposition is
12  hereby waived.
13
14             * * * * * * * * * * * *
15
16      THE COURT REPORTER:  Usual
17        stipulations?
18      MR. GRISTINA:  Yes.
19      MR. WALTER:  Yes.
20      MR. BAILEY:  Yes.
21
22
23
```

Deposition of David Tuten                                                July 13, 2006

Page 6

1                    DAVID TUTEN
2        The witness, after having first been duly sworn
3    to speak the truth, the whole truth, and nothing
4    but the truth, testified as follows:
5                    EXAMINATION
6    BY MR. GRISTINA:
7    Q.  Good morning, Mr. Tuten.  We've met
8        before.  I'm Thomas Gristina.  I represent
9        The Concrete Company in this litigation.
10       You've been to a number of depositions, so
11       you've kind of heard the ground rules, and
12       I hope you're familiar with them.  Do I
13       need to go through them again?
14   A.  No.
15   Q.  So if you answer my question, I'll assume
16       that you understood it and you answered it
17       to the best of my knowledge as you sit here
18       today.  Is that okay?
19   A.  Yes.
20   Q.  Mr. Tuten, could you give us your full name
21       and address, please?
22   A.  William David Tuten, 313 Lawton Road,
23       Marietta, Ohio.

Page 7

1    Q.  Now, Mr. Tuten, what is it that you do for
2        a living?
3    A.  I'm self-employed.
4    Q.  Self-employed in what business?
5    A.  I have a consulting business.
6    Q.  And what is the name of that business?
7    A.  Two Rivers Industries.
8    Q.  Did what does Two Rivers Industries do?
9    A.  That's just myself, and I do consulting
10       work for operations mainly in the
11       manufacturing of ferroalloys.
12   Q.  What is a ferroalloy?
13   A.  The production of silicon or ferrosilicon.
14   Q.  Who do you consult with currently?
15   A.  Right now no one.
16   Q.  And we'll go back in time and work up to
17       where we are now.
18           What's your date of birth?
19   A.  June 26th, 1959.
20   Q.  All right.  And did you complete high
21       school?
22   A.  Yes.
23   Q.  And where was that?

Page 8

1    A.  Fort Frye High School.
2    Q.  Where?
3    A.  Beverly, Ohio.
4    Q.  After high school what did you do for
5        education?
6    A.  I went to college, Georgetown College in
7        Georgetown, Kentucky, and also Washington
8        State Community College.
9    Q.  Did you receive a degree?
10   A.  Yes.
11   Q.  What type of degree?
12   A.  I have an associate's degree in accounting.
13   Q.  From which school?
14   A.  Washington State Community College.
15   Q.  What year was that?
16   A.  1980.
17   Q.  Before you completed that degree did you
18       work?
19   A.  Yes.
20   Q.  What was your employment?
21   A.  I worked in the summers.  When I wasn't
22       going to school, I worked in the summer.  I
23       worked for the soil and conservation

Page 9

1        district and also worked at Globe
2        Metallurgical.
3    Q.  Is that all in Ohio?
4    A.  Yes.
5    Q.  What were your duties with Globe?
6    A.  Oh, I was just a clerk, office clerk.
7    Q.  Do you recall how old you were when you
8        were doing that?
9    A.  Yeah.  I was 18.
10   Q.  Have you ever served in the military?
11   A.  Never.
12   Q.  And how long were you with Globe when you
13       were around 18 years old?
14   A.  Well, after I graduated from community
15       college, they offered me a full-time job,
16       and I was there for 22 years.
17   Q.  So starting -- I believe you said -- was it
18       '81 when you graduated?
19   A.  '80.
20   Q.  '80.  I'm sorry.  And then you began to
21       work full-time with Globe?
22   A.  In 1981 I became a full-time employee,
23       yes.

Deposition of David Tuten                                        July 13, 2006

Page 10

1    Q.   And what was your first duty with Globe?
2    A.   I was basically an office clerk, worked in
3         the accounting department.
4    Q.   How long did you remain in that position?
5    A.   Until -- in that department until about
6         1985.
7    Q.   And then what did you do?
8    A.   And then I moved into the purchasing
9         department.
10   Q.   Tell me about the business at that time
11        when you were in purchasing at Globe
12        Metallurgical.  What did it do for
13        business?
14   A.   What did Globe do?
15   Q.   Yes, sir.
16   A.   Globe was a manufacturer of ferroalloys.
17        They made different alloys that are made in
18        submerged arc furnaces.  They purchased --
19        you know, purchased raw materials, and
20        they're smelted in an electric arc furnace
21        and turned into an alloy compound that's
22        used in either steel-making, aluminum,
23        automotive type things.

Page 11

1    Q.   And silica is a ferroalloy?
2    A.   Silicon is considered a ferroalloy, yes.
3    Q.   Is it silicon or silica?
4    A.   Silicon.
5    Q.   O-N?
6    A.   O-N, that's correct.
7    Q.   I have no experience in the area, so I'm
8         going to learn something from you today.
9             Now, you said you were in purchasing.
10        What did you purchase for Globe?
11   A.   Mostly my experience in purchasing was --
12        delved in the raw material areas.
13        Purchased gravel, coal, coke, charcoal,
14        steel scrap -- I mean -- well, lime,
15        limestone, all kinds of products.
16   Q.   And those are all products that are used to
17        make silicon?
18   A.   Silicon and other ferroalloy types.
19        There's many different types.
20   Q.   So starting in 1985 you became a purchaser
21        to seek out raw materials for Globe that
22        were used in production?
23   A.   Correct.

Page 12

1    Q.   Where did you seek most of these raw
2         materials or were they all over the place?
3    A.   Oh, they were, yeah, everywhere.
4    Q.   Focusing on Alabama, did you develop
5         contacts in Alabama at that time?
6    A.   When I was -- got involved in purchasing, I
7         took over for a gentleman that had been
8         there for many, many years, and he had
9         already developed all these.  I just kind
10        of stepped into the job and, you know, took
11        over from where -- what he was already
12        doing.
13   Q.   And what was his name?
14   A.   His name was Bob Geddis.
15   Q.   Did he retire?
16   A.   Yes, he did.
17   Q.   And he had contacts already in Alabama?
18   A.   Yes, uh-huh (positive response).
19   Q.   Who were your contacts, if you can recall,
20        in Alabama starting in 1985 that you would
21        deal with in purchasing?
22   A.   Half of those people aren't even in
23        business anymore.  The main thing we bought

Page 13

1         in Alabama was gravel.  And I'm trying to
2         think here.  There was a company we used to
3         buy material from -- Crosby Carmichael was
4         one, Martin Marietta.  I can't remember.
5    Q.   All right.  I'm not asking you to guess,
6         and I know it was a long time ago.
7             At some point I presume that you
8         developed a contact with Mr. Harry Lambert;
9         is that correct?
10   A.   Yes.
11   Q.   And when was that?
12   A.   It would have been about 1987, '88,
13        somewhere in there.
14   Q.   And at that time were you still in
15        purchasing for Globe?
16   A.   Yes.
17   Q.   And how did you come to meet Mr. Lambert?
18   A.   We were buying gravel through another guy,
19        through a broker that was selling gravel
20        for Mr. Lambert.
21   Q.   Who was the broker?
22   A.   A fellow by the name of Pete Gibbs.
23   Q.   How did that relationship develop with

Page 14

1    Mr. Gibbs and Mr. Lambert?
2    A.  It had already -- I mean, I don't know.
3    Q.  Maybe I can rephrase it a little bit.
4        How did the broker aspect of that
5    relationship work?  Did you go to the
6    broker and then he would get you in touch
7    with Mr. Lambert?  Could you explain that a
8    little --
9        MR. WALTER:  Are you asking about
10           the broker relationship
11           between Globe and Mr. Gibbs?
12       MR. GRISTINA:  Well, I'll start
13           over.
14   Q.  Was Mr. Gibbs a broker?
15   A.  Yes.
16   Q.  What did he do as a broker?
17   A.  If we needed material, we would just
18   contact him and he'd get it.  He'd supply
19   it.
20   Q.  In your role as a purchaser for Globe did
21   you frequently deal with brokers of
22   aggregate materials?
23   A.  No.

Page 15

1    Q.  Is Mr. Gibbs the only one?
2    A.  Yes.
3    Q.  In terms of suppliers that Mr. Gibbs put
4    you in touch with, was Mr. Lambert one of
5    those suppliers?
6    A.  Yes.
7    Q.  Were there other suppliers that he put you
8    in touch with?
9    A.  Yes.
10   Q.  Who were the other ones?
11   A.  There was Pete Gibbs.  He represented three
12   or four, maybe more, gravel people.  One of
13   them was -- I think was Ingram.  I can't
14   remember.
15   Q.  Was Ingram a company or a man?
16   A.  I think that was the guy's last name, but
17   it was called Ingram Gravel.
18   Q.  Did you pay the broker or did you pay the
19   supplier directly for the product that you
20   got through Mr. Gibbs?
21   A.  I believe we paid the broker directly.
22   Q.  Were you familiar with how much of that
23   purchase price would go to the supplier?

Page 16

1    A.  No.
2    Q.  Were you familiar with what the commission
3    the broker received was?
4    A.  No.
5    Q.  How long after 1985 did you stay in
6    purchasing with Globe?
7    A.  Until I was -- I was involved in it until I
8    left there in 2003 in some capacity.
9    Q.  So, then, you were in purchasing for 18
10   years with Globe approximately?
11   A.  Approximately.
12   Q.  And in your 18 years was -- and I may have
13   asked this, but was Mr. Gibbs the only
14   broker you ever dealt with?
15   A.  Yes.
16   Q.  And it's through Mr. Gibbs that you
17   developed a relationship with Mr. Lambert;
18   is that correct?
19   A.  Yes.
20   Q.  Other than -- well, how long did that
21   relationship with Mr. Lambert last?
22   A.  I've known Mr. Lambert ever since.
23   Q.  Did you eventually begin to purchase

Page 17

1    directly from Mr. Lambert?
2    A.  Yes.
3        MR. WALTER:  Tom, just to make
4           sure we don't have a problem,
5           when you're saying you, are
6           you referring to Globe?
7        MR. GRISTINA:  I am.
8    Q.  On behalf of Globe did you continue to
9    purchase -- or begin to purchase directly
10   from Mr. Lambert?
11   A.  Yes.
12       MR. BAILEY:  Object to the form.
13           You mean Lambert individually
14           or Lambert's company?
15       MR. GRISTINA:  I'll get into that.
16       MR. BAILEY:  All right.
17   Q.  Was Mr. Lambert -- was he with a company
18   when you began to purchase from him -- when
19   Globe began to purchase from him?
20   A.  Yes.
21   Q.  What was his company?
22   A.  I don't remember.
23   Q.  This was about 1987?

Page 18

1   A.  Yes.
2   Q.  Do you remember when you began to purchase
3       directly from Mr. Lambert's company and not
4       through Mr. Gibbs?
5   A.  I don't remember exactly.  It was -- it was
6       in the late '80s, in '87, '88, '89,
7       somewhere in there.
8   Q.  And was there a reason why you stopped --
9       Globe stopped going through the broker and
10      went directly to Mr. Lambert?
11  A.  No.  But we -- you know, he approached me
12      about, you know, selling direct instead of
13      going through the broker, and so we -- you
14      know, we did.
15  Q.  Was it cheaper to go directly to
16      Mr. Lambert than through the broker?
17  A.  Yes.
18  Q.  How much cheaper, if you can recall,
19      approximately?
20  A.  I don't remember.
21  Q.  Was it your decision exclusively or was
22      there somebody else at Globe who was
23      involved in the decision to go directly to

Page 19

1       Mr. Lambert as opposed to through the
2       broker?
3   A.  I don't remember.  I can't recall that.
4   Q.  And then from that time forward you've had
5       an ongoing relationship with Mr. Lambert in
6       some form or another, and we'll get into
7       that.  Is that correct?
8           MR. BAILEY:  Object to the form.
9   A.  Yes.
10  Q.  How long did you continue to purchase or
11      did Globe continue to purchase directly
12      from Mr. Lambert after you stopped
13      purchasing through Mr. Gibbs?
14          MR. BAILEY:  Object to the form.
15          Go ahead.
16  A.  Repeat the question again.
17  Q.  How long did Globe continue to purchase
18      directly from Mr. Lambert after it stopped
19      purchasing through Mr. Gibbs?
20          MR. BAILEY:  Object to the form.
21  A.  Off -- you know, off and on up until -- I
22      don't remember, you know, when we quit
23      exactly.  Because as the years went on and

Page 20

1       my career took different changes, I had
2       people working under me that took on that
3       responsibility.  I kind of just oversaw it
4       but left it up to them to continue, you
5       know, purchasing the material.  But
6       probably, you know, right up to around 2000
7       maybe.
8   Q.  All right.  With respect to your career at
9       Globe you became a purchaser in 1985
10      approximately.  Can you tell us how that
11      career developed up until 2000, what
12      different roles you took on?
13  A.  In 1991 I got involved in operations and,
14      you know, from '91 until 2003 was mainly in
15      operations.  I ran the silicon operations
16      at Globe at their Beverly, Ohio, facility,
17      and then in 1994 I became the plant manager
18      at the Niagara Falls facility when we
19      purchased that from a competitor, and in
20      1999 became head of product development for
21      another product line at Globe.  And all
22      during that whole time I still was also in
23      charge of the purchasing group also.

Page 21

1   Q.  What was the new product that you assumed
2       responsibility for?
3   A.  It was a product we made at -- at only the
4       Beverly, Ohio, facility called magnesium
5       ferrosilicon.
6   Q.  How many people -- obviously it varies, but
7       when you left Globe, how many people did it
8       employ?
9   A.  Probably around 250, 275.
10  Q.  In your experience with Globe up to 2000
11      did you have any experience in the
12      construction of aggregate mining
13      operations?
14  A.  Never, no.
15  Q.  Did you have any experience in learning how
16      to locate aggregate product in Alabama?
17  A.  No.
18  Q.  Let me ask a better question.
19          In terms of locating product, I mean,
20      if a mining company was looking to open up
21      an operation, they would obviously try to
22      lease property where they believed product
23      was located underground.  Did you have any

Deposition of David Tuten                                                July 13, 2006

Page 22

1    experience in that type of development of
2    an operation?
3  A.  No.
4  Q.  Have you ever had any experience in that
5    type of operation?
6  A.  No.
7  Q.  Have you ever had any experience in
8    constructing a mining operation for
9    aggregate materials?
10  A.  No.
11  Q.  When did you leave Globe?
12  A.  2003.
13  Q.  We got up to 2000.  Between 2000 and 2003
14    what did you do for Globe?
15  A.  That's when I took over the development of
16    that product line, the magnesium
17    ferrosilicon.
18  Q.  In Niagara Falls?
19  A.  No.  I actually was relocated back to
20    Beverly, Ohio.
21  Q.  And then you left Globe in 2003?
22  A.  Right.
23  Q.  Why did you leave Globe?

Page 23

1  A.  I was dismissed.  The company went bankrupt
2    in April of 2003.  And when the company
3    went bankrupt, obviously they made a lot of
4    cutbacks, and I was one of the casualties.
5  Q.  Your dismissal, as you understand it, was
6    solely related to cutbacks associated to
7    the bankruptcy?
8  A.  That's correct.
9  Q.  Was there any other reason than the
10    bankruptcy?
11  A.  No, sir.
12  Q.  What did you do beginning in 2003?
13  A.  Well, in 2003 I -- because I've been in the
14    alloy business, you know, basically my
15    entire life, I felt that I could, you know,
16    help some other people as far as operations
17    is concerned, so I started a consulting
18    company.
19  Q.  And is that Two Rivers Industries?
20  A.  Uh-huh (positive response).
21  Q.  You've been great, but you've got to be
22    verbal.
23  A.  Oh, I'm sorry.  Yes.

Page 24

1  Q.  So in 2003 you started Two Rivers
2    Industries and you're still -- that's what
3    you do today?
4  A.  Yes.
5  Q.  Going back before you started Two Rivers
6    Industries and when you were responsible
7    for purchasing, did you spend a lot of time
8    down in Alabama dealing with suppliers?
9  A.  I don't know what you classify as a lot of
10    time.  You know, some people say -- well,
11    I'd probably make two trips a year.
12  Q.  And that's what I was going to ask.  It was
13    a bad question.
14        So you made trips to Alabama to deal
15    with suppliers --
16  A.  Correct, yes.
17  Q.  -- about twice a year?
18  A.  Yes.
19  Q.  And I assume that Globe had other suppliers
20    aside from Mr. Lambert or entities he was
21    associated with?
22  A.  Yes.
23  Q.  Who were they?

Page 25

1  A.  We bought material from Martin Marietta,
2    from, of course, The Concrete Company,
3    with -- the name -- Mike Phillips' company,
4    and the name escapes me at the moment.  His
5    company.  There might have been, you know,
6    one or two more off and on.
7  Q.  And were these all companies that you had
8    developed relationships over your years in
9    charge of purchasing with Globe?
10  A.  Mostly they were relationships that had
11    already been developed when I stepped into
12    the purchasing.
13  Q.  And Globe obviously purchased -- or has
14    purchased white oversized gravel in
15    Alabama; is that correct?
16  A.  Yes.
17  Q.  What other types of aggregates have they
18    purchased that you're aware of in Alabama
19    for use in their operations?
20        MR. BAILEY:  Object to the form.
21        Over what period of time?
22  Q.  In your period of time working for them.
23  A.  They also purchased brown oversized gravel.

Deposition of David Tuten                                                    July 13, 2006

Page 26

1    Q.   And are those two products used in making
2         silicon?
3    A.   The white oversized gravel is used in the
4         production of silicon.  The brown is used
5         in the production of ferrosilicon.
6    Q.   Are those two distinct products,
7         ferrosilicon and silicon?
8    A.   They're -- yes.  They're made -- they're
9         different, but yes.
10   Q.   Are they made out of the same kiln?
11   A.   No.
12   Q.   So do you ever use a combination of brown
13        oversized and white oversized in making any
14        products at Globe?
15   A.   Yes.
16   Q.   What products?
17   A.   Sometimes when making a ferrosilicon -- a
18        higher purity ferrosilicon product you
19        would mix some white oversized gravel with
20        the brown to make certain chemistries out
21        of the furnace, and that would be the only
22        time.
23   Q.   Is white oversized more expensive than

Page 27

1         brown oversized?
2    A.   Traditionally, yes.
3    Q.   When you would deal with suppliers
4         directly -- Globe would deal directly with
5         suppliers, did the suppliers bill Globe
6         directly or did they bill through you to
7         Globe?
8    A.   Billed Globe directly.
9    Q.   And at any time when you were in charge of
10        purchasing did you receive any compensation
11        directly from suppliers that did not go
12        through Globe?
13   A.   No.
14   Q.   Are you aware of any practice or whether it
15        takes place in the industry that a
16        purchaser will receive money directly from
17        a supplier that does not go through the
18        company for whom the purchaser is working?
19   A.   No.
20   Q.   Would that be an appropriate practice?
21   A.   Yes, would be inappropriate.
22   Q.   Inappropriate?
23   A.   Yes, sir.

Page 28

1    Q.   I probably should have been more clear.
2         What plants does Globe have in Alabama
3         currently?
4    A.   Currently they have a plant in Selma,
5         Alabama.
6    Q.   Is that the only Alabama plant they have?
7    A.   Yes.
8    Q.   Did you have any responsibilities with
9         respect to the operations of that plant at
10        any time during your Globe tenure?
11   A.   What do you mean by operations?
12   Q.   Well, did you ever work -- were you ever in
13        charge of any aspect of that plant?
14   A.   No.
15   Q.   Now, we spoke about the trips to Alabama,
16        approximately two a year.  Is that about
17        the average leading up to 2003 when you
18        left Globe?
19   A.   Actually probably beginning in 2000 I very
20        rarely made any trips.
21        MR. WALTER:  Referring to trips to
22        Alabama?
23        THE WITNESS:  Yes.

Page 29

1    Q.   When you would make your trips to Alabama,
2         did you call on Harry Lambert?
3    A.   Yes.
4    Q.   And what was the purpose of those contacts?
5    A.   We would just go and visit the operation
6         and check up on them.  You know, if we had
7         any problems, quality problems or anything,
8         we'd talk about them.
9    Q.   When you would come to visit, did you have
10        contact with Carol Lambert, Mr. Lambert's
11        wife?
12   A.   No.
13   Q.   Do you know Carol Lambert?
14   A.   Yes.
15   Q.   And how do you know Carol Lambert?
16   A.   I -- when we'd stop to visit -- when I was
17        at Globe, we came to visit the pit one time
18        and I met her.
19   Q.   Which pit was that?
20   A.   This was the Montgomery Materials.
21   Q.   All right.  And we'll get into that.  I
22        believe that would be the city pit?
23   A.   Yes.

Page 30

1  Q.  And Carol was there and you had the
2      opportunity to meet her then?
3  A.  Yes.
4  Q.  Since you've left Globe have you come to
5      know Carol Lambert better?
6  A.  Yes.
7  Q.  And how have you done that?
8  A.  Well, we -- Alabama Gravel hired Carol as
9      our bookkeeper.
10 Q.  All right.  And we'll get to that.  Leading
11     up to -- and you referred to this earlier.
12     During your time at Globe you had dealings
13     with The Concrete Company?
14 A.  Yes.
15 Q.  And do you recall when those dealings took
16     place?
17 A.  I can't recall exactly when they -- I mean,
18     we purchased material from them.
19 Q.  Who did you deal with primarily at The
20     Concrete Company?
21 A.  I didn't deal with anybody directly.
22     Mostly that was people underneath me at
23     that time, and they either -- I think they

Page 31

1      dealt directly with Frank most of the time,
2      Frank Foley.
3  Q.  Did you ever have any dealings directly
4      with Mr. Foley?
5  A.  No.
6  Q.  What about Mr. Gene Tally?
7  A.  I know Gene, and I had met him at their
8      operation several times.
9  Q.  Do you know Gene to be an honest and good
10     dealer?
11 A.  Gene is a good man.
12 Q.  Did you ever deal with Danny Luster?
13 A.  No.
14 Q.  You dealt with Harry when he was at
15     Montgomery Materials; is that correct?
16 A.  Yes.
17 Q.  During the time that you dealt with The
18     Concrete Company or people working for you
19     dealt with The Concrete Company, do you
20     recall having any complaints about the way
21     The Concrete Company supplied Globe?
22 A.  About the supply -- well, no, no.
23 Q.  Did you ever have any problems or hear

Page 32

1      about any problems from your subordinates
2      in dealing with The Concrete Company?
3  A.  The only issue we -- at Globe -- when I was
4      at Globe that we really had with The
5      Concrete Company was a lot of times we
6      would -- in order to get the white
7      oversized gravel we would have to buy so
8      much of the brown oversized material, and
9      it made it kind of tough in order to
10     balance inventories and -- you know,
11     because we needed the white more than we
12     needed the brown.
13 Q.  And would The Concrete Company require you
14     to buy a certain amount of brown in order
15     to be able to buy white?
16 A.  That's correct.
17 Q.  What time frame do you recall when you were
18     purchasing from The Concrete Company?
19 A.  I don't remember when we started purchasing
20     from The Concrete Company, but I know we
21     did through -- through the '90s -- latter
22     half of the 1990s for sure into 2000.
23 Q.  Was that white oversized used in the Selma

Page 33

1      plant?
2  A.  Yes.
3  Q.  Was it also used in any other plants
4      outside of Alabama?
5  A.  Yes.
6  Q.  Which other plants?
7  A.  I believe we used some at the Niagara Falls
8      plant in New York.
9  Q.  Is white oversized a scarce commodity?
10 A.  Yes.
11 Q.  Other than in Alabama are there other
12     states where Globe can purchase that
13     product?
14 A.  Yes.
15 Q.  Are there a lot of other states?
16 A.  No.
17 Q.  Where else can that product be purchased?
18 A.  Well, there's a region in the North --
19     North Carolina-South Carolina border area
20     that -- they produce also a very pure white
21     oversized material.
22 Q.  Are you familiar with The Concrete
23     Company's Shorter operation, the Ward plant

Deposition of David Tuten                                                July 13, 2006

Page 34

1   as it's been called?
2   A.  Yes.
3   Q.  And is that a place where white oversized
4       was purchased by Globe?
5   A.  Yes.
6   Q.  And the product that came from that plant,
7       did you ever hear about any complaints
8       concerning the quality of that white
9       oversized?
10  A.  The only complaint we had with the Ward
11      material -- the chemistry was outstanding,
12      very good.  Occasionally it would run a
13      little bit on the small side.
14  Q.  But the chemistry was always acceptable?
15  A.  Yes.
16  Q.  Do you recall who else in the Montgomery
17      area -- by the Montgomery area, I mean
18      around about 60 miles from where we're
19      sitting right now in a circle.  Do you
20      recall who else in this area supplied white
21      oversized to Globe when you were working
22      there?
23  A.  Mike Phillips supplied a lot of white

Page 35

1       oversized to the Selma plant, and then
2       there were several small what we would
3       consider mom-and-pop type operations that
4       also supplied white oversized to the Selma
5       plant.
6   Q.  But not nearly in the quantities as
7       Mr. Phillips or The Concrete Company; is
8       that correct?
9   A.  That's correct.
10  Q.  Now, Mr. Phillips, did you purchase
11      directly from him or through a broker?
12  A.  Directly through him.
13  Q.  Do you know what plant he got his white
14      oversized from?
15  A.  It was called Hickory Bend.  I don't ...
16  Q.  The Hickory Bend plant?
17  A.  Yeah.
18  Q.  Or pit, I guess.
19  A.  Yeah, pit.
20  Q.  When did you stop purchasing from
21      Mr. Phillips?
22  A.  I think when he died.
23  Q.  After Mr. Phillips passed away, who did you

Page 36

1       purchase white oversized from in the
2       Montgomery area?
3   A.  Well, probably The Concrete Company and --
4       and -- I can't recall exactly everybody.
5   Q.  Did you purchase from Elmore Sand & Gravel?
6   A.  Yes, that's correct.
7   Q.  Were they a substantial supplier or were
8       they one of the mom-and-pop types that you
9       described?
10  A.  No.  They were a substantial supplier.
11  Q.  Is it safe to say or is it fair to say that
12      in the Montgomery area when you were with
13      Globe there were not a lot of suppliers of
14      white oversized gravel?
15  A.  Yeah.  Yes.
16  Q.  And so is it also fair to say that it was
17      important for you to be able to purchase
18      substantial quantities from those suppliers
19      that did exist?
20  A.  Yes.
21  Q.  And the kilns at Globe, am I correct that
22      they need to be running all the time in
23      order to run efficiently?

Page 37

1   A.  Yes.
2   Q.  And if you have to turn them off, that's a
3       bad thing?
4   A.  Yes.
5   Q.  So it's important for you to have a large
6       quantity of white oversized gravel?
7   A.  Yes.
8   Q.  And so the market for white oversized
9       gravel is a pretty good one for the
10      suppliers, isn't it?
11          MR. WALTER:  I don't know if you
12          can answer that as far as --
13          MR. BAILEY:  Object to the form.
14          Go ahead.
15          MR. WALTER:  -- what pretty good
16          means.
17  Q.  Do you understand the question?
18          THE WITNESS:  Yeah.
19  Q.  The suppliers of white oversized are able
20      to charge a premium for that product
21      because it is in short supply; is that
22      correct?
23  A.  Well, as a -- being in purchasing, you

Deposition of David Tuten                                           July 13, 2006

Page 38

1    know, you would always -- you always like
2    to have a lot of options.  And, of course,
3    you would always use more than -- you never
4    want to be single-sourced.  You always want
5    to have more than one source.  And you'd
6    always try to leverage one guy against the
7    other, you know, to try to keep the prices
8    down.
9    Q.  So when you were with Globe you would
10       attempt to leverage white oversized
11       suppliers against each other to keep the
12       price down?
13   A.  Sure.
14   Q.  The purchases -- Globe as a purchaser had
15       an interest in controlling the white
16       oversized market to the extent you could
17       leverage suppliers against each other; is
18       that correct?
19            MR. BAILEY:  Object to the form.
20   A.  You did the best you could.
21   Q.  Were you aware of a dispute between
22       Mr. Lambert and Mr. Foley revolving around
23       Montgomery Materials?

Page 39

1            MR. WALTER:  At what point in
2       time?
3            MR. GRISTINA:  At any time.
4            MR. WALTER:  Including up to the
5       present?
6            MR. GRISTINA:  I'll clarify it.
7    Q.  Are you aware of when a dispute began
8       between Mr. Foley and Mr. Lambert regarding
9       Montgomery Materials?
10   A.  No.
11   Q.  When did you first learn of a dispute
12       between Mr. Foley and Mr. Lambert regarding
13       Montgomery Materials?
14   A.  After it was over, I guess.
15   Q.  What were you told?
16   A.  I was just told that -- that Mr. Lambert
17       was no longer involved in Montgomery
18       Materials.
19   Q.  Who told you that?
20   A.  He did.
21   Q.  Mr. Lambert?
22   A.  Yes.
23   Q.  Did he say why he was no longer involved?

Page 40

1    A.  No.
2    Q.  Did you speak with anybody at Montgomery
3       Materials or The Concrete Company regarding
4       that dispute?
5    A.  No.
6    Q.  Have you ever had any conversation with any
7       Concrete Company employees regarding that
8       dispute between The Concrete Company and
9       Mr. Lambert?
10   A.  No.
11   Q.  Have you ever had any conversations with
12       anybody working for Foley Materials Company
13       regarding that dispute?
14   A.  No.
15   Q.  Do you recall when Mr. Lambert -- and I
16       believe you've answered this to some
17       degree, but do you recall what year it was
18       when Mr. Lambert separated from Montgomery
19       Materials?
20   A.  I want to think it was around 2000.
21   Q.  Were you still at Globe when that happened?
22   A.  Yes.
23   Q.  And did you continue -- did Globe continue

Page 41

1    to purchase from The Concrete Company after
2    that time?
3            MR. BAILEY:  Object to the Form.
4    A.  To the best of my knowledge, yes.
5    Q.  Did you discuss with Mr. Lambert at that
6       time what his plans were after leaving
7       Montgomery Materials?
8    A.  No.
9    Q.  Did you discuss with him a noncompete
10       agreement that he had with The Concrete
11       Company?
12   A.  No.
13   Q.  Are you aware that there was a noncompete
14       with The Concrete Company between -- with
15       Mr. Lambert?
16            MR. WALTER:  At the present time?
17            MR. GRISTINA:  Yes.
18            MR. WALTER:  Well, at the present
19       time is he aware that there
20       was a noncompete, is that your
21       question?
22   Q.  Well, let me ask this:  When, if ever, did
23       you learn that there was a noncompete

Page 42

1    between Mr. Lambert and The Concrete
2    Company?
3    A.  Shortly after Mr. Lambert called me and
4    told me that he was no longer involved in
5    Montgomery Materials.  Sometime after that,
6    you know, he mentioned to me that, you
7    know, he couldn't be in the sand and gravel
8    business.
9    Q.  Do you recall exactly when that was?
10   A.  No, I do not.
11   Q.  Do you recall him ever telling you before
12   that time -- before he told you that he
13   couldn't be in the sand and gravel business
14   do you recall him ever telling you what he
15   planned on doing for a living?
16   A.  No.
17   Q.  Were you aware at any time of Mr. Lambert
18   getting involved in the trucking business
19   before he told you he couldn't be involved
20   in the sand and gravel business?
21         MR. BAILEY:  Object to the form.
22   A.  No.
23   Q.  No?

Page 43

1    A.  No.
2    Q.  Did you ever become aware that Mr. Lambert
3    was involved in the trucking business?
4         MR. BAILEY:  Object to the form.
5    A.  Yes.
6    Q.  And when was that?
7    A.  Sometime after 2000.  You know, maybe a
8    year or two later I heard that he got
9    involved in the trucking business.
10   Q.  What did you hear?
11   A.  Just that he was driving a truck.
12   Q.  Who did you hear that from?
13   A.  Some of our own people, people that worked
14   for me, some of my --
15   Q.  People that worked for Globe?
16   A.  Worked for Globe that worked underneath me
17   as far as buying raw materials.
18   Q.  Do you know what sort of contact they had
19   with Mr. Lambert to gain that information?
20   A.  No.
21   Q.  Aggregate is a product that's frequently
22   transported by truck, isn't it?
23   A.  Yes.

Page 44

1    Q.  When it comes to the Globe plants, is it
2    usually in the back of a truck?
3    A.  No.
4    Q.  How is it brought to the Globe plant?
5    A.  The Selma plant received all their
6    aggregate by truck because of the
7    proximity, but our other plants in Beverly,
8    Ohio, Niagara Falls, and Springfield,
9    Oregon, it all came by rail.
10   Q.  So aggregate, including white oversized, is
11   transported to Globe plants either by truck
12   or rail, depending on the plant?
13   A.  Or barge.
14   Q.  Or barge.  Depending on the plant?
15   A.  Yes.
16   Q.  And would you consider the trucks that
17   bring that aggregate to the plants to be
18   part of the sand and gravel business?
19         MR. BAILEY:  Object to the form.
20   A.  No.
21   Q.  Why not?
22   A.  The hauling of freight is a completely
23   separate issue.

Page 45

1    Q.  Is the mining of sand and gravel part of
2    the sand and gravel business?
3    A.  Yes.
4    Q.  Is the sale of sand and gravel part of the
5    sand and gravel business?
6    A.  Yeah.  Yes.
7    Q.  But it's your contention, then, that the
8    hauling in between those points is not part
9    of the sand and gravel business?
10   A.  No.
11   Q.  I asked the question bad.  Is that your
12   contention, that it's not part of it?
13   A.  Yes.
14   Q.  When Mr. Lambert told you that he couldn't
15   be in the sand and gravel business, what
16   else do you recall about that conversation?
17   A.  Nothing.
18   Q.  Were you aware when you learned that he was
19   in the trucking business that he was
20   hauling sand and gravel?
21         MR. BAILEY:  Object to the form.
22   A.  No.  I didn't know what he was hauling.
23   Q.  Have you ever -- did there ever come a time

Deposition of David Tuten                                                    July 13, 2006

Page 46

1    that you learned that Mr. Lambert was
2    driving trucks that contained sand and
3    gravel?
4  A.  Up until now?
5  Q.  Well, did you ever learn that -- I think
6    that would be yes or no -- and then I'll
7    ask you after that when you learned that.
8  A.  Yes.
9  Q.  All right.  When did you learn that?
10 A.  When all of this started.
11 Q.  So the first time you learned that
12    Mr. Lambert had driven trucks containing
13    sand and gravel was when my client filed
14    suit against your company?
15 A.  Right.
16 Q.  That would be --
17 A.  Up until that time I had no idea what he
18    was hauling.
19 Q.  So the complaint in this lawsuit was filed
20    in October 25th, 2005, and your company was
21    served shortly thereafter.  That was the
22    first time that you learned that he had
23    been in trucks hauling sand and gravel?

Page 47

1  A.  That was the first time I -- I mean, I
2    didn't -- like I said, I knew that he was
3    in the trucking business, but as far as
4    what he was hauling or whatever, you know,
5    in the past, I had no idea.
6  Q.  In October of 2005 were you aware of
7    Carol's Contracting?
8  A.  Yes.
9  Q.  What was your knowledge at that time of
10    Carol's Contracting?
11 A.  They were a trucking company.
12 Q.  Were you aware that Mr. Lambert was driving
13    trucks for Carol's Contracting?
14 A.  Yes.
15 Q.  And were you also aware that Carol's
16    Contracting was -- was Carol's Contracting
17    at that time hauling aggregate for Alabama
18    Gravel?
19 A.  Yes.
20 Q.  But you weren't aware until October 25th,
21    2005, or shortly thereafter when you were
22    served that Mr. Lambert was hauling -- was
23    driving trucks that were hauling aggregate?

Page 48

1  A.  Right.  Well, what I understood you to say
2    was in the past I didn't know what he had
3    hauled.  Back 2001, '02, '03, '04, I didn't
4    know what he was hauling.
5  Q.  When did your company -- when did Alabama
6    Gravel -- and we'll get into the formation
7    of that.  When did Alabama Gravel begin
8    using Carol's Contracting to haul aggregate
9    product?
10 A.  When the company was formed and we started
11    selling aggregate, we used them to haul the
12    aggregate.
13 Q.  I believe the company was incorporated on
14    March 24th, 2005; is that correct?
15 A.  Yes.
16        (Plaintiff's Exhibit 1 was marked
17         for identification.)
18 Q.  Do you recognize that document, Mr. Tuten?
19 A.  Yes.
20 Q.  And what is that?
21 A.  That's the articles of organization for
22    Alabama Gravel.
23 Q.  All right.  And the date on the back there

Page 49

1    when it was completed was March 24th, 2005;
2    is that correct?
3  A.  Yes.
4  Q.  Now, going back to where we were a little
5    while ago.  Shortly thereafter I believe
6    you testified that Alabama Gravel began
7    using Carol's Contracting to haul aggregate
8    product; is that correct?
9  A.  Yes.
10 Q.  And did you learn at that time that
11    Mr. Lambert was driving trucks for Carol's
12    Contracting that contained aggregate
13    product?
14 A.  I -- let me answer that.  I knew that Harry
15    Lambert was driving a truck, and I knew
16    that -- at that time, you know, that he had
17    trucked in the past, you know, all kinds of
18    things.  But what was the question, now?
19 Q.  Well, when you hired -- when Alabama Gravel
20    hired Carol's Contracting to haul
21    aggregate --
22 A.  Right.
23 Q.  -- did you know at that time that

Page 50

1    Mr. Lambert was going to be driving some of
2    those trucks?
3  A.  Yes.
4  Q.  And was it your intention at that time that
5    by hiring Carol's Contracting to haul
6    aggregate that Mr. Lambert would be able to
7    do that?
8  A.  Yes.
9  Q.  Were you intending at that time to
10   compensate Mr. Lambert for hauling that
11   aggregate product?
12         MR. BAILEY:  Object to the form.
13         MR. WALTER:  Well, when you say
14            compensate Mr. Lambert, are
15            you -- the contract was with
16            Carol's Contracting.
17         MR. GRISTINA:  I understand that.
18  Q.  Were you intending that Mr. Lambert receive
19   payment for driving those trucks?
20  A.  No.
21  Q.  Who was supposed to be paid for that?
22  A.  Carol's Contracting.
23  Q.  And did you have any knowledge of any

Page 51

1    relationship between Mr. Lambert and
2    Carol's Contracting that would have kept
3    him from receiving compensation for the
4    work he was doing for Carol's Contracting?
5         MR. BAILEY:  Object to the form,
6            but go ahead.
7  A.  One more time, please.
8         MR. GRISTINA:  Can you repeat
9            that?
10        (Requested portion of record was
11           read by the court reporter.)
12  A.  Was he getting paid for hauling the rock
13   from Carol's Contracting?  Is that --
14  Q.  That's not my question, but that's another
15   question.
16  A.  Okay.
17  Q.  But what I'm --
18  A.  I had no idea.
19  Q.  So you didn't know one way or the other if
20   he was getting paid by Carol's Contracting
21   for driving trucks?
22  A.  I did not know.
23  Q.  Did he ever tell you he was not getting

Page 52

1    paid?
2  A.  I believe he did, yes.
3  Q.  All right.  So that's different.  So you
4    understood, then, that he was not getting
5    paid because he told you?
6  A.  After the fact, yes.  I mean, after he had
7    already started hauling for us, it come up
8    in conversation.
9  Q.  And what did he say?
10  A.  Just said that, you know, he doesn't get
11   paid anything for driving the truck.  He
12   just does it to help out his wife.
13  Q.  Did he say why he didn't get paid?
14  A.  No, he did not.
15  Q.  Did he say he didn't want to receive
16   compensation because it would conflict with
17   his noncompete?
18  A.  No, he did not.
19  Q.  Did you ever -- before hiring Carol's
20   Contracting to deliver aggregate or haul
21   aggregate for Alabama Gravel did you ever
22   read Mr. Lambert's noncompete agreement?
23  A.  No.

Page 53

1  Q.  Did you ever see that agreement before the
2    litigation was filed in this case?
3  A.  No.
4  Q.  Have you seen it since the litigation?
5  A.  Yes.
6  Q.  Now, in 2003 you left Globe -- and we
7    talked about that -- and you formed the
8    consulting business.  What were the
9    companies in 2003 that you were consulting
10   with?
11  A.  The company I was consulting for in 2003
12   was a company called Simcala.
13  Q.  Where is Simcala located?
14  A.  Mount Meigs, Alabama.
15  Q.  Is Simcala a producer of silicon and
16   ferrosilicon?
17  A.  Just silicon.
18  Q.  Just silicon?
19  A.  Uh-huh (positive response).
20  Q.  How do you spell ferro?
21  A.  F-E-R-R-O.
22  Q.  Ferro.  Okay.  F-E-R-R-O-silicon?
23  A.  Correct.

Page 54

1  Q.  How did you come to meet or have any
2      contacts with Simcala?
3  A.  The guy that owned Simcala at the time or
4      was president of Simcala I had known for --
5      well, he had actually known my father for
6      many, many, many years.  They were in the
7      business together.  And they had contacted
8      me through an independent party about --
9      you know, looking for some help.  They were
10     having some operation -- operational
11     issues.  And so that's kind of how we
12     hooked up.
13 Q.  Who was the contact at Simcala?
14 A.  It was actually a person that supplies them
15     with coal that also supplied coal to Globe
16     in the past who knew that I was, you know,
17     wanting to start a consulting company and
18     had mentioned it to Simcala, and it kind of
19     went back and forth that way.
20 Q.  What was his name?
21 A.  It actually was a woman.
22 Q.  What was her name?
23 A.  Her name was Sandy Todd.

Page 55

1  Q.  Sandy Todd.  She's still -- or she's a
2      supplier; is that correct?
3  A.  That's correct.
4  Q.  Where is she located?
5  A.  Knoxville, Tennessee.
6  Q.  And you stated that another person put you
7      in touch with Simcala.  Who was that
8      independent person?
9  A.  It was Sandy Todd.
10 Q.  So Sandy Todd put you in touch with the
11     person at Simcala whom your father had
12     worked with?
13 A.  Yeah, had known.
14 Q.  Who was that?
15 A.  Mr. Ed Boardwine.
16 Q.  How long had your father been friends with
17     Ed Boardwine for?
18 A.  Probably 40 years.
19 Q.  Is Mr. Boardwine still with Simcala?
20 A.  No, he is not.
21 Q.  Is he retired?
22 A.  I -- that's a relative term.  I think he
23     has another business.  He does other

Page 56

1      things.  He does consulting work and stuff
2      like that.
3  Q.  Do you know when he left Simcala?
4  A.  Shortly after -- it was in 2003.  They were
5      purchased -- Simcala was bought out by Dow
6      Corning.
7  Q.  I've seen that name different ways.  Is it
8      Broadwine or Boardwine?
9  A.  Boardwine.
10 Q.  B-O-A-R-D-W-I-N-E?
11 A.  That's correct.
12 Q.  But he left Simcala in 2003?
13 A.  Yes.
14 Q.  Mr. Boardwine?
15 A.  Yes.
16 Q.  I'm looking at Alabama Gravel's initial
17     disclosures, and his address as of
18     December 27, 2006, was still listed as an
19     Ed Broadwine at Simcala, Inc.  Is that
20     different than Mr. --
21 A.  Yes.
22 Q.  Now, that will help me.
23     So, then, Ed Boardwine is the senior,

Page 57

1      the man that your father knew who had the
2      relationship with the coal supplier that
3      helped you begin to consult with Simcala;
4      is that correct?
5  A.  Yes.
6  Q.  And does he have a son who's still with
7      Simcala?
8  A.  Yes.
9  Q.  And that's Ed Boardwine, Jr.?
10 A.  Yes.
11 Q.  Is he still with Simcala?
12 A.  Yes.
13 Q.  Does Mr. Ed Boardwine, Sr., know anything
14     about this dispute that we have here
15     between the parties?
16 A.  I don't know.
17 Q.  But certainly his son does.  Ed Boardwine,
18     Jr., knows something about this dispute?
19 A.  Yes.
20 Q.  All right.  So then you began at some point
21     shortly after you left Globe consulting for
22     Simcala; is that correct?
23 A.  Yes.

Deposition of David Tuten                                                July 13, 2006

Page 58

1   Q.   And what did you assist them with?
2   A.   Mainly operational issues, melting
3        furnaces.
4   Q.   And did that relationship develop into
5        something else over the past three years?
6             MR. BAILEY:  Object to the form.
7   A.   I'm not sure I understand.
8   Q.   Have you begun to provide more advice in
9        different areas?
10  A.   No.
11  Q.   So your advice is limited to operations to
12       Simcala?
13  A.   It was.  I'm no longer working with them.
14  Q.   When did that stop?
15  A.   It was in 2005.
16  Q.   At any time did you help them with supply
17       or purchasing issues?
18  A.   No.
19            Let me rephrase that.  They would ask
20       me, you know, questions from time to time,
21       but I never had any input into that, no.
22       Mainly they would ask me about, you know,
23       what did Globe do or that sort of thing.

Page 59

1   Q.   Did they ask you for assistance in locating
2        suppliers of white oversized gravel in the
3        Montgomery area?
4   A.   They asked me if I knew anybody different,
5        but they already knew, you know, who all
6        the suppliers were.  I didn't know anybody
7        any different.
8   Q.   Were you aware of any relationship between
9        Mr. Harry Lambert and Simcala during that
10       period?
11  A.   No.
12  Q.   Other than Simcala who did you consult
13       with?
14  A.   That was the only one.  Well, also I do a
15       little work for a guy -- I do some work for
16       a guy in China.
17  Q.   What sort of work is that?
18  A.   Same, along the same lines.
19  Q.   They have a plant in China?
20  A.   They have many plants in China, yeah.
21  Q.   Do they produce white oversized gravel in
22       China?
23  A.   No.  This is the production of ferroalloys,

Page 60

1        silicon type thing.
2   Q.   And you consult with that company from time
3        to time?
4   A.   Right.
5   Q.   Do you do any consulting work for Globe?
6   A.   No.
7   Q.   Have you attempted to?
8   A.   No.
9   Q.   Since 2003 the only local company that
10       you've consulted with is Simcala?
11  A.   Correct.
12  Q.   And at some point you went into business, I
13       guess, with Mr. Robert Alexander and Rex
14       Dasinger; is that correct?
15  A.   Yes.
16  Q.   And when did you first meet Mr. Robert
17       Alexander?
18  A.   It was late 2004, early 2005.
19  Q.   How did you meet him?
20  A.   I was introduced to Robert through
21       Mr. Lambert.
22  Q.   Do you recall that meeting?
23  A.   Yeah.

Page 61

1   Q.   Where was that meeting?
2   A.   It was here in town.
3   Q.   And do you know how that meeting was
4        conceived or why it took place?
5   A.   I had mentioned to Mr. Lambert about
6        because of the situation at Simcala, with
7        them running out of white oversized and
8        also with contacts I had at Globe, that,
9        you know, there was a need for white
10       oversized gravel and that I would have an
11       interest in getting in the gravel business
12       mainly as an outside investor more than
13       anything else.  And I had asked
14       Mr. Lambert, you know, if he knew of
15       anyone, you know, that I could maybe get
16       involved with, and he put me in touch with
17       Mr. Alexander.
18  Q.   So that was in 2004.  Do you recall what
19       month of 2004?
20            And you may have said it, but I don't
21       remember.
22  A.   It had --
23            MR. WALTER:  Let me object just to

Page 62

1              the extent that I think he
2              said it was late 2004 or early
3              2005.
4          MR. GRISTINA:  Okay.
5     A.  It was cold.  I remember that.
6     Q.  All right.  Sometimes I'll repeat myself,
7          and I apologize for that.
8              So late 2004, early 2005 --
9     A.  Uh-huh (positive response).
10    Q.  -- as best you can recall is when this
11         meeting took place?
12    A.  Yes.
13    Q.  And you recall that it was cold?
14    A.  Yes.
15    Q.  And where did the meeting take place?
16    A.  It was here in town.
17    Q.  Where in town?
18    A.  We met at -- Mr. Alexander was staying in a
19         hotel here in town, and I met him at his
20         hotel.
21    Q.  If you know, did Mr. Alexander come to town
22         just for that meeting?
23    A.  I don't know if it was just for that

Page 63

1          meeting or not.
2     Q.  And you stated earlier that -- and I'm not
3          trying to rephrase what you stated, so
4          correct me if I'm wrong -- that you were
5          aware that Simcala was having some sort of
6          problem with oversized supply?
7     A.  Yes, sir.
8     Q.  And was that through your consulting work
9          and things that you had learned?
10    A.  Yeah.
11    Q.  What was the problem that Simcala was
12         having?
13    A.  They were running out of material.
14    Q.  And this was in the late 2004 period?
15    A.  Yes.
16    Q.  Did they say or identify any suppliers that
17         they were having problems with at that
18         time?
19    A.  Yes.
20    Q.  And who did they identify?
21    A.  The Concrete Company.
22    Q.  What did they say about The Concrete
23         Company?

Page 64

1     A.  Just said that they were having problems
2          with the material from the Ward plant.
3          They couldn't -- you know, wasn't getting
4          what they wanted.
5     Q.  What problems specifically did they say
6          they were having with the material?
7     A.  Just that it was -- the chemistry of the
8          material had changed and it was -- you
9          know, wasn't -- it wasn't as pure as what
10         it had been in the past.
11    Q.  And you at Globe had purchased from that
12         same plant and had not had chemistry
13         problems while you were at Globe at least?
14    A.  While I was at Globe, that's correct.
15    Q.  And then at some point after you left Globe
16         you learned from Simcala that they alleged
17         some chemistry problems?
18    A.  Yes.
19    Q.  Did you hear that from anybody at Globe
20         ever after you left Globe?
21    A.  Yes.
22    Q.  Who?
23    A.  From a fellow by the name of Bobby Becker.

Page 65

1     Q.  When did that take place?
2     A.  I don't recall exactly when that took
3          place, but I knew that he had mentioned to
4          me that they were having some issues as
5          well.
6     Q.  Was that after you left Globe?
7     A.  Yes.
8     Q.  And did Simcala mention that they were
9          having quantity issues with The Concrete
10         Company?
11    A.  Yes.
12    Q.  What did they say about that?
13    A.  They couldn't get enough, couldn't get what
14         they needed.
15    Q.  If there were chemistry problems, then do
16         you know why Simcala would want to get more
17         of the product from The Concrete Company?
18    A.  Well, it was a two-fold problem.  They
19         couldn't get enough.  What they were
20         getting, the chemistry wasn't what they had
21         experienced in the past, wasn't as good.
22    Q.  Is there some test that they do to ferret
23         out insufficient white oversized on the

Page 66

1    basis of chemistry before it's put in the
2    kiln?
3    A.  Yes.
4    Q.  Do they test all truckloads or trainloads
5    that are brought to the plant?
6    A.  Yes.
7    Q.  How does that take place?
8    A.  The people in the laboratory will go out
9    and collect a sample from each truckload or
10   trainload or whatever, and then it's
11   crushed in a mill and run through an x-ray
12   machine.
13   Q.  Are loads rejected on that basis?
14   A.  Yeah.
15   Q.  So you could have a situation where a truck
16   would come to the plant and they would run
17   that test --
18   A.  Uh-huh (positive response).
19   Q.  -- and then they would say we can't use
20   this truckload?
21   A.  Yes.
22   Q.  Would they still pay The Concrete Company
23   for that load?

Page 67

1    A.  I don't know if they did or didn't.
2    Q.  What would they do with the truckload that
3    was not going to be used?
4    A.  I can't recall specifically what they did.
5    My experience in the past, going back to
6    Globe, is a lot of times when we would have
7    situations like that we would set that
8    material -- if we couldn't return it, we
9    would set it aside.  We would either try to
10   negotiate a lower price for it because of
11   the chemistry and we would try to blend it
12   off to where it wouldn't hurt the operation
13   somehow.
14   Q.  So you would still try to use it.  You
15   would just go back to the supplier and say
16   we're not going to pay you as much because
17   we have to blend it in?
18   A.  Right.
19   Q.  And --
20   A.  We would let them -- either -- you know,
21   give them the option to either -- you know,
22   we can return it or we can, you know, try
23   to work out a -- you know, some sort of a

Page 68

1    settlement where, you know, we'll use it,
2    we'll have to blend it off, you know,
3    without causing us any problems.
4       MR. BAILEY:  Can we take a break?
5       MR. GRISTINA:  Yeah.
6       (A brief recess was taken.)
7    Q.  (Mr. Gristina continuing:)  Now, we were
8    talking before the break about truckloads
9    and testing on truckloads that would come
10   to the Globe plant.  Again, was every
11   truckload of white oversized tested that
12   came to Globe while you were there before
13   it was used?
14   A.  Yes.
15   Q.  And are you aware at Simcala, once you
16   began consulting with them, if they had a
17   similar practice?
18   A.  Yes.
19   Q.  Did Simcala ever share with you any of the
20   data that they obtained in testing The
21   Concrete Company white oversized?
22   A.  I had seen some of the data, yes.
23   Q.  What sort of form was that data in?  Was it

Page 69

1    in a book?  Was it in loose paper?
2    A.  Mostly on a -- just on a computer screen.
3    Q.  And so you saw the Simcala computer screen
4    that contained that data?
5    A.  Yes.
6    Q.  And were you aware of Simcala's practice
7    with respect to keeping that data aside
8    from in the computer?
9    A.  I knew they did.  I didn't know -- I didn't
10   know what their quality program was, how
11   they did their paperwork, no.
12   Q.  At Globe when you were there would you keep
13   that data in hard copy form?
14   A.  No.
15       Well, hard copy -- it was kept on a
16   hard disk on a computer, filed in that way,
17   but on paper, no.
18   Q.  How long was it preserved?
19   A.  Oh, boy.  I don't recall.
20   Q.  And do you know whether or not Simcala
21   printed out that data or saved it on a disk
22   outside of its hard drives?
23   A.  I know that they would print it out from

Page 70

1   time to time, yes, but whether they saved
2   it on a hard drive and all that, I do not
3   know.
4   Q.   And so then at some point after you began
5        consulting with Simcala you learned that
6        they had chemistry complaints about The
7        Concrete Company as well as quantity
8        complaints.  Is that true?
9   A.   Yes.
10  Q.   And then at some point around that same
11       time you decided to investigate going into
12       the oversized business yourself.  Is that
13       true?
14  A.   Yes.
15  Q.   What was it that caused you to come to that
16       decision?
17  A.   Well, I saw an opportunity in the
18       marketplace that -- with my background in
19       metallurgical oversized and with my
20       contacts at Globe -- I knew, you know, they
21       were having some issues -- that, you know,
22       it would be a good time to look into that.
23  Q.   Were you aware of another location in the

Page 71

1        Montgomery area where you could get white
2        oversized?
3   A.   Not at that time.
4   Q.   So that when you decided to investigate
5        that new line of business you didn't have
6        any idea of where you could actually get
7        the product that you were hoping to sell?
8   A.   That's correct.
9   Q.   Where did you think that you would get the
10       information as to how to locate that
11       product?
12  A.   I asked when I called Mr. Lambert and said,
13       you know, I was looking to -- would like to
14       investigate getting into the sand and
15       gravel business.  And he, you know,
16       informed me that he could not get in the
17       sand and gravel business, but he had been
18       doing some consulting work for a guy that
19       also wanted to get into the sand and gravel
20       business.  And, you know, he -- and he
21       said, well, you know, you two should get
22       together.  So that was Mr. Alexander.
23  Q.   So Mr. Lambert told you at that time he

Page 72

1        couldn't get in the sand and gravel
2        business but he had been doing some work --
3        consulting work for a guy who also wanted
4        to get in the business?
5   A.   That's correct.
6   Q.   Did he describe that consulting work he had
7        been doing for Mr. Alexander?
8   A.   Not in detail, no.
9   Q.   Did he describe it generally?
10  A.   Yeah.  He just said he was doing some
11       consulting work for a guy up in north
12       Alabama, looking at a sand plant or
13       something.
14  Q.   In north Alabama?
15  A.   Yes.
16  Q.   Did he say any other location that he was
17       doing consulting work for?
18  A.   No.
19  Q.   Do you know where in north Alabama he was
20       speaking of?
21  A.   No, sir.
22  Q.   Was that the conversation that you were
23       referring to earlier where he told you he

Page 73

1        couldn't be in the sand and gravel
2        business?
3            You said Mr. Lambert told you I can't
4        be in the sand and gravel business.  Was
5        that the first time he told you that?
6        MR. WALTER:  I'm confused, now,
7            Tom.  You have two or three
8            questions going.
9        MR. GRISTINA:  All right.  I'm a
10           little bit, too, because I'm
11           trying to pinpoint exactly
12           when Mr. Lambert first told
13           you he couldn't be in the sand
14           and gravel business.  And we
15           talked a little bit about it
16           earlier.  And we don't have
17           any set time period as best
18           you can recall, but we have
19           this call when -- conversation
20           which took place after
21           Mr. Tuten decided he wanted to
22           go in the business.  And he
23           stated that during that time

Page 74

1      Harry said I can't go in the
2      business but I've been doing
3      some consulting work for a guy
4      that wants to go into it.
5  Q.  So my question is, was that the first time
6      that Harry told you that he couldn't go
7      into the sand and gravel business?
8  A.  No.
9  Q.  Okay.  When was the first time?
10 A.  In the earlier conversation we had.
11     Sometime after he had left Montgomery
12     Materials -- I don't recall the exact time
13     elapsed -- but, you know, he said that he
14     was under a noncompete and he couldn't, you
15     know, be in the sand and gravel business.
16     That had to be in 2001, 2002, somewhere in
17     there.
18 Q.  During that period from when he first told
19     you that until the conversation that we
20     were just speaking of when you were
21     thinking about going into the business,
22     what sort of contact did you have with
23     Mr. Lambert?

Page 75

1  A.  Every once in a while I would call Harry
2      up, you know, because I've known him for a
3      long time and enjoyed talking to him.
4      Because, you know, we have bought a lot of
5      material from him over the years and just
6      maybe every six months or something, you
7      know, might call him up or something just
8      to see how he's doing.  That was it.
9  Q.  Was he a friend of yours?
10 A.  Yeah, I would consider him a friend of
11     mine, yeah.
12 Q.  Still is a friend?
13 A.  Yes.
14 Q.  I mean, as his friend weren't you curious
15     when he left Montgomery Materials what he
16     was going to be doing for a living?
17 A.  Well, shortly after he told me, you know,
18     when he called me up and said he was no
19     longer with Montgomery Materials, and
20     shortly after that time frame, you know, I
21     learned that he was in the trucking
22     business, driving a truck.
23 Q.  Were you aware of any contacts during that

Page 76

1      period between Mr. Lambert and Simcala?
2  A.  No.
3  Q.  What about between Mr. Lambert and Globe?
4  A.  No.  I mean, I was still at Globe at that
5      time.  So, I mean, if there was any
6      contacts, I would have known, other than
7      the ones that I had with him obviously.
8  Q.  After you left Globe were you aware of any
9      contact between Mr. Lambert and Globe?
10 A.  No.
11 Q.  When was the first time, if ever, that you
12     heard the name Jim Maddox?
13 A.  Probably after Alabama Gravel was formed.
14 Q.  And how did you learn of Mr. Maddox?
15 A.  Robert had -- Robert Alexander told me that
16     he wanted to buy some material from us.
17 Q.  Now, going back to the conversation with
18     Mr. Lambert -- well, strike that.
19         Before that conversation with
20     Mr. Lambert where you spoke with him once
21     you made the decision you wanted to go in
22     the white oversized business -- before that
23     time have we talked about every

Page 77

1      conversation that you can recall between
2      you and Mr. Lambert that dealt with his
3      noncompete?
4  A.  Yeah.  Yes.
5  Q.  So there's no other conversations that you
6      can recall?
7  A.  You know, I had conversations with Harry,
8      but we never talked about that.  I didn't
9      have any interest in that.
10 Q.  So, now, going to the meeting that took
11     place in late 2004, early 2005 here in
12     Montgomery with Mr. Alexander.  What hotel
13     was that at?
14 A.  It was one of the ones over there at
15     Prattville, on the Prattville exit.  I
16     can't remember if it was -- which exit it
17     was.  I don't remember if it was the
18     Hampton Inn or the Best Western.  It was on
19     that side of the road.  I remember that.
20     It was one of those -- one of those hotels.
21 Q.  Before that meeting was arranged had you
22     ever had any conversations with Mr. Lambert
23     about going into the white oversized

Page 78

1  business?
2  A.  The only conversation I had was, you know,
3      when I called him up that one time.  But,
4      no, I had not.
5  Q.  Had he ever told you before or mentioned to
6      you before that he wanted to go into the
7      white oversized business?
8  A.  No.
9  Q.  And so is it your testimony that it was you
10     that first contacted Mr. Lambert about
11     going into the business and not the other
12     way around?
13 A.  That's correct.
14 Q.  Now, the meeting with Mr. Alexander was
15     scheduled.  Was it Mr. Lambert who
16     contacted Mr. Alexander, or did you contact
17     Mr. Alexander?
18 A.  He contacted Mr. Alexander, because I
19     didn't know the man.
20 Q.  So you had never met Mr. Alexander before?
21 A.  Never.
22 Q.  And did Harry then call you back and say,
23     okay, he's ready to meet and give you a

Page 79

1      time, or how did that work?
2  A.  Yeah.  He called -- just said that he's
3      going to be in town, you know, at this date
4      and this is where he's going to be staying,
5      and that's how it was set up.
6  Q.  Did he tell you to go there at a certain
7      time or did you contact Mr. Alexander when
8      he got to town?
9  A.  He gave me his phone number and I called
10     him.
11 Q.  Do you know what Harry's cell phone number
12     is -- excuse me -- Mr. Lambert's cell phone
13     number is?
14 A.  Yes.
15 Q.  What is that?
16 A.  Can I look it up?
17 Q.  Sure.
18 A.  Because I've got it on automatic here.
19     It's 334.  I can tell you that much.
20         (334) 202-7177.
21 Q.  Now, as best you can recall is that the
22     only cell phone number you've ever had for
23     Mr. Lambert?

Page 80

1  A.  Yes.
2  Q.  What's your cell phone number?
3  A.  Mine is (740) 525-9396.
4  Q.  Have you had that number for a while?
5  A.  Yes.
6  Q.  How long?
7  A.  Couple of years.
8  Q.  And over the last couple of years if
9      someone wanted to reach you is that the
10     number they would call you at?
11 A.  Either that or my home number, yes.
12 Q.  And what's that?
13 A.  It's (740) 568-0797.
14         (Brief interruption.)
15 Q.  And do you still recall what your number
16     was at Globe before you left?
17 A.  Let me think.  It was (740) 984-8 -- I
18     think it's 8633.
19 Q.  And many companies have the same prefix for
20     all the numbers inside.
21 A.  Yes.  That's the way that is.
22 Q.  So Globe -- if you're calling Globe --
23     somewhere in Globe, you're going to be

Page 81

1      doing a 984 prefix?
2  A.  Yeah.  They've got like a general number
3      and then like all the extensions are
4      8-something.
5  Q.  And except for -- in the Ohio, I guess,
6      plant?
7  A.  That's the Ohio plant, yes.
8  Q.  What about in Selma?  Do you know the
9      prefix there still?
10 A.  I used to know that.
11         MR. WALTER:  Don't guess.
12 A.  Well, I -- I used to know it, but I
13     don't -- I can't remember.
14 Q.  All right.  Now, other than the home number
15     and the cell phone number and the work
16     number you gave me, over the last five
17     years is there another number that you
18     could have been commonly reached at?
19 A.  Huh-uh (negative response).
20 Q.  No?
21         MR. WALTER:  You need to answer.
22 A.  I'm sorry.  No.
23 Q.  Going back, then, to the meeting at the

Deposition of David Tuten                                                July 13, 2006

Page 82

1    hotel.  Did Mr. Lambert attend that
2    meeting?
3    A.  Yes.
4    Q.  Who else was there besides Mr. Lambert,
5        you, and Mr. Alexander?
6    A.  No one.
7    Q.  And I assume it was -- was it in
8        Mr. Alexander's room or was it --
9    A.  Yes.
10   Q.  And what time was that?
11   A.  It was in the evening.
12   Q.  And if you could tell me everything that
13       you recall about that meeting, please.
14   A.  Just basically he introduced us, you know,
15       who he was.  And we kind of gave each
16       other, you know, background, you know, who
17       we were.  I told him that, you know, I had
18       been involved in the metallurgical business
19       for a long time and I didn't know -- you
20       know, I didn't know nothing about the sand
21       and aggregate business.  But, you know, I
22       was looking to -- you know, just as a small
23       investor, you know, would be interested in

Page 83

1        working with somebody, getting the
2        business, and maybe I could just help them
3        on, you know, selling the oversized.
4            And Robert -- of course, his thing
5        is -- he owns a -- or owns part of a couple
6        of companies, I guess, in Atlanta, and he
7        has an interest in sand and aggregate.  And
8        so, you know, between the two of us, we --
9        you know, we had an interest in different
10       areas of the sand and gravel business, but
11       together, you know, we kind of covered all
12       of it.
13   Q.  And did you tell him specifically that you
14       were interested in going into business with
15       him as to white oversized gravel?
16           MR. WALTER:  When you say him, who
17           are you referring to?
18           MR. GRISTINA:  Mr. Alexander.
19   A.  Yes.
20   Q.  And --
21   A.  Yeah.  That's the only interest I had.
22       Because, like I said, I don't know anything
23       about any of the other stuff.

Page 84

1    Q.  What did Harry say during that meeting?
2    A.  Nothing.
3    Q.  You can't recall Mr. Lambert saying
4        anything at all during that meeting?
5    A.  You know, he basically introduced us and,
6        you know, told Robert how he knew me and
7        told me how he knew Robert, and that was
8        it.
9    Q.  Was there any discussion about any role for
10       Mr. Lambert in any new business venture
11       between you and Mr. Alexander?
12   A.  No.
13   Q.  Was there a discussion that that role could
14       not exist?
15           MR. BAILEY:  Object to the form.
16   A.  Yes.
17   Q.  And what was that discussion?
18   A.  Well, just Harry said -- you know, he said,
19       I can't be involved.  I can't get in the
20       sand and gravel business.  So, you know,
21       that was that.
22   Q.  Did The Concrete Company's name come up
23       during that conversation?

Page 85

1    A.  I don't know.  I mean, it might have.
2    Q.  You can't recall?
3    A.  I cannot recall.
4    Q.  Mr. Alexander, as far as you know did he
5        have any -- did Mr. Alexander as far as you
6        know have any business dealings in the
7        Montgomery area at that time?
8    A.  I did not know.
9    Q.  Was there a discussion during that meeting
10       as to how you all would locate a pit for
11       white oversized?
12   A.  Mr. Alexander had had some contacts with --
13       talked to a Mike Gentry, and he had -- you
14       know, he had been talking to him about
15       mining his pit.
16   Q.  And was that the first time that you
17       learned of Mr. Alexander's discussion with
18       Mr. Gentry?
19   A.  Yes.
20   Q.  And so what specifically did Mr. Alexander
21       say that he could mine from Mr. Gentry's
22       pit?
23   A.  He didn't say specifically at that

Page 86

1    meeting.  He just said that he had been
2    talking to this guy, that we might be able
3    to, you know, mine some aggregate in his
4    pit.
5    Q.  Did he indicate how he came to learn of
6    Mr. Gentry's pit?
7    A.  Yeah.  He -- he had been introduced to
8    Mr. Gentry through Mr. Lambert.
9    Q.  Do you know when that introduction took
10    place?
11    A.  I do not.
12    Q.  But it was before this meeting that you all
13    had at the hotel?
14    A.  Yes.
15    Q.  And during the meeting -- well, was there
16    anything else you can recall about the
17    discussion with Mr. Alexander during that
18    meeting?
19    A.  We talked for probably -- I don't know --
20    hour, hour and a half maybe and, you know,
21    just kind of left it that -- at that time I
22    kind of said, well, you know, I'll think it
23    over or whatever and, you know, get back

Page 87

1    with you, stay in touch, that sort of
2    thing, so ...
3    Q.  Now, I realize that you've given me a time
4    frame a couple of times when you said late
5    2004, early 2005.
6    A.  Right.
7    Q.  Was this meeting before you had -- well, at
8    some point after that did you have any
9    contact with Simcala that also involved
10    Mr. Alexander?
11    A.  At some time what?
12    Q.  After your meeting with Mr. Alexander did
13    you all have dealings with Simcala
14    together?
15    MR. WALTER:  You're referring to
16    Mr. Alexander and Mr. Tuten?
17    MR. GRISTINA:  And Mr. Tuten.
18    A.  After that?
19    Q.  Yes.
20    A.  Yeah.  Sometime after that we did, yeah.
21    Q.  All right.  And how long after that
22    meeting?
23    MR. WALTER:  Now, I guess the

Page 88

1    reason I'm a little confused,
2    are you asking about dealings
3    that Mr. Tuten was involved in
4    or things that Mr. Alexander
5    might have done that Mr. Tuten
6    knows about?
7    MR. GRISTINA:  Well, I'll ask it
8    both --
9    Q.  I'm not speaking now about you exclusively
10    dealing with Simcala.
11    A.  Okay.
12    Q.  So what I'm trying to figure out is after
13    this meeting at the hotel took place, did
14    there come a time when you and
15    Mr. Alexander met with anybody from
16    Simcala?
17    A.  After that point, yes.
18    Q.  And how long after that?
19    A.  Two, three months.
20    Q.  Had you ever met -- you and Mr. Alexander,
21    had you ever met with anybody from Simcala
22    before that meeting?
23    A.  No.

Page 89

1    Q.  Now, going back to the meeting in the
2    hotel, was there any discussion about
3    Mr. Lambert going into business with you
4    and Mr. Alexander after his covenant --
5    noncompete expired or after he got out of
6    jail?
7    A.  No.
8    Q.  Do you ever recall Mr. Lambert using the
9    term get out of jail as a reference to his
10    noncompete?
11    A.  Yes.
12    Q.  Is that the way that he would frequently
13    describe it?
14    A.  Yes.
15    Q.  So at that time when you all met in the
16    hotel there was no discussion whatsoever
17    about Mr. Lambert coming to work with you
18    all after he got out of jail?
19    A.  It was not discussed.
20    Q.  Did you contemplate that?
21    A.  Personally?
22    Q.  Yes.
23    A.  I thought, you know, after he got out of

Page 90

1  jail, it, you know, might be something
2  worth pursuing, but at that time, no.
3  Q.  Had you ever talked to Mr. Lambert about
4  that concept before the meeting?
5  A.  No.
6  Q.  And had he ever mentioned it to you?
7  A.  No.
8  Q.  Other than Mr. Gentry's pit, were there any
9  other sites -- mining sites discussed
10  during the hotel meeting?
11  A.  No.
12  Q.  Is there anything else that you can recall
13  about that meeting that we haven't
14  discussed?
15      MR. WALTER:  Referring to the
16      meeting at the hotel?
17      MR. GRISTINA:  At the hotel.
18  A.  We talked about, you know, if we were to --
19  you know, if Robert and I were to go into
20  business, I couldn't -- you know, I
21  couldn't be -- I'm not a day-to-day person
22  as far as the company is concerned and I
23  couldn't be, that, you know, we needed

Page 91

1  somebody that could kind of run the thing
2  for us.  And, you know, we talked about
3  Mr. Dasinger at that time also.
4  Q.  That's Rex Dasinger?
5  A.  Yes.
6  Q.  D-A-S-I-N-G-E-R?
7  A.  I'm not -- I don't know the spelling.
8  Q.  And so you told Mr. Alexander I can't be
9  the day-to-day guy --
10  A.  Right.
11  Q.  -- but maybe this Dasinger guy can be?
12  A.  Right.  Well, that we talked about it and
13  actually Mr. Lambert recommended him as
14  a -- would be a good person to, you know,
15  like be a foreman or what have you to run
16  the thing.  And we discussed that as well.
17  Q.  So was that recommendation from
18  Mr. Lambert -- was that during that hotel
19  meeting?
20  A.  Yes.
21  Q.  So then at least one conversation did take
22  place that involved Mr. Lambert and that
23  was him recommending Mr. Dasinger as a

Page 92

1  foreman type person?
2  A.  Well, we asked him, you know -- we asked
3  him if, you know, he knew of somebody we
4  could get or that, you know, could do that,
5  and he recommended Rex.
6  Q.  And did you know Rex before then?
7  A.  No.
8  Q.  At that time did Mr. Lambert tell you what
9  his relationship with Mr. Dasinger was?
10  A.  He -- yeah.  He -- I mean, he said that he
11  drove a truck for Carol's Contracting and
12  he had been in the gravel -- you know,
13  worked in gravel pits before and stuff and
14  he felt that, you know, he would be a good
15  guy to have.
16  Q.  Now, over the time period you came to know
17  Mr. Lambert before this meeting he was
18  somebody, wasn't he, that you understood
19  had extensive knowledge of the sand and
20  gravel business; is that correct?
21  A.  Yes.
22  Q.  And he's somebody that you understood knew
23  how to locate different types of sand and

Page 93

1  gravel; is that correct?
2  A.  Yes.
3  Q.  And, in fact, he's also somebody that you
4  understood knew how to set up a mining
5  operation; isn't that correct?
6  A.  I assume so, yes.
7  Q.  And, in fact, to your knowledge was
8  Mr. Lambert somebody very well known in the
9  Montgomery area for having experience in
10  all of those aspects of the sand and gravel
11  business?
12  A.  I would say he's well known in the area,
13  yes.
14  Q.  And known as somebody who knows how to find
15  aggregate; is that correct?
16  A.  I would say so, yes.
17  Q.  And known as somebody who's familiar with
18  the setting up of a mining operation; is
19  that correct?
20  A.  Yes.
21  Q.  Would you also describe him as somebody who
22  had extensive knowledge and contacts with
23  purchasers of aggregate?

Deposition of David Tuten                                                                July 13, 2006

Page 94

1   A.  Yeah, I guess so, yes.
2   Q.  I mean, also somebody who knew who wanted
3       to purchase white oversized aggregate?
4   A.  He might know, but he don't know more about
5       it than I did.
6   Q.  I'm sure you know a lot about it from Globe
7       and Simcala; correct?
8   A.  Yes.
9   Q.  But you didn't know Jim Maddox?
10  A.  No.
11  Q.  And you didn't know Robert Alexander?
12  A.  No.
13  Q.  Did you know Randy Willingham?
14  A.  No.
15  Q.  Did you know anybody outside of the state
16      of Alabama who purchased white oversized
17      aside from Globe?
18  A.  Well, besides people in the ferroalloy
19      industry.  I mean, I mean, I know a lot of people
20      that purchase, you know, oversized
21      material.
22  Q.  All right.  But you didn't know Randy
23      Willingham?

Page 95

1   A.  No.
2   Q.  You didn't know Robert Alexander?
3   A.  No.
4   Q.  And you didn't know Jim Maddox?
5   A.  No.
6   Q.  Had you ever heard of the company AgTran?
7   A.  No.
8   Q.  Isn't it true that if somebody wanted to
9       start up a mining operation in the
10      Montgomery area for white oversized Harry
11      Lambert would be a pretty good person to
12      talk to about it, wouldn't he?
13  A.  Yeah, I would say so.
14  Q.  In fact, would he probably be one of the
15      best people to talk to in the area about
16      it?
17  A.  That's a matter of opinion.
18  Q.  In your mind was he the best person to talk
19      to about it?
20  A.  I don't know if he was the best, but,
21      I mean, you know, I always thought he was
22      pretty good.
23  Q.  And that's why you went to him?

Page 96

1   A.  That's why I asked him, yes.
2   Q.  Now, going back to the meeting at the
3       hotel.  Other than recommending
4       Mr. Dasinger, was there any other
5       conversation that Mr. Lambert participated
6       in?
7   A.  No.
8   Q.  And he had indicated that he had experience
9       with Mr. Dasinger because Mr. Dasinger had
10      worked for whom?
11  A.  In the sand and gravel business?
12  Q.  Yes, sir.
13  A.  I believe that he -- he might have worked
14      for Elmore at one time, Elmore Sand &
15      Gravel.
16  Q.  Were you familiar with Mr. Dasinger's
17      separation from Elmore?
18  A.  No.
19  Q.  Did you know that Mr. Dasinger was a driver
20      for Carol's Contracting?
21  A.  At that meeting I learned that, yes.
22  Q.  Were you aware of Mr. Dasinger having any
23      experience in the construction of a mining

Page 97

1       operation?
2   A.  No.
3   Q.  Now, Alabama Gravel was formed in March
4       2004; correct?
5   A.  Yes.
6   Q.  Since that time Alabama Gravel has done
7       extensive construction on a mining
8       operation in Deatsville; isn't that
9       correct?
10  A.  Yes.
11  Q.  Were you aware at that time that you met
12      with Mr. Alexander as to whether he had any
13      experience in constructing a mining
14      operation?
15  A.  I learned that at that meeting, yes.
16  Q.  What did he tell you?
17  A.  Just --
18          MR. WALTER:  Tom, let me -- you
19          said a minute ago that Alabama
20          Gravel was formed in March of
21          2004, and I think maybe you
22          misspoke.  It was March of
23          2005.

25 (Pages 94 to 97)

Page 98

1      MR. GRISTINA: I apologize. March
2   24th, 2005. I'm sorry.
3   Q.  Now, if you can tell me what Mr. Alexander
4      said about his experience in constructing a
5      mining operation.
6   A.  I don't recall. He, you know, just said
7      that he had put up plants before in the
8      past and his history with, you know, AgTran
9      and -- I can't think -- Sand Rock, the two
10     companies he's involved with and his
11     partner Randy Willingham and places they
12     had done work and, you know, had sand pits
13     and stuff, Georgia and all over different
14     places.
15  Q.  So how was it contemplated during that
16     meeting or was it discussed who would be in
17     charge of constructing Alabama Gravel's
18     mining operation?
19  A.  Mr. Alexander, he's the -- I don't know
20     what you would call him. He's the managing
21     member of the company and that -- you know,
22     the day-to-day stuff, that all would
23     fall -- went to him.

Page 99

1   Q.  So it was contemplated that Mr. Alexander
2      would be the one setting up the day-to-day
3      operations and purchasing the equipment and
4      building the plant?
5   A.  That's correct.
6   Q.  Did Mr. Alexander have any contacts with
7      equipment suppliers in the Montgomery
8      area? Did you all discuss that?
9   A.  Did not discuss that, no.
10  Q.  Are you aware of him having any such
11     contacts?
12  A.  I'm not -- I wasn't aware at that time.
13  Q.  A mining plant consists of extensive
14     amounts of equipment and involves trucks,
15     bulldozers; isn't that correct?
16  A.  Yes.
17  Q.  Classifiers, is that one of the things they
18     have?
19  A.  Yes.
20  Q.  And sifters? Is that another thing, a
21     sifter?
22      MR. SORRELL: Shaker.
23  Q.  Shaker. Shaker. Is that correct?

Page 100

1   A.  Yes.
2   Q.  And you have to get permits to do all this
3      stuff; isn't that right?
4   A.  Yes.
5   Q.  And there are environmental issues; is that
6      correct?
7   A.  Yes.
8   Q.  And these are things that you've learned
9      since that meeting?
10  A.  Yes.
11  Q.  At that meeting was there any discussion
12     about who would hire all of the consultants
13     and builders and inspectors to do all that
14     construction?
15  A.  We didn't talk in detail about it. But, I
16     mean, Robert was going to -- I mean, he
17     runs it. It was going to be his thing.
18  Q.  Did Mr. Lambert ever say I know who all
19     these people are in the Montgomery area and
20     I can help you out with that?
21  A.  We asked him for his, you know, opinion,
22     you know, who would be a good person or
23     something like that.

Page 101

1   Q.  So Mr. Lambert had the information and the
2      specific individuals who could help you all
3      construct this plant?
4      MR. BAILEY: Object to the form.
5   A.  Yes.
6   Q.  And at that time had you located a place
7      where you all thought you would build this
8      plant?
9      You mentioned Gentry. Was there
10     another location?
11  A.  No.
12  Q.  At that time had you identified the
13     Deatsville site?
14  A.  No.
15  Q.  And when I say the Deatsville site, do you
16     understand what I'm talking about?
17  A.  Yes.
18  Q.  And where is that site located?
19  A.  It's just -- it's just outside the little
20     town of Deatsville.
21  Q.  And is that the first -- well, is that the
22     only site that Alabama Gravel has built so
23     far?

Deposition of David Tuten                                                                July 13, 2006

Page 102

1   A.   Yes.
2   Q.   When did you first locate that site?
3   A.   Well, Mr. Dasinger acquired the lease on
4        that property sometime early in 2005.
5   Q.   You say Mr. Dasinger acquired the lease.
6        Did he sign the lease and pay for the lease
7        or did -- individually?
8   A.   I don't know -- I don't know about paying
9        for the lease, but, I mean, he signed for
10       the lease, yes.
11  Q.   And you said early 2005. So that would
12       make it before Alabama Gravel was actually
13       formed according to its articles of
14       organization?
15  A.   Right. It was around -- yeah, right before
16       that, yes.
17  Q.   And do you know who that lease was obtained
18       from?
19  A.   The name on the lease is Cruise.
20  Q.   Could you -- C-R-U-Z or U-I-S-E?
21  A.   I think it's C-R-U-I-S-E, but I'm not sure.
22  Q.   You don't know the first name?
23  A.   No, I do not.

Page 103

1   Q.   Do you know how Mr. Dasinger located the
2        Deatsville site?
3   A.   No, I do not.
4   Q.   Do you know of any testing that was done on
5        the Deatsville site before the lease was
6        done?
7   A.   I know that he said he had tested it
8        himself.
9   Q.   Mr. Dasinger said that?
10  A.   Yes.
11  Q.   Did he say that he went there with
12       Mr. Lambert and bored holes to see if there
13       was white oversized gravel at that site?
14  A.   He did not say.
15  Q.   Are you aware of whether Mr. Lambert went
16       to the Deatsville site in 2004 before the
17       hotel meeting and did some testing to
18       determine if white oversized gravel could
19       be mined in the Deatsville site?
20  A.   I'm not aware of that.
21  Q.   You think that did not happen or --
22  A.   I don't know.
23  Q.   So you trusted Mr. Dasinger at some point

Page 104

1        to tell you that's where we can get this
2        product?
3   A.   Yes.
4   Q.   The only product at this time that you all
5        were interested in locating was white
6        oversized; is that correct?
7   A.   That's all I was interested in.
8   Q.   And that's a very scarce product in the
9        area; is that correct?
10  A.   Yes.
11  Q.   And you trusted Mr. Dasinger to tell you
12       the Deatsville site is where we need to be
13       to get that?
14            MR. BAILEY:  Object to the form.
15            Go ahead.
16  A.   Yes.
17  Q.   Without any knowledge of whether or not
18       Mr. Dasinger had worked with Mr. Lambert to
19       determine if in fact that would be a good
20       place to get white oversized?
21            MR. WALTER:  I'm not sure I quite
22            understand. You can answer it
23            if you understand it. I'm a

Page 105

1            little confused.
2   A.   Ask it again, please.
3   Q.   All right. As far as you knew Mr. Dasinger
4        had not worked with Mr. Lambert to test the
5        Deatsville site?
6   A.   I had no idea.
7   Q.   And so, then, you relied exclusively on
8        Mr. Dasinger to tell you that that would be
9        a good site for Alabama Gravel to open up
10       its first operation looking for the scarce
11       material of white oversized gravel?
12  A.   Yes.
13  Q.   And were you aware of Mr. Dasinger having
14       any experience at that time in actually
15       sniffing out that scarce stuff?
16  A.   No. I mean, he had been in the sand and
17       gravel business.
18  Q.   But locating white oversized is -- would
19       you agree with me that it takes some
20       experience?
21  A.   Yeah, I guess so. Yeah.
22  Q.   And you only knew that he had been in the
23       business, the sand and gravel business, but

Deposition of David Tuten                                                                July 13, 2006

Page 106

1    you didn't know whether or not Mr. Dasinger
2    had ever gone and actually done site
3    samples or soil samples to locate product?
4    A.   Yeah, I didn't know what he had done in the
5    past.
6    Q.   And at the meeting -- at the hotel
7    meeting -- and when I say the hotel
8    meeting, so we're on the same page, I'm
9    meaning the one with Mr. Alexander and
10   Mr. Lambert.  Did you all -- again, I
11   apologize.  Did you discuss the Deatsville
12   site?
13   A.   No.
14   Q.   Now, we talked earlier about Mr. Lambert's
15   discussions, the discussions you had with
16   him during that meeting, and the last part
17   that we talked about was him giving you
18   names of people who could help you with the
19   construction; is that correct?
20   A.   We asked, you know, if we were to
21   undertake -- you know, if we were to do
22   this, form a company, you know, if there
23   was, you know, anybody that -- if we had

Page 107

1    any questions or problems, you know, if we
2    knew to how to get ahold of, you know, an
3    electrical contractor or somebody like
4    that, that, you know, he could -- he could
5    give us, you know, some ideas on people he
6    had dealt with in the past.
7    Q.   Right.  Now, other than that and what we've
8    talked about earlier, are there any other
9    discussions you recall during that hotel
10   meeting with Mr. Lambert?
11           MR. BAILEY:  Object to the form.
12   A.   No.
13   Q.   And at the conclusion of the meeting was a
14   course of action decided upon between you
15   and Mr. Alexander as to how you would
16   proceed from there?
17   A.   Basically I said, well, you know, I'd think
18   about it and, you know, we would just stay
19   in contact and, you know, have to decide if
20   it was something that I wanted to be in --
21   you know, to get involved with or not.  So
22   we kind of left it up in the air at that
23   point.

Page 108

1    Q.   When was the next meeting or conversation
2    you had with Mr. Lambert after that hotel
3    meeting?
4    A.   I don't recall.  I mean, I don't remember
5    specifically.
6    Q.   What did you do after that meeting in terms
7    of pursuing the white oversized business?
8    A.   Actually nothing.  I mean, I, you know,
9    went home --
10   Q.   To Ohio?
11   A.   Yeah, went home to Ohio and, you know,
12   talked it over, talked to some family
13   members or what have you and, you know,
14   just kind of mulled it around to see if it
15   was something worth doing or not.
16   Q.   And what was the next step forward in the
17   process of forming Alabama Gravel as it
18   concerned you?
19   A.   Well, once I made the decision and, you
20   know, talked with Robert some more and
21   tried to get, you know, a better feeling
22   for him and everything and decided, you
23   know, to go forward with it, then we, you

Page 109

1    know, decided we would do it.  Then it was
2    just a matter of, you know, getting an
3    attorney and getting the thing put
4    together.
5    Q.   Is that the same cell phone you had at that
6    time?
7    A.   Yes, uh-huh (positive response).
8    Q.   Do you have Mr. Alexander's number in
9    there?
10   A.   Uh-huh (positive response).
11   Q.   And what's that number?
12   A.   It's (706) 825-9896.
13   Q.   That's Robert Alexander's -- is that his
14   cell phone?
15   A.   Yes.
16   Q.   Is that the only number you have for him?
17   A.   Actually I have his personal home phone
18   number.
19   Q.   What's that?
20   A.   It's (706) 733-989 -- wait a minute.
21   That's the same -- no, it's not.  9896 as
22   well.  Just a different prefix.
23   Q.   All right.  And you said that you talked to

Deposition of David Tuten                                                    July 13, 2006

Page 110

1    Robert Alexander after you came to the
2    decision to pursue the business. Before
3    you talked to Mr. Alexander again about
4    pursuing the business did you talk to Harry
5    Lambert again about it?
6  A. I don't recall if I talked to Harry between
7    those -- you know, between the meeting and
8    with Robert. But, you know, I did talk to
9    Harry when I, you know, made the decision
10   to -- you know, that I was going to do it,
11   you know, that -- get involved in it, you
12   know, just to let him know that I was going
13   to do that.
14 Q. What else can you recall about that
15   conversation?
16 A. Nothing. I mean, he was, you know -- you
17   know, he thought -- he said, well, Robert's
18   a good guy and, you know, I think you guys
19   would get along good. So that was about
20   it.
21 Q. Any discussion at that time about any role
22   Mr. Lambert would play in the new business
23   that was going to be formed?

Page 111

1  A. No.
2  Q. And then anything else you can recall about
3    that?
4  A. Nothing.
5  Q. And then you talked to Mr. Alexander, and
6    how did things proceed from there?
7  A. Well, when Robert -- you know, when we
8    decided to do it, we got ahold of an
9    attorney here in town and told him, you
10   know, what we wanted to do and to form the
11   company.
12 Q. All right. And when you touched something,
13   that was Exhibit 1 which was the articles
14   of organization?
15 A. Yes.
16 Q. And those were done by Rushton-Stakely, I
17   believe; is that correct?
18     I'm not going to ask you about the
19   specifics of it.
20       MR. WALTER: Yeah. Be careful not
21       to get into things that you
22       discussed with the attorney or
23       anything like the

Page 112

1    attorney-client privilege as
2    far as Alabama Gravel is
3    concerned.
4  Q. I don't want to know any specific
5    discussions, but was it done -- was the law
6    firm that you used Rushton-Stakely?
7  A. Yes.
8  Q. And that's the same law firm that's
9    representing Mr. Lambert in this
10   litigation; is that correct?
11 A. Yes.
12 Q. Now, at some point between your discussions
13   at the hotel, during that meeting, you met
14   Mr. Dasinger, I presume?
15 A. Yes.
16 Q. When was that?
17 A. I'm going to say it was probably February
18   or March.
19 Q. Of 2005?
20 A. Of 2005, yes.
21 Q. And how did you first meet?
22 A. I was -- happened to be in town and
23   Robert -- Mr. Alexander was in town, and we

Page 113

1    met -- we decided if we was going to have
2    Rex do something, you know, we needed to
3    all three of us sit down and get together
4    and figure out what was -- you know, who
5    was going to do what and, you know, kind of
6    line things up.
7  Q. How did you get in touch with
8    Mr. Dasinger?
9  A. Through Mr. Lambert.
10 Q. And did you call Mr. Lambert to get to
11   Mr. Dasinger or did Mr. Alexander?
12 A. Robert did that.
13 Q. And where did you all first meet?
14 A. We met over at where our office is.
15 Q. And where is that office?
16 A. I don't know what the address is.
17 Q. Is it Gunnels Road?
18 A. It's Gunnels Road, yes.
19 Q. And is that office on the same property
20   where Mr. Lambert lives?
21 A. Yes, that's correct.
22 Q. I want to get a description of that
23   property. I assume there's a house on the

Deposition of David Tuten                                                July 13, 2006

Page 114

1    property?
2    A.  Yes.
3    Q.  How big is the property?
4    A.  Oh, it's -- it's big.
5    Q.  Is it like a farm?
6    A.  Well, I wouldn't call it a farm, but, I
7        mean, it's probably ten acres anyway.
8    Q.  And is the Alabama Gravel office located in
9        Mr. Lambert's house?
10   A.  No.
11   Q.  Where on the property is it located?
12   A.  It's -- it's separate.  I mean, the house
13       is clear up on one end and the office
14       building is down on the other end.
15   Q.  So on the approximately ten acres there is
16       a house and then there is an office
17       building.  Is that the way you described
18       it?
19   A.  Well, it's a building that -- it's like
20       part garage for his trucks and then there's
21       like an office in there.  It's got an
22       apartment in there and, you know, a kitchen
23       and all that kind of stuff.

Page 115

1    Q.  All right.  At that point had it been
2        decided that that was going to be Alabama
3        Gravel's office?
4    A.  Yeah.  We met there and we talked to Harry
5        about, you know -- because we were just
6        starting up and obviously didn't have a lot
7        of money or anything and if we could rent
8        that from him.  Because it had the
9        apartment that Robert stays in and --
10       Mr. Alexander still stays there today.
11       And, of course, it had an office in there.
12       Kind of had everything, you know, we
13       needed.  And so we talked about renting
14       that and using that for an office.
15   Q.  Mr. Alexander stays in that apartment?
16   A.  Yes.
17   Q.  Did he live there?
18   A.  Well, yeah, through the week, yes.
19   Q.  Through the week?
20   A.  Yeah.
21   Q.  And then where does he go after that?
22   A.  He goes home.  When we first started the
23       company, I think he lived in Augusta, but

Page 116

1    now he lives in -- somewhere in South
2    Carolina.
3    Q.  All right.  Now, before that meeting had
4        you discussed with Mr. Alexander -- or
5        Mr. Lambert the use of that space as the
6        office or did it take place during that
7        meeting?
8    A.  No.  It took place during that meeting.  I
9        had never been there until then.
10   Q.  And was Mr. Lambert present throughout the
11       meeting with you and Mr. Alexander and
12       Mr. Dasinger?
13   A.  He was there in the beginning and then he
14       left.
15   Q.  Did he say why he was leaving?
16   A.  Because he didn't need to be there.
17   Q.  He specifically said I don't need to be
18       here and I'm leaving?
19   A.  Right.
20   Q.  And the meeting proceeded just with you,
21       then, and Mr. Dasinger and Mr. Alexander?
22   A.  That's correct.
23   Q.  And what did you all discuss?

Page 117

1    A.  Talked about, you know, forming the company
2        and, you know, what we wanted to do.
3        That's when I learned that, you know,
4        Mr. Dasinger was working on some lease
5        property and had acquired the lease for
6        this property.  And he knew these people.
7        He was from that area, you know, had a good
8        relationship with these people or what have
9        you and, you know, talked about just who
10       would kind of be responsible for what.
11   Q.  All right.  So was it Mr. Dasinger had
12       talked about the lease property?
13   A.  Uh-huh (positive response).
14   Q.  Did he identify the Deatsville
15       site at that time?
16   A.  Yeah.
17   Q.  And that's the lease property that he was
18       talking about?
19   A.  Yes.
20   Q.  Was there discussion of the Gentry pit at
21       that time?
22   A.  Yes.
23   Q.  And who brought that up?

Deposition of David Tuten                                           July 13, 2006

Page 118

1    A.  Robert.
2    Q.  What did he say?
3    A.  Just that he had talked to Mike Gentry and
4        he's got a pit up in Independence, Alabama,
5        that we could, you know, go in and mine and
6        get some gravel out of.
7    Q.  And, in fact, there was already an existing
8        mining operation there, wasn't there?
9    A.  Yeah.  He had kind of messed around in
10       there trying to mine some gravel.
11   Q.  Is Mr. Gentry in the ready-mixed business?
12   A.  Yes.
13   Q.  And do you know if ready-mixed concrete
14       uses white oversized gravel?
15   A.  I wouldn't think so.
16   Q.  Was there discussion about the fact that
17       white oversized was a byproduct of that
18       mining operation that was not getting sold?
19   A.  Yes.
20   Q.  Tell me about that discussion.
21   A.  Well, we talked about Mr. Gentry would let
22       us, you know, mine his existing pit and
23       that we would get the white oversized

Page 119

1        gravel and he would -- he got to keep the
2        sand and the small gravel.
3    Q.  All right.  And who was going to operate
4        the Gentry pit?
5    A.  Robert and Rex run it -- did run it.
6    Q.  The day-to-day operation of the pit would
7        be Robert Alexander and Mr. Dasinger?
8    A.  Uh-huh (positive response).
9    Q.  Is that --
10            MR. WALTER:  You need to answer.
11   A.  Yes.
12   Q.  Was there any discussion about Mr. Lambert
13       playing any role in running that pit?
14   A.  No, sir.
15   Q.  Was Mr. -- at any -- well, was Mr. Gentry
16       present during this meeting at all?
17   A.  No.
18   Q.  Had you all met with him yet?
19   A.  I had never met the man.
20   Q.  Had you ever spoken to him?
21   A.  No.
22   Q.  Do you know if Mr. Alexander had already
23       spoken to him?

Page 120

1    A.  No.
2    Q.  What did he say about his discussions with
3        him other than what we've talked about?
4    A.  Basically that was it.
5    Q.  Do you know at that time what sort of a
6        stockpile of white oversized -- did you
7        know at that time what sort of a stockpile
8        of white oversized Mr. Gentry had?
9    A.  No, I did not.
10   Q.  Did you know if that white oversized had
11       ever been tested before that meeting?
12   A.  No, I did not.
13   Q.  Do you know of any sales by Mr. Gentry
14       before that meeting of white oversized to
15       Simcala or Globe?
16   A.  No, do not know.
17   Q.  Do you know of anybody else hauling white
18       oversized from Mr. Gentry's pit to Simcala
19       or Globe before that meeting?
20   A.  No.
21   Q.  And this meeting took place a month or so
22       before Alabama Gravel was formed?
23   A.  Yes.

Page 121

1    Q.  And that was the first time that you met
2        Mr. Dasinger as well?
3    A.  Yes.
4    Q.  Now, before that meeting do you know if
5        Mr. Alexander had been providing any white
6        oversized product to Simcala?
7    A.  No, he had not.
8    Q.  Are you aware of the Swift Creek pit?
9    A.  Well, that's on Swift Creek up there where
10       that -- where we were mining.
11   Q.  The Deatsville pit?
12   A.  No.
13   Q.  Oh, the Gentry pit --
14   A.  Yeah.
15   Q.  -- is on Swift Creek?
16   A.  Yeah.
17   Q.  Do you know who Ralph Mims is?
18   A.  Yes, I do.
19   Q.  Does he have a pit?
20   A.  He has a lot of property on Swift Creek,
21       yes.  Does he have a pit?
22       I guess, yeah, he has a pit.
23   Q.  Is the Mims pit different from the Gentry

Deposition of David Tuten                                             July 13, 2006

Page 122

1     pit?
2    A.  Different locations.
3    Q.  So those are two different pits?
4    A.  Yeah.  They're like ten miles apart or
5     something.  I don't know.
6    Q.  Both on the Swift Creek?
7    A.  Yes.
8    Q.  And do you know if the Mims pit produces
9     white oversized?
10   A.  It did at one time, yes.
11   Q.  When you were consulting with Simcala, were
12    you ever aware of Simcala purchasing or
13    acquiring white oversized from the Mims
14    pit?
15   A.  I was not aware of any, no.
16   Q.  As you sit here today are you aware of
17    Simcala ever acquiring white oversized from
18    the Mims pit?
19   A.  No, I am not.
20   Q.  What about Globe?
21   A.  They own it right now.
22   Q.  Globe owns the Mims pit?
23   A.  Yeah.

Page 123

1    Q.  And presumably they get white oversized
2     from the Mims pit; is that correct?
3    A.  Yes.
4    Q.  Do you know when they bought the Mims pit?
5    A.  Just recently when Globe bought one of
6     their competitors out in West Virginia.
7    Q.  Elchem?
8    A.  Elchem.  Elchem started that operation up,
9     and that was part of the purchase was that
10    they got that pit.
11   Q.  Elchem started the Mims pit?
12   A.  Yes.
13   Q.  Do you know when they started it?
14   A.  Not exactly, no.  Probably a year and a
15    half ago, two years ago maybe.
16   Q.  Do you know if -- is Elchem a producer of
17    silicone?
18   A.  Yes.
19   Q.  And do you know of any arrangement between
20    Elchem and Simcala to share any white
21    oversized from the Mims pit?
22   A.  I'm not aware of any.
23   Q.  Do you know where Simcala was getting its

Page 124

1     white oversized between January 1, 2005,
2     and the time you formed Alabama Gravel in
3     March of 2005?
4    A.  They were buying some from Elmore Sand &
5     Gravel and The Concrete Company and --
6     well, that would be -- both of them would
7     be The Concrete Company.  They were getting
8     two different types from The Concrete
9     Company.
10   Q.  And were you aware of any arrangement where
11    Simcala could obtain white oversized from
12    the Gentry pit before the formation of
13    Alabama Gravel?
14   A.  No, I was not.
15   Q.  Were you aware of any arrangement whereby
16    Simcala could obtain white oversized gravel
17    from Swift Creek -- strike that -- from the
18    Mims pit before Alabama Gravel was formed?
19   A.  No.  I'm not aware of any, no.
20   Q.  Have you ever heard of the Mims pit being
21    referred to as the Swift Creek pit?
22   A.  Possibly.  I mean, I -- I -- I don't recall
23    specifically it being referred to as that.

Page 125

1     I personally have a long history with the
2     Mims property, and I've always referred to
3     it as the Mims property.
4    Q.  What's your history with the Mims property?
5    A.  Back in the early '80s Globe was involved
6     with the Mims pit through an English
7     company that was mining gravel out of
8     there.  And it went on for several years,
9     and then they -- Globe and this English
10    company had a little bit of a falling-out.
11    And they went out of business.  And I don't
12    recall the specific dates and time of all
13    this.  It's kind of ancient history.  And
14    they, you know, supplied a lot of material
15    to our Selma plant.  And then when this
16    English company went out of business, it
17    kind of -- the property sat there and
18    nobody used it for a long time.
19     And then Cecil Cash is a fellow that
20    produces some gravel and had produced some
21    gravel for Globe.  He had some property of
22    his own, also, on Swift Creek close to the
23    Mims property.  And he -- when Globe went

Page 126

1    bankrupt, unfortunately he was a casualty
2    in that, and Elchem bought all his
3    equipment and had him operate the Mims
4    property.
5    Q.  And you dealt with him when he was there
6        when you were with Globe?
7    A.  I didn't deal with him so much.  That was
8        done with the purchasing guy located at
9        Selma.  Each plant kind of had their own
10       purchasing guy and they kind of just
11       reported to me what they were doing, who
12       they were dealing with.
13   Q.  Now, at the meeting that you all had before
14       Alabama Gravel was formed at the Gunnels
15       Road location, what course of action was
16       decided to be taken after that meeting with
17       respect to moving the company forward?
18   A.  Just, you know, get an attorney and get
19       these -- this articles of organization
20       drawed up.
21   Q.  Now, the financing for the company, who was
22       it that put up the money to form the
23       company?

Page 127

1    A.  Robert and myself.
2    Q.  So you put up your own money and
3        Mr. Alexander put up money.  Did
4        Mr. Dasinger put up any money?
5    A.  No.
6    Q.  Where does Mr. Dasinger live?
7    A.  I have no idea.
8    Q.  Somewhere near the -- is it in Alabama?
9    A.  Yes.  Yes.
10   Q.  Is it near the Deatsville operation?
11       If you don't know --
12   A.  I don't know.
13   Q.  And was there a discussion at that time as
14       to how compensation would work with the
15       company?
16   A.  No.
17   Q.  Did you discuss Mr. Dasinger drawing a
18       salary?
19   A.  Yeah.  We talked about Rex being -- since
20       he was going to be like the foreman for the
21       thing, we talked about his salary and what
22       it should be.
23   Q.  What was that going to be?

Page 128

1    A.  I want to think it's about a thousand
2        dollars a week.
3    Q.  Was there any discussion about any
4        compensation to Mr. Lambert at that time?
5    A.  No.
6    Q.  Was there any discussion about who Alabama
7        Gravel would use to haul its product?
8    A.  Yes.
9    Q.  And what was that discussion?
10   A.  We just -- you know, we talked, you know,
11       that we need somebody to haul the material
12       and that we had Carol's Contracting haul
13       the material for us.
14   Q.  And how did you come to consider Carol's
15       Contracting to do the hauling?
16   A.  Well, just more as a, you know, favor than
17       anything else.  Just let them haul it for
18       us.
19   Q.  Did you talk to Harry about them doing the
20       hauling for you?
21   A.  Yes, I believe we did.
22   Q.  Did you ever talk to Mrs. Lambert about
23       doing the hauling for you?

Page 129

1    A.  Yes, we talked to her as well.
2    Q.  Who did you talk to first, Harry or
3        Mrs. Lambert?
4    A.  Harry.
5    Q.  And how much -- how many -- well, when you
6        talked to Mrs. Lambert, was there anything
7        new discussed that you hadn't already
8        talked to Harry about?
9    A.  Alls we really -- alls we asked was, you
10       know, would it be okay if we got Carol's
11       Contracting to haul it.  We never discussed
12       rates or prices or anything of that -- not
13       at that time we didn't, because it was, you
14       know, irrelevant at that point, but just
15       could you haul this for us.
16   Q.  And during those meetings did you talk
17       about other potential -- during that
18       meeting did you talk about other potential
19       haulers?
20   A.  No.
21   Q.  Did you talk about any other role that
22       Mrs. Lambert would play in Alabama Gravel?
23   A.  Yeah.  We talked that we needed some other

Deposition of David Tuten                                                July 13, 2006

Page 130

1   people. We needed -- you know, primarily
2   the first thing we needed was, you know, a
3   bookkeeper and that she had experience in
4   that area, being a bookkeeper, and we could
5   get her cheap. And so we -- you know, we
6   talked about seeing if she would do the
7   books for us.
8   Q.  Did you talk to Mr. Lambert about that
9       before you talked to Mrs. Lambert?
10  A.  Yes. Yes.
11  Q.  Did Harry -- did Mr. Lambert recommend
12      Mrs. Lambert to be the bookkeeper?
13  A.  He didn't recommend her. We asked him if
14      she would be interested in doing it. And
15      he said that he'd ask her, but he was sure
16      she probably would because, you know, she
17      was needing something to do.
18  Q.  He said she was needing something to do?
19  A.  Yeah.
20  Q.  Do you know when Carol's Contracting, Inc.,
21      was formed?
22  A.  I do not.
23  Q.  Have you ever heard of a company called

Page 131

1   Carol's Trucking, Inc.?
2   A.  No.
3   Q.  So then at that meeting you -- well, is
4       there anything else that was discussed at
5       that meeting that we haven't talked about?
6   A.  Not that I can recall, no.
7   Q.  Was there a discussion about where you were
8       going to acquire the equipment and the
9       vehicles necessary to begin the Deatsville
10      operation?
11  A.  Robert was going to handle all that.
12  Q.  What about the -- with respect to beginning
13      operations out of Gentry, what course of
14      action was put in place to deal with that?
15  A.  Robert -- again, Robert would handle that.
16  Q.  And what eventually did take place to get
17      the hauling out of Gentry, the mining of
18      Gentry undertaken?
19  A.  Robert met with Mr. Gentry and, you know,
20      they worked out a deal.
21  Q.  Did you ever go visit the Gentry site?
22  A.  Yes.
23  Q.  And was that before or after that meeting?

Page 132

1   A.  After.
2   Q.  And was it before Alabama Gravel was
3       incorporated?
4   A.  It was about the same time.
5   Q.  And what was the purpose of that visit?
6   A.  I just wanted to see it. You know, I had
7       never been there and didn't know anything
8       about it. Just wanted to see it, you know,
9       wanted to see, you know, what -- well, what
10      it looked like.
11  Q.  Now, I understand Mr. Alexander -- you've
12      told me about what Mr. Alexander was going
13      to do for the company and what Mr. Dasinger
14      was going to do for the company. What role
15      were you going to play moving forward with
16      the company?
17  A.  Really the only role I had was just, you
18      know, with all my contacts in the
19      metallurgical industry was being able to
20      move the oversized material.
21  Q.  So you were going to deal with the buyers?
22  A.  Right.
23  Q.  And was there a discussion at that meeting

Page 133

1   as to who the buyers were going to be --
2   and I'll be more specific -- the meeting --
3   the first meeting at the Gunnels Road
4   address in Mr. Lambert's office space?
5   A.  Yeah. We talked about, you know, where we
6       could sell material to, who we could sell
7       material to. We talked about Simcala. We
8       talked about Globe. We talked about
9       Tennessee Alloys, another company called
10      CCMA. And I know all those people.
11  Q.  Any companies that you didn't know that you
12      talked about?
13  A.  Well, they -- as far as oversized goes, no.
14  Q.  Was there a discussion at that time about
15      Alabama Gravel going into other products
16      besides white oversized?
17  A.  No. That's all we had at that time.
18  Q.  At Gentry?
19  A.  Yes.
20  Q.  Now, at Deatsville had you planned on
21      mining other products as well?
22  A.  Yes.
23  Q.  What other products were you planning on

Page 134

1    mining out of there?
2    A.  Well, we would have --
3         MR. WALTER:  Let me make sure
4         we're not mixing up time
5         periods here.  You're asking
6         about what their plans were at
7         the time they had this
8         meeting, kind of the first
9         meeting at the Gunnels Road,
10        or are you talking about what
11        they're doing, what their
12        plans are at the present
13        time?
14        MR. GRISTINA:  What they were
15        then.
16   Q.  What products were you aware that you
17       thought at that time you could get out of
18       Deatsville?
19   A.  Sand and construction aggregate, I guess is
20       what they call it.
21   Q.  And at that time had you all discussed any
22       sort of -- you mentioned that you were
23       going to use the Gunnels Road address as

Page 135

1    your office.  Was there a rental
2    arrangement entered into?
3    A.  There's no written agreement, no.
4    Q.  Do you pay rent for that space?
5    A.  Yes, we do.
6    Q.  Do you still pay rent for that space?
7    A.  Yes, we do.
8    Q.  How much do you pay?
9    A.  I think it's a thousand a month.
10   Q.  And has that changed during the course of
11       the time that you've been using it?
12   A.  No, it has not.
13   Q.  And who writes those checks?
14   A.  Robert signs all the checks.
15   Q.  Who are those checks written out to for the
16       rent?
17   A.  That's written out to Carol Lambert.
18   Q.  And she's the bookkeeper?
19   A.  Yes.
20   Q.  And so presumably those checks or copies of
21       those checks still exist; is that correct?
22   A.  Yes.
23   Q.  Have you ever seen any copies of those

Page 136

1    checks?
2    A.  No.
3    Q.  And so then --
4    A.  I don't see any of the checks.
5    Q.  You don't see any of the checks?
6    A.  No.
7    Q.  You don't have any involvement with the
8        bookkeeping?
9    A.  No.
10   Q.  And Mrs. Lambert handles all that?
11   A.  Yes.  Robert, I mean, he sees -- he sees
12       all the checks.
13   Q.  And I've seen other addresses, a P.O. box
14       in Millbrook, Alabama --
15   A.  Yes, that's correct.
16   Q.  -- for Alabama Gravel.
17        MR. WALTER:  Wait until he
18        finishes his question.
19   Q.  What is that for?
20   A.  Just a post office box.
21   Q.  Is the Gunnels Road -- that's in
22       Deatsville, though, isn't it?
23        MR. BAILEY:  Object to the form.

Page 137

1    A.  Yeah, I think so.
2    Q.  Is Deatsville right next to Millbrook?
3    A.  Yeah, I think.
4    Q.  So you don't know why --
5    A.  That whole area is kind of screwy, but
6        anyway ...
7         (Brief interruption.)
8    Q.  Now, after the meeting at the Gunnels Road
9        office you said you visited the Gentry
10       site; is that correct?
11   A.  Yes.
12   Q.  And then at some point you all formed the
13       articles of organization for the company;
14       is that correct?
15   A.  Yes.
16   Q.  And that was on March 24th, 2005?
17   A.  Yes.
18   Q.  And then how long after that did you all
19       begin selling product?
20   A.  I think we sold -- the first product we
21       sold was in April of 2005.
22   Q.  And to whom was that sold?
23   A.  To Simcala.

Page 138

1  Q.  At what point were you first made aware
2      that Simcala was going to buy product from
3      you?
4              MR. BAILEY:  Object to the form.
5  A.  Robert had met with Simcala -- I don't
6      remember the date or the time -- about, you
7      know, selling them material.
8  Q.  Had you talked to anybody at Simcala before
9      the first load was delivered to them about
10     selling them white oversized?
11 A.  Yes.
12 Q.  All right.  And when did that conversation
13     take place?
14 A.  It would have been in March, March of 2005.
15 Q.  And who did you talk to?
16 A.  I talked to Mr. Dick Wymer.
17 Q.  Who is Mr. Dick Wymer?
18 A.  He's a purchasing manager at Simcala.
19 Q.  Had you dealt with him when you were
20     consulting with Simcala?
21 A.  No, not necessarily.  Because I was
22     basically there just for operational
23     issues.

Page 139

1  Q.  Was that the first time you had spoken with
2      Mr. Dick Wymer?
3  A.  No.  I spoke with him every day probably in
4      passing.
5  Q.  When you were consulting with them?
6  A.  Yes, sir, uh-huh (positive response).
7  Q.  Were you on site consulting?
8  A.  Yes.
9  Q.  On a day-to-day basis?
10 A.  Well, usually it would be on a -- I would
11     be there for a couple of weeks, off for a
12     couple of weeks, on for a couple of weeks.
13 Q.  Before you decided to call Mr. Lambert
14     about going into the white oversized
15     business, had you talked to Dick Wymer
16     about your going into the business?
17 A.  No.
18 Q.  Had you talked to Ed Boardwine about it?
19 A.  No.
20 Q.  And, now, speaking of Mr. -- I'm speaking
21     about junior.
22 A.  Junior.
23 Q.  Ed Boardwine, Jr.  When did you first meet

Page 140

1      him?
2  A.  It was after I had left Globe in -- it was
3      in 2003.  I'd say it was July, August 2003,
4      something like that.
5  Q.  And what did you speak to him about?
6  A.  I talked to him about me, you know, helping
7      him out on some operational problems they
8      were having.
9  Q.  Did you talk to Mr. Ed Boardwine, Jr.,
10     about your going into the white oversized
11     business before you called Harry about that
12     the first time?
13 A.  No.
14 Q.  Now, you mentioned that you talked to Dick
15     Wymer in March of 2005.  What was the
16     substance of that conversation?
17 A.  I don't recall.  I mean, Dick would
18     occasionally come to me about, you know,
19     what did Globe do or who they were dealing
20     with and basically looking for information
21     of what Globe used to do or, you know,
22     different practices they would do.  But I
23     never spoke to Dick specifically about, you

Page 141

1      know, Alabama Gravel.  Robert did all that.
2  Q.  Were you involved in any of the discussions
3      with Simcala concerning the rates that
4      Simcala would pay Alabama Gravel for white
5      oversized material from the Gentry pit?
6  A.  No.
7  Q.  Do you know how that price was arranged?
8  A.  It was arranged through Robert.
9  Q.  Do you know how the shipping price for that
10     was arranged?
11 A.  No, I do not.
12 Q.  So you didn't have any --
13 A.  Well, we quoted -- Alabama Gravel -- Robert
14     quoted them a delivered price.
15 Q.  A delivered price?
16 A.  Uh-huh (positive response).
17 Q.  So -- is that yes?
18 A.  Yes.
19 Q.  So the price that Robert quoted him was --
20     is that what you call FOB?
21 A.  No.
22 Q.  So that's not -- the delivered price is
23     different from FOB?

Deposition of David Tuten                                                                July 13, 2006

Page 142

1   A.   Yes.
2   Q.   What is FOB?
3   A.   FOB would be the price at the pit.
4   Q.   So the quote he gave him was delivered
5        which would have included the shipping
6        costs?
7   A.   Correct.
8   Q.   I'm curious with your background in
9        purchasing and sales as to why
10       Mr. Alexander handled all the discussions
11       with Simcala concerning price and why you
12       weren't involved in that.  Is there any
13       particular reason?
14  A.   I just didn't think it was right.
15  Q.   Why didn't you think it was right?
16  A.   Because I was there at Simcala specifically
17       for operational things and not, you know,
18       purchasing or raw material things.
19  Q.   So at the time in March of 2005 and then
20       when the first Alabama Gravel load went to
21       Simcala were you still consulting with
22       Simcala?
23  A.   Yes.

Page 143

1   Q.   And that does not continue today; correct?
2   A.   That's correct.
3   Q.   When was that stopped?
4   A.   In 2005.  I want to say it was July or
5        August of 2005.
6   Q.   So only a few months after you all started
7        shipping?
8   A.   Right.  And the reason that was, was
9        because we were working on an operational
10       project, and once that project finished up
11       on a furnace maintenance project, then I
12       was pretty much done.
13  Q.   Did Mr. Dasinger have any responsibility
14       for negotiating with Simcala?
15  A.   Not -- no.  Not that I'm aware of, no.
16  Q.   And when the first loads from Gentry
17       started going to Simcala, were they hauled
18       by Carol's Contracting, Inc.?
19  A.   Yes.
20  Q.   And were you aware at that time that
21       Mr. Lambert was driving trucks for Carol's
22       Contracting, Inc.?
23  A.   Yes.

Page 144

1   Q.   And since that time are you aware of any
2        other hauling companies that have hauled
3        aggregate product for Alabama Gravel?
4   A.   Mike Gentry.  He hauls out of that pit and
5        uses his own trucks.  But for Alabama
6        Gravel, no.
7   Q.   Is that the only pit -- well, has the
8        Deatsville operation started?  Are you
9        mining products?
10  A.   No.
11  Q.   Is that the only pit that Alabama Gravel
12       operates out of?
13  A.   We're not operating out of it either.
14  Q.   So is the white oversized supply depleted
15       there?
16  A.   We've just -- I wouldn't say it's depleted,
17       but where we were digging and what we had a
18       permit to dig is finished.
19  Q.   When Simcala or any other customer contacts
20       Alabama Gravel to acquire product before
21       you stopped at Gentry, who would they call?
22  A.   Well, we only had three customers and --
23       Simcala and Globe and Jim Maddox.  Simcala

Page 145

1        and Globe -- Simcala would call me or
2        sometimes they would call Robert.  Globe
3        would call me.  And Jim Maddox would call
4        Robert.
5   Q.   And if you got a call from one of the three
6        customers that you mentioned -- and those
7        were the only customers you all ever sold
8        to before you shut down?
9   A.   That is correct.
10  Q.   If you got a call from one of those
11       customers, what would you then do to
12       arrange to make sure that the product got
13       there?
14  A.   I would just turn around and call Robert,
15       Mr. Alexander.
16  Q.   All right.  And so then you would call
17       Robert.  And to your knowledge what would
18       Robert do to facilitate the shipment of the
19       product to the customer?
20  A.   I would just call Robert and I'd, you know,
21       say, you know, customer A wants -- you
22       know, wants material, do we have it and,
23       you know, this is when they want it by.

Deposition of David Tuten                                                July 13, 2006

Page 146

1    And then I'd leave it in his lap.
2  Q.  You don't know if Robert then called
3    Carol's Contracting, or do you know how
4    that worked?
5  A.  No, I do not know.
6  Q.  Did you ever put a customer in touch with
7    Mr. Lambert to haul product to the
8    customer?
9  A.  No.
10 Q.  So you never got a call from a customer and
11   then called Mr. Lambert and said,
12   Mr. Lambert, here, this customer needs "X"
13   tons, go get it at Gentry and take it to
14   him?
15 A.  No.
16 Q.  Do you know if Mr. Alexander ever handled
17   it that way?
18 A.  I do not know.
19 Q.  Have you ever called Carol's Contracting?
20 A.  I've talked to Carol, yes.
21 Q.  So if you called Carol's Contracting, what
22   number would you dial?
23 A.  I don't know what the number is.  I've got

Page 147

1    it on a card, but I don't -- I don't know
2    what it is.  290-something.
3  Q.  So you don't have the Carol's Contracting
4    number in your cell phone?
5  A.  No, I do not.
6  Q.  But you have Mr. Lambert's number in your
7    cell phone?
8  A.  That's correct.
9  Q.  And so if you were going to call Carol's
10   Contracting, wouldn't you call Mr. Harry
11   Lambert?
12 A.  No.  I've -- no, would not.
13 Q.  And so have you had times when you needed
14   to deal with Carol's Contracting?
15 A.  No.
16 Q.  So have you ever called Carol's
17   Contracting?
18 A.  Yeah, I've called her.  But I've never had
19   an issue, you know, where a customer would
20   call -- what you're asking for I've never
21   had to deal with.
22 Q.  What have you called Carol's Contracting
23   about?

Page 148

1  A.  Just call her and ask a question about
2    something, you know, how many loads have we
3    hauled here or there.  That would be it.
4  Q.  So if you wanted to find out the load
5    history, then you would call Carol's
6    Contracting?
7  A.  Right.
8  Q.  And, again, you don't have that number, but
9    it's on a card somewhere?
10 A.  I've got it, yeah, on a card.
11 Q.  Where would that card be?
12 A.  Probably in my briefcase.
13 Q.  Did you bring it with you?
14 A.  No, I did not.
15 Q.  Is it in Ohio?
16 A.  It's in my hotel room.
17 Q.  But somewhere there's a card that you have
18   that says Carol's Contracting, Inc., on it,
19   or what does it say?
20 A.  Yeah, Carol's Contracting and just a phone
21   number written on it.
22 Q.  Now, going on to the Deatsville pit.  When
23   did you all begin construction on that pit?

Page 149

1  A.  Would have been sometime in 2005.  Probably
2    the latter half of the year 2005.
3  Q.  You didn't start before the second half of
4    the year 2005?
5  A.  I can't -- I can't recall.  I didn't have
6    much to do with that, so I don't recall.
7  Q.  Would Mr. Alexander be the one to talk to
8    about that?
9  A.  Yes, he would.
10 Q.  Do you recall going to the Deatsville pit
11   with Mr. Lambert in -- or the Deatsville
12   site with Mr. Lambert in 2004?
13 A.  Me and Mr. Lambert went to the Deatsville
14   site, but it had been -- it would have been
15   in 2005.  It would have been after -- right
16   around the time the company was formed.  It
17   might have been January, February 2005.  I
18   remember it was -- we rode up there one
19   time.
20 Q.  At some point, then, you all went to the
21   Deatsville site together?
22 A.  Yes.
23 Q.  Why did you do that?

Page 150

1    A.  Just out riding around and I wanted to, you
2        know, see where this place was that
3        Mr. Dasinger had talked about -- that he
4        had talked about and so we just -- he took
5        me up there.
6    Q.  Mr. Lambert knew where the Deatsville site
7        was?
8    A.  Yes.
9    Q.  And why were you out riding around with
10        Mr. Lambert?
11    A.  Because he knew where the site was and he
12        took me up there.
13    Q.  Did you call him to take you to the site?
14    A.  Yes, I did.
15    Q.  Why didn't you call Mr. Dasinger to take
16        you to it?
17    A.  Because he was working.
18    Q.  At Gentry?
19    A.  At the -- at that time I -- we hadn't
20        started the Gentry pit yet.  I don't know
21        where he was.
22    Q.  So, then, you all visited the Deatsville
23        site before you all began mining at Gentry?

Page 151

1    A.  Oh, yeah.
2    Q.  And when you went to the site, what did you
3        all do?
4    A.  We just drove around it, you know, rode
5        around in there.  It's kind of a swamp.
6    Q.  Did you take any soil samples when you were
7        there?
8    A.  I took some samples, yes.
9    Q.  So how did you do that?
10    A.  I just put them in a bag.  Picked up some
11        rocks, put them in a bag.
12    Q.  So is that something that you had
13        experience with before?
14    A.  Well, I've taken, you know, samples of rock
15        before, but, I mean, I'm not no expert.  I
16        just wanted to get them tested for
17        chemistry.
18    Q.  Were these rocks on top of the ground or
19        were they down under the ground?
20    A.  There was some existing holes where
21        Mr. Dasinger had went in there and dug,
22        some old holes.
23    Q.  Dug --

Page 152

1    A.  It was an existing pit.  You know, somebody
2        had mined that before.  It was the old
3        Ingram gravel pit.  So there was some, you
4        know, exposed areas where there was rock
5        and stuff.
6    Q.  So there were also some holes that
7        Mr. Dasinger had dug?
8    A.  Right.
9    Q.  Do you know how big those holes were that
10        Mr. Dasinger had dug?  I mean, were they
11        dug with a bulldozer, or how were they --
12    A.  With a backhoe.
13    Q.  So Mr. Dasinger had dug with a backhoe, and
14        you knew these spots that he had dug?
15    A.  I mean, just drove around and found them.
16    Q.  How did you know those were the ones that
17        Mr. Dasinger had dug and not from the old
18        Ingram operation?
19    A.  Because they looked pretty new.  I mean,
20        you know, the Ingram operation hadn't been
21        in there for probably ten years or longer
22        and you could tell by looking.
23    Q.  Did Mr. Lambert know where those holes

Page 153

1        were?
2    A.  I think he knew the holes were in there,
3        but I don't know if he knew specifically
4        where they were.
5    Q.  So he knew that Mr. Dasinger had dug some
6        holes there?
7    A.  Yes.
8    Q.  But you can't recall if he specifically
9        knew where they were?
10    A.  No.
11    Q.  And, again, is it your testimony that
12        Mr. Lambert didn't dig those holes?
13    A.  That is correct.
14    Q.  And the rocks that you took, did
15        Mr. Lambert help you take soil samples?
16    A.  No.
17    Q.  What did you do with those samples?
18    A.  I took them home with me and had them
19        tested.
20    Q.  Where were they tested?
21    A.  At Globe.
22    Q.  You still had contacts there at Globe that
23        would help you?

Page 154

1   A.   Yes.
2   Q.   And what did those test results yield?
3   A.   The chemistry of the product was good.
4   Q.   So could you see at that point holes --
5       well, strike that.
6           Did you take the rock samples from the
7       holes that you say Mr. Dasinger dug?
8   A.   Yes.
9   Q.   And not from the old Ingram area?
10  A.   Both.
11  Q.   Both.  And could you see at that time that
12      it looked like white oversized material?
13  A.   Yes.
14  Q.   And so that's why you had it tested?
15  A.   Yes.
16  Q.   And you were pleased with the chemistry?
17  A.   Yes.
18  Q.   Was this before the meeting at
19      Mr. Lambert's property had gone through the
20      first time with Mr. Dasinger and
21      Mr. Alexander?
22  A.   It was around that same time, yes.
23  Q.   And then what was the next involvement you

Page 155

1       had, if any, with the construction of the
2       Deatsville operation?
3   A.   I had nothing -- very little to do with the
4       Deatsville.  I mean, I don't know anything
5       about constructing a sand and gravel
6       plant.  So I had been out there, you know,
7       and watched them or whatever, but I haven't
8       had any input into anything.
9   Q.   Were you out there when they were
10      constructing the Deatsville operation?
11  A.   Yes.
12  Q.   Other than this time you spoke about with
13      you and Harry driving out there where you
14      took the soil samples, do you recall going
15      out to the Deatsville operation with
16      Mr. Lambert again?
17  A.   No.
18  Q.   Do you recall speaking with Mr. Lambert
19      again about the construction of the
20      Deatsville site?
21          MR. BAILEY:  Object to the form.
22      You mean anytime or prior to
23      January 2nd, 2006?

Page 156

1   Q.   This would be after your meeting with
2       Mr. Dasinger and Mr. Alexander at the
3       Gunnels Road property just before you were
4       incorporated.  Do you recall talking to
5       Mr. Lambert after that time about the
6       construction of the Deatsville site?
7   A.   No, I do not.
8   Q.   Do you know if Mr. Alexander talked to him
9       about it?
10  A.   I don't -- I have no knowledge of that.
11  Q.   Did you talk to Mr. Dasinger about that
12      construction?
13  A.   No.
14  Q.   When you went -- how many times have you
15      been to the Deatsville site?
16  A.   Since ...
17  Q.   Since the time with Mr. Lambert.
18  A.   Till today?
19  Q.   Yes.
20  A.   Maybe a dozen or so.
21  Q.   All right.  With respect to the product
22      that was sold from the Gentry site, did you
23      receive some sort of a cash distribution

Page 157

1       from Alabama Gravel?
2   A.   No.
3   Q.   Do you know where all the money is going
4       from income off of the sales from the
5       Gentry site and Alabama Gravel?
6   A.   Yes.
7   Q.   Where is it going?
8   A.   We've used it to purchase the equipment for
9       Deatsville.
10  Q.   So then the funds that were raised selling
11      from Gentry is what you've used to buy the
12      equipment at Deatsville?
13  A.   That's correct.
14  Q.   And who has handled all these purchases?
15  A.   Mr. Alexander.
16          I'll rephrase that.  I bought one
17      thing.  I bought a truck scale.
18  Q.   You were responsible for buying the truck
19      scale?
20  A.   Yeah.
21  Q.   Where did you buy that?
22  A.   From Turner Scales.
23  Q.   Is that something that a truck drives up

Deposition of David Tuten                                                July 13, 2006

Page 158

1    onto and it weighs it?
2    A.   Yeah.
3    Q.   How did you find Turner Scales?
4    A.   Through Globe.  I called somebody at Globe
5         about, you know, who they used at Selma for
6         their truck scales, and they had used
7         another company.  But when Globe went
8         bankrupt, it was kind of a nasty
9         situation.  So I asked if there was
10        somebody else, and they recommended this
11        Turner Scales.  So I went and saw Jim
12        Turner.
13   Q.   Now, did Mr. Lambert go with you to see
14        Mr. Turner?
15   A.   No.
16   Q.   You went by yourself?
17   A.   Yes.
18   Q.   Did you talk to him about the scales before
19        you went and bought them?
20   A.   Talk to --
21   Q.   Mr. Lambert.
22   A.   No, I did not.
23   Q.   Now, I believe Alabama Gravel has received

Page 159

1    a permit for the Deatsville site; is that
2    correct?
3    A.   Yes.
4    Q.   Do you know when that was obtained?
5    A.   I think it was April 1st of this year.
6    Q.   And so it's been -- it was approximately a
7         little more than a year from the date of
8         incorporation to the time you all were able
9         to get your permit?
10            MR. BAILEY:  Object to the form.
11               It assumes a lack of a permit
12               back then.
13   Q.   When did you apply for the permit?
14   A.   I can't be sure.  Robert did that.
15   Q.   Were you involved in any way with the
16        environmental work or other aspects of
17        applying for the permit?
18   A.   No, I was not.
19   Q.   But is it safe to say that it took -- well,
20        it's been a year -- it was a year from the
21        time you incorporated until the permit was
22        obtained?
23   A.   Yes.

Page 160

1    Q.   But operations have still not begun as of
2         July -- what's today -- July 13th; is that
3         correct?
4    A.   Yes.
5    Q.   Why have operations not started?
6    A.   Just hadn't got it done, I guess.
7    Q.   Is the plant finished?
8    A.   No.
9    Q.   Mr. Lambert is now helping with the plant,
10        isn't he?
11   A.   Right.
12   Q.   I want to go back to before January 2nd of
13        2006.  We've talked about one visit that
14        you and Mr. Lambert shared at the
15        Deatsville site.
16   A.   Uh-huh (positive response).
17   Q.   Are there any other times that you went to
18        that site with Mr. Lambert before January
19        2nd of 2006?
20   A.   There might have been, yeah.  Yes.
21   Q.   And tell me about that.
22   A.   I remember one time we went over to Elmore
23        Sand & Gravel and we -- just nosing around

Page 161

1    more than anything else.  And then we drove
2    from Elmore -- you know, I said, well,
3    let's drive up and just, you know, look in
4    and see what's going on up there at
5    Deatsville.  And so, you know, we just
6    stopped by.
7    Q.   Do you recall when that was?
8    A.   I do not.  I can't recall.  I don't
9         remember when it was.
10   Q.   Was construction going on at the site?
11   A.   No.  No.
12   Q.   Was anybody working there at that time at
13        Deatsville?
14   A.   No.
15   Q.   And what did you all do when you went to
16        the site that time?
17   A.   We just drove in and looked around.
18   Q.   Why were you all going to Elmore?
19   A.   We were just -- heard that -- you know, we
20        heard that they were having some
21        difficulties, and we just drove over by
22        there just to see what was going on.
23   Q.   What sort of difficulties?

Deposition of David Tuten                                                    July 13, 2006

Page 162

1   A.   Just production.
2   Q.   Were you focusing on white oversized
3        difficulties?
4   A.   No, not necessarily.
5   Q.   Who do you know at Elmore?
6   A.   I know Billy Stanley and I think -- is it
7        David Geddie?
8   Q.   Do you know them to be good men?
9   A.   I don't really know them that well.  I
10       mean, I just -- I've met them a few times.
11       Seem to be pretty nice fellows.
12  Q.   Then you went by that day to Elmore.  What
13       did you all learn there?
14  A.   Nothing.
15  Q.   And then you went to the Deatsville site
16       shortly thereafter?
17  A.   Right.  Because it's not very far from
18       there.
19  Q.   And do you know how far it is from the
20       Gentry site to the Elmore site?
21  A.   I don't know.  I don't know how far it is.
22  Q.   What about with respect to distance between
23       the Gentry site and the Simcala plant?

Page 163

1        That's at Mount Meigs; right?
2   A.   Yes.
3   Q.   Is that distance about the same as the
4        distance from the Elmore site to Mount
5        Meigs?
6   A.   I have no idea.
7   Q.   So then after you all went to the
8        Deatsville site -- that's the second
9        meeting we talked about at the Deatsville
10       site before January 2nd, 2006.  Was there
11       any other time that you and Mr. Lambert
12       went there?
13  A.   No.
14  Q.   How about discussions with Mr. Lambert
15       after the meeting we talked about at
16       Gunnels Road between you and Mr. Alexander
17       and Mr. Dasinger?  Were there any
18       discussions that you had with Mr. Lambert
19       about constructing the Deatsville site?
20  A.   I didn't have any, no.
21  Q.   Do you know if anybody else did?
22  A.   I don't know.
23            MR. WALTER:  This is prior to

Page 164

1            January 2nd, 2006?
2            MR. GRISTINA:  Yes.
3   A.   I don't know.
4   Q.   Now, are you aware of a consulting
5        agreement that was entered into between
6        Mr. Lambert and Alabama Gravel?
7   A.   Yes.
8   Q.   Were you involved in the drafting of that
9        agreement?
10  A.   I was present, yes.
11  Q.   All right.  Were lawyers present when that
12       was drafted?
13  A.   Yes.
14  Q.   When did you first discuss with Mr. Lambert
15       having a consulting agreement?
16  A.   I don't even know what the date of the
17       consulting agreement is, but it would have
18       been sometime before that -- shortly before
19       that.
20  Q.   Was it after January 2nd, 2006?
21  A.   Yes.
22  Q.   Did he bring it up with you or did you
23       bring it up with him?

Page 165

1   A.   We brought it up with him.
2   Q.   When you say we, who do you mean we?
3   A.   Well, Alabama Gravel.
4   Q.   And what was the impetus for that?
5   A.   Well, with my lack of involvement and as
6        far as being here -- and Robert, he's here
7        through the week -- on weekends, but we
8        could see that we were going to be running
9        into some trouble as far as, you know,
10       getting the work done the way we wanted to
11       get it done.  So we felt that Mr. Lambert
12       would be a good guy to oversee that and
13       make sure that things got done.
14  Q.   Was Mr. Dasinger not working out as the
15       day-to-day operations guy?
16  A.   Well, he was at the other -- he was at the
17       Gentry pit at that time.
18  Q.   So it was envisioned that Mr. Lambert would
19       take over at the Deatsville pit?
20  A.   He would oversee the construction, yeah.
21  Q.   And that was the idea behind the consulting
22       agreement?
23  A.   That's correct.

Page 166

1  Q.  Was that consulting agreement considered to
2      be any sort of deferred compensation for
3      work that Mr. Lambert had done in putting
4      you all together?
5  A.  No, sir.
6          (A lunch recess was taken.)
7  Q.  (Mr. Gristina continuing:)  Mr. Tuten, we
8      had discussed earlier chemical studies that
9      you had seen at, I believe, Simcala that
10     dealt with The Concrete Company white
11     oversized.  Do you recall that?
12 A.  Yes.
13 Q.  Do you recall seeing any chemical studies
14     at Simcala dealing with other suppliers of
15     white oversized?
16 A.  Yes.
17 Q.  What other suppliers' studies did you see?
18 A.  Elmore Sand & Gravel and Material -- we
19     always called it Phenix City, which is from
20     The Concrete Company.
21 Q.  From the Bickerstaff plant?
22 A.  Yeah, that's the one.
23 Q.  Now, how do they compare to Elmore and

Page 167

1      the -- I guess it would have been the Ward
2      plant studies?
3  A.  Right.  They were about the same.
4  Q.  So the Elmore quality was about the same as
5      The Concrete Company quality?
6  A.  Let me rephrase that.  The -- to my
7      recollection the Ward material was always
8      superior material to everyone.  But there
9      when -- they started having some supply
10     problems and they noticed that the
11     chemistry of the product, you know, had
12     gotten a lot worse and it was on the same
13     level as what Elmore Sand & Gravel was,
14     which was, you know, not as good a quality
15     as the Ward before, you know, before the
16     supply issues.
17 Q.  And in your experience are there not often
18     fluctuations in the quality of aggregate
19     material as it's mined?
20 A.  Yes.
21 Q.  I mean, as you go through a site and you
22     pull aggregate from different locations
23     you're going to see some range in quality?

Page 168

1  A.  Yes.
2  Q.  So simply because you have a drop in
3      quality in one month doesn't necessarily
4      mean that the quality won't improve the
5      next?
6  A.  Not necessarily.
7  Q.  So it could get better the next month?
8  A.  Could get better or could get worse.
9  Q.  Could get worse?
10 A.  Yeah.  But the Elmore property consistently
11     ran a lot worse.  It wasn't as good a
12     material as what came out of the Ward
13     property.
14 Q.  Now, you mentioned earlier that Harry had
15     been doing consulting work in north
16     Alabama.  Were you speaking about
17     consulting work for Robert Alexander?
18 A.  Yes.
19 Q.  But you don't know where in northern
20     Alabama that was?
21 A.  No, sir.
22 Q.  Or the nature of that work other than
23     consulting work?

Page 169

1  A.  No, sir.
2  Q.  The apartment on Mr. Lambert's property
3      that you spoke of that Mr. Alexander was
4      using, is that rented separately from the
5      rent that Alabama Gravel pays to use the
6      office space?
7  A.  No, sir.
8  Q.  So it's all part of the same approximately
9      $1,000 a month?
10 A.  Yes, sir.
11 Q.  When you all formed Alabama Gravel was
12     there a percentage of ownership agreed to
13     between you and Mr. Dasinger and
14     Mr. Alexander?
15 A.  Yes, sir.
16 Q.  And what is that percentage?
17 A.  Mr. Dasinger has 5 percent.  I have 25
18     percent, and Mr. Alexander has 70 percent.
19 Q.  And, again, was there any percentage of
20     ownership contemplated at the formation of
21     Alabama Gravel for Mr. Lambert?
22 A.  No, sir.
23 Q.  Since that time has any percentage of

Page 170

1    ownership in Alabama Gravel been
2    contemplated?
3  A.   No, sir.
4  Q.   You mentioned earlier that you had only
5        purchased one item for Alabama Gravel, and
6        I guess that was the scales that you talked
7        about; is that correct?
8  A.   Yes, sir.
9            (Plaintiff's Exhibit 2 was marked
10               for identification.)
11 Q.   All right.  Will you take a look at that,
12       please.
13 A.   Uh-huh (positive response).
14 Q.   Do you recognize any of those documents?
15 A.   I know I signed some documents for
16       Caterpillar.  Robert and I both signed some
17       documents for Caterpillar, but I don't know
18       if these are them or not.
19 Q.   What address is 123 Petunia Drive,
20       Deatsville, Alabama?
21           MR. GRISTINA:  And for the record,
22               that's reflected on the first
23               page of Defendant's (sic)

Page 171

1            Exhibit 2 -- the first page.
2            It's probably on the other
3            page too.  Let me see.  Yeah,
4            it's actually on -- it's
5            listed on all three pages.
6  A.   I do not have any idea.
7  Q.   Do you recall Mr. Lambert ever purchasing
8        any equipment for Alabama Gravel?
9  A.   No, sir.
10 Q.   Do you recall Mr. Lambert ever pointing you
11       in the right direction of a place to get
12       any equipment for Alabama Gravel?
13 A.   No, sir.
14 Q.   I have the binder of exhibits that we dealt
15       with in the earlier depositions.  I'm going
16       to look at this particular --
17           MR. GRISTINA:  I didn't photocopy
18               these again.  I apologize,
19               gentlemen.
20 Q.   But the first one is Defendant's Exhibit 5.
21           MR. GRISTINA:  Did I call the
22               earlier one -- Plaintiff's
23               Exhibit 2.  I'm sorry.

Page 172

1  Q.   All right.  Now, we are on Defendant's
2        Exhibit 5 from the previous depositions.
3            MR. GRISTINA:  And for the record,
4                this is the D & B sheet that
5                we talked about.
6  Q.   Do you see the address listed below Alabama
7        Gravel, LLC, on the first page?
8  A.   Yes.
9  Q.   Did you have any contact with anybody at
10       Dun & Bradstreet regarding that address?
11 A.   No.
12 Q.   And, again, we talked about how you all
13       came to use that address.
14           Now, the telephone number that's listed
15       for Alabama Gravel, do you recognize that
16       number, (334) 290-1454?
17 A.   Yes.
18 Q.   What number is that?
19 A.   That's Alabama Gravel.  That's our phone
20       number.
21 Q.   And where does that phone ring?
22 A.   In our office.
23 Q.   So that phone is in that structure on

Page 173

1        Mr. Lambert's property?
2  A.   Yes.
3            MR. BAILEY:  Object to the form.
4  Q.   And that's not inside the Lambert
5        household?
6  A.   No, sir.
7  Q.   They list the line of business as
8        construction sand and gravel.  Is that
9        consistent with your understanding of
10       Alabama Gravel's business?
11 A.   That's a pretty broad -- that's a pretty
12       broad title there, construction sand and
13       gravel.  I don't know what that means
14       exactly.
15 Q.   Well, I understand.  And you didn't have
16       any contact with Dun & Bradstreet preparing
17       this?
18 A.   No, sir.
19 Q.   But at least as it was originally
20       conceived, wasn't it Alabama Gravel's plan
21       to focus on the white oversized product?
22 A.   Yes, sir.
23 Q.   And as far as you know is that used in

Page 174

1   construction?
2   A.  I would hope not.
3   Q.  It wouldn't be very efficient?
4   A.  No, I wouldn't think.
5   Q.  And I apologize if I asked you this
6       before.  But are you aware of what
7       Mrs. Lambert's compensation is from Alabama
8       Gravel?
9              MR. WALTER:  You mean Carol's
10             Contracting?
11             MR. GRISTINA:  Well, that's a fair
12             clarification.
13  Q.  There will be two aspects of it, the first
14      being as a bookkeeper.  Are you aware of
15      what her compensation is?
16  A.  I think it's about $500 a week.
17  Q.  And that's as the bookkeeper for Alabama
18      Gravel?
19  A.  Yes, sir.
20  Q.  Now, separately, focusing on Carol's
21      Contracting, Inc., are you aware of any
22      compensation to Mrs. Lambert other than
23      monies that are paid to Carol's

Page 175

1       Contracting, Inc., in exchange for
2       hauling?
3              MR. BAILEY:  Object to the form.
4              He's already talked about a
5              lease.
6   A.  Repeat that one more time, please.
7   Q.  Well, Alabama Gravel pays Carol's
8       Contracting, Inc., hauling fees, doesn't
9       it?
10  A.  Yes.
11  Q.  And they pay -- well, who do they pay -- is
12      the rent for the office space to Carol's
13      Contracting, Inc., or is it to Carol
14      Lambert?
15  A.  It's to Carol Lambert.
16  Q.  So other than those two items of
17      compensation, one going directly to
18      Mrs. Lambert that you testified and the
19      other being the hauling charges to Carol's
20      Contracting, Inc., are you aware of any
21      other compensation that is paid to Carol
22      Lambert by Alabama Gravel?
23  A.  Other than what we pay her to do the books,

Page 176

1       too, the bookkeeping.
2   Q.  Anything else?
3   A.  No.
4   Q.  Do you pay any commissions to anybody in
5       terms of brokerage fees -- does Alabama
6       Gravel pay anybody any brokerage fee
7       commissions in exchange for setting Alabama
8       Gravel up with customers for white
9       oversized gravel?
10  A.  No, sir.
11  Q.  Have you ever paid Mr. Lambert any
12      commission for arranging deals between
13      Alabama Gravel and purchases of white
14      oversized gravel?
15  A.  No, sir.
16  Q.  Has that ever been discussed?
17  A.  No, sir.
18  Q.  Has he ever asked for any commissions?
19  A.  No, sir.
20  Q.  Isn't it true that Alabama Gravel wouldn't
21      exist today if it were not for Harry
22      Lambert?
23             MR. BAILEY:  Object to the form.

Page 177

1   A.  I wouldn't be involved in it.
2   Q.  So at least you would not be involved in
3       that company if it were not for
4       Mr. Lambert?
5   A.  Yes, probably.
6   Q.  Do you know how Mr. Alexander first got in
7       touch with Simcala?
8   A.  I believe they called -- I believe they
9       called Mr. Lambert and then Mr. Lambert
10      told them to call Mr. Alexander.
11  Q.  All right.  Okay.  Back to my earlier
12      question.  You stated that you would not be
13      involved with Alabama Gravel.  Wasn't it
14      your original concept?  Wasn't Alabama
15      Gravel your concept originally?
16  A.  Well, I wanted to, you know, be involved in
17      the gravel business.  And if, you know,
18      Mr. Lambert hadn't hooked me up with
19      Mr. Alexander, then I probably wouldn't
20      have, you know, pursued it any further than
21      that.
22  Q.  Do you think the company would have been
23      formed without you?

Deposition of David Tuten                                                                    July 13, 2006

Page 178

1   A.   Oh, it's quite possible.
2   Q.   Do you have any reason to believe that
3        other than possibility?
4   A.   Well, I mean, Mr. Alexander was -- you
5        know, he was wanting to get in the
6        business, you know, for himself for --
7        because of his business situation. So I
8        think he would have got in the business
9        anyway.
10  Q.   But certainly as it exists today with you
11       as a member it would not have existed?
12            MR. BAILEY:  Object to the form.
13            MR. WALTER:  I think that's a
14            mischaracterization.  Go ahead
15            and answer it.
16  Q.   Were it not for your dealings with
17       Mr. Lambert, the company wouldn't exist in
18       the form it is today; isn't that correct?
19            MR. BAILEY:  Object to the form.
20  A.   I don't know.
21  Q.   But you wouldn't be a part of it?
22  A.   But I wouldn't be a part of it.
23  Q.   Now, in speaking about Mr. Gentry, I assume

Page 179

1        that you've had conversations with him over
2        the course of dealing between Alabama
3        Gravel and his plant; is that correct?
4   A.   I have met Mr. Gentry two, three times.
5   Q.   All right.  In response to -- in Alabama
6        Gravel's initial disclosures there is an
7        entry for Mr. Gentry, and I'm showing that
8        to you.  You didn't sign these, but did you
9        participate in the drafting of these?
10           And I'm not asking you questions about
11       your -- you may have had with Mr. Walter or
12       his firm.
13  A.   Yeah.  I might have, yes.
14  Q.   All right.  Looking at the entry from Mike
15       Gentry, below his name it says Mr. Gentry
16       is expected to have information concerning
17       his dealings with the parties to this case
18       and why he would not be interested in doing
19       business with plaintiff, the plaintiff
20       being The Concrete Company.
21  A.   Uh-huh (positive response).
22  Q.   Is that a true statement as far as you
23       know?

Page 180

1            MR. WALTER:  Well, I'm going to
2            object and instruct him not to
3            answer because that gets into
4            work product.  He can testify
5            as to any conversations he
6            might have had with
7            Mr. Gentry, but I think for
8            him to otherwise answer that
9            question he would have to rely
10           upon communications with
11           counsel and work product.
12            MR. GRISTINA:  And I don't want to
13           get into that.  Let me ask it
14           this way and see if it's all
15           right.
16  Q.   Other than information you received from
17       your attorneys, have you had discussions
18       independent with Mr. Gentry about why he
19       would or would not want to do business with
20       The Concrete Company?
21  A.   No, I have not.
22  Q.   Has anybody else other than your attorneys
23       told you why he would not want to do

Page 181

1        business with The Concrete Company?
2   A.   Yes.
3   Q.   All right.  Who was that?
4   A.   Robert.  Robert Alexander.
5   Q.   What did Mr. Alexander tell you?
6   A.   Robert had talked to -- like I said, I've
7        only met Mr. Gentry a couple of times, and
8        Robert has had more dealings with him.  And
9        he had mentioned to me when this litigation
10       all started that Gentry had made the
11       comment that, you know, he wouldn't do
12       business with The Concrete Company.
13  Q.   Is that all you can recall about that
14       conversation?
15  A.   Yes, sir.
16  Q.   He didn't say why he wouldn't do business
17       with them?
18  A.   No.
19  Q.   Nothing specific about Mr. Foley or
20       Mr. Sorrell or anybody else with The
21       Concrete Company?
22  A.   No.
23  Q.   Were you familiar with Mr. Sorrell before

Page 182

1    this case?
2    A.  No.
3    Q.  By reputation or in person?
4    A.  No.
5    Q.  And I believe we've already covered this,
6        but with respect to Mr. Maddox, you didn't
7        have knowledge of Mr. Maddox until dealing
8        with Mr. Alexander; is that correct?
9    A.  That's correct.
10   Q.  And the same for AgTran and the
11       Willinghams?
12   A.  That's correct.
13   Q.  Now, have you had discussions with Dick
14       Wymer -- you personally have any
15       discussions with Dick Wymer about why he
16       would or would not want to continue to do
17       business with the Concrete Company?
18   A.  No, I have not.
19   Q.  Has anybody other than your attorneys told
20       you anything about Dick Wymer's feelings
21       about The Concrete Company or the products
22       it sells?
23   A.  No.

Page 183

1    Q.  The only thing you may have heard on that
2        would have been through counsel?
3    A.  No, I haven't heard anything.
4    Q.  Now, I understand that a consulting
5        agreement has been entered into, and we'll
6        talk more about it.  But did Alabama Gravel
7        come to the conclusion that Mr. Dasinger
8        was not capable of managing the operations
9        at both Gentry and now that that's closed
10       at Deatsville?
11   A.  We -- well, we felt that he didn't have
12       time.  Because he was at the Gentry pit,
13       you know, running it while we were trying
14       to do construction at the other site, and
15       there was no way he could be in two places
16       at once.
17   Q.  Now that the Gentry pit is no longer -- is
18       it true that you're no longer mining at the
19       Gentry pit?
20   A.  That is correct.
21   Q.  Now that that's completed, is it your
22       position that Mr. Dasinger is not capable
23       of managing the Deatsville construction and

Page 184

1    going on line at that plant?
2    A.  Rex is a -- he's a good hand, but he's not
3        what you would classify as super --
4        supervisor material.
5    Q.  Does he lack the knowledge and expertise to
6        construct a mining operation?
7    A.  He's -- he can construct -- he has trouble
8        communicating with other employees and
9        keeping people on task.
10   Q.  Is he familiar with the workings of a
11       production -- or a mining plant?
12   A.  Seems to be, yes.
13   Q.  But is it fair to say that Mr. Lambert is
14       much more experienced in those areas?
15   A.  Yeah.
16   Q.  Is Mr. Dasinger going to stay on as an
17       employee of Alabama Gravel?
18   A.  Yeah, I hope so.
19   Q.  Is he currently being paid by Alabama
20       Gravel?
21   A.  Yes.
22   Q.  We talked a little bit about the Mims
23       plant.  Other than what we talked about,

Page 185

1    have you had any other dealings with a man
2    named Ralph Mims?
3    A.  No.
4    Q.  Did Alabama Gravel ever enter into a supply
5        contract with any customers?
6    A.  No.
7    Q.  Did they ever refuse?  Did it ever refuse
8        to enter into a fixed supply agreement with
9        any customers?
10   A.  No.
11   Q.  Was it ever considered?
12   A.  No.
13   Q.  Do you know a man named Alan King?
14   A.  Yes.
15   Q.  How do you know Alan King?
16   A.  He's -- he's the contractor that's putting
17       the plant up in Deatsville.
18   Q.  Is he a builder?
19   A.  Yeah.
20   Q.  And do you know how Alabama Gravel got in
21       touch with Alan King?
22   A.  Robert -- Robert did that, Mr. Alexander.
23   Q.  Did you ever talk to Alan King?

Deposition of David Tuten

July 13, 2006

Page 186

1    A.  I have talked to Alan King, yes.
2    Q.  In what circumstances?
3    A.  Just I'd go up to visit the site just to
4         see how they were doing, just, hey, how's
5         it going, that kind of thing, casual.
6    Q.  If I asked Mr. King who he works for, who
7         would he tell me?
8              MR. BAILEY:  Object to the form.
9    Q.  You can answer.
10             MR. WALTER:  You might -- I think
11             he could tell you whether
12             Mr. King has made a comment to
13             him along that line, but I
14             don't think he can speculate
15             as to what somebody might tell
16             him if you were to ask him a
17             question.
18   Q.  Has he ever told you who he thinks he works
19        for?
20   A.  Yeah.
21   Q.  Who is that?
22   A.  Robert Alexander.
23   Q.  He's never said he works for Mr. Lambert?

Page 187

1    A.  No.
2    Q.  Do you know a man named Bobby Harvey?
3    A.  Yes.
4    Q.  Who is Bobby Harvey?
5    A.  He used to own Elmore Sand & Gravel.
6    Q.  And when did he get out of that business?
7    A.  I don't know.
8    Q.  Have you had any dealings with Mr. Harvey
9         since Alabama Gravel was formed?
10   A.  No.
11   Q.  Had you talked to him at all about this
12        case?
13   A.  No.
14   Q.  Have you talked to -- outside the presence
15        of any attorneys have you talked to
16        Mr. Lambert about his thoughts on this
17        litigation?
18   A.  Yes.
19   Q.  And what did y'all talk about?
20   A.  Just -- I don't know -- lots of things
21        about the case.  I mean, you know, covered
22        a lot of topics, I guess.
23   Q.  Did you talk about whether or not he thinks

Page 188

1         he violated his noncompete agreement?
2    A.  Yes.
3    Q.  And what did he say?
4    A.  He hasn't.
5    Q.  Did he say -- did he expand on that at all?
6    A.  No.
7    Q.  He just said he didn't violate it?
8    A.  Right.
9    Q.  Have you gotten a chance to read that
10        noncompete agreement since the litigation
11        started?
12   A.  I have not read it from front to back, no.
13   Q.  Do you feel that Mr. Lambert's involvement
14        with setting you up to meet with
15        Mr. Alexander and the other activities we
16        talked about today violate that noncompete?
17             MR. BAILEY:  Object to the form.
18             MR. WALTER:  I'm going to object.
19             I think that calls for a legal
20             conclusion, and Mr. Tuten is
21             not a lawyer.
22   Q.  Excepting that objection, can you answer
23        that question?

Page 189

1    A.  In my opinion that agreement was made to be
2         broken.
3    Q.  What do you mean by that?
4    A.  There's no way you can -- any person can,
5         you know, uphold to that agreement.
6    Q.  If he stayed out of the sand and gravel
7         business, wouldn't that be upholding the
8         agreement?
9    A.  Not the way that thing is written.  To
10        me -- and I'm no lawyer.  I mean, I just
11        read it.  It looks to me like if he was
12        ever to speak to somebody about the sand
13        and gravel business he was in violation of
14        it.
15   Q.  And do you consider driving a truck to be
16        in violation of it?
17   A.  I don't, no.
18   Q.  But if he spoke to somebody about the sand
19        and gravel business, the way you described
20        it --
21   A.  According to that agreement.
22   Q.  -- it would be a violation of it?
23   A.  Yeah.  That's my opinion.

Page 190

1  Q.  Are you familiar at all with -- well, when
2      was the last time you talked -- outside of
3      the presence of attorneys that you talked
4      to Harry about this case?
5  A.  This week.
6  Q.  And when was that?
7  A.  What's today?
8          Yesterday.
9  Q.  And were you on the phone or were you in
10     person?
11 A.  On the phone.
12 Q.  And what did y'all talk about?
13 A.  Just that if I was still scheduled to be
14     here this morning.
15 Q.  Did you talk about any of the facts of the
16     case?
17 A.  No, sir.
18 Q.  Did you talk about the responses to any
19     specific questions I might ask?
20 A.  No, sir.
21 Q.  You absolutely didn't know because you
22     didn't have them, but did he say if he asks
23     you this, this is what I understand or

Page 191

1      anything like that?
2  A.  No, sir.
3  Q.  Anything else other than that that you
4      talked about?
5  A.  No, sir.
6  Q.  And have you spoken with Mrs. Lambert about
7      this case?
8  A.  Yes.
9  Q.  And when was that?
10         Again, outside the presence of any
11     attorneys.
12 A.  Just in the office, you know, what little
13     time I'm there.  When she would be in the
14     office, we would talk about it.
15 Q.  And what do you recall about that?
16 A.  Just in passing, you know, I guess our
17     displeasure with the whole thing, you know.
18 Q.  Anything specifically about any of the
19     facts of the case?
20 A.  No, sir.
21 Q.  Now, Mr. Dasinger left -- at some point do
22     you understand that he left Elmore
23     Sand & Gravel?

Page 192

1  A.  That's my understanding.
2  Q.  And do you know anything about the
3      circumstances of that departure?
4  A.  No, I don't.
5  Q.  Do you know if he was fired from Elmore
6      Sand & Gravel?
7  A.  I do not know.
8  Q.  Is the Gentry pit in Independence,
9      Alabama?
10 A.  Yes, sir.
11 Q.  Is it ever referred to as the Independence
12     pit?
13 A.  I guess it could be.
14 Q.  Are there scales at that pit?
15 A.  Yes, sir.
16 Q.  Now, are you familiar with whether or not
17     the trucks -- the Carol's Contracting
18     trucks that ran from Gentry to Simcala were
19     weighed at Gentry or at Simcala?
20 A.  They're weighed at Simcala.
21 Q.  How does that work?  How are they able to
22     determine the weight of the gravel if
23     they're weighed loaded at Simcala?

Page 193

1  A.  The truck driver gets a copy of the weigh
2      ticket and then he turns that in.
3  Q.  So do they know the weight of the truck
4      relative to the gravel before he weighs it
5      in?
6  A.  I'm not sure I follow you.
7  Q.  How do they go about determining how much
8      gravel -- white oversized gravel is
9      delivered to Simcala when you arrive -- if
10     you can take me through it -- when you
11     arrive with your truck -- the Carol's
12     Contracting truck -- I apologize for how
13     long-winded this is, but I'm trying to
14     describe it.
15         The truck arrives with a load of white
16     oversized at Simcala.  How do they
17     determine how much weight is on that truck?
18 A.  He weighs in.  Then he'll go and dump it.
19     And then he'll weigh on the way out.
20 Q.  Now I understand.  And then that ticket,
21     then, determines the exact weight that was
22     delivered?
23 A.  Right.

Page 194

1  Q.  Now, are you aware of the customary or --
2      are you aware of any customary freight
3      charges that are charged per ton when
4      dealing with runs from Gentry or, say,
5      Elmore to Simcala?  I mean, is it done by
6      the mile, or how is the hauling charge
7      determined?
8  A.  I think it's by the mile or it's calculated
9      somehow.  We pay so much a ton to deliver
10     it, but I think that rate is calculated
11     somehow on the mileage or something.
12 Q.  In your experiences with Globe in
13     purchasing, would you pay some haulers more
14     per mile than you would others per mile?
15 A.  Depends on the situation.  If you were in a
16     situation where you needed the product, you
17     had to have it, then, you know, you were
18     kind of at the mercy of whoever was hauling
19     it.
20 Q.  But, otherwise, would it be pretty much
21     standardized what you would charge -- or
22     pay per mile?
23 A.  My experience has been -- and I didn't have

Page 195

1      a lot of experience with trucks per se.
2      Most of my experience has been with the
3      railroad and with barge companies, and
4      that's usually done on a contract rate
5      that's negotiated.
6  Q.  Do you know Don Triplett?
7  A.  I know the name Don Triplett, yes.
8  Q.  Does he work for Alabama Gravel now?
9  A.  No, sir.
10 Q.  Does he ever broker deals for Alabama
11     Gravel to sell white oversized to anybody?
12 A.  No, sir.
13 Q.  What dealings have you had with Don
14     Triplett?
15 A.  I believe he worked at Martin Marietta at
16     one time and Globe was purchasing gravel
17     from them.  And I spoke to him on the
18     phone, you know, maybe a couple of times.
19     I might have met him once.  That's it.
20 Q.  Let me ask you to look -- this is part of
21     Exhibit 10 -- Defendant's Exhibit 10.
22     These are Dick Wymer's, I believe, notes --
23     "DW" at the bottom -- from Simcala.  And

Page 196

1      these were the subject of discussion in
2      earlier depositions.  And he states in
3      there called Robert Alexander today for an
4      update -- I'm sorry.  This is dated
5      December 21, 2005.
6          It says called Robert Alexander today
7      for an update on new location.  He stated
8      looks like not before April 2006.  Still no
9      permits.  Still Swift Creek between now and
10     then.
11         The Swift Creek location, do you know
12     what Swift Creek pit he's talking about?
13     Is that Gentry or Mims?
14 A.  Yes, Gentry.
15 Q.  That would be Gentry?
16 A.  Yeah.
17 Q.  All right.  Now, this is the page TCC
18     000995.  And it's also part of Defendant's
19     Exhibit 10, and I'll represent to you that
20     it's a portion of Dick Wymer's calendar as
21     was produced to us by Simcala via
22     subpoena.
23         And if you look here at the January

Page 197

1      6th, 2005, date -- do you see where I'm
2      pointing?
3  A.  Uh-huh (positive response).
4  Q.  And it looks like they have an entry on
5      here.  It says around one o'clock, Harry
6      Lambert and then in brackets below it
7      Robert Alexander.  Then I have to turn it
8      so I can read it.  But it said, I
9      believe -- right below Robert Alexander is
10     an arrow pointed down and says called me on
11     1-10-05.  Will get back when he has some
12     more info.  Can reach him at (706)
13     733-9896, home, (706) 706-9896, cell.  But
14     I'm probably reading that wrong.  It's
15     probably 786, but it's the quality of the
16     copy.
17         All right.  Do you recall any
18     discussion with Mr. Alexander about that
19     time frame and any discussions he had with
20     Dick Wymer?
21 A.  I know that Dick had called or that Robert
22     had talked to Dick.
23 Q.  And were you involved in any of these

Page 198

1    discussions around January 6th, 2005?
2  A.  No, sir.
3  Q.  Do you know if in fact Mr. Alexander went
4    to Simcala's offices on January 6th, 2005?
5  A.  I have no idea.
6  Q.  All right.  Mr. Wymer, is he located out of
7    Mount Meigs?
8  A.  Yes.
9  Q.  And do you know if Mr. Lambert and
10   Mr. Alexander went to Mr. Wymer's office on
11   that day?
12  A.  I have no idea.
13  Q.  Were you aware of any discussions during
14   this same period, either shortly before or
15   shortly after, between Simcala and The
16   Concrete Company regarding production and
17   supply of white oversized from the Ward
18   plant to Simcala?
19  A.  No, I was not.
20  Q.  Had you ever talked to Mr. Wymer at that
21   time frame about The Concrete Company's
22   negotiations with him?
23  A.  No.

Page 199

1        (Plaintiff's Exhibit 3 was marked
2        for identification.)
3      MR. GRISTINA:  This is -- for the
4        record it's going to be
5        Alabama Gravel's documents
6        00098 through 105 with a cover
7        e-mail from Mr. Walter to
8        counsel.  It's a production --
9        it's the consulting agreement.
10  Q.  Have you seen that document before,
11   Mr. Tuten?
12  A.  Yes, sir.
13  Q.  Now, I want to be sure because I think you
14   mentioned earlier that this was drafted
15   with the assistance of counsel.  So none of
16   my questions are intended to elicit any
17   information that you conveyed to counsel or
18   they conveyed to you.
19      You state in the first page that
20   Alabama Gravel -- well, it states on the
21   first page that Alabama Gravel first began
22   selling such gravel from said pit after
23   April 1 of 2005.  Is it your contention

Page 200

1    that Alabama Gravel sold no gravel before
2    that date?
3  A.  That is correct.
4  Q.  Now, it also states that the company --
5    right above that it says that the company
6    was formed initially to mine and sell only
7    white oversized metallurgical gravel at the
8    Gentry pit near Independence, Alabama,
9    primarily for customers who were unable to
10   obtain sufficient supplies from The
11   Concrete Company.  Now, is that what the
12   initial plan for Alabama Gravel was?
13  A.  The initial plan was to sell white
14   oversized metallurgical gravel, yeah.
15   That's all we had.
16  Q.  But at that time weren't you also
17   contemplating opening the Deatsville
18   operation?
19  A.  Yes.
20  Q.  So, then, your initial plan wasn't just
21   limited to the Gentry pit?
22  A.  Well, in that time frame, but we knew the
23   Deatsville -- I mean, that was a long ways

Page 201

1    off.
2  Q.  Now, it states above that that Robert
3    Alexander was approached by Simcala in
4    early 2005 to supply white oversized gravel
5    due to its primary supplier -- The Concrete
6    Company -- reporting to Simcala that its
7    supplies were limited and apparently
8    approaching depletion.  Do you have any
9    knowledge of The Concrete Company's supply
10   approaching depletion?
11  A.  Yes, sir.
12  Q.  Do you believe that the Ward plant was
13   approaching depletion?
14  A.  Oh, not the Ward plant, no.  I'm sorry.
15  Q.  What was approaching -- which part of The
16   Concrete Company's supplies were
17   approaching depletion?
18  A.  The Simcala.  I thought it meant that
19   Simcala was running out of gravel.  They
20   almost had to shut down one weekend because
21   they didn't have any rock.
22  Q.  So, then, Simcala was running low?
23  A.  Yeah.

Page 202

1   Q.   Did you ever convey to -- or do you know if
2        Mr. Alexander or anyone else told
3        Simcala -- well, strike that.
4             You write on the third page that Harry
5        Lambert is known in this area -- I'm
6        sorry.  It states on the third page that
7        Harry Lambert is known in this area to be a
8        person who is experienced in setting of up
9        of a sand and gravel mining operation.
10       Now, you had that knowledge long before
11       this document was prepared; correct?
12  A.   Yes.
13  Q.   And down towards the end of the page on
14       page 3 it says since January 2nd, 2006,
15       Harry Lambert has been in the process of
16       making plans to get back into the sand and
17       gravel business in this area and intends to
18       begin operation of his own company by the
19       fall of 2006.  Is that knowledge that you
20       have independent of this piece of paper?
21  A.   Yes.
22  Q.   Is it your contention that Mr. Lambert had
23       not been making any plans to get back into

Page 203

1        the sand and gravel business before January
2        2nd, 2006?
3   A.   One more time, please.
4   Q.   Do you believe that Mr. Lambert had made no
5        plans before January 2nd, 2006, to get back
6        into the sand and gravel business?
7   A.   I'm not aware of any.
8   Q.   So you're not aware of any steps whatsoever
9        that he was taking before that time to get
10       back into the business?
11  A.   No, sir.
12  Q.   And you don't consider the assistance he
13       provided to you and Robert Alexander to be
14       part of that?
15  A.   No, sir.
16  Q.   Despite the fact that he's pursuant to this
17       agreement receiving substantial sums of
18       money now from Alabama Gravel or will be?
19            MR. BAILEY:  Object to the form.
20            MR. WALTER:  This agreement wasn't
21            signed or contemplated until
22            April.  You're asking about
23            plans prior to January 2nd,

Page 204

1             2006.  I don't understand the
2             connection.
3   Q.   Do you think that this contract indicates
4        that Mr. Lambert had plans before it was
5        executed and, in fact, before January 2nd,
6        2006, to get back into the sand and gravel
7        business?
8             MR. BAILEY:  Object to the form.
9   A.   I know that he wanted to get back into the
10       sand and gravel business, yes.
11  Q.   Have you ever had any experience in the
12       past with a consulting agreement similar to
13       this?
14  A.   Similar to this one right here?
15  Q.   Yes, sir.
16  A.   No.
17  Q.   If you look at page 4, the bottom of page
18       4, consultant will provide consulting
19       services required to supervise and set up a
20       sand and gravel plant located in
21       Deatsville, Alabama.  Consultant will be
22       responsible for the completion of stage one
23       of the sand and gravel plant.  Is that

Page 205

1        stage one complete to the best of your
2        knowledge?
3   A.   No, not yet.
4   Q.   Have the freshwater ponds, road
5        construction, and excavation work needed to
6        complete this project been done?
7   A.   We're probably 95 percent done with that.
8   Q.   Would that conclude stage one?
9   A.   Yeah.
10  Q.   I'll move on.
11            (Plaintiff's Exhibit 4 was marked
12            for identification.)
13  Q.   Do you recognize those documents,
14       Mr. Tuten?
15  A.   Yes, sir.
16  Q.   What are those?
17  A.   Those are electric bills.
18            MR. GRISTINA:  For the record,
19            it's Alabama Gravel 0090
20            through 97.
21  Q.   These are electric bills for what facility?
22  A.   This is the electric that we used at the
23       Gentry pit.

Deposition of David Tuten                                    July 13, 2006

Page 206

1   Q.   Was some arrangement made whereby Alabama
2        Gravel would pay Gentry's electric bill?
3   A.   Yes.
4   Q.   For the entire plant or is there some
5        portion of it?
6   A.   No.  It's just -- this is the -- the gravel
7        plant is on its own separate meter.
8   Q.   Well, doesn't the gravel plant produce also
9        the sand and everything else that
10       Mr. Gentry would use in his ready-mixed
11       business?
12  A.   Yes.
13  Q.   And so was the deal that Alabama Gravel in
14       exchange for the white oversized would pay
15       the power bill?
16  A.   Yes.
17  Q.   Was Alabama Gravel also responsible for
18       running the entire plant?
19  A.   Yes.
20  Q.   And, again, I guess that was Mr.Dasinger?
21  A.   Yes, and Mr. Alexander.
22  Q.   Did Alabama Gravel have any other employees
23       that were hired to work at the Gentry pit?

Page 207

1   A.   Yes.
2   Q.   Who were they?
3   A.   I don't know their names.
4   Q.   Were they hired after March 2004?
5   A.   Yes -- oh, no.  After 2005.
6          MR. WALTER:  2005.
7   Q.   2005.  I'm sorry.
8          Do you know any of their names?
9   A.   They've got nicknames, some of them.  I
10       don't know what their real names are.
11  Q.   Any managerial level or --
12  A.   No.
13  Q.   These are hands-on guys?
14  A.   Yeah.
15  Q.   Do you know where they were hired from?
16  A.   Where they were hired from?
17  Q.   Yeah.  Were they working at other companies
18       before?
19  A.   I don't know.
20  Q.   Do you know how these employees were
21       located?
22  A.   No, I do not.
23  Q.   Are you aware of Mr. Lambert assisting in

Page 208

1        any way in finding these employees?
2   A.   No, sir.  I think Rex knew some of them.
3        It was old buddies of his or something.
4   Q.   Mr. Dasinger knew some of them?
5   A.   Yeah.
6          (Plaintiff's Exhibit 5 was marked
7           for identification.)
8   Q.   Do you recognize that document?
9   A.   Yes, sir.
10         MR. GRISTINA:  It's, for the
11         record, Alabama Gravel 50
12         through 89 -- 00050 through
13         00089.
14  Q.   What are these documents?
15  A.   Those are invoices for gravel delivered to
16       Simcala.
17  Q.   By Alabama Gravel?
18  A.   By Alabama Gravel, yeah.
19  Q.   I guess they were sold by Alabama Gravel to
20       Simcala and delivered by Carol's
21       Contracting?
22  A.   Yes.
23  Q.   Now, it looks like if you go to the last

Page 209

1        page first, invoice number 1, it's 00089.
2        You see that in the upper right-hand
3        corner, invoice number 1?
4   A.   Yes.
5   Q.   To your knowledge is that the first invoice
6        that Alabama Gravel ever issued?
7   A.   Yes, sir.
8   Q.   And is that dated -- what's the shipment --
9        it's dated 4-11-2005; is that correct?
10  A.   Yes.
11  Q.   Now, the price on that, is that -- well,
12       maybe you can help me.  It says quantity
13       and the number 108.44 below.  What does
14       that mean, 108.44?
15  A.   That would be 108.44 tons.
16  Q.   So this invoice was for 108.44 tons of
17       oversized to Simcala.  Is that white
18       oversized?
19  A.   Yes.
20  Q.   And do you know where this was being
21       shipped from?
22  A.   From the Gentry pit.
23  Q.   And then price each, below that it says

53 (Pages 206 to 209)

Deposition of David Tuten                                                July 13, 2006

Page 210

1       26.  Does that mean $26 per ton?
2   A.  Yes.
3   Q.  And, again, I believe we talked about this,
4       but did you have any role in negotiating
5       that price?
6   A.  No, sir.
7   Q.  And do you know how much of that price
8       counts for shipping?
9   A.  I believe -- I believe it was $6.
10  Q.  And how do you come to that belief?
11  A.  I just remember, you know, in past
12      conversations.
13  Q.  With who?
14  A.  With Robert.
15  Q.  Do you know how the price $6 a ton was come
16      up with?
17  A.  No, I do not.
18  Q.  Do you know how much per ton other -- well,
19      do you know how much per ton hauling Elmore
20      Sand & Gravel was getting from Simcala?
21  A.  I do not.
22  Q.  Do you know if the haulers were being paid
23      $6 a ton to ship from Simcala -- I'm

Page 211

1       sorry -- from Elmore to Simcala?
2   A.  I do not.
3   Q.  Do you know if The Concrete Company charged
4       $6 a ton?
5           MR. BAILEY:  Object to the form.
6   A.  I do not.
7   Q.  Do you know if any of The Concrete
8       Company's haulers were paid $6 a ton to
9       ship from the Ward plant to Simcala's Mount
10      Meigs plant?
11  A.  I have no knowledge.
12  Q.  And that $6 a ton was paid directly to
13      Carol's Contracting, Inc.?
14  A.  As far as I know, yes.
15  Q.  Would that have been invoiced separately to
16      Simcala -- I mean, to Alabama Gravel?
17  A.  Yes.
18  Q.  These invoices that we're looking at there,
19      they're obviously a computer-generated
20      invoice -- appear to be anyways.  Do you
21      know whose computer these invoices came off
22      of?
23  A.  The Alabama Gravel computer.

Page 212

1   Q.  Would Mrs. Lambert have been the one who
2       prepared these invoices?
3   A.  Yes, probably.
4   Q.  Did you have any understanding as to how
5       much -- I mean, we have the invoices
6       obviously, but did you know what the rate
7       of shipment generally was to Simcala from
8       the Gentry pit -- to Simcala from the
9       Gentry pit?
10  A.  The rate --
11  Q.  How many tons a week were they buying from
12      Gentry?
13  A.  Oh, it varied.  It varied from -- it would
14      depend on, you know, how many furnaces they
15      were running and stuff like that.  It was
16      around 1500 to 1800 tons a week, I guess.
17  Q.  Is it fair to say that you were selling
18      them as much as they wanted to buy?
19          MR. BAILEY:  Object to the form.
20  A.  I mean, they -- they were buying from, you
21      know, Elmore Sand & Gravel as well, you
22      know.
23  Q.  Did you have the capacity at Alabama Gravel

Page 213

1       to deliver more than you sold to them?
2   A.  Well, I don't -- I don't know.  I suppose
3       working around the clock we probably could
4       have produced more.
5   Q.  So you could have increased your operations
6       and sold more?
7   A.  I would say, yeah, probably.
8   Q.  Was any consideration given by Alabama
9       Gravel to the notion -- as far as you know
10      to the notion of preserving your supply
11      over an extended period of time until your
12      Deatsville operation was set up?
13  A.  No, not really.
14  Q.  And were you aware that Simcala had stopped
15      buying or was stopping buying from The
16      Concrete Company at this time?
17  A.  Yes.
18  Q.  How did you get that knowledge?
19  A.  They told us.
20  Q.  Who told you?
21  A.  Well, Mr. Wymer told Robert that.
22  Q.  That he was going to buy from you guys and
23      not from The Concrete Company anymore?

Page 214

1   A.   Right.
2   Q.   And, again -- I'm going to ask it again
3        because I forgot the answer. I'm sorry.
4        Did you make plans to try to extend your
5        operations until the Deatsville plant was
6        up and running?
7   A.   No, sir. We just were going to dig until
8        we either ran out or, you know, whatever.
9   Q.   Do you think it's bad business or improper
10       business for a supplier to try to sustain
11       its production over a longer period of time
12       in order to extend their business, or
13       should a supplier produce as much as they
14       can to sell as much as they can?
15            MR. BAILEY: Object to the form.
16            MR. WALTER: And I object just
17            because I think there's bound
18            to be a bunch of different
19            variables that make it
20            impossible to answer the
21            question.
22                Go ahead to the extent
23            you can.

Page 215

1   A.   Well, I was going to say, I mean, it
2        depends on the situation. I mean, every
3        business is probably different.
4            (A brief recess was taken.)
5   Q.   Mr. Tuten, are you aware of what Simcala
6        was paying The Concrete Company per ton
7        delivered for white oversized gravel in
8        April -- or prior to April of 2005?
9   A.   Delivered, no.
10  Q.   Yes, sir. If I told you it was less than
11       $22 a ton, would that surprise you?
12  A.   No.
13  Q.   Do you have any reason -- or any knowledge
14       of why Simcala would be willing to pay so
15       much more per ton for Gentry white
16       oversized than it was for The Concrete
17       Company white oversized?
18            MR. BAILEY: Object to the form.
19            It assumes it was done, but go
20            ahead.
21  A.   They couldn't get any of the -- they
22       couldn't get enough of The Concrete Company
23       gravel. So I guess it -- you know, it's

Page 216

1        irrelevant what they would pay. They had
2        to have the gravel.
3   Q.   Did you ever see a side-by-side comparison
4        on the studies done by Simcala on Gentry
5        white oversized as opposed to Ward white
6        oversized?
7   A.   No.
8   Q.   Let me ask you to assume -- or do you know
9        that -- don't assume. Do you know if
10       Simcala was also paying a lot more for
11       Gentry white oversized than it was for
12       Elmore white oversized?
13  A.   I do not know.
14  Q.   Do you have any reason to -- do you
15       understand what any justification might be
16       by Simcala for paying more for Gentry than
17       it would for Elmore white oversized?
18  A.   The only justification that I would think
19       of would be that they had to have the
20       material.
21  Q.   Are you aware of The Concrete Company ever
22       telling Simcala we're not going to give you
23       any more material?

Page 217

1   A.   No.
2            (Plaintiff's Exhibit 6 was marked
3            for identification.)
4   Q.   Do you recognize that document?
5   A.   Yes, sir.
6   Q.   Are those documents --
7            MR. GRISTINA: This is, for the
8            record, Alabama Gravel 00001
9            through 38.
10  Q.   What are these documents?
11  A.   These are invoices from Alabama Gravel to
12       Globe Metallurgical in Selma, Alabama.
13  Q.   Were you involved in arranging an agreement
14       between Globe and Alabama Gravel for
15       Alabama Gravel to supply white oversized to
16       Globe?
17  A.   There was no agreement, but I was involved,
18       yes.
19  Q.   Who did you talk to at Globe about that?
20  A.   Bobby Becker.
21  Q.   And how long had you known Bobby Becker
22       for?
23  A.   I don't recall when Bobby first came to

Page 218

1   work, but Bobby had worked for me for quite
2   a few years.
3   Q.  All right.  And did you contact Bobby
4       Becker about beginning the relationship
5       between Alabama Gravel and Globe?
6   A.  Yes.
7   Q.  When do you recall doing that?
8   A.  I don't -- I don't recall specifically, you
9       know, when that was.  You know, probably
10      right around when we started.
11  Q.  Is the Globe plant closer to Gentry than
12      the Simcala plant?
13  A.  Yes.
14  Q.  And did Carol's Contracting do all the
15      hauling for this product from Gentry to
16      Globe?
17  A.  Yes.
18  Q.  And do you know what Alabama Gravel paid
19      Carol's Contracting per ton for those
20      shipments?
21  A.  I'd say $5 a ton.
22  Q.  Is there a reason why it was a dollar less
23      than you recall them paying for the Simcala

Page 219

1   shipments?
2   A.  It was -- like you stated, it was closer.
3   Q.  Do you know what The Concrete Company was
4       charging Globe per ton for Ward white
5       oversized?
6   A.  I do not.
7   Q.  Did you talk to Mr. Becker about The
8       Concrete Company white oversized?
9           We alluded to this earlier.  I'm going
10      to get back into it.
11  A.  Again, please.
12  Q.  We had talked about this earlier today, but
13      I want to get back into it.
14          I believe you said that you had spoken
15      to Mr. Becker about The Concrete Company's
16      product?
17  A.  Uh-huh (positive response).
18  Q.  Do you recall that?
19  A.  Yes.
20  Q.  And when was that?
21  A.  Oh, it's -- it was probably at the end
22      of -- I mean, I had heard about it through
23      a lot of contacts I still have at Globe.

Page 220

1   And I probably heard about it, you know, at
2   the end of 2004 and into 2005.
3   Q.  End of 2004?
4   A.  Uh-huh (positive response).
5   Q.  And you said a lot of contacts you had at
6       Globe?
7   A.  Uh-huh (positive response).
8   Q.  Are these ones in the Selma plant?
9   A.  No.
10  Q.  In Ohio?
11  A.  Uh-huh (positive response).
12  Q.  In addition to Mr. Becker, who else are you
13      speaking of?
14  A.  I have a brother that works there.
15  Q.  What's your brother's name?
16  A.  Keith.
17  Q.  Same last name?
18  A.  Uh-huh (positive response).
19  Q.  We've been going a long time, I know, and
20      you've been very responsive --
21          MR. WALTER:  Answer yes or no.
22  Q.  -- and I appreciate it.
23  A.  Oh, yes.  I'm sorry.

Page 221

1   Q.  So Keith Tuten.  Is he in the purchasing
2       wing?
3   A.  No, he is not.
4   Q.  What wing is he in?
5   A.  He's customer service.
6   Q.  All right.  And what did you hear from --
7       who else besides Keith Tuten?
8   A.  A lot of guys that worked for me still work
9       there, a lot of guys in operations,
10      different -- you know, different people.
11      Even guys that work out in the plant that,
12      you know, I'd run into on the street or
13      what have you.
14  Q.  It sounds like a lot of people were talking
15      about The Concrete Company white
16      oversized.
17  A.  No.  I mean, I was just talking about all
18      the contacts I have.
19  Q.  Well, I'm interested in who it was
20      specifically that told you about white
21      oversized from The Concrete Company.
22  A.  Mr. Becker.
23  Q.  And what did he tell you about it?

Deposition of David Tuten                                                July 13, 2006

Page 222

1    A.  That The Concrete Company had cut them way
2        back on supply and raised the price.
3    Q.  Let me ask you this:  If Simcala -- if
4        Alabama Gravel had not begun selling white
5        oversized to Simcala and Globe from the
6        Gentry plant, do you believe that Simcala
7        and Globe would have continued to buy from
8        The Concrete Company?
9             MR. BAILEY:  Object to the form.
10   A.  I wouldn't have any idea what they would
11       do.
12   Q.  Well, if you hadn't formed your company and
13       begun to sell from that plant, would they
14       have had any choice but to continue to keep
15       buying from The Concrete Company?
16            MR. BAILEY:  Object to the form.
17   A.  Again, I don't know what their -- what they
18       would have done.
19   Q.  I mean, the only other major supplier in
20       the area was who?
21   A.  Well, you had Elmore Sand & Gravel in the
22       area.
23   Q.  And do you have any knowledge as to whether

Page 223

1        or not Simcala could have met its supply
2        needs simply from Elmore Sand & Gravel and
3        the mom-and-pop operations in the area?
4    A.  I don't have any knowledge whether they
5        could or not.
6    Q.  What about Globe?
7    A.  I don't know.
8             (Plaintiff's Exhibit 7 was marked
9              for identification.)
10   Q.  Do you recognize this document?
11   A.  Yes, sir.
12   Q.  And what is that?
13   A.  It's an invoice from Alabama Gravel to
14       Maddox Stone & Gravel.
15   Q.  All right.  This is Plaintiff's 7, Alabama
16       Gravel 39 through 49.  It's the same form
17       invoice as we were dealing with before.  It
18       looks, however, that the prices per
19       ton are approximately 18.50; is that right?
20   A.  Yes.
21   Q.  So, now, Maddox -- where did Maddox pick up
22       its stone from?
23            Well, is it oversized?

Page 224

1    A.  Yes.
2    Q.  All right.  Where did Maddox pick up its
3        stone?
4    A.  At the Gentry pit.
5    Q.  And it looks like this was shipped to the
6        rail yard, the CSX rail yard.  Is that
7        true?
8    A.  Yes.
9    Q.  So did Carol's Contracting simply ship from
10       Gentry to the rail yard?
11   A.  Yes.
12   Q.  And is that the reason why the price is
13       18.50 as opposed to the higher prices to
14       Globe and Simcala?
15   A.  Well, yeah.
16   Q.  So I assume the rail yard is closer to
17       Gentry than Selma or Mount Meigs; is that
18       right?
19   A.  Yes.
20   Q.  And were you involved in any way in
21       negotiations with Mr. Maddox?
22   A.  No, sir.
23   Q.  Would that have been Mr. Alexander?

Page 225

1    A.  Yes, sir.
2             MR. GRISTINA:  I'm going to leave
3              all these together as one
4              exhibit so it's easier.
5             (Plaintiff's Exhibit 8 was marked
6              for identification.)
7    Q.  All right.  You obviously don't recognize
8        the front page because it's a letter from
9        Mr. Walter to me.
10            MR. GRISTINA:  But for the record,
11             this is a production from
12             Alabama Gravel, Alabama Gravel
13             documents 106 through 152.
14   Q.  Let me ask you to look at the first page,
15       Alabama Gravel 106, if you would, please.
16       Do you recognize that?
17   A.  I've never seen it before.
18   Q.  All right.  For the record, it's a copy of
19       an ADEM national pollutant discharge
20       elimination system individual permit.
21            Now, you haven't seen it before.  Let
22       me ask you this:  Do you know who assisted
23       Alabama Gravel in obtaining this permit?

Page 226

1   A.   Yeah.  Larry Speaks.
2   Q.   Did you get into contact with Mr. Speaks to
3        arrange that?
4   A.   I talked to his -- not to him directly.  I
5        talked to one of the guys that worked for
6        him occasionally.  Just asked him, you
7        know, what's the latest on the permit.
8   Q.   Do you know what's involved in obtaining
9        one of these permits?
10  A.   No, I do not.
11  Q.   Did you first contact Mr. Speaks or his
12       organization about helping Alabama Gravel
13       get this permit?
14  A.   No.
15  Q.   Do you know who did?
16  A.   Robert.
17  Q.   Do you know how Robert got Mr. Speaks'
18       name?
19  A.   No, I don't know.
20  Q.   Is that one of the names that you all ran
21       by Harry?
22  A.   I don't know.
23  Q.   If you look at the next page of Alabama

Page 227

1        Gravel, 10007, it looks like some sort of
2        figures done in bookkeeping.  Did you have
3        any involvement in these?
4   A.   I have no idea what that is.
5   Q.   That's a receipt of some sort.
6            I think that it's the total of the
7        pages that follow, but for purposes of
8        today, we'll focus on the next page.  This
9        is an invoice -- this is Alabama Gravel
10       00108.  This is an invoice dated September
11       22nd, 2005, from Southern Steel & Pipe to
12       Alabama Gravel.
13  A.   Uh-huh (positive response).
14  Q.   Do you recognize this document?
15  A.   No.  The first time I've seen it.
16  Q.   All right.  And this is where I got that
17       address from earlier, P.O. Box 1006,
18       Millbrook, Alabama 36054.
19  A.   Yes.
20  Q.   Do you recognize that address?
21  A.   Yes.
22  Q.   What is that address?
23  A.   That's our company post office box.

Page 228

1   Q.   All right.  And have you ever had any
2        contact with anybody at Southern Steel &
3        Pipe?
4   A.   No, I have not.
5   Q.   Do you know who -- below it says -- in the
6        middle it says net 30 and then it says rep
7        RKB.  Do you know who RKB is?
8   A.   I'm sorry.  You've lost me.
9   Q.   Up under --
10  A.   Oh, right here?
11  Q.   Yes, sir.
12  A.   No, I do not.
13  Q.   It appears to be initials for somebody.
14  A.   Yeah.
15  Q.   Were you aware of what Southern Steel was
16       doing for Alabama Gravel in September of
17       2005?
18  A.   Alls I knew is, you know, we were buying
19       steel from is to help build the plant.
20  Q.   So at least in terms of this invoice it
21       looks like in September you were purchasing
22       steel for plant construction.  Is that in
23       Deatsville?

Page 229

1   A.   Yes, it would be.
2   Q.   But you didn't have any contact directly
3        with Southern Steel?
4   A.   No, sir.
5   Q.   Do you know who was constructing things
6        with the steel at Deatsville?
7   A.   Yeah.  Mr. Alan King.
8   Q.   So these would have been supplies that
9        Mr. King needed to build the Deatsville
10       plant or part of it?
11  A.   Yes, sir.
12  Q.   And these invoices -- there's a number of
13       them, but it looks to me -- if you could
14       take a look at all the Southern Steel ones
15       and see if you agree with me -- that -- I
16       want to get to the earliest one.  I think
17       that the September one is the earliest one,
18       but I want to be sure.  They go up to AG
19       00122.
20           Are you aware of any work by Southern
21       Steel at Deatsville before September of
22       2005?
23  A.   No, sir.

Deposition of David Tuten                                                July 13, 2006

Page 230

1   Q.  And am I right that the dates on these
2       invoices appear to range from September of
3       2005 to April of 2006?
4   A.  That's what it says, yes.
5   Q.  And so that's approximately seven months;
6       is that correct?
7   A.  I guess so.
8   Q.  So at least in terms of what was being done
9       at Deatsville, it took Mr. King seven
10      months of invoicing and building to get you
11      guys to where it was the end of the
12      invoicing in April at least?
13  A.  It appears that way, yes.
14  Q.  And so certainly a production operation --
15      a mining operation isn't something you can
16      put together in less than seven months, is
17      it?
18  A.  Well --
19          MR. BAILEY:  Object to the form.
20  A.  -- I think if you had enough people in
21      doing it, yeah, you could probably go a
22      little faster than that.
23  Q.  But that's how long at least it's taken

Page 231

1       Alabama Gravel?
2   A.  That's correct.
3   Q.  Do you know who was telling Mr. King where
4       at the Deatsville site to put the plant?
5   A.  Yeah.  Robert.
6   Q.  So Robert, was he the only one who decided
7       the location of the plant, where it was
8       going to actually be put in the ground?
9   A.  Pretty much, yes.
10  Q.  Did you have any role in that?
11  A.  No.
12  Q.  Do you know where in proximity to the holes
13      that we talked about earlier that you and
14      Mr. Lambert went to -- do you know where in
15      proximity to those holes the plant was put?
16  A.  No.
17  Q.  Do you know if Mr. Lambert advised
18      Mr. Alexander on where to put that
19      plant?
20  A.  I do not know.
21  Q.  To your knowledge is the location of the
22      plant on the property to be mined an
23      important decision to be made?

Page 232

1   A.  I wouldn't have any idea.
2   Q.  Okay.  Looking at page 123 that's after all
3       of these invoices, Pond River Steel, Inc.
4       That's an invoice that looks to be dated
5       October 25th, 2005.  Do you know who Pond
6       River Steel, Inc., is?
7   A.  Yeah.  It looks like we bought some
8       conveyers off of them.
9   Q.  Did you have any involvement with them?
10  A.  No, sir.
11  Q.  I see where it says requested by Robert in
12      the upper right-hand corner.  Do you know
13      if that's Robert Alexander?
14  A.  I would assume so, yes.
15  Q.  And did you ever talk to somebody named
16      Kathy at Pond River Steel, Inc.?
17  A.  No, sir.
18  Q.  It looks like it's in Kentucky.  Did you
19      have any -- you didn't have any contact
20      with them in Kentucky?
21  A.  No, sir.
22  Q.  Do you know what contact or why Alabama
23      Gravel would be purchasing from the

Page 233

1       Kentucky operation?
2   A.  Like I say, Robert bought it.  I have no
3       idea.
4   Q.  It says issued to Alabama Sand & Gravel in
5       the upper left-hand corner.  Do you think
6       that's just a mistake and it should be
7       Alabama Gravel?
8   A.  Yeah, I'd say that's a mistake.
9   Q.  Do you know if Mr. Alexander has another
10      entity named Alabama Sand & Gravel?
11  A.  No, he does not.
12  Q.  Are you aware of another company called
13      that?
14  A.  Yes, I am.
15  Q.  Well, what's that company?
16  A.  That was the name of the company that
17      Elchem had that now Globe owns up on the
18      old Mims property.
19  Q.  But that company doesn't exist anymore as
20      far as you know?
21  A.  No.  It still exists, yes.
22  Q.  It does exists.  But Mr. Alexander hasn't
23      had any involvement with it, has he?

Deposition of David Tuten                                                    July 13, 2006

Page 234

1  A.  No.
2  Q.  The "334" number, 1454, is that the Alabama
3     Gravel phone number?
4  A.  Yes, sir.
5  Q.  And do you recognize that below number as
6     the Alabama Gravel fax number?
7  A.  Yes, sir.
8  Q.  And would these supplies as best you can
9     tell be the same things that Mr. King was
10    needing to build the plant?
11 A.  These are radial stackers.  Part of the
12    plant, yeah.
13 Q.  All right.  Looking at, I guess, the
14    invoices pages 125 through 129.  Have you
15    seen those before?
16 A.  No, sir.
17 Q.  Those are from Larry Speaks & Associates.
18    Is that the Mr. Speaks that we were
19    speaking about earlier?
20 A.  Yes, sir.
21 Q.  It looks like the earliest invoice from
22    Mr. Speaks' operation is dated May of '05;
23    is that correct?

Page 235

1  A.  It looks -- yeah.
2  Q.  So at least according to this you all began
3     to use Mr. Speaks for permit assistance in
4     May of 2005?
5  A.  Yes.
6  Q.  And then that permit was obtained in April
7     of '06; is that right?
8  A.  Yes.  It looks like he didn't do a very
9     good job, does it?
10 Q.  I don't know.  In your experience does it
11    take that long to get a permit?
12 A.  I wouldn't think it'd take a year, but it
13    did.
14 Q.  Do you have previous experience to indicate
15    that obtaining a permit such as this can be
16    done in less than a year?
17 A.  No.  I mean, I -- I -- we were told that it
18    would only take like four months is what we
19    were told.
20 Q.  He told you that?
21 A.  Well, he told Robert that.
22 Q.  And then Robert told you that?
23 A.  Yes.

Page 236

1  Q.  Was this a bone of contention in the
2     company as to why the permit was taking so
3     long?
4  A.  It was a topic of conversation.
5  Q.  Did you ever talk to Mr. Lambert about it?
6  A.  No.
7  Q.  So you just talked to Mr. Alexander about
8     it?
9  A.  Yeah, me and Robert.
10 Q.  What about Dasinger?  Did you speak to him
11    about it?
12 A.  No, sir.
13 Q.  Now, looking at invoice 131 through 133.
14    They appear to be from a Pearce Pump South,
15    Inc.  Do you know that company?
16 A.  I know of them, yes.
17 Q.  They're actually in Columbus, Georgia;
18    correct?
19 A.  Yes.
20 Q.  Have you talked to them before?
21 A.  No.  I mean, I know the guy from Pearce
22    Pump.  I've met him like twice, but that's
23    all.

Page 237

1  Q.  Where did you meet him?
2  A.  I met him up at the gravel pit.
3  Q.  Do you know who hired Pearce Pump to do
4     work for Alabama Gravel?
5  A.  Robert is the one that's dealing with him.
6     He had done business with him before, I
7     guess.
8  Q.  Do you know if Mr. Lambert had any dealings
9     with Pearce Pump?
10 A.  I don't know.
11 Q.  There's a rep indication on here.  It's
12    AL.  Do you know anybody by the initials of
13    AL?
14 A.  No, sir.
15 Q.  And it looks like the first invoice from
16    them was April 4th, 2005.  Does that seem
17    correct?
18 A.  Yes, sir.
19 Q.  Now, look at page 00134, please.
20 A.  Uh-huh (positive response).
21 Q.  What does this appear to you to be?
22    It looks like a deposit for Georgia
23    Power; is that correct?

Deposition of David Tuten                                                      July 13, 2006

Page 238

1    A.  For Alabama Power, yes.
2    Q.  I'm sorry.
3    A.  That's what it looks like.
4    Q.  Alabama Power.  Now, do you know when this
5         deposit was paid by Alabama Gravel?
6    A.  I know it's not been that long ago.  It
7         just says at the bottom delinquent after
8         March 26th.
9    Q.  Did you have any involvement with this
10        deposit?
11   A.  Not with this deposit, no.
12   Q.  Did you have any involvement with setting
13        up the power for the -- is this for the
14        Deatsville plant?
15   A.  Yes.
16   Q.  There is a service address that says 283
17        Cypress Road.  Do you recognize that
18        address?
19   A.  Yes.
20   Q.  What is that address?
21   A.  That is the physical address that was given
22        to us for the Deatsville plant.
23   Q.  And below service it says old plant?

Page 239

1    A.  Yes.
2    Q.  Do you know why it says old plant?
3    A.  Well, there used to be an old plant there.
4    Q.  But no other reason?
5    A.  No.
6    Q.  Now, looking at the next invoice, 136, from
7         Turner Scale.  Is that the product that you
8         purchased?
9    A.  Yes, sir.
10   Q.  That number -- voice number (334) 271-3232,
11        is that the Turner Scale number?
12   A.  I'm sorry.  Where is it again?
13   Q.  Just above sold to Alabama Gravel there's
14        two phone numbers.
15   A.  I would say so, yeah.
16   Q.  That's not your --
17   A.  That's not -- no.
18   Q.  Oh, do you have Mr. Dasinger's cell phone
19        number?
20   A.  No, I do not.
21   Q.  How do you reach him?
22   A.  I have no need to talk to him.
23   Q.  So you've never called Rex Dasinger?

Page 240

1    A.  No.  I talk to Robert.
2    Q.  Do you and Mr. Dasinger not get along or
3         something?
4    A.  No.  Just he takes his orders from Robert,
5         so -- like I said, I'm not involved in the
6         day-to-day operation or nothing, so I
7         really don't have a need to talk to him.
8         When I visit, I see him and, you know,
9         speak to him, but, I mean, we don't
10        converse, no.
11   Q.  So you don't have his cell phone number?
12   A.  No.
13   Q.  And I've got to ask the question again.
14        This is the scale that you bought?
15   A.  Yes.
16   Q.  Now, going to Alabama Gravel 139.  It's
17        invoices from Southern Wire Enterprises,
18        Inc.
19   A.  Uh-huh (positive response).
20   Q.  Do you know who they are?
21   A.  Southern Wire, yes.
22   Q.  What do they provide?
23   A.  Screen cloth.

Page 241

1    Q.  What is screen cloth?
2    A.  It's what goes on a shaker screen.
3    Q.  Did you have dealings with them?
4    A.  Well, actually I had dealings with them
5         when I was with Globe.
6    Q.  As it pertains to Alabama Gravel did you
7         have dealings with them?
8    A.  No, I did not.
9             (Plaintiff's Exhibit 9 was marked
10            for identification.)
11   Q.  These are documents that we received via
12        subpoena from Pearce Pump.  They're sort of
13        similar to the ones we saw earlier.  If you
14        look at the last page, TCC 000588 and 587,
15        there appear to be drawings, diagrams, like
16        a CAD of some sort.  Do you recognize
17        those?
18   A.  No, I do not.
19   Q.  Do you know who would have prepared these?
20   A.  No, I don't.
21   Q.  Have you seen what Pearce Pump sold to
22        Alabama Gravel?
23   A.  Yes.

Deposition of David Tuten                                                                July 13, 2006

Page 242

1   Q.   And now that you know what you bought, do
2        they look like anything in these diagrams?
3   A.   Yes.
4   Q.   It looks like the classification tanks; is
5        that right?
6   A.   Yes.
7   Q.   And who would have dealt with Pearce Pump
8        to come up with these diagrams?
9   A.   Robert.
10           MR. BAILEY:  Have those already
11               been exchanged?  Do I already
12               have a copy of these?
13           MR. GRISTINA:  Yeah, they've been
14               produced, 580 through 588.
15           (Plaintiff's Exhibit 10 was marked
16               for identification.)
17  Q.   For the record, these are documents that we
18       received from Maddox Stone & Gravel.  Do
19       you recognize these at all?
20           These were received via subpoena.
21  A.   Yeah.  These are -- these are the invoices
22       that we looked at a little while ago.
23  Q.   All right.  Mr. Maddox blacked out the -- I

Page 243

1        didn't.  Mr. Maddox did -- blacked out the
2        quantities and prices on the invoices.  But
3        what I'm curious about is, it looks like
4        on -- if you look at TCC 00600, there's
5        like some sort of an Alabama Gravel, LLC --
6        it's like a slip of some sort, 11-14-05,
7        Maddox Stone & Gravel.  Do you see that
8        sheet?
9   A.   Yes.
10  Q.   What type of document is this?
11  A.   It just looks like a delivery slip.
12  Q.   All right.  Now, the other invoices we were
13       looking at were ones that had come directly
14       from Alabama Gravel.  These are different.
15       Does the company keep these separately, or
16       are these left at the -- well, obviously
17       part of this is left with Maddox, but are
18       there yellow sheets or -- it says at the
19       bottom yellow, dash, office.  Are there
20       yellow slips that are back at Alabama
21       Gravel somewhere?
22  A.   I have no idea.
23  Q.   For all Alabama Gravel shipments, if you

Page 244

1        know, do --
2   A.   Oh, this is -- because we had no way of
3        weighing the trucks, this is the slip they
4        had to use instead of a weigh ticket.
5   Q.   So they would take this with them?
6   A.   Yeah.
7   Q.   How does it -- and it says net weight and
8        then tons.  They weighed at Maddox or
9        something?
10  A.   I think actually he loads the cars and
11       they -- he either has a scale on his loader
12       that he keeps track of or the railroad
13       weighs them.  I can't answer that.
14  Q.   So is there no scale at Gentry?
15  A.   There is a truck scale there, but it's
16       inoperable.
17  Q.   So that's why you would weigh your trucks
18       at Simcala, and the same -- these are
19       indicative of weighing them at the CSX
20       yard?
21  A.   Right.
22  Q.   Now, it looks like there's names of drivers
23       here.  Do you recognize the name of the

Page 245

1        driver on 600?
2   A.   I can't even read that.  It looks like
3        James something.
4   Q.   Do you recognize the name of that driver?
5   A.   No, sir.
6   Q.   What about the next page, 601?  It looks
7        like Tommy something or Tony something.
8   A.   No, sir.
9   Q.   Do you know a driver for Carol's
10       Contracting, Inc., named Grady?
11  A.   Yes.
12  Q.   Who is Grady?
13  A.   He's one of the guys that drives a truck.
14  Q.   It's Grady what or is it something Grady?
15  A.   I have no idea.  That's all I ever --
16  Q.   That's what they call him, Grady?
17  A.   Yeah.
18  Q.   Has he been with them the whole time you've
19       been there -- the whole time that Alabama
20       Gravel has been dealing with Carol's
21       Contracting?
22  A.   Yes.
23           (Plaintiff's Exhibit 11 was marked

Page 246

1          for identification.)
2  Q.  Do you recognize those documents?
3  A.  No, sir.
4  Q.  They appear to me to be invoices from
5       Southern Wire to Alabama Gravel, but you've
6       never seen them before?
7  A.  Unless they were in that earlier batch.
8  Q.  These are the ones that I obtained via
9       subpoena from Southern Wire.  But you've
10      never seen these before?
11  A.  No.
12  Q.  All right.  Looking at the invoices, it
13      appeared that the FOB for Maddox was less
14      than Globe and Simcala.  Is there a reason
15      why to your knowledge you would charge
16      Maddox less for white oversized than Globe
17      or Simcala?
18  A.  Robert negotiated that, so I don't know
19      what kind of deal he had.
20  Q.  Do you know if Maddox paid Carol's
21      Contracting, Inc., directly for hauling?
22  A.  No, I don't know.  I think it was -- I
23      think that price on that thing was probably

Page 247

1       a delivered price.
2  Q.  So you think the 18.50 was delivered?
3  A.  Yeah.
4          (Plaintiff's Exhibit 12 was marked
5           for identification.)
6  Q.  These are documents TCC 000944 through
7       950.  Is that what you have there?
8  A.  Yes, sir.
9  Q.  All right.  These are documents I obtained
10      via subpoena from Simcala.  Have you ever
11      seen sheets that look like this?
12  A.  No, sir.
13  Q.  And it looks like that they identify on the
14      page -- the first page it's the purchase
15      order number and then it lists the number
16      and it says date created 05-04-11.  Does
17      that make sense to you as to any date?
18  A.  No.
19  Q.  Would that be April 11, '05?  Have you ever
20      seen --
21  A.  I don't have any idea what that is.
22  Q.  And then it says 0, slash, S.  I assume
23      that's oversized.  Swift Creek.

Page 248

1          And then the next page that they've --
2       that I have in my order -- or the next one
3       I have in here is listing a supplier code.
4       011251 is Alabama Gravel, LLC, with the
5       purchase order number above O/S gravel,
6       Swift Creek.  Do you have any reason to
7       understand why they associate Swift Creek
8       with Alabama Gravel other than as the
9       Gentry operation?
10  A.  Just -- just probably because of where it
11      was located, I guess.
12  Q.  Now, on 000948 it appears -- at the top of
13      it says order items summary, and then it
14      lists some numbers in the middle, 60,000
15      ton and then 26 -- it looks like price,
16      extended price, total invoice cost.  It
17      looks like the number $1,560,000 and then
18      below that the number $1,448,269.39.  Do
19      you believe that Alabama Gravel has sold
20      between 1.4 and 1.5 or a little more than
21      $1.5 million in white oversized to Simcala?
22  A.  Over what time frame?
23  Q.  Well, in total from the Gentry pit.  Do you

Page 249

1       believe they sold that much white
2       oversized?
3  A.  Yeah.  Possibly, yeah.
4  Q.  Do you know what your net profit on that
5       sale was?
6  A.  I have no idea.
7  Q.  You have an accounting background, don't
8       you?
9  A.  Yes, sir.
10  Q.  But you don't have any involvement with the
11      books of Alabama Gravel?
12  A.  No, sir.
13  Q.  Do you believe that that number has been
14      calculated, the net profit on the sales
15      from the Gentry pit to Simcala?
16  A.  No.
17  Q.  Do you think it's possible that Alabama
18      Gravel sold more than $1.56 million in
19      white oversized to Simcala?
20          MR. BAILEY:  Object to the form.
21  A.  Yeah.
22  Q.  How much do you think they sold?
23  A.  I don't know what we had sold to Simcala in

Deposition of David Tuten                                                        July 13, 2006

Page 250

1    total.
2    Q.  What about to Globe?  Do you know how much
3         white oversized you sold to Globe?
4    A.  No, sir.  We haven't sold to Globe for
5         quite some time.
6    Q.  Is it a number anywhere approaching 1.56
7         million?
8    A.  I doubt it.
9    Q.  Did you pay Mr. Gentry any money for the
10        white oversized that you mined at his pit?
11   A.  No, sir.
12   Q.  So the arrangement was still the power and
13        operating his plant?
14   A.  And he got to keep all the sand and the
15        smaller gravel.
16   Q.  Do you know if anything was put in writing
17        to Mr. Gentry on that?
18   A.  There was nothing in writing.
19   Q.  Do you know who negotiated the terms of
20        that arrangement?
21   A.  Robert.
22             (Plaintiff's Exhibit 13 was marked
23             for identification.)

Page 251

1    Q.  Now, have you seen this letter before?
2    A.  Yes, sir.
3    Q.  When did you first see it?
4    A.  Just right after it was written we got a
5         copy of it.
6    Q.  And for the record, it's a letter from W.
7         Eddie Boardwine, vice president of Simcala,
8         to Mr. Robert Alexander, Alabama Gravel,
9         LLC.  And it states, Dear Mr. Alexander, I
10        would like to confirm our interest in
11        Alabama Gravel Company becoming a long-term
12        supplier of metallurgical grade quartz for
13        Simcala.  Is that another word for white
14        oversized?
15   A.  Yes, sir.
16   Q.  Picking up with the letter again, our
17        interest in contractual negotiations would
18        be based on our volume requirements, price
19        competitiveness, and quartz quality.  We
20        would like to begin discussions in the near
21        future for a contractual agreement between
22        our companies beginning no later than
23        January 1, 2006.  Our volume requirements

Page 252

1    and positive long-term business plan will
2    provide a mutually beneficial agreement.
3    We look forward to forming a more formal
4    relationship with Alabama Gravel in the
5    near future.  Sincerely, Mr. Boardwine.
6         Now, this letter -- did you ever enter
7    into a contractual agreement between the
8    companies?
9    A.  No, sir.
10   Q.  Do you recall why or not?
11   A.  We didn't -- just never had -- we haven't
12        got around to it.
13   Q.  Does Simcala have a problem with Alabama
14        Gravel now that the Gentry pit is not
15        producing?
16   A.  No, sir.
17   Q.  Were they aware -- at any time did you let
18        them know that the Gentry pit was running
19        low?
20   A.  Yes, sir.
21   Q.  What step do you know, if any, that they
22        took to go to other suppliers at that
23        point?

Page 253

1    A.  They -- they took extra in and built up
2         inventory.
3    Q.  Where did they take the extra in from?
4    A.  We shipped them extra material to carry
5         them over until we get the other site
6         running.
7    Q.  So you shipped from Gentry?
8    A.  Uh-huh (positive response).
9    Q.  So, in other words, the last bit of the
10        time you were producing there you were
11        shipping them as much as you could do so
12        they would build up more than they could
13        use?
14   A.  Yes, sir.
15   Q.  And that's what they're using now?
16   A.  Yes, sir.
17   Q.  Do you know when that supply is going to
18        run out?
19             MR. BAILEY:  I object to the
20             relevancy of this.  I think
21             the evidence is going to be
22             that Simcala was never a
23             customer of Montgomery

Page 254

1   Materials.  Your whole
2   contract, your whole argument
3   is that it deals with
4   customers as defined in the
5   agreement.  And now you're
6   getting into all this Simcala
7   stuff when they never were a
8   customer of Montgomery
9   Materials and you're asking
10  this guy information that
11  would help you compete with
12  them.  So I think it's
13  irrelevant to find out when
14  they think -- you guys would
15  love to know, I'm sure, when
16  they might be able to start
17  shipping some more gravel and
18  see this as a business
19  opportunity.
20      I'm just pointing out to
21  you that I think the evidence
22  is going to be that Simcala
23  was never a customer of

Page 255

1   Montgomery Materials.  All the
2   Simcala dealings are
3   irrelevant to your claims.
4   And it appears in light of
5   that you're trying to use this
6   lawsuit to gain some kind of
7   competitive advantage.
8   MR. GRISTINA:  And I object to --
9   MR. BAILEY:  But he's not my
10      witness.
11  MR. GRISTINA:  I object to the
12      speaking objection.  I
13      disagree with everything he
14      said.  It's totally
15      inappropriate, totally
16      inappropriate for you to put
17      that on the record in this
18      deposition.  If you want to
19      put it on afterwards when he's
20      not here, we can do it all you
21      want.  That's totally
22      inappropriate.
23      Could you read back my

Page 256

1       question, please?
2   A.  I know the answer.
3   Q.  Okay.  If you can answer it.
4   A.  Yeah.  I don't know when it's going to run
5       out.
6           MR. GRISTINA:  And I'm tired of
7           being accused of competing
8           inappropriately or abusing
9           this process simply by
10          enforcing contractual rights.
11          If your client had honored
12          his, we wouldn't be here.
13          It's been done in court.  It's
14          been done here.  It's
15          inappropriate.  If you win the
16          case, great, but it's just not
17          the place.
18      (Plaintiff's Exhibit 14 was marked
19      for identification.)
20  Q.  Have you seen this document before?
21  A.  Yes, sir.
22  Q.  It looks like up in the upper left-hand
23      corner the date is June 20th, 2005.  Is

Page 257

1   that consistent with when you recall seeing
2   it?
3   A.  I don't remember, you know, when I saw it,
4       but I have seen it.
5   Q.  And it's a letter from Mr. Alexander to
6       Mr. Boardwine; is that correct?
7   A.  Yes, sir.
8   Q.  Now, the first paragraph, Dear Eddie, I
9       received your letter of intent to discuss a
10      long-term contract with Alabama Gravel,
11      LLC, several weeks ago.  I want to
12      apologize for not responding sooner, but we
13      have been very busy starting the new gravel
14      operation.  We would like to meet with you
15      and start negotiations in the near future.
16      Our plant should arrive sometime in July,
17      and we will start erecting it sometime in
18      August.  The permitting process is the one
19      item we're trying to expedite as quickly as
20      possible.  The quicker we can get the
21      mining permit, the sooner we can start
22      supplying Simcala with material from
23      Deatsville.

Page 258

1        So at that point were you still
2    supplying from Gentry?
3    A.  Yes, sir.
4    Q.  And it states we hope the material we have
5    been supplying Simcala from the
6    Independence plant has worked well.  We
7    take pride in the fact that we have
8    performed as we said we would and will
9    continue to perform in this manner in the
10    future.  We are looking forward to a
11    long-term relationship with Simcala and
12    feel that Simcala can be a quality
13    supplier -- sorry -- feel that Alabama
14    Gravel can be a quality supplier you can
15    trust and depend on.  We really appreciate
16    your business, and we're looking forward to
17    a long and prosperous relationship.
18        Did you participate in the drafting of
19    that letter?
20    A.  No, sir.
21    Q.  Prior to the sales from -- I probably asked
22    this before, but one more time -- the sales
23    from the Gentry pit, had Alabama Gravel or

Page 259

1    any participant in Alabama Gravel, meaning
2    you or Mr. Alexander or Mr. Dasinger,
3    provided any product to Simcala?
4    A.  No, sir.
5    Q.  I'm nearly finished if you'd give me a
6    minute.
7    A.  Okay.
8        (Brief recess was taken.)
9    Q.  Do you know a Neal Fuller?
10    A.  I know of Neal Fuller, yes.
11    Q.  Have you had dealings with Neal Fuller in
12    the formation of Alabama Gravel?
13    A.  No, sir.
14    Q.  What contacts have you had with Neal
15    Fuller?
16    A.  I met him once.
17    Q.  When?
18    A.  I don't know.  It's been a long time ago.
19    Q.  Does he provide the white oversized to
20    customers?
21    A.  I'm not aware of any.
22    Q.  Have you talked to him about this dispute
23    at all?

Page 260

1    A.  No, sir.
2    Q.  Do you know Steve Shaw from Dothan who
3    manages Ready Mix USA?
4    A.  No.
5    Q.  Have you had any discussions with him?
6    A.  Don't know the man.
7        MR. GRISTINA:  I don't have
8            anything further.  Again, I
9            appreciate your time.
10        THE WITNESS:  Thank you.
11            EXAMINATION
12    BY MR. BAILEY:
13    Q.  Mr. Tuten, it's my understanding that as of
14    the time you began testifying this morning
15    you were aware that Alabama Gravel had been
16    dismissed as a defendant in this
17    litigation; is that correct?
18    A.  Yes, sir.
19    Q.  So the testimony you have given today has
20    been made as a person who's no longer a
21    party to the lawsuit -- or representing a
22    company that is no longer a party to the
23    lawsuit; is that correct?

Page 261

1    A.  Yes, sir.
2    Q.  You were asked about the integrity of some
3    people during your questioning by
4    Mr. Gristina.  Do you think Harry Lambert
5    is an honest and a good man to put it in a
6    phrase that he used?
7    A.  Yes, sir.
8    Q.  Let me ask you about when you were
9    purchasing white oversized gravel for Globe
10    or when you were in charge of that
11    process.  Who was your least favorite
12    supplier in this area during that time?
13    A.  For the reasons I think I stated earlier in
14    the questioning was that one of the issues
15    that we had with The Concrete Company was
16    to get so much of the white oversized we
17    had to take so much of the brown oversized,
18    and that was just something that, you know,
19    we did it, but we didn't always like to do
20    it.
21    Q.  Did other suppliers in this area require
22    you to buy materials that you didn't want
23    other than The Concrete Company?

Page 262

1  A.  No, sir.
2  Q.  Tell me again, what was it that triggered
3       your interest in getting into the white
4       oversized gravel business in this area as
5       an investor?
6  A.  I saw it just as an opportunity.
7  Q.  And what was it that you saw that gave you
8       the idea it might be an opportunity?
9  A.  That there seemed to be a shortage of white
10      oversized gravel and that, you know, if --
11      you know, there was an opportunity there to
12      do something.
13 Q.  And how did that information come to your
14      attention that there was a shortage of
15      white oversized gravel in this territory?
16 A.  Through my consulting work at Simcala and
17      also through contacts I had at Globe.
18 Q.  Was Harry Lambert the source of that
19      information?
20 A.  No, he was not.
21 Q.  As I understand what you've already said,
22      Harry Lambert had told you on at least
23      three occasions and maybe more that he

Page 263

1       could not go into the sand and gravel
2       business in this area after he left
3       Montgomery Materials; is that correct?
4  A.  Yes, sir.
5  Q.  And that he told you that he was under that
6       limitation until January the 2nd, 2006?
7  A.  He didn't necessarily tell me the time but
8       that -- you know, that he couldn't go into
9       it, go into business.
10 Q.  Let me ask you, did you consider your
11      contacts with him between the time he left
12      Montgomery Materials and the time he could
13      go back into business in January of 2006 to
14      constitute him conducting sand and gravel
15      business in this area?
16 A.  No, sir.
17 Q.  I ask you to assume that his noncompete
18      expired on January the 2nd, 2006; okay?
19 A.  Okay.
20 Q.  Do you know of any facts that would
21      indicate that Harry Lambert was conducting
22      the sand and gravel business in this area
23      between January 2nd, 2006, and the date he

Page 264

1       left Montgomery Materials?
2  A.  I don't know of any.
3  Q.  Since Alabama Gravel was formed and up
4       until the time that you entered into this
5       consulting agreement with Harry in April of
6       2006, has Harry Lambert received any
7       remuneration or compensation of any type
8       from Alabama Gravel?
9  A.  No, sir.
10 Q.  From your earlier answers I understand that
11      you are primarily in the consulting
12      business yourself?
13 A.  Yes, sir.
14 Q.  Does that involve getting paid to give
15      advice on matters of which you have
16      expertise?
17 A.  Yes, sir.
18 Q.  Do you charge for your consulting work?
19 A.  Yes, sir.
20 Q.  On what basis do you charge?  By the hour,
21      by the job, or is it variable?
22 A.  I charge -- usually I charge by the day.
23 Q.  Do you invoice for your consulting work

Page 265

1       when you do it?
2  A.  Yes, sir.
3  Q.  And you expect to get paid when you send an
4       invoice to somebody for consulting?
5  A.  Yes, sir.
6  Q.  Before the most recent consulting agreement
7       with Harry Lambert that was signed in April
8       of 2006 had Harry Lambert done any
9       consulting work for Alabama Gravel?
10 A.  No, sir.
11          MR. BAILEY:  Thank you.  I have
12      nothing further.
13          MR. GRISTINA:  I have nothing
14      further.
15      (Deposition concluded at
16      approximately 3:25 p.m.)
17      * * * * * * * * * *
18      FURTHER DEPONENT SAITH NOT
19      * * * * * * * * * *
20      REPORTER'S CERTIFICATE
21 STATE OF ALABAMA:
22 MONTGOMERY COUNTY:
23          I, Tracye Sadler, Certified Shorthand

Page 266

1    Reporter and Commissioner for the State of Alabama
2    at Large, do hereby certify that I reported the
3    deposition of:
4            DAVID TUTEN
5    who was duly sworn by me to speak the truth, the
6    whole truth and nothing but the truth, in the
7    matter of:
8            THE CONCRETE COMPANY,
9            Plaintiff,
10           vs.
11           HARRY E. LAMBERT, CAROL'S
12           CONTRACTING, INCORPORATED, and
13           ALABAMA GRAVEL, LLC,
14           Defendants.
15           IN THE UNITED STATES DISTRICT COURT
16           FOR THE MIDDLE DISTRICT OF ALABAMA
17           NORTHERN DIVISION
18           Case Number 2005-CV-1026-CSC
19   on July 13, 2006.
20       The foregoing 265 computer-printed pages
21   contain a true and correct transcript of the
22   examination of said witness by counsel for the
23   parties set out herein.  The reading and signing of

Page 267

1    same is hereby waived.
2        I further certify that I am neither of
3    kin nor of counsel to the parties to said cause nor
4    in any manner interested in the results thereof.
5        This 4th day of August 2006.
6
7
8    _____
     Tracye Sadler, Certified
9    Shorthand Reporter and
     Commissioner for the State
10   of Alabama at Large
11
12
13
14
15
16
17
18
19
20
21
22
23