## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **THE CONCRETE COMPANY,** | \| |
| | \| |
| **PLAINTIFF,** | \| |
| | \| |
| **vs.** | \|    **CASE NO. 2:05-CV-1026-CSC** |
| | \| |
| **HARRY E. LAMBERT,** | \| |
| **CAROL'S CONTRACTING,** | \| |
| **INC., and ALABAMA GRAVEL,** | \| |
| **LLC,** | \| |
| | \| |
| **DEFENDANTS.** | \| |

## DEFENDANTS'
## BRIEF IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT
## [Doc. 86]

COME NOW Defendants Harry E. Lambert (hereinafter "Lambert") and Carol's Contracting, Inc. (hereinafter "Carol's Contracting") and, in addition to the arguments raised in their pending Motions for Summary Judgment [Docs. 39 & 41], submit this brief in support of their Joint Motion for Summary Judgment filed concurrently herewith [Doc. 86] pursuant to Federal Rule of Civil Procedure 56 stating additional grounds as to why they should be entitled to judgment as a matter of law in their favor. In support of the joint motion, Defendants would state as follows:

# I.

## Statement of the Facts

1.    Harry Lambert was born October 30, 1943 in Maryville, Tennessee. *See* Dep. of Harry Lambert Exhibit B at 14:1-3.

2.    Lambert is a high school graduate. Exhibit B at 14:7.

3.    Lambert's father worked in rock quarries. Exhibit B at 14:14.

4.    Lambert worked in rock quarries as a laborer after he graduated from high school. Exhibit B at 15:20-16:4.

5.    Lambert met Carol while working as a supervisor at a rock quarry. Exhibit B 16:19-23.  They have been married since the 1960s.

6.    Later Lambert formed a company to drill holes to blast rock at rock quarries. Exhibit B at 18:20-20:13. That business lasted about 15 years. *Id*. at 21:13-16.

7.    In the late 1980s or early 1990s Lambert began working in the sand and gravel business. Exhibit B at 21:22-22:12.  It is the only work he is really good at. Aff. of Harry Lambert: Exhibit A at ¶ 2. Before 1996, Lambert already knew many people who potentially had deposits of sand and gravel on their property, every one of the companies in the sand and gravel business in this area and all of the existing buyers of large quantities of such products.  Exhibit A at ¶ 2.  For example, he already knew Jim Maddox, Sam Estock, Alan King, Bernie Ostervold, Dave Tuten, Rex Dasinger, Neal Labovitz and Mike Gentry.  Exhibit A at ¶ 3.

8.     Prior to 1996, The Concrete Company ("TCC") had been engaged in the ready mix concrete, concrete products and sand and gravel business for many years.  In 1996, TCC expanded into the Montgomery, Alabama, area by purchasing an existing ready mix concrete business in Montgomery.  [Doc. 1-1, ¶ 7]  TCC was, and is, controlled by Frank D. Foley, III ("Foley"). *Id*. ¶ 9.

9.     TCC has never been certified to conduct business as a common carrier in Alabama by the Alabama Public Service Commission. [Doc. 83, Exhibit K]

10.     Also in 1996, MMC Holdings, Inc. ("MMC Holdings") was organized and became engaged in mining sand and gravel from leased property (hereinafter referred to as the "City Pit") in Montgomery, Alabama. MMC Holdings was, at all pertinent times, controlled by Lambert. [Doc. 1 ¶ 8-9]

11.     On June 5, 1997, Foley and Lambert, individually and as representatives of their respective companies, executed a document which formed Montgomery Materials Company, LLC ("Montgomery Materials"), hereinafter referred to as the "Agreement". [Doc. 1, Exhibit A] Per the Agreement, TCC and MMC Holdings each owned 50% of the new company.  TCC contributed $300,000 in cash and MMC Holdings contributed the assets to operate the company, including the lease on the City Pit. [Doc. 1 ¶ 11]

12.     The Agreement contained a provision whereby during the term of joint ownership, TCC and MMC Holdings would not compete against Montgomery

Materials. [Doc. 1, Exhibit A ¶ 8.2] It specifically stated that "any opportunity for leasing or otherwise obtaining additional sources of sand or gravel . . . shall be first the opportunity of Montgomery [Materials]". *Id.*

13.    Montgomery Materials began mining sand and gravel from the City Pit in June 1997. [Doc. 1, ¶ 11]

14.    Lambert managed the day-to-day operations of Montgomery Materials as an employee of Montgomery Materials. Exhibit A at ¶ 5. His role was to manage where it mined and the amount of material mined and stored. *Id.* ¶ 7. He also arranged some sales. *Id.*

15.    While managed by Lambert, Montgomery Materials was only in the business of mining and selling sand and gravel and it was not in the trucking business as a common carrier. Exhibit A at ¶ 6. In fact, Montgomery Materials was never in the business of operating as a common carrier or commercial trucking business. Exhibit A at ¶ 6. *See, also* Doc. 39, Exhibit F. Companies in the sand and gravel business in this area do not wish to manage an over-the-road trucking operation. Exhibit A at ¶ 6. Independently owned and operated common carriers or customers would take delivery of the products of Montgomery Materials and haul them to those buying the materials. Exhibit A at ¶ 6. Montgomery Materials vehicles were utilized only to transport aggregate while on the property leased by Montgomery Materials. Exhibit A at ¶ 6. Most of the equipment the company

owned stayed on the site because Montgomery Materials loaded customer trucks or commercial trucks on site with its loaders.    Exhibit A at ¶ 6. The trucks Montgomery Materials owned were only utilized to move sand and gravel around at the pits so that that product could be in a central location for loading on commercial carriers or customer trucks.    Exhibit A at ¶ 6. Customers of Montgomery Materials would almost always purchase sand or gravel F.O.B. the plant.    Exhibit A at ¶ 6. Occasionally, a customer would ask Montgomery Materials to arrange to haul the materials and include the price of hauling as a delivered price. Exhibit A at ¶ 6. In those instances Montgomery Materials would hire a commercial trucking company at a per ton rate and include that cost in the amount charged for the material when they billed the customer.  Exhibit A at ¶ 6.

16.    Carol Lambert was employed as the bookkeeper for Montgomery Materials from 1998 until April 2002. [Doc. 83, Exhibit C]  She had previously served as the bookkeeper for MMC Holdings.  Exhibit A at ¶ 8.

17.    In May 1999, Montgomery Materials leased property in Montgomery County, Alabama from Anderson Farms (hereinafter the "Anderson Lease" or the "Anderson Pit") on condition that Lambert remain as an employee of Montgomery Materials. [Doc. 1, ¶ 12]

18.    It did not take long after Montgomery Materials was formed for Foley to create the situation that led to him taking the company away from MMC Holdings.

Exhibit A at ¶ 10. Foley told Lambert on several occasions that Lambert was incompetent to manage the company and he refused to allow Lambert to take action that Lambert thought would increase the value of the company. Exhibit A at ¶ 10.

19. Foley planned to trigger the buy-sell at the precise time Montgomery Materials would have the lowest value on paper but the highest value in reality. Exhibit A at ¶ 10.

20. On September 25, 2000, TCC notified MMC Holdings that it was invoking the buy-sell provisions of the Agreement. [Doc. 1, ¶ 20.]

21. TCC essentially offered MMC Holdings $2 million (less adjustments) for its share of Montgomery Materials if the Anderson Lease remained in force and $500,000 (less adjustments) if the Anderson Lease was cancelled because Lambert failed to remain as an employee of Montgomery Materials. [Doc. 1, ¶ 21.] Foley knew that Anderson Farms—the lessor—had stipulated that they would only allow mining on their property if Lambert was supervising those operations. Exhibit A, ¶ 10. Foley also knew he would not retain Lambert after he bought out the company. Exhibit A at ¶ 10.

22. Lambert viewed this as an attempt by Foley to require MMC Holdings to pay TCC $2 million for TCC's interest whereas TCC would only have to pay MMC Holdings $500,000 for its interest. Exhibit A at ¶ 10. With legal advice,

MMC Holdings offered TCC $500,000 for its interest as Lambert believed Montgomery Materials was worth more than $500,000 with or without the Anderson Farms lease. Exhibit A at ¶ 10.

23. Lambert attempted but failed to obtain consent from Anderson Farms to remove the stipulation in the Anderson Lease relating to his continued employment with Montgomery Materials. [Doc. 1, ¶ 24.] Anderson Farms did not wish to lease the property if TCC or Foley was in control. Exhibit A at ¶ 10.

24. Accordingly, on January 2, 2001, MMC Holdings notified TCC that it would purchase TCC's interest for $500,000 (less adjustments). [Doc. 1, ¶ 25.]

25. TCC took the position that because the offer was not identical to its offer, MMC Holdings had failed to make an election and that under the terms of the Agreement, was deemed to have sold its interests in Montgomery Materials to TCC. [Doc. 1, ¶ 27.]

26. TCC filed a declaratory judgment action against MMC Holdings on January 12, 2001. [Doc. 1, ¶ 28.] The suit sought a ruling that MMC Holdings had in effect sold its interest in Montgomery Materials to TCC effective January 2, 2001, for $500,000 (less adjustments). *Id.*

27. While the suit was pending, on July 25, 2001, TCC made a loan of $106,000 to a competitor of Montgomery Materials, namely Hickory Bend Farms, Inc./Michael Phillips of Montgomery, Alabama. [Doc. 83, Exhibit J] The "Supply

Agreement" executed in conjunction with the loan required Hickory Bend Farms/Michael Phillips to supply TCC gravel at $4.50 per ton for one year from that date. *Id.* At the time of this transaction Montgomery Materials was in the business of selling the same product in the Montgomery area and was in competition with Hickory Bend Farms/Michael Phillips. Exhibit A at ¶ 11. Mike Phillips competed with Montgomery Materials in the sale of white oversize grave. Exhibit G at pg. 34:23-35:12. Lambert was not aware of this action by Foley and TCC at the time. Exhibit A at ¶ 11.

28.    On September 7, 2001, TCC obtained a summary judgment declaring that MMC Holdings had sold Montgomery Materials to TCC for $500,000 (less adjustments). [Doc. 1, ¶ 29] Lambert was shocked when the court declared that MMC Holdings' offer was null and void and that it was deemed to have accepted TCC's $500,000 offer. Exhibit A at ¶ 10.

29.    Lambert appealed and worked for Montgomery Materials while the case was on appeal. [Doc. 35, Exhibit D, No. 1] While managing Montgomery Materials, Lambert may have had contacts with Crest Capital concerning the leasing of equipment. [Doc. 83, Exhibit H] A fax concerning those dealings was sent to TCC in December 2005, but the document pertained to communications back when Lambert was with Montgomery Materials [Doc. 83, Exhibit H & Doc. 77, Exhibit M]

30.    During the pendency of the appeal, TCC sought to have Lambert removed on the stated grounds that he was incompetent to manage the company. Exhibit A at ¶ 12.

31.    The order granting summary judgment to TCC was affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002. [Doc. 1 ¶ 30]

32.    The result of the case was that MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC for $500,000 (less adjustments) effective January 2, 2001. [Doc. 1, ¶ 31]

33.    The closing for the transaction occurred April 9, 2002, and resulted in a cash payment to MMC Holdings of $303,739.94. *Id.* ¶ 32. [Doc. 39, Exhibit E]  The sales documents do not reflect the sale or transfer of the "goodwill" of Montgomery Materials from MMC Holdings to TCC.  *See* Assignment of Limited Liability Company: Exhibit H.  Lambert received no additional consideration for the non-compete agreement.  Exhibit A at ¶ 13.

34.    Within six months after paying MMC Holdings $300,000 for its ½ interest in the assets of Montgomery Materials at the City Pit and the Anderson Pits, TCC sold the Montgomery Materials assets at the Anderson Pit back to Anderson Farms for approximately $1.2 million. Exhibit A at ¶ 14.

35.    Lambert was terminated as the manager of Montgomery Materials on April 9, 2002.  Exhibit A at ¶ 15.  At the time Lambert was 59 years-old.  Exhibit A at ¶ 16.

36.    Carol Lambert was terminated as the bookkeeper for Montgomery Materials that same day. [Doc. 39, Exhibit F]  Carol Lambert never signed any non-compete agreements with TCC, Montgomery Materials or any other person. [Doc. 39, Exhibit F]

37.    In order to generate income Carol Lambert formed Carol's Contracting, Inc. ("Carol's Contracting") as a commercial trucking business on April 24, 2002 [Doc. 39, Exhibit F] She purchased her first truck around April 29, 2002.  *Id.*  The business was run from her home in Deatsville, Alabama. *Id.*

38.    Carol's Contracting leased to Foshee Trucking Company, a contract hauler in the Montgomery area.  [Doc. 39, Exhibit F] Foshee Trucking had hauled sand and gravel for a customer of Montgomery Materials when Lambert managed Montgomery Materials.  Exhibit B at 83:20-84:4.

39.    Trucking companies are not considered to be in the sand and gravel business by persons in the trucking industry or by persons in the sand and gravel business. *See* Aff. of Neil Fuller: Exhibit C at pg. 2. *See also* Exhibit A at ¶ 6 and Exhibit G at pg 44:16-23 & pg. 45:7-13.

40.     On May 1, 2002, Carol's Contracting obtained liability insurance for a 2002 Peterbilt Dump with coverage for "Motor Truck Cargo" of up to $5,000.  Foshee Trucking, Inc. was an additional insured. *See* Exhibit I.

41.     On May 14, 2002, Carol's Contracting applied with the State of Alabama Public Service Commission for a certificate as a common carrier of property. [Doc. 83, Exhibit B]

42.     On May 20, 2002, Carol's Contracting was granted a certificate as a common carrier by motor vehicle, in interstate commerce, in the transportation of property (except household goods) between all points in the State of Alabama. *Id.*

43.     While leased to Foshee Trucking, Carol's Contracting hauled all types of freight, such as coal, alloy, corn, bean meal, fertilizer and haz-mat.  Exhibit A at ¶ 17. *See also* Doc. 39, Exhibit F.

44.     Carol Lambert asked her husband Harry Lambert to drive for Carol's Contracting when a regular driver was not available so he obtained a commercial driver's license. Exhibit A at ¶ 18.

45.     Carol's Contracting was not in the sand and gravel business. [Doc. 39, Exhibit F, No. 1]

46.     In June 2002, Harry Lambert personally drove a Carol's Contracting truck—leased to Foshee Trucking, Inc.—to TCC, d/b/a Montgomery Materials, to pick up a load of sand or gravel for a customer of TCC, d/b/a Montgomery Materials.

[Doc. 39, Exhibit F]  Employees of TCC, f/k/a Montgomery Materials, noted at the time that Lambert was now driving a truck hauling sand or gravel for a common carrier and said nothing about it. *See* Dep. of Danny Luster: Exhibit F at pg. 23:6-29:21.  Lambert was embarrassed to be seen driving a truck in June 2002 to pick up a load at Montgomery Materials—now operated by TCC—by some of his former Montgomery Materials employees.  Exhibit A at ¶ 18. The job had been dispatched by Foshee Trucking.  Exhibit A at ¶ 18. Lambert was picking up a load for a customer of Foshee Trucking who wanted sand or gravel they had purchased from TCC. Exhibit A at ¶ 18. Several TCC employees saw Lambert as he made no attempt to hide that he was a part-time truck driver. Exhibit A at ¶ 18.

47.    Lambert had no idea anyone would contend that was somehow a violation of his non-compete. Exhibit A at ¶ 18.  No one at TCC ever said anything to Lambert about it at all. Exhibit A at ¶ 18.

48.    Prior to filing suit in October 2005, no one from TCC ever complained to Carol Lambert about Harry Lambert driving one of the Carol's Contracting trucks. [Doc. 39, Exhibit F]

49.    Lambert's ability to drive trucks on occasion for his wife's company was curtailed by his contracting bladder cancer.  Exhibit A at ¶ 19. *See also* Doc. 39, Exhibit F.

50.    The provisions of the Agreement prohibited engaging in the sand and gravel business in a territory designated to be 60 miles from Montgomery. [Doc. 77, Exhibit A ¶ 8.1]  On two occasions Lambert served as a consultant for companies located outside that territory.  Exhibit A at ¶ 20.  Once he was hired to assess the value of a deposit of gravel that was being condemned. *Id.* The other time was in late December 2004 or early January 2005 when he was contacted by Robert Alexander of Georgia to look at a plant in Gadsden that Alexander was considering purchasing. Exhibit A at ¶ 21 and Exhibit B at 94:20-95:14 & 123:18-21. The plant was old and would have needed a lot of work to become productive.  Exhibit A at ¶ 21. As part of his consulting for Alexander in north Alabama Lambert recommended several persons he already knew who he thought could provide the materials and services he would need to get the plant up and running if Alexander purchased it.  For example, Lambert recommended Sam Estock, Alan King and others whom he had known for years. Exhibit A at ¶ 22 and Exhibit B at pgs 112:2-8 and 115:3-14.  Lambert also introduced Alexander to Mike Gentry, who was in the ready-mix business in Prattville; because Lambert knew Gentry had some used equipment that Alexander could use at the Gadsden plant. Exhibit A at ¶ 22 and Exhibit B at pg. 122:21-123:16.  As it turns out, however, Alexander never bought the Gadsden plant. Exhibit A at ¶ 23 and Exhibit B at pg. at 112:11.

51.    Although Alexander decided not to buy the facility in North Alabama, he later would contact King, Estock and Gentry relating to the operations of Alabama Gravel LLC (hereinafter "Alabama Gravel"). [Doc. 83, Exhibits G & F] and Aff. of Sam Estock: Exhibit D.  *See also* ¶ 63 *infra*.

52.    David Tuten is a resident of Ohio who worked as a purchasing agent for Globe Metallurgical, Inc. (hereinafter "Globe") in Ohio between 1985 and 2003. *See* Dep. of Dave Tuten: Exhibit G at pgs. 6:22-9:3, 10:8 & 16:8.    Globe is a manufacturer of ferroalloys.  *Id*. at 10:16-23.

53.    In 1987 or 1988 Tuten, then acting as purchasing manager for Globe, met Harry Lambert as a potential supplier of raw material. Exhibit G at pg. 13:12-20. Globe began purchasing material from Lambert in 1987 before Montgomery Materials was ever formed. Exhibit G at pg. 17:23-18:1.  Globe purchased oversize gravel from Montgomery Materials.  *Id.* at pg. 29:5-23.  Globe also purchased from TCC.  *Id*. at pg. 30:10-18.   In fact, there was a problem with TCC because it required Globe to buy brown gravel to get white oversized gravel.  *Id*. pg. 32:3-12. TCC was Globe's least favorite supplier because of the stipulations TCC placed on purchases of white oversize gravel.   *Id*. at pg. 261:8-20.

54.    While Tuten was at Globe, Lambert left Montgomery Materials and advised Tuten that he could not go into the sand and gravel business.  Exhibit G at pg. 42:3-8. Tuten left Globe when it went bankrupt in April 2003. *Id*. at pg. 23:1-4.

55.    After leaving Globe in 2003, Tuten formed a consulting company and did work for Simcala, Inc. (hereinafter "Simcala"). Exhibit G at pg. 53:6-12. *See also* ¶ 59 *infra*. As such, Tuten was asked for assistance in locating suppliers of white oversize gravel for Simcala. Exhibit G at pg. 59:1-7. Simcala is a company located in Mt. Meigs, Alabama, which purchases substantial quantities of oversize gravel for use in the manufacture of silicon metal. [Doc. 47, Exhibit C, ¶ 2] Gravel is an essential raw material in the manufacture of silicon metal and Simcala must have access to a steady supply of oversize gravel for continuous smelting operations. *Id*.

56.    As a consultant to Simcala, Tuten learned that Simcala was having problems with TCC material from a quantity and quality standpoint. *Id.* at pgs. 63:2-65:21.

57.    Because of the situation at Simcala running out of white oversize gravel Tuten became interested in getting into the gravel business in this area. Exhibit G at pg. 61:5-17. Lambert was not Tuten's source for the information about problems Simcala was having obtaining white oversize gravel from TCC. *Id*. at pg. 262:18-20. However, Tuten mentioned this to Lambert and Lambert, who had been consulting for Robert Alexander in north Alabama, put Tuten in touch with Alexander. *Id*. Lambert told Tuten that he, Lambert, still could not go into the business. *Id*. at pg. 71:12-72:15. There never was any discussion of any role for Lambert in any new business. *Id*. pg. 84:9-21. Lambert was asked also for and

gave a recommendation for Rex Dassinger as a person who could run an operation on a day-to-day basis.  *Id*. pg. 91:2-16.

58.    As one of the founders of Alabama Gravel in 2005, Tuten was aware that the company was using Carol's Contracting to haul material to customers and that Harry Lambert was driving trucks for Carol's Contracting and he thought nothing of it, even though Lambert had told him Lambert could not go into the sand and gravel business. Exhibit G at pgs. 48:23-50:3. As a person knowledgeable concerning gravel purchases for Globe, Tuten considers the hauling of freight to be a completely separate business from the sand and gravel business. Exhibit G at pg 44:16-23 & pg. 45:7-13.

59.    Richard Wymer is the Purchasing Manager for Simcala. [Doc. 47, Exhibit C, ¶ 1] Prior to 2005, he ordered large quantities of oversize gravel from TCC.  About half of Simcala's purchases from TCC came from a pit in Montgomery and the other half from a TCC pit in Phenix City, Alabama. [Doc. 47, Exhibit C, ¶ 3]

60.    On January 4, 2005, a representative of TCC called Wymer and advised him that TCC was running extremely low on oversize gravel from the pit in Montgomery which was the only TCC pit producing high quality white oversize gravel. [Doc. 47, Exhibit C, ¶ 4]  Wymer was told that TCC would be shipping only 500 tons of oversize gravel from that plant for the foreseeable future as opposed to the 2,000 tons that had been coming from that location. *Id*.

61.    As a result of this, Wymer felt it was essential to find additional suppliers of oversize gravel in the event TCC could not meet Simcala's needs. [Doc. 47, Exhibit C, ¶ 5]  Wymer asked Lambert if he knew anyone Simcala could obtain white oversize gravel from.  Lambert said he could not go into the business but would see if he could find someone. *Id*. and Exhibit A at ¶ 24.

62.    Later, Wymer received a call from Robert Alexander who was considering starting a new gravel operation in the area. [Doc. 47, Exhibit C, ¶ 5]

63.    Alabama Gravel was organized March 24, 2005. [Doc. 47, ¶ 7]   The principals are Robert Alexander, David Tuten and Rex Dassinger.   [Doc. 47, Exhibit A, ¶ 2]  Lambert had no interest in Alabama Gravel and received no compensation from Alabama Gravel during the term of the non-compete agreement. *Id*. ¶ 4.  *See also* Exhibit A at ¶ 25.

64.    Richard Wymer of Simcala negotiated with Alexander for Alabama Gravel to provide oversize gravel to the Simcala plant in Mt. Meigs, beginning in April 2005.  [Doc. 47, Exhibit C, ¶ 5] Wymer made the unilateral decision to seek out other suppliers, including Alabama Gravel, when he received information which led him to believe that Foley Materials might be unable to supply Simcala with adequate quantities of suitable oversize gravel. *Id*. ¶ 7.

65.    Mike Gentry is the president and owner of Gentry Ready Mix, a ready-mix concrete company. [Doc. 83, Exhibit F, pg. 1]  He is also the owner of a pit mine

on property in Independence, Alabama (hereinafter the "Gentry Pit".) According to Gentry, he dealt with Robert Alexander to reach an agreement whereby Alabama Gravel would mine his pit and take the white oversize gravel and leave him the sand for his concrete business. *Id.* pg. 2. Harry Lambert did not negotiate that deal or participate in the negotiations. *Id.*

66.    At that time Gentry would not have been inclined to do business with Foley or TCC as they were direct competitors of his in the concrete business. [Doc. 83, Exhibit F, pg. 3]

67.    On April 1, 2005, TCC transferred its assets to Foley Materials Company ("Foley Materials"). [Doc. 39, Exhibit D] Since that date, TCC has operated solely as a holding company. [Doc. 39, Exhibit C, 14:16-15:4; 21:10-21:16]

68.    Foley Materials has never been certified to conduct business as a common carrier in Alabama by the Alabama Public Service Commission. [Doc. 83, Exhibit K]

69.    On April 1, 2005, Carol's Contracting removed its trucks from contract hauler leasing programs and began to haul under its own authority. [Doc. 39, Exhibit F]

70.    On April 5, 2005, Carol Lambert was hired as bookkeeper for Alabama Gravel. [Doc. 39, Exhibit F]  She was offered the position at a salary slightly higher than what she had made three years earlier with Montgomery Materials but

with no medical or other benefits that had been provided by Montgomery Materials. *Id.*

71.    One of the incentives for Carol Lambert in taking the job was that Alabama Gravel leased a small apartment and maintenance shop a few hundred feet from her home in Deatsville for $1,000 per month.  [Doc. 39, Exhibit F] The property has been in her name since 2000. [Doc. 71 at pg. 5, fn. 3]

72.    On April 8, 2005, a representative of Foley Materials visited Richard Wymer at Simcala and advised him that even the Foley Materials Phenix City plant was going to reduce shipments to Simcala. [Doc. 47, Exhibit C, ¶ 4]  Subsequent conversations between Wymer and representatives of Foley Materials during the spring and summer of 2005 indicated to Wymer that Foley Materials had only a small amount of acceptable oversize gravel available for purchase and that the prices would be much higher than they had been in the past. *Id.* ¶ 6.

73.    Alabama Gravel began gravel mining operations in Independence Alabama in April 2005. [Doc. 39, Exhibit G, No. 1] Alabama Gravel made its first shipment of white oversize gravel on or about April 10, 2005. [Doc. 47, ¶ 8]

74.    Carol's Contracting only hauled white oversize gravel from Alabama Gravel to Simcala, Maddox Stone and Globe Metallurgical, Inc. during the times pertinent. [Doc. 51, Exhibit C: No. 14 on pg. 12 of 15].

75.    According to records produced by TCC, the only common customers of Foley Materials and Alabama Gravel were Simcala, Inc. and Globe Metallurgical, Inc.  Aff. of Paul Fields: Exhibit E at ¶ 2. Neither Simcala, Inc. nor Maddox Stone & Gravel had ever been customers of Montgomery Materials. Exhibit A at ¶ 9 and [Doc. 83, Exhibit C]

76.    The sales level of white oversize gravel by TCC in the three months prior to April 2005 was approximately the same as during the month of April 2005 and does not indicate a downturn in sales levels that one would expect to see if Alabama Gravel sales were replacing Foley Materials sales.  Aff. of Paul Fields: Exhibit E at ¶ 1.

77.    Based upon a review of records produced by TCC, there has been no significant change in sales of white oversize gravel to Globe from Foley Materials during the period April 1, 2005 through December 31, 2005.  *Id*. at ¶ 4.

78.    There does not appear from a forensic accounting standpoint to be any loss to Foley Materials resulting from sales of Alabama Gravel to Globe. Attributing any losses to Foley Materials caused by Alabama Gravel sales to Globe would be, from a forensic accounting standpoint, highly speculative.  *Id.* at ¶ 7.

79.    Effective May 1, 2005, TCC transferred its Alabama Department of Environmental Management Pollutant Discharge Permit in this area to Foley Materials.  [Doc. 83, Exhibit A] ADEM permits are indicia of engaging in the sand

and gravel business. 33 U.S.C. §§ 1251-1378 (Federal Water Pollution Control Act) and ALA. CODE §§ 22-22-1 to 14 (Alabama Water Pollution Control Act).

80.     Maddox Stone & Gravel, LLC ("Maddox Stone") is a broker in the sand and gravel business in Valdosta, Georgia. [Doc. 83, Exhibit D, pg. 1] It has never purchased sand or gravel from Lambert.   *Id*. It hires commercial trucking companies, like Carol's Contracting, to haul materials. *Id*.  It was never a customer of Montgomery Materials.  *Id*. pg. 3.

81.     Maddox Stone became a customer of Alabama Gravel in 2005 because it was looking for additional suppliers of oversize gravel when it was unable to buy white oversize gravel from TCC and another supplier in the area.   [Doc. 83, Exhibit D, pg. 2].

82.     Jim Maddox, the owner of Maddox Stone, worked for Lambert in the early '90s and considers Harry to be a personal friend.  [Doc. 83, Exhibit D, pgs. 2-3] While passing through Montgomery he made a social call on Harry and Carol Lambert. *Id*. During the discussion Maddox explained that he was unable to find white oversize gravel and asked if Lambert knew where he could buy some. *Id*. pg. 3. According to Maddox, Lambert suggested three possible suppliers including Alabama Gravel. *Id*. Maddox had already eliminated two of the suppliers and asked directions to Alabama Gravel at the Gentry Pit.  *Id*. The next day Maddox

spoke with Robert Alexander of Alabama Gravel and made arrangements to purchase white oversize gravel. *Id.*

83.    During these discussions Jim Maddox was aware that Lambert was under a non-compete since leaving Montgomery Materials and Maddox did not consider his discussions with Lambert to involve Lambert conducting sand and gravel business.  [Doc. 83, Exhibit D, pg. 3]

84.    After making a deal with Alexander at Alabama Gravel, Maddox contacted Carol Lambert to get a price and to make arrangements for hauling white oversize gravel to a railroad siding in Montgomery. *Id.*

85.    Randy Willingham is the owner and president of Willingham Stone Company in Georgia.  He is also a part owner of Agg-Tran LLC and Sand Rock Transit, Inc. [Doc. 83, Exhibit E, pg. 1]

86.    Willingham Stone has never purchased sand or gravel from Lambert or Alabama Gravel. *Id.* at 1 & 3.  Lambert has not acted as a broker, agent or salesman for Willingham Stone. *Id.* pg. 2.

87.    When approached by Foley to sign a contract to buy sand from Foley Materials for the next several years Willingham declined the offer only because he would not sign such a contract with anyone because he has never signed a purchase agreement for sand and gravel. [Doc. 83, Exhibit E, pg. 3] Lambert had nothing to do with Willingham's decision. *Id.*

88.    Carol Lambert has undergone terrible depression and uncontrolled crying as the result of the claims of TCC against her company.  [Doc. 39, Exhibit F]

89.    Harry Lambert has had difficulty re-entering the sand and gravel business in this territory because of the drain on his cash caused by defending this case and due to the perception that anyone who deals with him will be sued by Foley or TCC. Exhibit A at ¶ 29.

90.    Between April 2002 and January 2006, Lambert has held no interest of any kind in any sand and gravel business.  [Doc. 39, Exhibit D, No. 2] Between April 2002 and January 2006, Lambert has not engaged in the sand and gravel business. *Id.* No. 14 and Exhibit A at ¶ 26.

91.    Lambert has testified that he did not violate any of the terms of the non-compete agreement as he understood them.  Exhibit B at 59:7-63:16 & 73:10-74:11. and Exhibit A at ¶¶ 26, 27 and 28.

92.    Lambert did not consider Carol's Contracting to be in the sand and gravel business and did not consider driving for them to be engaging in the sand and gravel business.  Exhibit B at 80:3-10.

93.    On April 10, 2006, Lambert entered into a consulting agreement with Alabama Gravel relating to the construction of a new gravel pit in Deatsville, Alabama (hereinafter the "Deatsville Pit"). [Doc. 51, Exhibit D]  Prior to that time Lambert had not been a member or employee of Alabama Gravel and had not

received any payment or compensation from Alabama Gravel.  [Doc. 47, Exhibit A ¶ 4]  No commissions were paid or discussed for anything Lambert did.  Exhibit G at pg. 176:4-19.

94.    Other than the consulting work mentioned above, Lambert received no payments for any work done during the term of the non-compete.  Exhibit A ¶ 25.

95.    The Deatsville Pit lease was obtained by Rex Dasinger.  Exhibit G at pg. 101:15-102:10.

96.    Allen King is a self-employed electrical contractor who does contracting for various sand and gravel mining operations.  [Doc. 83, Exhibit G, pg. 1]  He was hired by Robert Alexander and Rex Dasinger of Alabama Gravel to build a sand and gravel plant in Deatsville, Alabama.  Prior to 2006, Lambert was not involved in the construction of the Deatsville, Alabama plant for Alabama Gravel. *Id*.

97.    Lambert was not involved in the construction of the Deatsville Plant for Alabama Gravel prior to the consulting agreement in April 2006. Exhibit B at 102:5-20.

## II.

## Statement of the Case

1.    This cause was filed October 25, 2005. [Doc. 1]  The sole plaintiff in the case is TCC.  In the complaint TCC alleged breach of contract, tortious interference with contractual and business relations, and conspiracy.    The

defendants were Alabama Gravel, a company in the gravel business, Carol's Contracting, a commercial trucking company, and Lambert, an individual.

2.      MMC Holdings was not named as a party.

3.      TCC's claims are based upon a non-competition agreement which is void under Alabama law unless it meets certain statutory criteria.  See ALA. CODE 8-1-1(a).  The provision was part of a buy-sell agreement triggered by TCC which required MMC Holdings to sell its interest in Montgomery Materials.  The five-year prohibition applicable to Lambert expired of its own terms January 2, 2006.

4.      Lambert filed an answer and counterclaim on November 23, 2005. [Doc. 12] Count One of the Counterclaim sought the following relief:

> a. The Non-Competition Provisions of the June 10, 1997, buy-sell agreement had already expired as the five-year period was unconscionable;
>
> b. The Non-Competition Provisions of the June 10, 1997, buy-sell agreement could not be enforced to prevent Lambert from driving a truck for Carol's Contracting, Inc.; and
>
> c. Lambert was entitled to attorney's fees and costs of suit.

5.      TCC answered the counterclaim on December 8, 2005, denying all allegations thereof [Doc. 13].

6.    On January 20, 2006, Lambert amended his counterclaim to seek the following relief under Count Two:  A declaratory judgment that:

    a.  The non-compete provisions of the agreement expired January 2, 2006;

    b.  After January 2, 2006, Lambert was free to engage in the gravel business in competition with TCC;

    c.  After January 2, 2006, Lambert may enter into a business relationship with any competitor of TCC, including but not limited to, Alabama Gravel;

    d.  That TCC may not utilize this litigation to interfere with competitive activities of Lambert after January 2, 2006;

    e.  That TCC may not utilize activities of Lambert after January 2, 2006 to attempt to prove liability or damages relating to conduct prior to January 2, 2006; and

    f.  That Lambert is entitled to attorney's fees and costs of suit per the terms of the non-compete agreement. [Doc. 25]

7.    TCC answered the amended counterclaim on January 30, 2006. [Doc. 27]

8.    On February 3, 2006, Lambert filed a motion for judgment on the pleadings finding that the non-compete provision expired of its own terms effective January 2, 2006. [Doc. 28]

9.     On February 6, 2006, Lambert filed a notice that the motion for judgment on the pleadings had been resolved by TCC's agreement that the non-compete/non-solicitation provision expired January 2, 2006. [Doc. 29, ¶ 3]

10.     On April 27, 2006, Lambert filed his first motion for summary judgment. [Doc. 39]  The motion seeks a ruling that:

    a.  TCC does not have standing to enforce the non-compete agreement after transferring its assets and interests in the sand and gravel business to Foley Materials effective April 1, 2005;

    b.  That TCC is estopped from pursuing claims against Lambert because the non-compete provisions were not mutually binding at the time suit was filed; and

    c.  Lambert was entitled to a judgment as a matter of law as to any damages arising after April 1, 2005 because TCC was no longer engaged in a similar business as required by Ala. Code 1975 § 8-1-1.

11.     That same date, Carol's Contracting filed its first motion for summary judgment. [Doc. 41]  That motion sought a ruling that the conspiracy claims of TCC also failed because TCC transferred its assets to Foley Materials on April 1, 2005.

12.     On May 2, 2006, this court ordered both motions submitted without oral argument on the briefs and materials filed by May 23, 2006. [Doc. 44].

13.    On May 18, Alabama Gravel filed a motion for summary judgment. [Doc.

47] That motion sought a ruling that it was entitled to summary judgment because:

      a.  It made its first shipment of gravel after April 1, 2005; and

      b.  It did not induce a customer of TCC—Simcala—to purchase less

         gravel from TCC because, in fact, Simcala's decision was made

         because TCC had advised Simcala that it could not supply adequate

         quantities to Simcala.  *Id.* ¶ 8 & 11-12.

14.    TCC filed its response to the defendants' motions on May 23, 2006. [Doc.

49]

15.    On May 30, 2006, the court ordered that the motion of Alabama Gravel

would be deemed submitted on June 7, 2006. [Doc. 50]

16.    TCC filed its response to the Alabama Gravel motion on June 7, 2006. [Doc.

51]

17.    On or about July 11, 2006, Alabama Gravel entered into a release and

settlement agreement with TCC.  [Doc. 74] The terms of the release are general

and release Alabama Gravel "and its successors, assigns, employees, directors,

officers, agents, subsidiaries, affiliated companies, attorneys, members and

representatives from any and all claims, demands, damages, actions, causes of

action, or suits of any kind whatsoever, whether known or unknown, relating to,

arising from or connected in any way with any and all claims which were asserted

or which could have been asserted in the above-styled cause or to any action taken by or on behalf of Alabama Gravel in the prosecution of this action. This release and discharge includes, but is not limited to, any claim, demand, damage, action, cause of action or suit of any kind under the Alabama Litigation Accountability Act and/or Federal Rule of Civil Procedure 11." [Doc. 74] The agreement provided for no payment by Alabama Gravel to TCC. *Id.*

18.    On July 13, 2006, TCC and Alabama Gravel filed a joint stipulation of dismissal. [Doc. 63]

19.    Alabama Gravel was dismissed July 18, 2006. [Doc. 65] That same day the court issued a revised scheduling order setting the cutoff date for dispositive motions for October 27, 2006. [Doc. 66, § 2]

20.    On August 31, 2006, Lambert and Carol's Contracting jointly moved for permission to amend their answers to plead the affirmative defense of release based upon the attached terms of the Settlement Agreement between TCC and Alabama Gravel. [Doc. 74]  The motion was granted September 20, 2006. [Doc. 79]  The amended answers of Lambert and Carol's Contracting were filed that day. [Docs. 80-81]

21.    The time for adding parties by either side has passed. [Doc. 66]

## III.

## Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *see also* Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings. *See* Fed. R. Civ. Pro. 56(e).

The court's role at the summary judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 105 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See* Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

## IV.

## Argument

Defendants would incorporate their arguments on standing and estoppel found in their pending motions for summary judgment establishing that when TCC transferred its sand and gravel assets to Foley Materials April 1, 2005, it lost standing to assert a breach of the non-compete agreement as of the time it filed suit October 25, 2005. [Docs. 39 & 41]. *See also*, Russell v. Birmingham Oxygen Service, Inc., 408 So.2d 90 (Ala. 1981), *cited with approval and explained* Campbell & Sons Oil Company, Inc. v. Murphy Oil USA, Inc., 2000 U.S. Dist. 9196 (N.D. Ala. Jan. 3, 2000). However, there are several additional reasons that this Court should grant summary judgment if TCC is found to have any standing to assert claims under the non-compete. The purpose of this motion is to raise those additional issues within the cutoff date for dispositive motions. These additional grounds essentially go to the enforceability of the non-competition agreement in general and the lack of proximate cause and damages. Additionally, the issue of release recently arose due to the form of the settlement negotiated with Alabama Gravel. Finally, there is an element of unclean hands by TCC to be considered.

## A.

## <u>Agreement Restrictions Exceed Permitted Exceptions of Section 8-1-1</u>

Based upon the undisputed facts established by the Defendants, the non-competition/non-solicitation agreement is unenforceable as to Lambert under Alabama law and it follows that if unenforceable against Lambert, no claims against Carol's Contracting could possibly survive.  A person or entity seeking to enforce a contract that restrains the exercise of a lawful trade or business has the burden of showing that it is not void under ALA. CODE 1975 § 8-1-1. <u>Construction Materials, Inc. v. Kirkpatrick Concrete, Inc.</u>, 631 So. 2d 1006, 1009 (Ala. 1994) and <u>Calhoun v. Brendle, Inc.</u>, 502 So. 2d 689, 693 (Ala. 1986).  Section 8-1-1 expresses the public policy of Alabama disfavoring contracts in restraint of trade; such contracts are disfavored "because they tend not only to deprive the public of efficient service but also ... to impoverish the individual." <u>Construction Materials</u>, 631 So. 2d at 1009 (*quoting* <u>Robinson v. Computer Servicenters, Inc.</u>, 346 So. 2d 940, 943 (Ala. 1977)).  *See also*, <u>Cherry, Bekaert & Holland v. Brown</u>, 582 So. 2d 502, 507 (Ala. 1981). A covenant not to compete that does not fall within the limited exceptions set out by § 8-1-1(b) is void.  <u>Pitney Bowes, Inc. v. Berney Office Solutions</u>, 823 So. 2d 659, 661 (Ala. 2001). *See also* <u>Livingston v. Dobbs</u>, 559 So. 2d 569 (Ala. 1990), and <u>Odess v. Taylor</u>, 282 Ala. 389, 211 So. 2d 805(1968).

Under ALA. CODE 1975 § 8-1-1(a) a non-competition/non-solicitation agreement is void as violating the basic public policy of free competition to the extent it exceeds the narrow exception found in ALA. CODE 1975 § 8-1-1(b). Section (a) plainly says:

> "(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void."

Since the sand and gravel business is certainly a lawful business and the Agreement restrains Lambert from engaging in that business, it is clearly void to the extent it does not come within the exceptions found in subsection (b) which provides:

> "(b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein."

This subsection contains only two exceptions: (1) It allows the enforcement of a non-compete by the "buyer" of a business "so long as the buyer, or any person deriving title to the good will from him…carries on a *like business* [in the territory]" and (2) It allows an employer to require an employee to "refrain from carrying on or engaging in *a similar business* and from soliciting old customers within a specified [territory]."  In this situation only the latter exception could be

asserted by TCC since MMC Holdings—the seller in the buy-sell arrangement—is not a party.

Here TCC wishes to enforce Agreement provisions against a former employee—Lambert—that do not fit within the ex-employee exception of Section 8-1-1(b) in a way that would extend far beyond the limits established by that section. TCC claims that Lambert was prohibited from doing things that would *not* amount to actually engaging in a similar business or soliciting old customers of Montgomery Materials. The business of Montgomery Materials involved the mining and selling of aggregate, mostly sand and gravel sold F.O.B. at its City and Anderson Pits in Montgomery. *See* Part I ¶ 15 *supra*. Prohibiting Lambert from engaging in such activity is the broadest prohibition any non-compete—regardless of its terms—could require (assuming a reasonable time and territory restriction was included). Yet TCC contends that according to the terms of the Agreement's non-compete provisions, TCC could prevent Lambert from "assisting" anyone in the sand and gravel business in any manner (such as by answering a question as to who might be able to provide supplies of gravel) or from "delivering" a load of sand and gravel (for his own use or as the employee of a common carrier) even if such activity was not part of any effort by Lambert to engage in the sand and gravel business in competition with Montgomery Materials. This contention is not consistent with Alabama public policy.

## B.

## Lambert Did Not Engage In the Sand and Gravel Business During The

## Protected Period

There is no evidence that Lambert has engaged in the sand and gravel business or solicited old Montgomery Materials customers during the period of the non-compete. In fact, there is precious little evidence he engaged in any business at all.  Engaging in any "business" infers an intention to generate some income from the effort.  In this context the word business refers to "the occupation, work or trade in which a person is engaged" or "a commercial enterprise or establishment" *See* THE AMERICAN COLLEGE DICTIONARY, pg. 220 (2nd Ed. 1982). One engaging in the sand and gravel business would logically need either to be intending to mine and sell sand and gravel to customers for a profit or intending to work in the business as an occupation, work or trade.  Here, Lambert flatly denies that he ever worked for a sand and gravel company or that he mined or sold sand or gravel during the term of the non-compete. *See* Part I ¶¶ 90 & 91 *supra*. He denies that he generated any income or compensation from doing so and there is no evidence to contradict him. *See* Part I ¶¶ 93 & 94 *supra*. The most TCC can say is that Lambert received some health coverage, a vehicle and a cell phone because he drove a truck for his wife's commercial trucking company that hauled a variety of commodities including sand and gravel. Interestingly, TCC never objected to Lambert driving

leased trucks loaded with *Foley Materials* sand and gravel in 2002 before the formation of Alabama Gravel. *See* Part I ¶¶ 47& 48 *supra*. The truth is that what upset TCC is that after the formation of Alabama Gravel in 2005, Lambert—when his health permitted—occasionally drove a commercial truck containing gravel which had been mined and sold by a true competitor of TCC in the gravel business, namely Alabama Gravel.  Of course, as a non-signatory to the non-compete, Alabama Gravel could not be prohibited by TCC from competing in the gravel business except by TCC alleging some sort of conspiracy with Lambert.  TCC has now voluntarily abandoned that effort by dismissing Alabama Gravel without payment by Alabama Gravel of any damages or settlement amount. *See* Part II ¶¶ 17& 18 *supra*.

## C.

### Trucking Is Not a Similar Business to Sand and Gravel Mining or Selling

Driving a truck loaded with sand or gravel for a common carrier does not amount to engaging in the sand and gravel business. Lambert has never hidden the fact that he occasionally drove a truck for Carol's Contracting when his health permitted. *See* Part I ¶ 46 *supra*. However, the fact that Lambert drove a truck for Carol's Contracting, as a matter of law, does not establish a breach of the non-compete because such conduct does not establish that Lambert was engaging in a similar or like business to that of Montgomery Materials.  In <u>Kershaw v. Knox</u>

Kershaw, Inc., 523 So. 2d 351 (Ala. 1988) the Alabama Supreme Court affirmed a ruling that a company primarily in the business of manufacturing and selling machines used by railroads for maintaining their tracks was not in the same business as a related company which contracted for the maintenance of railroad property although the two businesses involved the same type of machinery. *Id.* at 354. The two companies had actually been formed by the same person and a dispute arose between the sons after the founder's death. *Id.* The two railroad maintenance businesses were more closely related than a general common carrier trucking company would be to a sand and gravel mining operation. Both certainly involve the use of trucks but one business primarily consists of hiring their trucks out to carry loads of various commodities, including sand and gravel, for customers whereas the other primarily mines and markets a commodity and only uses its trucks to haul its own sand and gravel while on its own property.

As a common carrier authorized to haul all types of freight except household goods by the Alabama Public Service Commission, Carol's Contracting was not engaging in a similar business as TCC or Foley Materials, neither of which was ever certified by the Alabama Public Service Commission as a common carrier authorized to haul any type of freight over the roads of Alabama. Although trucking companies haul many types of freight for many types of businesses, the fact that they do so does not mean they are engaging in the business of the

customers whose freight they haul as contemplated by Section 8-1-1.  Carol's Contracting was not engaging in the coal mining business when its trucks hauled coal or the farming business when they hauled fertilizer and neither were its drivers.  Lambert's service as a truck driver or dispatcher for Carol's Contracting, whether or not he was compensated therefor, does not constitute his carrying on or engaging in a similar business as that conducted by Montgomery Materials, n/k/a Foley Materials, *i.e.*, the sand and gravel business.  Therefore, Lambert could not breach the non-compete relating to the sand and gravel business by driving trucks for a commercial common carrier—however loaded—and Carol's Contracting could not wrongfully conspire with Lambert to violate the non-compete by using him to drive trucks as part of a commercial trucking business.  Accordingly, defendants are both entitled to summary judgment as to any claims involving Lambert's service as a truck driver for Carol's Contracting.

### D.

### <u>Consulting Is Not Similar to Mining or Selling Sand and Gravel</u>

Even consulting with companies in the sand and gravel business would not constitute engaging in the sand and gravel business as had Montgomery Materials. The only "business" Lambert actually did during the term of the non-compete was to serve as a consultant for two clients located outside of the protected territory. *See* Part I ¶ 50 *supra*. One of those involved Robert Alexander and his proposed

purchase of a plant in Gadsden, Alabama. *Id*. Even if "consulting" was prohibited by the non-compete, Lambert complied.  However, here TCC apparently will contend—without substantial evidence to support the contention—that Lambert acted as an unpaid consultant for Alabama Gravel with some unwritten understanding that Alabama Gravel would compensate him indirectly through his wife or at some later time.  The problem with this contention is that even if true, it would not constitute Lambert "engaging" in a "similar business" of that as the one Montgomery Materials operated.  Consulting for companies in the sand and gravel business is sufficiently different from engaging in the mining of sand as to not be considered "similar" under Section 8-1-1 just as selling railroad maintenance equipment was considered distinct from renting or using the same equipment in the Kershaw case, *supra*.  Certainly, a different result might occur if the appropriate standard of review was to give non-compete agreements the broadest or most liberal interpretation.  However, it is clear that, under Alabama law, such restrictions are to be strictly construed because they are generally against public policy.  Restrictive covenants in an employment contract which restrict exercise of gainful employment are restraints in trade and will be cautiously considered, carefully scrutinized, looked upon with disfavor, strictly interpreted and reluctantly upheld. Hill v. Rice, 259 Ala. 587, 67 So. 2d 789 (1953).  Essentially, Alabama law only permits TCC the right to prohibit Lambert from starting up another sand

and gravel business in the Montgomery area for a reasonable period of time.  It is absolutely clear that Lambert did not do so during the non-compete period and, accordingly, TCC's unproven "consulting" claims fail as a matter of law.

## E.

### Non-Compete Agreements Cannot Be Enforced Against Spouses

Carol's Contracting should also be dismissed from this case because, under Alabama law, non-competition agreements cannot be enforced against the spouse of a former employee *even if the spouse had signed it*.  In fact, the Alabama Supreme Court has refused to enjoin the wives of the sellers of businesses from directly competing with the businesses their spouses sold when they did not own any part of the business sold.  Livingston v. Dobbs, 559 So. 2d 569 (Ala. 1990). Here, Carol Lambert clearly did not form a sand and gravel business competing with Foley Materials, f/k/a Montgomery Materials.  But even if she had, such action would not have constituted a breach of any non-competition agreement Harry Lambert had individually signed.  Yet, Carol Lambert's trucking company was sued by TCC and TCC has refused numerous requests to voluntarily do the right thing and dismiss Carol's Contracting.  Accordingly, defendants can only ask this Court to rule, as a matter of law, that TCC has no valid claim against a trucking company for hiring/utilizing as a driver a person who had signed a non-compete relating to engaging in the sand and gravel business.

Even if the Court determines that trucking or consulting is similar to mining, it should determine that the restriction does not meet other requirements for enforceability. Under Alabama law, courts should only enforce a covenant not to compete fitting within the exception of Section 8-1-1(b) if the following four additional requirements are met:

1.    The employer has a protectable interest;

2.    The restriction is reasonably related to that interest;

3.    The restriction is reasonable in time and place; and

4.    The restriction will impose no undue hardship on the employee.

Clark v. Liberty Nat'l Life Ins. Co., 592 So. 2d 564, 565-566 (Ala. 1992) *quoting* DeVoe v. Cheatham, 413 So. 2d 1141, 1142 (Ala. 1982).  TCC's claim lacks all of these elements.

## F.

## TCC Had No Protectable Interest

With regard to a protectable interest, defendants would rely upon the pending motions for summary judgment relating to TCC's sale of its aggregates division to Foley Materials as of April 1, 2005.  Whatever protectable interest TCC had in preventing competition from Lambert evaporated when it created a new legal entity to operate the sand and gravel business in this area and became only a

holding company.  However, there are additional reasons TCC had no protectable interest in keeping Lambert for a competitor or as a consultant in this area.

Certainly, TCC had no right to be free from competition in this area in general.  Therefore, in order to have a protectable interest TCC must have a substantial right and a sufficiently unique business to warrant the type of protection contemplated by a non-competition agreement.  Sheffield v. Stoudenmire, 553 So. 2d 125, 126 (Ala. 1989).  Justification must generally be "on the ground that the employer has a legitimate interest in restraining the employee from appropriating valuable trade information and customer relationships to which he has had access in the course of his employment."  RESTATEMENT (SECOND) OF CONTRACTS § 188, Comment b.  Here there is no evidence that Montgomery Materials was a unique type of sand and gravel business. There is no evidence that Lambert appropriated any valuable or unique trade information from Montgomery Materials.  There is no evidence that Lambert could have utilized knowledge or customer relationships that he gained *while working for Montgomery Materials* against that company or its purchaser, TCC.  Indeed, Lambert had been in the sand and gravel business long before his relationships with Foley and TCC and not one of TCC's customers was unknown to Lambert before the Agreement was signed.  *See* Part I ¶¶ 7, 10, 50, 53, & 82 *supra*.

Also Alabama law requires the transfer of the good will of a company to permit the buyer of a company to enforce a non-competition agreement against a former employee of the old company. <u>Gilmore Ford, Inc. v. Turner</u>, 599 So. 2d 29, 31 (Ala. 1992)(affirming summary judgment in favor of sellers of car dealership on finding undisputed evidence that purchaser bought only the sellers' tangible assets, no documents executed in connection with the sale stated that the purchaser was buying the sellers' good will and no value was allocated to good will in the sales documents). Here, a review of the sales documents executed in April 2002 between MMC Holdings and TCC reveals no mention of any transfer of good will and there is no allocation of any purchase amount to good will. *See* Part I ¶ 33 *supra*. Accordingly, TCC never acquired a protectable interest in the good will of Montgomery Materials from MMC Holdings that could be enforced against former employees of Montgomery Materials such as Lambert.

Additionally, enforcement of a covenant not to compete is unfair when the employer discharges the employee as was the case here as opposed to voluntarily leaving with valuable and confidential information gained through employment. Although Alabama courts have not specifically addressed the issue, the Alabama Supreme Court has clearly refused to enforce covenants where the employer intended to discharge the employee at the time the covenant was executed. <u>Robinson v. Computer Servicenters</u>, 346 So. 2d 940 (Ala. 1977).

# G.

## Agreement Provisions Were Not Reasonably Related To Protectable Interests of TCC

But assuming TCC still had a protectable interest in keeping Lambert out of the sand and gravel business in this area when it filed suit, the non-compete provisions in the Agreement are void because they are not reasonably related to those interests because the provisions of the agreement prohibit more than engaging in the sand and gravel business in this area. TCC argues the Agreement even prohibits "delivering" aggregate in the territory[1]! [Doc. 1-2, § 8.3(1)] Furthermore, TCC argues the Agreement also prohibits Lambert from "acting as an agent, broker, or distributor for or advisor or consultant to" any company in the sand and gravel business in the area. [Doc. 1-2, § 8.3(2)] Again, prohibiting Lambert from earning a living as a consultant is beyond the scope of any protectable interest TCC may have had because TCC has no right or protectable interest in suppressing Lambert's pre-employment general knowledge of the sand and gravel business kept from existing competitors of TCC in this area. Again, while protecting competitively sensitive information and customers TCC exposed to Lambert may be a protectable interest, prohibiting Lambert from using the

---

[1] Even if the provision were enforceable, the scope of this provision should be limited to prohibit "delivery" of aggregate only in the context of selling aggregate at wholesale or retail which Lambert and Carol's Contracting did not do.

experience he had gathered prior to working for Montgomery Materials to assist other competitors of TCC is not protectable. Furthermore, TCC does not have a legally protectable interest in prohibiting Lambert from responding to questions from purchasers of sand and gravel about potential sources of gravel (such as Simcala) or from referring persons wanting to go into the business (such as Dave Tuten) to others (such as Robert Alexander) after he had undisputedly advised all of them he could not go into the sand and gravel business himself. *See, e.g.,* Part I ¶¶ 58 & 60 *supra*.

## H.

### <u>Non-Compete Term of Five Years Was Unreasonable</u>

The restrictions on Lambert were also unreasonable as to duration. Five year restrictions have been considered too long by several Alabama courts. *See* <u>Sheffield</u> and <u>Calhoun</u>, *supra*. *See also*, <u>Mason Corp. v. Kennedy</u>, 286 Ala. 639, 244 So. 2d 585 (1971). This is true especially when the information obtained by the employee was not sufficiently substantial or unique to be protectable and the hardship on the employee was great. *Id*. Even very short restrictions—such as six months—have been declared unreasonable under similar circumstances. <u>Birmingham Television Corp. v. DeRamus</u>, 502 So. 2d 761 (Ala. Civ. App. 1986). *See also*, <u>Blalock v. Perfect Subscription</u>, 458 F. Supp. 123 (S.D. Ala. 1978), *aff'd*, 599 F.2d 743 (5th Cir. 1979)(120 day covenant against magazine salesman against

public policy and not within exceptions).  Under these undisputed facts, five years was unreasonable as a matter of law.  Since Alabama Gravel, the only alleged company to have caused TCC a loss of business (an allegation itself which is not supported by the evidence[2]), was formed seven months before the end of the five year term, any significant reduction in the length of the covenant would eliminate the only period TCC even alleges to have incurred damage.

## I.

## Non-Compete Restrictions Caused Undue Hardship on Lambert

The restrictions on Lambert set forth in the Agreement would have been expected to and have indeed caused undue hardship upon former employee Lambert.  Here, TCC attempts to restrict Lambert from engaging in the "only trade he [knew] and by which he [could] support himself." *See* Chavers v. Copy Products Co., 519 So. 2d 942, 945 (Ala. 1988). As stated in Hill v. Rice, 259 Ala. 587, 67 So. 2d 789 (1953), undue hardship exists when a restriction "imposed on the employee [a] greater restraint than is reasonably necessary to secure to the business of the employer . . . such protection, regard being had to the injury which may result to the public from restraining the breach of the covenant, in the loss of the employee's service and skill and the danger of his becoming a charge of the public." *Hill*, 249 Ala. 592-93, 67 So. 2d at 794.  For example, the Alabama

---

[2] *See* Part IV, Section L, *infra*.

Supreme Court has found that a 5-year, 50-mile covenant would impose an undue hardship on an insurance agent who is "50 years old, married and possesses significant financial obligations." Sheffield v. Stoudemire, 553 So. 2d 125, 127 (Ala. 1989). *See also*, Calhoun v. Brendle, Inc., 502 So. 2d 689 (Ala. 1986)(holding that covenant could not be enforced against an employee who was trained and had experience only in the business prohibited). Additionally, courts in Alabama are reluctant to enforce covenants when the employment lasted for only a brief period. *See, e.g.*, Sheffield, *supra* and 1 Malsberger, COVENANTS NOT TO COMPETE: A STATE-BY-STATE SURVEY, pg. 120 (3rd Ed. 2001). Here, Lambert's employment lasted only about three years before TCC invoked the buy-sell provision. At the time of the covenant he was over 50-years-old and the sand and gravel business was his only real marketable skill. *See* Part I ¶ 7 *supra*. At the time the buy-sell was invoked he was over 54-years-old and had spent his time loyally trying to increase the value of Montgomery Materials. During the term of the non-compete Lambert contracted bladder cancer which limited his ability to even drive trucks. *See* Part I ¶ 49 *supra*. Accordingly, enforcement of a prohibition from engaging in the only employment he really knew for five years was unreasonable and unenforceable.

## J.

## TCC Has Unclean Hands

Even if enforceable on their face, the terms of the Agreement cannot be enforced by TCC because it has unclean hands. It is an old principle that one seeking equity must come to the court with clean hands. Harton v. Little, 188 Ala. 640, 65 So. 951 (Ala. 1914). It is similar to the doctrine of equitable estoppel which prevents a party from asserting contractual rights when its own conduct renders the assertion of such rights contrary to equity and good conscience. Mazer to Jackson Ins. Agency, 340 So. 2d 770 (Ala. 1976). Here, it is undisputed that beginning in 1997 MMC Holdings, Lambert, Foley and TCC contractually agreed not to compete with Montgomery Materials. *See* Part I ¶ 12 *supra*. Yet, unbeknownst to Lambert, TCC blatantly breached the non-competition agreement prior to the termination of Lambert by making a direct loan to a competitor of Montgomery Materials which included a supply agreement whereby TCC bought gravel from the competitor at a reduced price. *See* Part I ¶ 27. One can only imagine what TCC would allege if Lambert had made a $100,000 loan to Alabama Gravel or its founders during the term of the non-compete. There are only two conclusions one can reach from this conduct: (1) TCC apparently interprets the Agreement to allow the making of loans to competitors of Montgomery Materials while not allowing a former employee to drive a truck for a commercial trucking

company hauling for customers of a competitor of the company formerly known as Montgomery Materials; or (2) TCC blatantly violated the terms of the Agreement and now seeks enforcement of that Agreement to an extent far beyond that which it was willing to follow. Either way, this Court, doing equity, should not countenance the conduct of TCC and should grant summary judgment for the defendants.

## K.

## Terms of General Release Apply to Defendants If TCC Allegations Are True

If Lambert or Carol's Contracting were indeed improperly acting as agents, servants or employees of Alabama Gravel, as TCC would have this court believe, then Lambert and Carol's Contracting would be entitled to dismissal under the terms of the general release signed by TCC in June of 2006. The terms of the release do not reserve any claims against Lambert or Carol's Contracting and generally release Alabama Gravel

> "and its successors, assigns, employees, directors, officers, agents, subsidiaries, affiliated companies, attorneys, members and representatives from any and all claims, demands, damages, actions, causes of action, or suits of any kind whatsoever, whether known or unknown, relating to, arising from or connected in any way with any and all claims which were asserted or which could have been asserted in the above-styled cause or to any action taken by or on behalf of Alabama Gravel in the prosecution of this action." [Doc. 74]

TCC cannot on the one hand claim that the defendants were undisclosed agents of Alabama Gravel and on the other deny that they have released agents of Alabama Gravel, known or unknown.

## L.

### TCC Damages Are Speculative

In addition to all of the problems with establishing liability that defendants have previously discussed, TCC has a serious problem with being able to prove legal damages caused by any alleged wrongful actions of the defendants.  "In a breach of contract action, the ordinary measure of damages is 'an amount sufficient to return the plaintiff to the position he would have occupied had the breach not occurred.'" Clark v. Liberty Nat'l Life Ins. Co., 592 So. 2d 564, 567 (Ala. 1992)(quoting Aldridge v. Dolbeer, 567 So. 2d 1267, 1269 (Ala. 1990)). While nominal damages may be available in the absence of compensatory damages, TCC can show no compensatory damages from any alleged breach of the enforceable provisions of the Agreement.  TCC simply cannot recover compensatory damages if Foley Materials lost no sales or if the sales lost were not the result of Lambert's engaging in the sand and gravel business or soliciting old customers of Montgomery Materials for loses of sales to Foley Materials. Here, defendants have put forth evidence establishing that: (1) In 2005 TCC was representing that it did not have enough white oversize gravel to accommodate its customers' needs; and

(2) TCC and Foley Material's sales of white oversize gravel in 2005 were not affected by sales by Alabama Gravel because TCC was able to sell all it could produce. From an accounting standpoint, TCC records do not establish any lost sales due to the competition from Alabama Gravel. As Paul Fields, a local CPA, has concluded, any claim that TCC or Foley Materials lost sales of oversize white gravel due to the entry of Alabama Gravel into the market would be speculative. *See* Part I ¶¶ 76, 77 & 78 *supra*.

Furthermore, TCC cannot show that Alabama Gravel—or a similar competitor—would not have formed but for the alleged breach of Lambert. Given that TCC took actions which generated fears in customers needing white oversize gravel, it is no surprise that the evidence submitted by defendants is overwhelming that buyers like Simcala and Maddox were scrambling to find new sources of metallurgical grade gravel. *See* Part I ¶¶ 60, 61& 72 *supra*. It is also undisputed that this unmet need was known by many people, especially by Simcala consultant David Tuten and that this knowledge was gained independently of any dealings with Lambert. *See* Part I ¶ 57 *supra*. It is basic economic theory that when a company like TCC approaches monopolization of a scarce commodity for which demand is high it will begin to increase prices as TCC told Simcala would be the case. It follows that eventually competitors will enter the market when the price reaches a level to overcome the barriers to entry into the market. Here, we know

that the Gentry Pit containing white oversize was controlled by a competitor of TCC who would not have allowed TCC to mine and that there were persons—like Robert Alexander and David Tuten—who had the resources to put the Gentry Pit into operation. For TCC to say that no-one would have entered the market under the circumstances existing in 2005 is speculative folly.  Accordingly, defendants are entitled to summary judgment as to any TCC claims for compensatory damages.

## V.

### Conclusion

TCC's claims against the defendants have numerous fatal flaws as to liability and damages.  It appears that this action is nothing more than a calculated method of delaying or suppressing competition from a former employee after the term of a non-compete/non-solicitation agreement has expired. *See* Exhibit A at ¶ 29. Defendants pray that this Court will halt TCC's efforts to oppress Harry and Carol Lambert by litigation.  Defendants respectfully request that this Court grant them summary judgment pursuant to their pending motions.

Respectfully submitted this 24th day of October 2006.

_/s/ Dennis R. Bailey_____
Dennis R. Bailey
Bethany L. Bolger
Attorneys for Defendant Harry E. Lambert
and Carol's Contracting, Inc.

Of counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama   36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rsjg.com (e-mail)
bbolger@rsjg.com (e-mail)

CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing pleading through the ECMF system on this the 24th day of October 2006 which will forward same to:

Robin G. Laurie, Esq.
Griffin Lane Knight, Esq.
Balch & Bingham, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Alabama   36104-3515

Thomas Gristina, Esq.
William Leonard Tucker, Esq.
Page, Scrantom, Sprouse, Tucker & Ford
Synovus Center, Third
1111 Bay Avenue
Columbus, Georgia   31901

_/s/ Dennis R. Bailey_____
Of                                                  counsel