THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2007 FEB 23 A 11: 14

THE CONCRETE COMPANY,

Plaintiff,

v.

HARRY E. LAMBERT, CAROL'S CONTRACTING, INC. and ALABAMA GRAVEL, LLC,

Defendants.

Case No.: 2:05-cv-01026-CSC

**BRIEF IN OPPOSITION TO DEFENDANTS' JOINT SUMMARY JUDGMENT MOTION**[1]

**-- INTRODUCTION --**

The facts of this case inescapably demonstrate that Defendant Harry Lambert, in conspiracy with Defendant Carol's Contracting, Inc. ("CCI"), spearheaded the formation of a vertically integrated sand and gravel mining, distributing and sales operation in violation of Lambert's non-compete agreement with Plaintiff The Concrete Company ("TCC"). Defendants' joint summary judgment motion is a baseless effort to avoid their clear liability for these actions.

[1] Harry Lambert and Carol's Contracting, Inc. filed two previous summary judgment motions [Docs. ##39 & 41]. This Court's November 15, 2006 Order [Doc. #92] denied those motions as moot with the understanding that, in evaluating Defendants' joint motion, the Court will incorporate and consider the issues, arguments and evidence submitted in support of Defendants' prior motions as well as the arguments and evidence submitted in opposition thereto. This opposition, therefore, also addresses and refutes the arguments and evidence Defendants submitted in support of their two earlier motions. It also incorporates by reference the Opposition to Defendants Harry Lambert's and Carol's Contracting's Summary Judgment Motions [Doc. #49], Plaintiff's Opposition and Motion to Strike in Response to Defendants Harry E. Lambert's and Carol's Contracting, Inc.'s Second Motion for Protective Order and Supplementation of Brief in Support of Motion for Summary Judgment [Doc. # 61] and the evidence and oral argument proffered to date in opposition to Defendants' prior summary judgment motions.

Defendants' "version" of events and take on the law is simply untrue and inaccurate and is contradicted by overwhelming evidence demonstrating, in summary, the following.

Immediately after the non-compete between Lambert and TCC was triggered in April 2002, Lambert's wife, Carol, formed CCI, a trucking company delivering sand, gravel and other materials. Up to that point, Mrs. Lambert's work experience was as a bookkeeper. Lambert, therefore, who had extensive experience in the sand and gravel business, including mining, sales and delivery, began driving trucks for CCI. He coordinated deliveries for CCI drivers to CCI customers and handled CCI truck maintenance issues. Lambert tries to justify this breach of his non-compete with the claim that he was not "paid" for his work other than being provided food and a place to live. This is in fact compensation. Lambert was also compensated with health insurance, workman's compensation benefits, a cellular telephone and a company vehicle. Lambert was also the beneficiary of Mrs. Lambert's CCI draw during the duration of the non-compete on hundreds of thousands of dollars of CCI delivery charges.

Furthermore, Lambert's involvement in aggregate delivery kept him informed as to the status of the aggregate market in the Montgomery area – the area covered by his non-compete. His contact with the market was so close that in January 2005 he learned of a temporary issue TCC had in supplying white oversize to one of its largest customers, Simcala, Inc. TCC had sold over $1 million in aggregate to Simcala since 1999. With this knowledge (gained from a 30 to 45 minute meeting with Simcala executives and rather than waiting a year until his non-compete expired) Lambert coordinated the formation of Alabama Gravel, LLC as a new source of white oversize gravel for Simcala and two other major TCC customers – Globe Metallurgical, Inc., and Maddox Stone & Gravel. He brought together Dave Tuten, Robert Alexander and Rex Dasinger – who would later become Alabama Gravel principals –and provided them an office on his

family land.[2] Tuten, a Simcala consultant and former Globe purchaser, had the customer contacts, Alexander provided financial backing and Dasinger had a Deatsville, Alabama mining rights lease and, along with Lambert, the ability to supervise day-to-day operations.

Lambert also placed Alabama Gravel in touch with Mike Gentry, who had a readily available source of white oversize gravel that could be used until the Alabama Gravel's Deatsville operation on Dasinger's leased land was complete. The construction at Deatsville was to be funded with sales from Gentry's land. Lambert then made sure that Alabama Gravel hired Mrs. Lambert for bookkeeping services and CCI to deliver sand and gravel. No other company was used to deliver Alabama Gravel aggregate. Lambert also gave his time and expertise in expanding the ADEM Permit for mining on Gentry's land[3] and the construction of the Deatsville operation. Lambert also introduced Maddox Stone & Gravel to Alexander, which enabled Maddox to purchase Alabama Gravel aggregate. Finally, Lambert delivered white oversize samples to Globe for testing and met with Globe's purchasing director at the Deatsville site to discuss shipments of white oversize to Globe. ***All these events took place before the non-compete expired on January 2, 2006.***

Again, Lambert claims all this was acceptable since he allegedly was not paid. Lambert wrongly refuses to acknowledge any benefit or compensation from the nearly ***$500,000*** in delivery payments by Alabama Gravel to CCI in 2005, the $1,000.00 per month office rent Alabama Gravel paid Mrs. Lambert or the approximately $50,000.00 annual salary Alabama Gravel pays Mrs. Lambert. He also refuses to acknowledge that the rich consulting agreement

---

[2] The land appears to be technically listed in Carol Lambert's name as a result of a November 2, 2000 statutory warranty deed transferring the property from Harry and Carol Lambert to just Carol Lambert for $10.00 in consideration.

[3] ***Lambert did this despite Defendants' admission in their summary judgment motion that an ADEM Permit is indicia of being in the sand and gravel business.***

he signed with Alabama Gravel just months after his non-compete expired is deferred compensation for services before the non-compete expired.

For these and other reasons, and as more specifically set forth below, Defendants' summary judgment motion should be denied in its entirety.

**-- DISPUTED FACTS --**

## I. Preliminary Statement

Defendants' motion's "Statement of the Facts" ("Defs' SOF") consists of 97 numbered paragraphs. TCC responds to a number of those paragraphs that it disputes below.[4]

## II. Disputed Paragraphs Of Defendants' "Statements of the Facts"

### A. *Paragraph 12*

Defendants assert in Paragraph 12 that pursuant to the June 10, 1997 Agreement ("1997 Agreement"), TCC and MMC Holdings agreed "not to compete against Montgomery Materials." But, then instead of completely quoting 1997 Agreement § 8.2, which is the pertinent section, Defendants only quote, in part, the final sentence of § 8.2 ("any opportunity for leasing or otherwise obtaining additional sources of sand or gravel . . . shall first be the opportunity of Montgomery [Materials]"). The partial quote fails to cite the clear exceptions to § 8.2 or to accurately portray what activities were covered by the non-compete.[5]

Section 8.2, in its entirety, reads as follows:

> 8.2. During Co-Ownership. Except as otherwise provided in Section 8.6, so long as both Concrete [TCC] and Montgomery, Inc. [MMC Holdings] own a Membership Interest in Montgomery,

---

[4] In addition to those paragraphs specifically addressed below, TCC disputes all the paragraphs to the extent they suggest any potential liability against TCC. In disputing Defendants' version of the facts, however, TCC also, respectfully, makes clear that the actual facts, which are set forth by TCC below and in its motion for partial summary judgment filed contemporaneously herewith, demonstrate that the only summary judgment that is appropriate in this case is that sought by TCC.

[5] As will be demonstrated herein and in TCC's motion for partial summary judgment, Defendants' efforts to rewrite the applicable non-competes has become a recurrent false theme.

> LLC [Montgomery Materials] none of Montgomery, Inc., Concrete, Foley or Lambert, or any entity, other than Montgomery, LLC, in which any of them has an ownership interest will engage in the excavation, mining, selling, delivery, or distribution, or other disposition of Product within the Territory. In addition, so long as both Concrete and Montgomery, Inc., own a Membership Interest in Montgomery, LLC, any opportunity for leasing or otherwise obtaining additional sources of Product within the Territory, now or hereafter known to Concrete, Montgomery, Inc., Foley [Frank Foley] or Lambert [Harry Lambert] or any entity in which any of them has an ownership interest shall be first the opportunity of Montgomery, LLC, and none of the foregoing shall take advantage of such opportunity until both Concrete and Montgomery, Inc. elect that Montgomery, LLC shall refuse it.

*See* 1997 Agreement, Exhibit 1 hereto, at § 8.2. Read completely, § 8.2 precludes – in addition to the lost opportunity language Defendants cite – excavation, mining, selling, delivery or distribution, or other disposition of Product within the Territory.[6] It also allows for waiver of the lost opportunity language where TCC and MMC Holdings refuse the opportunity. Finally, § 8.2 states that ***it is limited by the exceptions set forth in § 8.6.***

Section 8.6(1) and (2) allow TCC and Foley to mine and sell Product from the Montgomery area Ward and Dozier pits. Subject to the Requirements and Supply Contract between TCC and MMC Holdings entered into contemporaneously with the 1997 Agreement, § 8.6(3) and (4) also allow: (1) TCC and Foley to obtain Product for use in their operations from "any source;" and (2) TCC and Foley to sell Product as part of Ready-Mix concrete and in raw form as an incidental part of the Ready-Mix concrete business.

**B. *Paragraph 15***

TCC disputes Paragraph 15 because it incorrectly implies that delivery of aggregate material from mines to customers is not part of the sand and gravel business. Numerous

[6] Product is defined as sand, gravel, clay and/or topsoil by § 1(b), and Territory is defined as the area within 60 miles of the limits of Montgomery, Alabama, by § 8.1.

witnesses, including Carol Lambert, have testified that trucking and delivering aggregate are part of the sand and gravel business.[7] In fact, TCC purchased a majority interest in D&H Trucking Company in 1996. *See* Affidavit of Frank D. Foley ("Foley Aff."), Exhibit 7 hereto, at ¶3. TCC operated the company for a short period before rolling it into TCC. *See id.* While the company operated, it was used to deliver aggregate from TCC mines to retail customers in Montgomery and to TCC's ready mix plants. *See id.* TCC also remains in the trucking business through Foley Materials Company's operation as an interstate and intrastate private carrier regulated by the Federal Motor Carrier Safety Administration, license number #1346785. *See id.*

TCC also disputes Paragraph 15 to the extent that it incorrectly implies that the non-compete only limited Lambert from engaging in the "sand and gravel business." However

---

[7] Mrs. Lambert testified:

Q. Do you consider – well, did you consider at that time CCI to be in the sand and gravel business?
A. No, I did not.
Q. Do you consider trucking or hauling aggregate to be part of the sand and gravel business?
A. I would say yes, in a way, it's – if you haul material, yes.

*See* Transcript of Deposition of Carol Lambert ("C. Lambert Tr."), taken August 22, 2006, Exhibit 2 hereto, at 29.23-30.8. Later in her deposition, after a break, Mrs. Lambert unsuccessfully attempted to qualify this clear testimony when she was asked if CCI was in the business of mining aggregate. As she put it:

> No, and it never has been. It hauls material. And that – I think I stated earlier that if it's involved with sand and gravel operations, the only way it's involved with the sand and gravel operation is by hauling the material. It does not dig material out of the ground or put material through a processing plant. The only thing it does, it drives into a location, the material is loaded on the truck, and it's delivered to wherever it needs to go. It is not in no way related to a sand and gravel business.

*See id.* at 122.14-123.5; *see also* Transcript of Deposition of Larry Speaks ("Speaks Tr."), taken January 12, 2007, Exhibit 3 hereto, at 95.9-96.17; Transcript of Deposition of James Maddox ("Maddox Tr."), taken January 17, 2007, Exhibit 4 hereto, at 45.3-47.4; Affidavit of David N. Gaddy, Exhibit 5 hereto, at ¶2; and Affidavit of Billy Stanley, Exhibit 6 hereto, at ¶7.

Lambert may attempt to redefine the sand and gravel business, the language of the non-compete, 1997 Agreement (Exhibit 1 hereto) § 8.4, controls and, is as follows:

> 8.4. Lambert. If Montgomery, Inc. transfers its entire Membership Interest in Montgomery, LLC [Montgomery Materials] to Concrete [TCC] or any other party, Lambert agrees that during the Period he will not:
>
> (1) engage, as an employee or otherwise, in the Territory in the Prohibited Activity;
>
> (2) in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity;
>
> (3) in the Territory induce a Customer (as defined below): (i) to purchase Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC [Montgomery Materials] or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC [Montgomery Materials]. As used in this subsection, "Customer" means any actual customer who purchased Product from Montgomery, LLC [Montgomery Materials] in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. [MMC Holdings] of its Membership Interest in Montgomery, LLC [Montgomery Materials] . . ..

The "Prohibited Activity" is engaging "in the Territory in the business of excavating, mining, distributing, delivering, selling or otherwise disposing of any Product at wholesale or retail." *See id.* at § 8.3(1). Again, "Product" is "sand, gravel, clay and/or topsoil." *See id.* at § 1(b).

Thus, while the activities prohibited by § 8.4 are part of the sand and gravel business, their inclusion in that "business" is not determinative. The relevant inquiry is not whether Lambert engaged in the sand and gravel business generally, but rather, it is whether he engaged in activity violating the specifics of his non-compete.

### C. *Paragraphs 18 Through 26 And 28 Through 32*

TCC disputes Paragraphs 18 through 26 and 28 through 32 because they incompletely and inaccurately set forth the history of Lambert's, MMC Holdings', Foley's and TCC's business dealings and litigation with respect to Montgomery Materials. *See generally* Foley Aff., Exhibit 7. The Paragraphs are also riddled with unsupported speculation by Lambert. *See generally id.* Those business dealings and the litigation are accurately set forth as follows. *See id.* at ¶¶9-24.

#### (1) **Formation Of Montgomery Materials**

Foley and Lambert decided to go into the aggregate mining business together. *See id.* at ¶11. Foley caused TCC, and Lambert caused MMC Holdings, to form Montgomery Materials, a new Alabama limited liability company on June 5, 1997. *See id.* TCC and MMC Holdings each owned 50% of Montgomery Materials. *See id.* TCC, in return for its 50% interest, contributed $300,000.00 in cash. *See id.* MMC Holdings, in return for its 50% interest, contributed a substantial part of its assets, including the leasehold interest in the City Pit and mining equipment, subject to certain liabilities. *See id.* Montgomery Materials hired Lambert as General Manager. *See id.* Pursuant to his June 10, 1997 Employment Agreement, Lambert was paid a monthly base rate of $6,737.25. *See* Employment Agreement, Exhibit 8 hereto, at § 4. He also received health insurance, a $600,000.00 term life insurance policy and was to be reimbursed for travel and entertainment expenses. *See id.* at Exhibit A. As a result of these transactions, Montgomery Materials began mining sand and gravel from the City Pit in June 1997. *See* Foley Aff., Exhibit 7, at ¶11.

**(2) <u>The Anderson Pit</u>**

Lambert and Foley desired to expand Montgomery Materials' source of aggregate by obtaining additional mining leases. *See id.* at ¶12. Lambert proposed that Montgomery Materials lease property in Montgomery County, Alabama, from Anderson Farms, LLC ("Anderson Farms"). *See id.* Lambert told Foley that Anderson Farms would lease the property (the "Anderson Pit") to Montgomery Materials only so long as Lambert was employed by Montgomery Materials, since Anderson Farms was unwilling to entrust the mining of their property to anyone other than Lambert. *See id.* In May 1999, Foley agreed that Montgomery Materials should enter into a lease (the "Anderson Lease") for the Anderson Pit which contained terms allowing Anderson Farms to terminate the Anderson Lease if Lambert's Montgomery Materials employment terminated. *See id.* Montgomery Materials spent about $600,000 on equipment, prepaid royalties and costs of stripping overburden to prepare the Anderson Pit for mining. *See id.* Substantially all of these funds were advanced by TCC. *See id.* Montgomery Materials did not repay the advances as promised. *See id.*

**(3) <u>Lambert's Failed South Alabama Business</u>**

In late 1999, a large aggregate business (the "South Alabama Business") became available for purchase in south Alabama. *See id.* at ¶13. Foley and Lambert considered Montgomery Materials purchasing the South Alabama Business. *See id.* But, after investigation, Foley felt that the price was too high. *See id.* Lambert proposed that he, Lambert, together with others, might purchase the South Alabama Business if Foley were unwilling for Montgomery Materials to purchase it. *See id.* Foley advised Lambert against that because he thought the price was too high and because he thought it would divert Lambert's attention managing Montgomery Materials. *See id.* Lambert's Montgomery Materials Employment Agreement

provided that Lambert "will not engage in any business activities other that those of [Montgomery Materials]." *See* Employment Agreement, Exhibit 8, at § 3. Foley waived this provision only as it pertained to the South Alabama Business because Lambert felt so strongly that the South Alabama Business offered an exceptional opportunity. *See* Foley Aff., Exhibit 7 at ¶13. In early 2000, Lambert and others purchased the South Alabama Business. *See id.*

In the summer of 2000, Lambert told Foley that the South Alabama Business was in financial difficulty and that he, Lambert, might have to obtain the value of his interest in Montgomery Materials (i.e., MMC Holdings' 50% Montgomery Materials interest) to pay debts of the South Alabama Business. *See id.* at ¶14. Lambert said that he might have to use his interest as collateral for a loan or even sell his interest to Foley or others to raise cash. *See id.* Lambert asked Foley to also consider dividing up the assets of Montgomery Materials between TCC and MMC Holdings. *See id.* Lambert also asked Foley to consider putting Montgomery Materials "on the market" to see how much it could be sold for. *See id.*

**(4) <u>The 1997 Agreement And Buy-Sell Provision</u>**

Foley was reluctant to take any of these actions. *See id.* at ¶15. Although Foley felt that Montgomery Materials had suffered when Lambert's attention was diverted by the South Alabama Business, Foley also felt that Montgomery Materials had potential to be a very good business. *See id.* Despite his reluctance, Foley, because of the pressure on Lambert from the South Alabama Business, agreed to consider Lambert's requests. *See id.* A professional consulting firm, FMI, was contacted to evaluate Montgomery Materials and determine what price it might be sold for, although it was never engaged. *See id.* A third party expressed an interest in buying Montgomery Materials, and Foley agreed to allow Montgomery Materials to furnish confidential financial information to the prospective purchaser. *See id.* Lambert

proposed that Montgomery Materials be split into two operations. *See id.* MMC Holdings would receive the Anderson Pit, and TCC would receive the City Pit. *See id.* Lambert proposed that TCC buy MMC Holding's 50% interest in Montgomery Materials. *See id.* Foley considered these and other proposals during the summer and fall of 2000, but he and Lambert could not agree on what to do. *See id.*

The terms of the Anderson Lease were a complicating factor in these negotiations. *See id.* at ¶16. The Anderson Pit had proven to contain a substantial deposit of sand and gravel, and it was probably more valuable than the City Pit. *See id.* But, the Anderson Lease could be terminated if Lambert did not remain employed by the lessee. *See id.* Therefore, it was important that Lambert remain employed by the lessee after the transaction so the Anderson Lease would remain in effect for the new owner. *See id.* But, this meant that Lambert had to remain involved with (i.e., employed by) the lessee after the sale. *See id.* Lambert approached Anderson Farms about amending the Anderson Lease to eliminate or at least substantially modify the requirement that Lambert remain employed by the lessee. *See id.* Initially it appeared that Anderson Farms might allow such an amendment. *See id.*

By September 2000, Foley was doubtful that he and Lambert would be able to agree on what to do with Montgomery Materials. *See id.* at ¶17. Foley had considered Lambert's numerous proposals, and none seemed to be acceptable to he and Lambert. *See id.* The South Alabama Business continued to pull Lambert's attention away from Montgomery Materials. *See id.* In addition, Foley and Lambert differed on the management of Montgomery Materials, and their disagreements became more frequent and serious. *See id.*

Foley decided that he and Lambert had to either resolve their differences and continue in business together or one had to buy out the other. *See id.* at ¶18. The previously executed 1997

Agreement (Exhibit 1 hereto), among Montgomery Materials, TCC, MMC Holdings, Foley and Lambert, provided a mechanism (hereinafter referred to as the "Buy-Sell") in § 5.3. *See* Foley Aff., Exhibit 7, at ¶18. On September 25, 2000, TCC delivered to Lambert, as President of MMC Holdings, notice that TCC was invoking § 5.3 of the 1997 Agreement. *See id.*

The § 5.3 Notice set forth a "Cash Price" for Montgomery Materials of $1 million and an "adjustment" to the Cash Price in the form of an increase of $3 million if the Anderson Lease was not subject to termination after the sale. *See id.* at ¶19. The "Cash Price" was the price for all interests in Montgomery Materials; since TCC and MMC Holdings each owned a 50% interest, the seller would receive 50% of the $1 million cash price, which is $500,000, at closing, and 50% of the $3 million "adjustment," which is $1.5 million, when the conditions for the adjustment were satisfied. *See id.*

Representatives of TCC who delivered the § 5.3 Notice to MMC Holdings at Montgomery Materials office in Montgomery, Alabama, told Lambert that Foley wanted to keep trying to work out the differences between Foley and Lambert despite the § 5.3 Notice. *See id.* at ¶20. But, if they were unsuccessful by the end of the 120 day period for MMC Holdings to respond, Foley intended to enforce the Buy-Sell. *See id.* Before delivering the § 5.3 Notice to MMC Holdings, TCC's representatives, to show good faith, allowed Montgomery Materials to consolidate the various overdue notes for the money spent to develop the Anderson Pit into a single $600,000 note payable over five years. *See id.*

MMC Holdings acknowledged receipt of the § 5.3 Notice by letter dated October 11, 2000. *See id.* at ¶21. Foley and Lambert continued to consider alternatives to one purchasing the other's interest through December 2000. *See id.* Lambert told Foley that he was not able to get Anderson Farms to remove the provisions of the Anderson Lease which allowed Anderson

Farms to terminate it if Lambert were not employed by the lessee. *See id.* Therefore, the Anderson Lease could only be preserved if Lambert remained an employee of the lessee. *See id.* As a result, Lambert told Foley that he had decided MMC Holdings would buy out the TCC's 50% Montgomery Materials interest. *See id.* Lambert told Foley that he had arranged for $2.6 million in financing, of which $2 million would be used to pay for TCC's 50% interest, and $600,000 would be used by Montgomery Materials to repay TCC the $600,000 it had loaned Montgomery Materials to fund the development of the Anderson Pit. *See id.*

Despite these representations, on January 2, 2001, MMC Holdings notified ("MMC Holdings' Response") TCC that MMC Holdings would purchase TCC's 50% interest in Montgomery Materials for $500,000, not $2 million. *See id.* at ¶22. MMC Holdings' Response attempted to select the parts of TCC's § 5.3 Notice which MMC Holdings liked and ignore the parts which MMC Holdings disliked. *See id.* The "offer" that MMC Holdings claimed to be accepting appears nowhere in TCC's § 5.3 Notice. *See id.* MMC Holdings could not create a bargain which TCC did not propose. *See id.*

Since MMC Holdings' Response was not identical with the terms of TCC's offer, it was a rejection of TCC's offer. *See id.* at ¶23. As a result, TCC was relieved from liability on the offer. *See id.* In effect, MMC Holdings failed to make an election. *See id.* Section 5.3 of the 1997 Agreement provided that "[a]n Electing Member who fails to make an election shall be deemed to have sold its Interest to the Activating Members." *See id.* Therefore, MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC. *See id.*

### (5) The Declaratory Judgment Action And Resulting Summary Judgment Ruling In TCC's Favor

The above facts resulted in TCC filing a declaratory judgment action against MMC Holdings on January 12, 2001. *See id.* at ¶24.[8] TCC obtained summary judgment in its favor with this Court ruling, in pertinent part, by Order dated September 7, 2001, that:

> the Buy-Sell provision was properly "activated" within the meaning of the Agreement inasmuch as TCC's Notice included a price formula contemplated by the parties. Consequently, MMC had 120 days to elect which it failed to do. Therefore the court must give effect to the default provision of Section 5.3 and conclude that Montgomery Materials has been deemed sold to TCC. TCC's formula presumed that Anderson [Farms] would terminate the lease and the record indicates as much. As such, the court finds that the adjustment of $3,000,000 is inapplicable to the sale, so TCC has purchased Montgomery Materials for $1,000,000.

*See id.* This Order was affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002. *See id.* The result of the summary judgment Order, as affirmed, is that MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC on January 2, 2001. *See id.*

### D. *Paragraph 27*

TCC disputes Paragraph 27 because it inaccurately and incompletely describes the loan transaction with aggregate supplier, and now deceased, Michael Phillips. TCC also disputes Paragraph 27 for its implication that, through the loan transaction, TCC was improperly competing with Montgomery Materials.

The Promissory Note and attached Supply Agreement, Exhibit 9 hereto, specifically state that TCC was obtaining #67 gravel from Phillips for use at its ready mix plants or for resale. As cited above, 1997 Agreement § 8.6(3) and (4) allow TCC and Foley to obtain Product for use in

---

[8] The case was captioned *The Concrete Company v. MMC Holdings, Inc.* (United States District Court for the Middle District of Alabama, Northern Division; Civil Action No. 2001-D-54-N).

their operations from "any source,"[9] and to sell Product as part of ready mix concrete and in raw form as an incidental part of the ready mix concrete business.

All gravel purchased from Phillips was either sold as part of Ready-Mix concrete or in raw form as an incidental part of the Ready-Mix concrete business. *See* Foley Aff., Exhibit 7, at ¶4. TCC also disputes Paragraph 27 because it believes Lambert was aware of the loan transaction. *See id.*

In addition, the Phillips loan transaction was consummated after January 2, 2001, which was the effective date of the closing. TCC was deemed to have bought-out MMC Holdings at that time. This would nullify any ability of Lambert to complain about the transaction.

**E. *Paragraph 29***

In addition to those reasons set forth in § II(C) above, TCC disputes Paragraph 29 to the extent Defendants claim that while Lambert was working for Montgomery Materials, he may have had contacts with Crest Capital and that the fax ("the Crest Capital Fax")(Exhibit 10 hereto) sent by Crest Capital to TCC in December 2005 pertained to communications between Lambert and Crest Capital while he was with Montgomery Materials.

The Crest Capital Fax, on its face, refutes this claim. The fax was sent on December 6, 2005. *See id.* It also bears the following handwritten note:

> *Harry, [i]f you have the Invoice – Descriptions for the Equipment – send those too and I'll take care of it before the Holidays. Thanks. Mike.*

*See id.* If the fax dealt with Lambert's dealings at Montgomery Materials, which ended in April 2002 – as opposed to Lambert's dealings on and around December 6, 2005 – there would be no reference to the Holidays.

---

9 This obviously includes, but is not limited to Mr. Phillips.

In a further effort in Paragraph 29, to re-date the Crest Capital Fax, Lambert cites to an affidavit from Mike Hong, the author of the fax. Paragraph 6 of the Hong affidavit, Exhibit 11 hereto, states in part that the fax "was not dated recently. It was requested and faxed in December 2005 but it pertains to communications back when Harry Lambert was with Montgomery Materials, LLC." On deposition, however, Hong refuted his own affidavit.

According to Hong, he has been working for Crest Capital for approximately five years. *See* Transcript of Deposition of Michael Hong ("Hong Tr."), taken January 16, 2007, Exhibit 12 hereto, at 7.16-.18. Crest Capital is an equipment finance company that finances any type of equipment including bulldozers and front loaders. *See id.* at 7.19-8.6. The December 6, 2005 fax is an application for equipment financing, which Hong confirmed bears his handwriting. *See id.* at 9.16-10.15. Hong has no recollection of preparing the fax or how he got the name "Harry;" but he added that has no reason to believe that he did not write the note on the fax on December 6, 2005. *See id.* at 11.11-12.11.

Hong stated that he would send out a fax like the Crest Capital Fax for any number of reasons, including getting a call from an equipment buyer or seller or someone with a referral. *See id.* at 17.7-.17. He added that there are instances when the vendor providing the referral or lead might get the potential borrower's contact information, such as company name or telephone number, wrong. *See id.* at 30.25-31.20.

Hong said he received the affidavit from, and was called about signing the affidavit by, Carol Lambert or an attorney for Carol Lambert. *See id.* at 13.5-.15. He was told that all he needed to do was sign the affidavit and he would not be bothered anymore and that it would end his involvement with the case. *See id.* at 13.18-14.2. Hong testified that he had no input into the affidavit and simply signed what was given to him. *See id.* at 19.24-20.4. Hong testified that by

stating in his affidavit that the fax was not dated recently, he was referring to the December 6, 2005 date. *See id.* at 14.6-.13. He signed the affidavit on September14, 2006. He also said that he did not give information to the person who gave him the affidavit that the fax was requested and faxed in December 2005 but pertains to communications back when Harry Lambert was with Montgomery Materials. *See id.* at 20.5-.12. He said that statement in the affidavit by him was based on his assumption that a financing application went out to Lambert in December 2005. *See id.* at 14.14-.24. He stated that he does not know when Lambert worked for Montgomery Materials. *See id.* at 14.25-15.6.

He also did not know if, when he signed the affidavit, he was attempting to state that the fax dealt with communications with Lambert back in 2002, nor did he know if he had any conversations with Lambert in 2002. *See id.* at 15.10-16.3. He did, however, confirm that he assumed that the "Holiday" reference in the fax dealt with Christmas because it was faxed on December 6, 2005. *See id.* at 16.4-.9.

**F. *Paragraph 33***

TCC disputes Paragraph 33 because it misstates the terms of the April 9, 2002 closing whereby TCC purchased MMC Holdings' interest in Montgomery Materials. Defendants state that MMC Holdings received a cash payment of $303,739.94. They fail to point out that MMC Holdings was also compensated by TCC's payment of $4,650.00 in fees and expenses and $36,166.06 for an account receivable of Lambert to Montgomery Materials. *See* Closing Statement, Exhibit 13 hereto, at TCC0002850. Defendants also fail to point out that as part of the transaction, TCC assumed full responsibility for in excess of $300,000 in debts owed by Montgomery Materials to outside vendors. *See* Assignment of Limited Liability Company Interest and Indemnification ("Assignment"), Exhibit 14 hereto, at TCC0002851-53; *see also*

Document Entitled TCC's Assumed Debt of Montgomery Materials LLC as of 3/31/02, Exhibit 15 hereto. TCC also absorbed other debt – the approximately $600,000 in consolidated debt that it had loaned Montgomery Materials.

TCC also disputes Defendants' claim that the closing documents do not reflect the sale or transfer of MMC Holdings' interest in Montgomery Materials' goodwill. The word "goodwill" is not specifically written on the documents, but it was certainly transferred to TCC via MMC Holdings assignment of its "fifty percent (50%) interest as a member in Montgomery Materials Company, L.L.C. . . . including all Governance Rights and Financial Rights." *See* Assignment, Exhibit 14, at TCC0002851, ¶1. A contract for the sale of a business need not expressly mention the goodwill of the business for that good will to be transferred. *Files v. Schaible*, 445 So. 2d 257, 259-60 (Ala. 1984). It should also be recognized that TCC always maintained its 50% interest in Montgomery Materials' goodwill. It would be completely illogical to assume that the buy-out did not transfer the remaining 50% held by MMC Holdings. A membership interest or stock interest transfers good will by implication. *Kershaw v. Knox Kershaw, Inc.*, 523 So. 2d 351, 358 (Ala. 1988)("[a]lthough 'good will' was not specified as an asset in the sale, it was 'incidental to and inherent in' the business itself, and was, therefore, included in the exchange of stock").

Finally, TCC disputes Defendants' contention that Lambert received no "additional" consideration for the non-compete. As Foley has testified, most if not all of the purchase price at closing was for the non-compete. *See* Transcript of Deposition of Frank Foley, III ("Foley Tr."), taken April 18, 2006, Exhibit 16 hereto, at 17.1-17.22. TCC also disputes any implication that Lambert received no consideration for the non-compete. In addition to the payments made and the debt assumed and absorbed by TCC at the closing, consideration for the non-compete began

flowing to Lambert the moment the 1997 Agreement was executed. This consideration is also obviously found in Lambert's compensation as Montgomery Materials General Manager and TCC's performance of its obligations under the 1997 Agreement. In addition, TCC contributed $300,000 in cash to Montgomery Materials' operations. *See* 1997 Agreement, Exhibit 1, at § 1(c). In fact, TCC continued to fund Montgomery Materials' operations throughout its existence whenever revenue did not cover expenses and when additional capital expenditures were needed. *See* Foley Aff, Exhibit 7, at ¶5. As stated above, by 2001, TCC had loaned $600,000 to Montgomery Materials and allowed this debt to be consolidated into a single five year note.

**G. *Paragraph 34***

TCC disputes Paragraph 34 because, as set forth above, it misrepresents the terms of the amounts and benefits MMC Holdings received at the April 2002 closing. It also misrepresents the circumstances of the equipment sale to Anderson Road Materials, LLC. Defendants state that TCC received $1.2 million for the Montgomery Materials' assets located at the Anderson Pit when TCC only paid $300,000 for its one-half interest in all Montgomery Materials' assets. This implication of outrageous profit is simply false.

It fails to account for any of the hundreds of thousands of dollars of Montgomery Materials debt TCC assumed. Also, as set forth above, on September 25, 2000, TCC invoked § 5.3 of the 1997 Agreement. The § 5.3 Notice set forth a "Cash Price" for Montgomery Materials of $1 million and an "adjustment" to the Cash Price in the form of a $3 million increase if the Anderson Lease was not subject to termination after the sale. The "Cash Price" was the price for all interests in Montgomery Materials; since TCC and MMC Holdings each owned a 50% interest, the seller would receive 50% of the $1 million cash price, which is $500,000, at closing,

and 50% of the $3 million "adjustment," which is $1.5 million, when the conditions for the adjustment were satisfied.

Since MMC Holdings' response was not identical with the terms of TCC's offer, it was a rejection of TCC's offer. As a result, TCC was relieved from liability on the offer. In effect, MMC Holdings failed to make an election. Section 5.3 of the 1997 Agreement provided that "[a]n Electing Member who fails to make an election shall be deemed to have sold its Interest to the Activating Members." Therefore, MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC.

All of the above re-stated, the Court agreed with TCC and the closing took place under just terms. The Anderson Road equipment sale thereafter is totally irrelevant since the Anderson Pit assets had already been contemplated as assets at the time of TCC's buy-out offer, which the Court adjudicated as appropriate.

### H. *Paragraphs 37, 39, 43 Through 47 And 49*

TCC disputes Paragraphs 37, 39, 43 through 47 and 49 because they misrepresent (1) the circumstance of CCI's formation and operation leading up to its 2005 dealings with Alabama Gravel; (2) the sand and gravel business; and (3) Lambert's involvement with CCI during his non-compete. The facts of those dealings are as follows.

#### (1) **CCI's Formation And Operation Leading Up To Its 2005 Dealings With Alabama Gravel**

Carol Lambert first worked as a bookkeeper in 1967 for Interstate Drilling, a company she owned with Lambert that was in the business of drilling blast holes in rock quarries. *See* C. Lambert Tr., Exhibit 2, at 8.9-.20. She was then a bookkeeper for and co-owner with Lambert of Lambert Sand & Gravel, which was in the business of producing sand and gravel. *See id.* at 9.22-10.11 & 12.9-.13. She went to work as a bookkeeper for MMC Holdings in the 1990s. *See*

*id.* at 10.12-.20. Up to that point, she had no other work experience aside from being a bookkeeper. *See id.* at 10.21-11.10. When asked if she had any experience in the trucking business up to that point, she responded, "[w]ell, I don't know if you would consider the drills. You know, drills are big, heavy pieces of equipment, like a big truck, and that could be possible, I suppose." *See id.* at 11.11-.17.

But, she admitted that while at Interstate Drilling, she was not responsible for selecting drills for purchase. *See id.* at 11.21-12.1. Similarly, when she worked for Lambert Sand & Gravel, she did not have any experience or duties with respect to selecting trucks that were used. *See id.* at 15.5-.10. In fact, up to the time she went to work for MMC Holdings, she had not gained any experience in the purchase of trucks for hauling aggregate. *See id.* at 15.11-.15. She had the same duties as a bookkeeper with MMC Holdings that she had with the past companies. *See id.* at 16.18-17.3.

Mrs. Lambert formed CCI on April 26, 2002. She claims it was formed to be a trucking company. *See id.* at 20.8-.16. When asked why she formed CCI, Mrs. Lambert responded, "[w]e had to have income. I did it to make a living." *See id.* at 20.1-.4. As she later agreed, "we," meaning she and Lambert, "needed to earn a living." *See id.* at 21.15-.20. Mrs. Lambert says she is CCI's sole owner and officer. *See id.* at 22.14-.16. She claims the first two other employees of CCI were brothers Grady and John Parker who had, immediately before that, worked for Montgomery Materials. *See id.* at 22.20-23.12. When asked why she chose to form a trucking company, Mrs. Lambert testified as follows:

> Q. You had mentioned so that, as you said, we could earn a living. Why did you select a trucking company for that purpose?
>
> A. It's just what I chose to do. No specific reason.

Q. If I may, Mrs. Lambert, we were speaking earlier about your prior experience, and I believe I heard you correctly that you did not have any other experience related to trucking other than the drilling relationship you mentioned. Why did you choose a business that you had that level of experience with?

A. It's just what I chose to do.

*See id.* at 25.12-26.1.

Mrs. Lambert claims that she located CCI's initial trucks for purchase by finding the name of a company in the telephone book and going to talk to the company. *See id.* at 26.9-.19. She claims she relied exclusively on the truck dealer for advice and did not get recommendations from anyone else. *See id.* at 27.21-28.12. That stated, she cannot recall:

(1) how much she paid for the first trucks (*see id.* at 28.13-.18);

(2) what mileage the trucks got (*see id.* at 50.7-.18);

(3) the terms of the warranties on those initial trucks or whether she got warranties on subsequently purchased trucks (*see id.* at 52.7-.17); ***or***

(4) when CCI traded in its first truck, what she got for it, how many trucks CCI has purchased over the past four years, or the purchase price for any of those trucks (*see id.* at 52.18-54.10).

She says she knows that she purchased separate dump trailers for the trucks CCI currently owns, but she does not know how much CCI paid or when it purchased them. *See id.* at 54.11-55.12.

Mrs. Lambert claims she does not recall Lambert ever assisting her in selecting CCI drivers. *See id.* at 78.21-80.10. She does not recall ever checking references on any of her drivers or going on any rides with prospective drivers to see if they were competent. *See id.* Mrs. Lambert states that she cannot recall whether someone recommended Foshee Trucking to her as someone to whom she could lease CCI trucks. *See id.* at 35.7-.12. She could not recall if Lambert made this recommendation.[10] *See id.*

---

[10] Mrs. Lambert's story, respectfully, is implausible.

Under the arrangement with Foshee Trucking, Foshee would obtain delivery jobs for CCI trucks, invoice the purchasers directly and then pay CCI for the deliveries. *See id.* at 32.9-33.22. Mrs. Lambert admits there were times when Lambert would call the Foshee dispatcher to see if a hauling job was available. *See id.* at 45.2-.10. Foshee Trucking issued Form 1099s, copies of which are collectively attached as Exhibit 17 hereto, to CCI in 2002 for ***$79,993.72***, in 2003 for over ***$400,000***[11] and in 2004 for ***$401,568.97.***

**(2) Misrepresentation Of The Sand And Gravel Business**

At the time she formed CCI, Mrs. Lambert was aware that Lambert had an agreement not to go back into the sand and gravel business. As cited above, she then testified:

Q. Do you consider – well, did you consider at that time CCI to be in the sand and gravel business?

A. No, I did not.

Q. Do you consider trucking or hauling aggregate to be part of the sand and gravel business?

A. ***I would say yes, in a way, it's – if you haul material, yes.***

*See* C. Lambert Tr., Exhibit 2, at 29.23-30.8 (emphasis added).[12] Despite this testimony, Defendants' statement of facts Paragraphs 39 and 45 again try to separate trucking companies from the sand and gravel business. As shown above by Mrs. Lambert's own testimony, and referring back to TCC's response to Paragraph 15, this cannot be done. Trucking is integral to the sand and gravel business.

---

[11] There appear to be two 1099's for 2003, and both are difficult to read in the form transmitted by Foshee Trucking to TCC.

[12] As also cited above, later in her deposition, after a break, Mrs. Lambert unsuccessfully attempted to qualify this clear testimony. *See id.* at 122.14-123.5.

**(3) Lambert's Involvement With CCI During His Non-compete**

Paragraphs 44 through 49 imply that Lambert's only involvement with CCI was that of an occasional driver when another driver was unavailable. According to Mr. and Mrs. Lambert's own testimony, others' testimony and documentary evidence, that is false.

It is important to consider what is exhaustively set forth below and in the rest of this opposition against the backdrop of Defendants' efforts to hide Lambert's involvement with CCI. For example, Lambert has always taken the position that he received no compensation from CCI and drove CCI trucks without compensation to help "his wife's company." [Answer and Counterclaim of Defendant Harry E. Lambert; Doc. #7, ¶¶16 &17] Defendants' position in this regard is totally untrue. Lambert was actively involved in CCI's operations, received compensation from CCI and benefited from CCI's earnings.

Although Lambert claims that he did not give Mrs. Lambert advice "in a business sense" on what trucks CCI should buy, he describes the sense in which he gave advice as follows:

> [i]n a – she might ask me at the supper table, you know, if I thought she maybe ought to buy what kind of truck, and it would be the same thing as if she asked me if she wanted to buy a different lawn mower or what. It was in a husband and wife is any talk that we would have. But in a business sense, no.

*See* Transcript of Deposition of Harry E. Lambert ("H. Lambert Tr."), taken August 29, 2006, Exhibit 18 hereto, at 65.13-66.1. Asked if it was possible if he participated in discussions with truck dealers before CCI trucks were purchased, Lambert replied "[a]nything's possible." *See id.* at 66.16-.23. When asked if he put CCI in touch with Foshee Trucking, he stated that he could not recall, but again stated "[a]nything's possible." *See id.* at 84.12-.18.

Throughout CCI's existence, Lambert has assisted CCI with truck maintenance, such as changing tires and putting on brakes. *See id.* at 68.22-70.3. While he tries to deny being paid for

those services, *see id.* at 70.4-.5, he states "I wasn't paid any money. I was furnished a roof over my head and food to eat." *See id.* at 70.9-.12. Lambert's pick-up truck is actually owned by CCI. *See id.* at 145.2-.14. Mrs. Lambert also acknowledges that CCI listed Lambert as a driver on its liability policy. *See* C. Lambert Tr., Exhibit 2, at 40.7-.16. CCI also pays Lambert's health insurance, and he is separately listed and has a separate premium from Mrs. Lambert. *See id.* at 43.23-44.17. CCI also pays Lambert's cellular telephone bill. *See id.* at 48.4-.15. CCI also "probably" listed Lambert as a driver for whom worker's compensation premiums needed to be paid. *See id.* at 139.8-140.8. Foshee Trucking paid these premiums and then withheld that amount from checks to CCI. *See id.*

Lambert has also been active in driving and dispatching for CCI. While, again, Defendants describe Lambert's driving CCI trucks as occasional, the records are replete with dozens and dozens of load tickets dating back to CCI's formation indicating Lambert as a frequent CCI driver.[13] Lambert also admits (1) that he had numerous discussions with persons at Alabama Gravel relating to their use of CCI which caused him to be at Alabama Gravel's location regularly; (2) that he answered the telephone when Alabama Gravel and Simcala called CCI requesting hauls; (3) that he had conversations with Maddox Stone & Gravel about loading rail cars with white oversize gravel using CCI, and he drove CCI trucks to the Maddox Stone & Gravel rail yard;[14] and (4) that he talked with Globe about quantities of Alabama Gravel white

---

[13] Exhibit 19 hereto is a collective sample of these load tickets. It should also be recognized that Lambert's reference in Paragraph 49 to his health is irrelevant to this case. It is indisputable that Lambert was an active driver for CCI and that this violated his non-compete. TCC is sympathetic to Lambert's health, but respectfully submits that Lambert has unfairly attempted to use it a sword and a shield in this litigation. The Court should not let it be used for either.

[14] Lambert actually introduced Jim Maddox of Maddox Stone & Gravel to Alexander. *See* Maddox Tr., Exhibit 4 hereto, at 23.25-26.22. Maddox was looking for gravel in the Montgomery area. *See id.*. After Lambert gave Alexander's name, Maddox had dinner with Alexander and Lambert, although he claims Lambert did not participate in discussions about Maddox buying from Alabama Gravel. *See id.*. at 28.5-29.8. Maddox also testified that he would imagine there would be some benefit

oversize gravel Globe wanted CCI to haul. *See* Defendant Harry E. Lambert's Responses to First Interrogatories, Exhibit 20 hereto, at Response Nos. 6-8 & 11.

Lambert further admits speaking with Jim Maddox of Maddox Stone & Gravel about the availability of CCI trucks to haul Alabama Gravel white oversize gravel. *See* H. Lambert Tr., Exhibit 18, at 92.2-93.18. Maddox would call either him or Mrs. Lambert about this, and that when Maddox called Mrs. Lambert, she would call Lambert "to see what the availability of the trucks were." *See id.* Lambert admits that his telephone calls with Maddox in July and August 2005[15] "could" have been about coordinating shipments of white oversize gravel. *See* H. Lambert Tr., Exhibit 18, at 209.18-210.11.

Lambert also admits to giving Mrs. Lambert information she used to arrive at the $6.00 per ton rate CCI charged to haul white oversize gravel from the Gentry Pit to Simcala. *See id.* at 161.10-162.7. He also stated that he could have supplied some mileage information to Mrs. Lambert to assist in determining the $5.00 per ton shipping charge to Globe, but he does not "remember." *See id.* at 178.11-.23.

Globe has confirmed that it dealt with Lambert when arranging deliveries of Alabama Gravel aggregate.[16] According to Robert Becker, Globe's Purchasing Director, during his initial conversation with Alabama Gravel around May 7, 2005, Tuten told him that Lambert would

---

to Lambert from CCI's hauling aggregate since Lambert's wife owned the business. *See id.*. at 33.19-34.1.

[15] These telephone calls and others discussed herein are reflected in telephone records subpoenaed from Lambert's cellular telephone provider. Utilizing TCC's telephone number records, those publicly available and information obtained during depositions, TCC has compiled cumulative and detailed schedules of these records indicating calls between Lambert and pertinent individuals, such as Maddox. These schedules, along with a copy of the complete subpoenaed records are incorporated into an affidavit from TCC executive Hugh Sorrell. *See* Affidavit of Horald "Hugh" Sorrell Concerning Telephone Records ("Sorrell Telephone Record Affidavit"), Exhibit 21 hereto.

[16] In the 24 months before the April 2002 Closing, Globe purchased aggregate from Montgomery Materials. *See* Foley Aff, Exhibit 7, at ¶8.

deliver the first loads of Alabama Gravel aggregate for testing. *See* Transcript of Deposition of Robert R. Becker ("Becker Tr."), taken February 16, 2007, Exhibit 22 hereto, at 38.21-40.1 & 42.3-.13. Becker believes Lambert or somebody affiliated with Lambert delivered those first loads. *See id.* The tests run on those loads led to additional Globe purchases from Alabama Gravel. *See id.* at 40.2-.9 & 41.22-42.1. Becker further testified that he negotiated directly with Lambert concerning what CCI would charge Globe for deliveries and how many loads of gravel Globe expected to move. *See id.* at 41.10-.19. When asked whether Lambert participated in subsequent deliveries to Globe, Becker replied "[w]hether Mr. Lambert delivered them, I couldn't tell you. Maybe some of his affiliates or he made arrangements for that gravel delivered. Yes." *See id.* at 42.14-.21.

Lambert could not explain how or why he placed or received ***over 800*** telephone calls to the other CCI's drivers' cellular numbers (*see* Sorrell Telephone Record Affidavit, Exhibit 21), but admitted that sometimes he directly dispatched the drivers for CCI hauling jobs. *See* H. Lambert Tr., Exhibit 18, at 224.18-225.7. When asked under what circumstances, he dispatched CCI drivers in 2005, Lambert further admitted:

> [i]s that the drivers would ask me how many loads to haul, and I would tell them, lots of times on a daily basis, to haul X amount of loads to Globe, X amount of loads to Simcala per truck. So I talked to them on a daily basis to see how many loads that they hauled. I'd call them and ask them if they – how many loads that they had hauled. Just different reasons.

*See id.* at 226.4-.14. Lambert added that the CCI drivers were allowed to haul when they wanted to and that he coordinated "some of that." *See id.* at 226.21-227.15. They would call Lambert or he would call them and "ask them what hours they were going to run and what have you." *See id.*

**I.** ***Paragraphs 50, 51, 53, 54, 56 Through 65, 70 Through 73, 81 Through 84 And 93 Through 97***

TCC disputes Paragraphs 50, 51, 53, 54, 56 through 65, 70 through 73, 81 through 84 and 93 through 97 because they do not accurately portray Lambert's and CCI's involvement with and assistance to Alabama Gravel in establishing its relationships with TCC's customers, Simcala, Globe and Maddox Stone & Gravel. The actual facts are as follows.

**(1) <u>Alabama Gravel's Formation</u>**

Tuten was involved in Globe's aggregate martial purchasing for 18 years before he left in 2003. *See* Transcript of Deposition of David Tuten ("Tuten Tr."), taken July 13, 2006, Exhibit 23 hereto, at 16.5-.11. In 2003, he formed a consulting business and consulted with Simcala until 2005. *See id.* at 53.6-.14 & 57.20-59.7. He met Robert Alexander for the first time in late 2004 or early 2005 when he was introduced by Lambert. *See id.* at 60.16-.23. Tuten testified as follows about how that meeting took place:

> I had mentioned to Mr. Lambert about because of the situation at Simcala, with them running out of white oversized and also with contacts I had at Globe, that you know, there was a need for white oversized gravel and that I would have an interest in getting in the gravel business mainly as an outside investor more than anything else. And I had asked Mr. Lambert, you know, if he knew of anyone, you know, that I could maybe get involved with, and he put me in touch with Mr. Alexander.

*See id.* at 61.3-.17. At that time, Tuten was not aware of another location in the Montgomery area where he could get white oversize gravel and did not have any idea where he could get the white oversize gravel he was hoping to sell. *See id.* at 70.10-71.8. He asked Lambert this. *See id.* at 71.9-.22. Tuten testified that he would not be involved with Alabama Gravel were it not for Lambert. *See id.* at 176.20-177.5. ***Tuten says that if Lambert had not hooked him up with***

***Alexander, he would not have pursued it any further.*** *See id.* at 177.11-.21. Many critical events took place before Tuten met Alexander.

**(a) *The Gadsden, Simcala And Gentry Meetings***

During the first week of January 2005, Alexander met Lambert and Rex Dasinger in Gadsden, Alabama.[17] Defendants claim this meeting ("the Gadsden Meeting") took place because Alexander was considering purchasing an aggregate plant in Gadsden. *See* Defs' SOF at ¶50. Defendants, however, fail to state that Lambert took Dasinger with him to the Gadsden Meeting and that Dasinger went to that meeting to discuss with Alexander working with him in opening a mining operation on land in Deatsville, Alabama, for which Dasinger was working on obtaining a lease.[18] *See id.* at 33.5-37.2 & 58.16-59.8. Defendants also fail to mention that at around the same time as the Gadsden Meeting, Lambert had a 30 to 45 minute meeting ("the Simcala Meeting") with Simcala employees Dick Wymer and Ed Boardwine, Jr. *See* H. Lambert Tr., Exhibit 18, at 130.11-133.21; *see also* Document Bearing Bates Stamp No. TCC000995, Exhibit 26 hereto.

Wymer's calendar (Exhibit 26 hereto) indicates that the Simcala Meeting with Lambert was on January 6, 2005, although Wymer could not recall if that was the exact date of the meeting. *See* Transcript of Deposition of Richard D. Wymer ("Wymer Tr."), taken January 11, 2006, Exhibit 27 hereto, at 100.23-101.101.9. In any event, Alexander's name and telephone

---

[17] Alexander has stated through his attorney that he believes the Gadsden Meeting took place during the first week in January, 2005. *See* Email from James N. Walter, Esq. to Thomas F. Gristina, Esq., dated January 10, 2007, Exhibit 24 hereto.

[18] Dasinger began his efforts to obtain that lease about five years ago. *See* Transcript of Deposition of William "Rex" Dasinger ("Dasinger Tr."), taken December 4, 2006, Exhibit 25 hereto, at 16.3-18.12. Dasinger was interested in starting a mining operation. *See id.* at 18.23-19.2. Dasinger was encouraged by several people to get a financial backer in these efforts. *See id.* at 20.12-.21. Dasinger says he approached Foley and that Foley declined because the Deatsville site is too close to Elmore Sand & Gravel. *See id.* at 21.18-22.4. He then approached Lambert, and he says that Lambert declined, citing

numbers appear directly below Lambert's with the notation that Alexander called Wymer and would get back to him when he had more information. *See* TCC000995, Exhibit 18. Lambert admits to having recommended Alexander to Simcala during the Simcala Meeting when Wymer and Boardwine expressed a need to obtain additional white oversize gravel. *See* H. Lambert Tr., Exhibit 18, at 130.11-133.21. Wymer confirmed that Alexander did, in fact, call him back on January 10, 2005. *See* Wymer Tr., Exhibit 27, at 101.13-103.103.5. This was after the Gadsden Meeting. Alexander indicated during his January 10, 2005 telephone call to Wymer that he was checking into a "source" for Simcala. *See id.* at 104.7-.21.

In the meantime, and before Alexander called Wymer on January 10, 2005, Lambert had introduced Alexander to Mike Gentry in Prattville, Alabama ("the Gentry Meeting"). *See* Transcript of Deposition of Robert J. Alexander ("Alexander Tr."), taken December 4, 2006, Exhibit 28 hereto, at 58.9-.22 & 61.5-.18. The purported purpose of the Gentry Meeting was to discuss the possibility of Alexander purchasing some sand screws from Gentry for use at the Gadsden site. *See id.* Lambert knew about the sand screws because Gentry had previously called him and asked him to let him know if he knew anyone who wanted to buy the used equipment. *See* Transcript of Deposition of Howard M. Gentry ("Gentry Tr."), taken January 9, 2007, Exhibit 29 hereto, at 30.14-31.19. Sand screws are used in mining aggregate. *See id.* During the Gentry Meeting, Gentry and Alexander discussed Gentry's aggregate mining operation in Independence, Alabama (the "Gentry Pit").[19] *See* Alexander Tr., Exhibit 28, at 62.2-64.17. Alexander and Gentry rode out to look at the Gentry Pit the next day. *See id.* at 64.22-65.22.

---

the non-compete. *See id.* at 22.23-23.20. But, Lambert later introduced him to Alexander. *See id.* at 23.21-24.2 & 25.23-26.4. That introduction took place at the Gadsden Meeting. *See id.* at 33.5-.10.

[19] The Gentry Pit is within the Territory covered by the Lambert's non-compete.

During that initial Gentry Pit visit, Alexander and Gentry discussed Alexander taking over Gentry Pit operations. *See* Gentry Tr., Exhibit 29, at 43.14-46.3; Alexander Tr., Exhibit 28, at 76.5-.10. There was a stockpile of white oversize gravel at the site, and Alexander and Gentry discussed the Gentry Pit's ability to produce white oversize. *See* Gentry Tr., Exhibit 29, at 43.14-46.3. Alexander later asked Gentry if Gentry would be interested in an arrangement whereby Alexander would take the white oversize and leave everything else to Gentry. *See id.*

After going to the Gentry Pit, Alexander and Lambert discussed whether Lambert thought the white oversize at the Gentry Pit "would do for metallurgical rock." *See* Alexander Tr., Exhibit 28, at 78.14-79.11. Alexander cannot recall if he learned that Simcala was looking for white oversize before or after the visit to the Gentry Pit, but he does recall that at some point after that visit, Lambert told Alexander to call Wymer. *See id.* at 79.12-83.14. Again, Wymer confirms that this call was on January 10, 2005. *See* Wymer Tr., Exhibit 27, at 101.13-103.103.5. Alexander also confirms that when he called Wymer and told him that he would get back to him when he had something to talk about, he had the Gentry Pit in mind, if it would meet the metallurgical requirements.[20,21] *See* Alexander Tr., Exhibit 28, at 83.15-84.2.

* * * * * *

---

[20] At some point thereafter and before Alabama Gravel began its first deliveries of white oversize from the Gentry Pit, an unwritten deal was struck with Gentry whereby Alabama Gravel would be responsible for running the mining operation, paying the power and dealing with reclamation. *See* Gentry Tr., Exhibit 29, at 51.20-52.19. In exchange for those things, Alabama Gravel would get all white oversize, and Gentry would get all the other aggregate produced at the Gentry Pit. *See id.* Before finalizing the deal with Alabama Gravel, Gentry called Lambert to check up on Alexander and Lambert told Gentry Alexander was "a jam up guy." *See id.* at 73.8-74.2 & 77.18-78.18. Lambert's recommendation was important to Gentry. *See id.* at 77.18-78.18. Between the Gentry Meeting and the time Gentry finalized this deal with Alabama Gravel, Gentry recalls Lambert pulling into the Gentry Pit with equipment on a "low boy" trailer – "an old loader or something like that" – used in mining sand and gravel. *See id.* at 55.2-56.11 & 91.9-93.4. Gentry does not know if he left the equipment there. *See id.*

[21] Alexander has also stated that the idea was to use the revenue from Gentry Pit sales to build the mining operation on the Deatsville site. *See* Alexander Tr., Exhibit 28, at 135.18-136.7.

Thus, before Tuten met Alexander the first time, Lambert had introduced Dasinger, who was getting access to the Deatsville site, to Alexander. He had also introduced him to Gentry, who had an existing source of white oversize gravel. And, he had placed Alexander in touch with Simcala, who had a stated need for white oversize. In other words, thanks to Lambert, before they first met, Alexander and Tuten had both aggregate sources, a delivery method and a solid customer.

**(b) *The Hotel Meeting***

Tuten ended up meeting Alexander in a hotel ("the Hotel Meeting") in the Montgomery area two to three weeks after the Gadsden Meeting.[22] Lambert had called Alexander, found out when he would be in town and gave Tuten that information and Alexander's telephone number. *See* Tuten Tr., Exhibit 23, at 78.14-79.10. Lambert attended the Hotel Meeting, during which Tuten and Alexander discussed obtaining white oversize gravel from the Gentry Pit. *See id.* at 81.23-82.6 & 85.9-86.11. Tuten testified that Alexander told him he had been introduced to Gentry by Lambert. *See id.* During the Hotel Meeting, Lambert recommended Dasinger to Alexander and Tuten as a good person to be a foreman and run operations. *See id.* at 90.12-92.15. Lambert was also asked who they could use to construct their operation. *See id.* 100.11-101.5. Lambert had the specific information and the specific individuals who could help Tuten and Alexander construct a plant. *See id.*[23]

After the Hotel Meeting and during the time of the Gunnells Road Meeting discussed below, Alexander had ongoing discussions with Lambert about gravel at the Gentry Pit. *See*

---

[22] Alexander provided this timeframe as well through his attorney. *See* Email from James N. Walter, Esq. to Thomas F. Gristina, Esq., Exhibit 24; *see also* Tuten Tr., Exhibit 23, at 62.6-.20.

[23] It should also be noted that right around the time Alabama Gravel was formed, Tuten admits that Lambert drove him to the Deatsville site where Tuten took rock samples from holes he says Dasinger dug. *See id.* at 149.10-153.10. He claims that Lambert knew Dasinger had dug the holes. *See id.*

Alexander Tr., Exhibit 28, at 103.3-.13. Alexander wanted Lambert to confirm that what Alexander thought about the Gentry Pit was correct. *See id.* at 103.14-104.8. ***Alexander admits that Lambert was "assisting" him in opening the Gentry Pit.*** *See id.* at 104.9-106.14.

**(c) *The Gunnells Road Meeting***

Alabama Gravel was organized on March 24, 2005. [Doc. #47, ¶7] Its principals are Alexander, Tuten and Dasinger, owning 70%, 25% and 5% of the company respectively. *See* Dasinger Tr., Exhibit 25, at 41.22-42.18. On March 25, 2005, the day after Alabama Gravel was formed, Tuten, Alexander and Dasinger met ("the Gunnells Road Meeting") at the Gunnells Road address that eventually became Alabama Gravel's office.[24,25] *See* Tuten Tr., Exhibit 23, at 112.12-113.21. This office is on the same property where Lambert lives. *See id.* They got in touch with Dasinger through Lambert. *See id.* They talked to Lambert about renting the office. *See id.* at 115.1-.14. Lambert was present for the beginning of the meeting, but then left, claiming he did not need to be there. *See id.* at 116.10-.19.

Nevertheless, at the Gunnells Road Meeting, Tuten, Dasinger and Alexander discussed CCI hauling white oversize for Alabama Gravel. *See id.* at 128.6-129.4. They talked to Lambert about CCI doing this hauling before they talked to Carol Lambert about it. *See id.* Tuten admits that when Alabama Gravel hired CCI to haul aggregate, it was his intention at that time that by hiring CCI to do that, Lambert would be able to drive some of those trucks. *See id.* at 49.19-50.8. Tuten, Alexander and Dasinger also talked about Mrs. Lambert doing Alabama Gravel's bookkeeping. *See id.* at 129.21-130.19. They talked to Lambert about this first, and he said he

---

[24] Alexander has also stated through his attorney that he believes the Gunnells Road Meeting took place on March 25, 2005. *See* Email from James N. Walter, Esq. to Thomas F. Gristina, Esq., Exhibit 24.

[25] Alabama Gravel pays Carol Lambert $1,000 per month to rent that office. *See* Tuten Tr., Exhibit 23, at 169.2-.10.

was sure Carol Lambert would be interested in this because, as Tuten says Lambert put it, "she was needing something to do."[26] *See id.*

**(d) *The ADEM Permit Meeting***

Lambert's involvement with Alabama Gravel's formation and operation went even further. On March 17, 2005, a week before the Gunnells Road Meeting, Lambert met with civil engineers Larry Speaks and Russ Ware ("the ADEM Permit Meeting") to discuss revision of the ADEM Permit for the Gentry Pit. *See* Affidavit of Russell D. Ware, Jr. ("Ware Aff."), Exhibit 30 hereto, at ¶3. Lambert was seeking to revise the Gentry Pit ADEM Permit to expand the number of acres and areas that could be mined. *See id.* at ¶5. Up to that point, Ware, who had assisted Gentry before with respect to that Permit, recalls the Gentry Pit as a small mining operation by comparison to others that he had assisted in obtaining ADEM Permits. *See id.* at ¶¶4-5. Lambert's plans represented a significant expansion of the Gentry Pit mining operation. *See id.* at ¶5.

During the ADEM Permit meeting, Lambert and Ware reviewed and marked on the PAP map that had been submitted with the application for the existing Gentry Pit ADEM Permit. *See id.* at ¶6. Lambert marked the PAP as he told Ware where digging would take place and where drainage areas would be under the revised permit. *See id.* It appeared to Ware, from the way Lambert described to Ware and Speaks his plans for the mining operation on Gentry's land, that Lambert was in charge of that mining operation. *See id.* at ¶7. Ware does not recall Lambert mentioning the name Alabama Gravel during the meeting or any individuals that would be working with him in the mining operation. *See id.* The information Lambert imparted to Ware that morning was necessary, and intended to be used, to revise the Gentry Pit ADEM Permit.

---

[26] This, despite the fact that she was purportedly running CCI.

*See id.* at ¶8. ***Defendants admit that "ADEM permits are indicia of engaging in the sand and gravel business."*** *See* Defs' SOF at ¶80.

### (e) *Lambert's Assistance In Plant Construction And Alabama Gravel Operations*

There is extensive evidence of Lambert's further involvement with Alabama Gravel mining plant construction and operations. TCC employee Danny Luster saw a mining plant being built in Deatsville and was told by Allen King that King was building the plant in Deatsville for Luster's "former boss." *See* Transcript of Deposition of Danny Luster ("Luster Tr."), taken March 29, 2006, Exhibit 31 hereto, at 45.3-50.15 & 79.18-.21. Luster worked for Lambert at MMC before the 2002 transfer and closing and stayed on with TCC, eventually becoming a plant manager. *See id.* at 11.11-13.4 &14.17-20.5. Earlier, in January 2005, Lambert had stopped-in on Luster at TCC's Shorter, Alabama, mining operation and told Luster that "it wouldn't be long and that he had a few surprises for some people." *See id.* at 31.17-32.12. Luster took that to mean that Lambert would be getting back into the aggregate business. *See id.* at 32.13-.16. After mentioning there would be some surprises, Lambert also told Luster that he "didn't care if he told the four-eyed f__ker." *See id.* at 33.1-.15 (redacted). Luster understood Lambert as referring to Foley. *See id.* at 96.15-.19.

Lambert was also involved in the acquisition of equipment for operation and construction of Alabama Gravel's mining operations at the Gentry Pit and the Deatsville site. Pete Long, who brokers machinery used in construction of mining operations, brokered a deal through Lambert that resulted in Alabama Gravel purchasing used mining equipment from a Georgia dealer named Mack Tilly. *See* Declaration of William P. Long, Exhibit 32 hereto. Long states that Lambert told him the equipment was not for him but for Alabama Gravel and not to mention Lambert's name since he was under a non-compete with Foley. *See id.* Lambert stated that

Lambert could talk to anybody he wanted to and could give advice. *See id.* Long was paid $250 by Alabama Gravel for this deal. *See* Alabama Gravel check, dated May 2, 2005, Exhibit 33 hereto.

Lambert also referred Alabama Gravel to Southern Wire Enterprises, Inc. *See* Transcript of Deposition of Samuel W. Estock ("Estock Tr."), taken January 10, 2007, Exhibit 34 hereto, at 28.23-30.6. Southern Wire sells wear parts and machines that are used in gravel mining operations. *See id.* at 20.4-.17. On February 16, 2005, Southern Wire provided a price quote to Alexander for, among other things, a $56,480.00 "Trio 44" X 32 ft. Twin Fine Material Washer." *See* Southern Wire Deposition Documents, Exhibit 35 hereto.[27] That piece of equipment was invoiced to Alabama Gravel on December 15, 2005. *See* Southern Wire Deposition Documents, Exhibit 35; Estock Tr., Exhibit 34, at 68.12-.21. Below the "P.O. NO." on that invoice appears the name "Harry Lambert." *See* Southern Wire Deposition Documents, Exhibit 35. The name "Harry" also appears below the "P.O. NO." on Southern Wire's April 26, July 18 and September 9, 2005 invoices to Alabama Gravel.[28]

Estock has testified that Harry Lambert did not order the equipment on the December 15, 2005 invoice. *See* Estock Tr., Exhibit 34, at 72.7-.19. Estock says Lambert's name was put on there by his daughter because Estock mentioned Lambert's name so many times about Lambert

---

27 These documents were produced and authenticated by Estock at his deposition and attached to the deposition transcript at Exhibit 1. *See* Estock Tr., Exhibit 34, at 30.23-34.10.

28 *See* Southern Wire Documents Produced In Response to First Subpoena, Exhibit 36 hereto, at TCC000915, 920 & 931. While these references to "Harry" appear on the invoices produced by Southern Wire in response to the first subpoena TCC served in January 2006, they do not appear on the same invoices produced at by Estock at his deposition. *See* Southern Wire Deposition Documents, Exhibit 35. Since his deposition, Estock has informed undersigned counsel that he instructed his daughter, who works for him, to redact the documents produced at his deposition because he claims Lambert's name should not have been on them. It must also be noted that Alabama Gravel, for whom Carol Lambert acts as bookkeeper, produced its copies of Southern Wire invoices. *See* Southern Wire Invoices Produced by Alabama Gravel, Exhibit 37 hereto. The reference to Harry Lambert appears to have been redacted from Alabama Gravel's copy of the December 15, 2005 invoice before it was

having gotten Southern Wire that account. *See id.* at 69.9-71.23. This, however, does not explain why Lambert's telephone records show a 13 minute telephone call to Estock's cellular telephone on December 15, 2005. *See* Sorrell Telephone Record Affidavit, Exhibit 21. In fact, Estock had numerous conversations with Lambert in an around the time Southern Wire was providing equipment to and invoicing Alabama Gravel. *See id.*

Lambert's involvement with Alabama Gravel's mining operations is further confirmed by his telephone records showing telephone calls to Tuten, Alexander, Dasinger, Gentry, Becker, Simcala, Southern Steel & Pipe, Inc., Trey Holley of the Volvo large tractor equipment and large haul trucks dealership, Allen King, Pond River Steel, Cowin Equipment Company, Hardy Traylor of the Caterpillar dealership, Pearce Pump South, Inc. employee Bernie Ostervold and Texas Crusher System, Inc.[29] In addition to Tuten, Alexander and Dasinger, all of these entities and people are involved in the aggregate industry in the Montgomery, Alabama, area. *See id.* When asked about the calls, Lambert responded as follows.

(1) Lambert's records show calls to Southern Steel four times in September 2005 – a time when Southern Steel was doing work for Alabama Gravel on the Deatsville site – but he does not recall speaking with them. *See* H. Lambert Tr., Exhibit 18, 198.9-199.13. Lambert said he had no business ventures that would have required him to call Southern Steel during that time. *See id.* at 198.9-199.13. Lambert then testified that it could have been someone he loaned his telephone to, like Alexander or Dasinger, that placed those calls. *See id.* at 199.22-201.3 & 243.15-244.1. He does not know why Southern Steel called him more than a dozen times between September and October 25, 2005. *See id.* at 217.15-218.11. Southern Steel was invoicing Alabama Gravel during that period. *See* Southern Steel Invoices, Exhibit 38 hereto. He says that Southern Steel would not have been calling him about the Deatsville site, but that he had no business ventures at that time that would have required him to use Southern Steel. *See* H. Lambert Tr., Exhibit 18, at 217.15-218.11.

---

produced. *See id.* at AG 00149. In addition, Alabama Gravel failed to produce any copies of the other three invoices referencing "Harry." *See generally id.*

[29] All of these calls are contained in Lambert's telephone records and confirmed by the Sorrell Telephone Record Affidavit, Exhibit 21.

(2) The records show telephone calls between Lambert and Trey Holley of a Volvo truck dealership specializing in mining equipment. Lambert stated that CCI did not use Volvo trucks, but he knew there was a Volvo truck at the Deatsville site. *See id.* at 207.10-208.7. Nevertheless, he could not "really recall" speaking with Mr. Holley before January 2006 about Volvo trucks. *See id.*

(3) The records show Allen King speaking to Lambert more than 200 times between July 2005 and December 2005. Carl King was hired by Alabama Gravel to build the Deatsville site. Lambert claims the only discussion of King's work on the Deatsville site would have been "casual." *See id.* at 222.17-224.17.

(4) Lambert knew there were conveyers at the Deatsville site with the name Pond River Steel on them, but he had no idea how Alabama Gravel got connected with them. *See id.* at 215.21-217.5. He denies placing Pond River Steel in touch with Alabama Gravel despite the fact that Pond River Steel called him on October 12 and 17, 2005 and invoiced Alabama Gravel on October 25, 2005. *See id.*; *see also* Pond River Steel Invoice, Exhibit 39 hereto. He has no idea why Pond River Steel called him. *See* H. Lambert Tr., Exhibit 18, at 215.21-217.5.

(5) Lambert knows Becker as a Globe purchasing agent, but does not "know specifics" of why he called Becker in July and August 2005. *See id.* at 250.22-.6-251.12. Of course, as set forth above, Becker has testified to critical conversations and interactions with Lambert concerning Alabama Gravel product and CCI delivery of the same.

(6) Lambert knows Cowin Equipment Company as a company that sells excavators and off-road trucks used in mining operations, but does not remember why they called him more than a dozen times between July and December 2005. *See id.* at 219.10-221.1.

(7) Hardy Traylor called Lambert more than a two dozen times from July 2005 until the end of 2005. Lambert knows Traylor as a Caterpillar salesman. *See id.* at 227.16-229.5. He added that the calls could have been related to servicing CCI trucks, a friendship call or for "various reasons." *See id.* He denies the calls were related to the Deatsville site, but admits there are a Caterpillar bulldozer, a "couple" of Caterpillar excavators and a Caterpillar truck on the Deatsville site. *See id.* Lambert called Caterpillar dozens of times from July until the end of 2005, but again denies it was related to equipment at the Deatsville site. *See id.* at 242.8-.23. He does not "recall" why he called them. *See id.* Despite Lambert's claims, the records reveal that he exchanged calls with Traylor a total of more than 70 times.

(8) Lambert says that many telephone calls from Pearce Pump employee Lars "Bernie" Ostervold between August and November 2005 had nothing to do with the work Pearce Pump was doing on the Deatsville site. *See id.* at 233.4-.22.

Lambert says this despite the fact that Pearce Pump was invoicing Alabama Gravel during this same period. *See* Pearce Pump Invoices, Exhibit 40 hereto.

(9) Lambert says that none of the hundreds of telephone calls between him and Tuten in 2005 related to work by Lambert at the Deatsville site. *See id.* H. Lambert Tr., Exhibit 18, at 233.23-235.2. He could not recall the specifics of any of those conversations, but said the Deatsville site may have come up in "casual conversation." *See id.*

(10) The records also reflect more than ***500*** telephone calls between Dasinger and Lambert. Again, Dasinger was Alabama Gravel's day-to-day operations man.

(11) Lambert does not "really" know Texas Crusher System, Inc., but would say they sell crushers. *See id.* at 235.3-.12. He admits that crushers are used in the aggregate business but has no idea why they called him in November 2005. *See id.*

In short, there is simply no explanation for the above telephone calls and those reflected in Lambert's records with others in the sand and gravel industry other than that Lambert was actively engaged with Alabama Gravel and CCI in the sand and gravel business during his non-compete. Defendants may try to explain away all these hundreds and hundreds of calls with Lambert's bald assertion that they had nothing to do with business or with the claim that deposition and affidavit testimony from some of the call participants shows that they either cannot remember the calls or that they had nothing to do with the sand and gravel business. Considering the sheer volume of the calls and their coincidence with Alabama Gravel business operations, these explanations are not credible.

Lambert's involvement with Alabama Gravel's mining operations is also circumstantially confirmed by the Crest Capital Fax. That fax was not sent out of nowhere. It may be inferred that Lambert was doing something that lead to a tip going to Crest Capital, a company that specializes in equipment financing, and the resulting credit application.

Finally, Globe's Becker confirms that he actually met with Lambert at the Deatsville site in October 2005. *See* Becker Tr. Exhibit 22, at 44.9-.21 & 56.22-57.24. During that visit, they

discussed what the mileage from that location was to Globe's Selma plant and how the gravel could possibly be transported by river to Globe's Beverly, Ohio plant. *See id.* at 47.24-48.8.

**(2) <u>Alabama Gravel's Sales To Simcala, Globe And Maddox Stone & Gravel</u>**

Alabama Gravel began delivering white oversize gravel from the Gentry Pit to Simcala in April 2005. *See* Carol's Contracting, Inc. Invoices ("CCI Invoices"), Exhibit 41 hereto, at Bates Stamp Nos. CCI0001-0086. Simcala stopped buying from TCC at that time. CCI is the only company Alabama Gravel has used to haul white oversize to Simcala[30] and was paid $6.00 per ton for these deliveries.[31] *See* CCI Invoices, Exhibit 41. Simcala was not told this, but was given a delivered price. *See* Wymer Tr. at 128.23-129.10 & 135.9-136.2. Simcala would have liked to have known what CCI was being paid so it could have negotiated a better price from Alabama Gravel and believes that the appropriate freight charge should have been $4.00 per ton. *See id.* at 135.9-137.23. Simcala Purchase Order inquiries indicate that as of the date Simcala responded to TCC's January 2006 subpoena, it had purchased ***$1,448,269.39*** in Gentry Pit white oversize gravel from Alabama Gravel at $26.00 per ton. *See* Wymer Tr., Exhibit 27, at 153.9-157.23; *see also* Purchase Order Inquiry, Exhibit 42 hereto, at TCC00947-948. Simcala has testified that there was no give and take with Alabama Gravel on the $26.00 per ton price. *See* Wymer Tr., Exhibit 27, at 128.4-.22. Alexander told them $26.00 per ton and Simcala had to take it. *See id.* CCI invoices confirm that from April 10, 2005 until December 25, 2005, CCI was paid at least ***$478,929.37*** by Alabama Gravel for hauling white oversize gravel to TCC customers Simcala, Globe and Maddox Stone & Gravel.

---

[30] *See* Alexander Tr., Exhibit 28, at 189.20-.23.

[31] The CCI drivers even had keys to the Gentry Pit for after hours loading of white oversize and were allowed to do so using Alabama Gravel's $300,000 loader. *See* Dasinger Tr., Exhibit 25, at 77.21-81.5. Under this arrangement, Alabama Gravel learned the amount CCI hauled from scales upon delivery to Simcala. *See id.*

**J. *Paragraphs 67 And 68***

TCC disputes Paragraphs 67 and 68 because they misrepresent the history of the formation of Foley Materials Company ("FMC") and the business operations of TCC and FMC. Defendants are attempting to suggest that TCC is simply a holding company no longer in the sand and gravel business or in a business similar to CCI. Again, the facts are to the contrary.

TCC sold its ready-mix concrete business to Lafarge Corporation effective March 31, 2004. TCC, however, remains actively engaged in the aggregate business, which includes among other things, the sale of sand and gravel, through wholly owned operating subsidiary FMC. TCC is also actively engaged in the pre-cast concrete products business through wholly owned operating subsidiary Foley Products Company ("FPC"). FMC and FPC were formed on April 1, 2005.

According to Eric Nix, TCC's Vice-President of Finance, as of April 1, 2004, TCC's business was precast concrete products and aggregates. *See* Transcript from Deposition of Eric Nix ("Nix Tr."), taken March 29, 2006, Exhibit 43 hereto, at 5.20-6.12 & 9.1-10.13. On April 1, 2005, TCC became a holding company after forming operating entities FMC and FPC. *See id.* at 10.14-12.20. As part of this transaction, certain TCC assets were transferred to FMC and FPC. *See id.* at 12.21-13.8.

"[F]rom a business standpoint," FMC and FPC were formed because some of the concrete plants Lafarge acquired continued to purchase supplies in TCC's name. *See id.* at 11.1-12.11. Lafarge's plants did not pay their bills timely, and FMC's and FPC's "ongoing businesses" were getting hurt. *See id.*

Nix was asked "what is The Concrete Company in the business of right now?" *See id.* at 13.17-.18. He responded, "[t]he primary operating businesses are" FMC and FPC. *See id.* at

13.19-.21. TCC owns 100 percent of FMC's and FPC's stock. *See id.* at 13.11-14.12. TCC, FMC and FPC have separate employees, but some employees, like Nix, are employees of all three entities. *See id.* All of Nix's salary is paid by TCC. *See id.* at 15.1-.6. In addition to being a holding company for FMC and FPC and owning and managing real property, TCC provides administrative services to its two operating companies, FMC and FPC. *See id.* at 14.13-.23. Accounting, invoicing, payables, payroll and human resources are all centralized with TCC. *See id.* FMC and FPC reimburse TCC for these services. *See id.*[32]

TCC President Frank Foley confirms that FMC was formed to address Lafarge's plants' late payments. *See* Foley Tr., Exhibit 16, at 41.20-42.19. The operating entities were formed from a liability standpoint given the previous sale of TCC's assets and to address customer confusion resulting from the sale. *See id.* He then testified as follows:

Q. Prior to Foley Materials existing, had The Concrete Company had any problems with producing the quantities of white oversized gravel that were being requested by customers for that product?

A. The fact that Foley Materials was set up, I mean, it's a wholly-owned subsidiary, Foley Materials. So there's no –

Q. So it's a legal entity that doesn't mean anything?

MR. LAURIE: I object to that.

A. It's – it's an LLC subsidiary.

Q. But it is a legal entity?

A. Yeah.

Q. It exists?

---

[32] TCC holds, in its own name, 16 aggregate leases in Montgomery, Macon and Russell Counties, Alabama. It also owns three pieces of land in Montgomery and Macon Counties, Alabama, and one piece of land in Taylor County, Georgia, which will be used for aggregate mining. *See* Affidavit of Horald "Hugh" Sorrell ("Sorrell Aff."), taken May 23, 2006, Exhibit 44 hereto, at ¶¶3-4. In addition, FMC and FPC employees share in common retirement and health plans with TCC employees, both of which are administered by TCC. *See id.* at ¶5.

A. Right.

Q. It is the name of the company that operates aggregates now?

A. And it's a hundred percent owned by The Concrete Company.

Q. And you set that up for legal purposes?

A. For the reasons I told you.

Q. One of them being liability issues?

A. Yeah.

Q. You didn't want The Concrete Company to be liable for legal problems that Foley Materials might have?

A. That – that could be.

*See id.* at 43.4-44.18.

Defendants' allegations appear based on brief quotes from Hugh Sorrell's deposition. Sorrell is FMC's Vice-President and General Manager. In previous summary judgment filings [Docs. ##39 & 41], Defendants have made similar allegations based also on limited portions of Eric Nix's testimony. The Nix testimony Defendants previously cited simply establishes that when he went to work for TCC in 1998, it was in the ready-mix concrete, precast concrete products and aggregates business; that TCC operated those businesses via divisions; and that in April 2005, TCC became a holding company. *See* Nix Tr., Exhibit 43, at 7.11-8.7 & 10.9-.19. Defendants fail to cite the additional testimony set forth above which places context around FMC's and FPC's formation and interrelationship with TCC. More importantly, Defendants fail to cite any testimony from Nix that TCC ever left the aggregates business. In fact, as Nix's testimony demonstrates, the only thing that changed in April 2005 was that TCC's precast

concrete and aggregate operating divisions became wholly owned operating companies. TCC remained in the aggregate business via its operating division, FMC.

Sorrell's testimony is similarly taken out of context. Sorrell was asked whether TCC is in the aggregate business in the territory covered by the non-compete agreement at issue. *See* Transcript from Deposition of Horald Sorrell ("Sorrell Tr."), taken March 28, 2006, Exhibit 45 hereto, at 21.10-.16. He responded, "The Concrete Company is not." *See id.* Sorrell was asked what business TCC is in. *See id.* at 14.16-15.4. He said TCC now serves as a holding company that owns FMC and FPC. *See id.* He had previously testified that FMC is in the business of excavating, mining, distributing, delivering, selling or otherwise disposing of aggregate at wholesale or retail. *See id.* at 13.10-.15. He later added that TCC was involved in the sale of aggregate "[t]hrough its ownership of" FMC. *See id.* at 133.19-134.7. Taken in context, therefore, Sorrell's testimony actually describes TCC's extensive relationship and involvement in the aggregate business via FMC. In any event, these facts were appropriately covered by Nix and Foley. Considering all the testimony, there is no doubt that TCC is still engaged in the aggregate business, including, but not limited to, sand and gravel.

Defendants also assert that "TCC transferred its assets to Foley Materials Company" on April 1, 2005." The clear implication of this assertion is that TCC transferred all of its assets to FMC. In Defendants' previous filing, they did actually assert that "TCC transferred ***all*** of its assets ***(i.e., sand and gravel operations in the Montgomery area)*** to Foley Materials on April 1, 2005." [Doc. #40, ¶9] (Emphasis added). TCC disputes this unsupported allegation.

First, the portions of Sorrell's deposition Defendants cited in the earlier summary judgment filing – Sorrell Tr., Exhibit 45, at 17.13-21.1 – do not support the allegation. In the cited testimony, Sorrell describes the aggregate plants FMC has owned and operated since April

1, 2005 in the territory covered by the non-compete. He states he was aware of the transaction that resulted in the FMC's formation but did not participate in it. *See id.* at 19.21-20.2. Finally, he states TCC assets were transferred to FMC; but he does not describe the assets or say that ***all*** TCC assets were transferred. *See id.* at 20.22-21.1.

Second, the Bill of Sale From A Parent To Wholly Owned Subsidiary ("Bill of Sale") Defendants now cite does not support their allegation. The Bill of Sale states TCC transferred "all the personal property used in the Aggregates Division, including all finished goods, work in process, raw materials, machinery, equipment, and vehicles." *See* Bill of Sale, Exhibit 46 hereto, at "Whereas" clause, p.1. The Bill of Sale does not transfer all assets. Rather, only specified personalty was transferred. This specified personalty is not described as, and does not constitute, all TCC's assets or TCC's ***"sand and gravel operations in the Montgomery area."*** This is because TCC retained all of its assets not listed, including, but not limited to, its leases, owned real estate and contractual rights and obligations, and specifically including the contract containing the non-compete. TCC also retained 100% ownership of FMC.

**K.** ***Paragraph 75***

TCC disputes Paragraph 75 because it states that Maddox Stone & Gravel is not a common customer of FMC and Alabama Gravel. Maddox Stone & Gravel purchases materials from FMC and purchased from TCC before FMC was formed as an operating subsidiary. *See* Maddox Tr., Exhibit 4, at 19.23-22.22.

**L.** ***Paragraphs 76 Through 78***

TCC disputes Paragraphs 76 through 78 because they, and the associated report of Defendants' designated expert witness, Paul Fields, inaccurately portray TCC's damages in this

case. As set forth in TCC's response to Lambert's Interrogatory No. 22, TCC's damages are accurately set forth as follows:

> RESPONSE: Yes. Plaintiff's actual damages, excluding attorneys' fees and costs to which it is also entitled and which continue to accrue, are at least $1,096,038.00, plus interest. These damages are calculated and computed as follows.
>
> These damages are the result of Defendants' improper activity resulting in Plaintiff's two largest white oversize gravel customers, Simcala and Globe, purchasing less of that product from Plaintiff beginning in January 2005.
>
> By the spring 2004, Plaintiff had accumulated an estimated inventory stockpile of 51,592 tons of white oversize gravel at the Ward Plant in Shorter, Alabama. Production continued at the plant into 2006. Plaintiff began selling large quantities of oversize to Simcala in April 2004, and to Globe in July 2004. From April to December 2004, the net effect of plant production and sales to Simcala and Globe was a decrease in Plaintiff's estimated oversize gravel inventory stockpile. As a result of the decreasing stockpile levels at the Ward Plant, Plaintiff's management became aware that its estimated oversize gravel inventory stockpile was less than it had previously thought. Plaintiff notified its two largest customers, Simcala and Globe, that it was working to sort through this inventory discrepancy. Plaintiff also notified these customers that in the short term, Plaintiff would only sell each of them 500 tons of white oversize per month.
>
> Again, this was intended to be a short term arrangement, and in fact, in assessing its inventory, Plaintiff determined that it could increase the Ward Plant production by working six days per week instead of the four it had previously been producing. There was sufficient capacity at the plant and sufficient reserves in the ground to allow for this 50% increase in production. Plaintiff was willing to increase production to meet its customers' additional needs for white oversize gravel. At the time, the land available at the Ward Plant for mining had several years of aggregate reserves remaining.
>
> As a result of Defendants' impermissible activity, however, Plaintiff was improperly denied the opportunity to increase production and retain Simcala and Globe as its customers. Simcala bought 22,307 tons of white oversize gravel from Plaintiff's Ward Plant from April 2004 through December 2004. Simcala purchased 540 tons of white oversize in January 2005, 566 tons in February 2005, none in March 2005, 333 tons in April 2005 and none since. Globe bought 21,296 tons of white oversize gravel from Plaintiff's Ward Plant from July 2004 through December 2004. Globe purchased 1,049 tons in January 2005, 31 tons in February 2005, 947 tons in March 2005, an average of 2,360 tons per month from April to December 2005, a total of 2,716 tons in January and February 2006 and none since.

Therefore, after consistent purchases of white oversize gravel by Simcala and Globe in the second half of 2004, Simcala's purchasing level was zero by April 2005 and has never recovered. Globe's purchasing level returned to approximately 65% of its 2004 level before stopping in February 2006. Additionally, as stated above, Plaintiff's management was prepared to increase production by 50% to meet increased demand for its white oversize gravel.

There are two elements of lost profits as a result of Defendants' improper activity and interference in Plaintiff's relationship with Simcala and Globe: lost profits on sales consistent with 2004 monthly levels and lost profits on sales resulting from a 50% increase in production. The term of the damages calculation is from January 1, 2005 to June 15, 2006. This period is consistent with the timing of Defendants' improper activity and interference with Plaintiff's relationship with Simcala and Globe. It is also consistent with the date the lessor of the Ward Plant requested that Plaintiff temporarily not conduct mining operations on the site. This request is addressed further in response to Interrogatory No. 23 below, and the response and objections thereto are incorporated herein. Lost profits resulting from Defendants' actions during this period are $751,482.

Plaintiff's earlier lost profits calculation, indicated in part by February 2006 spread sheets tendered to Defendants, were based on facts and circumstances known in February 2006. That calculation was prepared by calculating lost profits on additional sales to Simcala for production at Ward for six days per week versus the four days per week. Damages were also projected for lost profits associated with projected 2006 sales to Globe, based on actual sales for April 2004 through December 2005. Additionally, lost profits were calculated for a projected price decrease to Globe from $21 to $17 per ton for white oversize gravel, and from $11.75 to $10.95 per ton for brown gravel.

Plaintiff's updated damages calculation is based on lost profits on sales from January 2005 to June 15, 2006, that would have occurred with the production level that Plaintiff would have generated from the Ward Plant absent Defendants' improper activity and interference. The updated damages calculation does not differentiate sales to Simcala versus sales to Globe or any other smaller customers. This is because the previous damages calculation was a customer oriented calculation, whereas the updated damages calculation is based on Ward Plant production that would have occurred and been sold.

Given the stable market that existed before Defendants' improper activity and interference in late 2004 and early 2005, the updated calculation is conservative and a reasonable and rational method for calculating damages.

The updated calculation, shown on the spread sheets attached hereto, begins with a calculation of the variable cost per unit of production at the Ward

Plant. This calculation is different from the previously submitted damages calculation in which variable costs were based on a per unit processed computation (which separately counts units produced and units shipped and adds the two together). In the updated calculation, the variable cost per unit is calculated by dividing variable production costs by the number of units produced. The result is a higher variable cost per unit, which then yields a lower incremental profit. While either approach works and gives a reasonable and sound basis for calculating damages, the updated calculation is more conservative. Actual plant costs for January through December 2005 were used as a basis for calculating the variable cost per unit of production for 2005.

The next element of the updated damages calculation is the projection of production of white oversize gravel. This is calculated by projecting actual production levels at a four day production week to a six day production week, assuming the same output per day for each of the six days. Plaintiff then added its estimated inventory at December 31, 2004 of 1,200 tons and subtracted an inventory level for downtime of 4,000 tons to arrive at tons available for shipment in 2005 of 46,498.

Next, Plaintiff reduces the tonnage of white oversize gravel from the Ward Plant available for shipment by the amount that was actually sold out of the plant. This yields a net tonnage available for shipment. Plaintiff multiplies this tonnage by the lower of its 2005 prices of $19.50 to arrive at lost revenues due to Simcala and Globe not buying from Plaintiff. From these lost revenues, Plaintiff subtracts the required royalty fee of 7% and the previously described variable cost per unit of $1.89. This results in lost profits due to Simcala and Globe not buying white oversize gravel from Plaintiff in 2005 of at least $351,119.

This calculation is prepared similarly but separately for 2005 and 2006. The 2006 computation covers the period from January 1, 2006 to June 15, 2006.[33] To account for a partial year of production, Plaintiff calculates a per week production figure that is applied to the 24 weeks from January 1, to June 15, 2006. One difference between the 2005 and 2006 calculations is that the 4,000 tons held in inventory reserve for downtime is treated as available for sale in 2006. Otherwise the two years' computations are similar. It should also be recognized that Plaintiff has conservatively held the price per ton at the lowest of the 2005 prices ($19.50). The lost profits for 2006 are at least $400,363.

It must also be recognized that the spread sheets do not specifically mention Maddox Stone & Gravel, who apparently purchased white oversize

[33] It must be noted that while sales apparently did not start at Alabama Gravel's Deatsville site until after June 15, 2006, those sales and Defendants' activity with respect to that site are relevant and admissible as to both liability and damages in that the opening of the Deatsville site was clearly a significant factor in Simcala and Globe shifting their purchases from Plaintiff.

gravel from Alabama Gravel in 2005 and 2006. This is because Plaintiff reasonably anticipates that all increased production would have been sold to Simcala and Globe. Nevertheless, Maddox's purchases are relevant to liability in that they demonstrate Defendants' improper conduct and to damages in that in the unlikely event that Simcala and Globe did not purchase all available increased production, material would have been available to Maddox.

Another element of compensable damages to Plaintiff is for Harry Lambert's breach of the non-compete and the effect this and Defendants' other improper actions had on Plaintiff's customer relations and on Plaintiff's ability to present white oversize gravel in the market. Defendants denied Plaintiff the benefit of the non-compete for which it paid. The debt assumed by Plaintiff and the funds paid to MMC Holdings, which was owned and controlled by Harry Lambert, at the time of the Montgomery Materials buy-out were for the benefit of and in exchange for the non-compete. Lambert never complied with the non-compete and while violating the same interfered, along with CCI, with Plaintiff's business relations. Plaintiff was denied the benefit of its bargain. This additional element of damages amounts to at least $344,556.00, plus the aforementioned lost profits.

The following documents support this itemization:

(1) Damages spread sheets already produced and those produced herewith.

(2) Financial statements for the Ward Plant already produced and/or produced herewith.

(3) Invoices, tickets and other records produced by Defendants, Simcala, Globe, Maddox Stone & Gravel, copies of which Defendants have and/or which have already been produced.

(4) April 9, 2002 Closing Statement and April 10, 2002 Assignment, copies of which are already in Defendants' possession and are being produced herewith.

*See* Plaintiff's Responses to Defendant Harry E. Lambert's Third Interrogatories and Request for Production, Exhibit 47 hereto.

TCC's damages model has been bolstered by the testimony of Simcala. Eddie Boardwine is Site Manager and Vice President of Simcala. *See* Transcript of Deposition of William E. Boardwine, taken January 10, 2007, Exhibit 48 hereto, at 13.17-.20. He confirms that there is a

very limited market for white oversize in the Montgomery area. *See id.* at 48.23-49.4. He also stated that if TCC had been willing to increase production in January 2005, he would have been willing to continue to buy from them. *See id.* at 73.6-.11. At that time, the only two white oversize suppliers in the Montgomery area that he was aware of were TCC and Elmore Sand & Gravel. *See id.* at 74.1-.6. Wymer adds that when Simcala went looking for additional suppliers in January 2005, he was not able to locate another supplier besides Alabama Gravel. *See* Wymer Tr., Exhibit 27, at 91.19-93.2. Simcala was in a "dire" need for gravel. *See id.* at 125.12-126.15.

Taken in context with the fact that Elmore Sand & Gravel declined so sell them additional white oversize, *see* Stanley Aff. at ¶3, this means that Simcala would have had to come back to TCC for additional product, which TCC would have provided at a reasonably increased price. Boardwine confirms that Simcala would have paid TCC more. *See* Boardwine Tr., Exhibit 48, at 73.12-.18. Alabama Gravel's entry into the market made it unnecessary to go back to TCC and denied TCC the opportunity to increase production. This is confirmed by Boardwine's testimony that he never discussed with TCC increasing the price Simcala would pay for TCC oversize and does not recall discussing increasing production. *See id.* at 71.6-73.2.

**M. *Paragraphs 81 Through 84***

TCC disputes Paragraphs 81 through 84 because they do not reference the dinner that Lambert attended with Alexander and Maddox and because, again, Lambert is attempting to redefine the sand and gravel business to exclude his activities in violation of the non-compete. Maddox also told Sorrell that he would place orders directly with Lambert. *See* Sorrell Tr., Exhibit 45, at 24.4-25.9.

**N. *Paragraphs 86 And 87***

TCC disputes Paragraphs 86 and 87 because Randy Willingham told Sorrell that he would place orders for gravel from Alabama Gravel directly with Lambert. *See id.* TCC also believes that Lambert's assistance to Alabama Gravel and its resulting entry into the market has lead to Willingham declining to enter into a long-term contract. *See* Foley Aff., Exhibit 7, at ¶6.

**O. *Paragraphs 88 And 89***

TCC disputes Paragraphs 88 and 89 because there is no supporting evidence and they are totally irrelevant. Mrs. Lambert's health and Lambert's claimed difficulty reentering the market are not at issue.

**P. *Paragraphs 90 Through 92***

TCC disputes Paragraphs 90 through 92 because they are false. The facts extensively set forth above demonstrate Lambert's interest in and benefits derived from CCI and Alabama Gravel, both of which are in the sand and gravel business. Lambert's own testimony also demonstrates that he violated his non-compete. He cannot now try to re-write the non-compete.

**Q. *Paragraphs 93 Through 97***

TCC disputes Paragraphs 93 through 97 because they misrepresent the circumstances of the consulting agreement and Mr. Lambert's involvement at Deatsville. Given the extensive assistance Lambert has given Alabama Gravel, it is clear that the consulting agreement is deferred compensation for services before the non-compete expired. Moreover, the above facts demonstrate the Lambert was involved with construction at and sales from Deatsville.

* * * * *

All of the above disputed facts unequivocally demonstrate that Defendants are not entitled to summary judgment.

**-- SUMMARY JUDGMENT STANDARD --**

Summary judgment is appropriate if the pleadings, depositions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "material" if it is a legal element of a claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law, the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor. *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985).

In accordance with this standard, Defendants' purported arguments in support of summary judgment will be addressed and refuted separately below.

**-- ARGUMENT AND CITATION OF AUTHORITY --**

Defendants have made a "kitchen sink" attack on TCC's appropriate efforts to enforce its non-compete with Lambert. It appears Defendants' motion is more of an effort to avoid summary judgment in TCC's favor, which is clearly warranted as to liability on Lambert's breach of the non-compete. As it has done above with respect to Defendants' version of events, TCC refutes all of Defendants' purported arguments below.

**I. <u>Standing And Estoppel</u>**

Defendants begin their "Argument" by incorporating by reference their previous

summary judgment filings asserting lack of standing and estoppel. *See* Def' Brief at p.32. TCC, therefore, incorporates by reference its opposing filings on those issues. [Docs. ##49 & 61] There no basis to award summary judgment on grounds of standing or estoppel.

## II. <u>The Non-Compete Is Appropriate Under § 8-1-1</u>

Defendants contend that the non-compete agreement does not fall within the exceptions of Ala. Code 1975 § 8-1-1. *See* Def' Brief at pp.33-34. That provision states, in pertinent part, that:

> (a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.
>
> (b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein.

Defendants claim the first § 8-1-1(b) exception allowing a seller of the goodwill of a business to agree with the buyer to refrain from carrying on or engaging in a similar business and from soliciting old customers does not apply since MMC Holdings is not a party. Defendants further claim that the non-compete is not enforceable under the second § 8-1-1(b) exception dealing with an employee because the non-compete prohibits things that would not amount to Lambert engaging in a similar business or soliciting old customers of Montgomery Materials. *See* Defs' Brief at p. 32-35. Defendants are wrong on both counts. This case falls within both § 8-1-1(b) exceptions.

First, MMC Holdings is not a necessary party. Lambert is both the seller and the employee. Section 8-1-1(b) begins with the language "***[o]ne*** who sells the good will of a

business . . .." (Emphasis added) In this case, Lambert is the "one" who sold the 50% interest, including good will, of Montgomery Materials. While that interest was technically owned by MMC Holdings, Lambert controlled MMC Holdings and authorized the same. That is why he was specifically listed as a party and signatory to the 1997 Agreement. *See First Ala. Bancshares, Inc. v. McGahey*, 355 So. 2d 681, 682, 684 (Ala. 1977)(non-compete enforced against bank director/shareholder who specifically agreed not to compete following bank merger). The 1997 Agreement even specifies Lambert benefited from its terms as a MMC Holdings shareholder. *See* 1997 Agreement, Exhibit 1, at § 1(d). Lambert was also listed as an indemnitee in the Assignment effectuating the transfer of MMC Holdings 50% interest in Montgomery Materials to TCC. *See* Assignment, Exhibit 14, at ¶3.

There does not appear to be any authority for Defendants' apparent proposition that where a company sells its interest in a business, only the company – as opposed to the individual authorizing the selling company's actions – can be bound by a non-compete. Such a requirement would make no sense as the non-compete would be totally worthless. The individual authorizing the sale could simply compete in his own name or form a new company and compete. Taken another way, under Defendants' theory, were a company to sell itself, and its shareholders personally sign a non-compete, the shareholders would not be accountable for the non-compete because they were not the sellers. *Cf.*, *Yost v. Patrick*, 245 Ala. 275, 280, 17 So. 2d 240 (1944)("[t]he seller may not make use of a corporation entity as a means of evading the obligation of his covenant"). TCC is not attempting to enforce a non-compete against company shareholders who had no employment role with the company or involvement with its sale. Rather, TCC is enforcing the non-compete against the actual seller, MMC Holdings' key man, who had total control over the company and the sale of its interest in Montgomery Materials.

Second, the non-compete correctly encompasses business activities similar to those of Montgomery Materials and TCC, who was both a party to the non-compete and a successor to Montgomery Materials' interest in the same. The "Prohibited Activity" covered by the non-compete is excavating, mining, distributing, delivering, selling or otherwise disposing of any Product at wholesale or retail. During its term, Lambert also could not (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity. Montgomery Materials engaged and TCC has at all pertinent times engaged and continues to engage in all of these activities. The non-compete is, therefore, reasonably tailored to cover Montgomery Materials' and TCC's similar businesses.

## III. <u>There Is Exhaustive Evidence Lambert Violated The Non-Compete</u>

Defendants next argue that "there is no evidence that Lambert has engaged in the sand and gravel business or solicited old Montgomery Materials customers during the period of the non-compete." *See* Defs' Brief at p.36. As Defendants put it, "[t]he truth is that what upset TCC is that after formation of Alabama Gravel in 2005, Lambert---when his health permitted---occasionally drove a commercial truck containing gravel which had been mined and sold by a true competitor of TCC in the gravel business, namely Alabama Gravel." *See* Defs' Brief at p.36. ***These are totally false statements that encapsulate Defendants obfuscation in this case.***

TCC's factual recitation tendered in response to this motion and the one submitted in support of TCC's motion for partial summary judgment exhaustively demonstrate via direct and circumstantial evidence Lambert's activities in the sand and gravel business in violation of his

non-compete. Lambert was integrally involved in the formation of a vertically integrated sand and gravel business for which he and his wife have been handsomely paid.

Instead of abiding by his non-compete, Lambert assisted his wife in forming CCI, which allowed him to earn money while at the same time staying in contact with all major aggregate suppliers and purchasers in the Montgomery area. He was then able to immediately recognize and capitalize on TCC's temporary supply issues in January 2005. TCC was never able to accommodate its valuable customer with increased production because Lambert quickly set up Alabama Gravel through the Simcala, Gadsden, Gentry, Hotel, Gunnells Road and ADEM Permit Meetings. As Tuten, he would not have been involved with Alabama Gravel were it not for Lambert, would not have pursued it further if Lambert had not hooked him up with Alexander. Lambert even offered his wife's property and bookkeeping assistance. Alexander even admits that Lambert assisted him in opening the Gentry Pit. And, of course, CCI received the exclusive rights to deliver Alabama Gravel white oversize. Defendants have in fact conceded that Lambert was engaged in the sand and gravel business when he attended the ADEM Permit Meeting. As Defendants state, an ADEM Permit is indicia of engaging in the sand and gravel business.[34]

Lambert also assisted Alabama Gravel in obtaining Globe as a customer via his delivery of product for testing and discussions with Becker at the Deatsville site and elsewhere. The Southern Wire documents, Pete Long's statement and Lambert's own telephone records indicate that Lambert was also actively involved in the construction of the Deatsville site both via contractor and equipment supplier recommendations and telephone conversations with contractors and equipment suppliers.

---

[34] It is not, however, the only indicia. All of Lambert's and CCI's other activities are also part of the business.

In addition to violating the non-compete provisions § 8.4(1) and (2) described in Argument Section II above, Lambert's interaction with Globe violated non-compete provisions § 8.4(3) prohibiting inducing a "Customer" (i) to purchase Product in the Territory from any business entity operating in the Territory other than Montgomery Materials or its affiliates; or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery Materials. "Customer" means any actual customer who purchased Product from Montgomery Materials in the Territory, within the 24 month period prior to the date of the closing of the sale by MMC Holdings of its Membership Interest in Montgomery Materials. Globe was such a Customer. *See* Foley Aff., Exhibit 7, at ¶8.

It must also be recognized that not only is now clear from the above facts and discussion that Lambert violated his non-compete. It is also now clear that CCI conspired with him to do so and to tortiously interfere with TCC's contractual and business relations. The facts also demonstrate that Lambert and CCI did this with requisite intent to establish all elements of this tort. From the time of CCI's formation, through Alabama Gravel's formation and sales to TCC's customers and, indeed, throughout this litigation, Defendants have misrepresented and attempted to conceal their activities and role in Alabama Gravel mining, delivery and sales. Their mantra has been that CCI is just an ordinary trucking company and that Lambert drove a truck for free on occasion when his health permitted. Discovery, which Defendants fought to prevent, has revealed that this simply is not true. Discovery has also revealed that Defendants also failed to disclose to Simcala that CCI was receiving exorbitant freight rates and that Defendants forced the high price of aggregate on Simcala. Defendants have not only deceived TCC, they have deceived its customer – all in a successful effort to coerce Simcala to end its relationship with TCC.

## IV. Trucking And Consulting Are Part Of Sand And Gravel Mining And Selling

Defendants next argue that they cannot be accountable for their actions because trucking and consulting are somehow not part of sand and gravel mining or selling. *See* Defs' Brief at pp.36-40. This argument fails, first and foremost, because even if all Lambert did was truck and consult, the non-compete is not limited to "sand and gravel mining and selling." Rather, the non-compete sets for numerous specific prohibited activities including, but not limited to:

- excavating, mining, ***distributing, delivering, selling or otherwise disposing of*** any Product;
- having any interest in (whether as a shareholder, partner, member or otherwise), acting as agent, broker, or ***distributor for or advisor or consultant to***;
- in any way ***assisting*** (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged in the Prohibited Activities; and
- inducing a Customer (i) to purchase Product in the Territory from any business entity operating in the Territory other than Montgomery Materials or its affiliates; or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery Materials. (For purposes of this prohibited activity, "Customer" means any actual customer who purchased Product from Montgomery Materials in the Territory, within the 24 month period prior to the date of the closing of the sale by MMC Holdings of its Membership Interest in Montgomery Materials.

Clearly, trucking and consulting expressly, or at a minimum, implicitly, fall within these parameters.

Defendants' reliance on *Kershaw v. Knox Kershaw, Inc.*, 523 So. 2d 351 (Ala. 1988), is also misplaced. Defendants assert that in *Kershaw*, the Alabama Supreme Court "affirmed a ruling that a company primarily in the business of manufacturing and selling machines used by

railroads for maintaining their tracks was not in the same business as a related company which contracted for the maintenance of railroad property although the two businesses involved the same type of machinery." *See* Defs' Brief at p.37, *citing Kershaw*, 523 So. 2d at 354. *Kershaw*, however, never affirmed such a ruling. By contrast, *Kershaw* actually upheld a non-compete between the two companies despite the fact that the defendant company was attempting to engage in a leasing business in which there was no trial court finding that the plaintiff company had ever been engaged. 523 So. 2d at 360. Before the litigation, the defendant company was a manufacturer and seller of railroad maintenance equipment and the plaintiff company was a maintenance service provider for the same type of machinery. *Id.* at 354. The Supreme Court nevertheless upheld the non-compete to the extent that it prohibited direct and indirect competition. *Id.* According to the Court, every time the defendant company leases equipment so that it could conduct its own maintenance, it proportionally decreased the railroad's need to hire the plaintiff company to perform the maintenance services. *Id.*

Here, there is even less of a distinction between TCC and Defendants' activities because "trucking" aggregate cannot be separated from TCC business dealings. Trucking, or the delivery of aggregate, is part in parcel to TCC's sand and gravel operations. This is exactly the testimony of Elmore Sand & Gravel (a TCC competitor) employees David Gaddy and Billy Stanley. Mrs. Lambert testified much the same way. Moreover, even if there were some distinction, the competition would have been a sort of indirect competition clearly covered by the non-compete.

Defendants' efforts to distinguish trucking are even more refuted by the fact that Lambert was in direct communication with buyers. He met with Simcala at Simcala, he met at Deatsville with Globe and he had dinner with Maddox and Alexander. Lambert was therefore involved in sales as well. CCI also received $6.00 per ton to deliver to Simcala, which Simcala has testified

was two dollars ***too much*** per ton. CCI's excess compensation is evidence of its receiving a direct portion of the sales price for the aggregate as opposed to its being paid simply for hauling.

CCI's and Lambert's close affiliation with Alabama Gravel further distinguish it from any sort of independent trucking operation. CCI was Alabama Gravel's exclusive hauler. Its drivers had keys to the Gentry Pit and were allowed to operate and expensive loader and load their own trucks. Its President, Mrs. Lambert, was also Alabama Gravel's bookkeeper. Their "offices" were even on the same property.

Defendants' efforts to distinguish consulting are similarly flawed. Consulting is specifically covered by the non-compete. Despite Lambert's statements to the contrary, he clearly consulted within the territory at the Simcala, Gentry, Hotel and Gunnells Road Meetings. He was also providing consulting services at the ADEM Permit Meeting. Indeed, all of Lambert's activities set forth above fall within the consulting umbrella.

Finally, Defendants' efforts to have this court apply the careful scrutiny described in *Hill v. Rice*, 67 So. 2d 789 (Ala. 1953), to the non-compete are misplaced. *See* Defs' Brief at p.39. Components of the non-compete related to Lambert's post-employment, but the non-compete was clearly ancillary to the sale of a business. As discussed further *infra*, the scrutiny described in *Hill* does not appear to apply where the non-compete emanates from a business sale. But, even under *Hill* scrutiny, the covenant should be enforced because it clearly covers Lambert's actions.

Critically, Defendants even concede that Alabama law "permits TCC the right to prohibit Lambert from starting up another sand and gravel business in the Montgomery area for a reasonable period of time." *See* Defs' Brief at pp.39-40. That is exactly what the non-compete is targeted at preventing. It is also exactly what Lambert did in violation of the same.

## V. TCC Is Not Seeking To Enforce The Non-Compete Against Lambert's Spouse

Defendants next argue that TCC is seeking to enforce the non-compete against Lambert's spouse. *See* Defs' Brief at p.40. This too is false. TCC has sued CCI, not Carol Lambert. Nor is TCC arguing that CCI breached a contract by conspiring with Lambert regarding his violation of the non-compete. Rather, CCI tortiously interfered with TCC's contract with Lambert and business relations with its customers by working with Lambert with knowledge of the non-compete. Mrs. Lambert admits she knew Lambert had a non-compete which she says prohibited him from going into the sand and gravel business. CCI cannot utilize the services of someone governed by a non-compete to steal TCC's sand and gravel business. *Daughtry v. Capital Gas Co.*, 229 So. 2d 480, 485 (Ala. 1969)("a stranger to the covenant may well be enjoined from, in conjunction with the covevantor, or with assistance, conducting a business in competition with the covenantee"); *James S. Kemper & Co. Southeast v. Cox & Assoc.*, 434 So. 2d 1380, 1386-87 (Ala. 1983)(subsequent employer held liable for tortious interference).

## VI. TCC Has A Protectable Interest To Which The Non-Compete Is Reasonably Related

Defendants argue that TCC has no protectable interest in enforcing the non-compete. *See* Defs' Brief at pp.41-43. First, incorporating their earlier summary judgment filings, they argue that TCC lost any protectable interest when FMC was formed. The flaws in this argument have already been demonstrated by TCC in its responses to Defendants' earlier filings.

Defendants next argue that TCC does not have a substantial right and sufficiently unique business to warrant the type of protection afforded by a non-competition agreement. Defendants argue Lambert should be free of the non-compete because he did not appropriate any valuable trade information or customer relationships while with Montgomery Materials. Defendants are

wrong for two reasons.

First, like *Hill*, *supra*, the authority Defendants cite, *Sheffield v. Stoudenmire*, 553 So. 2d 125 (Ala. 1989), addresses non-competes stemming purely from employment relationships as opposed to those related to the sale of a business. Here, there was clearly a sale of a business. The non-compete does not even appear in Lambert's Employment Agreement (Exhibit 8 hereto), but rather is contained in the 1997 Agreement and is triggered by the buy-sell. *Sheffield* does not appear to require that a buyer of a business have a substantial right and sufficiently unique business, but rather it focuses entirely on an "employer" interest in a "post-employment restraint." 553 So. 2d at 126 ([i]n the case of a 'post employment restraint,' as in the present case . . ."). It would make no sense to apply such a requirement to buyer of a business because so long as the seller could argue that his business was general, as opposed to unique, the buyer would have no protections against him opening a competing operation immediately after the sale. The buyer would get no benefit from his purchase.

More significantly, *Sheffield* and Defendants rely on a selective and limited quotation of Comment b from the Restatement (Second) of Contracts § 188. Comment b does appear to apply a higher scrutiny in finding a protectable interest in employment contract based non-competes. However, cited more completely, Comment b also makes clear that a lower level of scrutiny applies to non-competes – like the one here that are ancillary to the sale of a business.

> *b. Need of the promissee.* If a restraint is not ancillary to some transaction or relationship that gives rise to an interest worthy of protection, the promise is necessarily unreasonable under the rule stated in the preceding Section. In some instances, however, a promise to refrain from competition is a natural and reasonable means of protecting a legitimate interest of the promisee arising out of the transaction to which the restraint is ancillary. In those instances the same reasons argue for its enforceability as in the case of any other promise. For example, competitors who are combining their efforts in a partnership may

> promise as part of the transaction not to compete with the partnership. Assuming that the combination is not monopolistic, such promises, reasonable in scope, will be upheld in view of the interest of each party as promisee. . . . The extent to which the restraint is needed to protect the promisee's interests will vary with the nature of the transaction. Where a sale of good will is involved, for example, the buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as unreasonably to diminish the value of what he has sold. The same is true of any other property interest of which exclusive use is part of the value. . . . In the case of a post-employment restraint, ***however,*** the promisee's interest is less clear. Such a restraint, ***in contrast to one accompanying a sale of good will,*** is not necessary in order for the employer to get the full value of what he has acquired. Instead, it must usually be justified on the ground that the employer has a legitimate interest in restraining the employee from appropriating valuable trade information and customer relationships to which he has had access in the course of his employment. Arguably the employer does not get the full value of the employment contract if he cannot confidently give the employee access to confidential information needed for most efficient performance of his job. But it is often difficult to distinguish between such information and normal skills of the trade, and preventing use of one may well prevent or inhibit use of the other. . . . ***Because of this difference in the interest of the promisee, courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment.***

Restatement (Second) of Contracts § 188, Comment b (emphasis added).

Even assuming *arguendo* that the *Sheffield* "substantial right and sufficiently unique business" requirement were to apply to Lambert's non-compete, Montgomery Materials and its purchaser TCC had a substantial right and sufficiently unique business. While working at Montgomery Materials, Lambert was privileged to all facets of the business including aggregate suppliers, purchasers, delivery companies, plant manufacturers and equipment suppliers. *See* Foley Aff., Exhibit 7, at ¶7. He was also privileged to TCC operations in the sense that he was in frequent contact with Foley and his employees. *See id.* He was able to learn TCC's business

practices. *See id.* TCC also bankrolled Montgomery Materials and Lambert and enabled him to maintain extensive contact with the Montgomery area aggregate market. Pursuant to the 1997 Agreement, TCC contributed $300,000 to Montgomery Materials. TCC also loaned Montgomery Materials $600,000 on favorable terms. A protectable interest arises from this significant TCC investment. *E.g.*, *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1087-88 (11th Cir. 1990)(protectable interest arose from investment interests), *citing Kemper*, 434 So. 2d at 1382, & *Daniel v. Trade Winds Travel, Inc.*, 532 So. 2d 653, 654 (Ala. Civ. App. 1988);[35] *Aerotek, Inc. v. Burton*, 835 So. 2d 197, 201 (Ala. Civ. App. 2001)(where contract employee left employer placement company to work for client, employer had protectable interest in being compensated for its service of hiring and placing contract employees). Defendants' argument would leave TCC's investment interests totally "unvindicated." *Nationwide Mut. Ins. Co.*, 907 F.2d at 1088.

In summary, even if *Sheffield* type scrutiny applies, which it does not, TCC with its money and information kept Lambert in a business that, given its complexity and its operating costs, is not widely known or available to the public. TCC earned a protectable interest in this regard. Lambert should not be able to circumvent this by simply claiming he was in the business before and did not learn anything new. *Keystone Auto. Ind., Inc. v. Stevens*, 854 So. 2d 113, 116-17 (Ala. Civ. App. 2003)(summary judgment finding no protectable interest reversed where employer enabled defendant to nurture pre-existing customer relationships and despite employee's claim that he gained his customer relationships and sales knowledge in prior employment).

Defendants next argue that TCC did not purchase Montgomery Materials' goodwill and

---

[35] *Kemper* and *Daniel* are cited for their courts' focus on the employers' investment in the employee and overhead as a factor in upholding non-competes.

therefore cannot enforce the non-compete. While the word "goodwill" is not specifically written on the sale documents, it was certainly transferred to TCC via MMC Holdings assignment of its 50% interest as a member in Montgomery Materials, including all Governance Rights and Financial Rights. A contract for the sale of a business need not expressly mention the goodwill of the business for that goodwill to be transferred. *Files v. Schaible*, 445 So. 2d 257, 259-60 (Ala. 1984); *Kershaw*, 523 So. 2d at 358 ("[a]lthough 'good will' was not specified as an asset in the sale, it was 'incidental to and inherent in' the business itself, and was, therefore, included in the exchange of stock"). Moreover, TCC always maintained its 50% interest in Montgomery Materials' goodwill. It would be completely illogical to assume that the buy-out did not transfer the remaining 50% held by MMC Holdings.

Defendants next claim that enforcement of the covenant is unfair when an employee is terminated. Defendants cite no authority for this, other than a case, *Robinson v. Computer Servicenters*, 346 So. 2d 940 (Ala. 1997), for the proposition that a non-compete will not be enforced where the employer intended to fire an employee at the time the covenant was executed. Obviously, that case has no applicability here since TCC and Foley did not intend to fire Lambert when the 1997 Agreement was executed. The evidence actually demonstrates that TCC and Lambert did everything possible to assist Montgomery Materials and Lambert and that the buy-out which resulted in Lambert's separation from Montgomery Materials was a last resort.

## VII. **The Provisions Of The Non-Compete Are Reasonably Related To TCC's Protectable Interest**

Again falsely arguing that the non-compete prohibits more than engaging in the sand and gravel business, Defendants claim that the scope of the non-compete is not reasonably related to TCC's protectable interests. *See* Defs' Brief at pp.44. Defendants, however, continue to ignore

the facts. TCC had a protectable interest in a non-compete that prohibited Lambert from doing exactly what he did – form a competing sand and gravel operation. TCC bought Lambert out of Montgomery Materials. Through that transaction and since the beginning of his employment with Montgomery Materials, TCC had paid for a non-compete that would prohibit Lambert from starting or assisting a competing operation for five years. The non-compete is specifically tailored to address each method by which Lambert might – and indeed did – do this.

Defendants suggest that TCC has no right to keep Lambert from referring customers away from TCC or placing people together who wish to start sand and gravel businesses. This is a blatant example of Lambert's improper efforts to rewrite history and rationalize his breach of the non-compete. He did much more than simply refer purchasers to suppliers and place people together. He orchestrated a vertically integrated sand and gravel operation for his own benefit.

## VIII. The Non-Compete Term Is Reasonable And It Does Not Create An Undue Hardship

Defendants argue that the term of the non-compete was unreasonable and created and undue hardship on Lambert. *See* Defs' Brief at pp.45-47. The non-compete is five years long and covered an area within 60 miles of Montgomery. Numerous courts have upheld covenants containing five-year terms. *Slay v. Hess*, 41 So. 2d 582, 583-84 (Ala. 1949)(temporary injunction affirmed on five year non-compete); *Kershaw*, 523 So. 2d at 354, 360 (enforcement of non-compete with five-year term affirmed); *First Ala. Bancshares, Inc.*, 355 So. 2d at 682, 684 (same).

Nor does the non-compete impose an undue hardship. Lambert was handsomely paid for the non-compete after the 1997 Agreement was signed and at the 2002 closing. Lambert was free to engage in the sand and gravel business outside the 60 mile restriction. Lambert actually lives in Deatsville, Alabama, which is approximately 14 miles from the center of Montgomery.

Lambert has also admitted to a consulting on job in Gadsden. Consequently, there is no reason Lambert could not have pursued opportunities outside the protected area. There is also no reason he could not have pursued other types of work. Indisputably, he is qualified to drive a truck. He could have done this, just not hauling sand and gravel.

Moreover, the undue hardship authority Defendants cite again focuses on post-employment covenants as opposed to those ancillary to the sale of a business where lesser scrutiny applies. Lambert was well aware of the terms of his non-compete when he signed the 1997 Agreement and received all the benefits therefrom, including extensive employment compensation in excess of $80,000 per year and the subsequent buy-out funds well in excess of $300,000 in cash, plus significant assumed debt. He should be held to those terms. *E.g.*, *Cent. Bank of the S. v. Beasley*, 439 So. 2d 70, 74 (Ala. 1984)(former bank officer did no suffer undue hardship when compensated with over $250,000 for stock and was able to accept a non-banking position in the county and any position outside of the county); *Nationwide Mut. Ins. Co.*, 907 F.2d at 1089-90 (no undue hardship where insurance agent with other job skills voluntarily executed non-compete agreement and received valuable consideration therefore).

TCC also respectfully states that Lambert's health does not excuse his behavior, particularly where he suggests that all he was doing was driving a truck and it limited his ability to do that. The facts reveal that Lambert did much more than drive trucks. Lambert cannot use his health as a sword and a shield. It simply is not relevant.

Finally, an undue hardship is more appropriately shown during the term of a non-compete. Despite their clear understanding of the terms when the non-compete was signed, a party might argue a change in circumstance that should allow them to avoid a non-compete before its expiration. That is not this case. Lambert never sought to quash the non-compete.

Rather, he systematically and surreptitiously breached it. In addition, the non-compete has expired. Defendants' argument, therefore, is more that he should not be held accountable for malfeasance rather than be relieved of the non-compete on a going forward basis.

## IX. TCC Does Not Have Unclean Hands

Defendants argue that TCC has unclean hands via the Phillips loan transaction. *See* Defs' Brief at pp.48-49. Even if that doctrine did apply – which is does not since TCC has not sought an equitable injunction – TCC has ***clean*** hands because the Phillips transaction was a pre-paid aggregate purchase agreement expressly permitted by the 1997 Agreement. TCC was allowed to obtain Product for use in their operations from "any source," including, but not limited to, Phillips, and to sell Product as part of ready mix concrete and in raw form as an incidental part of the ready mix concrete business. All gravel purchased from Phillips was either sold as part of Ready-Mix concrete or in raw form as an incidental part of the Ready-Mix concrete business. TCC also believes Lambert was aware of the loan transaction.

In addition, the Phillips loan transaction was consummated after January 2, 2001, which was the effective date of the closing. TCC was deemed to have bought-out MMC Holdings at that time. This would nullify any ability of Lambert to complain about the transaction.

## X. There Was No General Release

Distorting and ignoring pertinent portions of the record and TCC's and Alabama Gravel's intent with respect to the July 11, 2006, Settlement Agreement and Release ("Settlement Agreement"), Defendants claim that the Settlement Agreement was a general release and that they were covered by its terms to the extent they assert TCC contends they were Alabama Gravel "agents," "employees" or "servants." *See* Defs' Brief at pp.49-50. In fact, the Settlement

Agreement was not a general release and did not release or satisfy TCC's claims against Defendants.

On July 11, 2006, TCC and Alabama Gravel entered into a Settlement Agreement and Release ("Settlement Agreement")(Exhibit 49 hereto) This was not a "general" release as Defendants suggest. Instead, the Settlement Agreement released:

> Alabama Gravel and its successors, assigns, employees, directors, officers, agents, subsidiaries, affiliated companies, attorneys, members and representatives from any and all claims, demands, damages, actions, causes of action or suits of any kind whatsoever, whether known or unknown, relating to, arising from or connected in any way with any and all claims which were asserted or which could have been asserted in the above-styled cause or to any action taken by or on behalf of Alabama Gravel in the prosecution of this action.

*See id.* at ¶2. Lambert and CCI were not parties to the Settlement Agreement. Nor did TCC or Alabama Gravel intend for Lambert or CCI to be released. This is made further clear by the fact a "Joint Pro Tanto Stipulation Of Dismissal With Prejudice" ("Pro Tanto Dismissal") [Doc. #63], was entered dismissing the action against Alabama Gravel "only."[36] Moreover, as specific consideration for the dismissal, Alabama Gravel and its directors, employees and/or agents agreed to appear for deposition and to further participate in discovery in this action at TCC's request. *See* Settlement Agreement, Exhibit 49, at ¶4. This consideration is obvious evidence of TCC's and Alabama Gravel's understanding and intent that only Alabama Gravel be released and that this matter would continue with respect to Lambert and CCI.

It should also be recognized that the Pro Tanto Dismissal was filed on July 13, 2006. Defendants filed a motion to stay discovery [Doc. #67] on July 18, 2006, in which they asserted

[36] In their motion, Lambert and CCI chose not to alert the Court to the plain language of the Pro Tanto Dismissal. This must be because they are aware that they were not included in the Settlement Agreement or released thereby.

that since "Alabama Gravel is no longer a party," the expense associated with further discovery to "these defendants will be great." Defendants, therefore, also understood and took the position in their motion that they were not released by the Settlement Agreement.

For a release to be a general release, it must, in addition to naming the specific parties to be released, contain language releasing "any and all other persons." *Wittner v. Kemp*, 529 So. 2d 961, 962 (Ala. 1988)(the release at issue not containing the "any and all other persons" language was not a general release). The Settlement Agreement does not contain anything close to this language and is not a general release. The fact that the Settlement Agreement is not a general release is made even more clear by the Pro Tanto Dismissal – which again Defendants fail to cite – explicitly dismissing Alabama Gravel "only." Moreover, the Settlement Agreement specifically contemplated the case going forward against Lambert and CCI because as specific consideration for the dismissal, Alabama Gravel, and its directors, employees and/or agents agreed to appear for deposition and to further participate in discovery in this action at the request of TCC.

In addition to proving that the release was not objectively general, all of the above point to the inescapable conclusion that TCC and Alabama Gravel did not intend to release Lambert or CCI. All releases must have effect according to the intention of the parties thereto. *Am. Pioneer Life Ins. Co. v. Sandlin*, 470 So. 2d 657, 661 (Ala. 1985), *citing* Ala. Code (2005) § 12-21-109. The result should be no different here. Lambert and CCI cannot be allowed to assert that they were released or satisfied by an agreement that did not contemplate or effect either.[37]

---

[37] It should be noted that where the language of the release "is not in terms a general release," the release does not have to specifically reserve the right to pursue another tort-feasor. *Wittner*, 529 So. 2d at 963, *quoting Am. Pioneer Life Ins. Co.*, 470 So. 2d at 661. "The true inquiry is did the parties intend to limit the release to the parties named, with no intent that the cause of action be satisfied in full?" *Am. Pioneer Life Ins. Co.*, 470 So. 2d at 661, *quoting Steenhuis v. Holland*, 115 So. 2, 3-4 (Ala. 1927). The answer to that question here is undeniably "yes."

Similarly, Lambert and CCI cannot claim that they were released on the purported basis that TCC allegedly contends they are "agents," "servants" or "employees." First, such a claim is not a necessary element of TCC's claims, nor has TCC plead that Lambert and CCI were Alabama Gravel "agents," "servants" or "employees." TCC's Complaint alleges that Defendants acted improperly "individually and in concert with each other." [Doc. #1] Moreover, the language of the covenant not-to-compete is broad enough to cover Lambert's known actions in violation of the covenant irrespective of whether he was an agent, servant or employee. For example, there is evidence he was a "broker," "distributor," "advisor" and "consultant" to both Alabama Gravel and CCI. Finally, even if TCC were to contend that Lambert and CCI were under certain circumstances Alabama Gravel "agents," "servants" or "employees," Lambert and CCI were still not released because the clear intent of the parties was to the contrary.

## XI. TCC's Damages Are Not Speculative

Defendants final claim is that TCC's damages are speculative. *See* Defs' Brief at pp.50-52. That is far from the case. TCC's damages model is production based. In the very limited white oversize gravel market, and but for Defendants' actions, TCC would have had the opportunity to increase its production and sales to Simcala. It would have done this given the increased price Simcala was willing to pay. At the time Alabama Gravel was formed with Defendants' assistance, there were only two other suppliers of white oversize, Elmore Sand & Gravel and TCC. Elmore Sand & Gravel declined to increase its supply to Simcala. TCC would have filled the void.

Defendants appear to suggest that "eventually" competitors would have entered the market irrespective of their actions. This argument ignores the fact that because of Lambert's unique position, Defendants were able to open a source of white oversize for Simcala in four

months and at the exact time of TCC's temporary supply issue. There is absolutely no evidence that another supplier was coming into or could have come into the market at that time or that fast. The only evidence is that the limited market would have allowed TCC to recover with increased production.

TCC's damages also include the additional consideration paid to Lambert for the non-compete. According to Foley, most if not all the funds and debt assumed at closing were for the non-compete. Lambert cannot violate the non-compete and keep the money received for it. Nor should CCI be able to interfere with the non-compete and leave TCC's investment in the same unvindicated.

Defendants also appear to argue that Lambert's actions were not the proximate cause of TCC's damages because TCC's customers' decision to stop purchasing from TCC was allegedly not attributable to his affirmative conduct. TCC concedes that it must show proximate cause for its damages; but Defendants are attempting to apply a "but for" test, which the Alabama Supreme Court has rejected in tortious interference cases, such as *Utah Foam Prods., Inc. v. Polytec, Inc.*, 584 So. 2d 1345 (Ala. 1991).

In *Utah Foam*, the defendant tried to argue that to prove damages for tortious interference, the plaintiffs had to prove that "but for" the defendant's interference, plaintiffs would have been awarded the contract at issue. *Id.* at 1353. The Court rejected this. "The tort of interference with a business relationship is designed to protect property interests in businesses and to compensate for the damage caused by that interference. It is the right to do business in a fair setting that is protected." *Id.*[38] Moreover, "proof that a company would not have been awarded a particular contract is not the sine qua non of the tort of interference with contract or a

[38] *See also Teitel v. Wal-Mart Stores, Inc.*, 287 F. Supp. 2d 1268, 1280-81 (M.D. Ala. 2003)(J. Albritton)(rejecting "but for" analysis and citing *Utah Foam* with approval).

business relationship." *Utah Foam*, 584 So. 2d at 1353. The tort has two aspects: damage can occur regardless of the fact that the company would not have been awarded the contract, and it can also take other forms. *Id.* Thus, the court found, regardless of the fact that the customer maintained it would not have awarded the contract to the plaintiff, the defendants actions thwarted the plaintiffs' ability to adequately present products and services and virtually eliminated any possibility that the plaintiffs could have been awarded the contract. *Id.*

Defendants urge what *Utah Foam* rejects. Even if Simcala or another customer claims that it would not have done business with TCC irrespective of Defendants' conduct,[39] summary judgment is inappropriate because TCC has been denied the right to conduct business in a fair setting. Defendants' actions denied TCC the ability to compete by creating another supplier in a market with only two. Had Defendants not done this, TCC would have been able to retain Simcala and other lost business. As in *Utah Foam*, Defendants' conduct virtually eliminated this possibility.

**-- CONCLUSION --**

For the foregoing reasons, TCC respectfully submits that Defendants' summary judgment motion should be denied in its entirety.

[39] By contrast, given the restrictive white oversize market and Simcala and Globe's executives' testimony, it is clear that Simcala would have remained a TCC customer were it not for Defendants' actions.

This the 23rd day of February, 2007.

One of the Attorneys for Plaintiff
The Concrete Company

OF COUNSEL:

Robin G. Laurie (ASB-4217-U64R)
G. Lane Knight (ASB-6748-I72K)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
rlaurie@balch.com

Thomas F. Gristina
William L. Tucker
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
1111 Bay Avenue, Third Floor, Synovus Centre
Columbus, Georgia 31901

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February, 2006, I served a copy of the foregoing Opposition To Defendants' Joint Summary Judgment, with accompanying Brief In Opposition To Defendants' Joint Summary Judgment and Notice Of Filing Evidence In Opposition To Defendants' Joint Summary Judgment, by hand-delivery to the following:

Dennis R. Bailey, Esquire
Rushton, Stakely, Johnston & Garrett
P. O. Box 270
Montgomery, Alabama 36101-0270

OF COUNSEL