# EXHIBIT 7

THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE CONCRETE COMPANY, | * |
| Plaintiff, | * |
| v. | * Case No.: 2:05-cv-01026-CSC |
| HARRY E. LAMBERT and CAROL'S CONTRACTING, INC., | * |
| Defendants. | * |

**AFFIDAVIT OF FRANK D. FOLEY**

Personally appeared before the undersigned officer, duly authorized to administer oaths, Frank D. Foley who being duly sworn, deposes and states:

1. I am President of The Concrete Company ("TCC") and its two operating subsidiaries Foley Products Company ("FPC") and Foley Materials Company ("FMC"). TCC is actively engaged in the sand and gravel business in the Montgomery, Alabama, area. TCC has been in this business for more than a decade.

2. The delivery of aggregate materials via trucking companies is an integral part of the sand and gravel business.

3. TCC purchased two-thirds of ownership of D&H Trucking Company in 1996. TCC operated the company for a short period before rolling it into TCC. While the company operated, it was used to deliver aggregate from TCC mines to retail customers in Montgomery and to TCC's ready mix plants. TCC remains in the trucking business in the Montgomery area through FMC's operation as an interstate and intrastate private carrier regulated by the Federal Motor Carrier Safety Administration. FMC's license number is #1346785.

4.     On July 25, 2001, TCC entered into a Promissory Note with attached Supply Agreement with Michael Phillips and his company, Hickory Bend Farms, Inc., specifically stating that TCC would obtain #67 gravel from Mr. Phillips for use at TCC's ready mix plants or for resale. All gravel purchased from Mr. Phillips was either sold as part of Ready-Mix concrete or in raw form as an incidental part of the Ready-Mix concrete business. During that period, I had frequent contact with Mr. Phillips and Mr. Harry Lambert. I believe Mr. Lambert was aware of the above loan transaction.

5.     TCC funded Montgomery Materials' operations throughout its existence whenever revenue did not cover expenses and when additional capital expenditures were needed.

6.     I also believe that Mr. Lambert's assistance to Alabama Gravel and its resulting entry into the market has lead to Willingham Stone declining to enter into a long-term contract with TCC.

7.     While working at Montgomery Materials, Mr. Lambert was privilege to all facets of the business including suppliers, purchasers, delivery companies, plant manufacturers and equipment suppliers. He was also privilege to TCC operations in the sense that he was in frequent contact with me and TCC's employees. He was able to learn TCC's business practices.

8.     In the 24 months before the April 2002 closing, Globe purchased aggregate from Montgomery Materials.

9.     I dispute and disagree with Defendants' version of events leading up to the Declaratory Judgment action between TCC and MMC Holdings. Defendants omit reference to the true facts. Those facts will be set forth below. But, before doing so, I want to specifically state that Defendants' statement that I "created" "the situation that lead to him [me] taking the company [Montgomery Materials] away from MMC Holdings" is false. Defendants' claims that

I refused to allow Lambert to take action that Lambert thought would increase the value of Montgomery Materials and that I planned to trigger the buy-sell at the time Montgomery Materials would have the lowest value on paper but the highest value in realty are also inaccurate.

10.     The history of Lambert's, MMC Holdings', my and TCC's business dealings and litigation with respect to Montgomery Materials are as follows.

### (1) Formation Of Montgomery Materials

11.     Lambert and I decided to go into the aggregate mining business together. I caused TCC, and Lambert caused MMC Holdings, to form Montgomery Materials, a new Alabama limited liability company on June 5, 1997. TCC and MMC Holdings each owned 50% of Montgomery Materials. TCC, in return for its 50% interest, contributed $300,000.00 in cash. MMC Holdings, in return for its 50% interest, contributed a substantial part of its assets, including the leasehold interest in the City Pit and mining equipment, subject to certain liabilities. Montgomery Materials hired Lambert as General Manager. Pursuant to his June 10, 1997 Employment Agreement, Lambert was paid a monthly base rate of $6,737.25. He also received health insurance, a $600,000.00 term life insurance policy and was to be reimbursed for travel and entertainment expenses. As a result of these transactions, Montgomery Materials began mining sand and gravel from the City Pit in June 1997.

### (2) The Anderson Pit

12.     Lambert and I desired to expand Montgomery Materials' source of aggregate by obtaining additional mining leases. Lambert proposed that Montgomery Materials lease property in Montgomery County, Alabama, from Anderson Farms, LLC ("Anderson Farms"). Lambert told me that Anderson Farms would lease the property (the "Anderson Pit") to Montgomery

Materials only so long as Lambert was employed by Montgomery Materials, since Anderson Farms was unwilling to entrust the mining of their property to anyone other than Lambert. In May 1999, I agreed that Montgomery Materials should enter into a lease (the "Anderson Lease") for the Anderson Pit which contained terms allowing Anderson Farms to terminate the Anderson Lease if Lambert's Montgomery Materials employment terminated. Montgomery Materials spent about $600,000 on equipment, prepaid royalties and costs of stripping overburden to prepare the Anderson Pit for mining. Substantially all of these funds were advanced by TCC. Montgomery Materials did not repay the advances as promised.

### (3) Lambert's Failed South Alabama Business

13. In late 1999, a large aggregate business (the "South Alabama Business") became available for purchase in south Alabama. Lambert and I considered Montgomery Materials purchasing the South Alabama Business. But, after investigation, I felt that the price was too high. Lambert proposed that he, together with others, might purchase the South Alabama Business if I were unwilling for Montgomery Materials to purchase it. I advised Lambert against that because I thought the price was too high and because I thought it would divert Lambert's attention managing Montgomery Materials. Lambert's Montgomery Materials Employment Agreement provided that Lambert "will not engage in any business activities other that those of [Montgomery Materials]." I waived this provision only as it pertained to the South Alabama Business because Lambert felt so strongly that the South Alabama Business offered an exceptional opportunity. In early 2000, Lambert and others purchased the South Alabama Business.

14. In the summer of 2000, Lambert told me that the South Alabama Business was in financial difficulty and that he might have to obtain the value of his interest in Montgomery Materials (i.e., MMC Holdings' 50% Montgomery Materials interest) to pay debts of the South Alabama Business. Lambert said that he might have to use his interest as collateral for a loan or even sell his interest to me or others to raise cash. Lambert asked me to also consider dividing up the assets of Montgomery Materials between TCC and MMC Holdings. Lambert also asked me to consider putting Montgomery Materials "on the market" to see how much it could be sold for.

(4) **The 1997 Agreement And Buy-Sell Provision**

15. I was reluctant to take any of these actions. Although I felt that Montgomery Materials had suffered when Lambert's attention was diverted by the South Alabama Business, I also felt that Montgomery Materials had potential to be a very good business. Despite my reluctance, I, because of the pressure on Lambert from the South Alabama Business, agreed to consider Lambert's requests. A professional consulting firm, FMI, was contacted to evaluate Montgomery Materials and determine what price it might be sold for, although it was never engaged. A third party expressed an interest in buying Montgomery Materials, and I agreed to allow Montgomery Materials to furnish confidential financial information to the prospective purchaser. Lambert proposed that Montgomery Materials be split into two operations. MMC Holdings would receive the Anderson Pit, and TCC would receive the City Pit. Lambert proposed that TCC buy MMC Holding's 50% interest in Montgomery Materials. I considered these and other proposals during the summer and fall of 2000, but Lambert and I could not agree on what to do.

TCC's 50% interest, and $600,000 would be used by Montgomery Materials to repay TCC the $600,000 it had loaned Montgomery Materials to fund the development of the Anderson Pit.

22.   Despite these representations, on January 2, 2001, MMC Holdings notified ("MMC Holdings' Response") TCC that MMC Holdings would purchase TCC's 50% interest in Montgomery Materials for $500,000, not $2 million. MMC Holdings' Response attempted to select the parts of TCC's § 5.3 Notice which MMC Holdings liked and ignore the parts which MMC Holdings disliked. The "offer" that MMC Holdings claimed to be accepting appears nowhere in TCC's § 5.3 Notice. MMC Holdings could not create a bargain which TCC did not propose.

23.   Since MMC Holdings' Response was not identical with the terms of TCC's offer, it was a rejection of TCC's offer. As a result, TCC was relieved from liability on the offer. In effect, MMC Holdings failed to make an election. Section 5.3 of the 1997 Agreement provided that "[a]n Electing Member who fails to make an election shall be deemed to have sold its Interest to the Activating Members." Therefore, MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC.

### (5)   The Declaratory Judgment Action And Resulting Summary Judgment Ruling In TCC's Favor

24.   The above facts resulted in TCC filing a declaratory judgment action against MMC Holdings on January 12, 2001.[1] TCC obtained summary judgment in its favor with this Court ruling, in pertinent part, by Order dated September 7, 2001, that:

> the Buy-Sell provision was properly "activated" within the meaning of the Agreement inasmuch as TCC's Notice included a price formula contemplated by the parties. Consequently, MMC had 120 days to elect which it failed to do. Therefore the court must give effect to the default provision of Section 5.3 and

---

[1]   The case was captioned *The Concrete Company v. MMC Holdings, Inc.* (United States District Court for the Middle District of Alabama, Northern Division; Civil Action No. 2001-D-54-N).

conclude that Montgomery Materials has been deemed sold to TCC. TCC's formula presumed that Anderson [Farms] would terminate the lease and the record indicates as much. As such, the court finds that the adjustment of $3,000,000 is inapplicable to the sale, so TCC has purchased Montgomery Materials for $1,000,000.

This Order was affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002. The result of the summary judgment Order, as affirmed, is that MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC on January 2, 2001.

FURTHER AFFIANT SAYETH NOT.

This 23 day of Feb, 2007.

_____
FRANK D. FOLEY

Sworn to and subscribed before me this
23 day of February, 2007.
_____
NOTARY PUBLIC
My Commission Expires:_____

MY COMMISSION EXPIRES SEPTEMBER 22, 2010