# Exhibit 16

# FREEDOM COURT REPORTING

TRAVEL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT OF

MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NUMBER: 2:05-CV-1026-D

THE CONCRETE COMPANY,

    Plaintiff,

VS.

HARRY E. LAMBERT, CAROL'S CONTRACTING,

INC., AND ALABAMA GRAVEL, LLC,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

FRANK FOLEY

April 18th, 2006

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRAVEL TRANSCRIPT PREPARED BY

FREEDOM COURT REPORTING

RENA' MESSICK LANIER, CSR

(334) 300-3832

www.freedomreporting.com
1-877-373-3660

Page 17

1  Q. (BY MR. BAILEY) But your
2  testimony is that the entire five-hundred-
3  thousand-dollar cash price for the
4  interest of Montgomery Materials Company
5  was related solely to the buy/sell -- the
6  value of the noncompete agreement that you
7  would get from Mr. Lambert?
8     A. Well, I don't remember the
9  exact amount of the debt that was assumed.
10 But because there were two bids, one of
11 them wouldn't go with us because it
12 tracked Harry's employment.
13       The remaining asset that was
14 in the company was not worth much. It had
15 been losing money, and it continued to
16 lose money.
17       So, you know, I don't
18 remember the exact amounts of debt
19 outstanding or -- but basically most of
20 the purchase price if not all I would
21 have -- I would have put to the
22 noncompete.
23    Q. And this was an unspoken,

Page 18

1  unwritten valuation?
2     A. This was just my opinion.
3     Q. But it was your opinion at
4  the time?
5     A. Yes.
6     Q. Now, you just said that the
7  company was losing money and continued to
8  lose money?
9     A. Not the company.
10    Q. What company are you talking
11 about?
12    A. There were two pits in
13 Montgomery Materials, the Anderson Road
14 pit, which was very profitable, and the
15 City pit, which is not profitable.
16    Q. Well, which one was -- which
17 assets were transferred on April the 9th,
18 2002?
19    A. Well, both were transferred.
20 But then the owner of the Anderson Road
21 land had the right to buy back, take back
22 the lease on that pit.
23    Q. Who did the books for

Page 19

1  Montgomery Materials, LLC, and kept the
2  books?
3     A. I think we had a CPA firm
4  doing that.
5     Q. A local firm?
6     A. Yes.
7     Q. Richard Stabler?
8     A. Yes. I believe that rings a
9  bell.
10    Q. What was the net profit for
11 that company for the last year of
12 operation?
13    A. I don't remember.
14    Q. Is it your representation to
15 us that it was a loss?
16    A. No. I never said it was a
17 loss. I said the --
18    Q. You said the company was
19 losing money and --
20    A. I said one -- no.
21    Q. -- continued to lose money.
22       MR. LAURIE: Let me object to
23 the form. He's answered that very

Page 20

1  precisely. So you need to ask him the
2  question very precisely again.
3        MR. BAILEY: I'm sorry. I
4  will be very precise with Mr. Foley.
5     Q. (BY MR. BAILEY) If you
6  don't understand any question I ask you,
7  all you have to do is tell me you didn't
8  understand. But if you answer it, we're
9  going to assume you understood it.
10    A. Well, I've already answered
11 it once. If you want me to answer it
12 again, I will.
13    Q. Is it your testimony that
14 Montgomery Materials, LLC, was losing
15 money and continuing to lose money up
16 until the time you bought it?
17    A. No.
18    Q. When did it start making
19 money?
20    A. I don't remember. But I
21 mean you've got the books, I'm sure. We
22 could look at the books and show you.
23    Q. I'll represent that the

### Page 41

1   A.  Repeat it if you would.
2   Q.  One of the items on the
3 deposition notice was incorrectly stated,
4 but I think your counsel understood it to
5 be the capacity of TCC, or the plaintiff,
6 to provide oversized gravel over the past
7 five years.
8       Who would be the person who
9 would best be able to answer questions
10 about the white oversized gravel capacity
11 of The Concrete Company?
12  A.  Hugh Sorrell and myself.
13  Q.  Have you done any -- have
14 you prepared any documents to indicate the
15 capacity of the company -- those companies
16 to produce that gravel?
17  A.  I hadn't done any documents.
18 Hugh I think has done some, but I hadn't
19 done any.
20  Q.  Why did TCC spin off its
21 gravel operations to Foley Materials?
22  A.  We were setting up operating
23 LLCs to -- part of it from a liability

### Page 42

1 standpoint because of the sale assets that
2 were in The Concrete Company.
3       Part of it was LaFarge had
4 the right to use The Concrete Company name
5 in the Redi-Mix business. And even though
6 we didn't expect them to do that for a
7 very long period, they continued to do it.
8 And it was a lot of confusion with
9 customers of who was The Concrete Company.
10      Part of it was that LaFarge
11 was not paying their bills, operating
12 under those plants of The Concrete
13 Company, and we were getting a bad credit
14 rap.
15      We already had Foley Products
16 that was an operating name for our pipe
17 and precast division. So it just sort of
18 made sense to add something that could be
19 identified with materials.
20  Q.  Prior to the date that
21 occurred, which I understand is April 1st,
22 2005, what, if anything, had affected the
23 ability of The Concrete Company to develop

### Page 43

1 white oversized gravel or sell white
2 oversized gravel?
3   A.  Ask that again.
4   Q.  Prior to Foley Materials
5 existing, had The Concrete Company had any
6 problems with producing the quantities of
7 white oversized gravel that were being
8 requested by customers for that product?
9   A.  The fact that Foley
10 Materials was set up, I mean, it's a
11 wholly-owned operating subsidiary company,
12 it doesn't change anything.
13      The Concrete Company is still
14 the parent company and still owns the
15 assets through its wholly-owned
16 subsidiary, Foley Materials. So there's
17 no --
18  Q.  So it's a legal entity that
19 doesn't mean anything?
20      MR. LAURIE: I object to
21 that.
22  A.  It's -- it's an LLC
23 subsidiary.

### Page 44

1   Q.  But it is a legal entity?
2   A.  Yeah.
3   Q.  It exists?
4   A.  Right.
5   Q.  It is the name of the
6 company that operates aggregates now?
7   A.  And it's a hundred percent
8 owned by The Concrete Company.
9   Q.  And you set that up for
10 legal purposes?
11  A.  For the reasons I told you.
12  Q.  One of them being liability
13 issues?
14  A.  Yeah.
15  Q.  You didn't want The Concrete
16 Company to be liable for legal problems
17 that Foley Materials might have?
18  A.  That -- that could be.
19  Q.  Well, getting back to my
20 actual question, prior to the formation of
21 Foley Materials, The Concrete Company was
22 directly operating an aggregate sand and
23 gravel business in this area?