70

1  time to time, yes, but whether they saved
2  it on a hard drive and all that, I do not
3  know.
4  Q. And so then at some point after you began
5  consulting with Simcala you learned that
6  they had chemistry complaints about The
7  Concrete Company as well as quantity
8  complaints. Is that true?
9  A. Yes.
10 Q. And then at some point around that same
11 time you decided to investigate going into
12 the oversized business yourself. Is that
13 true?
14 A. Yes.
15 Q. What was it that caused you to come to that
16 decision?
17 A. Well, I saw an opportunity in the
18 marketplace that -- with my background in
19 metallurgical oversized and with my
20 contacts at Globe -- I knew, you know, they
21 were having some issues -- that, you know,
22 it would be a good time to look into that.
23 Q. Were you aware of another location in the

71

1       Montgomery area where you could get white
2       oversized?
3 A.  Not at that time.
4 Q.  So that when you decided to investigate
5       that new line of business you didn't have
6       any idea of where you could actually get
7       the product that you were hoping to sell?
8 A.  That's correct.
9 Q.  Where did you think that you would get the
10      information as to how to locate that
11      product?
12 A.  I asked when I called Mr. Lambert and said,
13      you know, I was looking to -- would like to
14      investigate getting into the sand and
15      gravel business. And he, you know,
16      informed me that he could not get in the
17      sand and gravel business, but he had been
18      doing some consulting work for a guy that
19      also wanted to get into the sand and gravel
20      business. And, you know, he -- and he
21      said, well, you know, you two should get
22      together. So that was Mr. Alexander.
23 Q.  So Mr. Lambert told you at that time he

78

1     business?

2 A.   The only conversation I had was, you know,

3     when I called him up that one time. But,

4     no, I had not.

5 Q.   Had he ever told you before or mentioned to

6     you before that he wanted to go into the

7     white oversized business?

8 A.   No.

9 Q.   And so is it your testimony that it was you

10    that first contacted Mr. Lambert about

11    going into the business and not the other

12    way around?

13 A.   That's correct.

14 Q.   Now, the meeting with Mr. Alexander was

15    scheduled. Was it Mr. Lambert who

16    contacted Mr. Alexander, or did you contact

17    Mr. Alexander?

18 A.   He contacted Mr. Alexander, because I

19    didn't know the man.

20 Q.   So you had never met Mr. Alexander before?

21 A.   Never.

22 Q.   And did Harry then call you back and say,

23    okay, he's ready to meet and give you a

| | | |
|---|---|---|
| 1 | | time, or how did that work? |
| 2 | A. | Yeah. He called -- just said that he's |
| 3 | | going to be in town, you know, at this date |
| 4 | | and this is where he's going to be staying, |
| 5 | | and that's how it was set up. |
| 6 | Q. | Did he tell you to go there at a certain |
| 7 | | time or did you contact Mr. Alexander when |
| 8 | | he got to town? |
| 9 | A. | He gave me his phone number and I called |
| 10 | | him. |
| 11 | Q. | Do you know what Harry's cell phone number |
| 12 | | is -- excuse me -- Mr. Lambert's cell phone |
| 13 | | number is? |
| 14 | A. | Yes. |
| 15 | Q. | What is that? |
| 16 | A. | Can I look it up? |
| 17 | Q. | Sure. |
| 18 | A. | Because I've got it on automatic here. |
| 19 | | It's 334. I can tell you that much. |
| 20 | | (334) 202-7177. |
| 21 | Q. | Now, as best you can recall is that the |
| 22 | | only cell phone number you've ever had for |
| 23 | | Mr. Lambert? |

81

1  doing a 984 prefix?
2  A.  Yeah. They've got like a general number
3      and then like all the extensions are
4      8-something.
5  Q.  And except for -- in the Ohio, I guess,
6      plant?
7  A.  That's the Ohio plant, yes.
8  Q.  What about in Selma? Do you know the
9      prefix there still?
10 A.  I used to know that.
11         MR. WALTER: Don't guess.
12 A.  Well, I -- I used to know it, but I
13     don't -- I can't remember.
14 Q.  All right. Now, other than the home number
15     and the cell phone number and the work
16     number you gave me, over the last five
17     years is there another number that you
18     could have been commonly reached at?
19 A.  Huh-uh (negative response).
20 Q.  No?
21         MR. WALTER: You need to answer.
22 A.  I'm sorry. No.
23 Q.  Going back, then, to the meeting at the

82

1     hotel.  Did Mr. Lambert attend that
2     meeting?
3  A.  Yes.
4  Q.  Who else was there besides Mr. Lambert,
5     you, and Mr. Alexander?
6  A.  No one.
7  Q.  And I assume it was -- was it in
8     Mr. Alexander's room or was it --
9  A.  Yes.
10 Q.  And what time was that?
11 A.  It was in the evening.
12 Q.  And if you could tell me everything that
13    you recall about that meeting, please.
14 A.  Just basically he introduced us, you know,
15    who he was.  And we kind of gave each
16    other, you know, background, you know, who
17    we were.  I told him that, you know, I had
18    been involved in the metallurgical business
19    for a long time and I didn't know -- you
20    know, I didn't know nothing about the sand
21    and aggregate business.  But, you know, I
22    was looking to -- you know, just as a small
23    investor, you know, would be interested in

1  A.  I don't know. I mean, it might have.
2  Q.  You can't recall?
3  A.  I cannot recall.
4  Q.  Mr. Alexander, as far as you know did he
5      have any -- did Mr. Alexander as far as you
6      know have any business dealings in the
7      Montgomery area at that time?
8  A.  I did not know.
9  Q.  Was there a discussion during that meeting
10     as to how you all would locate a pit for
11     white oversized?
12 A.  Mr. Alexander had had some contacts with --
13     talked to a Mike Gentry, and he had -- you
14     know, he had been talking to him about
15     mining his pit.
16 Q.  And was that the first time that you
17     learned of Mr. Alexander's discussion with
18     Mr. Gentry?
19 A.  Yes.
20 Q.  And so what specifically did Mr. Alexander
21     say that he could mine from Mr. Gentry's
22     pit?
23 A.  He didn't say specifically at that

1   meeting. He just said that he had been
2   talking to this guy, that we might be able
3   to, you know, mine some aggregate in his
4   pit.
5  Q. Did he indicate how he came to learn of
6   Mr. Gentry's pit?
7  A. Yeah. He -- he had been introduced to
8   Mr. Gentry through Mr. Lambert.
9  Q. Do you know when that introduction took
10   place?
11 A. I do not.
12 Q. But it was before this meeting that you all
13   had at the hotel?
14 A. Yes.
15 Q. And during the meeting -- well, was there
16   anything else you can recall about the
17   discussion with Mr. Alexander during that
18   meeting?
19 A. We talked for probably -- I don't know --
20   hour, hour and a half maybe and, you know,
21   just kind of left it that -- at that time I
22   kind of said, well, you know, I'll think it
23   over or whatever and, you know, get back

```
 1        jail, it, you know, might be something
 2        worth pursuing, but at that time, no.
 3   Q.   Had you ever talked to Mr. Lambert about
 4        that concept before the meeting?
 5   A.   No.
 6   Q.   And had he ever mentioned it to you?
 7   A.   No.
 8   Q.   Other than Mr. Gentry's pit, were there any
 9        other sites -- mining sites discussed
10        during the hotel meeting?
11   A.   No.
12   Q.   Is there anything else that you can recall
13        about that meeting that we haven't
14        discussed?
15             MR. WALTER:  Referring to the
16                  meeting at the hotel?
17             MR. GRISTINA:  At the hotel.
18   A.   We talked about, you know, if we were to --
19        you know, if Robert and I were to go into
20        business, I couldn't -- you know, I
21        couldn't be -- I'm not a day-to-day person
22        as far as the company is concerned and I
23        couldn't be, that, you know, we needed
```

|    |    |                                                                 |
|----|----|-----------------------------------------------------------------|
| 1  |    | somebody that could kind of run the thing                       |
| 2  |    | for us. And, you know, we talked about                          |
| 3  |    | Mr. Dasinger at that time also.                                 |
| 4  | Q. | That's Rex Dasinger?                                            |
| 5  | A. | Yes.                                                            |
| 6  | Q. | D-A-S-I-N-G-E-R?                                                |
| 7  | A. | I'm not -- I don't know the spelling.                           |
| 8  | Q. | And so you told Mr. Alexander I can't be                        |
| 9  |    | the day-to-day guy --                                           |
| 10 | A. | Right.                                                          |
| 11 | Q. | -- but maybe this Dasinger guy can be?                          |
| 12 | A. | Right. Well, that we talked about it and                        |
| 13 |    | actually Mr. Lambert recommended him as                         |
| 14 |    | a -- would be a good person to, you know,                       |
| 15 |    | like be a foreman or what have you to run                       |
| 16 |    | the thing. And we discussed that as well.                       |
| 17 | Q. | So was that recommendation from                                 |
| 18 |    | Mr. Lambert -- was that during that hotel                       |
| 19 |    | meeting?                                                        |
| 20 | A. | Yes.                                                            |
| 21 | Q. | So then at least one conversation did take                      |
| 22 |    | place that involved Mr. Lambert and that                        |
| 23 |    | was him recommending Mr. Dasinger as a                          |

92

1  foreman type person?
2  A. Well, we asked him, you know -- we asked
3     him if, you know, he knew of somebody we
4     could get or that, you know, could do that,
5     and he recommended Rex.
6  Q. And did you know Rex before then?
7  A. No.
8  Q. At that time did Mr. Lambert tell you what
9     his relationship with Mr. Dasinger was?
10 A. He -- yeah. He -- I mean, he said that he
11    drove a truck for Carol's Contracting and
12    he had been in the gravel -- you know,
13    worked in gravel pits before and stuff and
14    he felt that, you know, he would be a good
15    guy to have.
16 Q. Now, over the time period you came to know
17    Mr. Lambert before this meeting he was
18    somebody, wasn't he, that you understood
19    had extensive knowledge of the sand and
20    gravel business; is that correct?
21 A. Yes.
22 Q. And he's somebody that you understood knew
23    how to locate different types of sand and

100

1  A.  Yes.
2  Q.  And you have to get permits to do all this
3      stuff; isn't that right?
4  A.  Yes.
5  Q.  And there are environmental issues; is that
6      correct?
7  A.  Yes.
8  Q.  And these are things that you've learned
9      since that meeting?
10 A.  Yes.
11 Q.  At that meeting was there any discussion
12     about who would hire all of the consultants
13     and builders and inspectors to do all that
14     construction?
15 A.  We didn't talk in detail about it.  But, I
16     mean, Robert was going to -- I mean, he
17     runs it.  It was going to be his thing.
18 Q.  Did Mr. Lambert ever say I know who all
19     these people are in the Montgomery area and
20     I can help you out with that?
21 A.  We asked him for his, you know, opinion,
22     you know, who would be a good person or
23     something like that.

1   Q.  So Mr. Lambert had the information and the
2       specific individuals who could help you all
3       construct this plant?
4           MR. BAILEY:  Object to the form.
5   A.  Yes.
6   Q.  And at that time had you located a place
7       where you all thought you would build this
8       plant?
9       You mentioned Gentry.  Was there
10      another location?
11  A.  No.
12  Q.  At that time had you identified the
13      Deatsville site?
14  A.  No.
15  Q.  And when I say the Deatsville site, do you
16      understand what I'm talking about?
17  A.  Yes.
18  Q.  And where is that site located?
19  A.  It's just -- it's just outside the little
20      town of Deatsville.
21  Q.  And is that the first -- well, is that the
22      only site that Alabama Gravel has built so
23      far?

102

1  A.  Yes.
2  Q.  When did you first locate that site?
3  A.  Well, Mr. Dasinger acquired the lease on
4      that property sometime early in 2005.
5  Q.  You say Mr. Dasinger acquired the lease.
6      Did he sign the lease and pay for the lease
7      or did -- individually?
8  A.  I don't know -- I don't know about paying
9      for the lease, but, I mean, he signed for
10     the lease, yes.
11 Q.  And you said early 2005. So that would
12     make it before Alabama Gravel was actually
13     formed according to its articles of
14     organization?
15 A.  Right. It was around -- yeah, right before
16     that, yes.
17 Q.  And do you know who that lease was obtained
18     from?
19 A.  The name on the lease is Cruise.
20 Q.  Could you -- C-R-U-Z or U-I-S-E?
21 A.  I think it's C-R-U-I-S-E, but I'm not sure.
22 Q.  You don't know the first name?
23 A.  No, I do not.

103

1 Q. Do you know how Mr. Dasinger located the
2    Deatsville site?
3 A. No, I do not.
4 Q. Do you know of any testing that was done on
5    the Deatsville site before the lease was
6    done?
7 A. I know that he said he had tested it
8    himself.
9 Q. Mr. Dasinger said that?
10 A. Yes.
11 Q. Did he say that he went there with
12    Mr. Lambert and bored holes to see if there
13    was white oversized gravel at that site?
14 A. He did not say.
15 Q. Are you aware of whether Mr. Lambert went
16    to the Deatsville site in 2004 before the
17    hotel meeting and did some testing to
18    determine if white oversized gravel could
19    be mined in the Deatsville site?
20 A. I'm not aware of that.
21 Q. You think that did not happen or --
22 A. I don't know.
23 Q. So you trusted Mr. Dasinger at some point

Case 2:05-cv-01026-CSC    Document 102-4    Filed 02/23/2007    Page 16 of 16

104

```
 1         to tell you that's where we can get this
 2         product?
 3   A.    Yes.
 4   Q.    The only product at this time that you all
 5         were interested in locating was white
 6         oversized; is that correct?
 7   A.    That's all I was interested in.
 8   Q.    And that's a very scarce product in the
 9         area; is that correct?
10   A.    Yes.
11   Q.    And you trusted Mr. Dasinger to tell you
12         the Deatsville site is where we need to be
13         to get that?
14              MR. BAILEY:  Object to the form.
15              Go ahead.
16   A.    Yes.
17   Q.    Without any knowledge of whether or not
18         Mr. Dasinger had worked with Mr. Lambert to
19         determine if in fact that would be a good
20         place to get white oversized?
21              MR. WALTER:  I'm not sure I quite
22              understand.  You can answer it
23              if you understand it.  I'm a
```

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455