IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THE CONCRETE COMPANY,            *
                                 *
    Plaintiff,                   *
                                 *
v.                               *    Case No.: 2:05-cv-01026-CSC
                                 *
HARRY E. LAMBERT AND CAROL'S     *
CONTRACTING, INC.,               *
                                 *
    Defendants.                  *

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

    Plaintiff The Concrete Company ("TCC") should, respectfully, be granted summary judgment in its favor as to liability on its breach of contract claim (Complaint Count I) against Defendant Harry E. Lambert for his violation of the non-competition agreement between TCC and Lambert.

## -- INTRODUCTION --

    Lambert, in conspiracy with Defendant Carol's Contracting, Inc. ("CCI"), spearheaded the formation of a vertically integrated sand and gravel mining, distributing and sales operation. This was all done in violation of Lambert's non-compete agreement with TCC.

    Immediately after the non-compete between Lambert and TCC was triggered in April 2002, Lambert's wife, Carol, formed CCI, a trucking company delivering sand, gravel and other materials. Up to that point, Mrs. Lambert's work experience was as a bookkeeper. Lambert, therefore, who had extensive experience in the sand and gravel business, including mining, sales and delivery, began driving trucks for CCI. He coordinated deliveries for CCI drivers to CCI

customers and handled CCI truck maintenance issues.  Lambert tries to justify this breach of his

non-compete with the claim that he was not "paid" for his work other than being provided food

and a place to live.  This is in fact compensation.  Lambert was also compensated with health

insurance, workman's compensation benefits, a cellular telephone and a company vehicle.

Lambert was also the beneficiary of Mrs. Lambert's CCI draw during the duration of the non-

compete on hundreds of thousands of dollars of CCI delivery charges.

Furthermore, Lambert's involvement in aggregate delivery kept him informed as to the

status of the aggregate market in the Montgomery area – the area covered by his non-compete.

His contact with the market was so close that in January 2005 he learned of a temporary issue

TCC had in supplying white oversize to one of its largest customers, Simcala, Inc.  TCC had sold

over $1 million in aggregate to Simcala since 1999.  With this knowledge (gained from a 30 to

45 minute meeting with Simcala executives, and rather than waiting a year until his non-compete

expired) Lambert coordinated the formation of Alabama Gravel, LLC as a new source of white

oversize gravel for Simcala and two other major TCC customers – Globe Metallurgical, Inc., and

Maddox Stone & Gravel.  He brought together Dave Tuten, Robert Alexander and Rex Dasinger

– who would later become Alabama Gravel principals –and provided them an office on his

family land.[1]  Tuten, a Simcala consultant and former Globe purchaser, had the customer

contacts, Alexander provided financial backing and Dasinger had a Deatsville, Alabama mining

rights lease and, along with Lambert, the ability to supervise day-to-day operations.

Lambert also placed Alabama Gravel in touch with Mike Gentry, who had a readily

available source of white oversize gravel that could be used until the Alabama Gravel's

Deatsville operation on Dasinger's leased land was complete.  The construction at Deatsville was

---

[1]    The land appears to be technically listed in Carol Lambert's name as a result of a
November 2, 2000 statutory warranty deed transferring the property from Harry and Carol Lambert to just
Carol Lambert for $10.00 in consideration.

to be funded with sales from Gentry's land.  Lambert then made sure that Alabama Gravel hired Mrs. Lambert for bookkeeping services and CCI to deliver sand and gravel.  No other company was used to deliver Alabama Gravel aggregate.  Lambert also gave his time and expertise in expanding the ADEM Permit for mining on Gentry's land[2] and the construction of the Deatsville operation.  Lambert also introduced Maddox Stone & Gravel to Alexander, which enabled Maddox to purchase Alabama Gravel aggregate.  Finally, Lambert delivered white oversize samples to Globe for testing and met with Globe's purchasing director at the Deatsville site to discuss shipments of white oversize to Globe.  *All these events took place before the non-compete expired on January 2, 2006.*

Again, Lambert claims all this was acceptable since he allegedly was not paid.  Lambert wrongly refuses to acknowledge any benefit or compensation from the nearly *$500,000* in delivery payments by Alabama Gravel to CCI in 2005, the $1,000.00 per month office rent Alabama Gravel paid Mrs. Lambert or the approximately $50,000.00 annual salary Alabama Gravel pays Mrs. Lambert.  He also refuses to acknowledge that the rich consulting agreement he signed with Alabama Gravel just months after his non-compete expired is deferred compensation for services before the non-compete expired..

For these and other reasons, and as more specifically set forth below, summary judgment should be granted in TCC's favor as to liability on its breach of contract claim against Lambert for violation of the non-compete (Complaint Count I).

---

[2]     *Lambert did this despite Defendants' admission in their summary judgment motion that an ADEM Permit is indicia of being in the sand and gravel business.*

3

## -- INDISPUTABLE FACTS --

**I.    Preliminary Statement**

1.     As shown in opposition to Defendants' summary judgment motion, there is extensive testimonial and documentary evidence demonstrating Lambert's breach of the non-compete. Where possible TCC has shortened this statement of facts to avoid duplicative filings. Nevertheless, while TCC is reluctant to burden this Court with duplicative filings, TCC believes it is important to present its summary judgment motion in a "stand-alone" document. Many of the facts and corresponding exhibits herein, therefore, have also been included in opposition to Defendants' motion.

**II.    The Non-Compete Agreement**

2.     On June 10, 1997, TCC and Lambert entered into an Agreement ("1997 Agreement"),[3] related to their shared ownership in Montgomery Materials Company, LLC ("Montgomery Materials"). Montgomery Materials was "formed for the purpose of acquiring the business of Montgomery, Inc. [MMC Holdings, Inc.] and excavating, mining, selling and distributing sand, gravel, clay and/or topsoil" in the Montgomery, Alabama, area. *See* Agreement, at § 1(b). Lambert was President of MMC Holdings, Inc. ("MMC Holdings"). The Agreement contained a non-competition provision applicable to Lambert stating, in pertinent part:

> 8.4.    Lambert. If Montgomery, Inc. transfers its entire Membership Interest in Montgomery, LLC [MMC] to Concrete [TCC] or any other party, Lambert agrees that during the Period he will not:
>
> (1)    engage, as an employee or otherwise, in the Territory in the Prohibited Activity;

---

[3]    The 1997 Agreement is Exhibit 1 to TCC's Brief In Opposition To Defendants' Joint Summary Judgment Motion.

(2)    in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity;

(3)    in the Territory induce a Customer (as defined below): (i) to purchase Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC [Montgomery Materials] or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC [Montgomery Materials]. As used in this subsection, "Customer" means any actual customer who purchased Product from Montgomery, LLC [Montgomery Materials] in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. [MMC Holdings] of its Membership Interest in Montgomery, LLC [Montgomery Materials] . . ..

See id. at § 8.4. The "Period," or duration, of the non-compete was five years from the date of

the transfer described in the first paragraph of the non-compete. See id. at §§ 8.3 & 8.4. The

"Prohibited Activity" is engaging "in the Territory in the business of excavating, mining,

distributing, delivering, selling or otherwise disposing of any Product at wholesale or retail." See

id. The "Territory" is "the area contained within the 60 miles of the present [then] limits of

Montgomery, Alabama." See id. at § 8.1. "Product" is "sand, gravel, clay and/or topsoil." See

id. at § 1(b).

## III.    The Declaratory Judgment Action And Resulting Summary Judgment Ruling In TCC's Favor

3.    TCC filed a declaratory judgment action related to the 1997 Agreement against

MMC Holdings on January 12, 2001.[4] TCC obtained summary judgment in its favor with this

Court ruling, in pertinent part, by Order dated September 7, 2001, that:

---

[4]    The case was captioned *The Concrete Company v. MMC Holdings, Inc.* (United States District Court for the Middle District of Alabama, Northern Division; Civil Action No. 2001-D-54-N).

the Buy-Sell provision was properly "activated" within the meaning of the Agreement inasmuch as TCC's Notice included a price formula contemplated by the parties. Consequently, MMC had 120 days to elect which it failed to do. Therefore the court must give effect to the default provision of Section 5.3 and conclude that Montgomery Materials has been deemed sold to TCC. TCC's formula presumed that Anderson [Farms] would terminate the lease and the record indicates as much. As such, the court finds that the adjustment of $3,000,000 is inapplicable to the sale, so TCC has purchased Montgomery Materials for $1,000,000.

This Order was affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002. The result of the summary judgment Order, as affirmed, is that MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC on January 2, 2001.

## IV.     The April 9, 2002 Closing

4.     On April 9, 2002, TCC and MMC Holdings conducted the closing with respect to that sale. MMC Holdings received a cash payment of $303,739.94. MMC Holdings was also compensated by TCC's payment of $4,650.00 in fees and expenses and $36,166.06 for an account receivable of Lambert to Montgomery Materials (*see* Closing Statement, Exhibit 1 hereto, at TCC0002850), and TCC assumed full responsibility for in excess of $300,000 in debts owed by Montgomery Materials to outside vendors. *See* Assignment of Limited Liability Company Interest and Indemnification ("Assignment"), Exhibit 2 hereto, at TCC0002851-53; *see also* Document Entitled TCC's Assumed Debt of Montgomery Materials LLC as of 3/31/02, Exhibit 3 hereto. TCC also absorbed other debt – approximately $600,000 in consolidated debt that it had loaned Montgomery Materials. *See* TCC's Brief In Opposition To Defendants' Joint Summary Judgment Motion.

---

The indisputable facts leading up to and including the declaratory judgment action are set forth in TCC's Brief In Opposition To Defendants' Summary Judgment Motion.

5.      Before the closing, via a March 26, 2002 letter, Lambert was reminded of his obligations with respect to the Agreement's non-compete provisions, which were triggered by the closing and effective as of January 2, 2001 and ran until January 2, 2006.

**V.      CCI's Formation And Operation Leading Up To Its 2005 Dealings With Alabama Gravel And Lambert's Involvement With CCI During His Non-compete**

      **A.      *CCI's Formation And Operation Leading Up To Its 2005 Dealings With Alabama Gravel***

6.      Carol Lambert first worked as a bookkeeper in 1967 for Interstate Drilling, a company she owned with Lambert that was in the business of drilling blast holes in rock quarries. *See* Transcript of Deposition of Carol Lambert ("C. Lambert Tr."), taken August 22, 2006, Exhibit 4 hereto, at 8.9-.20. She was then a bookkeeper for and co-owner with Lambert of Lambert Sand & Gravel, which was in the business of producing sand and gravel. *See id.* at 9.22-10.11 & 12.9-.13. She went to work as a bookkeeper for MMC Holdings in the 1990s. *See id.* at 10.12-.20. Up to that point, she had no other work experience aside from being a bookkeeper. *See id.* at 10.21-11.10. When asked if she had any experience in the trucking business up to that point, she responded, "[w]ell, I don't know if you would consider the drills. You know, drills are big, heavy pieces of equipment, like a big truck, and that could be possible, I suppose." *See id.* at 11.11-.17.

7.      But, she admitted that while at Interstate Drilling, she was not responsible for selecting drills for purchase. *See id.* at 11.21-12.1. Similarly, when she worked for Lambert Sand & Gravel, she did not have any experience or duties with respect to selecting trucks that were used. *See id.* at 15.5-.10. In fact, up to the time she went to work for MMC Holdings, she had not gained any experience in the purchase of trucks for hauling aggregate. *See id.* at 15.11-

.15. She had the same duties as a bookkeeper with MMC Holdings that she had with the past companies. *See id.* at 16.18-17.3.

8.    Mrs. Lambert formed CCI on April 26, 2002. She claims it was formed to be a trucking company. *See id.* at 20.8-.16. When asked why she formed CCI, Mrs. Lambert responded, "[w]e had to have income. I did it to make a living." *See id.* at 20.1-.4. As she later agreed, "we," meaning she and Lambert, "needed to earn a living." *See id.* at 21.15-.20. Mrs. Lambert says she is CCI's sole owner and officer. *See id.* at 22.14-.16. She claims the first two other employees of CCI were brothers Grady and John Parker who had, immediately before that, worked for Montgomery Materials. *See id.* at 22.20-23.12. When asked why she chose to form a trucking company, Mrs. Lambert testified as follows:

> Q.    You had mentioned so that, as you said, we could earn a living.
>        Why did you select a trucking company for that purpose?
>
> A.    It's just what I chose to do. No specific reason.
>
> Q.    If I may, Mrs. Lambert, we were speaking earlier about your prior
>        experience, and I believe I heard you correctly that you did not
>        have any other experience related to trucking other than the drilling
>        relationship you mentioned. Why did you choose a business that
>        you had that level of experience with?
>
> A.    It's just what I chose to do.

*See id.* at 25.12-26.1.

9.    Mrs. Lambert claims that she located CCI's initial trucks for purchase by finding the name of a company in the telephone book and going to talk to the company. *See id.* at 26.9-.19. She claims she relied exclusively on the truck dealer for advice and did not get recommendations from anyone else. *See id.* at 27.21-28.12. That stated, she cannot recall:

(1)    how much she paid for the first trucks (*see id.* at 28.13-.18);

(2)    what mileage the trucks got (*see id.* at 50.7-.18);

8

(3)     the terms of the warranties on those initial trucks or whether she got warranties on subsequently purchased trucks (*see id.* at 52.7-.17); *or*

(4)     when CCI traded in its first truck, what she got for it, how many trucks CCI has purchased over the past four years, or the purchase price for any of those trucks (*see id.* at 52.18-54.10).

She says she knows that she purchased separate dump trailers for the trucks CCI currently owns, but she does not know how much CCI paid or when it purchased them. *See id.* at 54.11-55.12.

10.     Mrs. Lambert claims she does not recall Lambert ever assisting her in selecting CCI drivers. *See id.* at 78.21-80.10. She does not recall ever checking references on any of her drivers or going on any rides with prospective drivers to see if they were competent. *See id.* Mrs. Lambert states that she cannot recall whether someone recommended Foshee Trucking to her as someone to whom she could lease CCI trucks. *See id.* at 35.7-.12. She could not recall if Lambert made this recommendation.[5]  *See id.*

11.     Under the arrangement with Foshee Trucking, Foshee would obtain delivery jobs for CCI trucks, invoice the purchasers directly and then pay CCI for the deliveries. *See id.* at 32.9-33.22. Mrs. Lambert admits there were times when Lambert would call the Foshee dispatcher to see if a hauling job was available. *See id.* at 45.2-.10. Foshee Trucking issued Form 1099s (Exhibit 5 hereto) to CCI in 2002 for *$79,993.72*, in 2003 for over *$400,000*[6] and in 2004 for *$401,568.97.*

12.     At the time she formed CCI, Mrs. Lambert was aware that Lambert had an agreement not to go back into the sand and gravel business. She then testified:

Q.      Do you consider – well, did you consider at that time CCI to be in the sand and gravel business?

---

[5]      Mrs. Lambert's story, respectfully, is implausible.
[6]      There appear to be two 1099's for 2003, and both are difficult to read in the form transmitted by Foshee Trucking to TCC.

A.     No, I did not.

Q.     Do you consider trucking or hauling aggregate to be part of the
       sand and gravel business?

A.     I would say yes, in a way, it's – if you haul material, yes.

*See* C. Lambert Tr., Exhibit 4, at 29.23-30.8.[7]

### B.     *Lambert's Involvement With CCI During His Non-compete*

13.     Lambert was actively involved in CCI's operations, received compensation from

CCI and benefited from CCI's earnings.[8]

14.     Although Lambert claims that he did not give Mrs. Lambert advice "in a business

sense" on what trucks CCI should buy, he describes the sense in which he gave advice as

follows:

> [i]n a – she might ask me at the supper table, you know, if I
> thought she maybe ought to buy what kind of truck, and it would
> be the same thing as if she asked me if she wanted to buy a

---

[7]     Later in her deposition, after a break, Mrs. Lambert unsuccessfully attempted to qualify
this clear testimony when she was asked if CCI was in the business of mining aggregate. As she put it:

> No, and it never has been. It hauls material. And that – I think I stated
> earlier that if it's involved with sand and gravel operations, the only way
> it's involved with the sand and gravel operation is by hauling the
> material. It does not dig material out of the ground or put material
> through a processing plant. The only thing it does, it drives into a
> location, the material is loaded on the truck, and it's delivered to
> wherever it needs to go. It is not in no way related to a sand and gravel
> business.

*See id.* at 122.14-123.5; *see also* Transcript of Deposition of Larry Speaks ("Speaks Tr."), taken January
12, 2007, Exhibit 6 hereto, at 95.9-96.17; Transcript of Deposition of James Maddox ("Maddox Tr."),
taken January 17, 2007, Exhibit 7 hereto, at 45.3-47.4; Affidavit of David N. Gaddy, Exhibit 8 hereto, at
¶2; and Affidavit of Billy Stanley, Exhibit 9 hereto, at ¶7.

[8]     It is important to consider what is exhaustively set forth below and in TCC's opposition
materials submitted in response to Defendants' summary judgment motion against the backdrop of
Defendants' efforts to hide Lambert's involvement with CCI. Lambert has always taken the position that
he received no compensation from CCI and drove CCI trucks without compensation to help "his wife's
company." [Answer and Counterclaim of Defendant Harry E. Lambert; Doc. #7, ¶¶16 &17] Defendants'
position in this regard is implausible, and with all due respect, totally untrue.

> different lawn mower or what. It was in a husband and wife is any
> talk that we would have. But in a business sense, no.

*See* Transcript of Deposition of Harry E. Lambert ("H. Lambert Tr."), taken August 29, 2006,

Exhibit 10 hereto, at 65.13-66.1. Asked if it was possible if he participated in discussions with

truck dealers before CCI trucks were purchased, Lambert replied "[a]nything's possible." *See id.*

at 66.16-.23. When asked if he put CCI in touch with Foshee Trucking, he stated that he could

not recall, but again stated "[a]nything's possible." *See id.* at 84.12-.18.

15.    Throughout CCI's existence, Lambert has assisted CCI with truck maintenance,

such as changing tires and putting on brakes. *See id.* at 68.22-70.3. While he tries to deny being

paid for those services, *see id.* at 70.4-.5, he states "I wasn't paid any money. I was furnished a

roof over my head and food to eat." *See id.* at 70.9-.12. Lambert's pick-up truck is actually

owned by CCI. *See id.* at 145.2-.14. Mrs. Lambert also acknowledges that CCI listed Lambert

as a driver on its liability policy. *See* C. Lambert Tr., Exhibit 4, at 40.7-.16. CCI also pays

Lambert's health insurance, and he is separately listed and has a separate premium from Mrs.

Lambert. *See id.* at 43.23-44.17. CCI also pays Lambert's cellular telephone bill. *See id.* at

48.4-.15. CCI also "probably" listed Lambert as a driver for whom worker's compensation

premiums needed to be paid. *See id.* at 139.8-140.8. Foshee Trucking paid these premiums and

then withheld that amount from checks to CCI. *See id.*

16.    Lambert has also been active in driving and dispatching for CCI. While, again,

Defendants describe Lambert's driving CCI trucks as occasional, the records are replete with

dozens and dozens of load tickets dating back to CCI's formation indicating Lambert as a

frequent CCI driver.[9] Lambert also admits (1) that he had numerous discussions with persons at

---

[9]    Exhibit 11 hereto is a collective sample of these load tickets. It should also be recognized that Lambert's reference in Paragraph 49 to his health is irrelevant to this case. It is indisputable that Lambert was an active driver for CCI and that this violated his non-compete. TCC is sympathetic to

Alabama Gravel relating to their use of CCI which caused him to be at Alabama Gravel's location regularly; (2) that he answered the telephone when Alabama Gravel and Simcala called CCI requesting hauls; (3) that he had conversations with Maddox Stone & Gravel about loading rail cars with white oversize gravel using CCI, and he drove CCI trucks to the Maddox Stone & Gravel rail yard;[10] and (4) that he talked with Globe about quantities of Alabama Gravel white oversize gravel Globe wanted CCI to haul. *See* Defendant Harry E. Lambert's Responses to First Interrogatories, Exhibit 12 hereto, at Response Nos. 6-8 & 11.

17.    Lambert further admits speaking with Jim Maddox of Maddox Stone & Gravel about the availability of CCI trucks to haul Alabama Gravel white oversize gravel. *See* H. Lambert Tr., Exhibit 10, at 92.2-93.18. Maddox would call either him or Mrs. Lambert about this, and that when Maddox called Mrs. Lambert, she would call Lambert "to see what the availability of the trucks were." *See id.* Lambert admits that his telephone calls with Maddox in July and August 2005[11] "could" have been about coordinating shipments of white oversize gravel. *See* H. Lambert Tr., Exhibit 18, at 209.18-210.11.

18.    Lambert also admits to giving Mrs. Lambert information she used to arrive at the $6.00 per ton rate CCI charged to haul white oversize gravel from the Gentry Pit to Simcala. *See*

---

Lambert's health, but respectfully submits that Lambert has unfairly attempted to use it as a sword and a shield in this litigation. The Court should not let it be used for either.

[10]    Lambert actually introduced Jim Maddox of Maddox Stone & Gravel to Alexander. *See* Maddox Tr., Exhibit 7, at 23.25-26.22. Maddox was looking for gravel in the Montgomery area. *See id..* After Lambert gave Alexander's name, Maddox had dinner with Alexander and Lambert, although he claims Lambert did not participate in discussions about Maddox buying from Alabama Gravel. *See id..* at 28.5-29.8. Maddox also testified that he would imagine there would be some benefit to Lambert from CCI's hauling aggregate since Lambert's wife owned the business. *See id..* at 33.19-34.1.

[11]    These telephone calls and others discussed herein are reflected in telephone records subpoenaed from Lambert's cellular telephone provider. Utilizing TCC's telephone number records, those publicly available and information obtained during depositions, TCC has compiled a summary of these records indicating calls between Lambert and pertinent individuals, such as Maddox. This summary, along with a copy of the complete subpoenaed records are incorporated into an affidavit from TCC executive Hugh Sorrell. *See* Affidavit of Horald "Hugh" Sorrell Concerning Telephone Records ("Sorrell Telephone Record Affidavit"), Exhibit 13 hereto.

*id.* at 161.10-162.7. He also stated that he could have supplied some mileage information to
Mrs. Lambert to assist in determining the $5.00 per ton shipping charge to Globe, but he does not
"remember." *See id.* at 178.11-.23.

19.    Globe has confirmed that it dealt with Lambert when arranging deliveries of
Alabama Gravel aggregate.[12]  According to Robert Becker, Globe's Purchasing Director, during
his initial conversation with Alabama Gravel around May 7, 2005, Tuten told him that Lambert
would deliver the first loads of Alabama Gravel aggregate for testing. *See* Transcript of
Deposition of Robert R. Becker ("Becker Tr."), taken February 16, 2007, Exhibit 15 hereto, at
38.21-40.1 & 42.3-.13. Becker believes Lambert or somebody affiliated with Lambert delivered
those first loads. *See id.* The tests run on those loads led to additional Globe purchases from
Alabama Gravel. *See id.* at 40.2-.9 & 41.22-42.1. Becker further testified that he negotiated
directly with Lambert concerning what CCI would charge Globe for deliveries and how many
loads of gravel Globe expected to move. *See id.* at 41.10-.19. When asked whether Lambert
participated in subsequent deliveries to Globe, Becker replied "[w]hether Mr. Lambert delivered
them, I couldn't tell you. Maybe some of his affiliates or he made arrangements for that gravel
delivered. Yes." *See id.* at 42.14-.21.

20.    Lambert could not explain how or why he placed or received ***over 800*** telephone
calls to the other CCI's drivers' cellular numbers (*see* Sorrell Telephone Record Affidavit,
Exhibit 13), but admitted that sometimes he directly dispatched the drivers for CCI hauling jobs.
*See* H. Lambert Tr., Exhibit 10, at 224.18-225.7. When asked under what circumstances, he
dispatched CCI drivers in 2005, Lambert further admitted:

---

[12]    In the 24 months before the April 2002 closing, Globe had purchased aggregate from
Montgomery Materials. *See* Affidavit of Frank Foley ("Foley Aff."), Exhibit 14 hereto, at ¶8.

> [i]s that the drivers would ask me how many loads to haul, and I
> would tell them, lots of times on a daily basis, to haul X amount of
> loads to Globe, X amount of loads to Simcala per truck. So I
> talked to them on a daily basis to see how many loads that they
> hauled. I'd call them and ask them if they – how many loads that
> they had hauled. Just different reasons.

*See id.* at 226.4-.14. Lambert added that the CCI drivers were allowed to haul when they wanted

to and that he coordinated "some of that." *See id.* at 226.21-227.15. They would call Lambert or

he would call them and "ask them what hours they were going to run and what have you." *See*

*id.*

## VI.    Lambert's Involvement With And Assistance To Alabama Gravel In Establishing Its Relationships With TCC's Customers, Simcala, Globe and Maddox Stone & Gravel

21.    Despite his non-compete, Lambert and CCI were actively involved with and

assisted Alabama Gravel in establishing its relationships with TCC's customers, Simcala, Globe

and Maddox Stone & Gravel.

### A.    *Alabama Gravel's Formation*

22.    Tuten was involved in Globe's aggregate martial purchasing for 18 years before

he left in 2003. *See* Transcript of Deposition of David Tuten ("Tuten Tr."), taken July 13, 2006,

Exhibit 16 hereto, at 16.5-.11. In 2003, he formed a consulting business and consulted with

Simcala until 2005. *See id.* at 53.6-.14 & 57.20-59.7. He met Robert Alexander for the first time

in late 2004 or early 2005 when he was introduced by Lambert. *See id.* at 60.16-.23. Tuten

testified as follows about how that meeting took place:

> I had mentioned to Mr. Lambert about because of the situation at
> Simcala, with them running out of white oversized and also with
> contacts I had at Globe, that you know, there was a need for white
> oversized gravel and that I would have an interest in getting in the
> gravel business mainly as an outside investor more than anything
> else. And I had asked Mr. Lambert, you know, if he knew of

14

anyone, you know, that I could maybe get involved with, and he
put me in touch with Mr. Alexander.

*See id.* at 61.3-.17.  At that time, Tuten was not aware of another location in the Montgomery

area where he could get white oversize gravel and did not have any idea where he could get the

white oversize gravel he was hoping to sell.  *See id.* at 70.10-71.8.  He asked Lambert this.  *See*

*id.* at 71.9-.22.  Tuten testified that he would not be involved with Alabama Gravel were it not

for Lambert.  *See id.* at 176.20-177.5.  **Tuten says that if Lambert had not hooked him up with**

**Alexander, he would not have pursued it any further.**  *See id.* at 177.11-.21.  Many critical

events took place before Tuten met Alexander.

### (1)    The Gadsden, Simcala And Gentry Meetings

23.    During the first week of January 2005, Alexander met Lambert and Rex Dasinger

in Gadsden, Alabama.[13]  Defendants claim this meeting ("the Gadsden Meeting") took place

because Alexander was considering purchasing an aggregate plant in Gadsden.  Defendants,

however, fail to state that Lambert took Dasinger with him to the Gadsden Meeting and that

Dasinger went to that meeting to discuss with Alexander working with him in opening a mining

operation on land in Deatsville, Alabama, for which Dasinger was working on obtaining a

lease.[14]  *See id.* at 33.5-37.2 & 58.16-59.8.  Defendants also fail to mention that at around the

same time as the Gadsden Meeting, Lambert had a 30 to 45 minute meeting ("the Simcala

---

[13]    Alexander has stated through his attorney that he believes the Gadsden Meeting took place during the first week in January, 2005.  *See* Email from James N. Walter, Esq. to Thomas F. Gristina, Esq., dated January 10, 2007, Exhibit 17 hereto.

[14]    Dasinger began his efforts to obtain that lease about five years ago.  *See* Transcript of Deposition of William "Rex" Dasinger ("Dasinger Tr."), taken December 4, 2006, Exhibit 18 hereto, at 16.3-18.12.  Dasinger was interested in starting a mining operation.  *See id.* at 18.23-19.2.  Dasinger was encouraged by several people to get a financial backer in these efforts.  *See id.* at 20.12-.21.  Dasinger says he approached Foley and that Foley declined because the Deatsville site is too close to Elmore Sand & Gravel.  *See id.* at 21.18-22.4.  He then approached Lambert, and he says that Lambert declined, citing the non-compete.  *See id.* at 22.23-23.20.  But, Lambert later introduced him to Alexander.  *See id.* at 23.21-24.2 & 25.23-26.4.  That introduction took place at the Gadsden Meeting.  *See id.* at 33.5-.10.

Meeting") with Simcala employees Dick Wymer and Ed Boardwine, Jr. *See* H. Lambert Tr.,

Exhibit 10, at 130.11-133.21; *see also* Document Bearing Bates Stamp No. TCC000995, Exhibit

19 hereto.

24.    Wymer's calendar (Exhibit 19 hereto) indicates that the Simcala Meeting with

Lambert was on January 6, 2005, although Wymer could not recall if that was the exact date of

the meeting. *See* Transcript of Deposition of Richard D. Wymer ("Wymer Tr."), taken January

11, 2006, Exhibit 20 hereto, at 100.23-101.101.9. In any event, Alexander's name and telephone

numbers appear directly below Lambert's with the notation that Alexander called Wymer and

would get back to him when he had more information. *See* TCC000995, Exhibit 19. Lambert

admits to having recommended Alexander to Simcala during the Simcala Meeting when Wymer

and Boardwine expressed a need to obtain additional white oversize gravel. *See* H. Lambert Tr.,

Exhibit 10, at 130.11-133.21. Wymer confirmed that Alexander did, in fact, call him back on

January 10, 2005. *See* Wymer Tr., Exhibit 20, at 101.13-103.103.5. This was after the Gadsden

Meeting. Alexander indicated during his January 10, 2005 telephone call to Wymer that he was

checking into a "source" for Simcala. *See id.* at 104.7-.21.

25.    In the meantime, and before Alexander called Wymer on January 10, 2005,

Lambert had introduced Alexander to Mike Gentry in Prattville, Alabama ("the Gentry

Meeting"). *See* Transcript of Deposition of Robert J. Alexander ("Alexander Tr."), taken

December 4, 2006, Exhibit 21 hereto, at 58.9-.22 & 61.5-.18. The purported purpose of the

Gentry Meeting was to discuss the possibility of Alexander purchasing some sand screws from

Gentry for use at the Gadsden site. *See id.* Lambert knew about the sand screws because Gentry

had previously called him and asked him to let him know if he knew anyone who wanted to buy

the used equipment. *See* Transcript of Deposition of Howard M. Gentry ("Gentry Tr."), taken

16

January 9, 2007, Exhibit 22 hereto, at 30.14-31.19. Sand screws are used in mining aggregate. *See id.* During the Gentry Meeting, Gentry and Alexander discussed Gentry's aggregate mining operation in Independence, Alabama (the "Gentry Pit").[15] *See* Alexander Tr., Exhibit 21, at 62.2-64.17. Alexander and Gentry rode out to look at the Gentry Pit the next day. *See id.* at 64.22-65.22.

26.     During that initial Gentry Pit visit, Alexander and Gentry discussed Alexander taking over Gentry Pit operations. *See* Gentry Tr., Exhibit 22, at 43.14-46.3; Alexander Tr., Exhibit 21, at 76.5-.10. There was a stockpile of white oversize gravel at the site, and Alexander and Gentry discussed the Gentry Pit's ability to produce white oversize. *See* Gentry Tr., Exhibit 22, at 43.14-46.3. Alexander later asked Gentry if Gentry would be interested in an arrangement whereby Alexander would take the white oversize and leave everything else to Gentry. *See id.*

27.     After going to the Gentry Pit, Alexander and Lambert discussed whether Lambert thought the white oversize at the Gentry Pit "would do for metallurgical rock." *See* Alexander Tr., Exhibit 21, at 78.14-79.11. Alexander cannot recall if he learned that Simcala was looking for white oversize before or after the visit to the Gentry Pit, but he does recall that at some point after that visit, Lambert told Alexander to call Wymer. *See id.* at 79.12-83.14. Again, Wymer confirms that this call was on January 10, 2005. *See* Wymer Tr., Exhibit 20, at 101.13-103.103.5. Alexander also confirms that when he called Wymer and told him that he would get back to him when he had something to talk about, he had the Gentry Pit in mind, if it would meet

---

[15]     The Gentry Pit is within the Territory covered by the Lambert's non-compete.

the metallurgical requirements.[16],[17]  *See* Alexander Tr., Exhibit 21, at 83.15-84.2.

\*          \*          \*          \*          \*          \*

28.      Thus, before Tuten met Alexander the first time, Lambert had introduced

Dasinger, who was getting access to the Deatsville site, to Alexander.  He had also introduced

him to Gentry, who had an existing source of white oversize gravel.  And, he had placed

Alexander in touch with Simcala, who had a stated need for white oversize.  In other words,

thanks to Lambert, before they first met, Alexander and Tuten had both aggregate sources, a

delivery method and a solid customer.

### (2)      The Hotel Meeting

29.      Tuten ended up meeting Alexander in a hotel ("the Hotel Meeting") in the

Montgomery area two to three weeks after the Gadsden Meeting.[18]  Lambert had called

Alexander, found out when he would be in town and gave Tuten that information and

Alexander's telephone number.  *See* Tuten Tr., Exhibit 16, at 78.14-79.10.  Lambert attended the

Hotel Meeting, during which Tuten and Alexander discussed obtaining white oversize gravel

from the Gentry Pit.  *See id.* at 81.23-82.6 & 85.9-86.11.  Tuten testified that Alexander told him

he had been introduced to Gentry by Lambert.  *See id.*  During the Hotel Meeting, Lambert

---

[16]      At some point thereafter and before Alabama Gravel began its first deliveries of white oversize from the Gentry Pit, an unwritten deal was struck with Gentry whereby Alabama Gravel would be responsible for running the mining operation, paying the power and dealing with reclamation.  *See* Gentry Tr., Exhibit 22, at 51.20-52.19.  In exchange for those things, Alabama Gravel would get all white oversize, and Gentry would get all the other aggregate produced at the Gentry Pit.  *See id.*  Before finalizing the deal with Alabama Gravel, Gentry called Lambert to check up on Alexander and Lambert told Gentry Alexander was "a jam up guy."  *See id.* at 73.8-74.2 & 77.18-78.18.  Lambert's recommendation was important to Gentry.  *See id.* at 77.18-78.18.  Between the Gentry Meeting and the time Gentry finalized this deal with Alabama Gravel, Gentry recalls Lambert pulling into the Gentry Pit with equipment on a "low boy" trailer – "an old loader or something like that" – used in mining sand and gravel.  *See id.* at 55.2-56.11 & 91.9-93.4.  Gentry does not know if he left the equipment there.  *See id.*

[17]      Alexander has also stated that the idea was to use the revenue from Gentry Pit sales to build the mining operation on the Deatsville site.  *See* Alexander Tr., Exhibit 21, at 135.18-136.7.

[18]      Alexander provided this timeframe as well through his attorney.  *See* Email from James N. Walter, Esq. to Thomas F. Gristina, Esq., Exhibit 17; *see also* Tuten Tr., Exhibit 16, at 62.6-.20.

recommended Dasinger to Alexander and Tuten as a good person to be a foreman and run

operations. *See id.* at 90.12-92.15. Lambert was also asked who they could use to construct their

operation. *See id.* 100.11-101.5. Lambert had the specific information and the specific

individuals who could help Tuten and Alexander construct a plant. *See id.*[19]

30.    After the Hotel Meeting and during the time of the Gunnells Road Meeting

discussed below, Alexander had ongoing discussions with Lambert about gravel at the Gentry

Pit. *See* Alexander Tr., Exhibit 21, at 103.3-.13. Alexander wanted Lambert to confirm that

what Alexander thought about the Gentry Pit was correct. *See id.* at 103.14-104.8. ***Alexander***

***admits that Lambert was "assisting" him in opening the Gentry Pit.*** *See id.* at 104.9-106.14.

(3)    **The Gunnells Road Meeting**

31.    Alabama Gravel was organized on March 24, 2005. [Doc. #47, ¶7] Its principals

are Alexander, Tuten and Dasinger, owning 70%, 25% and 5% of the company respectively. *See*

Dasinger Tr., Exhibit 18, at 41.22-42.18. On March 25, 2005, the day after Alabama Gravel was

formed, Tuten, Alexander and Dasinger met ("the Gunnells Road Meeting") at the Gunnells

Road address that eventually became Alabama Gravel's office.[20,21] *See* Tuten Tr., Exhibit 16, at

112.12-113.21. This office is on the same property where Lambert lives. *See id.* They got in

touch with Dasinger through Lambert. *See id.* They talked to Lambert about renting the office.

*See id.* at 115.1-.14. Lambert was present for the beginning of the meeting, but then left,

claiming he did not need to be there. *See id.* at 116.10-.19.

---

[19]    It should also be noted that right around the time Alabama Gravel was formed, Tuten
admits that Lambert drove him to the Deatsville site where Tuten took rock samples from holes he says
Dasinger dug. *See id.* at 149.10-153.10. He claims that Lambert knew Dasinger had dug the holes. *See
id.*
[20]    Alexander has also stated through his attorney that he believes the Gunnells Road
Meeting took place on March 25, 2005. *See* Email from James N. Walter, Esq. to Thomas F. Gristina,
Esq., Exhibit 17.
[21]    Alabama Gravel pays Carol Lambert $1,000 per month to rent that office. *See* Tuten Tr.,
Exhibit 16, at 169.2-.10.

32.    Nevertheless, at the Gunnells Road Meeting, Tuten, Dasinger and Alexander discussed CCI hauling white oversize for Alabama Gravel. *See id.* at 128.6-129.4. They talked to Lambert about CCI doing this hauling before they talked to Carol Lambert about it. *See id.* Tuten admits that when Alabama Gravel hired CCI to haul aggregate, it was his intention at that time that by hiring CCI to do that, Lambert would be able to drive some of those trucks. *See id.* at 49.19-50.8. Tuten, Alexander and Dasinger also talked about Mrs. Lambert doing Alabama Gravel's bookkeeping. *See id.* at 129.21-130.19. They talked to Lambert about this first, and he said he was sure Carol Lambert would be interested in this because, as Tuten says Lambert put it, "she was needing something to do."[22] *See id.*

### (4)    The ADEM Permit Meeting

33.    Lambert's involvement with Alabama Gravel's formation and operation went even further. On March 17, 2005, a week before the Gunnells Road Meeting, Lambert met with civil engineers Larry Speaks and Russ Ware ("the ADEM Permit Meeting") to discuss revision of the ADEM Permit for the Gentry Pit. *See* Affidavit of Russell D. Ware, Jr. ("Ware Aff."), Exhibit 23 hereto, at ¶3. Lambert was seeking to revise the Gentry Pit ADEM Permit to expand the number of acres and areas that could be mined. *See id.* at ¶5. Up to that point, Ware, who had assisted Gentry before with respect to that Permit, recalls the Gentry Pit as a small mining operation by comparison to others that he had assisted in obtaining ADEM Permits. *See id.* at ¶¶4-5. Lambert's plans represented a significant expansion of the Gentry Pit mining operation. *See id.* at ¶5.

34.    During the ADEM Permit meeting, Lambert and Ware reviewed and marked on the PAP map that had been submitted with the application for the existing Gentry Pit ADEM Permit. *See id.* at ¶6. Lambert marked the PAP as he told Ware where digging would take place

---

[22]    This, despite the fact that she was purportedly running CCI.

and where drainage areas would be under the revised permit. *See id.* It appeared to Ware, from the way Lambert described to Ware and Speaks his plans for the mining operation on Gentry's land, that Lambert was in charge of that mining operation. *See id.* at ¶7. Ware does not recall Lambert mentioning the name Alabama Gravel during the meeting or any individuals that would be working with him in the mining operation. *See id.* The information Lambert imparted to Ware that morning was necessary, and intended to be used, to revise the Gentry Pit ADEM Permit. *See id.* at ¶8. ***Defendants admit that "ADEM permits are indicia of engaging in the sand and gravel business."*** *See* Defendants' Brief In Support Of Joint Motion For Summary Judgment [Doc. #87] at p.21, ¶80.

### (5) Lambert's Assistance In Plant Construction And Alabama Gravel Operations

35.     There is extensive evidence of Lambert's further involvement with Alabama Gravel mining plant construction and operations. TCC employee Danny Luster saw a mining plant being built in Deatsville and was told by Allen King that King was building the plant in Deatsville for Luster's "former boss." *See* Transcript of Deposition of Danny Luster ("Luster Tr."), taken March 29, 2006, Exhibit 24 hereto, at 45.3-50.15 & 79.18-.21. Luster worked for Lambert at MMC before the 2002 transfer and closing and stayed on with TCC, eventually becoming a plant manager. *See id.* at 11.11-13.4 &14.17-20.5. Earlier, in January 2005, Lambert had stopped-in on Luster at TCC's Shorter, Alabama, mining operation and told Luster that "it wouldn't be long and that he had a few surprises for some people." *See id.* at 31.17-32.12. Luster took that to mean that Lambert would be getting back into the aggregate business. *See id.* at 32.13-.16. After mentioning there would be some surprises, Lambert also told Luster that he "didn't care if he told the four-eyed f__ker." *See id.* at 33.1-.15 (redacted). Luster understood Lambert as referring to Foley. *See id.* at 96.15-.19.

21

36.     Lambert was also involved in the acquisition of equipment for operation and construction of Alabama Gravel's mining operations at the Gentry Pit and the Deatsville site. Pete Long, who brokers machinery used in construction of mining operations, brokered a deal through Lambert that resulted in Alabama Gravel purchasing used mining equipment from a Georgia dealer named Mack Tilly. *See* Declaration of William P. Long, Exhibit 25 hereto. Long states that Lambert told him the equipment was not for him but for Alabama Gravel and not to mention Lambert's name since he was under a non-compete with Foley. *See id.* Lambert stated that Lambert could talk to anybody he wanted to and could give advice. *See id.* Long was paid $250 by Alabama Gravel for this deal. *See* Alabama Gravel check, dated May 2, 2005, Exhibit 26 hereto.

37.     Lambert also referred Alabama Gravel to Southern Wire Enterprises, Inc. *See* Transcript of Deposition of Samuel W. Estock ("Estock Tr."), taken January 10, 2007, Exhibit 27 hereto, at 28.23-30.6. Southern Wire sells wear parts and machines that are used in gravel mining operations. *See id.* at 20.4-.17. On February 16, 2005, Southern Wire provided a price quote to Alexander for, among other things, a $56,480.00 "Trio 44" X 32 ft. Twin Fine Material Washer." *See* Southern Wire Deposition Documents, Exhibit 28 hereto.[23] That piece of equipment was invoiced to Alabama Gravel on December 15, 2005. *See* Southern Wire Deposition Documents, Exhibit 28; Estock Tr., Exhibit 27, at 68.12-.21. Below the "P.O. NO." on that invoice appears the name "Harry Lambert." *See* Southern Wire Deposition Documents, Exhibit 28. The name "Harry" also appears below the "P.O. NO." on Southern Wire's April 26, July 18 and September 9, 2005 invoices to Alabama Gravel.[24]

---

[23]     These documents were produced and authenticated by Estock at his deposition and attached to the deposition transcript at Exhibit 1. *See* Estock Tr., Exhibit 17, at 30.23-34.10.
[24]     *See* Southern Wire Documents Produced In Response to First Subpoena, Exhibit 29 hereto, at TCC000915, 920 & 931. While these references to "Harry" appear on the invoices produced by

38.    Estock has testified that Harry Lambert did not order the equipment on the December 15, 2005 invoice. *See* Estock Tr., Exhibit 27, at 72.7-.19. Estock says Lambert's name was put on there by his daughter because Estock mentioned Lambert's name so many times about Lambert having gotten Southern Wire that account. *See id.* at 69.9-71.23. This, however, does not explain why Lambert's telephone records show a 13 minute telephone call to Estock's cellular telephone on December 15, 2005. *See* Sorrell Aff., Exhibit 13. In fact, Estock had numerous conversations with Lambert in an around the time Southern Wire was providing equipment to and invoicing Alabama Gravel. *See id.*

39.    Lambert's involvement with Alabama Gravel's mining operations is further confirmed by his telephone records showing telephone calls to Tuten, Alexander, Dasinger, Gentry, Becker, Simcala, Southern Steel & Pipe, Inc., Trey Holley of the Volvo large tractor equipment and large haul trucks dealership, Allen King, Pond River Steel, Cowin Equipment Company, Hardy Traylor of the Caterpillar dealership, Pearce Pump South, Inc. employee Bernie Ostervold and Texas Crusher System, Inc.[25] In addition to Tuten, Alexander and Dasinger, all of these entities and people are involved in the aggregate industry in the Montgomery, Alabama, area. *See id.* When asked about the calls, Lambert responded as follows.

(1)    Lambert's records show calls to Southern Steel four times in September 2005 – a time when Southern Steel was doing work for Alabama Gravel on the Deatsville

---

Southern Wire in response to the first subpoena TCC served in January 2006, they do not appear on the same invoices produced at by Estock at his deposition. *See* Southern Wire Deposition Documents, Exhibit 28. Since his deposition, Estock has informed undersigned counsel that he instructed his daughter, who works for him, to redact the documents produced at his deposition because he claims Lambert's name should not have been on them. It must also be noted that Alabama Gravel, for whom Carol Lambert acts as bookkeeper, produced its copies of Southern Wire invoices. *See* Southern Wire Invoices Produced by Alabama Gravel, Exhibit 30 hereto. The reference to Harry Lambert appears to have been redacted from Alabama Gravel's copy of the December 15, 2005 invoice before it was produced. *See id.* at AG 00149. In addition, Alabama Gravel failed to produce any copies of the other three invoices referencing "Harry." *See generally id.*

[25]    All of these calls are contained in Lambert's telephone records and confirmed by the Sorrell Telephone Record Affidavit, Exhibit 13.

site – but he does not recall speaking with them. *See* H. Lambert Tr., Exhibit 10, 198.9-199.13. Lambert said he had no business ventures that would have required him to call Southern Steel during that time. *See id.* at 198.9-199.13. Lambert then testified that it could have been someone he loaned his telephone to, like Alexander or Dasinger, that placed those calls. *See id.* at 199.22-201.3 & 243.15-244.1. He does not know why Southern Steel called him more than a dozen times between September and October 25, 2005. *See id.* at 217.15-218.11. Southern Steel was invoicing Alabama Gravel during that period. *See* Southern Steel Invoices, Exhibit 31 hereto. He says that Southern Steel would not have been calling him about the Deatsville site, but that he had no business ventures at that time that would have required him to use Southern Steel. *See* H. Lambert Tr., Exhibit 10, at 217.15-218.11.

(2)    The records show telephone calls between Lambert and Trey Holley of a Volvo truck dealership specializing in mining equipment. Lambert stated that CCI did not use Volvo trucks, but he knew there was a Volvo truck at the Deatsville site. *See id.* at 207.10-208.7. Nevertheless, he could not "really recall" speaking with Mr. Holley before January 2006 about Volvo trucks. *See id.*

(3)    The records show Allen King speaking to Lambert more than 200 times between July 2005 and December 2005. Carl King was hired by Alabama Gravel to build the Deatsville site. Lambert claims the only discussion of King's work on the Deatsville site would have been "casual." *See id.* at 222.17-224.17.

(4)    Lambert knew there were conveyers at the Deatsville site with the name Pond River Steel on them, but he had no idea how Alabama Gravel got connected with them. *See id.* at 215.21-217.5. He denies placing Pond River Steel in touch with Alabama Gravel despite the fact that Pond River Steel called him on October 12 and 17, 2005 and invoiced Alabama Gravel on October 25, 2005. *See id.*; *see also* Pond River Steel Invoice, Exhibit 32 hereto. He has no idea why Pond River Steel called him. *See* H. Lambert Tr., Exhibit 10, at 215.21-217.5.

(5)    Lambert knows Becker as a Globe purchasing agent, but does not "know specifics" of why he called Becker in July and August 2005. *See id.* at 250.22-.6-251.12. Of course, as set forth above, Becker has testified to critical conversations and interactions with Lambert concerning Alabama Gravel product and CCI delivery of the same.

(6)    Lambert knows Cowin Equipment Company as a company that sells excavators and off-road trucks used in mining operations, but does not remember why they called him more than a dozen times between July and December 2005. *See id.* at 219.10-221.1.

(7)    Hardy Traylor called Lambert more than two dozen times from July 2005 until the end of 2005. Lambert knows Traylor as a Caterpillar salesman. *See id.* at 227.16-229.5. He added that the calls could have been related to servicing CCI

24

trucks, a friendship call or for "various reasons." *See id.* He denies the calls were related to the Deatsville site, but admits there are a Caterpillar bulldozer, a "couple" of Caterpillar excavators and a Caterpillar truck on the Deatsville site. *See id.* Lambert called Caterpillar dozens of times from July until the end of 2005, but again denies it was related to equipment at the Deatsville site. *See id.* at 242.8-.23. He does not "recall" why he called them. *See id.* Despite Lambert's claims, the records reveal that he exchanged calls with Traylor a total of more than 70 times.

(8)    Lambert says that many telephone calls from Pearce Pump employee Lars "Bernie" Ostervold between August and November 2005 had nothing to do with the work Pearce Pump was doing on the Deatsville site. *See id.* at 233.4-.22. Lambert says this despite the fact that Pearce Pump was invoicing Alabama Gravel during this same period. *See* Pearce Pump Invoices, Exhibit 33 hereto.

(9)    Lambert says that none of the hundreds of telephone calls between him and Tuten in 2005 related to work by Lambert at the Deatsville site. *See id.* H. Lambert Tr., Exhibit 10, at 233.23-235.2. He could not recall the specifics of any of those conversations, but said the Deatsville site may have come up in "casual conversation." *See id.*

(10)   The records also reflect more than *500* telephone calls between Dasinger and Lambert. Again, Dasinger was Alabama Gravel's day-to-day operations man.

(11)   Lambert does not "really" know Texas Crusher System, Inc., but would say they sell crushers. *See id.* at 235.3-.12. He admits that crushers are used in the aggregate business but has no idea why they called him in November 2005. *See id.*

In short, there is simply no explanation for the above telephone calls and those reflected in Lambert's records with others in the sand and gravel industry other than that Lambert was actively engaged with Alabama Gravel and CCI in the sand and gravel business during his non-compete. Defendants may try to explain away all these hundreds and hundreds of calls with Lambert's bald assertion that they had nothing to do with business or with the claim that deposition and affidavit testimony from some of the call participants shows that they either cannot remember the calls or that they had nothing to do with the sand and gravel business. Considering the sheer volume of the calls and their coincidence with Alabama Gravel business operations, these explanations are not credible.

40.    Lambert's involvement with Alabama Gravel's mining operations is also circumstantially confirmed by the fax TCC received from Crest Capital on December 6, 2005 ("the Crest Capital Fax"). *See* Crest Capital Fax, Exhibit 34 hereto. The Crest Capital Fax bears the following handwritten note:

> *Harry, [i]f you have the Invoice – Descriptions for the Equipment*
> *– send those too and I'll take care of it before the Holidays.*
> *Thanks. Mike.*

*See id.* The author of the fax is Mike Hong.

41.    According to Hong, he has been working for Crest Capital for approximately five years. *See* Transcript of Deposition of Michael Hong ("Hong Tr."), taken January 16, 2007, Exhibit 35 hereto, at 7.16-.18. Crest Capital is an equipment finance company that finances any type of equipment including bulldozers and front loaders. *See id.* at 7.19-8.6. The December 6, 2005 fax is an application for equipment financing, which Hong confirmed bears his handwriting. *See id.* at 9.16-10.15. Hong has no recollection of preparing the fax or how he got the name "Harry;" but he added that has no reason to believe that he did not write the note on the fax on December 6, 2005. *See id.* at 11.11-12.11.

42.    Hong stated that he would send out a fax like the Crest Capital Fax for any number of reasons, including getting a call from an equipment buyer or seller or someone with a referral. *See id.* at 17.7-.17. He added that there are instances when the vendor providing the referral or lead might get the potential borrower's contact information, such as company name or telephone number, wrong. *See id.* at 30.25-31.20.

43.    The Crest Capital Fax was not sent out of nowhere. It may be inferred that Lambert was doing something that lead to a tip going to Crest Capital, a company that specializes in equipment financing, and the resulting credit application.

26

44.    Globe's Becker confirms Defendants' involvement with Alabama Gravel operations because he actually met with Lambert at the Deatsville site in October 2005. *See* Becker Tr. Exhibit 15, at 44.9-.21 & 56.22-57.24. During that visit, they discussed what the mileage from that location was to Globe's Selma plant and how the gravel could possibly be transported by river to Globe's Beverly, Ohio plant. *See id.* at 47.24-48.8.

45.    Finally, given the extensive assistance Lambert has given Alabama Gravel, it is clear that Lambert's consulting agreement (Exhibit 36 hereto) with Alabama Gravel, which he made sure was executed just a few months after the non-compete expired, is deferred compensation for services provided during the non-compete. The agreement provided for an immediate payment of $10,000. *See* Consulting Agreement, Exhibit 36, at p.6.

46.    The consulting agreement also evidence's Lambert's efforts to hide his previous assistance to Alabama Gravel. In it, the parties assert that four months after the non-compete expired, Lambert and Alabama Gravel met and discussed a possible business relationship for the first time. *See id.* at p.4. The above facts demonstrate Lambert discussing his and CCI's business relationship with Alabama Gravel on many prior occasions. The facts also demonstrate that there was a business relationship long before the consulting agreement.

**B.    *Alabama Gravel's Sales To Simcala, Globe And Maddox Stone & Gravel***

47.    Alabama Gravel began delivering white oversize gravel from the Gentry Pit to Simcala in April 2005. *See* Carol's Contracting, Inc. Invoices ("CCI Invoices"), Exhibit 37 hereto, at Bates Stamp Nos. CCI0001-0086. Simcala stopped buying from TCC at that time. CCI is the only company Alabama Gravel has used to haul white oversize to Simcala[26] and was

---

[26]    *See* Alexander Tr., Exhibit 21, at 189.20-.23.

paid $6.00 per ton for these deliveries.[27]  *See* CCI Invoices, Exhibit 37.  Simcala was not told

this, but was given a delivered price.  *See* Wymer Tr., Exhibit 20, at 128.23-129.10 & 135.9-

136.2.  Simcala would have liked to have known what CCI was being paid so it could have

negotiated a better price from Alabama Gravel and believes that the appropriate freight charge

should have been $4.00 per ton.  *See id.* at 135.9-137.23.  Simcala Purchase Order inquiries

indicate that as of the date Simcala responded to TCC's January 2006 subpoena, it had purchased

*$1,448,269.39* in Gentry Pit white oversize gravel from Alabama Gravel at $26.00 per ton.  *See*

Wymer Tr., Exhibit 20, at 153.9-157.23; *see also* Purchase Order Inquiry, Exhibit 38 hereto, at

TCC00947-948.  Simcala has testified that there was no give and take with Alabama Gravel on

the $26.00 per ton price.  *See* Wymer Tr., Exhibit 20, at 128.4-.22.  Alexander told them $26.00

per ton and Simcala had to take it.  *See id.*  CCI invoices confirm that from April 10, 2005 until

December 25, 2005, CCI was paid at least *$478,929.37* by Alabama Gravel for hauling white

oversize gravel to TCC customers Simcala, Globe and Maddox Stone & Gravel.

*        *        *        *        *

All of the above disputed facts unequivocally demonstrate that TCC is entitled to

summary judgment as to liability with respect to Lambert's breach of the non-compete.[28]

## -- SUMMARY JUDGMENT STANDARD --

Summary judgment is appropriate if the pleadings, depositions and affidavits show that

there is no genuine issue of material fact and that the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  An issue is

---

[27]    The CCI drivers even had keys to the Gentry Pit for after hours loading of white oversize and were allowed to do so using Alabama Gravel's $300,000 loader. *See* Dasinger Tr., Exhibit 18, at 77.21-81.5. Under this arrangement, Alabama Gravel learned the amount CCI hauled from scales upon delivery to Simcala. *See id.*

[28]    Because TCC is not seeking summary judgment at this time as to damages, it has not proffered its evidence as to those damages. TCC has, however, set forth its damages position in its Brief In Opposition To Defendants' Joint Summary Judgment Motion.

"material" if it is a legal element of a claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen*, 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. Although all reasonable inferences arising from the undisputed facts should be made in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable. *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985).

Applying this standard, summary judgment is warranted for TCC.

## -- ARGUMENT AND CITATION OF AUTHORITY --

### I.    Defendant Lambert Clearly Breached The Non-Compete

TCC's factual recitation tendered in support of this motion and the one submitted in opposition to Defendants' summary judgment exhaustively demonstrate via direct and circumstantial evidence Lambert's activities in the sand and gravel business in violation of his non-compete. The terms of non-compete are, again, as follows:

8.4.    Lambert. If Montgomery, Inc. transfers its entire Membership Interest in Montgomery, LLC [MMC] to Concrete [TCC] or any other party, Lambert agrees that during the Period he will not:

(1)    engage, as an employee or otherwise, in the Territory in the Prohibited Activity;

(2)    in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent,

broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employees or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity;

      (3)    in the Territory induce a Customer (as defined below): (i) to purchase Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC [Montgomery Materials] or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC [Montgomery Materials]. As used in this subsection, "Customer" means any actual customer who purchased Product from Montgomery, LLC [Montgomery Materials] in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. [MMC Holdings] of its Membership Interest in Montgomery, LLC [Montgomery Materials] . . ..

*See id.* at § 8.4. The "Period," or duration, of the non-compete was five years from the date of the transfer described in the first paragraph of the non-compete. *See id.* at §§ 8.3 & 8.4. The "Prohibited Activity" is engaging "in the Territory in the business of excavating, mining, distributing, delivering, selling or otherwise disposing of any Product at wholesale or retail." *See id.* The "Territory" is "the area contained within the 60 miles of the present [then] limits of Montgomery, Alabama." *See id.* at § 8.1. "Product" is "sand, gravel, clay and/or topsoil." *See id.* at § 1(b).

    Instead of abiding by these terms and in the face thereof, Lambert was integrally involved in the formation of a vertically integrated sand and gravel business for which he and his wife have been handsomely paid. Lambert assisted his wife in forming CCI, which allowed him to earn money while at the same time staying in contact with all major aggregate suppliers and purchasers in the Montgomery area. He was then able to immediately recognize and capitalize on TCC's temporary supply issues in January 2005. TCC was never able to accommodate its valuable customer with increased production because Lambert quickly set up Alabama Gravel

30

through the Simcala, Gadsden, Gentry, Hotel, Gunnells Road and ADEM Permit Meetings. As Tuten, he would not have been involved with Alabama Gravel were it not for Lambert, would not have pursued it further if Lambert had not hooked him up with Alexander. Lambert even offered his wife's property and bookkeeping assistance. Alexander even admits that Lambert assisted him in opening the Gentry Pit. And, of course, CCI received the exclusive rights to deliver Alabama Gravel white oversize. Defendants have in fact conceded that Lambert was engaged in the sand and gravel business when he attended the ADEM Permit Meeting. As Defendants state, an ADEM Permit is indicia of engaging in the sand and gravel business.[29]

Lambert also assisted Alabama Gravel in obtaining Globe as a customer via his delivery of product for testing and discussions with Becker at the Deatsville site and elsewhere. The Southern Wire documents, Pete Long's statement and Lambert's own telephone records[30] indicate that Lambert was also actively involved in the construction of the Deatsville site both via contractor and equipment supplier recommendations and telephone conversations with contractors and equipment suppliers.

In addition to violating the non-compete provisions § 8.4(1) and (2) described in Argument Section II above, Lambert's interaction with Globe violated non-compete provisions § 8.4(3) prohibiting inducing a "Customer" (i) to purchase Product in the Territory from any business entity operating in the Territory other than Montgomery Materials or its affiliates; or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery Materials. "Customer" means any actual customer who purchased Product from Montgomery Materials in

---

[29]    It is not, however, the only indicia. All of Lambert's and CCI's other activities are also part of the business.

[30]    As discussed in its Brief In Opposition To Defendants' Joint Summary Judgment Motion, Defendants may try to create a question of fact as to whether the telephone records demonstrate Lambert's violation of his non-compete. Even assuming *arguendo* the records could create a question of fact, they are not required for summary judgment as to liability. The other evidence is collectively overwhelming.

the Territory, within the 24 month period prior to the date of the closing of the sale by MMC

Holdings of its Membership Interest in Montgomery Materials. Globe was such a Customer.

*See* Foley Aff., Exhibit 14, at ¶8.

## -- CONCLUSION --

For the foregoing reasons, TCC respectfully submits that its motion for partial summary

judgment should be granted in its entirety and that the Court should enter an order granting

judgment in its favor as to liability on Count I of the Complaint.

This the 23rd day of February, 2007.

One of the Attorneys for Plaintiff
The Concrete Company

OF COUNSEL:

Robin G. Laurie (ASB-4217-U64R)
G. Lane Knight (ASB-6748-I72K)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
rlaurie@balch.com

Thomas F. Gristina
William L. Tucker
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
1111 Bay Avenue, Third Floor, Synovus Centre
Columbus, Georgia 31901

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2006, I served a copy of the foregoing

Plaintiff's Motion For Partial Summary Judgment, with accompanying Brief In Support Of

Plaintiff's Motion For Partial Summary Judgment and Notice Of Filing Evidence In Support Of

Partial Summary Judgment, by hand-delivery to the following:

      Dennis R. Bailey, Esquire
      Rushton, Stakely, Johnston & Garrett
      P. O. Box 270
      Montgomery, Alabama 36101-0270

                OF COUNSEL

4