53

1  imagine, in some way, shape, or form.
2  A. Yes. They were traded.
3  Q. All right. When was the first one you
4     traded?
5  A. I don't remember. I don't remember.
6  Q. Do you remember what you got for that truck
7     when you traded it?
8  A. No, I don't.
9  Q. Can you tell me how many trucks CCI has
10    purchased over the last four years?
11 A. No.
12 Q. Can you tell me the purchase price for any
13    one of those trucks?
14 A. No. Not exactly, no.
15 Q. Can you tell me approximately?
16 A. I don't want to do that. That would be
17    speculation.
18 Q. Okay. Did the trucks that you purchased,
19    the first trucks, the Mack trucks, did they
20    come with dump bodies?
21 A. They did.
22 Q. And what is that?
23 A. It's the back part of a truck. The bed

54

1        raises up and dumps the material out.
2 Q.  What brand were the dump bodies?
3 A.  I don't recall.
4 Q.  Were they purchased separately from the
5       Mack trucks?
6 A.  I don't recall.
7 Q.  Have you ever purchased a dump body
8       separately from one of the trucks that
9       you've purchased?
10 A.  I don't recall without looking back.
11 Q.  Are you aware of the brand of any of the
12      dump bodies on any of the CCI trucks?
13 A.  Right now we have what they call a Travis
14      trailer. We have -- did have a Ram
15      trailer, and we have a TrailStar trailer.
16 Q.  And are those part of the trucks that you
17      currently own?
18           MR. BAILEY: Object to the form.
19           They're trailers. Part of
20           the --
21 A.  They're trailers that can be disconnected
22      from the truck.
23 Q.  So do the trucks themselves have any sort

55

1  of a dumping device on them, or is it just
2  these trailers?
3  A. Just the trailers.
4  Q. And did you purchase those three types of
5  trailers separately from the trucks?
6  A. Yes.
7  Q. How much did you pay for those?
8  A. I couldn't tell you without looking back.
9  Q. Do you know when you purchased them?
10 A. I don't know the exact date, no.
11 Q. And do you know how much you paid for them?
12 A. Not without looking at the records, no.
13 Q. Carol's Contracting has an office in your
14 house where you keep records; is that
15 correct?
16 A. That's right.
17 Q. All right. And in those records, am I
18 correct, would be receipts or records
19 related to all of these purchases?
20 A. Some, I would think so, yes.
21 Q. Do you depreciate those trucks?
22 A. You'd have to talk to my accountant about
23 that.

1   A.   Where did we obtain it?
2   Q.   Where did you pick it up?
3   A.   The one place I remember we picked it up
4        from was Elmore Sand and Gravel.
5   Q.   And did Mr. Willingham tell you where to
6        obtain that product?
7   A.   He did.
8   Q.   Do you know Billy Stanley?
9   A.   I think I saw him during the depositions.
10       Is he one of the ones that was at the
11       depositions?  Other than that, if he
12       wasn't, I don't know him.
13  Q.   No, ma'am.  Mr. Stanley, I believe, runs
14       Elmore Sand and Gravel.  Does that make you
15       more familiar with that name now?
16  A.   (Witness shakes head from side to side.)
17            MR. BAILEY:  You need to say yes
18       or no.
19  A.   Oh, okay.  No, I'm not familiar with him,
20       no.
21  Q.   Okay.  What criteria do you use at CCI in
22       selecting truck drivers?
23  A.   What do you mean?

79

1   Q.   How do you pick a truck driver to come to
2        work at CCI?
3   A.   If he asks for a job, I check out his
4        driving license.  He gets a health card,
5        takes a drug test, and he's hired.
6   Q.   Do you use any outside companies to assist
7        in selecting truck drivers?
8   A.   No.
9   Q.   Other than you personally, do you ask
10       anybody else for advice when it comes to
11       picking a truck driver?
12            MR. BAILEY:  Object to the form.
13                 Go ahead and answer as best
14                 you can.
15  A.   Unless I check some references, that would
16       be the only way I would know.
17  Q.   And have you from time to time checked
18       references on prospective drivers?
19  A.   Not that I remember at this time.
20  Q.   So none of the drivers -- you've never
21       checked, on any of the drivers you've
22       hired, references?
23  A.   I don't remember if I have or not.

80

1  Q.  Have you ever ridden a truck with them to
2      see if they're competent drivers?
3  A.  I don't remember if I have or not.
4  Q.  Did Mr. Lambert ever assist you in
5      selecting drivers?
6  A.  Not that I recall.
7  Q.  Do you know if Mr. Lambert ever went on
8      rides with these drivers to see if they
9      were competent drivers?
10 A.  Not that I know of.
11 Q.  Were you asked at some point to become a
12     bookkeeper for Alabama Gravel?
13 A.  I was.
14 Q.  Who asked you to do that?
15 A.  Robert Alexander.
16 Q.  And was that at the same time you-all
17     discussed CCI hauling for Alabama Gravel?
18 A.  I don't remember.
19 Q.  Were you later employed as a bookkeeper for
20     Alabama Gravel?
21 A.  Yes.
22 Q.  Where is Alabama Gravel's office?
23 A.  It's in a building on my property.

1          Pond River Steel or Alan King to retain
2          their services?
3     A.   No.
4     Q.   The same question for Southern Wire. Any
5          reason your husband would need to contact
6          Southern Wire in the year 2005 to hire them
7          for services?
8     A.   No.
9     Q.   Same question for a man named Sam Estock.
10         Is there any reason why your husband would
11         need to call and hire Mr. Sam Estock for
12         services in 2005?
13    A.   No.
14    Q.   CCI is not in the business of mining
15         aggregate, is it?
16    A.   No, and it never has been. It hauls
17         material. And that -- I think I stated
18         earlier that if it's involved with sand and
19         gravel operations, the only way it's
20         involved with the sand and gravel operation
21         is by hauling the material. It does not
22         dig material out of the ground or put
23         material through a processing plant. The

123

1   only thing it does, it drives into a
2   location, the material is loaded on the
3   truck, and it's delivered to wherever it
4   needs to go. It is not in no way related
5   to a sand and gravel business.
6 Q. Are you aware of any business ventures that
7   your husband was involved in between the
8   court order related to the Montgomery
9   Materials, LLC matter that gave the company
10  to The Concrete Company and January 1,
11  2006?
12 A. Any companies he had what?
13 Q. That question got so long, I forgot it.
14      Are you aware of any business
15  involvement in construction of a sand and
16  gravel mining operation that your husband
17  was involved with between the date of the
18  court order that gave Montgomery Materials,
19  LLC to The Concrete Company and January 1,
20  2006?
21 A. No.
22      (Plaintiff's Exhibit 17 was marked
23      for identification.)

1   Pond River Steel or Alan King to retain
2   their services?
3 A. No.
4 Q. The same question for Southern Wire. Any
5   reason your husband would need to contact
6   Southern Wire in the year 2005 to hire them
7   for services?
8 A. No.
9 Q. Same question for a man named Sam Estock.
10   Is there any reason why your husband would
11   need to call and hire Mr. Sam Estock for
12   services in 2005?
13 A. No.
14 Q. CCI is not in the business of mining
15   aggregate, is it?
16 A. No, and it never has been. It hauls
17   material. And that -- I think I stated
18   earlier that if it's involved with sand and
19   gravel operations, the only way it's
20   involved with the sand and gravel operation
21   is by hauling the material. It does not
22   dig material out of the ground or put
23   material through a processing plant. The

1   only thing it does, it drives into a
2   location, the material is loaded on the
3   truck, and it's delivered to wherever it
4   needs to go. It is not in no way related
5   to a sand and gravel business.
6   Q.  Are you aware of any business ventures that
7       your husband was involved in between the
8       court order related to the Montgomery
9       Materials, LLC matter that gave the company
10      to The Concrete Company and January 1,
11      2006?
12  A.  Any companies he had what?
13  Q.  That question got so long, I forgot it.
14      Are you aware of any business
15      involvement in construction of a sand and
16      gravel mining operation that your husband
17      was involved with between the date of the
18      court order that gave Montgomery Materials,
19      LLC to The Concrete Company and January 1,
20      2006?
21  A.  No.
22              (Plaintiff's Exhibit 17 was marked
23              for identification.)

139

1  Q.  Now, this document, this is not your
2      handwriting, is it?
3  A.  It is not, no.
4  Q.  And had you ever been provided a copy of
5      this by Foshee?
6  A.  I don't remember. It's possible, but I
7      don't remember.
8  Q.  All right. Looking at the top of the -- of
9      that sheet, it has Roman numeral one,
10     January 1, '02 through April 30th, '03. It
11     says, premium equals $125 per month per
12     driver. Do you know what that relates to?
13 A.  Foshee Trucking runs, from what I
14     understand, somewhere between 50 and 100
15     trucks. They have to carry worker's comp
16     for anybody that's leased to them. They
17     charged us worker's comp for my drivers.
18     That's what that's for.
19 Q.  And so you paid Foshee for worker's
20     compensation for your drivers?
21 A.  It was withheld from the amount due Carol's
22     Contracting.
23 Q.  And did you identify by name the drivers

140

| | | |
|---|---|---|
| 1 | | that were driving for you to Foshee? |
| 2 | A. | I believe so, yes. |
| 3 | Q. | So, then, when Mr. Lambert was driving for |
| 4 | | CCI and your trucks were leased to Foshee, |
| 5 | | would you have identified him to Foshee as |
| 6 | | a driver with respect to whom worker's |
| 7 | | compensation needed to be paid by them? |
| 8 | A. | Probably. |
| 9 | Q. | You list the number of drivers -- the |
| 10 | | drivers -- |
| 11 | | Well, excuse me. The sheet of paper |
| 12 | | lists the drivers -- rather -- well, it has |
| 13 | | number 201, 202, 202, 203, 204. Do you see |
| 14 | | that? |
| 15 | A. | I do. |
| 16 | Q. | Do you know what those numbers refer to? |
| 17 | A. | They appear to be my truck numbers. |
| 18 | Q. | All right. Do you know why they list -- do |
| 19 | | you know why they list number 202 twice? |
| 20 | A. | It appears to have different dates. |
| 21 | Q. | Do you see where it says below, deducted |
| 22 | | 26.25 -- I'm going to put my finger on it |
| 23 | | right there. It says, undercharged 260 per |