# Exhibit 14

THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE CONCRETE COMPANY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: 2:05-cv-01026-CSC |
| | * | |
| HARRY E. LAMBERT and | * | |
| CAROL'S CONTRACTING, INC., | * | |
| | * | |
| Defendants. | * | |

## AFFIDAVIT OF FRANK D. FOLEY

Personally appeared before the undersigned officer, duly authorized to administer oaths, Frank D. Foley who being duly sworn, deposes and states:

1.    I am President of The Concrete Company ("TCC") and its two operating subsidiaries Foley Products Company ("FPC") and Foley Materials Company ("FMC"). TCC is actively engaged in the sand and gravel business in the Montgomery, Alabama, area. TCC has been in this business for more than a decade.

2.    The delivery of aggregate materials via trucking companies is an integral part of the sand and gravel business.

3.    TCC purchased two-thirds of ownership of D&H Trucking Company in 1996. TCC operated the company for a short period before rolling it into TCC. While the company operated, it was used to deliver aggregate from TCC mines to retail customers in Montgomery and to TCC's ready mix plants. TCC remains in the trucking business in the Montgomery area through FMC's operation as an interstate and intrastate private carrier regulated by the Federal Motor Carrier Safety Administration. FMC's license number is #1346785.

4.    On July 25, 2001, TCC entered into a Promissory Note with attached Supply Agreement with Michael Phillips and his company, Hickory Bend Farms, Inc., specifically stating that TCC would obtain #67 gravel from Mr. Phillips for use at TCC's ready mix plants or for resale. All gravel purchased from Mr. Phillips was either sold as part of Ready-Mix concrete or in raw form as an incidental part of the Ready-Mix concrete business.  During that period, I had frequent contact with Mr. Phillips and Mr. Harry Lambert.  I believe Mr. Lambert was aware of the above loan transaction.

5.    TCC funded Montgomery Materials' operations throughout its existence whenever revenue did not cover expenses and when additional capital expenditures were needed.

6.    I also believe that Mr. Lambert's assistance to Alabama Gravel and its resulting entry into the market has lead to Willingham Stone declining to enter into a long-term contract with TCC.

7.    While working at Montgomery Materials, Mr. Lambert was privilege to all facets of the business including suppliers, purchasers, delivery companies, plant manufacturers and equipment suppliers.  He was also privilege to TCC operations in the sense that he was in frequent contact with me and TCC's employees.  He was able to learn TCC's business practices.

8.    In the 24 months before the April 2002 closing, Globe purchased aggregate from Montgomery Materials.

9.    I dispute and disagree with Defendants' version of events leading up to the Declaratory Judgment action between TCC and MMC Holdings.  Defendants omit reference to the true facts.  Those facts will be set forth below.  But, before doing so, I want to specifically state that Defendants' statement that I "created" "the situation that lead to him [me] taking the company [Montgomery Materials] away from MMC Holdings" is false.  Defendants' claims that

I refused to allow Lambert to take action that Lambert thought would increase the value of Montgomery Materials and that I planned to trigger the buy-sell at the time Montgomery Materials would have the lowest value on paper but the highest value in realty are also inaccurate.

10.      The history of Lambert's, MMC Holdings', my and TCC's business dealings and litigation with respect to Montgomery Materials are as follows.

### (1)      Formation Of Montgomery Materials

11.      Lambert and I decided to go into the aggregate mining business together.  I caused TCC, and Lambert caused MMC Holdings, to form Montgomery Materials, a new Alabama limited liability company on June 5, 1997.  TCC and MMC Holdings each owned 50% of Montgomery Materials.  TCC, in return for its 50% interest, contributed $300,000.00 in cash. MMC Holdings, in return for its 50% interest, contributed a substantial part of its assets, including the leasehold interest in the City Pit and mining equipment, subject to certain liabilities.  Montgomery Materials hired Lambert as General Manager.  Pursuant to his June 10, 1997 Employment Agreement, Lambert was paid a monthly base rate of $6,737.25.  He also received health insurance, a $600,000.00 term life insurance policy and was to be reimbursed for travel and entertainment expenses.  As a result of these transactions, Montgomery Materials began mining sand and gravel from the City Pit in June 1997.

### (2)      The Anderson Pit

12.      Lambert and I desired to expand Montgomery Materials' source of aggregate by obtaining additional mining leases.  Lambert proposed that Montgomery Materials lease property in Montgomery County, Alabama, from Anderson Farms, LLC ("Anderson Farms").  Lambert told me that Anderson Farms would lease the property (the "Anderson Pit") to Montgomery

Materials only so long as Lambert was employed by Montgomery Materials, since Anderson

Farms was unwilling to entrust the mining of their property to anyone other than Lambert. In

May 1999, I agreed that Montgomery Materials should enter into a lease (the "Anderson Lease")

for the Anderson Pit which contained terms allowing Anderson Farms to terminate the Anderson

Lease if Lambert's Montgomery Materials employment terminated. Montgomery Materials

spent about $600,000 on equipment, prepaid royalties and costs of stripping overburden to

prepare the Anderson Pit for mining. Substantially all of these funds were advanced by TCC.

Montgomery Materials did not repay the advances as promised.

(3)    **Lambert's Failed South Alabama Business**

13.    In late 1999, a large aggregate business (the "South Alabama Business") became

available for purchase in south Alabama. Lambert and I considered Montgomery Materials

purchasing the South Alabama Business. But, after investigation, I felt that the price was too

high. Lambert proposed that he, together with others, might purchase the South Alabama

Business if I were unwilling for Montgomery Materials to purchase it. I advised Lambert against

that because I thought the price was too high and because I thought it would divert Lambert's

attention managing Montgomery Materials. Lambert's Montgomery Materials Employment

Agreement provided that Lambert "will not engage in any business activities other that those of

[Montgomery Materials]." I waived this provision only as it pertained to the South Alabama

Business because Lambert felt so strongly that the South Alabama Business offered an

exceptional opportunity. In early 2000, Lambert and others purchased the South Alabama

Business.