14.     In the summer of 2000, Lambert told me that the South Alabama Business was in financial difficulty and that he might have to obtain the value of his interest in Montgomery Materials (i.e., MMC Holdings' 50% Montgomery Materials interest) to pay debts of the South Alabama Business. Lambert said that he might have to use his interest as collateral for a loan or even sell his interest to me or others to raise cash. Lambert asked me to also consider dividing up the assets of Montgomery Materials between TCC and MMC Holdings. Lambert also asked me to consider putting Montgomery Materials "on the market" to see how much it could be sold for.

### (4)     The 1997 Agreement And Buy-Sell Provision

15.     I was reluctant to take any of these actions. Although I felt that Montgomery Materials had suffered when Lambert's attention was diverted by the South Alabama Business, I also felt that Montgomery Materials had potential to be a very good business. Despite my reluctance, I, because of the pressure on Lambert from the South Alabama Business, agreed to consider Lambert's requests. A professional consulting firm, FMI, was contacted to evaluate Montgomery Materials and determine what price it might be sold for, although it was never engaged. A third party expressed an interest in buying Montgomery Materials, and I agreed to allow Montgomery Materials to furnish confidential financial information to the prospective purchaser. Lambert proposed that Montgomery Materials be split into two operations. MMC Holdings would receive the Anderson Pit, and TCC would receive the City Pit. Lambert proposed that TCC buy MMC Holding's 50% interest in Montgomery Materials. I considered these and other proposals during the summer and fall of 2000, but Lambert and I could not agree on what to do.

16. The terms of the Anderson Lease were a complicating factor in these negotiations. The Anderson Pit had proven to contain a substantial deposit of sand and gravel, and it was probably more valuable than the City Pit. But, the Anderson Lease could be terminated if Lambert did not remain employed by the lessee. Therefore, it was important that Lambert remain employed by the lessee after the transaction so the Anderson Lease would remain in effect for the new owner. But, this meant that Lambert had to remain involved with (i.e., employed by) the lessee after the sale. Lambert approached Anderson Farms about amending the Anderson Lease to eliminate or at least substantially modify the requirement that Lambert remain employed by the lessee. Initially it appeared that Anderson Farms might allow such an amendment.

17. By September 2000, I was doubtful that Lambert and I would be able to agree on what to do with Montgomery Materials. I had considered Lambert's numerous proposals, and none seemed to be acceptable to me and Lambert. The South Alabama Business continued to pull Lambert's attention away from Montgomery Materials. In addition, Lambert and I differed on the management of Montgomery Materials, and our disagreements became more frequent and serious.

18. I decided that Lambert and I had to either resolve our differences and continue in business together or one had to buy out the other. The previously executed 1997 Agreement among Montgomery Materials, TCC, MMC Holdings, me and Lambert, provided a mechanism (hereinafter referred to as the "Buy-Sell") in § 5.3. On September 25, 2000, TCC delivered to Lambert, as President of MMC Holdings, notice that TCC was invoking § 5.3 of the 1997 Agreement.

19.   The § 5.3 Notice set forth a "Cash Price" for Montgomery Materials of $1 million and an "adjustment" to the Cash Price in the form of an increase of $3 million if the Anderson Lease was not subject to termination after the sale. The "Cash Price" was the price for all interests in Montgomery Materials; since TCC and MMC Holdings each owned a 50% interest, the seller would receive 50% of the $1 million cash price, which is $500,000, at closing, and 50% of the $3 million "adjustment," which is $1.5 million, when the conditions for the adjustment were satisfied.

20.   Representatives of TCC who delivered the § 5.3 Notice to MMC Holdings at Montgomery Materials office in Montgomery, Alabama, told Lambert that I wanted to keep trying to work out the differences between Lambert and I despite the § 5.3 Notice. But, if they were unsuccessful by the end of the 120 day period for MMC Holdings to respond, I intended to enforce the Buy-Sell. Before delivering the § 5.3 Notice to MMC Holdings, TCC's representatives, to show good faith, allowed Montgomery Materials to consolidate the various overdue notes for the money spent to develop the Anderson Pit into a single $600,000 note payable over five years.

21.   MMC Holdings acknowledged receipt of the § 5.3 Notice by letter dated October 11, 2000. Lambert and I continued to consider alternatives to one purchasing the other's interest through December 2000. Lambert told me that he was not able to get Anderson Farms to remove the provisions of the Anderson Lease which allowed Anderson Farms to terminate it if Lambert were not employed by the lessee. Therefore, the Anderson Lease could only be preserved if Lambert remained an employee of the lessee. As a result, Lambert told me that he had decided MMC Holdings would buy out the TCC's 50% Montgomery Materials interest. Lambert told me that he had arranged for $2.6 million in financing, of which $2 million would be used to pay for

TCC's 50% interest, and $600,000 would be used by Montgomery Materials to repay TCC the $600,000 it had loaned Montgomery Materials to fund the development of the Anderson Pit.

22. Despite these representations, on January 2, 2001, MMC Holdings notified ("MMC Holdings' Response") TCC that MMC Holdings would purchase TCC's 50% interest in Montgomery Materials for $500,000, not $2 million. MMC Holdings' Response attempted to select the parts of TCC's § 5.3 Notice which MMC Holdings liked and ignore the parts which MMC Holdings disliked. The "offer" that MMC Holdings claimed to be accepting appears nowhere in TCC's § 5.3 Notice. MMC Holdings could not create a bargain which TCC did not propose.

23. Since MMC Holdings' Response was not identical with the terms of TCC's offer, it was a rejection of TCC's offer. As a result, TCC was relieved from liability on the offer. In effect, MMC Holdings failed to make an election. Section 5.3 of the 1997 Agreement provided that "[a]n Electing Member who fails to make an election shall be deemed to have sold its Interest to the Activating Members." Therefore, MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC.

    (5) <u>**The Declaratory Judgment Action And Resulting Summary Judgment Ruling In TCC's Favor**</u>

24. The above facts resulted in TCC filing a declaratory judgment action against MMC Holdings on January 12, 2001.[1] TCC obtained summary judgment in its favor with this Court ruling, in pertinent part, by Order dated September 7, 2001, that:

> the Buy-Sell provision was properly "activated" within the meaning of the Agreement inasmuch as TCC's Notice included a price formula contemplated by the parties. Consequently, MMC had 120 days to elect which it failed to do. Therefore the court must give effect to the default provision of Section 5.3 and

---

[1] The case was captioned *The Concrete Company v. MMC Holdings, Inc.* (United States District Court for the Middle District of Alabama, Northern Division; Civil Action No. 2001-D-54-N).

> conclude that Montgomery Materials has been deemed sold to TCC. TCC's formula presumed that Anderson [Farms] would terminate the lease and the record indicates as much. As such, the court finds that the adjustment of $3,000,000 is inapplicable to the sale, so TCC has purchased Montgomery Materials for $1,000,000.

This Order was affirmed by the Eleventh Circuit Court of Appeals on March 21, 2002. The result of the summary judgment Order, as affirmed, is that MMC Holdings was deemed to have sold its 50% interest in Montgomery Materials to TCC on January 2, 2001.

FURTHER AFFIANT SAYETH NOT.

This 23 day of Feb, 2007.

_____
FRANK D. FOLEY

Sworn to and subscribed before me this
23 day of February, 2007.
_____
NOTARY PUBLIC
My Commission Expires: _____

MY COMMISSION EXPIRES SEPTEMBER 22, 2010