# Exhibit 16

ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

THE CONCRETE COMPANY,

    Plaintiff,

vs.                     CIVIL ACTION NO.
                         2005-CV-1026-CSC

HARRY E. LAMBERT, CAROL'S
CONTRACTING, INCORPORATED, and
ALABAMA GRAVEL, LLC,

    Defendants.

\* \* \* \* \* \* \* \* \* \* \* \*

**DEPOSITION OF DAVID TUTEN**, taken pursuant to stipulation and agreement before Tracye Sadler, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Balch & Bingham, Suite 200, 105 Tallapoosa Street, Montgomery, Alabama, on July 13, 2006, commencing at approximately 9:05 a.m.

\* \* \* \* \* \* \* \* \* \* \* \*

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

16

1  A.  No.
2  Q.  Were you familiar with what the commission
3      the broker received was?
4  A.  No.
5  Q.  How long after 1985 did you stay in
6      purchasing with Globe?
7  A.  Until I was -- I was involved in it until I
8      left there in 2003 in some capacity.
9  Q.  So, then, you were in purchasing for 18
10     years with Globe approximately?
11 A.  Approximately.
12 Q.  And in your 18 years was -- and I may have
13     asked this, but was Mr. Gibbs the only
14     broker you ever dealt with?
15 A.  Yes.
16 Q.  And it's through Mr. Gibbs that you
17     developed a relationship with Mr. Lambert;
18     is that correct?
19 A.  Yes.
20 Q.  Other than -- well, how long did that
21     relationship with Mr. Lambert last?
22 A.  I've known Mr. Lambert ever since.
23 Q.  Did you eventually begin to purchase

1    when it was completed was March 24th, 2005;
2    is that correct?
3 A. Yes.
4 Q. Now, going back to where we were a little
5    while ago. Shortly thereafter I believe
6    you testified that Alabama Gravel began
7    using Carol's Contracting to haul aggregate
8    product; is that correct?
9 A. Yes.
10 Q. And did you learn at that time that
11    Mr. Lambert was driving trucks for Carol's
12    Contracting that contained aggregate
13    product?
14 A. I -- let me answer that. I knew that Harry
15    Lambert was driving a truck, and I knew
16    that -- at that time, you know, that he had
17    trucked in the past, you know, all kinds of
18    things. But what was the question, now?
19 Q. Well, when you hired -- when Alabama Gravel
20    hired Carol's Contracting to haul
21    aggregate --
22 A. Right.
23 Q. -- did you know at that time that

1    Mr. Lambert was going to be driving some of
2    those trucks?
3  A. Yes.
4  Q. And was it your intention at that time that
5    by hiring Carol's Contracting to haul
6    aggregate that Mr. Lambert would be able to
7    do that?
8  A. Yes.
9  Q. Were you intending at that time to
10   compensate Mr. Lambert for hauling that
11   aggregate product?
12            MR. BAILEY:  Object to the form.
13            MR. WALTER:  Well, when you say
14                compensate Mr. Lambert, are
15                you -- the contract was with
16                Carol's Contracting.
17            MR. GRISTINA:  I understand that.
18 Q. Were you intending that Mr. Lambert receive
19   payment for driving those trucks?
20 A. No.
21 Q. Who was supposed to be paid for that?
22 A. Carol's Contracting.
23 Q. And did you have any knowledge of any

53

1  Q.  Did you ever see that agreement before the
2      litigation was filed in this case?
3  A.  No.
4  Q.  Have you seen it since the litigation?
5  A.  Yes.
6  Q.  Now, in 2003 you left Globe -- and we
7      talked about that -- and you formed the
8      consulting business. What were the
9      companies in 2003 that you were consulting
10     with?
11 A.  The company I was consulting for in 2003
12     was a company called Simcala.
13 Q.  Where is Simcala located?
14 A.  Mount Meigs, Alabama.
15 Q.  Is Simcala a producer of silicon and
16     ferrosilicon?
17 A.  Just silicon.
18 Q.  Just silicon?
19 A.  Uh-huh (positive response).
20 Q.  How do you spell ferro?
21 A.  F-E-R-R-O.
22 Q.  Ferro. Okay. F-E-R-R-O-silicon?
23 A.  Correct.

|    |    |                                                              |
|----|----|--------------------------------------------------------------|
| 1  |    | the man that your father knew who had the                    |
| 2  |    | relationship with the coal supplier that                     |
| 3  |    | helped you begin to consult with Simcala;                    |
| 4  |    | is that correct?                                             |
| 5  | A. | Yes.                                                         |
| 6  | Q. | And does he have a son who's still with                      |
| 7  |    | Simcala?                                                     |
| 8  | A. | Yes.                                                         |
| 9  | Q. | And that's Ed Boardwine, Jr.?                                |
| 10 | A. | Yes.                                                         |
| 11 | Q. | Is he still with Simcala?                                    |
| 12 | A. | Yes.                                                         |
| 13 | Q. | Does Mr. Ed Boardwine, Sr., know anything                    |
| 14 |    | about this dispute that we have here                         |
| 15 |    | between the parties?                                         |
| 16 | A. | I don't know.                                                |
| 17 | Q. | But certainly his son does. Ed Boardwine,                    |
| 18 |    | Jr., knows something about this dispute?                     |
| 19 | A. | Yes.                                                         |
| 20 | Q. | All right. So then you began at some point                   |
| 21 |    | shortly after you left Globe consulting for                  |
| 22 |    | Simcala; is that correct?                                    |
| 23 | A. | Yes.                                                         |

1  Q. And what did you assist them with?
2  A. Mainly operational issues, melting
3     furnaces.
4  Q. And did that relationship develop into
5     something else over the past three years?
6        MR. BAILEY: Object to the form.
7  A. I'm not sure I understand.
8  Q. Have you begun to provide more advice in
9     different areas?
10 A. No.
11 Q. So your advice is limited to operations to
12    Simcala?
13 A. It was. I'm no longer working with them.
14 Q. When did that stop?
15 A. It was in 2005.
16 Q. At any time did you help them with supply
17    or purchasing issues?
18 A. No.
19    Let me rephrase that. They would ask
20    me, you know, questions from time to time,
21    but I never had any input into that, no.
22    Mainly they would ask me about, you know,
23    what did Globe do or that sort of thing.

59

1  Q.  Did they ask you for assistance in locating
2      suppliers of white oversized gravel in the
3      Montgomery area?
4  A.  They asked me if I knew anybody different,
5      but they already knew, you know, who all
6      the suppliers were. I didn't know anybody
7      any different.
8  Q.  Were you aware of any relationship between
9      Mr. Harry Lambert and Simcala during that
10     period?
11 A.  No.
12 Q.  Other than Simcala who did you consult
13     with?
14 A.  That was the only one. Well, also I do a
15     little work for a guy -- I do some work for
16     a guy in China.
17 Q.  What sort of work is that?
18 A.  Same, along the same lines.
19 Q.  They have a plant in China?
20 A.  They have many plants in China, yeah.
21 Q.  Do they produce white oversized gravel in
22     China?
23 A.  No. This is the production of ferroalloys,

60

| | | |
|---|---|---|
| 1 | | silicon type thing. |
| 2 | Q. | And you consult with that company from time |
| 3 | | to time? |
| 4 | A. | Right. |
| 5 | Q. | Do you do any consulting work for Globe? |
| 6 | A. | No. |
| 7 | Q. | Have you attempted to? |
| 8 | A. | No. |
| 9 | Q. | Since 2003 the only local company that |
| 10 | | you've consulted with is Simcala? |
| 11 | A. | Correct. |
| 12 | Q. | And at some point you went into business, I |
| 13 | | guess, with Mr. Robert Alexander and Rex |
| 14 | | Dasinger; is that correct? |
| 15 | A. | Yes. |
| 16 | Q. | And when did you first meet Mr. Robert |
| 17 | | Alexander? |
| 18 | A. | It was late 2004, early 2005. |
| 19 | Q. | How did you meet him? |
| 20 | A. | I was introduced to Robert through |
| 21 | | Mr. Lambert. |
| 22 | Q. | Do you recall that meeting? |
| 23 | A. | Yeah. |

61

| | | |
|---|---|---|
| 1 | Q. | Where was that meeting? |
| 2 | A. | It was here in town. |
| 3 | Q. | And do you know how that meeting was |
| 4 | | conceived or why it took place? |
| 5 | A. | I had mentioned to Mr. Lambert about |
| 6 | | because of the situation at Simcala, with |
| 7 | | them running out of white oversized and |
| 8 | | also with contacts I had at Globe, that, |
| 9 | | you know, there was a need for white |
| 10 | | oversized gravel and that I would have an |
| 11 | | interest in getting in the gravel business |
| 12 | | mainly as an outside investor more than |
| 13 | | anything else.  And I had asked |
| 14 | | Mr. Lambert, you know, if he knew of |
| 15 | | anyone, you know, that I could maybe get |
| 16 | | involved with, and he put me in touch with |
| 17 | | Mr. Alexander. |
| 18 | Q. | So that was in 2004.  Do you recall what |
| 19 | | month of 2004? |
| 20 | | And you may have said it, but I don't |
| 21 | | remember. |
| 22 | A. | It had -- |
| 23 | | MR. WALTER:  Let me object just to |

```
1              the extent that I think he
2              said it was late 2004 or early
3              2005.
4         MR. GRISTINA: Okay.
5  A.   It was cold.  I remember that.
6  Q.   All right.  Sometimes I'll repeat myself,
7       and I apologize for that.
8              So late 2004, early 2005 --
9  A.   Uh-huh (positive response).
10 Q.   -- as best you can recall is when this
11      meeting took place?
12 A.   Yes.
13 Q.   And you recall that it was cold?
14 A.   Yes.
15 Q.   And where did the meeting take place?
16 A.   It was here in town.
17 Q.   Where in town?
18 A.   We met at -- Mr. Alexander was staying in a
19      hotel here in town, and I met him at his
20      hotel.
21 Q.   If you know, did Mr. Alexander come to town
22      just for that meeting?
23 A.   I don't know if it was just for that
```

```
 1         time to time, yes, but whether they saved
 2         it on a hard drive and all that, I do not
 3         know.
 4    Q.   And so then at some point after you began
 5         consulting with Simcala you learned that
 6         they had chemistry complaints about The
 7         Concrete Company as well as quantity
 8         complaints.  Is that true?
 9    A.   Yes.
10    Q.   And then at some point around that same
11         time you decided to investigate going into
12         the oversized business yourself.  Is that
13         true?
14    A.   Yes.
15    Q.   What was it that caused you to come to that
16         decision?
17    A.   Well, I saw an opportunity in the
18         marketplace that -- with my background in
19         metallurgical oversized and with my
20         contacts at Globe -- I knew, you know, they
21         were having some issues -- that, you know,
22         it would be a good time to look into that.
23    Q.   Were you aware of another location in the
```

71

1      Montgomery area where you could get white
2      oversized?
3   A. Not at that time.
4   Q. So that when you decided to investigate
5      that new line of business you didn't have
6      any idea of where you could actually get
7      the product that you were hoping to sell?
8   A. That's correct.
9   Q. Where did you think that you would get the
10     information as to how to locate that
11     product?
12  A. I asked when I called Mr. Lambert and said,
13     you know, I was looking to -- would like to
14     investigate getting into the sand and
15     gravel business.  And he, you know,
16     informed me that he could not get in the
17     sand and gravel business, but he had been
18     doing some consulting work for a guy that
19     also wanted to get into the sand and gravel
20     business.  And, you know, he -- and he
21     said, well, you know, you two should get
22     together.  So that was Mr. Alexander.
23  Q. So Mr. Lambert told you at that time he

HAISLIP, RAGAN, GREEN, STARKIE & WATSON, P.C.
(334) 263-4455

```
 1         business?
 2    A.   The only conversation I had was, you know,
 3         when I called him up that one time.  But,
 4         no, I had not.
 5    Q.   Had he ever told you before or mentioned to
 6         you before that he wanted to go into the
 7         white oversized business?
 8    A.   No.
 9    Q.   And so is it your testimony that it was you
10         that first contacted Mr. Lambert about
11         going into the business and not the other
12         way around?
13    A.   That's correct.
14    Q.   Now, the meeting with Mr. Alexander was
15         scheduled.  Was it Mr. Lambert who
16         contacted Mr. Alexander, or did you contact
17         Mr. Alexander?
18    A.   He contacted Mr. Alexander, because I
19         didn't know the man.
20    Q.   So you had never met Mr. Alexander before?
21    A.   Never.
22    Q.   And did Harry then call you back and say,
23         okay, he's ready to meet and give you a
```