FREEDOM COURT REPORTING

Page 104

1  don't recall.
2      Q.   And again, sir, the date -- the
3  entry of Robert Alexander on your January
4  6th calendar entry, you don't recall when
5  you wrote that?
6      A.   No.
7      Q.   Now, going back to subsequent
8  conversations, am I correct that Mr.
9  Alexander called you on January 10th, 2005?
10     A.   Yes.
11     Q.   All right.  Now, during that
12 conversation, he didn't reference, did he, a
13 location for a product that he was going to
14 supply, did he?
15     A.   No.
16     Q.   Did he say he had a potential
17 source but was checking into it?
18     A.   I believe he was checking into a
19 source and he would get back to me when he
20 had more info.  If I had needed to talk to
21 him, he gave me his phone number.
22     Q.   Anything else you recall about
23 that conversation?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

1  Q. Now, am I also correct that of the
2  chemistry tests that you do, the iron and
3  the titanium tests are important because you
4  cannot -- I can't remember how Mr. Boardwine
5  said it, but you can't burn those away so to
6  speak?
7  A. Correct.
8  Q. You're stuck with them?
9  A. Yes.
10 Q. And the aluminum you can refine
11 out?
12 A. That's correct.
13 Q. Now, what was your opinion of
14 these Swift Creek test results once you
15 received them?
16 A. Well, the opinion was it's like
17 most gravel sources because he divulged this
18 was taken over X amount of acres, which I
19 don't recall how many acres it was. So it's
20 not unusual that it would not all come out
21 at the same.
22   So it's -- it's just -- there's no
23 other way of putting it. It's just not that

1  you're going to get exact numbers out of
2  several different locations on a given piece
3  of property.
4      Q.   Were these levels of -- Were these
5  test results acceptable to you at that time?
6      A.   The first three basically were not
7  acceptable.  The way we also had to look at
8  this was we were in a desirable need of
9  gravel, that if we didn't come up with
10 something, we were in trouble.
11     Q.   Now, you said desirable.  Did you
12 mean dire?  You said desirable.
13     A.   Dire, correct.
14     Q.   You mean dire, D-I-R-E?
15     A.   Right.
16     Q.   Okay.  Now, are you -- Did you
17 inquire as to how many acres the Swift Creek
18 permit covered?
19     A.   Yes.  But I don't recall what it
20 was.
21     Q.   And that's important because you
22 want to know how long the supply is going to
23 be?

1  And we reached a price agreement at the
2  time. And I asked for a delivery price. So
3  he gave me gravel price, freight price.
4     Q.  And what was that price?
5     A.  I don't think I have anything
6  here. It was in the mid-twenties.
7     Q.  Does twenty-six dollars a ton
8  sound correct?
9     A.  Possible.
10    Q.  I'll represent to you that it was
11 twenty-six dollars a ton.
12    A.  Okay.
13    Q.  Now, up to that point -- Well, was
14 that the price that Mr. Alexander said he
15 would sell it to you at or was there any
16 give and take?
17    A.  There's always give and take. But
18 we -- Simicala didn't win. It was whatever
19 you just said it was.
20    Q.  So he told you twenty-six and you
21 had to take it?
22    A.  Yes.
23    Q.  All right. Now, did he tell you

**FREEDOM COURT REPORTING**

Page 129

1  how much -- And the price he gave you
2  included freight?
3      A.   Correct.
4      Q.   Did he break down for you what the
5  freight price was?
6      A.   He did not.
7      Q.   Did he tell you they were paying
8  six dollars a ton to Carol's Contracting,
9  Inc., to deliver that product to Simcala?
10     A.   No.
11     Q.   All right.  Did you know what
12 Carol's Contracting, Inc., was at that time?
13     A.   He just said that was going to be
14 the trucking company delivering the
15 material.
16     Q.   And did you know who the president
17 of Carol's Contracting, Inc., was?
18     A.   No.
19     Q.   Did you have any idea that it
20 might be Carol Lambert?
21     A.   No.
22     Q.   Did you know Carol Lambert at that
23 time?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

FREEDOM COURT REPORTING

Page 135

1  Q. And then that -- But the knowledge
2  that Deatsville would come on line was
3  important to you?
4  A. Yes.
5  Q. Are you aware of the fact that Mr.
6  Rex Dasinger was the person who obtained the
7  lease for the Deatsville site?
8  A. No.
9  Q. Would the fact that Carol's
10 Contracting was receiving six dollars per
11 ton to haul from Swift Creek to Simcala have
12 been an important number for you to have
13 known?
14 A. No.
15 Q. Would you have liked to have known
16 that number so that you could negotiate a
17 better price from Mr. Alexander?
18 A. Sure.
19 Q. And yet it was not supplied to
20 you?
21 A. Pardon me?
22 Q. Mr. Alexander did not tell you
23 that?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**FREEDOM COURT REPORTING**

Page 136

1  A.  No.  I asked for a delivery price
2  and that's what he gave me.
3  Q.  Now, in your experience as a
4  purchaser, you have frequently dealt with
5  freight charges, have you not?
6  A.  Frequently is a broad term.
7  Q.  All right.
8  A.  I would have to ask for that.
9  That normally when I'm buying raw materials,
10  I ask for a delivery price on all of them.
11  Now, there are some suppliers that say we
12  don't want to get involved with freight.
13  But that's not the majority.  And
14  if I say, well, I don't want to deal with
15  the freight, you take care of it, some you
16  win, some you don't.  So normally, to answer
17  your question, frequently deal with freight,
18  no.
19  Q.  And there have been times -- But
20  there have been times when you have dealt
21  with freight?
22  A.  Yes.
23  Q.  In giving your -- those