# Exhibit 35

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THE CONCRETE COMPANY,      )
                           )
    PLAINTIFF,              )
                           )
vs.                        ) CIVIL ACTION FILE NO:
                           ) 2:05-CV-1026-ID-CSC
HARRY E. LAMBERT and CAROL'S )
CONTRACTING, INC.,         )
                           )
    DEFENDANTS.            )

COPY

\* \* \*

The following deposition of MICHAEL HONG was taken pursuant to stipulations contained herein, the reading and signing of the deposition waived, before Tanga Donnelly, Certified Court Reporter in the State of Georgia, on January 16, 2007 at 30 Ivan Allen Jr. Boulevard, Atlanta, Georgia commencing at 1:13 P.M.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
METRO ATLANTA REPORTERS, INC.
CERTIFIED COURT REPORTERS
POST OFFICE BOX 1442
SNELLVILLE, GEORGIA 30078
770-958-2344   FAX 770-985-5044
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
 1        A.    Uh-huh (affirmative).
 2        Q.    And you already graduated from high school in
 3   Texas?
 4        A.    Yes.
 5        Q.    And did you take those college classes here in
 6   Georgia?
 7        A.    Yes, at Georgia State.
 8        Q.    And was that immediately after you moved here?
 9        A.    I think I took a year off.  I took a year off,
10   a full year off.
11        Q.    The reason I'm asking you these questions is
12   I'm trying to precisely understand when you started
13   working at Crest Capital.  Do you know if you were
14   working at Crest Capital before April of 2002?
15        A.    I believe I was.
16        Q.    Now it's 2007 now, so you've been working there
17   for almost five years; is that right?
18        A.    About five years, yeah.
19        Q.    What is the business of Crest Capital?
20        A.    We are an equipment finance company.
21        Q.    What type of equipment do you finance?
22        A.    Any type.
23        Q.    Would that be heavy machinery?
24        A.    We do.
25        Q.    Bulldozers?
```

```
 1      A.   Sure.
 2      Q.   Front loaders?
 3      A.   Uh-huh (affirmative).
 4      Q.   You're doing great, but you're got to be
 5 verbal.
 6      A.   Okay, yes.
 7      Q.   And how does Crest Capital locate its
 8 customers?  And by customer, I mean the people that
 9 obtain financing through Crest Capital?
10      A.   I don't really know 100 percent, but there's
11 lots of different ways.
12      Q.   Maybe I'll do it this way.  What have you done
13 for Crest Capital since you started working there?
14      A.   Well, I started off as an intern, so I kind of
15 did data entry, you know, very minor stuff.  And now I
16 led myself as a sales assistant in sales.
17      Q.   And how long did you do data entry for?
18      A.   Maybe like two years.
19      Q.   In data entry did you have any contact with
20 customers of Crest Capital?
21      A.   Sometimes I would pick up the phone and screen
22 calls.
23      Q.   Would you ever be responsible for sending faxes
24 to customers during that period?
25      A.   Sometimes.
```

```
 1     Q.    Now, are you in sales now?
 2     A.    I am.
 3     Q.    What do you do now?
 4     A.    Just inside sales.
 5     Q.    What are inside sales?
 6     A.    You handle leads or you handle follow-up.  You
 7  help the credit people, I mean, it's just kind of a
 8  general term.
 9     Q.    How does Crest Capital get its leads?
10     A.    From any number of sources.  It could be
11  anything from someone who sells the equipment that
12  contacts us.  It could be someone --  It could be
13  anything from a fish bowl in a restaurant where someone
14  drops their business card because everyone buys equipment
15  basically.
16     Q.    All right.  Why don't we look at what has been
17  marked as Plaintiff's Exhibit 1.  Do you see that
18  document?
19     A.    This one?
20     Q.    Yes.
21     A.    Okay.
22     Q.    And for the record, that's TCC0002399.  When
23  was the first time you saw that document?
24     A.    The first time I saw this was a couple of
25  months ago when someone told me about this fax.
```

```
 1        Q.   Do you recognize what type of a document this
 2   is?
 3        A.   It's an application.
 4        Q.   And application for what?
 5        A.   For equipment financing.
 6        Q.   And is it a Crest Capital application?
 7        A.   Yes.
 8        Q.   And is it something that's prepared at Crest
 9   Capital's office?
10        A.   Yes.
11        Q.   And do you see the handwriting on the -- what
12   would be your right-hand side of the page?
13        A.   Yes.
14        Q.   Is that your handwriting?
15        A.   It is.
16        Q.   Could you read that for me, please?
17        A.   "Harry, if you have the invoice, descriptions
18   for the equipment, send those, too, and I'll take care of
19   it before the holidays.   Thanks, Mike."
20        Q.   What's the date of this document?
21        A.   It looks to be December 6th of 2005.
22        Q.   And what makes you believe that that's the date
23   of the document?
24        A.   That's just a fax header stamp.
25        Q.   And the -- Is -- Where it says 12/6/05 10:34,
```

```
 1  is that a fax indicator from Crest or is that --  How do
 2  those numbers get on this piece of paper?
 3       A.   I don't know.
 4       Q.   Are these types of applications something you
 5  generate off a computer?
 6       A.   Yes.
 7       Q.   And explain to me how that process works that
 8  the computer would generate this application.
 9       A.   Well, it's just a template that you can type
10  into and then you print it out.
11       Q.   And so it's my understanding that you don't
12  recall preparing this document; is that correct?
13       A.   Yes.
14       Q.   Do you have any reason to believe that anyone
15  other than you at Crest Capital prepared this document?
16       A.   Maybe, but this is my writing, so --
17       Q.   So the handwriting is yours?
18       A.   Yes.
19       Q.   And did you fax that document on December 6th,
20  2005?
21       A.   I don't know.
22       Q.   Your handwriting on the document, do you have
23  any reason to believe that you did not write that on
24  there on December 6th, 2005?
25       A.   No.
```

1    Q.   Do you recall speaking with Harry Lambert at
2  that time?
3    A.   No.
4    Q.   Do you recall ever speaking to Harry Lambert?
5    A.   No.
6    Q.   Do you know how you got Harry -- Well, do you
7  know how you got the name Harry that you wrote on this
8  document?
9    A.   No.
10   Q.   And you just have no recollection of that?
11   A.   I have no recollection.
12   Q.   Now, when the document is printed from the
13 computer at Crest Capital, where is that printed when you
14 would print out an application like this?
15   A.   Just a regular printer.
16   Q.   Next to your desk?
17   A.   It's actually --  There's a couple of people
18 that share a printer.
19   Q.   And when it's printed, do you know if the --
20 And I'm specifically looking at the numbers 12/6/05 and
21 the 10:34, not the December-06-05, 2005.
22   A.   Uh-huh (affirmative).
23   Q.   Does the 12/06/05 10:34, does that appear when
24 you print it?
25   A.   No.

```
 1      Q.   So that's generated when it's faxed?
 2      A.   I guess so.
 3      Q.   Do you know?
 4      A.   I don't know.
 5      Q.   Look at, if you could, please, at Plaintiff's
 6 Exhibit 2.
 7      A.   Okay.
 8      Q.   Do you see that?
 9      A.   Okay.
10      Q.   Do you recall signing that document?
11      A.   I do.
12      Q.   Who called you about signing that document?
13      A.   I believe it was Carol Lambert or an attorney
14 for Carol Lambert, but it was a female that had sent this
15 to me.
16      Q.   And did they give their name?
17      A.   I don't recall.
18      Q.   Did they tell you that all you needed to do was
19 sign that Affidavit and that you wouldn't be bothered
20 anymore?
21      A.   Yes.
22      Q.   Did they tell you that that would end your
23 involvement in this case?
24      A.   Yes.
25      Q.   What else do you recall about that
```

13

```
 1  conversation?
 2       A.   That's about it.
 3       Q.   Did you review this document before you signed
 4  it?
 5       A.   I did.
 6       Q.   Could you look at the second page and you see
 7  where it says in the last paragraph, "The fax attached
 8  hereto was not dated recently."  And what did you mean
 9  when you said it was not dated recently?
10       A.   Well, it's a year old, more than that.
11       Q.   So when you say recently, you mean that's
12  because of the date December 6th, '05 appears on the fax?
13       A.   Yes.
14       Q.   And the next sentence it says, "It was
15  requested and faxed in December 2005, but it pertains to
16  communications back when Harry Lambert was with
17  Montgomery Materials, LLC."  Is that an accurate
18  statement?
19       A.   That's just based on an assumption.
20       Q.   And what assumption is that?
21       A.   That an application went out to him on that
22  date.
23       Q.   On December 2005?
24       A.   Yes.
25       Q.   Now, do you see where it says, but it pertains
```

14

1  to communications back when Harry Lambert was with
2  Montgomery Materials, LLC?
3      A.   Okay.
4      Q.   Do you know when Harry Lambert worked with
5  Montgomery Materials, LLC?
6      A.   I don't.
7      Q.   Do you know that he has not been with
8  Montgomery Materials since April of 2002?
9      A.   I did not.
10     Q.   And so when you signed this, were you
11 attempting to state that this fax dealt with
12 communications with Mr. Lambert back in 2002?
13          MR. BAILEY:  Object to the form.
14 BY THE WITNESS:   (Resuming)
15     A.   I don't know.
16     Q.   But you didn't have any conversations with Mr.
17 Lambert in 2002, did you?
18          MR. BAILEY:  Object to the form.
19 BY THE WITNESS:   (Resuming)
20     A.   I don't know.
21     Q.   Do you have any recollection of any
22 conversations with Mr. Lambert in 2002?
23     A.   I do not.
24     Q.   Mr. Hong, do you have any reason to believe
25 that this fax dealt with business dealings from 2002?

```
 1              MR. BAILEY:  Object to the form.
 2   BY THE WITNESS:  (Resuming)
 3        A.   I don't know.
 4        Q.   When you wrote, "I'll take care of it before
 5   the holidays," what holidays were you referring to?
 6        A.   I would assume Christmas, it was in December.
 7        Q.   Why would you assume that?
 8        A.   Because it says it was faxed on December 6 of
 9   2005.
10        Q.   Do you have any reason at all, Mr. Hong, to
11   believe that this document came from anywhere else other
12   than Crest Capital?
13        A.   No.
14        Q.   And is this a standard Crest Capital form?
15        A.   Yes.
16        Q.   And it's something that you use in the ordinary
17   course of your business?
18        A.   Yes.
19        Q.   How often do you use these types of documents?
20        A.   Very often.
21        Q.   Do you see where the phone number is circled
22   there, the fax number?
23        A.   Uh-huh (affirmative).
24        Q.   Do you know who circled that?
25        A.   I don't know.
```

```
 1        Q.    Is that something that you do when you fax
 2   these things out as a matter of practice is circle it?
 3        A.    Sometimes.
 4        Q.    And is it common for you to write notes on the
 5   side as you did in this instance?
 6        A.    Sometimes.
 7        Q.    Now, in your business, in sales, are there
 8   instances where you would send out a fax like this--  Let
 9   me ask you this way.  What leads you to send out faxes
10   like this in your line of work?
11        A.    It could be any number of things.
12        Q.    And tell me some of those.
13        A.    It could be, like I said, for, you know,
14   someone's that's buying the equipment could call.  It
15   could be someone selling the equipment that calls us.  It
16   could be just a lead.  It could be a referral.  I mean,
17   it could be any number of things.
18        Q.    All right.  Now, you said if somebody calls you
19   who's buying or somebody calls you who's selling?
20        A.    Uh-huh (affirmative).
21        Q.    And you said a lead.  Now, does a -- is a lead
22   the result of somebody calling you as well?
23        A.    It could be.
24        Q.    I mean, are there instances where you could get
25   a lead without speaking with a person?
```

17

```
 1      A.    Someone could call in, then an application goes
 2 out and then you call them until the application comes in
 3 and that's pretty much where my job ends.
 4      Q.    And you don't recall ever speaking with Mr.
 5 Lambert about this application?
 6      A.    No.
 7      Q.    Now, and again, this is your handwriting on
 8 this document?
 9      A.    Yes.
10      Q.    And do you have any reason to believe that you
11 wrote on this document before December 6th, 2005?
12      A.    I don't know.
13      Q.    Do you have any reason to believe you did?
14            MR. BAILEY:  Object to the form.  Asked and
15 answered.
16 BY THE WITNESS:   (Resuming)
17      A.    I don't know.
18      Q.    You just can't recall when you did it?
19      A.    Right.
20      Q.    After this document the Affidavit was given to
21 you, which is Plaintiff's 2.  Did you make any changes to
22 it?
23      A.    No.
24      Q.    Did you have any input in the preparation of
25 this document?
```

1      A.    No.
2      Q.    You simply signed it in the form as was given
3  to you?
4      A.    Yes.
5      Q.    And again, this last sentence in the, I guess
6  it's the second to last sentence in the document, "It was
7  requested and faxed in December of 2005, but it pertains
8  to communications back when Harry Lambert was with
9  Montgomery Materials, LLC."  Did you tell the lawyer or
10 the person that you talked to about this Affidavit, did
11 you give them that information?
12     A.    No.
13     Q.    Do you agree with that sentence?
14     A.    I mean, it could be.
15     Q.    But you don't know?
16     A.    I don't know.
17     Q.    And you were not in sales with Crest in April
18 of 2002, were you?
19          MR. BAILEY:  Object to the form.
20 BY MR. GRISTINA: (Resuming)
21     Q.    Were you in sales with Crest in April of 2002?
22     A.    I don't know.
23     Q.    Were you still an intern then?
24     A.    I don't know.
25     Q.    Do you know how long Crest has used this form,

20

```
 1       Q.   Is there a database whereby you could troll for
 2  information regarding sales of heavy equipment?
 3       A.   I don't know.
 4       Q.   What about, do you ever go to the secretary of
 5  state websites for various states to see about any
 6  filings for equipment financing?
 7       A.   I don't know.
 8       Q.   Did anybody at The Concrete Company ask you to
 9  fax Exhibit 1 to them in December of 2005?
10       A.   I don't know.
11       Q.   And going back to the instances where you would
12  receive information from a vendor regarding a sale, can
13  you give me an example of one of those instances?
14       A.   When a vendor --
15       Q.   Lets you know about a sale that had been made
16  and thereby provided you a lead.
17       A.   That's what would happen.
18       Q.   Do they call you personally?
19       A.   Sometimes.
20       Q.   Do you deal with vendors in Montgomery,
21  Alabama?
22       A.   I don't know.
23       Q.   Can you recall dealing with any vendors there?
24       A.   I don't know.
25       Q.   And when those vendors call, what sort of
```

```
 1  information do you ask for them to give you?
 2       A.   Whatever information they have.
 3       Q.   About who?
 4       A.   The customer.
 5       Q.   And so there could be instances where a vendor
 6  would give you information about a customer that might
 7  turn out to be wrong in terms of address and telephone
 8  number; is that true?
 9            MR. BAILEY:  Object to the form.
10  BY MR. GRISTINA:  (Resuming)
11       Q.   Are there instances where you've ever been
12  given inaccurate information by a vendor concerning a
13  potential customer of yours?
14       A.   Yes.
15       Q.   How often does that happen?
16       A.   Not often.  Not infrequently either.
17       Q.   And what sort of things have they gotten wrong
18  when they've given you that information?
19       A.   Sometimes the company name, sometimes the phone
20  number.  I mean, really everything could be wrong.
21            MR. GRISTINA:  I have no further questions.  I
22  appreciate it.
23                    RECROSS-EXAMINATION
24  BY MR. BAILEY:
25       Q.   Mr. Hong, just for the benefit of the court, we
```

31