## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **THE CONCRETE COMPANY,** | \| |
| | \| |
| **PLAINTIFF,** | \| |
| | \| |
| **vs.** | \|     **CASE NO. 2:05-CV-1026-CSC** |
| | \| |
| **HARRY E. LAMBERT and** | \| |
| **CAROL'S CONTRACTING,** | \| |
| **INC.,** | \| |
| | \| |
| **DEFENDANTS.** | \| |

### DEFENDANT LAMBERT'S
### BRIEF IN OPPOSITION TO PLAINTIFF'S BRIEF IN SUPPORT OF
### PARTIAL MOTION FOR SUMMARY JUDGMENT [Doc. 107]

COMES NOW Defendant Harry E. Lambert (hereinafter "Lambert") and, in addition to the arguments raised in his pending Motion for Summary Judgment [Doc. 86], submits this brief in opposition to TCC's Brief in Support of Partial Motion for Summary Judgment filed by Plaintiff [Doc. 107] stating additional grounds as to why the TCC's motion should be denied and the pending motion for summary judgment [Doc. 86] should be granted as a matter of law[1]:

---

[1] TCC does not seek a summary judgment against Carol's Contracting, Inc.

## I.

## Supplemental Statement of the Facts

First, Lambert would adopt and incorporate by reference facts 1-97 found in the Brief in Support of Defendants' Summary Judgment Motion [Doc. 87] and facts 1-13 in Harry Lambert's Brief in Support of Summary Judgment Motion [Doc. 40].  In addition, Lambert would add the following facts:

1.      All remaining Alabama Gravel representatives have confirmed that they had no business relationship with Harry Lambert in the territory prior to the expiration of the non-compete[2].[3]

   a. Alabama Gravel founder Robert Alexander says he began looking for sources in Alabama because his companies in Georgia were having trouble obtaining material in Georgia from, among others, TCC. [Exhibit N at page 261: line 15 to page 264: line 9].  Harry Lambert had nothing to do with his decision to come to Alabama and look for gravel sources. [*Id*. page 263: line 20].  Alexander specifically testified that Lambert was not involved in the "stage one" process of establishing a new Alabama Gravel plant in Deatsville, Alabama, prior to April 2006 when Lambert agreed to assist them.  [*Id*. page 276: line 13]

---

[2] Alabama Gravel's Dave Tuten has already given affidavit and deposition testimony to this effect. [Exhibit G: Doc. 86]

[3] Others associated with Alabama Gravel -- e.g., buyers, contractors, suppliers – similarly testified that Lambert was not involved in the process of buying, selling, erecting, operating, or maintaining facilities for Alabama Gravel prior to the expiration of the non-compete.  *See* ¶13, *infra*.

b. Alexander says he never saw Harry Lambert engaging in the sand and gravel business while Lambert was under his non-compete. [*Id.* page 274: line 12] It was Dave Tuten of Alabama Gravel who obtained the business of Globe Metallurgical for Alabama Gravel and not Harry Lambert. Alexander negotiated the deal with Maddox Stone, not Harry Lambert. Both Alexander and Tuten obtained the business of Simcala, not Harry Lambert. [*Id.* page 265: line 12 to page 266: line 3] It was common and general information that TCC had reduced supplies to Simcala and Globe which assisted Alexander in making his decision to sell oversize gravel in this area and without that information he would not have been interested in mining in this area. [*Id.* pages 269: line 6 to 270: line 10]

c. Alabama Gravel minority owner William "Rex" Dassinger never saw Lambert say or do anything that made Dassinger think Lambert was engaging in the sand and gravel business in Montgomery during the existence of the non-compete. [Exhibit P: page 101: lines 9-20]

d. Dassinger testified that he never saw Lambert at the Alabama Gravel Deatsville site between March 2005 (when the company was formed) and January 2, 2006 (when his non-compete expired). [*Id.* page 56: lines 19-23]. When he was forming Alabama Gravel, Dassinger never even

contemplated or considered that Lambert would have an interest in the company after his non-compete expired.  [*Id.* page 68: lines 13-18].

2.    Mining and common carrier trucking are unquestionably distinct business and industries.  The United States Government has created classifications and agencies recognizing that the two industries are not the same.

a.  Mining and common carrier trucking are not considered to be in the same business sectors by standard business classification definitions employed by the federal government.  In 1997, the government adopted the North American Industry Classification System (NAICS). [Exhibit DD: Development of NAICS] Hauling freight is classified in the NAICS transportation and warehousing sectors 48-49 whereas mining is in business sector 21.  *Compare* 2002 NAICS Definitions: 48-49 Transportation and Warehousing *with* 2002 NAICS Definitions: 21 Mining.  These classifications all are based upon the primary activities in which companies engage.  *See, e.g.*, 2002 NAICS Definitions: 212321 Construction Sand and Gravel Mining. Using the official U.S. Government definitions for business classifications, Montgomery Materials LLC would have been classified in the mining sector and the company Lambert drove for—Carol's Contracting Inc.—would be classified in the transportation sector.

**b.** Two separate and distinct agencies have been created by the federal government to oversee mining and common carrier trucking. The mining industry is regulated by the Mine Safety and Health Administration ("MSHA"), an agency of the United States Department of Labor. http://www.dol.gov/dol/aboutdol/orgchart.htm. MSHA's mission "is to administer the provisions of the Federal Mine Safety and Health Act of 1977 (Mine Act) and to enforce compliance with mandatory safety and health standards as a means to eliminate fatal accidents; to reduce the frequency and severity of nonfatal accidents; to minimize health hazards; and to promote improved safety and health conditions in the Nation's mines." http://www.msha.gov/MSHAINFO/MISSION.HTM. The common carrier trucking industry is regulated by the Federal Motor Carrier Safety Administration ("FMCSA"), an agency of the U.S. Department of Transportation. http://www.dot.gov/DOTagencies.htm. According to its website, the primary mission of FMCSA is "to reduce crashes, injuries and fatalities involving large trucks and buses." http://www.fmcsa.dot.gov/about/aboutus.htm. To carry out this mission, FMCSA "[d]evelops and enforces data-driven regulations that balance motor carrier (truck and bus companies) safety with industry efficiency." http://www.fmcsa.dot.gov/about/what-we-do/strategy/strategy.htm.

3.      Persons familiar with the sand and gravel business in this area recognize the obvious difference between mining and commercial trucking even though trucking is necessary to support a variety of different types of businesses.

> a.  When Harry Lambert hired civil engineer Larry Speaks after his non-compete expired Lambert's business card said "heavy equipment hauling". [Exhibit W: page 72: lines 2-21]
>
> b.  Alabama Gravel minority owner Rex Dassinger has been in both the sand and gravel business and the trucking business in the past and knows that the sand and gravel business is a "total different business" from the trucking business. [Exhibit P: page 101: line 21 to page 102: line 3]
>
> c.  Robert Alexander, an owner of a sand and gravel companies in Alabama and Georgia, has stated that companies in the sand and gravel business are not in the trucking business and that Carol's Contracting was an "independent" trucking business. [Exhibit N page 271: line 10 to page 274: line 6]
>
> d.  When Simcala purchasing agent Richard "Dick" Wymer approached Lambert in January 2005 about finding additional sources of oversize, Lambert was acting as a truck driver transporting a by-product of the Simcala smelting operation. [Page 221: lines 16-22] Wymer does not consider commercial trucking companies to be in the metal smelting

business or the sand and gravel business although both businesses use commercial truckers. [Exhibit N: page 223: line 13 to page 224: line 7]

e. After Harry Lambert left Montgomery Materials his friend and Georgia gravel broker Randolph C. "Randy" Willingham spoke to Lambert while Lambert was driving a truck for Foshee Trucking hauling a load of material Willingham's company had sold to a customer. [Exhibit O: page 15: lines 1-13] Willingham told Foshee Trucking that since Lambert could not be in the sand and gravel business he would prefer they use Lambert for hauling Willingham's product to customers. [*Id.* page 17: lines 19 to page 18: line 8] Willingham uses many commercial trucking companies to deliver material to customers. [*Id.* page 19: line 19 to page 20: line 4]  He considers the sand and gravel business and the trucking business to be "two different things." [*Id.* page 43: line 15] He never considered Lambert's driving a truck nor Carol's Contracting, Inc.'s trucking operations to be engaging in the sand and gravel business. [*Id.* page 43: line 24 to page 46 line 6]

f. Howard "Mike" Gentry, an owner of a local gravel pit, knew Harry Lambert was under a non-compete in the sand and gravel business and knew Lambert was making a living as a truck driver which he does not

consider being in the sand and gravel business. [Exhibit Q: page 98: lines 6-13]

g. The owner of an equipment supply company which sold to Alabama Gravel, Samuel Warren Estock, Jr., testified that he does not consider driving commercial trucks to be part of the sand and gravel business. He just thought Harry Lambert was "doing whatever he could to make a living." [Exhibit S: page 88: line 2-16]

h. Gravel broker and Maddox Stone owner James B. "Jim" Maddox testified that he never considered Carol's Contracting, Inc. to be in the sand and gravel business. [Exhibit T: page 46: line 23 to page 47: line 1]

i. As a person involved in supplying equipment and parts to the sand and gravel business, Lars Berent "Bernie" Ostervold does not consider himself nor the commercial trucking companies he uses to be in the sand and gravel business. [Exhibit U: page 49: lines 7-24]

j. Steel supplier Neil Labovitz occasionally hires commercial trucks to ship and deliver his steel to companies in the sand and gravel business. He does not consider commercial trucking firms to be in the steel business or the sand and gravel business. His company is not in the commercial trucking business although occasionally he uses his own trucks to deliver steel. [Exhibit CC: page 67: line 9 to page 69: line 16]

4. TCC in fact stopped engaging in the mining business in this territory in April 2005.

    a. Invoices for sales of product from Ward to Simcala and Globe started bearing the name "Foley Materials" effective April 1, 2005. Exhibit Z: [Plaintiff's Responses to Defendant Harry E. Lambert's Seventh Interrogatories and Request for Production].

    b. The U.S. Geological Mining Industry Survey for 2005 listed "Foley Materials Company" (and not TCC) as a company engaging in the Mineral Industry in Alabama in 2005. Indeed it was listed as one of the 79 biggest mineral companies in the United States. [Exhibit EE]

    c. The current Montgomery Yellow Pages do not list TCC or Foley Materials as being in the sand and gravel business. [Exhibit FF: Pages 540-541] In fact, Foley Materials Company is only listed in the ready mixed concrete section. [*Id.* page 209]

5. Neither Montgomery Materials LLC nor TCC nor Foley Materials Company were ever common carriers in the trucking business as is Carol's Contracting, Inc. Of course, the only entity and time frame that should be considered when determining the scope of a non-compete contained in a buy-sell transaction applies to would be scope of the business "sold" on the effective date of the sale which, in this case, would be Montgomery Materials LLC as of January 1, 2001 which

defendants have previously established never engaged in the trucking business. [Exhibit A: Doc. 86 ¶¶ 5-6] But the fact that Foley Materials has been assigned DOT number 1346785 is not proof that it was ever in the trucking business as a common carrier in this area.  That DOT number states that a Foley Materials Company with a physical address in Columbus, Georgia filed a MC-150 form in 2005 stating that it had 1 truck and 2 drivers classified to haul "Private (Property)". [Exhibit GG: SAFER Web-Company Snapshot: Foley Materials Company] "Private (Property)" means "A motor carrier whose highway transportation are incidental to, and in furtherance of, its primary business activity." [*Id.* SAFER WEB-Help page 3 of 6.] TCC simply has never been certified to conduct business as a common carrier in Alabama because trucking was never its primary business activity. [Doc. 83, Exhibit K]  Carol's Contracting Inc. has such a certification from the Alabama Public Service Commission because it was operating as a common carrier.  [Doc. 39: Exhibit F—Affidavit of Carol Lambert]

6.     The primary buyers of white oversize gravel in this territory stopped buying from TCC because of the inability or unwillingness of TCC to supply them and not because of any wrongful acts of Harry Lambert.  Depositions from representatives of both Globe Metallurgical and Simcala establish that they sought and found other sources of gravel before the existence of Alabama Gravel.

a. According to Globe Metallurgical raw materials buyer Robert R. "Bobby" Becker, the existence of Alabama Gravel as an additional supplier of white oversize gravel did not affect Globe's purchases of gravel from TCC. [Exhibit K: Page 95: lines 16-19] Harry Lambert had nothing to do with Becker finding alternative sources of gravel for Globe. [*Id.* page 88: lines 8-11] Becker was told by TCC in late 2004 or early 2005 that Globe would be limited to buying 500 tons a month of white oversize gravel from TCC Ward because TCC was running out of gravel at that location. [*Id.* page 74: lines 1-12; page 76: lines 1-9; page 81: line 18 to page 82: line 4] Becker was told that inventories of white gravel were not what TCC expected and that TCC could only supply Globe 500 tons per month. [*Id.* page 82: lines 1-4] TCC offered Globe only a very small portion of Globe's monthly gravel requirements given the Selma facility uses 210 tons per day. [*Id.* page 82: lines 5-9]. Becker needed 18,000 to 21,000 tons of gravel per month for all of Globe's operations. [*Id.* page 77: lines 13-17] Becker sought and obtained material from the Carolinas to make up the difference between what he expected to buy from TCC and what he was allowed to buy. [*Id.* page 87: lines 9-21] In other words, no one supplier was able to supply all the needs for the Globe operation in Selma in 2005 and Globe bought as much white

oversize gravel as TCC would allow them to buy.  [Page 99: lines 13-22 & page 103: lines 12-15]

b. According to Simcala's Mt. Meigs site manager, William Edward Boardwine, it was TCC's own actions that caused Simcala to stop buying white gravel from TCC.  Harry Lambert was not the reason Simcala stopped buying from TCC and Harry Lambert did nothing to interfere with the relationship between Simcala and TCC.  [Exhibit L: Page 145: lines 1-13] The reason Simcala stopped purchasing from TCC for any period in 2005 was that after telling Boardwine in mid-2004 that supplies in 2005 would continue, in late December 2004 or early January 2005 TCC advised Boardwine that TCC's white oversize gravel was going to "dry up" and by April 2005, according to TCC, it did. [*Id.* page 142: line 16 to page 144: line 6] Simcala was willing to enter into a long-term supply agreement with TCC but TCC could not supply the white oversize gravel long-term. [*Id.* page 150: line 8]

c. In fact, it was Simcala purchasing agent Richard "Dick" Wymer who made the unilateral decision to seek other suppliers after he received information that the TCC might be unable to supply Simcala with adequate supplies of oversize gravel. Harry Lambert did not induce Simcala to purchase less oversize from TCC and did not interfere with

the relationship between Simcala and TCC. [Exhibit M: page 220: lines 4-21] Harry Lambert never was involved in Simcala's purchase of gravel from Alabama Gravel. [*Id.* page 221: line 15] Simcala went elsewhere simply because TCC advised Wymer they did not have oversize to sell. [*Id.* page 222: line 17 to page 223: line 4]

    d.  Gravel broker Randolph "Randy" Willingham confirms that TCC owner "Foley is pretty rough on his customers." [Exhibit O: page 52: line 2]

7.    The only other customer TCC claims it lost as a result of the actions of Harry Lambert, Maddox Stone, was located outside the territory in Georgia. Maddox Stone owner James B. "Jim" Maddox testified that Maddox Stone never purchased any sand or gravel from Harry Lambert or Montgomery Materials, Co. LLC. [Exhibit T: page 47: lines 5-13]   Accordingly, it was not covered by the scope of the non-compete and its sales are irrelevant.

8.    TCC's and Foley Materials Company sales were not affected by the formation of Alabama Gravel because Alabama Gravel only sold to its customers oversize gravel TCC could not itself produce. Nevertheless, Foley Materials actually sold more white oversize gravel in 2005 than TCC representatives had told Globe and Simcala it would be able to produce in that year but then ran out of gravel. Records of shipments of oversize gravel to Globe and Simcala in 2005 show that 24,704 tons were shipped from 502-Ward in 2005 which is *twice* the

amount TCC represented to Simcala and Globe in January 2005 those companies could purchase from Ward in 2005 (Both Simcala and Globe were limited to 500 tons per month or a total of 12,000 tons per year *before* Alabama Gravel came into existence). [Exhibit AA & TCC 2855]

9.    TCC was not the only source for white oversize gravel in the Montgomery area whether or not Alabama Gravel came into existence.

    a.  Over the years Simcala's purchasing agent has purchased from at least nine different suppliers of white oversize gravel in this area. [Exhibit M: page 210: line 9]

    b.  The 2007 Montgomery Yellow Pages list 20 businesses in the "Sand and Gravel" category.  [Exhibit FF: pages 540-541]  Interestingly, none of them currently include TCC or Foley Materials Company.

    c.  After TCC cut them back to 500 tons a month and before Alabama Gravel came into existence, Simcala was able to secure sources of white oversize outside of the territory for use in the territory. [Exhibit K: page 87: lines 9-21]

10.   Foley Materials in fact ran out of white oversize gravel and is no longer producing white oversize in the territory. For example, Globe's last purchase from Foley Materials' Ward-502 pit was on February 10, 2006.  Bobby Becker understood the reason to be that Ward was not producing the percentage of rock to

sand which created large inventories of sand which were hard to sell. [Exhibit K: page 95: line 24 to page 97: line 21] The Montgomery Yellow Pages list the company as being in the ready mixed concrete business. [Exhibit FF: Page 290]

11.   TCC's own actions were also the reason Robert Alexander began looking for sources of gravel in Alabama and initially contacted Harry Lambert about an operation near Gadsden.

   a.   Alabama Gravel founder Robert Alexander has confirmed that he began looking for sources of gravel in Alabama because his companies in Georgia were having trouble obtaining material in Georgia from TCC. [Exhibit N: page 261: line 15 to page 264: line 9] He says that Harry Lambert had nothing to do with his decision to come to Alabama and look for gravel sources. [*Id.* page 263: line 20]

   b.   Randy Willingham, who was a partner with Robert Alexander in Georgia, was in on the decision to send Alexander to Alabama to seek other sources of material because TCC had increased prices in Georgia and reduced the volumes Willingham could purchase in Georgia. [Exhibit O: page 33: lines 10-25]

12.   Harry Lambert responded to questions from persons looking for sources of gravel and did not become involved in the businesses that supplied them during the term of his non-compete.

a. For example, on January 4, 2005, Richard Wymer was told by TCC that the TCC Ward plant (a major source of quality gravel) was almost out of white oversize. [Exhibit M: page 217: line 6] After being shocked by TCC, Wymer saw Lambert and had the following conversation:

> "I asked him, I said it looks like we're going to have a gravel problem.  I know you're not in the gravel business now, you're driving a truck, but you've been in the gravel business for years and years, you drive a truck to many places that I don't go, would you have some idea where I could obtain some larger size gravel?
>
> And his answer was, well, I'm in a non-compete.  I can't be in the gravel business.  But I'll check around and somebody might call you."

[Page 94: line 19 to page 95: line 7]

b. Gravel broker and Maddox Stone owner James B. "Jim" Maddox testified that when he inquired if Lambert knew of places he could buy gravel, he was not expecting to buy any from him because Lambert had told him that he was not in the business of producing gravel. [Exhibit T: page 48: lines 18-23]  Maddox never expected to pay nor did he ever pay compensation or commissions to Lambert for any information because he asked Lambert as a friend would ask another for help. [*Id.* page 48: line 24 to page 49: line 13]

13.    According to the persons who actually purchased from, constructed and supplied Alabama Gravel's mining operations, although they spoke with Harry Lambert—sometimes quite often—Harry Lambert was not in fact involved in the process of buying, selling, erecting, operating or maintaining facilities for Alabama Gravel prior to the expiration of the non-compete.

a.  The owner of Gentry Ready-Mix and the Independence, Alabama Gentry Pit, Howard "Mike" Gentry, has testified that Harry Lambert refused to help him with a problem with his dredging operation in 2003 because Lambert said he was under a non-compete. [Exhibit Q : page 96: line 6 to page 98: line 5]   Even assuming that Lambert met with civil engineers Russ Ware and Larry Speaks[4] regarding obtaining an ADEM permit for the Gentry pit as described in TCC's brief [Doc. 107: pages 20-21], it is undisputed that Lambert had no further involvement with the Gentry Pit. Gentry, the owner of the pit, testified that Lambert did not assist him or operate the pit in any way.  [Exhibit Q: page 36: lines 17-23].  *See* ¶15, *infra*.

b.  The contractor who worked on the Gentry Pit and who erected the new Alabama Gravel Deatsville plant, Carl "Allen" King, has testified that when Robert Alexander of Alabama Gravel met with him at the Gentry

---

[4] Ware's supervisor Speaks has a different recollection. *See* ¶ 15, *infra*.

Pit and arranged for him to do the repair/maintenance work there for Alabama Gravel Harry Lambert was not present. [Exhibit R: page 32: line 1 to page 34: line 3] According to King, it was Robert Alexander who arranged for King to erect the new Deatsville operation for Alabama Gravel and again, Harry Lambert was not involved. [*Id.* page 36: line 2 to page 37: line 2] King confirmed that Lambert did not assist in the construction of the Deatsville Alabama Gravel plant until Lambert's agreement with Alabama Gravel in April 2006 [after the non-compete expired]. [*Id.* page 56: line 12 to page 57: line 7] While the non-compete existed, Harry Lambert only visited the Deatsville site a "time or two" inquiring of King as to when it would ever be finished probably never even getting out of his truck. [*Id.* page 54: line 9 to page 56: line 11]

c.  Gravel broker Randy Willingham says he never called Lambert to purchase or locate material. [Exhibit O: page 26: line 14 to page 27: line 5]  In fact, Willingham never purchased or brokered gravel through Alabama Gravel. [*Id.* page 30: lines 9-14]  Some of his calls to and from Lambert related to his concern for Harry's bout with bladder cancer. [*Id.* age 31: lines 1-5]

d.  The owner of an equipment supply company which sold to Alabama Gravel, Samuel Warren Estock, Jr., testified that he knows of no facts

that would indicate that Harry Lambert violated his non-compete agreement with TCC. The only time he spoke with Lambert, Lambert was driving a truck. [Exhibit S: page 85: lines 4-19]

e. Equipment supplier Lars Berent "Bernie" Ostervold says emphatically that he did not speak with Lambert about Lambert purchasing equipment needed for mining sand and gravel until 2006—after the non-compete expired. [Exhibit U: page 50: line 9 to page 51: line 18] He had no business dealings with Lambert during the term of the non-compete. [*Id.* page 16: lines 11-17] Before then, the only work Ostervold knew Lambert was doing was driving a truck. [*Id.* page 14: line 16 to page 15: line 8] The first and only person Ostervold dealt with concerning sales to Alabama Gravel before 2006 was Robert Alexander. [*Id.* page 16: line 18 to page 18: line 17] He had known Alexander since the early 1980s. [Page 19: line 10]

f. Alabama Gravel's steel supplier Neil Labovitz remembers no conversations with Harry Lambert between June 2005 and the end of 2005. He is aware of no involvement between Harry Lambert and Alabama Gravel. [Exhibit CC: page 31: lines 6-23] Labovitz sold steel to Alabama Gravel at the Deatsville operation. [*Id.* page 17: lines 13-22] The first sales of steel for Deatsville occurred in September 2005 and

were ordered by Allen King. [*Id.* page 28: line 11 to page 29: line 18] His first dealings with Harry Lambert regarding the Deatsville operation occurred in April 2006. [*Id.* page 48: lines 15-23]

14.    The Crest Capital fax authored by Michael Hong does not establish any involvement of Harry Lambert with Alabama Gravel or any other mining operation during the term of his non-compete. Crest Capital equipment financing agent Hong sends faxes all the time soliciting financing for equipment without first being contacted and asked for a quote. [Exhibit V: page 16: line 20; page 17: lines 7-17; and page 25: lines 11-16] Hong cannot say that a fax he sent in December 2005 was anything but a cold solicitation. He has no explanation for how he got the address and telephone and fax numbers he put on that fax. He cannot say the "Harry" mentioned is Harry Lambert. [*Id.* page 26: lines 14-24] Hong cannot remember ever speaking with Harry Lambert about financing equipment. [*Id.* page 12: lines 1-5]  He does not know how he got the name "Harry" that he wrote on a fax he sent in December 2005. [*Id.* page 12: lines 6-11] Hong cannot explain why in December 2005 he would have sent a fax to a company and address that no longer existed but to the current fax number for The Concrete Company.  The fax in question was directed to "Montgomery Materials Co. LLC" at the address of "739 Oliver Road" with a telephone number of "334-271-6565". [*Id.* page 29: lines 1-8] [TCC2399]  In June 2002, Montgomery Materials LLC invoices showed those

to be the business name, address and phone number for Montgomery Materials Co. LLC (the company taken from Lambert by TCC on April 9, 2002). [Doc. 1, ¶ 31-32; Exhibit BB: TCC 1069] However, by December 2005 Montgomery Materials LLC no longer existed and TCC was operating from a different location. Oddly, however, the fax number to which the Crest Capital fax was directed was the then-current fax of TCC in Columbus, Georgia that had not been the fax number of "Montgomery Materials Co. LLC" when Lambert was associated therewith. [Exhibit BB: TCC 1069] Hong has checked his records and Montgomery Materials Company, LLC, TCC, Alabama Gravel, Carol's Contracting, Inc. and Harry Lambert have never had accounts with his company Crest Capital. [Exhibit V: page 26: lines 2-13 and page 28: lines 17-25]

15.    Larry Speaks and Associates did not do any work for Harry Lambert during the term of the non-compete. The principal of Larry Speaks and Associates, civil engineer Larry Speaks, has testified that it was not until sometime in 2006 (after the non-compete expired) that Lambert first approached Speaks about helping a company called Lambert Materials LLC in getting a permit for a mining operation. Speaks first worked for Mike Gentry on the Gentry Pit in September 2001 (before the non-compete began and while Harry Lambert was with Montgomery Materials). [Exhibit W: page 21: line 9 to page 23 line 15] Speaks says he did work on the Gentry Pit (Independence Pit) for Mike Gentry. Speaks has never

seen Harry Lambert there nor has he ever discussed his work on the Gentry Pit with Harry Lambert. [*Id.* page 34: line 23 to page 36: line 8.]  Although Russell Ware, one of Speaks' employees at the time, submitted an affidavit stating that Lambert met with Speaks and Ware regarding obtaining a permit for the Gentry Pit, Speaks testified in deposition that Lambert was not in any way involved with obtaining a permit for that pit.  [*Id.* page 88: line 19 to page 89: line 1].  Speaks also stated that the first time he dealt with Harry Lambert concerning Alabama Gravel's Deatsville operation was in 2006 (after the non-compete expired). [*Id.* page 66: line 3 to page 67: line 12].

16.    It has taken Harry Lambert much longer to return to the sand and gravel business than TCC counsel has stated in open court it would take if a person honored such an agreement. Harry Lambert became manager of Lambert Materials, LLC after the non-compete expired on January 2, 2006. [Exhibit X, pg. 1, ¶ 31] Lambert Materials LLC first acquired a lease on property in Macon County, Alabama for mining sand and gravel in 2006 and none of those negotiations occurred before the non-compete expired. [*Id.* ¶ 32] An ADEM permit is required before any mining operations can begin. The permit process was initiated with ADEM after the lease in Macon County was executed. [*Id.* ¶ 33]  The ADEM permit was not issued to Lambert Materials LLC until August or September 2006. [*Id.* ¶ 34] Lambert Materials LLC has only recently been able to

acquire financing for the equipment needed to erect a sand and gravel plant.  If all goes well, the company may be in the sand and gravel business by May 2007—approximately 16 months after the expiration of the non-compete.  [*Id.* ¶¶ 36-37] According to statements of counsel for TCC made in open court, due to barriers to entry it would take a person who honored a non-compete at least 8 months after the expiration of a non-compete to re-enter the sand and gravel business and compete for sales of aggregate against existing suppliers in the area. [*Id.* ¶ 37]

17.    This suit is being pursued solely for anti-competitive reasons.  TCC owner Frank Foley has vowed to third persons to put Lambert out of business once Lambert Materials, LLC is able to re-enter the sand and gravel business in this area. [Exhibit X ¶ 38]

18.    Harry Lambert received no compensation for the non-competition agreement or the good will of the business when the buy-sell transaction closed in April 2002. [Exhibit J: page 58: line 15 to page 59: line 14 and Exhibit Y: TCC 3149]

19.    Harry Lambert was not aware of nor did he approve the making of a loan by TCC to a direct competitor of Montgomery Materials, LLC.  [Exhibit X ¶40]

## II.

### Argument

It is incredible that in its brief claiming entitlement to summary judgment, TCC fails to cite any legal authority supporting its motion on any ground.  TCC

apparently refuses to acknowledge that the terms of the non-compete are to be strictly construed and limited because they are fundamentally against Alabama public policy and anti-competitive in nature. *See* Pitney Bowes, Inc. v. Berney Office Solutions, 823 So. 2d 659, 662 (Ala. 2001) ("A covenant not to compete that does not fall within the limited exceptions set out by Ala. Code § 8-1-1(b) is void"); Livingston v. Dobbs, 559 So. 2d 569, 571 (Ala. 1990) ("Contracts restraining employment have been traditionally disfavored"), *citing* Calhoun v. Brendle, Inc., 502 So.2d 689 (Ala. 1986); Robinson v. Computer Servicenters, Inc., 346 So.2d 940 (Ala. 1977); and Hill v. Rice, 259 Ala. 587, 67 So.2d 789 (1953).

The reason for that should be clear from reading TCC's version of the facts. Essentially, TCC takes the position that it and Elmore Sand and Gravel would have acquired a monopoly on white oversize gravel in this territory if they could have gagged Harry Lambert and prevented him from responding to questions from concerned purchasers of gravel, friends and business associates as to where they might replace supplies of white oversize that TCC was telling customers it could not supply. Failing that, TCC argues that the provisions can be stretched to the point that the formation and operation of a commercial trucking company or—in Harry Lambert's case—the driving of trucks would be prohibited if a truck involved in that business ever hauled any sand or gravel in the territory.

## A.

### Agreement Restrictions Exceed Permitted Exceptions of Section 8-1-1

TCC has failed to meet its burden of proving that the non-compete provision is not void under ALA. CODE 1975 § 8-1-1. *See* Construction Materials, Inc. v. Kirkpatrick Concrete, Inc., 631 So. 2d 1006, 1009 (Ala. 1994); Calhoun v. Brendle, Inc., 502 So. 2d 689, 693 (Ala. 1986). In its brief opposing summary judgment for the defendants, TCC has taken the position that a lower standard should be applied in reviewing the terms of the non-compete provisions because this was solely a purchase situation under ALA. CODE 1975 § 8-1-1(b). That is simply not the case. Harry Lambert was an employee of the company which was sold and the owner of the company which sold its one-half interest therein. The agreement was structured with that in mind such that Lambert was also a signatory. Since Harry Lambert, individually, was not the "seller" of any interest in Montgomery Materials, LLC, the only way he would be bound would be as an employee of the former company. The fact that his employment agreement did not contain that provision is merely a reflection of the fact that he was already individually bound by the provisions relating to the formation of the business. Accordingly, if there is a lower standard for buy-sell non-competes that would allow them to be more onerous than employment non-competes, it should not be applied here.

But regardless of whether the Court views this as a buy-sell non-compete or a employment non-compete, it is too broad—as interpreted by TCC—to be enforced for five years.  It is clear that TCC claims that Lambert was prohibited from doing things that would *not* amount to actually engaging in a similar business or soliciting old customers of Montgomery Materials.

**B.**

## Lambert Did Not Engage In the Sand and Gravel Business During The Protected Period

TCC has not produced evidence that Lambert was engaged in the sand and gravel business or solicited old Montgomery Materials LLC customers during the period of the non-compete. None of the evidence submitted by TCC establishes that Lambert ever worked for a sand and gravel company or that he mined or sold sand or gravel during the term of the non-compete. The evidence submitted by defendants, from the persons actually buying the gravel, flatly refutes any suggestion that Harry Lambert influenced their decisions whether to buy gravel from TCC, or subsequently from Foley Materials Company.  Testimony from Simcala, Globe and Maddox Stone representatives simply and clearly provide that Harry Lambert had nothing to do with their decisions regarding whether to buy gravel from TCC or Alabama Gravel.  *See* Part I ¶¶ 6 and 7. TCC and then Foley Materials drove those customers away by telling them they could not supply their

needs in 2005. *Id.* TCC and Foley Materials then proceeded to sell all the white oversize gravel they produced and more than they projected to sell in 2005 until they ran out of gravel. *Id.*; Part I ¶ 8. The customers TCC asserts it lost because of Lambert conversely testify that Lambert was not the reason they were forced to look elsewhere for gravel. To learn the identity of the persons who primarily caused TCC's customers to leave or buy elsewhere, the management of TCC need only look in the mirror.

At the other end of the distribution chain a review of the facts leads to the same result. The persons who formed Alabama Gravel—the company which in truth mined and sold gravel to Simcala, Globe and Maddox Stone—completely refute TCC's suggestion that Lambert was a part of that company. TCC cannot use circumstantial evidence or inferences to overcome the testimony of all of the actual owners/operators of Alabama Gravel who all deny that Lambert was an employee, officer owner or participant in that business. *See* Part I ¶ 1. The facts simply are that Harry Lambert did not materially affect the decisions of Simcala, Globe or Maddox Stone regarding buying gravel nor did he materially affect the decisions of Alexander, Tuten and Dassinger concerning Alabama Gravel's mining and sale of gravel. Without any evidentiary support from the major buyers and seller of the white oversize gravel TCC could not itself supply, TCC cannot create the

impression that Lambert was in the sand and gravel business through inference and innuendo.[5]

Additionally, Counsel for TCC has represented in open court that if Lambert had adhered to the non-compete it would take an additional eight months after the expiration thereof to re-enter the sand and gravel business.  *See* Part I ¶ 16. Although Lambert began trying to get back into the business soon after the agreement expired, it has taken him much longer to get to the point that he hopes to be mining and selling gravel in May 2007—16 months later.  *Id.* Accordingly, the statements of counsel for TCC should be considered an admission that Lambert did in fact adhere to the non-compete agreement or that TCC's efforts to use this litigation for non-competitive purposes have been successful in delaying his re-entry or a combination of the two.  Regardless, neither interpretation suggests a summary judgment for TCC would be supportable or equitable.

## C.

## <u>Trucking Is Not a Similar Business to Sand and Gravel Mining</u>

TCC apparently contends that it could prevent Harry Lambert from driving a truck for any commercial trucking firm that hauls sand or gravel. To do that, TCC

---

[5] Based on TCC's own brief, inferences are permissible at the summary judgment stage only to the extent that they are reasonable.  "[A]n inference based on speculation and conjecture is not reasonable."  In addition, any inferences must be "made in favor of the nonmoving party."  [Doc. 107, pg. 29, "Summary Judgment Standard," quoting <u>Blackston v.  Shook & Fletcher Insulation Co.</u>, 764 F.2d 1480, 1482 (11th Cir. 1985).

takes the position that it was also in the trucking business. But TCC's claims that it has been in the trucking business or that the mining business and trucking businesses are the same are irrelevant, absurd and a contradiction to the sworn testimony of TCC's own 30(b)(6) deponents Horald Sorrell and Eric Nix. They are irrelevant because under Alabama law the scope of the non-compete is determined by the scope of the business *Montgomery Materials LLC* was in as of the date of the beginning of the non-compete term on January 1, 2001. At that time, Montgomery Materials was not in the trucking business and there is no evidence to contradict that. Part I, ¶ 5. Obviously, Alabama courts would not allow the scope of a non-compete relating to the sand and gravel business to be expanded to also cover the commercial trucking business if the company trying to enforce it went into the trucking business after the non-compete term began. Such an interpretation would directly contradict the express language of Alabama Code § 8-1-1.

TCC's claim that trucking and mining are similar or like businesses is patently absurd. Official U.S. Government's classification standards establish that mining and commercial trucking are in totally different and distinct business sectors. Part I ¶ 2. Persons with common sense know that common carrier trucking firms are distinct from their customers. Part I ¶ 3. Commercial carriers do not somehow change into sand and gravel mining companies, or steel suppliers,

or parts suppliers, or manufacturers depending on the load being hauled in the trailer. *Id.* Defendants have proven that Carol's Contracting, Inc. is a common carrier commercial trucking firm authorized to haul freight in Alabama for hire. [Exhibit B: Doc. 83]  Defendants have also proven that neither TCC nor Foley Materials have ever been so authorized. [Exhibit K: Doc. 83]  Indeed, Foley Materials has a DOT License number only as a private carrier providing ancillary hauling incidental to its primary business—which at the present time appears to be ready mix concrete.  Part I ¶¶ 2 & 4c.  Accordingly, TCC's contention that it was in the trucking business is spurious as is any claim that they are similar.

Furthermore, the contention that TCC was in the trucking business totally contradicts supposedly sworn testimony by TCC's corporate representatives. Before they realized the legal implication of their testimony, Horald Sorrells and Eric Nix testified that TCC and Foley Materials were not in the commercial trucking business, that they did not consider commercial trucking companies to be business competitors, and that they had no plans to go into the trucking business. [Doc. 39: Exhibit B, pages 59:2-59:8; 60:3-60:7 & 35:12-35:19 & Exhibit C, pages 33:16-34:8 & 28:2-29:21.]  As the Court may recall, it was also Horald Sorrells who testified without equivocation that TCC was in the business of being a holding company effective April 1, 2005 and that TCC had not been in the aggregate business since that date. [Doc. 39: Exhibit C, page 14:16-22 & 21:10-16]  In fact,

new evidence supports their original testimony that TCC ceased aggregate operations in this territory in April 2005.  Part I ¶ 4.

The contention of TCC that Lambert's driving a commercial truck is a violation of the non-compete is also contradicted by TCC's own conduct.  The evidence is undisputed that TCC employees/managers were directly aware of Lambert driving trucks loaded with gravel to/from TCC's locations as early as June 2002 because Lambert made no effort to hide his work as a truck driver from TCC or anyone else.   [Doc. 39: Exhibit F; Doc. 86: Exhibit F at pages 23:6-29:21; & Doc. 87: Exhibit A at ¶ 18]  This either establishes that TCC did not consider Lambert's driving gravel trucks for a common carrier to be a violation or that TCC should be prevented from now contending that driving a truck for a commercial carrier was a violation of the non-compete relating to the sand and gravel business. In any event, driving a truck loaded with sand or gravel for a common carrier does not amount to engaging in the sand and gravel business.

## D.

## Responding to Questions Is Not Engaging in the Business of  Mining or Selling Sand and Gravel

Other than perhaps driving a commercial vehicle for no pay, the only "business" Lambert actually conducted during the term of the non-compete was to serve as a consultant for two clients located outside of the protected territory.

[Doc. 86: Exhibit A at ¶¶ 20-21]  Indeed, many of the so-called "meetings" listed by TCC initially arose out of Lambert's consulting work outside of the territory.  In that context Lambert certainly answered questions posed by friends and acquaintances who sought him out for information.  Part I ¶ 12. But TCC contends that the word "assist" in the non-compete should be taken out of context and expanded to become a prior restraint on Lambert's ability to associate with friends or respond to their questions or to, it appears, even help someone on a gravel truck change a tire.   Lambert's communications with long-time friends and acquaintances who buy gravel and sell gravel in this area, as well as those who supply the industry, were sporadic, incidental and not part of a concerted effort by Lambert to engage in the sand and gravel business.  In fact, Lambert often made a point of telling people he could not engage in the business and he simply referred them to those that might.  *See, e.g.*, Part I ¶ 12a. Again, non-compete provisions should be looked upon with disfavor, strictly interpreted and reluctantly upheld rather than expansively enforced to the extent TCC would have this Court do. Hill v. Rice, 259 Ala. 587, 67 So. 2d 789 (1953).  Interpreting the non-compete with the correct standard of review will not result in granting summary judgment for TCC.

## E.

## <u>TCC Had No Protectable Interest</u>

If the Court somehow determines that trucking is similar to mining, it should determine that the restriction does not meet other requirements for enforceability. Under Alabama law, courts should only enforce a covenant not to compete fitting within the exception of Section 8-1-1(b) if the following four additional requirements are met:

1.      The employer has a protectable interest;

2.      The restriction is reasonably related to that interest;

3.      The restriction is reasonable in time and place; and

4.      The restriction will impose no undue hardship on the employee.

<u>Clark v. Liberty Nat'l Life Ins. Co.</u>, 592 So. 2d 564, 565-566 (Ala. 1992) *quoting* <u>DeVoe v. Cheatham</u>, 413 So. 2d 1141, 1142 (Ala. 1982).  TCC's claim lacks all of these elements. Whatever protectable interest TCC had in preventing competition from Lambert evaporated when it created a new legal entity to operate the sand and gravel business in this area and became only a holding company.  However, there are additional reasons TCC had no protectable interest in keeping Lambert from driving a truck or answering questions in this area even if such actions somehow led to the formation of competing companies owned by others. TCC had no right to be free from competition in this area in general.  Lambert did not appropriate any

valuable or unique trade information from Montgomery Materials LLC.  Oddly, TCC apparently contends that <u>after</u> the non-compete term began Lambert could not earn a living in any business—such as commercial trucking—where he might learn information that would be valuable to him after the non-compete expired or—for that matter—pass such knowledge on to anyone else upon request and without compensation.  Such a broad interpretation of the effect of non-competes is directly contrary to the restricted and narrow construction Alabama public policy demands.

In addition, the facts establish that TCC did not pay anything to Lambert for the non-compete.  Part I, ¶ 18.  It only paid Montgomery Holdings LLC for the one-half of the assets of the company.  There was no consideration for any agreement of Lambert to honor the non-compete paid by TCC to anyone.  If TCC had believed it had a valuable and protectable interest in keeping Lambert out of the sand and gravel business, it certainly should have paid something to Lambert and designated it as such.  Furthermore, here, TCC clearly intended to discharge Lambert as an employee upon the closing of the buy-sell and the implementation of the non-compete agreement which makes enforcement of the agreement even more unfair and egregious.

## F.

## Agreement Provisions Were Not Reasonably Related To Protectable Interests of TCC

TCC makes no effort in its brief in support of its motion to defend the scope of the non-compete. Those provisions are void because they are not reasonably related to legitimate business interests because the provisions of the agreement prohibit more than engaging in the sand and gravel business in this area and are based upon the assumption that TCC could acquire and exercise monopoly power if successful in keeping all competitors out of this territory for five years. *See* Doc. 87: Part IV(G); Sheffield v. Stoudemire, 553 So. 2d 125, 126 (Ala. 1989) (holding restriction from competing "in any way" with Sheffield for a period of 60 months within a 50-mile radius of Thomasville was not reasonably related to Sheffield's interest).

## G.

## Non-Compete Term of Five Years Was Unreasonable

The restrictions on Lambert were also unreasonable as to duration. Five year restrictions have been considered too long by several Alabama courts. *See* Sheffield, *supra*; Calhoun, *supra*; *see also* Mason Corp. v. Kennedy, 286 Ala. 639, 244 So. 2d 585 (1971). This is true especially when the information obtained by the employee was not sufficiently substantial or unique to be protectable and the

hardship on the employee was great. *Id*. Even very short restrictions—such as six months—have been declared unreasonable under similar circumstances. Birmingham Television Corp. v. DeRamus, 502 So. 2d 761 (Ala. Civ. App. 1986). *See also*, Blalock v. Perfect Subscription, 458 F. Supp. 123 (S.D. Ala. 1978), *aff'd*, 599 F.2d 743 (5th Cir. 1979)(120 day covenant against magazine salesman against public policy and not within exceptions). Under these undisputed facts, five years was unreasonable as a matter of law.

## H.

### Non-Compete Restrictions Caused Undue Hardship on Lambert

In addition to the authorities cited in Doc. 87: Part IV(I), Lambert would note that as of the filing of this response he is still not able to engage in the business of mining and selling sand and gravel in this area and for all that appears it will take him 16 months after the expiration of that agreement to do so. Part I, ¶ 16. The restrictions on Lambert set forth in the Agreement would have been expected to and have indeed caused undue hardship upon former Montgomery Materials LLC employee Lambert. Here, TCC attempts to restrict Lambert from engaging in the "only trade he [knew] and by which he [could] support himself." *See* Chavers v. Copy Products Co., 519 So. 2d 942, 945 (Ala. 1988). As stated in Hill v. Rice, 259 Ala. 587, 67 So. 2d 789 (1953), undue hardship exists when a restriction "imposed on the employee [a] greater restraint than is reasonably

necessary to secure to the business of the employer . . . such protection, regard being had to the injury which may result to the public from restraining the breach of the covenant, in the loss of the employee's service and skill and the danger of his becoming a charge of the public." *Hill*, 249 Ala. 592-93, 67 So. 2d at 794.  For example, the Alabama Supreme Court has found that a 5-year, 50-mile covenant would impose an undue hardship on an insurance agent who is "50 years old, married and possesses significant financial obligations." Sheffield, *supra*, 553 So. 2d at 127; *see also* Calhoun v. Brendle, Inc., 502 So. 2d 689 (Ala. 1986) (holding that covenant could not be enforced against an employee who was trained and had experience only in the business prohibited).  Additionally, courts in Alabama are reluctant to enforce covenants when the employment lasted for only a brief period. *See, e.g.*, Sheffield, *supra* and 1 Malsberger, COVENANTS NOT TO COMPETE: A STATE-BY-STATE SURVEY, pg. 120  (3rd Ed. 2001).  Here, Lambert's employment lasted only about three years before TCC invoked the buy-sell provision.  At the time of the covenant he was over 50-years-old and the sand and gravel business was his only real marketable skill. At the time the buy-sell was invoked he was over 54-years-old and had spent his time loyally trying to increase the value of Montgomery Materials. During the term of the non-compete Lambert contracted bladder cancer which limited his ability to even drive trucks. Accordingly,

enforcement of a prohibition from engaging in the only employment he really knew for five years was unreasonable and unenforceable.

## I.

### TCC Has Unclean Hands

TCC has very unclean hands in this case. TCC has suggested that its loan to a direct competitor of Montgomery Materials LLC was not a violation because it occurred after TCC had triggered the buy-sell and before the closing date of the transaction or that Harry Lambert knew about it.  In fact, the transaction was hidden from Lambert.  [Exhibit X: ¶ 40]  Again, imagine what TCC would allege if Lambert had made a $100,000 loan to Alabama Gravel or its founders during the term of the non-compete.  There are only two conclusions one can reach from this conduct: (1) TCC apparently interprets the Agreement to allow direct assistance of competitors more than Lambert has ever incidentally assisted Alabama Gravel; or (2) TCC blatantly violated the terms of the Agreement and now seeks enforcement of that Agreement in bad faith to an extent far beyond that which it was willing to apply to itself.  "One of the time honored maxims of equity is that 'He who comes into equity must come with clean hands.'"  *See* Helms v. Tullis, 398 So. 2d 253, 254 (Ala. 1981) ("applying doctrine where plaintiff misled electrical cooperative into believing that neighbors' land in fact was owned by himself"); *see also* Dixson v. C. & G. Excavating, Inc., 364 So. 2d 1160, 1162 (Ala. 1978) (one who seeks

equitable relief must come into court with clean hands); <u>Durr Drug Co. v. Acree</u>, 194 So. 544, 546 (Ala. 1940) (complainant will be denied relief in equity on account of any unconscientious conduct connected with the controversy by which he takes advantage of his own wrong).

The doctrine of laches should also be considered. As has been mentioned previously, TCC knew as early as June 2002 that Harry Lambert was driving trucks loaded with sand and gravel for a commercial trucking company.  Yet it waited until 2 months before the agreement expired on January 1, 2006 to file suit and try to further delay Harry Lambert from entering the business by forcing him to siphon off capital in legal fees.  TCC's owner Foley has told third parties that he intends to drive Harry Lambert out of the business and the progress of this litigation evidences that it is being pursued for non-competitive reasons and, so far, has been successful in delaying Lambert's re-entry into the business.  Part I ¶¶ 16, 17.  In any event, this Court, in equity, should not countenance the conduct of TCC and should deny summary judgment to TCC and grant summary judgment for the defendants.  *See* <u>Clark Constr. Co. v. Pena</u>, 930 F. Supp. 1470, 1480 (M.D. Ala. 1996) ("[t]he doctrine of laches is based upon maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity"), *quoting* Black's

Law Dictionary 875 (6th ed. 1990); (holding doctrine barred plaintiff realty company's action to set aside a contract award where it waited nearly two months after award had been made to take any action).

## J.

### Terms of General Release Apply to Defendants If TCC Allegations Are True

If Lambert was indeed improperly acting as an agent, servant or employee of Alabama Gravel, as TCC argues but never proves, then Lambert would be entitled to dismissal under the terms of the general release signed by TCC in June 2006. The terms of the release do not reserve any claims against Lambert and generally release Alabama Gravel

> and its successors, assigns, employees, directors, officers, agents, subsidiaries, affiliated companies, attorneys, members and representatives from any and all claims, demands, damages, actions, causes of action, or suits of any kind whatsoever, whether known or unknown, relating to, arising from or connected in any way with any and all claims which were asserted or which could have been asserted in the above-styled cause or to any action taken by or on behalf of Alabama Gravel in the prosecution of this action. [Doc. 74]

TCC cannot on the one hand claim that Lambert was an undisclosed agent of Alabama Gravel and on the other deny that they have released agents of Alabama Gravel, known or unknown.

# III.

## TCC's Version of the Facts are Misleading, Incomplete, or Contradictory

### A.

### Credibility of Witnesses

Throughout TCC's brief, TCC comments about the credibility (or lack thereof) of witness testimony.  For example, TCC consistently questions Carol Lambert's testimony regarding the formation of her company, her involvement with Alabama Gravel, and her attempts to earn some income for the Lamberts while Harry Lambert was unable to obtain meaningful employment for five years under the TCC noncompete agreement.  [Doc. 107, pgs. 7-10].  TCC summarizes its evaluation of her testimony on page 9 of its brief, where it states that "Mrs. Lambert's story, respectfully, is implausible."  [*Id*., pg. 9, n.5].  TCC reiterates its commentary/argument on page 10 of its brief, stating that Harry Lambert's testimony that he received no compensation from Defendant CCI "is implausible, and with all due respect, totally untrue."  [*Id*., pg. 10, n.8].

TCC's subjective assessment of witness testimony is not limited to the Lamberts.  For example, TCC questions Samuel Estock's testimony stating that Harry Lambert did not order equipment from Southern Wire Enterprises, Inc., on behalf of Alabama Gravel.  [*Id*., pg. 23].  TCC questions the "purported purpose" of a meeting between Robert Alexander and Mike Gentry.  [*Id*., pg. 16].  TCC also

states that Defendants' position regarding certain phone calls made during the period of the non-compete is "not credible."  [*Id.*, pg. 25].  In the same paragraph of its brief, TCC admits that Defendants are able to support their position by citing sworn testimony of other witnesses (i.e., the call participants) that the calls had nothing to do with the sand and gravel business.  [*Id*].

Such comments are clearly not appropriate for this Court's consideration in a summary judgment motion.  *See* Fed. R. Civ. P. 56; <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1316 (11th Cir. 2001) (holding that assessments of witness credibility cannot, by definition, be resolved at summary judgment); <u>Bischoff v. Osceola County</u>, 222 F.3d 874, 876 (11th Cir. 2000) (holding that district court erred in making findings of disputed facts and judgments regarding credibility at summary judgment stage); <u>Kern v. Std. Fire Ins. Co.</u>, 2006 U.S. Dist. LEXIS 46283, 2:05-CV-00698-DRB (M.D. Ala. July 7, 2006) ("*Issues concerning **credibility of witnesses** and weight of the evidence are questions of fact which requires resolution by the trier of fact"*) (emphasis in original), *quoting* <u>Tippens v. The Celotex Corp.</u>, 805 F. 2d 949, 953-54 (11th Cir. 1986).

Apparently, TCC is attempting to either (1) present the facts in such a way so as to make this Court believe that there are genuine issues of material fact or (2) present the facts in such a way so as to make this Court believe that credibility of witnesses is an appropriate argument to make at this juncture.  Under the former

scenario, TCC is making a veiled attempt to turn its "motion for partial summary judgment" into a litany of reasons why judgment as a matter of law should *not* be granted.[6]  Under the latter scenario, this Defendant has no doubt that the Court is well aware of the proper summary judgment standard under FED. R. CIV. P. 56.

Under either scenario, it is clear that TCC has no choice but to comment on the credibility of witnesses (despite the inappropriateness of doing so at this stage) because the witnesses do not support its version of the case.  A plain reading of the witness testimony – credibility aside – shows that the evidence overwhelmingly supports Defendant Lambert's position.  This is particularly damaging for TCC since this Court has been very generous during the discovery phase of this matter in allowing TCC to pursue any and all "leads" which it represented to the Court as being potentially relevant in proving its case.  Now that the discovery phase is over, however, it is clear that TCC's expensive and protracted attempts to prove its claims against Defendant Lambert have fallen well short.

**B.**

**Cell Phone Conversations**

Several witnesses testified that they borrowed Defendant Lambert's cell phone on numerous occasions.  For example:

---

[6] TCC's Motion for Partial Summary Judgment seems disingenuous in that (1) issues of fact are presented as though they are disputed and (2) its brief is utterly lacking in any citations to legal authority which would support judgment *as a matter of law* in its favor.

Q.   Did you ever talk to Mr. Lambert about the steel that you were going to order from Southern Steel?

A.   I borrowed his phone to call Southern Steel before.

Q.   How many times?

A.   I can't remember.  I can't remember how many times.

Q.   More than five?

A.   Could have been because my phone didn't get good reception up there.

…

Q.   Were there any other occasions that you borrowed Mr. Lambert's phone to make phone calls that dealt with the Deatsville site?

A.   You mean just to call Neal?

Q.   To call anybody on any issue related to the Deatsville site.

A.   I've called Neal.  And I think I used it one time or two to call National Rental.

…

Q. … did Mr. Lambert mention to you anything about him borrowing your cell phone?

A.   Borrowing mine?

Q.   Yes, sir.

A.   Shoot, I can't remember.  We borrowed so many cell phones back and forth, I don't know.

[Exhibit R: page 62: line 22 to page 64: line 7]

Q.    You ever borrowed Mr. Lambert's cell phone?

A.    Yes, numerous times.

Q.    Where were you when you did that?

A.    Mainly at the Gentry pit.

Q.    Why did you borrow his cell phone?

A.    Well, sometimes I forget mine or I didn't have signal.

[Exhibit P: page 84: lines 4-13]

Q.    Did you ever -- I may have asked you this before, did you ever borrow [Harry Lambert's] phone?

A.    I borrowed his phone, yes, sir.

Q.    Where were you when you did that?

A.    Well, probably at the Gentry pit.

Q.    Do you know how often you did that?

A.    No.

Q.    Was it more than once?

A.    Yes.

[Exhibit M: page 208: line 18 to page 209: line 8].  *See also* Exhibit X, ¶41.

Of the phone conversations that Lambert had with individuals in the sand and gravel business, many of these were social in nature. [Exhibit P: page 98: line 17 to page 99: line 10] [Exhibit R: page 39: lines 5-14] [Exhibit O: page 31: lines 1-5].

TCC suggests that evidence that Defendant Lambert's cellular telephone bill reflects "hundreds" of phone calls to and from his phone is proof not only that Defendant Lambert made those calls but that Defendant Lambert was engaged in the sand and gravel business when he made those calls. First, talking on the telephone, in itself, is not violative of a non-compete agreement. Second, TCC ignores, or dismisses as non-credible, the evidence which shows that other individuals often used Defendant Lambert's phone. Third, TCC ignores, or summarily dismisses, the evidence which shows that many, if not all, of the calls were made for purely social reasons. Even TCC's farfetched and broad reading of the noncompete agreement would not support an assertion that Defendant Lambert was required to cut off all communications, over a five-year period, with anyone engaged in the sand and gravel business, many of whom he had known for several years. Further, such a reading of the agreement would not comport with Alabama law, which generally disfavors non-compete agreements and which requires a strict and limited construction thereof. *See* Ala. Code § 8-1-1; Pitney Bowes, *supra*; Livingston v. Dobbs, *supra*. TCC's motion is due to be denied.

# IV.

## Conclusion

TCC's claims against Lambert have so many flaws that it appears TCC has made no real attempt to carry its burden under Rule 56.  It appears that this action is nothing more than a calculated method of delaying or suppressing competition from a former employee after the term of a non-compete/non-solicitation agreement has expired. Defendant Lambert prays that this Court will halt TCC's efforts to oppress him by litigation.  Lambert respectfully requests that this Court deny the motion for summary judgment filed by TCC and grant the pending motion of the Defendants.

Respectfully submitted this 16[h] day of March 2007.


        */s/ Dennis R. Bailey*         
Dennis R. Bailey
Bethany L. Bolger
Attorneys for Defendant Harry E. Lambert

Of counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama   36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rsjg.com (e-mail)
bbolger@rsjg.com (e-mail)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing pleading through the ECMF system on this the 16th day of March 2007 which will forward same to:

Robin G. Laurie, Esq.
Griffin Lane Knight, Esq.
Balch & Bingham, LLP
105 Tallapoosa Street, Suite 200
Montgomery, Alabama   36104-3515

Thomas Gristina, Esq.
William Leonard Tucker, Esq.
Page, Scrantom, Sprouse, Tucker & Ford
Synovus Center, Third
1111 Bay Avenue
Columbus, Georgia   31901


_/s/ Dennis R. Bailey_____
Of counsel