# Exhibit M

Case 2:05-cv-01026-CSC   Document 116-5   Filed 03/16/2007   Page 1 of 14

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


THE CONCRETE COMPANY,        )

    Plaintiff,           )

vs.                          ) CASE NUMBER:

HARRY E. LAMBERT and         ) 2:05-CV-1026-ID-CSC

CAROL'S CONTRACTING,         )

INC.,                        )

    Defendants.          )


    DEPOSITION OF RICHARD D. WYMER,

    In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy Weldon, am hereby delivering to Thomas F. Gristina, the original transcript of the oral testimony taken on the 11th day of January, 2007, along with exhibits.

    Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

1   A.   I don't recall. It was the same
2 time area.
3   Q.   And do you know why Mr. Lambert
4 was at Simcala that day?
5   A.   He had in the past picked up a
6 product we called dross --
7   Q.   Can you spell that, sir?
8   A.   D-R-O-S-S.
9   Q.   Okay.
10   A.   -- to make deliveries to a
11 customer we had. And again, this is not my
12 department. But I believe Marietta. I
13 didn't ask him. But I assumed he was in
14 there to pick up a load of that.
15   Q.   And when you saw him, did you all
16 have a conversation?
17   A.   Yes.
18   Q.   What did you all talk about?
19   A.   I asked him, I said it looks like
20 we're going to have a gravel problem. I
21 know you're not in the gravel business now,
22 you're driving a truck, but you've been in
23 the gravel business for years and years, you

1 drive a truck to many places that I don't
2 go, would you have some idea where I could
3 obtain some larger size gravel.
4          And his answer again was, well,
5 I'm in a non-compete. I can't be in the
6 gravel business. But I'll check around and
7 somebody might call you.
8     Q.   Is there anything else you can
9 recall about that conversation?
10    A.   Oh, yes. I took him over and I
11 felt sure Eddie Boardwine had not met
12 Harry. So I just took him over and
13 introduced him.
14    Q.   And did he have a conversation
15 with Mr. Boardwine in your presence?
16    A.   Pretty much the same as what I
17 just said that he and I had a conversation
18 about.
19    Q.   Was there any differences in the
20 conversation?
21    A.   Not that I recall.
22    Q.   All right. Now, how long did you
23 all speak with Mr. Lambert from the time you

1 sell it then if they wished without
2 affecting the quality of the rock?
3  A. My assumption is yes.
4  Q. And you purchased over your years
5 with Simcala -- I listed at least nine
6 different suppliers. Are there probably
7 even more than that, that you have dealt
8 with over the years?
9  A. That's a reasonable number.
10  Q. All right. Have any of those
11 suppliers developed a reputation in your
12 mind as being better than others in terms of
13 working with them to supply the needs of
14 your plant?
15  A. No.
16  Q. Do good suppliers give you as much
17 warning as possible if there are going to be
18 any significant changes in the quality or
19 quantities that they might be able to
20 supply?
21  A. Yes.
22  Q. Has any supplier ever required you
23 to buy rock you thought was inferior in

1 order to get adequate supplies of rock you
2 needed to run the plant of a higher quality?
3    A.   You're asking anybody, any
4 supplier?
5    Q.   Yes, sir.
6    A.   Not that I recall.
7    Q.   As I understand it, you -- would
8 it be fair to state that you were shocked to
9 learn in January of 2005 that the Concrete
10 Company was not going to meet your needs for
11 the near future?
12   A.   Yes. We got scared.
13   Q.   Is that especially true because as
14 early as December 21st, three weeks earlier
15 you had been given indications that they had
16 adequate supplies for at least six more
17 months?
18   A.   Yes. We felt good about that.
19   Q.   Based on your training and
20 experience as a purchasing agent for raw
21 materials of this type, would it surprise
22 you that a company would believe they had
23 adequate supplies on December the 21st, 2004

1      A.    Yes.

2      Q.    Why would you have expected that
3 from this supplier?

4      A.    Well, any supplier. That would
5 give us more time to search for a
6 replacement.

7      Q.    If you had had from August or
8 September of 2004 to find a replacement for
9 fifteen hundred tons of gravel a month by
10 January 2005, would you have been in a
11 better position to make arrangements to do
12 that?

13     A.    Yes.

14     Q.    Let me show you what is marked as
15 TCC 1984.

16     A.    What's a DOR?

17     Q.    I don't know. I believe there's
18 been testimony that it's some kind of daily
19 operating report.

20           But my question is, please review
21 this and tell me if this indicates to you as
22 a person in the gravel purchasing business
23 that Don Triplett, the person with whom you

1 were dealing, and Hugh Sorrell, the person
2 with whom you also dealt with during this
3 period of time, were aware as early as
4 August 31st, 2004 that there was likely to
5 be a supply problem for this type of gravel
6 as of January 2005?
7      A.   That surprises me.
8      Q.   Why does this surprise you, Mr.
9 Wymer?
10     A.   Because of what you just said
11 earlier.  It looks like by reading this, it
12 was knowledgeable in August of what we were
13 told at the end of the year.
14     Q.   Is this consistent -- Is this
15 August 31, 2004 e-mail from Don Triplett to
16 Hugh Sorrell copied to Frank Foley
17 consistent with what you were told in
18 December of 2004?
19     A.   Yes.
20     Q.   I thought in December of 2004 you
21 were told that they had adequate supplies?
22     A.   Correct.
23     Q.   So is this e-mail consistent with

1 almost out of oversize.

2          Do you recall knowing that in
3 October of 2004 or do you recall first
4 learning of that January the 4th, 2005 as
5 your notes reflect?

6     A.   Early 2005.

7     Q.   Now, the final sentence of that
8 says, quote, unless we improve production of
9 this size, we will be facing a rationing
10 situation before too long. Would you have
11 liked to have known that in October of 2004?

12    A.   Sure.

13    Q.   Why would you prefer to know it
14 then than in January 2005?

15    A.   Why would I want to know again?

16    Q.   Why would you want to know it
17 earlier?

18    A.   Oh. To give me time to go out and
19 source what I wasn't going to get from the
20 current supplier.

21    Q.   And look at the last page of this
22 exhibit, TCC 1945. It's a January 11 e-mail
23 from Don Triplett to Hugh Sorrell of

1 some statements you make there about Alabama
2 Gravel. I'm going to ask you essentially
3 the same questions about Harry Lambert.
4          Did Harry Lambert solicit or
5 induce Simcala to purchase less oversize
6 gravel from the Concrete Company?
7     A.   No.
8     Q.   Did Harry Lambert interfere in any
9 business relationship between Simcala and
10 the Concrete Company?
11          MR. GRISTINA: Object to the form.
12    A.   No.
13    Q.   Did you in your position as
14 purchasing manager of Simcala make the
15 unilateral decision to seek out other
16 suppliers, including Alabama Gravel, after
17 you received information which led you to
18 believe that the Concrete Company might be
19 unable to supply Simcala with adequate
20 quantities of suitable oversize gravel?
21    A.   Yes.
22    Q.   When you learned that the Concrete
23 Company might be unable to supply Simcala

1 with adequate quantities of oversize gravel,
2 did you attempt to make it known in this
3 area that Simcala was looking for new
4 sources of white oversize gravel?
5    A.   I'm not sure what you mean by did
6 I make it known. I contacted Elmore. We
7 went to Elmore. The statement previously
8 made that I ran into Harry at the guard
9 office and asked if he knew of anybody.
10 Beyond that, no.
11   Q.   Did you ever deal with Harry
12 Lambert relating to arranging for the
13 purchase of white oversize gravel for
14 Alabama Gravel?
15   A.   No.
16   Q.   You mentioned that Harry was a
17 truck driver when you mentioned this to him
18 first?
19   A.   Yes.
20   Q.   And he was carrying what you
21 described as dross?
22   A.   Yes.
23   Q.   Does the fact that he was a truck

1 driver driving a truck that was loaded with
2 dross means that he was in the silicon metal
3 business?
4      A.   No.
5      Q.   Did the thought ever occur to you
6 that Harry Lambert was violating his
7 non-compete by driving a truck?
8      A.   No.
9      Q.   You were asked many questions by
10 Mr. Gristina about whether TCC was
11 accommodating to you.  And my question is,
12 if TCC was so accommodating to Simcala, why
13 did you switch over and start buying gravel
14 from Alabama Gravel?
15           MR. GRISTINA:  Objection to form.
16      A.   I'm lost on what's TCC.
17      Q.   The Concrete Company.  If the
18 Concrete Company was so accommodating, why
19 would you stop buying from them and start
20 buying from Alabama Gravel at a higher
21 price?
22      A.   They were accommodating as far as
23 accommodations went.  But we went elsewhere

Page 223

1 because they didn't have it to sell.

2  Q. And who told you they didn't have
3 it to sell?

4  A. Hugh Sorrell and Don Triplett.

5  Q. And did you go to a location and
6 actually see for yourself what they had on
7 the ground?

8  A. At a later time, I went to Ward.
9 I never went to Phenix City.

10 Q. And with Ward, did they have a
11 large quantity on the ground?

12 A. No.

13 Q. Did you consider Carol's
14 Contracting trucking company to be in the
15 silicon metal business?

16 A. No.

17 Q. Did you consider that trucking
18 company to be in the sand and gravel
19 business?

20 A. No.

21 Q. What kind of business did you
22 understand Carol's Contracting was in?

23 A. Trucking.

Page 224

1    Q.   Is that a different business than
2 the silicon metal business?
3    A.   Yes.
4    Q.   Is that a different business than
5 the sand and gravel business?
6    A.   Yes.
7         MR. BAILEY:  That's all I have.
8         MR. GRISTINA:  Nothing further.
9 Thank you very much for your time.  I
10 realize it's been a long day.
11        (Whereupon, Defendant's Exhibit
12 No. 1 was marked for identification and
13 attached to the original transcript.)
14
15
16
17
18
19
20
21
22
23