# Exhibit O

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF ALABAMA
                   NORTHERN DIVISION
```

THE CONCRETE COMPANY,           )
                                )
     PLAINTIFF,                 )
                                )
vs.                             ) CIVIL ACTION FILE NO:
                                ) 2:05-CV-1026-ID-CSC
HARRY E. LAMBERT and CAROL'S    )
CONTRACTING, INC.,              )
                                )
     DEFENDANTS.                )

                      * * *

The following deposition of RANDOLPH C. WILLINGHAM was taken pursuant to stipulations contained herein, the reading and signing of the deposition waived, before Tanga Donnelly, Certified Court Reporter in the State of Georgia, on January 16, 2007 at 1170 Peachtree Street, Atlanta, Georgia commencing at 9:45 a.m.

```
    ***********************************
         METRO ATLANTA REPORTERS, INC.
            CERTIFIED COURT REPORTERS
              POST OFFICE BOX 1442
            SNELLVILLE, GEORGIA 30078
         770-958-2344   FAX 770-985-5044
    ***********************************
```

1  A.   Best I can say it was several, meaning many,
2 months after that he accidentally picked up a load for me
3 when he was leased to Foshee Trucking and called me on
4 his cell phone and says, guess what, I've got a load of
5 your gravel on my truck.
6  Q.   And what did he do with that load of gravel?
7  A.   He delivered it.
8  Q.   To which company of yours?
9  A.   None.
10  Q.   Was it a personal shipment of gravel?
11  A.   No; I sold it to a customer.
12  Q.   Which customer was that?
13  A.   I couldn't tell you.
14  Q.   You can't recall which customer?
15  A.   I don't recall.
16  Q.   What is the business of Willingham Stone
17 Company?
18  A.   Well, it resells gravel and agricultural
19 limestone.
20  Q.   And where does Willingham Stone Company obtain
21 the gravel that it resells?
22  A.   Various suppliers.
23  Q.   And one of those suppliers would be The
24 Concrete Company; is that correct?
25  A.   Yes.

1 'cause we mentioned Willingham Stone, so that would be
2 three companies. Are Agg-Tran and Sand-Rock Transit in
3 the same business?
4    A.   Yes.
5    Q.   And do they receive aggregate product by rail?
6    A.   Yes.
7    Q.   They both receive them by rail?
8    A.   Yes.
9    Q.   And do they receive aggregate product by truck?
10   A.   Yes.
11   Q.   Are there any other ways that aggregate product
12 is delivered to Agg-Tran and Sand-Rock?
13   A.   No.
14   Q.   Does Willingham Stone have a storage facility?
15   A.   No.
16   Q.   Is Willingham Stone, it would be proper to
17 refer to Willingham Stone as a broker of aggregate?
18   A.   Yes.
19   Q.   Now, after Mr. Lambert called you and told you
20 that he accidentally had picked up a load of Willingham
21 Stone gravel, what was the next dealing you had with Mr.
22 Lambert?
23   A.   He told me he was leased to Foshee Trucking and
24 I was doing business with Foshee Trucking. And since we
25 had a long connection and I wasn't buying gravel from him

1 anymore, I thought it was very fitting that I tell Foshee
2 in the future if I give you an order and Harry can haul
3 it, I'd appreciate you letting him haul it.
4    Q.    What is the business of Foshee Trucking?
5    A.    They haul sand and gravel.
6    Q.    And do you know what the relationship was
7 between Mr. Lambert and Foshee Trucking?
8    A.    He was leased to them.
9    Q.    What does that mean when you say he was leased
10 to them?
11    A.    It was his truck, he drove it. They -- I
12 don't know who carried the insurance. But when you order
13 materials, you order deliveries, you usually call the
14 dispatcher for Foshee.
15    Q.    And so as a broker, am I correct, then, that
16 you would -- you first as a broker need to locate a
17 source for the aggregate that you are brokering?
18    A.    Well, I've had sources for a long time.
19    Q.    And can you tell me, sir, how you are contacted
20 about the aggregate that you sell? Do customers call
21 Willingham Stone directly?
22    A.    Yes.
23    Q.    And then you go to your sources to provide that
24 aggregate product to the customer?
25    A.    Yes.

1   Q.   And the aggregate never actually travels
2 through Willingham Stone's storage facilities?
3   A.   Yes.
4   Q.   'Cause they don't have any?
5   A.   Right.
6   Q.   And am I correct, sir, that the transportation
7 of that aggregate product is a critical part of that
8 relationship with your customers?
9   A.   Right.
10  Q.   And how does Willingham Stone ensure that the
11 aggregate it is selling is transported to its customers?
12  A.   How does it ensure it?
13  Q.   Well, I'll clarify. What means does Willingham
14 Stone use to get the gravel from its suppliers to its
15 customers?
16  A.   Truck.
17  Q.   Does it use any rail?
18  A.   No.
19  Q.   And from April 2002 up to December 2nd, 2006,
20 what trucking companies did Willingham Stone use to
21 deliver its aggregate product to its customers?
22  A.   You want all of them?
23  Q.   Well, you mentioned Foshee. Is there others
24 that you can recall?
25  A.   Lance Trucking, Wallace Allen, West Cobb

```
 1 Building Supply, Dempsey, Incorporated, Jag Trucking,
 2 ISR, Kennedy, Fuller Five, Carol's Contracting,
 3 Montgomery Bulk, Lovick Trucking, KNK, Wilbeck, Tommy
 4 Roberts.  That's 90 percent of them.
 5      Q.   Any others that you can recall?
 6      A.   They'll come to me gradually.
 7      Q.   If they do, if you could let me know.  Now,
 8 Carol's Contracting was one that you mentioned.  When did
 9 you first start using Carol's Contracting?
10      A.   I think that was '05.
11      Q.   And why did you --  How did you learn of
12 Carol's Contracting?
13      A.   Because Harry wasn't leased to anybody else
14 anymore.
15      Q.   And at that point had Mr. Lambert left Foshee?
16      A.   Yes.
17      Q.   And did he tell you about Carol's Contracting?
18      A.   Yes.
19      Q.   Would you like some water, sir?
20      A.   No, I'm fine.
21      Q.   Let me know if at any time you'd like to take a
22 break.  I don't think it's going to be an exceedingly
23 long morning, but if you want to take a break, it's up to
24 you.
25      A.   No, I'm fine.
```

1    A.    No.

2    Q.    Did Willingham Stone Company provide BellSouth
3 with aggregate product?

4    A.    Yes.

5    Q.    And what form of aggregate was that?

6    A.    Number Sixes.

7    Q.    And was Mr. Lambert responsible for delivering
8 large quantities of those Sixes to BellSouth on behalf of
9 Willingham Stone Company?

10    A.    Yes.

11    Q.    And did he do that when he was leased on with
12 Foshee Trucking?

13    A.    Yes.

14    Q.    During the time frame, April 2nd, 2002 up to
15 January 2nd, 2006, were there instances where you called
16 Mr. Lambert to locate sources of aggregate?

17    A.    No.

18    Q.    Were there instances where you called Mr.
19 Lambert to purchase aggregate?

20    A.    No.

21    Q.    Did you have telephone conversations with Mr.
22 Lambert during that time period?

23    A.    Yes.

24    Q.    And what was the purpose of those telephone
25 conversations?

1      A.    The purposes for all of them were to give him
2  orders and tell him where the loads went.
3      Q.    Did you ever call him when you needed to obtain
4  aggregate product?
5      A.    No.
6      Q.    And do you recall about how often you spoke
7  with Mr. Lambert during that period?
8      A.    In '03 and '04 I talked to him nearly every
9  day, sometimes several times a day.
10     Q.    And would those have been for the purpose that
11 you described a second ago?
12     A.    Yes.
13     Q.    What about in '05?
14     A.    He had other hauling, my business dropped off,
15 so we kind of drifted apart. I'd call him sometimes and
16 offer him loads. Sometimes he would take them and
17 sometimes his trucks were going to Ohio or Florida or
18 local hauling, I don't know. A lot of times he just --
19 '03 and '04 our businesses just fit like a glove. In '05
20 he had other business and my business dropped off and we
21 just didn't do as much business.
22     Q.    Do you know, would there have been any business
23 relationship that you're aware of between Mr. Lambert and
24 Agg-Tran between 2002, April of 2002 and January 2nd,
25 2006?

1 -- Well, I'll put a time period around it. From April
2 of 2002 until January 2nd, 2006, who are Willingham
3 Stone's aggregate suppliers in the Montgomery, Alabama
4 area?
5     A.   Lafarge, Martin Marietta, Elmore, Anderson
6 Rowe, The Concrete Company.
7     Q.   Any others?
8     A.   No.
9     Q.   Did Willingham Stone Company ever purchase
10 aggregate from Alabama Gravel?
11    A.   No.
12    Q.   Did it ever broker the sale of aggregate using
13 Alabama Gravel as a supplier?
14    A.   No.
15    Q.   If you look at the bottom of page two of your
16 Affidavit in the final paragraph on page two that begins
17 with I also recall, you state that in the next sentence,
18 "Most of our conversations while he was under his non-
19 compete were purely related to trucking issues because
20 the loads he hauled for me through the above trucking
21 companies were difficult as they are mostly single loads
22 going primarily to South Florida and Louisiana." When
23 you used the word most, and to a lawyer, that requires me
24 to follow up, what were the other conversations about
25 while he was under his non-compete?

1   A.   Well, he had bladder cancer.  I was concerned
2 about his health.  We talked about that.  His mother was
3 in bad shape in Tennessee, I always asked about her.  I
4 guess we talked about the weather sometimes.  I don't
5 recall anything else.
6   Q.   So the other conversations were of a personal
7 nature and not business-related?
8   A.   Yeah.
9   Q.   In the first sentence of that same paragraph
10 you write, "I also recall several occasions when Harry
11 Lambert told me that he could not go into the sand and
12 gravel business after he left Montgomery Materials in
13 April 2002."  Did Mr. Lambert say it to you just that way
14 that he could not go into the sand and gravel business?
15   A.   No.  He said I can't do anything until I get
16 out of jail, jail meaning the non-compete.  That was his
17 common response to anybody that asked him.
18   Q.   And how did you come up with the term sand and
19 gravel business for your Affidavit?
20       MR. BAILEY:  Object to the form.
21 BY THE WITNESS:  (Resuming)
22   A.   That's what we're talking about, sand and
23 gravel business.
24   Q.   Do you know if the non-compete states that Mr.
25 Lambert can't go into the sand and gravel business?

```
 1      A.     No.
 2      Q.     Do you recall if it was in 2005?
 3      A.     I don't have any idea.
 4      Q.     How did you hear that Foley had sued Mr.
 5 Lambert?
 6      A.     I don't know.
 7      Q.     Are you aware that Mr. Frank Foley didn't file
 8 the lawsuit, but that it's filed by The Concrete Company?
 9      A.     Yeah.
10      Q.     Were you -- Do you know how Robert Alexander
11 came into contact with Simcala, Inc. regarding the sale
12 of aggregate material by Alabama Gravel to Simcala?
13      A.     No.  I wasn't involved in any of that.
14      Q.     Were you involved in any way with Mr.
15 Alexander's decision to seek out a source for aggregate
16 material in the Montgomery area?
17      A.     Yes.
18      Q.     And what was your involvement with that?
19      A.     That since Foley, you call it The Concrete
20 Company, same to me, since they consistently increased
21 their prices to the extent they were cutting our volume,
22 we decided that the only way we could survive was to
23 produce our own product.
24      Q.     And what steps did you all take to do that?
25      A.     Robert went to Alabama to look around.
```

1                    CROSS-EXAMINATION

2 BY MR. BAILEY:

3      Q.   Mr. Willingham, my name is Dennis Bailey.  I
4 represent Harry Lambert and Carol's Contracting, Inc.
5 You said you are in the sand and gravel brokerage
6 business.

7      A.   Willingham Stone is.

8      Q.   Right.  Does the sand and gravel business
9 conducted by Willingham Stone hire companies in the
10 trucking business to deliver it?

11     A.   Yes.

12     Q.   Is there a difference in your mind between a
13 company engaged in the sand and gravel business and a
14 commercial trucking company?

15     A.   Two different things.

16     Q.   I believe you stated there may be as many as 10
17 to 15 trucking companies that you might hire to deliver
18 product that you arranged to sell to customers?

19     A.   It would be more than 10 to 15.  That's just
20 all the names I could pop out right there.

21     Q.   Now, the people that drive these commercial
22 trucks, would you call them truck drivers?

23     A.   Yes.

24     Q.   Would you consider truck drivers for commercial
25 trucking companies to be engaging in the sand and gravel

1 business?

2     A.    No.

3     Q.    Even if their truck is loaded with gravel,
4 would they be in the sand and gravel business?

5     A.    No.

6     Q.    Don't they normally charge you by the ton,
7 these companies that haul your product?

8     A.    Always.

9     Q.    And they don't care whether it's a ton of
10 peanuts or a ton of gravel, do they?

11    A.    No.

12    Q.    It's a ton?

13    A.    A ton.

14    Q.    And if you couldn't find Harry Lambert or
15 Carol's Contracting to hire to haul a ton of coal or a
16 ton of gravel, you could pick up the phone and find 13 or
17 14 other companies willing to do it, couldn't you?

18    A.    I do it now.

19    Q.    So the fact that Carol's Contracting was
20 conducting commercial trucking operations in Alabama,
21 what effect, if any, did that have on competition with
22 The Concrete Company?

23    A.    None.

24    Q.    In fact, would it surprise you, Mr. Willingham,
25 to learn that The Concrete Company used Carol's

1 Contracting to haul some of their product?

2  A.  That would surprise me.

3  Q.  Why would that surprise you?

4  A.  I thought there was bad blood between them.

5  Q.  Now, do you -- Under Federal Law I can use
6 this deposition at trial if you live more than a certain
7 amount of miles away from the courthouse. Can you tell
8 me approximately how many miles you live away from
9 Montgomery, Alabama, the center of Montgomery, Alabama?

10         MR. GRISTINA:  Object to the form.

11 BY THE WITNESS:  (Resuming)

12  A.  200.

13  Q.  Has Willingham Stone ever purchased gravel,
14 aggregate or any other products from Harry Lambert since
15 he worked at Montgomery Material?

16  A.  Not after he left. I'd like to add like I did
17 in the previous answer, he never asked me, suggested to
18 me or I never asked him about another source of gravel.

19  Q.  What kind of business did you consider Carol's
20 Contracting to be?

21  A.  A trucker.

22  Q.  Did you ever consider Carol's Contracting to be
23 in the sand and gravel business?

24  A.  No.

25  Q.  Are your companies, any of them, in the

1 trucking business?

2     A.    No.

3     Q.    Do you consider companies in the trucking
4 business to be competitors of your companies in the sand
5 and gravel business?

6     A.    No.

7     Q.    Now, is The Concrete Company a competitor?

8     A.    Frank Foley said that he is now my competitor,
9 yes.

10    Q.    When did he say that to you?

11    A.    As recently as three weeks ago.

12    Q.    Were you previously not competitors?

13    A.    He was my main supplier.

14    Q.    What happened, if anything, between you and Mr.
15 Foley to change your relationship?

16    A.    They planned on a price increase January 1st,
17 '06, then said they'd delay it to February or March. And
18 he and Hugh Sorrels called me the last week or two in
19 December and announced that they were going up January
20 the 1st, not only what they had said, but more than that,
21 another 50 cents on sand. And I told him we just
22 couldn't afford that, same thing I told his salesman for
23 months, that he was pricing himself out of the market.
24 And he said, we'll be good competitors. He's talking
25 about the yard he plans to put in White, Georgia five

1    A.    Foley is pretty rough on his customers.

2    Q.    You're one of his customers, or used to be?

3    A.    Right.

4    Q.    Isn't it true that somebody that mines sand and
5 gravel can stockpile that gravel and hold it in big piles
6 without it losing its value?

7    A.    Yes.

8    Q.    And by doing so, they can drive up the price of
9 the product?

10    A.    Yes.

11          MR. BAILEY:  No further questions.

12          MR. GRISTINA:  I have a few follow-ups.

13                REDIRECT EXAMINATION

14 BY MR. GRISTINA:

15    Q.    Mr. Willingham, did Mr. Lambert ever refer any
16 customers to Willingham Stone?

17    A.    No.

18    Q.    Did he refer any customers to Sand-Rock?

19    A.    No.

20    Q.    Did he refer any customers to Agg-Tran?

21    A.    No.

22    Q.    Did any customers ever contact you at
23 Willingham Stone and say they'd gotten your name from Mr.
24 Lambert?

25    A.    I don't recall any.