# Exhibit U

```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF ALABAMA
                  NORTHERN DIVISION
```

**THE CONCRETE COMPANY,**         )
                                  )
      Plaintiff,               )
                                  )
vs.                               ) 2:05-cv-01026-CSC
                                  )
**HARRY E. LAMBERT and**          )
**CAROL'S CONTRACTING, INC.,**    )
                                  )
      Defendants.              )


    Video Deposition of **LARS BERENT OSTERVOLD**, witness, called by the plaintiff, before Eric Cavanaugh, Certified Court Reporter, held at the law office of Page, Scrantom, Sprouse, Tucker & Ford, 1111 Bay Avenue, Third Floor, on the **26th day of January, 2007**, commencing at 9:35 a.m.

RUSSELL A. COCKRIT
Certified Court Reporters
P.O. Box 7143
Columbus, Georgia 31908
(706) 324-0497
cane.cockrit@letsgoout.net

1  Q.  What did Mr. Sorrell tell you?
2  A.  It was -- had to do with a non-compete of some
3  type.
4  Q.  And when was that conversation?
5  A.  Six, eight months ago.  I don't -- I don't
6  remember.  I don't know.
7  Q.  Anything else you recall about that
8  conversation?
9  A.  We just talked.  Hugh and I talked in general
10  about that.  I was at his office and we were working
11  on some equipment.
12  Q.  All right.
13  A.  It was -- yeah, I'm -- I don't know.  Well,
14  heck.  We're 207 (sic), so I guess it was last year.
15  Yeah.
16  Q.  All right.  Now, I'm going to give you some
17  time periods.  Much of this case revolves around time
18  periods, and so I'm going to be as precise as I can
19  and work with you.  And just answer these as best you
20  can recall.
21      From the time period of April 2002 up until
22  the end of 2005, do you recall having any business
23  dealing with Mr. Harry Lambert?
24  A.  No.
25  Q.  All right.  Do you recall conversations with

1  Mr. Lambert during that time period?
2     A.  I met him for breakfast one time about -- he
3  was driving a truck or something and we met at a
4  Waffle House and ate breakfast. That was a long time
5  ago.
6     Q.  Is that the only time you remember meeting
7  with Mr. Lambert during that time?
8     A.  Pretty much, yes.
9     Q.  Do you recall speaking on the telephone with
10 Mr. Lambert during that time?
11    A.  No.
12    Q.  Is he somebody that you would call frequently
13 during that time period?
14       MR. BAILEY: Object to the form. That just
15    means I -- I think the question is ambiguous. But
16    you can answer it if you want to.
17    A.  I mean, I -- no. There was no real -- real
18 reason.
19    Q.  Looking towards the time period from July 2003
20 until the end of the year. Do you have any reason --
21 do you know of any reason why you would have had
22 telephone conversations with Mr. Lambert during that
23 time period?
24    A.  Not that I recall.
25    Q.  Are you aware that we have subpoenaed a copy

```
 1   of Mr. Lambert's cellular phone records?
 2      A.   I might have been told that.  I don't know.
 3      Q.   Well, do you know of any reason why Pearce
 4   Pumps' telephone number would appear in those records
 5   during the summer of 2005?
 6      A.   One of us called each other.  I mean, I don't
 7   know.
 8      Q.   And would -- do you know what the purpose of
 9   those calls would have been?
10      A.   No.
11      Q.   Were you and Mr. -- was Pearce Pump conducting
12   any business with Mr. Harry Lambert during that time
13   period?
14      A.   No.
15      Q.   Were you conducting any business outside of
16   Pearce Pump with Mr. Lambert during that time period?
17      A.   No.
18      Q.   When did you first learn of the company
19   Alabama Gravel, LLC?
20      A.   I don't recall exactly, but it had to be 2005
21   when I talked to Robert.
22      Q.   Who was the first person that contacted you
23   about doing business with Alabama Gravel?
24      A.   I don't recall that.  More than likely it was
25   Robert Alexander.
```

```
 1      Q.   And if you could, you can take a look at
 2   your -- what's Plaintiff's 2.  And let me -- looking
 3   at     look at the whole exhibit and then I'm going to
 4   ask some questions about it.
 5      A.   Okay.  Is this it?
 6      Q.   You've got it.
 7      A.   Okay.
 8      Q.   On the first page of this exhibit, is that
 9   your handwriting?
10      A.   Yes.
11      Q.   All right.  And am I correct that this is the
12   -- the response that you mailed to Balch and
13   Bingham --
14      A.   Yes.
15      Q.   -- to the subpoena that was served in January
16   of 2006?  And I think you'll see the subpoena on the
17   second page.
18      A.   Yeah.  This was mailed to me, yes.
19      Q.   All right.  And then you then mailed back a
20   package containing these invoices and quotations to
21   Lane Knight?
22      A.   That's correct.
23      Q.   And did you prepare these documents?
24      A.   Yes.
25      Q.   And you prepared them in response to the
```

17

1  subpoena?
2     A.  Yes.
3     Q.  And are these all Pearce Pump business
4  documents?
5     A.  Well, yes, except for that drawing, which is a
6  standard drawing, which is mine.
7     Q.  Right. And I'm going to ask you about that.
8  I appreciate that.
9         All right. But the -- the drawing is -- is a
10 -- is something that you sent back to Mr. Knight?
11    A.  Yes.
12    Q.  Looking at the first quotation, it appears to
13 be dated April 4th, 2005. Do you recall who you were
14 giving that quotation to?
15    A.  Robert.
16    Q.  Mr. Robert Alexander?
17    A.  Yes.
18    Q.  And is this the Quickbooks program that
19 generated this?
20    A.  Yes.
21    Q.  What was the quotation for?
22    A.  Sand classifying plan.
23    Q.  And that's a rather specialized piece of
24 equipment; isn't it?
25    A.  Yes.

```
 1      Q.   And it looks like it cost right at seventy-
 2   nine thousand dollars?
 3      A.   Yes.
 4      Q.   At least that's what the quote was for.
 5      A.   Right, right.  I mean, I -- yeah.
 6      Q.   And had you had any business dealings with
 7   Mr. Robert Alexander before April of 2005?
 8      A.   Yes.
 9      Q.   And how long have you known him?
10      A.   Since '80 -- early '80s.  '83.
11      Q.   And -- and given that you were quote -- did
12   you end up selling this seventy-nine thousand dollar
13   piece of equipment to Alabama Gravel?
14           MR. BAILEY:  Object to the form.  It's not one
15       piece of equipment.
16           WITNESS OSTERVOLD:  Yeah.  It's -- it's --
17    MR. GRISTINA:
18      Q.   Did you end up selling the items listed on the
19   4-4-05 quotation to Alabama Gravel?
20      A.   Yes.
21      Q.   And when did you end up selling those -- those
22   items to Alabama Gravel?
23           MR. BAILEY:  You mean when were they delivered
24       or invoiced?
25           MR. GRISTINA:  Sure, sure.
```

```
1   but they are different businesses; aren't they?
2       A.  Yes.
3       Q.  I note that you -- you've used probably many
4   different shipping companies to get equipment from
5   point A to point B.
6       A.  Yes.
7       Q.  UPS is one of them, I see.
8       A.  Yes.
9       Q.  Since Harry Lambert left Montgomery Materials,
10  have -- have you done any business with him or his
11  company or any company he's ever been associated
12  with?
13      A.  No.  I mean, what -- are you talking in that
14  -- that frame?
15      Q.  Well, have you done any business with him
16  since 2006 when he was out from underneath the
17  non-compete agreement?
18      A.  We talked about a water pump.
19      Q.  And that was within the last year?
20      A.  Last six or eight months.
21      Q.  And has he purchased anything from you?
22      A.  He hasn't.  Robert did.  I mean, it was --
23      Q.  And you're aware that in 2006, Harry became a
24  consultant for Alabama Gravel?
25      A.  Yes.
```

50

```
 1     Q.  And you had some dealings with him about that
 2  then?
 3     A.  Yes.
 4     Q.  But before that, Harry had not been involved
 5  with Alabama Gravel to your knowledge?
 6     A.  That's correct.
 7     Q.  In your discussions that you may have had with
 8  Harry, have they been of the -- have y'all had
 9  personal discussions?  How you're doing, what's going
10  on?
11     A.  Yes.
12     Q.  So you have talked over -- over the years with
13  Harry for no business reason at all; haven't you?
14     A.  That's correct.
15     Q.  And during those kinds of conversations, were
16  you aware that he was under a non-compete at some
17  point in time in the past?
18     A.  Yes.
19     Q.  Did he tell you anything about that, that he
20  couldn't go    he couldn't go back in?
21     A.  He said he had to wait five years.  Right
22  after he left the Concrete Company or whatever, we
23  had breakfast.  I ran into him one day and we
24  talked.  I asked him what he was going to do.  He
25  said I can't do anything for five years.
```