# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| **THE CONCRETE COMPANY,** | \| |
| | \| |
| **PLAINTIFF,** | \| |
| | \| |
| **vs.** | \|     **CASE NO. 2:05-CV-1026-CSC** |
| | \| |
| **HARRY E. LAMBERT and** | \| |
| **CAROL'S CONTRACTING,** | \| |
| **INC.,** | \| |
| | \| |
| **DEFENDANTS.** | \| |

## DEFENDANT'S EVIDENTIARY SUBMISSION IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Doc. 107]

COMES NOW Defendant Harry E. Lambert (hereinafter "Lambert") and, in addition to the evidence submitted in support of his pending Motion for Summary Judgment [Doc. 86], submits the following additional evidence developed during the discovery (involving 15 depositions in three states) conducted since October 24, 2006, in opposition to the Partial Motion for Summary Judgment filed by Plaintiff [Doc. 107]:

11.     Exhibit Z: Invoices for sales of product from Ward to Simcala or Globe started bearing the name "Foley Materials" effective April 1, 2005.     [Plaintiff's Responses to Defendant Harry E. Lambert's Seventh Interrogatories and Request for Production]. An example of such an invoice is provided with Exhibit Z. [TCC3150] Foley

Materials opened a separate bank account in April 2005 to receive payments for aggregate.

12. Exhibit K: Excerpts from the February 15, 2007 deposition of Globe Metallurgical raw materials buyer Robert R. "Bobby" Becker taken in Marietta, Ohio which establish the following additional undisputed facts:

a. The existence of Alabama Gravel as an additional supplier of white oversize gravel did NOT affect Globes purchases of gravel from TCC. [Page 95: lines 16-19]

b. In August of 2004 Becker inquired about a long term supply contract with TCC and many other Alabama area suppliers. [Page 75: lines 4-11] However, unlike many suppliers, in the past TCC would tend to raise prices in exchange for a long-term agreement which caused Globe not to enter into such agreements with TCC. [Page 76: line 10 to page 77: 6] In any event, TCC never got back to Globe nor offered any long-term agreement after Becker's overtures in 2004. [Page 75: lines 19-23]

c. Becker was told by TCC in late 2004 or early 2005 that Globe would be limited to buying 500 tons a month of white oversize gravel from TCC Ward because TCC was running out of gravel at

that location.  [Page 74: lines 1-12; page 76: lines 1-9; page 81: line 18 to page 82: line 4]   Becker was told that inventories of white gravel were not what TCC expected and that TCC could only supply Globe 500 tons per month. [Page 82: lines 1-4]

d. TCC offered Globe only a very small portion of the monthly Globe need for gravel given the Selma facility uses 210 tons per day. [Page 82: lines 5-9]. Becker needed 18,000 to 21,000 tons of gravel per month for all of Globe's operations. [Page 77: lines 13-17]

e. Becker sought and obtained material from the Carolinas to make up the difference between what he expected to buy from TCC and what he was allowed to buy. [Page 87: lines 9-21]   Harry Lambert had nothing to do with Becker finding alternative sources of gravel for Globe. [Page 88: lines 8-11]

f. David Tuten, a former Globe employee, contacted Globe about the availability of gravel from Alabama Gravel which Globe first purchased in May 2005. [Page 94: lines 9-13; page 99: line 23 to page 100: line 4]

g. Alabama Gravel could not supply Globe's need in the area and Globe still needed more gravel from sources in the area.  Globe would have purchased more gravel from TCC if it was available.

[Page 95: lines 9-11]  In other words, no one supplier was able to supply all the needs for the Globe operation in Selma in 2005. Globe bought as much white oversize gravel as TCC would allow them to buy in 2005.  [Page 99: lines 13-22 & page 103: lines 12-15]

h. Globe's last purchase from Foley Materials' Ward-502 pit was on February 10, 2006.  Becker understood the reason to be that Ward was not producing the percentage of rock to sand which created large inventories of sand which were hard to sell.  [Page 95: line 24 to page 97: line 21]

i. Globe's recent efforts to buy material from Foley Materials have not been successful because of the price charged by Foley Materials. [Page 98: line 15 to page 99: line 9]

j. Globe now has purchased its own gravel pit in Alabama through a transaction beginning in December 2005 and culminating in 2006. [Page 16: lines 4-10.

13. Exhibit L: Excerpts from the January 10, 2007 deposition of Simcala's Mt. Meigs site manager, William Edward Boardwine, taken in Montgomery, Alabama which establish the following additional undisputed facts:

a. TCC's own actions caused Simcala to stop buying white gravel from TCC. Harry Lambert was not the reason Simcala stopped buying from TCC.  Harry Lambert did nothing to interfere with the relationship between Simcala and TCC.  [Page 145: lines 1-13]

b. The reason Simcala stopped purchasing from TCC in 2005 was that after telling him in 2004 that supplies in 2005 would continue, in late December 2004 or early January 2005 TCC advised him that TCC's white oversize gravel was going to "dry up" and by April 2005, according to TCC, it did. [Page 142: line 16 to page 144: line 6]

c. Simcala was willing to enter into a long-term supply agreement with TCC but TCC could not supply the white oversize gravel long-term. [Page 150: line 8]

d. Before filing this suit, TCC never contacted him to ask why he had stopped buying gravel from them. [Page 148: lines 12-23]

14. Exhibit M: Excerpts from the January 11, 2007 deposition of Simcala purchasing agent Richard "Dick" Wymer taken in Montgomery, Alabama which establish the following undisputed facts:

a. Wymer made the unilateral decision to seek other suppliers after he received information that the TCC might be unable to supply

Simcala with adequate supplies of oversize gravel. Harry Lambert did not induce Simcala to purchase less oversize from TCC and did not interfere with the relationship between Simcala and TCC. [Page 220: lines 4-21]

b. Harry Lambert never was involved in Simcala's purchase of gravel from Alabama Gravel. [Page 221: line 15]

c. Over the years he has purchased from at least nine different suppliers of white oversize gravel in this area. [Page 210: line 9]

d. In January 2005, he was shocked to learn that TCC was not going to meet Simcala's needs for gravel in the near future. [Page 211: line 12] He had been told as late as December 2004 that TCC would have adequate supplies. [Page 214: line 22]

e. If he had been given more notice of TCC's inability to supply gravel he would have been in a better position to arrange to replace that source of gravel. [Page 213: line 13]  Yet on January 4, 2005, he was told by TCC that the TCC Ward plant (the major source of quality gravel) was almost out of white oversize. [Page 217: line 6]

f. Simcala went elsewhere simply because TCC advised Wymer they did not have oversize to sell. [Page 222: line 17 to page 223: line 4]

g. After being shocked by TCC, Wymer saw Lambert and had the

following conversation:

"I asked him, I said it looks like we're going to have a gravel problem.  I know you're not in the gravel business now, you're driving a truck, but you've been in the gravel business for years and years, you drive a truck to many places that I don't go, would you have some idea where I could obtain some larger size gravel?

 And his answer was, well, I'm in a non-compete.  I can't be in the gravel business.   But I'll check around and somebody might call you."

[Page 94: line 19 to page 95: line 7]

h. When Wymer approached Lambert in January 2005 about finding additional sources of oversize, Lambert was acting as a truck driver transporting a by-product of the Simcala smelting operation. [Page 221: lines 16-22]  Wymer does not consider commercial trucking companies to be in the metal smelting business or the sand and gravel business although both businesses use commercial truckers. [Page 223: line 13 to page 224: line 7]

15.    Exhibit N: Excerpts from the December 4, 2006 deposition of Alabama Gravel founder Robert Alexander taken in Montgomery, Alabama which establish the following additional undisputed facts:

a. Alexander never saw Harry Lambert engaging in the sand and gravel business while Lambert was under his non-compete. [Page

274: line 12]

b. Alexander began looking for sources of gravel in Alabama because his companies in Georgia were having trouble obtaining material in Georgia from, among others, TCC. [Page 261: line 15 to page 264: line 9]  Harry Lambert had nothing to do with his decision to come to Alabama and look for gravel sources. [Page 263: line 20]

c. Alexander already had 29 years of experience in the sand and gravel business with prior experience in erecting sand, gravel and crushing plants. [Page 264: line 18 to page 265: line 2]

d. Dave Tuten obtained the business of Globe Metallurgical for Alabama Gravel.  Alexander negotiated the deal with Maddox Stone. Both Alexander and Tuten obtained the business of Simcala. [Page 265: line 12 to page 266: line 3]

e. Information that TCC had reduced supplies to Simcala and Globe assisted Alexander in making his decision to sell oversize gravel in this area and without that information he would not have been interested in mining the Gentry Pit. [Pages 269: line 6 to 270: line 10]

f. Companies in the sand and gravel business are not in the trucking business and Carol's Contracting was an "independent" trucking

business. [Page 271: line 10 to page 274: line 6]

g.  Harry Lambert was not involved in the "stage one" process of establishing a new Alabama Gravel plant in Deatsville, Alabama prior to April 2006 when Lambert agreed to assist them.  [Page 276: line 13]

h.  Alexander has borrowed Lambert's cell phone to make calls.  [Page 208, line 18 to page 209, line 8].

16.  Exhibit O: Excerpts from the January 16, 2007 deposition of gravel broker Randolph C. "Randy" Willingham taken in Atlanta, Georgia which establish the following additional undisputed facts:

a.  Willingham never called Lambert to purchase or locate material. [Page 26: line 14 to page 27: line 5]

b.  Willingham never purchased or brokered gravel through Alabama Gravel. [Page 30: lines 9-14]

c.  Willingham, as partner with Robert Alexander in Georgia, was in on the decision to send Alexander to Alabama to seek other sources of material because TCC had increased prices in Georgia and reduced the volumes Willingham could purchase in Georgia. [Page 33: lines 10-25]

d.  Willingham confirms that "Foley is pretty rough on his customers."

[Page 52: line 2]

e. After Lambert left Montgomery Materials Willingham remembers Lambert calling while Lambert was driving a truck for Foshee Trucking hauling a load of material Willingham's company had sold to a customer. [Page 15: lines 1-13]

f. Willingham told Foshee Trucking that since Lambert could not be in the sand and gravel business he would prefer they use Lambert for hauling Willingham's product to customers. [Page 17: lines 19 to page 18: line 8]

g. Willingham uses many commercial trucking companies to deliver material to customers. [Page 19: line 19 to page 20: line 4]  He considers the sand and gravel business and the trucking business to be "two different things." [Page 43: line 15] He never considered Lambert's driving a truck nor Carol's Contracting, Inc.s' trucking operations to be engaging in the sand and gravel business. [Page 43: line 24 to page 46 line 6]

h. Some of his calls to and from Lambert concerned his concern for Harry's bout with bladder cancer. [Page 31: lines 1-5]

17. Exhibit P: Excerpts from the December 4, 2006 deposition of Alabama Gravel minority owner William "Rex" Dassinger taken in

Montgomery, Alabama which establish the following additional undisputed facts:

a. Dassinger was aware that Harry Lambert was under a non-compete and Dassinger never saw Lambert say or do anything that made Dassinger think Lambert was engaging in the sand and gravel business in Montgomery during the existence of the non-compete. [Page 101: lines 9-20]

b. Dassinger has been in both the sand and gravel business and the trucking business in the past and knows that the sand and gravel business is a "total different business" from the trucking business. [Page 101: line 21 to page 102: line 3]

c. Dassinger never saw Harry Lambert at the Alabama Gravel Deatsville site between March 2005 (when the company was formed) and January 2, 2006 (when his non-compete expired). [Page 56: lines 19-23]. When he was forming Alabama Gravel, Dassinger never even contemplated or considered that Lambert would have an interest in the company after his non-compete expired. [Page 68: lines 13-18].

d. Dassinger has borrowed Harry Lambert's cell phone "numerous times." [Page 84, lines 4-13]. Dassinger said that Carl "Allen"

King, the contractor who worked on the Gentry Pit and who erected the new Alabama Gravel Deatsville plant, would often call people he knew (e.g., Dassinger and Lambert) and invite them over to eat fish with him. [Page 98, line 17 to page 99, line 10].

18.  Exhibit Q: Excerpts from the January 9, 2007 deposition of the owner of Gentry Ready-Mix and the Independence, Alabama Gentry Pit, Howard "Mike" Gentry, taken in Montgomery, Alabama which establish the following additional undisputed facts:

a.  Harry Lambert refused to help him with a problem with his dredging operation in 2003 because Lambert said he was under a non-compete. [Page 96: line 6 to page 98: line 5]

b.  Lambert did not assist Gentry or help operate the Gentry Pit in any way while Lambert was under the non-compete. [Page 36: lines 17-23].

c.  During the non-compete Gentry thought Lambert was making a living as a truck driver which he does not consider being in the sand and gravel business. [Page 98: lines 6-13]

19.  Exhibit R: Excerpts from the January 9, 2007 deposition of the contractor who worked on the Gentry Pit and who erected the new Alabama Gravel Deatsville plant, Carl "Allen" King, taken in

Montgomery, Alabama which establish the following additional undisputed facts:

a. When Robert Alexander of Alabama Gravel met with him at the Gentry Pit and arranged for him to do the repair/maintenance work there for Alabama Gravel Harry Lambert was not present. [Page 32: line 1 to page 34: line 3]

b. It was Robert Alexander who arranged for King to erect the new Deatsville operation for Alabama Gravel and again, Harry Lambert was not involved. [Page 36: line 2 to page 37: line 2]

c. King confirmed that Lambert did not assist in the construction of the Deatsville Alabama Gravel plant until Lambert's agreement with Alabama Gravel in April 2006 [after the non-compete expired]. [Page 56: line 12 to page 57: line 7]  During construction Harry Lambert only visited the Deatsville site a "time or two" inquiring of King as to when it would ever be finished probably never even getting out of his truck. [Page 54: line 9 to page 56: line 11]

d. King has borrowed Harry Lambert's cell phone on several occasions. [Page 62: line 22 to page 64: line 7; Page 113, line 21 to page 114, line 5].  During the period of 2000 to 2005, King and

Lambert were friends. [Page 39: line 5 to page 40: line 6] They would speak on the phone to each other, and King would visit Lambert at Lambert's house. [*Id.*]

20.   Exhibit S: Excerpts from the January 10, 2007 deposition of the owner of a equipment supply company, Samuel Warren Estock, Jr., taken in Montgomery, Alabama which establish the following undisputed facts:

   a.   He knows of no facts that would indicate that Harry Lambert violated his non-compete agreement with TCC. The only time he spoke with Lambert, Lambert was driving a truck. [Page 85: lines 4-19]

   b.   He does not consider driving commercial trucks to be part of the sand and gravel business. He just thought Harry Lambert was "doing whatever he could to make a living." [Page 88: line 2-16]

21.   Exhibit T: Excerpts from the January 17, 2007 deposition of gravel broker and Maddox Stone owner James B. "Jim" Maddox taken in Valdosta, Georgia which establish the following undisputed facts:

   a.   Maddox Stone never purchased any sand or gravel from Harry Lambert or Montgomery Materials, Co. LLC. [Page 47: lines 5-13] When he inquired if Lambert knew of places he could buy gravel,

he was not expecting to buy any from Lambert because Lambert had told him he was not in the business of producing gravel. [Page 48: lines 18-23]

b. Maddox never expected to pay nor did he ever pay compensation or commissions to Lambert for any information because he asked Lambert as a friend would ask another for help. [Page 48: line 24 to page 49: line 13]

c. As a gravel broker he never considered Carol's Contracting, Inc. to be in the sand and gravel business. [Page 46: line 23 to page 47: line 1]

22.    Exhibit U: Excerpts from the January 26, 2007 deposition of equipment supplier Lars Berent "Bernie" Ostervold taken in Columbus, Georgia which establish the following additional undisputed facts:

a. Ostervold did not speak with Lambert about Lambert purchasing equipment needed for mining sand and gravel until 2006. [Page 50: line 9 to page 51: line 18] He had no business dealings with Lambert during the term of the non-compete. [Page 16: lines 11-17] Before then, the only work Ostervold knew Lambert was doing was driving a truck. [Page 14: line 16 to page 15: line 8]

b. The first and only person Ostervold dealt with concerning sales to Alabama Gravel before 2006 was Robert Alexander. [Page 16: line 18 to page 18: line 17]  He had known Alexander since the early 1980s. [Page 19: line 10]

c. As a person involved in supplying equipment and parts to the sand and gravel business, Ostervold does not consider himself nor the commercial trucking companies he uses to be in the sand and gravel business. [Page 49: lines 7-24]

23.    Exhibit CC: Excerpts from the deposition of steel supplier Neil Labovitz which establish the following additional facts:

a. Labovitz remembers no conversations with Harry Lambert between June 2005 and the end of 2005.  He is aware of no involvement between Harry Lambert and Alabama Gravel. [Page 31: lines 6-23]

b. Labovitz sold steel to Alabama Gravel at the Deatsville operation. [Page 17: lines 13-22] The first sales of steel for Deatsville occurred in September 2005 and were ordered by Allen King. [Page 28: line 11 to page 29: line 18]

c. His first dealings with Harry Lambert regarding the Deatsville operation occurred in April 2006. [Page 48: lines 15-23]

d. Labovitz occasionally hires commercial trucks to ship and deliver

his steel to companies in the sand and gravel business.  He does not consider commercial trucking firms to be in the steel business nor the sand and gravel business.  His company is not in the commercial trucking business although occasionally he uses his own trucks to deliver steel. [Page 67: line 9 to page 69: line 16]

24.    Exhibit V: Excerpts from the January 16, 2007 deposition of Crest Capital equipment financing agent Michael Hong taken in Atlanta, Georgia which establish the following additional undisputed facts:

a.  Hong sends faxes all the time soliciting financing for equipment without first being contacted and asked for a quote. [Page 16: line 20; page 17: lines 7-17; and page 25: lines 11-16]

b.  Hong cannot say that a fax he sent in December 2005 was anything but a cold solicitation. He has no explanation for how he got the address and telephone and fax numbers he put on that fax. He cannot say the "Harry" mentioned is Harry Lambert. [Page 26: lines 14-24] Hong cannot remember ever speaking with Harry Lambert about financing equipment. [Page 12: lines 1-5]  He does not know how he got the name "Harry" that he wrote on a fax he sent in December 2005. [Page 12: lines 6-11]

c.  Hong cannot explain why in December 2005 he would have sent a

fax to a company and address that no longer existed but to the current fax number for The Concrete Company. The fax in question was directed to "Montgomery Materials Co. LLC" at the address of "739 Oliver Road" with a telephone number of "334-271-6565". [Page 29: lines 1-8] [TCC2399]

d. In June 2002, Montgomery Materials LLC invoices showed those to be the business name, address and phone number for Montgomery Materials Co. LLC (the company taken from Lambert by TCC on April 9, 2002). [Doc. 1, ¶ 31-32; Exhibit BB: TCC 1069] However, by December 2005 Montgomery Materials LLC no longer existed and TCC was operating from a different location. Oddly, however, the fax number to which the Crest Capital fax was directed was the then-current fax of TCC in Columbus, Georgia that had not been the fax number of "Montgomery Materials Co. LLC" when Lambert was associated therewith. [Exhibit BB: TCC 1069]

e. Hong has checked his records and Montgomery Materials Company, LLC, TCC, Alabama Gravel, Carol's Contracting, Inc. and Harry Lambert have never had accounts with his company Crest Capital. [Page 26: lines 2-13 and page 28: lines 17-25]

25.    Exhibit W: Excerpts from the January 12, 2007 deposition of civil engineer Larry Speaks taken in Montgomery, Alabama which establish the following additional undisputed fact:

a. It was not until sometime in 2006 [after the non-compete expired] that Lambert first approached Speaks about helping a company called Lambert Materials LLC in getting a permit for a mining operation. [Page 70: line 10 to page 73: line 6]

b. Speaks first worked for Mike Gentry on the Gentry Pit in September 2001 (before the non-compete began and while Harry Lambert was with Montgomery Materials). [Id. page 21: line 9 to page 23 line 15]

c. Speaks worked on the Gentry Pit (Independence Pit) for Mike Gentry. Speaks has never seen Harry Lambert there nor has he ever discussed his work on the Gentry Pit with Harry Lambert. [Id. page 34: line 23 to page 36: line 8.]

d. Harry Lambert was not involved in obtaining an ADEM permit for the Gentry Pit. [Id. page 88: line 19 to page 89: line 1].

e. Speaks first dealt with Harry Lambert concerning Alabama Gravel's Deatsville operation in 2006 (after the non-compete expired). [Id. page 66: line 3 to page 67: line 12]

26.     Exhibit X: Supplemental Affidavit of Harry E. Lambert which establishes the following additional facts:

a.  Lambert Materials LLC was formed in 2006.  Harry Lambert became manager of Lambert Materials, LLC after the non-compete expired on January 2, 2006. [Exhibit X, pg. 1, ¶ 31]

b. Lambert Materials LLC first acquired a lease on property in Macon County, Alabama for mining sand and gravel in 2006 and none of those negotiations occurred before the non-compete expired. [Id. ¶ 32]

c. An ADEM permit is required before any mining operations can begin.  The permit process was initiated with ADEM after the lease in Macon County was executed. [Id. ¶ 33]  The ADEM permit was not issued to Lambert Materials LLC until August or September 2006. [Id. ¶ 34]

d. Lambert Materials LLC has only recently been able to acquire financing for the equipment needed to erect a sand and gravel plant. If all goes well, the company may be in the sand and gravel business by May 2007—approximately 16 months after the expiration of the non-compete.  [Id. ¶¶ 36-37]

e. According to statements of counsel for TCC made in open court,

due to barriers to entry it would take a person who honored a non-compete at least 8 months after the expiration of a non-compete to re-enter the sand and gravel business. [Id. ¶ 37]

f.  Frank Foley has vowed to third persons to put Lambert out of business once Lambert Materials, LLC is able to re-enter the sand and gravel business in this area. [Id. ¶ 38]

g.  I have often lent my cell phone to friends and acquaintances whenever my phone had a signal and theirs did not or their batteries were dead and they needed to make a call.  The fact that a call is listed on my cell phone record is not proof that I personally made the call.  [Id. ¶ 41]

27.   Exhibit AA: Shipments of oversize gravel to Globe and Simcala in 2005 shows that 24,704 tons were shipped from 502-Ward in 2005 which is *twice* the amount TCC represented to Simcala and Globe in January 2005 those companies could purchase from Ward in 2005 (Both Simcala and Globe were limited to 500 tons per month or a total of 12,000 tons per year *before* Alabama Gravel came into existence). [TCC 2855]

28.   Exhibit BB: TCC 1069: Invoice for Montgomery Materials Co. LLC dated in 2002 which establish the address, phone and fax numbers

used at that time.

29.    Exhibit J: Excerpts from the February 1, 2007 deposition of Certified Public Account Paul B. Fields taken in Montgomery, Alabama which establish the following additional undisputed fact:

a. Harry Lambert received no compensation for the non-competition agreement or the good will of the business when the buy-sell transaction closed in April 2002. [Page 58: line 15 to page 59: line 14]

30.    Exhibit Y: TCC 3149: Notes to financial statement of TCC showing that TCC effective April 8, 2002 "purchased the remaining 50% interest in Montgomery Materials, LLC, for cash consideration of approximately $340,000 and the assumption of all liabilities of the acquired company.  Prior to this date the Company accounted for this investment utilizing the equity method."

31.    Exhibit DD: NAICS Definitions showing that trucking and mining are in separate and distinct business sectors.

32.    Exhibit EE: USGS 2005 Mining Industry Survey showing that Foley Materials Company and not TCC was shown to be engaging in the mining industry in 2005 in Alabama.

33.    Exhibit FF: Montgomery Yellow Pages Excerpts showing 20 different

sand and gravel companies in the area—none of which are TCC or Foley Materials.

34.     Exhibit GG: US DOT Snapshot of Foley Materials Company and explanations of terms showing that Foley Materials Company was only hauling its own property incidental to its primary business and was not a contract carrier like Carols' Contracting.

Respectfully submitted this 16th day of March 2007.


_/s/ Dennis R. Bailey_____
Dennis R. Bailey
Bethany L. Bolger
Attorneys for Defendant Harry E. Lambert
and Carol's Contracting, Inc.

Of counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama   36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rsjg.com (e-mail)
bbolger@rsjg.com (e-mail)

CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing pleading through the ECMF system on this the 16th day of March 2007 which will forward same to:

Robin G. Laurie, Esq.
Griffin Lane Knight, Esq.
Balch & Bingham, LLP

105 Tallapoosa Street, Suite 200
Montgomery, Alabama   36104-3515

Thomas Gristina, Esq.
William Leonard Tucker, Esq.
Page, Scrantom, Sprouse, Tucker & Ford
Synovus Center, Third
1111 Bay Avenue
Columbus, Georgia   31901


  _/s/ Dennis R. Bailey_____
Of counsel