# ATTACHMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| THE CONCRETE COMPANY, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Case No.: 2:05-cv-01026-CSC |
| | * |
| HARRY E. LAMBERT AND CAROL'S | * |
| CONTRACTING, INC., | * |
| | * |
| Defendants. | * |

### REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff The Concrete Company ("TCC") briefly replies to Defendant Harry Lambert's

opposition to TCC's motion for partial summary judgment as follows.

### -- REPLY --

- ***The Length Of The Factual Briefing Supports Summary Judgment***

TCC acknowledges that collectively, the summary judgment briefs amount to more than

100 pages. The volume of briefing, however, does not suggest a material issue of fact. On the

contrary, TCC has gone to great lengths to document the overwhelming indisputable evidence of

Lambert's violation of his non-compete. That this took dozens of pages is a reflection of the

number of instances Lambert violated the contract and, further, a reflection of why TCC is

entitled to summary judgment as to liability on this issue.

- ***Lambert Has Failed To Refute The Facts Supporting Summary Judgment As To Liability***

Lambert's opposition brief is a rehash of the bald generalizations made in his summary

judgment motion. In summary, he claims that he drove a truck for free, merely answered his friends questions concerning their aggregate operations and did not do anything to harm TCC. He also continues to try to redefine the terms of the non-compete and TCC's business in an effort to circumvent his contractual obligations. But, no matter how hard Lambert tries, he cannot avoid the *facts*. During the term and in direct violation of his non-compete, Lambert was integrally involved in the formation of a vertically integrated sand and gravel business for which he and his wife have been handsomely paid. Lambert can deny this, but he does not and cannot refute this. His actions, represented by direct and circumstantial evidence – exhaustively detailed in TCC's motion – are indisputable. The following are just some examples.

**FACT:** Lambert assisted his wife in forming and operating CCI, received extensive compensation for his efforts and placed himself in a perfect position to take advantage of TCC's temporary supply issue in early 2005.

**FACT:** The Simcala, Gadsden, Gentry, Hotel and Gunnells Road Meetings.[1] He cannot explain away or create an issue of fact as to his being the catalyst for and a major participant in these meetings, which he cannot now deny took place. Nor can he refute the testimony describing the business he conducted and facilitated at these meetings in violation of his non-compete.

**FACT:** The ADEM Permit Meeting. It is not clear, but it appears Lambert tries to suggest this meeting did not take place. Lambert cites Larry Speaks' lack of recollection of that meeting. *But, Lambert himself, never denies the meeting took place.*

**FACT:** Lambert assisted Alabama Gravel in obtaining Globe – an old Montgomery

---

[1]      Defendants have conceded that Lambert was engaged in the sand and gravel business when he attended the ADEM Permit Meeting. As Defendants state, an ADEM Permit is indicia of engaging in the sand and gravel business. It is not, however, the only indicia. All of Lambert's and CCI's other activities are also part of the business.

Materials customer – as a customer via his delivery of product for testing and discussions with Becker at the Deatsville site and elsewhere.

**FACT:** The Southern Wire documents, Pete Long's statement and Lambert's own telephone records -- all indicating that Lambert was also actively involved in the construction of the Deatsville site both via contractor and equipment supplier recommendations and telephone conversations with contractors and equipment suppliers.

- ***Authority Cited By TCC Supports Summary Judgment***

Lambert states that TCC has cited no "legal authority" in support of its motion. This is not true. TCC's has, through its opposition brief and earlier filings, put forth extensive case law supporting enforcement of the non-compete. There was no reason to re-state these cases in TCC's motion. Moreover, armed with the facts, TCC has no need to parse cases and contractual terms to prove its case.

- ***TCC Did Not Run Out Of White Oversize***

On page 5, at ¶13(b), of his evidentiary submission [Doc. #116] in opposition to TCC's summary judgment motion, Lambert states that:

> [t]he reason Simcala stopped purchasing from TCC in 2005 was that after telling him [Simcala's Mt. Meigs site manager, William Edward Boardwine] that supplies in 2005 would continue, in late December 2004 and early January 2005 TCC advised him that TCC's white oversize gravel was going to "dry up" and by April 2005, according to TCC, it did.

Lambert repeats this statement that TCC ran out of white oversize gravel in his brief. He does this because he is trying to suggest that TCC cannot claim damages for something it did not have to sell. Lambert's problem, however, is that his statement is totally false. TCC has never run out of white oversize.

Moreover, Lambert's statement is not even supported by the deposition testimony upon which he purports to rely. Lambert cites to – *but does not quote* – page 142, line 16, through page 144, line 6, of Boardwine's deposition transcript. That testimony is as follows:

> Q.   Let me ask you some questions about the decision to start buying from Alabama Gravel. Let me – What – As the person who is the site manager for the Simcala plant, what is the reason that Simcala stopped purchasing from the Concrete Company in 2004, if you know?
>
> A.   What are the reasons we stopped purchasing?
>
> Q.   Yes, sir.
>
> A.   We – They couldn't supply us. We met with them there in the fourth quarter – going into the fourth quarter of 2004 and then everything felt fine, you know. The Concrete Company thought the tonnage and everything was okay.
> Before '05, around the December time frame, is when the Ward – the Phenix City, from what I remember, was going to be okay, but the Ward was – the first six months would be okay.
> And then sometime, either late December or early January, then the Phenix City – we were still getting *Phenix City*, but it was told to us from Don Triplett that pretty soon that gravel was going to dry up.
> And back in April of that year, it was just a few months later, it did. It was producing – I think it was in their ninety-two percent sand or something. So we didn't have a security.
>
> Q.   Where did you get that information that they were running out?
>
> A.   From Don Triplett.
>
> Q.   And who is he?
>
> A.   Don Triplett was our – one of our contacts with the Concrete Company.

*See* Transcript of Deposition of William Edward Boardwine ("Boardwine Tr."), taken January 10, 2007, Exhibit A hereto, at 142.16-144.6 (emphasis added). Boardwine, therefore, did not testify that TCC's white oversize supply was going to dry up or that it ran out. Rather, he was

referring to the gravel supply from TCC's Phenix City operation. This is a huge distinction. Phenix City did not even supply Simcala *white* oversize, it supplied larger *brown* oversize, and TCC is not seeking damages for lost sales of brown oversize from Phenix City.[2]

- ### TCC's Overall 2005 Sales Confirm Its Supply Issue In Early 2005 Was Temporary

On page 22, at ¶27, of his evidentiary submission [Doc. #116] in opposition to TCC's summary judgment motion, Lambert points out that TCC sold over 24,000 tons of white oversize from the Ward Pit in 2005 and that this amount was in excess of the 500 tons per month TCC told Simcala and Globe it could sell in early 2005. Lambert suggests that this somehow shows that TCC's sales were unaffected by Alabama Gravel's entry into the market. *See* Lambert's Opposition Brief [Doc. No. 115] at p.13, ¶27. Again, Lambert is wrong.

TCC's overall sales demonstrate that the supply issue in early 2005 was – as represented to Simcala and Globe – temporary. Moreover, TCC's would have sold much more than 24,000 tons of white oversize in 2005 as it would have increased production from four to six days a week to accommodate Simcala had Alabama Gravel not entered the market. TCC's damages model, already submitted in opposition to Defendants' summary judgment motions, is production based. Simcala and Globe's demand and Simcala's willingness to pay more would have resulted in sales of all additional white oversize produced as a result of going to six days production.

---

[2]     Additional Boardwine testimony, that Lambert fails to cite, explains the distinction between the Phenix City and Ward oversize and the fact that Boardwine was speaking about Phenix City oversize running out. Simcala purchased oversize from both Phenix City and Ward. *See* Boardwine Tr., Exhibit A, at 27.7-28.1. Triplett told Boardwine (in a meeting that followed a November 30, 2005 meeting Boardwine had with TCC) that TCC's Phenix City operation would be out of gravel within a few months. *See id.* at 58.3-64.16. The chemistry of the Phenix City oversize was not as good as the Ward oversize, but it was blended with Ward oversize because the Phenix City oversize was larger. *See id.*

Again, Lambert's citation to 2005's overall sales proves that TCC's supply issue was temporary. It is also worth noting that Lambert's citation to 2005's overall sales also confirms the harm that TCC suffered as a result of Defendants' actions. Because of Defendants, TCC lost its best customer during the supply issue and the increased sales it would have made.[3]

- ***Lambert's Populist Theme Is Baseless***

As he has done throughout this litigation, Lambert tries to portray a populist theme. He says he is a victim of TCC and has done nothing but simply try to earn a living. He claims – without any evidence – that Frank Foley has vowed to put him out of business. Foley has made no such statements. Lambert also claims – without any evidence – that this lawsuit is filed for improper anti-competitive purpose. There is, however, nothing wrong with TCC seeking to enforce its contractual rights. TCC has no improper purpose here, and the evidence overwhelmingly validates TCC's claims.

- ***It Is Clear Why Lambert Sought To Avoid Discovery***

Lambert asserts that the "Court has been very generous during the discovery phase of this matter" and that "it is clear that TCC's expensive and protracted attempts to prove its claims against Defendant Lambert have fallen well short." Lambert is simply wrong again. As evidenced by the extensive deposition testimony and documentary evidence submitted in TCC's summary judgment filings, discovery in this case yielded tremendous amounts of additional evidence proving TCC's case. That is why Lambert repeatedly sought to block it.

Taking a few examples, discovery obtained after TCC filed its motion for additional discovery in an effort to overcome Defendants' motion to stay, included the depositions of Robert Alexander, Rex Dasinger, Mike Gentry, Ed Boardwine, Dick Wymer and Larry Speaks.

---

[3]    Lambert's citation to 2005 sales is also inconsistent with his above-referenced assertion that TCC ran out of white oversize. TCC could not possibly have run out of white oversize in April 2005 when it sold 24,000 tons overall in 2005.

Up to that point, TCC had only been allowed to depose Dave Tuten and Harry and Carol Lambert. The Alexander, Dasinger and Gentry depositions provided extensive evidence surrounding the Simcala, Gadsden, Gentry, Hotel and Gunnells Road Meetings – all of which prove Lambert violated the non-compete. Similarly, the Speaks deposition yielded a PAP map bearing Lambert's hand-writing and allowed TCC to provide additional direct evidence of the ADEM Permit Meeting – another blatant violation of the non-compete.

Discovery, therefore, has been fruitful. Unfortunately, however, it may have been unnecessary had Lambert simply acknowledged his activities. This brings up a final point. Lambert suggests the Court has been generous with discovery and implies that TCC has somehow protracted the same. In fact, TCC has simply been afforded its rights as a litigant in our judicial system. Lambert protracted discovery by his refusal to admit his actions.

**-- CONCLUSION --**

For the foregoing reasons, as well as for those set forth in TCC's initial brief in support of its summary judgment motion, TCC respectfully submits that its motion for partial summary judgment should be granted in its entirety and that the Court should enter an order granting judgment in its favor as to liability on Count I of the Complaint.

This the ____ day of March, 2007.

_____
One of the Attorneys for Plaintiff
The Concrete Company

OF COUNSEL:

Robin G. Laurie (ASB-4217-U64R)
G. Lane Knight (ASB-6748-I72K)
BALCH & BINGHAM LLP
P. O. Box 78
Montgomery, Alabama 36101
Telephone: (334) 834-6500
Facsimile: (334) 269-3115
rlaurie@balch.com

Thomas F. Gristina
William L. Tucker
Page, Scrantom, Sprouse, Tucker & Ford, P.C.
1111 Bay Avenue, Third Floor, Synovus Centre
Columbus, Georgia  31901

## CERTIFICATE OF SERVICE

I hereby certify that on this ____ day of_____, 2007, I served a copy of the

foregoing Plaintiff's Motion For Partial Summary Judgment, with accompanying Brief In

Support Of Plaintiff's Motion For Partial Summary Judgment and Notice Of Filing Evidence In

Support Of Partial Summary Judgment, by hand-delivery to the following:

        Dennis R. Bailey, Esquire
        Rushton, Stakely, Johnston & Garrett
        P. O. Box 270
        Montgomery, Alabama 36101-0270


                        _____
                              OF COUNSEL

# EXHIBIT A
# TO
# ATTACHMENT

## FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5    THE CONCRETE COMPANY,     )

6              Plaintiff,      )

7    vs.                       )  CASE NUMBER:

8    HARRY E. LAMBERT and      )  2:05-CV-1026-ID-CSC

9    CAROL'S CONTRACTING,      )

10   INC.,                     )      COPY

11              Defendants.    )

12

13     DEPOSITION OF WILLIAM EDWARD BOARDWINE

14            In accordance with Rule 5(d) of

15   The Alabama Rules of Civil Procedure, as

16   Amended, effective May 15, 1988, I, Cindy

17   Weldon, am hereby delivering to Thomas F.

18   Gristina, the original transcript of the

19   oral testimony taken on the 10th day of

20   January, 2007, along with exhibits.

21            Please be advised that this is the

22   same and not retained by the Court Reporter,

23   nor filed with the Court.

## FREEDOM COURT REPORTING

Page 27

1    Q.    Your lab?

2    A.    Yes.

3    Q.    Okay.  But these are Simcala

4    documents produced in the ordinary course of

5    business?

6    A.    Yes.

7    Q.    All right.  Now, from what I have

8    gathered in this case, Simcala uses -- when

9    Simcala purchased from the Concrete Company,

10   it purchased not only white oversize gravel,

11   but it purchased brown gravel.

12            And specifically it purchased

13   white oversize from the Ward pit and brown

14   oversize from the Concrete Company's

15   Bickerstaff pit; is that correct.

16            MR. BAILEY:  Object to the form.

17   A.    Bickerstaff.

18   Q.    Yes.  Phenix City.

19   A.    Phenix City.  I don't remember it

20   being called brown gravel.

21   Q.    But did it -- fair enough.  Did it

22   also -- Did Simcala purchase gravel from the

23   Phenix City pit as well as the Ward pit?

## FREEDOM COURT REPORTING

Page 28

1    A.    Yes, sir.

2    Q.    All right.  And with respect to

3  the types of -- Are there more than one type

4  of quartz gravel that Simcala uses in it

5  furnaces?

6    A.    We want the most pure gravel that

7  we can buy.

8    Q.    And what do you -- When you say

9  the most pure, what qualities are you

10  looking for in order to determine pureness?

11    A.    Iron --

12    Q.    Purity, I believe.

13    A.    Yes, purity.  Iron, aluminum and

14  titanium.

15    Q.    And if you would look, sir, at the

16  document that's been marked as Plaintiff's

17  Exhibit 2 at the first page, I believe that

18  you -- that this Simcala document lists

19  targets for iron, aluminum and titanium; is

20  that correct?

21    A.    Yes, sir.

22    Q.    And iron, I guess -- my chemistry

23  is terrible.  What do you call -- FE stands

## FREEDOM COURT REPORTING

1  that calendar?

2       A.    Yes.

3       Q.    All right.  Do you recall the

4  first time that you met Mr. Lambert?

5       A.    Do I recall?

6       Q.    Yes.

7       A.    Yes.

8       Q.    When was that?

9       A.    Sometime early January.  I don't

10  know the exact date.

11       Q.    Was it a face to face meeting?

12       A.    Yes.

13       Q.    And where did it take place?

14       A.    At my plant.

15       Q.    And who was present?

16       A.    Dick Wymer.

17       Q.    And anybody else besides you and

18  Mr. Wymer and Mr. Lambert?

19       A.    No.

20       Q.    Do you know why that meeting took

21  place?

22       A.    Yes.

23       Q.    Why did it take place?

## FREEDOM COURT REPORTING

Page 59

1      A.    Dick approached him to ask him if

2  he knew anywhere that we could buy gravel,

3  oversize gravel.

4      Q.    Do you know why Mr. Wymer did

5  that?

6      A.    Yes.

7      Q.    And why was that?

8      A.    We were running out of gravel.

9      Q.    Why were you running out?

10      A.    The Ward property was having that

11  quality problem.  And the Phenix City pit we

12  were told would be out of gravel within a

13  few month period.  So we felt like we would

14  not have enough gravel for 2005.

15      Q.    Did you have a quantity issue from

16  the Ward plant?

17      A.    Did we have a quantity issue?

18      Q.    Yes.

19          MR. BAILEY:  Object to the form.

20      A.    This is what -- This is what the

21  Concrete Company or Foley Products said that

22  was good for 2005.

23      Q.    And you're looking at what

## FREEDOM COURT REPORTING

Page 60

1    document?

2        A.    I'm looking at TCC -- which number

3    do you go by?

4        Q.    Either one.

5        A.    Simcala 000 --

6        Q.    42?

7        A.    42.

8        Q.    All right.  Are those your notes?

9        A.    No, sir.

10        Q.    Whose notes are those?

11        A.    Dick Wymer's.

12        Q.    Okay.  And tell me what those

13    notes tell you.

14        A.    For 2005, Phenix City quantity

15    okay.  For 2005, Ward quantity, first six

16    months.  Then we'll look at it again.

17    Should be okay.

18        Q.    And this note is dated December

19    21, '04; is that correct?

20        A.    That's correct.

21        Q.    And did this reflect a meeting?  I

22    mean, up at the top of the page it says Don,

23    Eddie and Dick.  Do you know --

## FREEDOM COURT REPORTING

Page 61

1      A.    Yes.

2      Q.    -- why those names were there?

3      A.    Yes.  This was when Don was at the

4   plant.

5      Q.    And were these notes based on a

6   discussion that the three of you had?

7      A.    Yes.

8      Q.    And Don is Don Triplett?

9      A.    Yes.

10     Q.    And he worked for the Concrete

11  Company?

12     A.    Yes.

13     Q.    Okay.  All right.  And then do

14  these -- Does this note reflect a quantity

15  issue from the Ward plant or did this note

16  give you concern about quantities?

17     A.    Well, the first six months.

18     Q.    Where do you --

19     A.    Because it says right here.  I'm

20  reading --

21     Q.    Okay.  I see it.  Yes, sir.  For

22  --

23     A.    For 2005, Phenix City quantity

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 62

1    okay.  For 2005, Ward quantity okay first

2    six months.  Then will look at it again.  It

3    should be okay.  This reflects a follow-up

4    meeting that we had on November 30th with

5    Don Triplett, Frank Foley, Dick, me.  And I

6    know there was one other person that Foley

7    Products had.

8         Q.    Was it Mr. Hugh Sorrell?

9         A.    Name -- Yes.  The name sounds

10   familiar.

11        Q.    All right.  And so --

12        A.    When we met that day, when we

13   talked about 2005, we felt confident and

14   felt okay with the supply from the Concrete

15   Company in 2005.  But I don't remember any

16    -- There was no total confirmation.

17             It was, yes, that should work

18   okay.  But we had to take so much Phenix

19   City, we had to take so much Ward.

20        Q.    And there's no reflection of any

21   quality concern on this note, is there, the

22   December 21, '04 note?

23        A.    I don't see any.

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

1     Q.   All right.  Did there come a time

2   after that, that you became concerned about

3   the quantities coming from the Concrete

4   Company?

5     A.   Yes.

6     Q.   And when was that?

7     A.   It wasn't -- It was not too far

8   after this when we had a visit from Don

9   Triplett and he told us that within a few

10   months, that the Phenix City pit would be

11   out of gravel.

12         So, you know, what we're faced

13   with is in November 30th, everything -- we

14   felt okay.  We'd be okay for 2005 from the

15   Concrete Company.  The 21st, it was put to

16   us that the first six months of Ward should

17   be okay.

18         And then it was put to us that,

19   well, Phenix City, within a few months, will

20   probably be out of gravel.

21     Q.   And you were using the Phenix City

22   gravel and a blend, were you not, with other

23   gravels in your furnaces?

## FREEDOM COURT REPORTING

Page 64

1       A.    Yes, sir.

2       Q.    And -- Because I don't believe

3   there's any question that the -- Is the

4   quality of the Ward white oversize better

5   than the quality of the Phenix City gravel

6   that you were getting from the Concrete

7   Company?

8       A.    In chemistry, yes.  In sizing, no.

9       Q.    And is that the reason why you

10  blended the two together?

11      A.    Yes, sir.

12      Q.    And so by blending the Ward

13  oversize with the Phenix City oversize or

14  Phenix City gravel, you were able to address

15  the size factor; is that correct?

16      A.    Yes.  It helped the size.

17      Q.    All right.  Now, going back to the

18  supply issue, and looking specifically at

19  Simcala number 43, the next page, is that a

20  note that you made?

21      A.    No, sir.

22      Q.    Do you recognize that handwriting?

23      A.    Yes, sir.

## FREEDOM COURT REPORTING

Page 142

1  Simcala did business with the Concrete

2  Company.

3        Q.    Who would be the best person for

4  me to ask at Simcala as to why purchases

5  stopped from the Concrete Company in 2001?

6        A.    Dick Wymer.

7        Q.    Are you privy -- Do you know that

8  information?  Do you know the answer to that

9  question, as to why in 2001 there were no

10  more sales purchased from Simcala -- I mean

11  from TCC and then there were for about a two

12  year period?

13        A.    No, I don't.  Dick would be the

14  best one to answer.  He was the one directly

15  involved with it.

16        Q.    Let me ask you some questions

17  about the decision to start buying from

18  Alabama Gravel.  Let me -- What -- As the

19  person who is the site manager for the

20  Simcala plant, what is the reason that

21  Simcala stopped purchasing from the Concrete

22  Company in 2004, if you know?

23        A.    What are the reasons we stopped

# FREEDOM COURT REPORTING

Page 143

1  purchasing?

2       Q.   Yes, sir.

3       A.   We -- They couldn't supply us.  We

4  met with them there in the fourth quarter --

5  going into the fourth quarter of 2004 and

6  then everything felt fine, you know.  The

7  Concrete Company thought the tonnage and

8  everything was okay.

9            Before '05, around the December

10  time frame, is when the Ward -- the Phenix

11  City, from what I remember, was going to be

12  okay, but the Ward was -- the first six

13  months would be okay.

14            And then sometime, either late

15  December or early January, then the Phenix

16  City -- we were still getting Phenix City,

17  but it was told to us from Don Triplett that

18  pretty soon that gravel is going to dry up.

19            And back in April of that year, it

20  was just a few months later it did.  It was

21  producing -- I think it was in there

22  ninety-two percent sand or something.  So we

23  didn't have a security.

# FREEDOM COURT REPORTING

Page 144

1    Q.    Where did you get that information

2   that they were running out?

3    A.    From Don Triplett.

4    Q.    And who is he?

5    A.    Don Triplett was our -- one of our

6   contacts with the Concrete Company.

7    Q.    Did you assume he was telling you

8   the truth when he gave you that information?

9    A.    Sure.  We didn't have any reason

10  why he would lie to us.

11   Q.    Well, if somebody from the

12  Concrete Company testified that if all you

13  said was I'll pay you more and they would

14  supply all your needs and they would have

15  done it, would that be consistent with what

16  you were being told during this period of

17  time?

18        MR. GRISTINA:  Object to the form.

19   A.    No.  It didn't make any sense to

20  me, no.

21   Q.    Why doesn't it make any sense to

22  you?

23   A.    They couldn't supply.