# EXHIBIT A

FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

THE CONCRETE COMPANY,            )
            Plaintiff,           )
vs.                              ) CASE NUMBER:
HARRY E. LAMBERT and             ) 2:05-CV-1026-ID-CSC
CAROL'S CONTRACTING,             )
INC.,                            )
            Defendants.          )

COPY

DEPOSITION OF WILLIAM EDWARD BOARDWINE

In accordance with Rule 5(d) of The Alabama Rules of Civil Procedure, as Amended, effective May 15, 1988, I, Cindy Weldon, am hereby delivering to Thomas F. Gristina, the original transcript of the oral testimony taken on the 10th day of January, 2007, along with exhibits.

Please be advised that this is the same and not retained by the Court Reporter, nor filed with the Court.

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 27

1  Q. Your lab?

2  A. Yes.

3  Q. Okay. But these are Simcala
4  documents produced in the ordinary course of
5  business?

6  A. Yes.

7  Q. All right. Now, from what I have
8  gathered in this case, Simcala uses -- when
9  Simcala purchased from the Concrete Company,
10 it purchased not only white oversize gravel,
11 but it purchased brown gravel.

12      And specifically it purchased
13 white oversize from the Ward pit and brown
14 oversize from the Concrete Company's
15 Bickerstaff pit; is that correct.

16      MR. BAILEY: Object to the form.

17 A. Bickerstaff.

18 Q. Yes. Phenix City.

19 A. Phenix City. I don't remember it
20 being called brown gravel.

21 Q. But did it -- fair enough. Did it
22 also -- Did Simcala purchase gravel from the
23 Phenix City pit as well as the Ward pit?

1   A.   Yes, sir.
2   Q.   All right.  And with respect to
3   the types of -- Are there more than one type
4   of quartz gravel that Simcala uses in it
5   furnaces?
6   A.   We want the most pure gravel that
7   we can buy.
8   Q.   And what do you -- When you say
9   the most pure, what qualities are you
10  looking for in order to determine pureness?
11  A.   Iron --
12  Q.   Purity, I believe.
13  A.   Yes, purity.  Iron, aluminum and
14  titanium.
15  Q.   And if you would look, sir, at the
16  document that's been marked as Plaintiff's
17  Exhibit 2 at the first page, I believe that
18  you -- that this Simcala document lists
19  targets for iron, aluminum and titanium; is
20  that correct?
21  A.   Yes, sir.
22  Q.   And iron, I guess -- my chemistry
23  is terrible.  What do you call -- FE stands

**FREEDOM COURT REPORTING**

Page 58

1  that calendar?
2      A.   Yes.
3      Q.   All right.  Do you recall the
4  first time that you met Mr. Lambert?
5      A.   Do I recall?
6      Q.   Yes.
7      A.   Yes.
8      Q.   When was that?
9      A.   Sometime early January.  I don't
10 know the exact date.
11     Q.   Was it a face to face meeting?
12     A.   Yes.
13     Q.   And where did it take place?
14     A.   At my plant.
15     Q.   And who was present?
16     A.   Dick Wymer.
17     Q.   And anybody else besides you and
18 Mr. Wymer and Mr. Lambert?
19     A.   No.
20     Q.   Do you know why that meeting took
21 place?
22     A.   Yes.
23     Q.   Why did it take place?

Page 59

1  A.   Dick approached him to ask him if
2  he knew anywhere that we could buy gravel,
3  oversize gravel.
4  Q.   Do you know why Mr. Wymer did
5  that?
6  A.   Yes.
7  Q.   And why was that?
8  A.   We were running out of gravel.
9  Q.   Why were you running out?
10 A.   The Ward property was having that
11 quality problem.  And the Phenix City pit we
12 were told would be out of gravel within a
13 few month period.  So we felt like we would
14 not have enough gravel for 2005.
15 Q.   Did you have a quantity issue from
16 the Ward plant?
17 A.   Did we have a quantity issue?
18 Q.   Yes.
19      MR. BAILEY:  Object to the form.
20 A.   This is what -- This is what the
21 Concrete Company or Foley Products said that
22 was good for 2005.
23 Q.   And you're looking at what

FREEDOM COURT REPORTING

Page 60

1  document?
2      A.   I'm looking at TCC -- which number
3  do you go by?
4      Q.   Either one.
5      A.   Simcala 000 --
6      Q.   42?
7      A.   42.
8      Q.   All right.  Are those your notes?
9      A.   No, sir.
10     Q.   Whose notes are those?
11     A.   Dick Wymer's.
12     Q.   Okay.  And tell me what those
13  notes tell you.
14     A.   For 2005, Phenix City quantity
15  okay.  For 2005, Ward quantity, first six
16  months.  Then we'll look at it again.
17  Should be okay.
18     Q.   And this note is dated December
19  21, '04; is that correct?
20     A.   That's correct.
21     Q.   And did this reflect a meeting?  I
22  mean, up at the top of the page it says Don,
23  Eddie and Dick.  Do you know --

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 61

1    A.    Yes.
2    Q.    -- why those names were there?
3    A.    Yes. This was when Don was at the
4  plant.
5    Q.    And were these notes based on a
6  discussion that the three of you had?
7    A.    Yes.
8    Q.    And Don is Don Triplett?
9    A.    Yes.
10   Q.    And he worked for the Concrete
11 Company?
12   A.    Yes.
13   Q.    Okay. All right. And then do
14 these -- Does this note reflect a quantity
15 issue from the Ward plant or did this note
16 give you concern about quantities?
17   A.    Well, the first six months.
18   Q.    Where do you --
19   A.    Because it says right here. I'm
20 reading --
21   Q.    Okay. I see it. Yes, sir. For
22 --
23   A.    For 2005, Phenix City quantity

1  okay. For 2005, Ward quantity okay first
2  six months. Then will look at it again. It
3  should be okay. This reflects a follow-up
4  meeting that we had on November 30th with
5  Don Triplett, Frank Foley, Dick, me. And I
6  know there was one other person that Foley
7  Products had.
8       Q.   Was it Mr. Hugh Sorrell?
9       A.   Name -- Yes. The name sounds
10 familiar.
11      Q.   All right. And so --
12      A.   When we met that day, when we
13 talked about 2005, we felt confident and
14 felt okay with the supply from the Concrete
15 Company in 2005. But I don't remember any
16 -- There was no total confirmation.
17           It was, yes, that should work
18 okay. But we had to take so much Phenix
19 City, we had to take so much Ward.
20      Q.   And there's no reflection of any
21 quality concern on this note, is there, the
22 December 21, '04 note?
23      A.   I don't see any.

1  Q.   All right.  Did there come a time
2  after that, that you became concerned about
3  the quantities coming from the Concrete
4  Company?
5  A.   Yes.
6  Q.   And when was that?
7  A.   It wasn't -- It was not too far
8  after this when we had a visit from Don
9  Triplett and he told us that within a few
10 months, that the Phenix City pit would be
11 out of gravel.
12      So, you know, what we're faced
13 with is in November 30th, everything -- we
14 felt okay.  We'd be okay for 2005 from the
15 Concrete Company.  The 21st, it was put to
16 us that the first six months of Ward should
17 be okay.
18      And then it was put to us that,
19 well, Phenix City, within a few months, will
20 probably be out of gravel.
21 Q.   And you were using the Phenix City
22 gravel and a blend, were you not, with other
23 gravels in your furnaces?

FREEDOM COURT REPORTING

Page 64

1  A. Yes, sir.

2  Q. And -- Because I don't believe
3  there's any question that the -- Is the
4  quality of the Ward white oversize better
5  than the quality of the Phenix City gravel
6  that you were getting from the Concrete
7  Company?

8  A. In chemistry, yes. In sizing, no.

9  Q. And is that the reason why you
10 blended the two together?

11 A. Yes, sir.

12 Q. And so by blending the Ward
13 oversize with the Phenix City oversize or
14 Phenix City gravel, you were able to address
15 the size factor; is that correct?

16 A. Yes. It helped the size.

17 Q. All right. Now, going back to the
18 supply issue, and looking specifically at
19 Simcala number 43, the next page, is that a
20 note that you made?

21 A. No, sir.

22 Q. Do you recognize that handwriting?

23 A. Yes, sir.

FREEDOM COURT REPORTING

Page 142

1  Simcala did business with the Concrete
2  Company.
3      Q.  Who would be the best person for
4  me to ask at Simcala as to why purchases
5  stopped from the Concrete Company in 2001?
6      A.  Dick Wymer.
7      Q.  Are you privy -- Do you know that
8  information?  Do you know the answer to that
9  question, as to why in 2001 there were no
10 more sales purchased from Simcala -- I mean
11 from TCC and then there were for about a two
12 year period?
13     A.  No, I don't.  Dick would be the
14 best one to answer.  He was the one directly
15 involved with it.
16     Q.  Let me ask you some questions
17 about the decision to start buying from
18 Alabama Gravel.  Let me -- What -- As the
19 person who is the site manager for the
20 Simcala plant, what is the reason that
21 Simcala stopped purchasing from the Concrete
22 Company in 2004, if you know?
23     A.  What are the reasons we stopped

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

FREEDOM COURT REPORTING

Page 143

1  purchasing?
2      Q.   Yes, sir.
3      A.   We -- They couldn't supply us.  We
4  met with them there in the fourth quarter --
5  going into the fourth quarter of 2004 and
6  then everything felt fine, you know.  The
7  Concrete Company thought the tonnage and
8  everything was okay.
9           Before '05, around the December
10 time frame, is when the Ward -- the Phenix
11 City, from what I remember, was going to be
12 okay, but the Ward was -- the first six
13 months would be okay.
14          And then sometime, either late
15 December or early January, then the Phenix
16 City -- we were still getting Phenix City,
17 but it was told to us from Don Triplett that
18 pretty soon that gravel is going to dry up.
19          And back in April of that year, it
20 was just a few months later it did.  It was
21 producing -- I think it was in there
22 ninety-two percent sand or something.  So we
23 didn't have a security.

Page 144

1  Q.  Where did you get that information
2  that they were running out?
3  A.  From Don Triplett.
4  Q.  And who is he?
5  A.  Don Triplett was our -- one of our
6  contacts with the Concrete Company.
7  Q.  Did you assume he was telling you
8  the truth when he gave you that information?
9  A.  Sure.  We didn't have any reason
10 why he would lie to us.
11 Q.  Well, if somebody from the
12 Concrete Company testified that if all you
13 said was I'll pay you more and they would
14 supply all your needs and they would have
15 done it, would that be consistent with what
16 you were being told during this period of
17 time?
18        MR. GRISTINA:  Object to the form.
19 A.  No.  It didn't make any sense to
20 me, no.
21 Q.  Why doesn't it make any sense to
22 you?
23 A.  They couldn't supply.