IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THE CONCRETE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  2:05cv1026-CSC |
| | ) | |
| HARRY E. LAMBERT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

> When business competitors join together for strategic purposes, they would be wise to structure their arrangements with an eye toward minimizing the inevitable friction which the future might bring. Absent mechanisms to turn to when bad blood grows invective, irreconcilable business disputes quickly transgress into legal quagmires. The subsequent fallout seeks in vain for a remedy, turning eventually to the courts to alleviate the impasse. Such a situation has brought the present matter before the court.

*Concrete Co., Inc. v. MMC Holdings, Inc.* 201 F.Supp.2d 1192, 1193 (M.D. Ala., 2001).

Once again the court finds itself embroiled in a business dispute involving the same two principals – Frank Foley and Harry Lambert.  In this case, the plaintiff The Concrete Company[1] ("TCC"), claims that defendant Harry Lambert ("Lambert") breached his contract with it by violating a non-competition provision.  TCC further argues that Carol's Contracting ("CC") is guilty of intentionally interfering with a business relationship.  Carol's Contracting is a trucking company owned by Carol Lambert, Harry Lambert's wife.  Finally,

---

[1] The Concrete Company is controlled by Frank Foley.

TCC alleges that Lambert and CC conspired to intentionally interfere with a business relationship.

The court has jurisdiction of this action pursuant to its diversity jurisdiction, *see* 28 U.S.C. § 1332, under which the court applies state substantive law and federal procedural law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938). Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment. Now pending before the court is the defendants' motion for summary judgment filed on October 24, 2006 (doc. # 86) and the plaintiff's motion for partial summary judgment filed on February 23, 2007 (doc. # 106). After careful review and consideration of the motions for summary judgment, and the responses and the evidentiary material filed in support of and in opposition to the motions, the court concludes that the plaintiff's motion for partial summary judgment is due to be denied, and the defendants' motion for summary judgment is due to be granted.

## II. THE SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c) summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993);  *see also*  FED. R. CIV. P. 56(e). ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242,

---

[2]  In *Celotex Corp.v. Catrett*, 477 U.S. 317 (1986), the court stated:

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial...We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . .

*Id.* at 324.

248 (1986).  A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); *Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995).  However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor." *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law  FED. R. CIV. P. 56(c).  With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

## III. FACTS[3]

The Concrete Company is a Georgia corporation involved in the ready mix concrete and sand and gravel business.  (Compl. at ¶ 1).  TCC is controlled by Frank D. Foley.  In

---

[3] On a motion for summary judgment the court must construe the facts in the light most favorable to the non-movant who, in this case, is the plaintiff. *See, e.g. Brown v. Crawford*, 906 F.2d 667 (11th Cir. 1990).

1996, TCC entered the Montgomery market by purchasing a ready mix concrete business.

Harry Lambert is sixty-three (63) years old, has a high school education, and has worked in rock quarries since he graduated from high school. When Harry met Carol, he was working at a rock quarry, and they married in 1967. In the late 1980's or early 1990's, Lambert began working in the sand and gravel business.[4] In 1996, Lambert formed MMC Holdings, Inc. ("MMC Holdings"), a corporation engaged in the business of mining sand and gravel in Montgomery, Alabama. MMC Holdings mined aggregate from leased property referred to as the City Pit.

On June 5, 1997, Foley, individually and on behalf of TCC, and Lambert, individually and on behalf of MMC Holdings, entered into an agreement ("Agreement") to form a limited liability corporation, Montgomery Materials Company, L.L.C ("Montgomery Materials"). TCC provided the capital and MMC Holdings provided the assets, resulting in each entity acquiring a fifty percent (50%) ownership interest in Montgomery Materials. Montgomery Materials hired Lambert as its general manager and began mining the City Pit. Carol Lambert was hired as the bookkeeper for Montgomery Materials.

By the summer of 2000, Foley and Lambert's relationship had soured. For reasons not material to the issues in this case, TCC triggered the Buy-Sell provision contained in the Agreement that created Montgomery Materials. As a result of litigation, TCC forced a sale

---

[4] Sand and gravel is also referred to as "aggregate" in the mining business.

of Lambert and MMC Holdings' interests in Montgomery Materials to Foley and TCC.[5] The buy-sell provision was fully realized on April 10, 2002, but was retroactively effective to January 2, 2001. Also as a result of the forced sale, Carol Lambert was also fired from her job as bookkeeper.

The Agreement contains non-competition provisions. At issue in this case is the non-competition agreement which prohibits Lambert from "engaging in the Territory in the business of excavating, mining, distributing, delivering, selling or otherwise disposing of any Product at wholesale or retail." The Territory is defined as 60 miles of the Montgomery city limits. The "Product" is defined in section 1(b) as "sand, gravel, clay, and/or topsoil." The Period is for five years.

The non-competition provision also prohibits Lambert from having any interest in, acting as an agent, broker, distributor, advisor or consultant to, or assisting any person, firm, corporation, or business in the Territory in performing prohibited activity. The parties all agree that the non-competition provision, if enforceable, became effective on January 2, 2001, and expired by its own terms on January 2, 2006.

Shortly after the forced sale, and during the period of the non-competition provision, Carol Lambert formed a trucking company which she incorporated on April 26, 2002. (Dep. Carol Lambert at 20). Carol knew that Lambert had an agreement "not to go back in the sand

---

[5] The parties spend an inordinate amount of time discussing the terms of the buy-sell provision and the reasons for activating the buy-sell agreement. As noted, the terms of the buy-sell provision were the subject of prior litigation. *See The Concrete Co., Inc. v. MMC Holdings, Inc.*, Civ. Act. No. 2:01cv54-ID (M.D. Ala.) (Memorandum Opinion and Order, doc. # 39) *aff'd* 34 Fed. Appx. 390 (11th Cir. 2002). Consequently, the court need not and most certainly will not revisit those issues.

and gravel business," but they "had to have an income."[6]  (*Id*.).  Carol hired two drivers, although she concedes that Lambert also drove for her.  She leased her trucks to Foshee Trucking which in turn would obtain jobs to haul aggregate, dispatch her trucks, and pay her a commission.  (*Id*. at 32-33).  Carol's Contracting trucks only hauled aggregate and was paid by Foshee, not the purchasers of the aggregate that her trucks hauled.  Foshee Trucking also paid worker's compensation premiums for Carol's drivers, including Lambert.  (*Id*. at 140).  It is undisputed that during the applicable period of the non-competition provision, Lambert drove a truck for his wife's company.  It was through this arrangement with Foshee Trucking that Carol's Contracting trucks and drivers hauled material and aggregate.[7]  (*Id*. at 122).  Carol's Contracting and Foshee maintained this leasing arrangement until Carol's Contracting was hired by Alabama Gravel to haul its aggregate in April 2005.

Also during the period prescribed by the non-competition provision,[8] Lambert consulted on a project in Gadsden, Alabama, an area outside the protected territory of the non-competition provision, for his friend, Robert Alexander.[9]  (Dep. Robert Alexander at 58).  While working together in Gadsden, Alexander and Lambert discussed purchasing some "sand screws."  (*Id*.).  Alexander was also interested in entering the sand and gravel market

---

[6] Although she concedes that all her prior work experience was in bookkeeping, Carol testified in deposition that it was her decision to start a trucking business.

[7] It is undisputed that Carol's Contracting does not mine aggregate.

[8] Although the facts are not clear about the time period in which these events occurred, there is no doubt that the events occurred during the period in which the non-competition provision was applicable.

[9] Because Gadsden is outside of the protected area, Lambert was not constrained in any way from working with Alexander.

in Alabama. (*Id*. at 264). Lambert introduced Alexander to Mike Gentry, the owner of the Gentry Pit, because Gentry had some sand screws he was willing to sell.[10] (*Id*. at 62). Because of his interest in the sand and gravel market in Alabama, Alexander eventually went to look at Gentry's pit. At that time, Alexander and Gentry did not come to an agreement about mining the pit. Alexander, however, had informed Lambert of his interest in the sand and gravel market in Alabama.

At another time, when the non-competition provision was applicable, Lambert encountered David Tuten, a consultant for Simcala.[11] Lambert and Tuten had known each other since 1987 or 1988. (*Id*. at 13). Tuten had experience in the sand and gravel business because he had been a purchasing agent for Globe Metallurgical, Inc. ("Globe"). (*Id*. at 11). Tuten mentioned to Lambert that "there was a need for white oversized gravel and that [he] would have an interest in getting in the gravel business mainly as an outside investor." (*Id*. at 61). Because Lambert knew that Alexander was interested in getting into the sand and gravel market, Lambert suggested that Tuten meet Alexander. Lambert subsequently introduced Tuten to Alexander.[12] (*Id*.).

Another person Lambert had contact with was William Dasinger ("Dasinger") who also worked in the sand and gravel business. He secured a lease to mine property in

---

[10]   Gentry was selling the sand screws because he had closed his pit. (Dep. Alexander at 62-63).

[11]   Tuten left Globe in 2003 and began work as a consultant for Simcala. (Dep. Tuten at 60).

[12]   Alexander had also heard "on the streets that Simcala was interested in obtaining white oversized gravel." (Dep. Alexander at 81).

Deatsville, Alabama. (Dep. Williams Dasinger at 16). Dasinger approached Foley about mining this property, but Foley was not interested. (*Id*. at 21-22). Dasinger subsequently told Lambert that "he was looking for a backer," and Lambert introduced Dasinger to Alexander and Tuten. (*Id*. at 25-26; Dep. Alexander at 104; Dep. Tuten at 91). Alexander, Tuten and Dasinger later formed Alabama Gravel in March 2005.[13] Alabama Gravel used Carol's Contracting for its hauling needs and hired Carol Lambert as its bookkeeper. Alabama Gravel also rented office space from Carol and Harry Lambert.

Coinciding with the period when Lambert was introducing Alexander, Tuten and Dasinger to each other, a supply problem with oversized white gravel was developing in the Montgomery area. Simcala, Globe, Willingham Stone Company ("Willingham"), Alabama Sand and Gravel ("Alabama Sand") and Maddox Sand and Gravel ("Maddox") are companies in the territory that all purchased oversized white gravel from TCC. However, sometime in late fall 2004 or early 2005, TCC notified its customers that it did not have enough white oversized gravel to meet its customer needs. It is undisputed that Don Triplett, on behalf of TCC, called customers and advised them that TCC wasn't "able to keep up with the demand that [it] had at the time." (Dep. Robert Becker at 74; Dep. Ed Boardwine at 142-43; Dep. Richard Wymer at 223).

---

[13] While Alabama Gravel was named as a defendant in this action, TCC and Alabama Gravel have settled their dispute and Alabama Gravel has been dismissed as a party. Nonetheless, the parties spend a great deal of time mining the facts related to Lambert's involvement in the formation of Alabama Gravel as well as his contacts with Simcala, Globe and other sand and gravel businesses. Because the court ultimately concludes that the non-competition provision cannot be sustained, any disputes regarding these facts are immaterial and do not preclude summary judgment.

Simcala and Globe were advised that TCC would limit the amount of white oversized gravel it would sell to them each month to 500 tons per month.[14]  Because TCC could not supply Simcala with the gravel it needed, Simcala began searching for alternative sources of the gravel.  (Dep. Edward Boardwine at 142-45).  In January 2005, Lambert was at Simcala picking up dross[15] when Wymer approached him.  (Dep. Richard Wymer at 94, 221)

> I asked him, I said it looks like we're going to have a gravel problem.  I know you're not in the gravel business now, you're driving a truck, but you've been in the gravel business for years and years, you drive a truck to many places that I don't go, would you have some idea where I could obtain some larger size gravel.
>     And his answer again was, well, I'm in a non-compete.  I can't be in the gravel business.  But I'll check around and somebody might call you.

(*Id*. at 95).

Globe purchased as much white gravel as TCC would allow it to buy but that amount was still not enough.  (Dep. Robert Becker at 99, 103).  In fact, Globe would have continued to purchase gravel from TCC if TCC had made the gravel available for purchase.  (*Id*. at 95).  Maddox also encountered difficulty getting necessary product from TCC.  (Dep. James Maddox at 22).  Maddox asked Lambert "did he know anywhere where [Maddox Stone] could get white gravel."  Lambert  suggested to both Wymer and Maddox that they contact Alexander and both Maddox and Simcala subsequently purchased oversized gravel from

---

[14]  Although TCC asserts that "it was prepared to increase production" and the shortage was only "temporary," TCC points to no evidence from which the court could conclude that it advised its customers of this fact or that it did indeed increase production.  The undisputed evidence clearly demonstrates that it was only after TCC placed limitations on its supply of white oversized gravel that its customers began looking for alternate sources of the gravel.

[15] Dross is the waste product that results from molten metal during smelting.

Alexander and Alabama Gravel.

To further complicate matters, on April 1, 2005, TCC sold to its wholly owned subsidiary Foley Materials Company, "all finished goods, work in process, raw materials, machinery, equipment, and vehicles used in connection with its Sand and Gravel plants located in Russel (sic), Macon, and Montgomery Counties, Alabama." (Doc. # 39, Ex. 4). According to the Bill of Sale, TCC was "determined to reorganize its Aggregates Division by incorporating Foley Materials Company as a wholly owned subsidiary and transferring to Foley Materials Company as a contribution to capital all the personal property used in the Aggregates Division, including all finished goods, work in process, raw materials, machinery, equipment and vehicles." (*Id*). Effective April 1, 2005, TCC became a holding company for Foley Products Company and Foley Materials Company. As the holding company, TCC manages their real property and provides administrative assistance to the two companies. In exchange, the two companies pay TCC for its services. (Dep. Eric Nix at 10-14).

TCC filed this action on October 25, 2005.

### III. DISCUSSION

#### A. Breach of Contract - Non-competition provision

The non-competition provisions of the Agreement are the primary focus of the dispute in this case. Section 8 of the Agreement between The Concrete Company and Frank Foley and MMC Holdings, Inc. and Harry Lambert contains those provisions.

8.1. *Territory*. The parties hereto acknowledge that Montgomery, LLC

11

presently operates and sells Product in all locations which are within 60 miles (measured in a straight line by air) from the present limits of the City of Montgomery, Alabama (the area contained within 60 miles of the present limits of Montgomery, Alabama is herein called the "Territory.")
. . .

8.4. *Lambert*.  If Montgomery, Inc. transfers its entire Membership interest in Montgomery, LLC to Concrete or any other party, Lambert agrees that during the Period[16] he will not:

(1) engage, as an employee or otherwise, in the Territory in the Prohibited Activity;

(2) in the Territory (i) have any interest in (whether as a shareholder, partner, member or otherwise), (ii) act as agent, broker, or distributor for or advisor or consultant to, or (iii) in any way assist (whether by solicitation of customers or employee or otherwise), any person, firm, corporation or business entity which is engaged, or which he reasonably knows is undertaking to become engaged, in the Territory in the Prohibited Activity.

(3) in the Territory induce a Customer (as defined below): (i) to purchase Product in the Territory from any business entity operating in the Territory (other than Montgomery, LLC or its affiliates); or (ii) to withdraw, curtail or cancel such Customer's business with Montgomery, LLC.  As used in this subsection, "Customer" means any actual customer who purchased Product from Montgomery, LLC in the Territory, within the twenty-four month period prior to the date of the closing of the sale by Montgomery, Inc. of its Membership Interest in Montgomery, LLC; . . .

"Prohibited Activity" is defined in Section 8.3(1) as "the business of excavating, mining, distributing, delivering, selling, or otherwise disposing of any Product at wholesale or retail."

In Alabama, the public policy against contracts that restrict employment is expressed in ALA. CODE § 8-1-1 (1975):

(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.

(b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his

---

[16] The "Period" is defined as a "five-year period beginning with the transfer." *See Section* 8.3 of the agreement.

> employer to refrain from carrying on or engaging in a similar business and
> from soliciting old customers of such employer within a specified county, city,
> or part thereof so long as the buyer, or any person deriving title to the good
> will from him, or employer carries on a like business therein.
> (c) Upon or in anticipation of a dissolution of the partnership, partners may
> agree that none of them will carry on a similar business within the same
> county, city or town, or within a specified part thereof, where the partnership
> business has been transacted.

ALA. CODE § 8-1-1 (1975).

"Section 8-1-1 expresses the public policy of Alabama disfavoring contracts in restraint of trade; such contracts are disfavored "because they tend not only to deprive the public of efficient service but also . . . to impoverish the individual." *Constr. Materials, Ltd., Inc. v. Kirkpatrick Concrete, Inc.*, 631 So. 2d 1006, 1009 (Ala. 1994). Under Alabama law, the party seeking to enforce an agreement not to compete that restrains the practice of a lawful business or trade must demonstrate that the non-competition agreement, pursuant to Section 8-1-1(a), is not void. *Id.*; *Orkin Exterminating Co. v. Etheridge*, 582 So. 2d 1102, 1104 (Ala. 1991). Section 8-1-1(a) provides for a general prohibition on covenants not to compete subject only to the limited exceptions provided by sub-sections (b) and (c) of Section 8-1-1.[17] *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 505 (Ala. 1991).

> Subsection (b) permits the seller of the good will of a business to agree with
> the buyer to refrain from carrying on or engaging in a similar business.

*Files v. Schaible*, 445 So.2d 257, 259-60 (Ala. 1984). *See also Defco, Inc. v. Decatur Cylinder, Inc.*, 595 So. 2d 1329, 1330-31 (Ala. 1992) ("Within certain limitations, paragraph

---

[17] The parties do not argue that subsection (c) is applicable.

(b) of that section allows the seller of the good will of a business to enter an agreement not to compete with the buyer...").   TCC, by its own admission, concedes that Lambert's employment agreement with Montgomery Materials contained no non-competition provision. *See* Doc. # 97 at 62; Doc. # 98, Ex. 8.   Consequently, the non-competition agreement is applicable only if the buy-sell agreement encompassed the "good will" of Montgomery Materials.   "Good will is not a thing apart, but an incident to and inherent in the thing itself – the business." *Kershaw v. Knox Kershaw, Inc.*, 523 So.2d 351, 357 (Ala. 1988).   Alabama law is clear that it is not required that the sales contract for the sale of a business contain language specifying that the parties are selling good will. *Files*, 445 So.2d at 260.   The court concludes that the agreement between the parties can reasonably be interpreted as The Concrete Company purchasing the good will of Montgomery Materials.

Having concluded that MMC Holdings' sale of its interest in Montgomery Materials included the sale of good will, the court next turns to the question of whether the non-competition provision is enforceable.[18]   TCC argues that the evidence "exhaustively demonstrates via direct and circumstantial evidence [that] Lambert's activities in the sand and gravel business [are] (sic) in violation of his non-compete."   (Br. in Opp. at 55-56). Specifically, TCC points to the formation of Carol's Contracting, Lambert's contacts with

---

[18]   The parties dispute TCC's standing to enforce the non-competition agreement for two reasons. Lambert asserts that only Montgomery Materials can enforce the non-competition provision, not TCC, and, in light of TCC"s sale of its assets to Foley Materials, TCC is no longer in a similar business to be able to enforce the non-competition provision.  The court need not resolve the standing issue because, even assuming that TCC has standing to seek to enforce the non-competition provision, the court concludes that TCC has failed to meet its burden of establishing that the non-competition should be enforced.

Alexander, Dasinger, Tuten, and others in the sand and gravel business, and ultimately the formation of Alabama Gravel as evidence that Lambert violated the non-competition provision of the Agreement by which he was bound. Lambert, on the other hand, argues that the non-competition provision in the agreement is unenforceable because the scope of the limitation imposed upon Lambert is unreasonable in terms of time and it places an undue burden on him.

Assuming that the non-competition agreement is not otherwise void, Alabama Courts will enforce the terms of a covenant not to compete if: (1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship. *Clark v. Liberty Nat'l Life Ins. Co*., 592 So. 2d 564, 565-65 (Ala. 1992) (citing *DeVoe v. Cheatham*, 413 So. 2d 1141, 1142 (Ala. 1982)); *see also James S. Kemper & Co. Southeast, Inc. v. Cox & Assocs., Inc.*, 434 So. 2d 1380, 1384 (Ala. 1983); *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F. 2d 1085, 1087 (11th Cir. 1990); *Ex parte Caribe, U.S.A., Inc.*, 702 So. 2d 1234, 1236 (Ala. 1997)

As the party seeking to enforce the non-competition provision, it is The Concrete Company's burden to produce some evidence from which a reasonable jury could conclude that the non-competition provision should be enforced. *Orkin Exterminating Co. v. Etheridge*, 346 So. 2d 1102, 1104 (Ala. 1991). TCC repeatedly argues that Lambert violated the non-competition provision. "TCC acknowledges that collectively, the summary judgment briefs amount to more than 100 pages. . . . TCC has gone to great lengths to document the

overwhelming indisputable evidence of Lambert's violation of his non-compete." (*Reply Br. in Supp. of Pl's Mot. for Partial Summ. J.* at 1).

However, TCC ignores the fact that the issue the court must first address is ***whether*** the non-competition provision is ***enforceable*** before the court turns to whether Lambert violated the provision.

> 'As to the reasonableness of such covenants, 'the test generally applied * * * is whether or not the restraint is necessary for the protection of the business or good will of the employer, and, if so, whether it imposes on the employee any greater restraint that is reasonably necessary to secure to the business of the employer, or the good will thereof, such protection, regard being had to the injury which may result to the public from restraining the breach of the covenant, in the loss of the employee's service and skill and the danger of this becoming a charge upon the public. * * *

*Mason Corp. v. Kennedy*, 286 Ala. 639, 244 So.2d 585 (Ala. 1971).  Not surprisingly, The Concrete Company and Lambert take diametrically opposed positions with regard to each factor.  The court will address each factor seriatim.[19]

**1. Protectable interest.**  "In order to have a protectable interest, the employer must possess 'a substantial right in its business sufficiently unique to warrant the type of protection contemplated by [a] noncompetition agreement."  *Orkin*, 582 So.2d at 1104; *Kemper*, 434 So.2d at 1384; *DeVoe*, 413 So.2d at 1142.  TCC argues that because the non-competition provision arises in the context of the sale of good-will exception, it is not required to demonstrate that it has a protectable interest.  *See* Br. in Opp at 61-63.  TCC relies on

---

[19]  The majority of Alabama cases address non-competition provisions arising from an employer-employee relationship.  The court has found no Alabama law which suggests that the analytical approach to non-competition agreements arising from the sale of good will should be different.

Comment b of Restatement (Second) of Contracts § 188 to support its position.

> . . .Because of this difference in the interest of the promisee, courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts.

(*Id.* at 63) (emphasis omitted). This general statement of law does not support TCC's position. While courts are more willing to uphold promises to refrain from competition made in connection with the sale of good will than with employment contracts, the Alabama Supreme Court has consistently examined whether the employer has established a "substantial right and sufficiently unique business" to warrant protection by a non-competition agreement regardless of which exception of Ala. Code § 8-1-1(b) is applicable. *See Clark*, 592 So. 2d at 565; *Orkin*, 582 So.2d at 1104; *Central Bancshares of the South, Inc. v. Puckett*, 584 So. 2d 829, 831 (Ala. 1991); *Kershaw v. Knox Kershaw, Inc.*, 523 So. 2d 351, 357-59(Ala. 1988); *Calhoun v. Brendle, Inc.*, 502 So. 2d 689, 691-92 (Ala. 1987); *Tyler v. Eufaula Tribune Publishing Co., Inc.*, 500 So. 2d 1005,1006-07 (Ala. 1986); *Greenlee v. Tuscaloosa Office Products & Supply, Inc.*, 474 So. 2d 669, 671 (Ala. 1985); *Reed v. Herren*, 423 So. 2d 139, 142 (Ala. 1982); *DeVoe v. Cheatham*, 413 So. 2d 1141, 1142-43 (Ala. 1982); *Mason Corp. v. Kennedy*, 286 Ala. 639,644-45, 244 So. 2d 585, 589-90 (Ala. 1971); *Hill v. Rice*, 259 Ala. 587, 592-93, 67 So. 2d 789, 793-94 (Ala. 1953). Consequently, the court must still consider whether TCC has a protectable interest sufficiently unique to justify application of a non-competition agreement, even in the context of a sale involving good will.

17

Moreover, TCC argues, in the alternative, that it has established a protectable interest in its business. (Br. in Opp. at 63). TCC argues in brief that its' protectable interest is in prohibiting Lambert from forming a competing gravel business. (Br. in Opp. at 60 & 66). In essence, TCC asserts that by making contacts and talking to people, Lambert "orchestrated a vertically integrated sand and gravel operation for his own benefit." (*Id.* at 66). Simply put, the facts do not support counsel's argument.[20] Rather, the facts show that Lambert had no interest, equity or otherwise, in Alabama Gravel. Lambert was not a principal or stock holder in Alabama Gravel. The undisputed evidence before the court establishes that Lambert informed Alexander, Dasinger and Tuten that he was under a non-competition provision and could not get involved in a sand and gravel business. After Lambert introduced the men, he left their meetings.

TCC also relies on the affidavit of Foley to argue that it has established a protectable interest in its business sufficient to warrant protection.

> While working at Montgomery Materials, Lambert was privileged to all facets of the business including aggregate suppliers, purchasers, delivery companies, plant manufacturers and equipment suppliers. *See* Foley Aff., Exhibit 7, at ¶ 7. He was also privileged to TCC operations in the sense that he was in frequent contact with Foley and his employees. *See id.* He was able to learn TCC's business practices. *See id.* TCC also bankrolled Montgomery Materials and Lambert and enabled him to maintain extensive contact with the Montgomery area aggregate market. . . .
>
> In summary, even if *Sheffield* type scrutiny applies, which it does not,

---

[20] TCC relies in part on Lambert's cellular telephone records to argue that Lambert was both the instigator and impetus for the creation of Alabama Gravel. Lambert testified that he did not recall making most of the phone calls nor could he recall any of the content of the calls. He also testified that he loaned his phone to a number of people. Lambert and Carol's Contracting concede that Lambert drove a truck for the company. Consequently, it does not appear that the phone calls were out of the ordinary for a truck driver.

> TCC with its money and information kept Lambert in a business that, given its complexity and its operating costs, is not widely known or available to the public.

(*Id.* at 63-64).

Again, argument of counsel is not evidence and thus, is insufficient to create a genuine issue of material fact defeating summary judgment. Foley's broad conclusory statements are insufficient to meet TCC's burden of demonstrating a protectable interest. TCC points the court to no evidence that would suggest that the nature or manner of operations of TCC's business is in any way different from other sand and gravel businesses. TCC does not explain how its business is "sufficiently unique" to warrant protection. More importantly, however, TCC does not have a protectable interest in not having competition.

Although not as clear, TCC also seems to argue that Lambert gained information about TCC while driving a truck for Carol's Contracting. The evidence before the court clearly shows that while highly competitive, the sand and gravel business is hardly secretive. TCC ignores the undisputed evidence that Lambert was well-known in the sand and gravel business prior to his involvement with Montgomery Materials. When Lambert and Foley created Montgomery Materials, Lambert brought his expertise to the business while Foley brought the financial capital. TCC points to no evidence that would demonstrate that Lambert's knowledge of the sand and gravel business was exclusively or even largely the result of his work with Montgomery Materials. Indeed, Lambert's knowledge more probably reflects how the sand and gravel business is not unique.

Moreover, the evidence before the court does not show that Lambert's actions with

19

respect to Alabama Gravel arose from knowledge gained as a result of his work with Montgomery Materials. Rather, the evidence shows that a primary motivating factor in the creation of Alabama Gravel was TCC's inability to meet demand for oversized white gravel. Although Lambert drove a truck for Carol's Contracting, there is no evidence before the court that he was privy to confidential information in that position. TCC's argument that Lambert learned of its white oversized gravel shortage as a result of driving a truck is simply unsupported by the evidence. It is undisputed that TCC, through Don Triplett and Hugh Sorrell, told its customers that it could not meet their gravel needs. (Dep. Boardwine at 142-43; Pl's Ex. 47, doc. # 108; Dep. Robert Becker at 74). Becker, on behalf of Globe, contacted Martin-Marietta, Elmore Sand and Gravel, TCC, and other suppliers in Alabama "looking for a long-term agreement" to provide gravel. (Dep. Becker at 75). According to Becker, he bought from "anyplace [he] could try to get it . . . from" because no single supplier could meet all of Globe's needs, particularly in 2005. (*Id*. at 87 & 99). Becker "made it known to as many suppliers as [he] could locate that [Globe] was looking for gravel in this area." (*Id.* at 100). It was "no secret" that oversized white gravel was in short supply. (*Id*.)

On behalf of Simcala, Wymer purchased oversized white gravel from at least nine different suppliers. When Don Triplitt and Hugh Sorrell both told him that TCC was not going to be able to meet Simcala's needs, he began looking for other sources. (Dep. Wymer at 210-211, 220 & 223). One reason Alexander was interested in getting in the sand and

gravel market in Alabama was because he had heard "on the streets"[21] that Simcala was looking for oversized white gravel.  (Dep. Alexander at 81).  Maddox also sought oversized white gravel for Maddox Sand and Gravel from other sources.  (Dep. Maddox at 22 & 26).  Maddox testified in deposition that he "called on every quarry in a hundred mile radius of Montgomery" looking for gravel.  (*Id.* at 20).

"A protectable interest may exist when an employee is "in a position to gain confidential information, [to gain] access to secret lists, or to develop a close relationship with clients."  *See Clark*, 592 So.2d at 566.  *See also, Central Bancshares of the South, Inc. v. Puckett*, 584 So.2d 829, 831 (Ala. 1991).  "This is particularly so in fields where the acquisition and protection of customer lists and a regular clientele are of crucial importance."  *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085 1087 (11th Cir. 1990).  This is not the case here.  Plainly, it was common knowledge that TCC was unable to meet the needs of its customers.  There is no evidence before the court that Lambert took confidential information gained from his employment with Montgomery Materials or from when he was driving a truck, and used it to surreptitiously contact Montgomery Materials' clients or undermine TCC's business.  Nor has TCC pointed the court to any evidence that Lambert had access to "valuable trade information" or confidential customer lists.  "To be protectable, a customer list must be treated in a confidential manner..."  *Calhoun*, 502 So.2d at 692.  TCC has presented no evidence from which the court could conclude that its customer lists were

---

[21]  When asked what he meant by "on the streets," Alexander said he had heard from truck drivers.

confidential or treated in a confidential manner. In fact, it is apparent that at least in the sand and gravel business in Montgomery, information was readily available. Indeed, TCC presents no evidence and never explains how the nature of its operation is any different from other sand and gravel businesses.

To the extent that Lambert took actions which arguably violated the non-competition provision, those actions did not impair a reasonably related protectable interest. It is undisputed that TCC was unable to meet demand for oversized white gravel. The facts show that Lambert's relationship with and arguable assistance to Alexander, Dasinger and Tuten were related to, and partially the result of, TCC's inability to provide white oversized gravel. TCC's inability to meet demand hardly rises to the level of a protectable interest. This inability to supply oversized white gravel, coupled with Lambert's lack of a financial interest in Alabama Gravel, undercuts TCC's argument that it has a substantial right, sufficiently unique, to enforce the noncompetition provision.[22] To the extent that Lambert arguably violated the non-competition provision by acting as a catalyst for the formation of a competitor, his actions did not impair a protectable interest. TCC's inability to meet demand for oversized white gravel does not rise to that level.

**2. Restriction reasonably related to protectable interest.** Because the court concludes that TCC has failed to demonstrate a sufficiently unique protectable interest, the

---

[22]In reaching this conclusion, the court is not conflating the legal question of whether the provision is enforceable with whether there was a breach. The question of enforceability is fact-bound and must be resolved before reaching the issue of a breach. In resolving the enforceability question, the court is required to assay all the facts.

court pretermits discussion of the reasonableness of the non-competition provision as it relates to that interest.

**3. Reasonable in time and place**. There is no dispute that the 60 mile territory is reasonable under the circumstances. However, Lambert argues that the five-year limitation period was unreasonable under the facts of this case. A survey of Alabama cases strongly suggests that the five year period is at the outer most limits of what is considered reasonable by the Alabama Courts.[23] The great weight of authority suggests that, in order to be reasonable, a non-competition agreement's time restraint should be shorter. *See Ex parte Howell Engineering & Surveying, Inc.*, ___ So. 2d ___, 2006 WL 3692536 (Ala. Dec. 15, 2006) (upholding a one-year period); *Systrends, Inc. v. Group 8760, LLC,* 2006 WL 2925323 (Ala. 2006) (upholding a one-year period); *Kemper*, 434 So.2d at 1384 (upholding two-year period as reasonable); *Clark*, *supra* (upholding a one year restriction); *Central Bankshares of the South, Inc. v. Puckett*, 584 So. 2d 829 (Ala. 1991) (upholding a two-year period); *Orkin*, *supra* (upholding a two-year period); *Tyler v. Eufaula Tribune Publishing Co*., *Inc*., 500 So.2d 1005, 1007 (Ala. 1986) (two-year period reasonable); *Shelton v. Shelton*, 238 Ala. 489, 192 So. 55 (Ala. 1939) (upholding three year period of non-competition).

Moreover, the Alabama Supreme Court has held a five year restriction to be unreasonable. *See Mason Corp.*, 286 Ala. at 644, 244 So.2d at 589. In *Mason*, the court held

---

[23] Although periods of five years have been upheld in Alabama, each case has turned on its own facts. For example, in *Kershaw v. Know Kershaw, Inc.*, 523 So.2d 351 (Ala. 1988), the limitation period was five years but the court did not address the reasonableness of that length of time. Rather, the court concluded that the provision was "overly broad and ambiguous," and declined to uphold the provision based on terms other than duration. *Id*. at 359.

the five-year non-competition agreement held by the corporation was unreasonable after considering "the nature or character of the employment, the size and condition of the locality to which the prohibition extends, the duration of the prohibition, and the consideration moving to the employee for his agreement to the restriction." *Id*. at 590. *See also Sheffield v. Stoudenmire*, 553 So. 2d 125 (Ala. 1989) (five-year restriction on 50-year old, married insurance agent not reasonably related to agency's interest.)

TCC relies on *Slay v. Hess*, 252 Ala. 455, 41 So.2d 582 (Ala. 1949) and *First Alabama Bancshares, Inc*., 355 So.2d 681 (Ala. 1977) to support its position that a five-year period is reasonable. TCC's reliance on these cases is misplaced. Both cases are distinguishable on their facts. First, *Slay* is distinguishable because the issue before the court was whether the trial court erred in granting of a temporary injunction. Neither the trial court nor the Alabama Supreme Court reached their decision on the merits of the enforceability of the non-competition provision at issue. Neither court considered the reasonableness of the five-year period contained in non-competition provision. Both courts simply deemed appropriate the issuance of a temporary injunction pending a hearing on the merits.

Next, *First Alabama Bancshares*, *Inc*., is also distinguishable on its facts. In *First Alabama Bancshares*, the non-competition provision arose in the context of the sale of good will of a bank. The very nature of the banking industry differs greatly from the sand and gravel business. *See generally Central Bancshares of the South, Inc.*, 584 So. 2d at 831 ("the very nature of the positions [the defendants] held at Central Bank warrants the conclusion" that a restriction on competing in the banking industry for two years is reasonable). "The

24

utmost trust and personal faith is required of a banker by his customers." *First Alabama Bancshares*, *Inc*., 355 So.2d at 685. The loyalty and trust required of one's banker is simply not a tenet of the sand and gravel business where supply and demand are the order of the day. Wymer, Becker, Maddox and Willingham all contacted numerous sources looking for oversized white gravel because TCC could not meet their companies' needs. Becker sought other suppliers because TCC would increase its prices when Globe increased its purchases. (Dep. Becker at 74). Willingham encountered the same difficulty with Foley and TCC. "[They] consistently increased their prices to the extent they were cutting our volume, we decided that the only way we could survive was to produce our own product." (Dep. Willingham at 33). In the sand and gravel business, fealty is to the quarry that can supply the material when needed. Viewing the facts in the light most favorable to TCC, the court concludes that TCC has failed to demonstrate that a reasonable jury could conclude that the five-year period encompassed by the non-competition provision was reasonable under the specific facts of this case.

**4. Undue hardship**. Finally, the court must consider whether the non-competition provision imposed upon Lambert an undue hardship in terms of whether the non-competition provision effectively prevented Lambert "from engaging in the "only trade he [knew] and by which he [could] support himself." *Clark*, 592 So.2d at 566. *See also Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1089 (11th Cir. 1990) ("nearly every Alabama "undue hardship" case cited . . . noted that enforcement of the restraint would have prohibited a worker from engaging in *the only trade he know and could rely upon to support his*

25

*dependents*.") (emphasis in original).

The undisputed evidence demonstrates that Lambert was 59 years old when the non-competition provision became effective.  He was involved in rock quarries and sand and gravel business since he was in high school.   TCC argues that Lambert could have pursued consulting jobs outside the prohibited territory or he could have pursued other types of work. In its brief, TCC argues that because Lambert is qualified to drive a truck, he could have done this, if he had refrained from hauling sand and gravel.  (Br. in Opp. at 67).  On the other hand, TCC has argued that driving a truck is part and parcel of the sand and gravel business and the non-competition prohibits Lambert from engaging in that activity. (*Id*. at 23 & 59). TCC cannot have it both ways - either driving a truck is an "integral part" of the sand and gravel business or it is not.  TCC's very position regarding Lambert's ability to drive a truck is the type of dilemma for a person on which the Alabama courts frown.  In *Calhoun v. Brendle*, the Court declined to uphold a non-competition agreement holding "that enforcement of the noncompetition agreement imposed an undue hardship on the employee because the agreement prohibited him from practicing the only trade that he knew."  886 So.2d 689, 693-94 (Ala. 1986).  "[T]he noncompetition agreement cannot so burden [the employee] that it would result in [his] impoverishment."  *King v. Head Start Family Hair Salons, Inc.*, 886 So. 2d 769, 772 (Ala. 2004).  To prohibit Lambert from involvement in the sand and gravel business and to prohibit him from driving trucks which haul sand and gravel effectively prohibits Lambert from practicing any trade he knows.  TCC has failed to demonstrate that the restrictions imposed by the non-competition provision, including

prohibiting Lambert from driving a truck, are reasonably necessary to protect its business. "[A]n undue hardship exists when a restriction "imposes on the employee [a] greater restraint than is reasonably necessary to secure to the business of the employer . . . such protection, regard being had to the injury which may result to the public from restraining the breach of the covenant, in the loss of the employee's service and skill and the danger of his becoming a charge on the public." *Clark*, 592 So.2d at 567.

TCC argues that Lambert received over $300,000 in exchange for signing the non-competition provision. It is undisputed that Lambert received $303, 739.34 from the forced sale of Montgomery Materials to TCC. According to TCC, this money ameliorates any undue hardship on Lambert. TCC argument fails because it ignores Lambert's *50% equity interest* in Montgomery Materials. When Lambert and Foley formed Montgomery Materials, Lambert brought with him a skill set which he already possessed as well as other asserts including equipment. TCC's argument. Consequently, when he was forced to sell his 50% interest in Montgomery Materials to TCC, Lambert was compensated for his equity in the company.

TCC seeks to enforce the non-competition provision which extends for five years. The long term consequence of the enforcement is that Lambert is effectively prevented from practicing the only trade he knows and utilizing the only skill set he possesses. Based on the facts of this case, the court concludes that TCC has failed to demonstrate that the non-

27

competition provision at issue the should be enforced.[24]  *Orkin, supra.*

### B. Tortious Interference Claim

Under Alabama law, to establish the tort of interference with contractual or business relations, a plaintiff must prove: 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference with the contract or business relation, 4) the absence of justification for the defendant's interference, and 5) damage to the plaintiff as a result of the interference.  *Teitel v. Wal-Mart Stores, Inc.,* 287 F. Supp. 2d 1268, 1279 (M.D. Ala. 2003) (citing *Parsons v. Aaron*, 849 So. 2d 932, 946 (Ala. 2002)).

TCC charges that Carol's Contracting tortiously interfered with its contract with Lambert by interfering with the non-competition provision and with its customers by forming a business with Lambert that allowed him to operate a competing business.  Carol's Contracting argues that it is entitled to summary judgment on the Plaintiff's claims because she was not a party to the non-competition provision, the non-competition provision is unenforceable, and, in the alternative, any interference was minimal at best.

Even if Carol's Contracting hired Lambert as a truck driver assuming he was under a non-competition provision, absent a showing that the non-competition provision was enforceable, TCC's claim of intentional interference is without merit.

Without a showing that the employee had an enforceable noncompetition

---

[24]  Because the court concludes that the non-competition provision of the agreement is unenforceable on its terms, the court pretermits discussion of the parties' other issues as they relate to TCC's breach of contract claim.

agreement with the plaintiff or that the defendant did more than simply hire its competitor's employee, we see no basis for allowing an action for intentional interference in circumstances such as those presented in this case.

*Defco, Inc. v. Decatur Cylinder, Inc*., 595 So.2d 1329, (Ala. 1992).  *See also Construction Materials, LTD, Inc. v. Kirkpatrick Concrete, Inc.*, 631 So.2d 1006, 1010 (Ala. 1994) ("The second claim . . . interference with business relations, is not a viable claim, in view of the fact that the covenant not to compete is itself not enforceable.").

Furthermore, to the extent that TCC argues that Carol's Contracting interfered with its relationships with its customers, TCC's position is without merit.  "A well-established principle of Alabama law is that, to recover in tort, a plaintiff must establish that the defendant's misconduct was the "proximate cause" – and not just the "remote cause" – of the plaintiff's injuries.**"**  *United Food & Commercial Workers Union, Employers Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1217, 1273 (11th Cir. 2000).

The undisputed evidence demonstrates Carol's Contracting was not the proximate cause of TCC's problems with Simcala, Globe and other companies.  These companies sought other sources of oversized white gravel because of The Concrete Company's inability to provide quality gravel in sufficient amounts.  Simcala and Globe were told by employees of TCC, specifically Don Triplett and Hugh Sorrell, that TCC would be unable to provide the requisite amount of oversized gravel to meet the needs of either company.  Consequently, the court concludes that TCC has failed to demonstrate that any reasonable juror could conclude that Carol's Contracting was the "proximate cause" of these companies seeking oversized gravel from suppliers other than TCC.  *See Powell v. South Central Bell Telephone*

29

*Co.*, 361 So.2d 103 (Ala. 1978). Although TCC argues that "it would have begun mining more gravel," this is simply insufficient as a matter of law. TCC did not increase its production, nor did it inform its customers that it could meet their needs.

### C.  Conspiracy Claim

TCC alleges, in very general terms, that Lambert and Carol's Contracting conspired against it. A conspiracy claim justifiably may be dismissed because of the conclusory, vague, and general nature of the allegations of a conspiracy. *Fullman v. Graddick*, 739 F.2d 553, 556-557 (11th Cir. 1984). More importantly, however, under Alabama law, "civil conspiracy is not an independent action; rather, a plaintiff must have a viable underlying cause of action." *United States Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1294 (11th Cir. 2001). *See also Moonehyam v. State Bd. of Chiropractic Examiners*, 802 So. 2d 200, 206 (Ala. 2001) *quoting Ex parte Ala. Dep't of Transp.*, 764 So.2d 1263, 1271 (Ala. 2000) ("'liability for civil conspiracy rests upon the existence of an underlying wrong and [that] if the underlying wrong provides no cause of action, then neither does the conspiracy.'"); *Allied Supply Co., Inc. v. Brown*, 585 So.2d 33, 36 (Ala. 1991) ("This Court has stated that a conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy by the underlying wrong that was allegedly committed."). Thus, the court concludes that the defendants' motions for summary judgment on the plaintiff's conspiracy claim is due to be granted.

Previously, the court has entered an order (doc. # 137) which, consistent with this opinion, denied the plaintiff's motion for partial summary judgment (doc. # 106) and which

granted the defendants' motion for summary judgment (doc. # 86). Neither that order nor this opinion resolves the remaining issues in this case of which there are three. Two of those matters are pending motions: a motion to strike counterclaim allegations (doc. # 120) and a motion in limine (doc. # 133). Those motions are now moot.

The last question is the issues raised in Lambert's amended counterclaim. (doc. # 25) which is not addressed in any of the summary judgment motions, supporting and opposing briefs and evidentiary materials. Until this question is resolved, the court will not enter a final appealable order. Accordingly, it is

ORDERED that the motion to strike counterclaim allegations (doc. # 120) and the motion in limine (doc. # 133) be and are hereby DENIED as moot. It is further

ORDERED that a status and scheduling conference be and is hereby set on June 18, 2007, at 2:00 p.m. in Courtroom 4B, United States Courthouse Complex, One Church Street, Montgomery, Alabama.

Done this 1st day of June, 2007.

_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE